

**FILED**

JAN 11 2008

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ Deputy Clerk

**ENTERED**

JAN 15 2008

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re: | Case No. 6:07-bk-18293-PC |
| VALLEY HEALTH SYSTEM, a California Local Health Care District, | Chapter 9 |
| | Date:  January 8, 2008 |
| | Time:  9:30 a.m. |
| | Place: United States Bankruptcy Court |
| | Courtroom # 303 |
| Debtor. | 3420 Twelfth Street |
| | Riverside, CA 92501 |

## MEMORANDUM DECISION

Valley Health System, a California Local Health Care District ("District") seeks an order finding that appointment of a patient care ombudsman is unnecessary for the protection of patients under the specific facts and circumstances of this case. The United States trustee ("UST") opposes the request on the grounds that the appointment of a patient care ombudsman is mandated by Congress under § 333(a)(1) of the Code[1] whenever a health care business declares bankruptcy. At the hearing, Gary E. Klausner and H. Alexander Fisch appeared for the District; Christian L. Raisner appeared for SEIU-United Healthcare Workers West, and Timothy J. Farris appeared for the UST. The court, having considered the District's motion and the UST's opposition thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[2] pursuant to Fed. R. Civ. P. 52, as incorporated into Fed.

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

[2] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

1  R. Bankr. P. 7052 and made applicable to contested matters by Fed. R. Bankr. P. 9014(c).

2                                    I. STATEMENT OF FACTS

3          The District is a public agency formed in 1946 under the State of California Local

4  Healthcare District Law.[3]  The District encompasses 882 square miles in the San Jacinto Valley

5  in Riverside County, California, and serves a population within the District of nearly 360,000.

6  At its inception, the District operated only an 18-bed hospital purchased from the city of Hemet,

7  California.  It now owns and operates the Hemet Valley HealthCare Center (the "Nursing

8  Facility"), a 113-bed skilled nursing facility in Hemet, California, together with three acute

9  hospitals - Hemet Valley Medical Center ("Hemet Hospital"), a 340-bed facility in Hemet,

10 California; Menifee Valley Medical Center ("Menifee Hospital"), an 84-bed facility in Sun City,

11 California; and Moreno Valley Community Hospital ("Moreno Valley Hospital"), a 95-bed

12 facility in Moreno Valley, California.  The Moreno Valley Hospital and its primary service area

13 are situated outside the District's boundaries.  Each of the hospitals provides comprehensive

14 health services and 24-hour emergency medical services.[4]

15         The cost of the District's comprehensive health care system was financed, in large part,

16 by two series of bonds issued by the District (collectively, the "Bonds"): (1) the 1996 series A

17 hospital revenue bond, and (2) the series 1993 certificates of participation.  There was

18

19  _____

20  [3] Cal. Health & Safety Code § 32000, et. seq.

21  [4] Services offered at the Hemet Hospital include the Emory J. Cripe Radiation Therapy
    Treatment Center for cancer treatment; cardiac care services; inpatient and outpatient surgical
22  services; behavioral health services; speech, physical, and occupational therapy services; and CT
    imaging and magnetic resonance imaging.  The Menifee Hospital provides inpatient and
23  outpatient X-ray services, including mammography, CT scan, and MRI; a critical care unit;
    inpatient and outpatient surgery; inpatient and outpatient laboratory services; respiratory
24  services; physical therapy services; a joint replacement center; and cataract and retina specialty
    surgeries.  The Moreno Valley Hospital offers inpatient medical, surgical and pediatric services;
25  critical care, post-critical care, and telemetry units; maternity and women's services; obstetrics;
    inpatient and outpatient surgery; the Spine Center of Excellence program; cardiopulmonary
26  services; and physical rehabilitation services.

27

                                            - 2 -

1   approximately $84 million in principal and interest outstanding on the bonds as of the date of the

2   petition.

3          On December 13, 2007, the District filed a voluntary petition under chapter 9 in this case

4   disclosing not more than 5,000 creditors holding claims in excess of $100 million.  On December

5   28, 2007, the District filed a motion seeking an order that the appointment of a patient care

6   ombudsman under § 330(a)(1) was not necessary for the protection of patients under the specific

7   facts of this case.  On January 7, 2008, the UST filed a response opposing the District's motion

8   and urging the immediate appointment of a patient care ombudsman under § 330(a)(1).  On

9   January 8, 2008, the court conducted a hearing on the District's motion.[5]  At the conclusion of

10  the hearing, the matter was taken under submission.

11                                  II.  DISCUSSION

12         This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and

13  1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).  Venue is

14  appropriate in this court.  28 U.S.C. § 1409(a).

15         If the debtor in a case under chapter 7, 9, or 11 is a health care business,[6] the appointment

16

17  [5] No creditor or other party in interest, including SEIU-United Healthcare Workers West, filed a
18  written response to the District's motion or appeared at the hearing in opposition to the motion.

19  [6] The term "health care business" –

20      (A) means any public or private entity (without regard to whether that entity is organized
21      for profit or not for profit) that is primarily engaged in offering to the general public
        facilities and services for –

22          (i) the diagnosis or treatment of injury, deformity, or disease; and
23          (ii) surgical, drug treatment, psychiatric, or obstetric care; and

24      (B) includes –

25          (i) any –

26              (I) general or specialized hospital;

27
                                      - 3 -

1    of a patient care ombudsman is mandated by § 333(a)(1), not later than 30 days after

2    commencement of the case, to monitor the quality of patient care and to represent the interests of

3    the debtor's patients "unless the court finds that appointment of such ombudsman is not

4    necessary for the protection of patients under the specific facts of the case."[7]  An ombudsman

5    _____

6                (II) ancillary ambulatory, emergency, or surgical treatment facility;
            (III) hospice;

7                (IV) home health agency; and

8                (V) other health care institution that is similar to an entity referred to in
               subclause (I), (II), (III), or (IV); and

9
       (ii) any long-term care facility, including any –

10

11               (I) skilled nursing facility;
            (II) intermediate care facility;

12               (III) assisted living facility;
            (IV) home for the aged;

13               (V) domiciliary care facility; and

14               (VI) health care institution that is related to a facility referred to in
               subclause (I), (II), (III), (IV), or (V), if that institution is primarily

15                  engaged in offering room, board, laundry, or personal assistance with
               activities of daily living and incidentals to activities of daily living.

16

17   11 U.S.C. § 101(27A).

18   [2]  Section 333(a)(1) states:

19       If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall
    order, not later than 30 days after the commencement of the case, the appointment of an

20       ombudsman to monitor the quality of patient care and to represent the interests of the
    patients of the health care business unless the court finds that the appointment of such

21       ombudsman is not necessary for the protection of patients under the specific facts of the

22       case.

23   11 U.S.C. § 333(a)(1).  Section 333 was added by the Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005, Pub. L. 109-8, § 1104(a)(1), 119 Stat. 23, 191 (2005),

24   effective for all cases filed on or after October 17, 2005.  Rule 2007.2(a) further provides, in

25   pertinent part, that "the court shall order the appointment of a patient care ombudsman under §
333 of the Code, unless the court, on motion of the United States trustee or a party in interest

26   filed not later than 20 days after the commencement of the case or within another time fixed by
the court, finds that the appointment of a patient care ombudsman is not necessary for the

27

1  appointed under § 333(a)(1) must be a disinterested person,[8] and must:

2      (1) monitor the quality of patient care provided to patients of the debtor, to the extent
       necessary under the circumstances, including interviewing patients and physicians;

3      (2) not later than 60 days after the date of appointment, and not less frequently than at 60-
4      day intervals thereafter, report to the court after notice to the parties in interest, at a
       hearing or in writing, regarding the quality of patient care provided to patients of the
5      debtor; and

6      (3) if such ombudsman determines that the quality of patient care provided to patients of
       the debtor is declining significantly or is otherwise being materially compromised, file
7      with the court a motion or a written report, with notice to the parties in interest
       immediately upon making such determination.

8  11 U.S.C. § 333(b).

9  A.    The District is a Health Care Business

10         Neither party disputes the fact that the District meets the definition of a "health care

11  business" under § 101(27A).  The District is a public entity.  It is engaged primarily in offering

12  to the general public facilities and services, which include services at three hospitals and a

13  skilled nursing facility.  The District's facilities and services are offered to the public for the

14  diagnosis or treatment of injury, deformity, or disease, and the District's facilities and services

15  are offered to the public for surgical care, drug treatment, psychiatric care, or obstetric care.  See,

16  e.g., In re William L. Saber, M.D., P.C., 369 B.R. 631, 637 (Bankr. D. Colo. 2007) (holding that

17  a chapter 11 debtor, who was in the business of providing plastic and reconstructive surgery to

18

19  ─────────────────────

20  protection of patients under the specific circumstances of the case."  Fed. R. Bankr. P. 2007.2(a).

21  [8] 11 U.S.C. § 333(a)(2)(A).  The term "disinterested person" means a person that –

22      (A) is not a creditor, an equity security holder, or an insider;
23      (B) is not and was not, within 2 years before the date of the filing of the petition, a
       director, officer, or employee of the debtor; and
24      (C) does not have an interest materially adverse to the interest of the estate or of any class
       of creditors or equity security holders, by reason of any direct or indirect relationship to,
25      connection with, or interest in, the debtor, or for any other reason.

26  11 U.S.C. § 101(14).

27

1  the general public, met the definition of a "health care business" under § 101(27A)); <u>In re</u>

2  <u>Medical Assocs. of Pinellas</u>, 360 B.R. 356, 359 (Bankr. M.D. Fla. 2007) (holding that a chapter

3  11 debtor, which provided services to the public only ancillary to its primary function of

4  administrative support to a physicians group, was not a health care business within the scope of §

5  101(27A)); <u>In re 7-Hills Radiology, LLC</u>, 350 B.R. 902, 904 (Bankr. D. Nev. 2006) (finding that

6  § 101(27A)'s definition of a "health care business" did not include a chapter 11 debtor that

7  rendered radiology and X-ray services to patients only at the request of referring physicians, not

8  to the general public).  The UST disagrees with the District's argument that, notwithstanding the

9  District's status as a "health care business," the appointment of an ombudsman that would

10 otherwise be required under § 333(a)(1) is not necessary due to the particular facts and

11 circumstances of this case.

12 B.      <u>The Necessity of a Patient Care Ombudsman.</u>

13          To determine whether the appointment of a patient care ombudsman is necessary under

14 the specific facts of this case, the court must examine the operations of the debtor in light of the

15 following nine non-exclusive factors:

16      1.      The cause of the bankruptcy;

17      2.      The presence and role of licensing or supervising entities;

18      3.      Debtor's past history of patient care;

19      4.      The ability of the patients to protect their rights;

20      5.      The level of dependency of the patients on the facility;

21      6.      The likelihood of tension between the interests of the patients and the debtor;

22      7.      The potential injury to the patients if the debtor drastically reduced its level of

23              patient care;

24      8.      The presence and sufficiency of internal safeguards to ensure appropriate level of

25              care; and

26      9.      The impact of the cost of an ombudsman on the likelihood of a successful

27

1    reorganization.

2    In re Alternate Family Care, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007).  The weight to be

3    accorded to each of the Alternative Family Care factors in making a determination whether to

4    appoint a patient care ombudsman is left to the sound discretion of the court.  Other factors to be

5    considered by the court include:  (1) the high quality of the debtor's existing patient care; (2) the

6    debtor's financial ability to maintain high quality patient care; (3) the existence of an internal

7    ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and

8    oversight by federal, state, local, or professional association programs which renders the services

9    of an ombudsman redundant.  See 3 Collier on Bankruptcy ¶ 333.02, at 333-4 (Alan N. Resnick

10    & Henry J. Sommer eds., 15th ed. 2007).

11        Factor 1:  Cause of the Bankruptcy.  The District sought relief under chapter 9 primarily

12    due to the burden of servicing the Bonds and problems stemming from "certain limitations

13    inherent in the District's contractual capitation relationships."  There is no evidence that the

14    bankruptcy was precipitated by allegations of deficient patient care or privacy concerns.

15        Factor 2:  Presence and Role of Licensing or Supervising Entities.  The District is subject

16    to substantial monitoring by a variety of federal and state regulatory agencies and independent

17    accreditation associations.  The District must undergo a triennial certification by the Joint

18    Committee on Accreditation for Hospital Organizations ("JCAHO"), a national accreditation

19    organization, to confirm that its hospitals are in compliance with JCAHO's standards and

20    elements of performance.[9]  The District's next JCAHO inspection will occur during the next 12

21    _____

22    [9] Every aspect of a hospital's operations are evaluated under the JCAHO 's standards, which
     include:  (1) Ethics, Rights, and Responsibilities; (2) Provision of Care, Treatment, and Services;
23    (3) Medication Management; (4) Surveillance, Prevention, and Control of Infection; (5)
     Improving Organization Performance; (6) Leadership; (7) Management of the Environment of
24    Care; (8) Management of Human Resources; (9) Management of Information; (10) Medical
     Staff; and (11) Nursing.  Hospitals accredited by the JCAHO as having met their standards and
25    elements of performance are deemed to be in compliance with Medicare Conditions of
     Participation under title 42 of the Code of Federal Regulations.  If a hospital is not in compliance
26    with Medicare Conditions of Participation, it loses Medicare and Medicaid funding.

27

1  months.  The District is also subject to monitoring and inspection by several state and county

2  regulatory agencies, including frequent and unannounced inspections by the California

3  Department of Public Health ("CDPH") (formerly the Department of Health Services) to verify

4  compliance with title 22 of the California Code of Regulations.  The CDPH also conducts a

5  formal triennial inspection of the hospitals, often coinciding with the JCAHO evaluation and

6  certification.  The California Department of Mental Health ("DMH") reviews annually each

7  hospital's policies and procedures for treating psychiatric patients.  Each hospital is required to

8  self-report to the DMH any unusual occurrence involving a psychiatric patient.  Finally, the

9  District's hospitals are fully accredited by the JCAHO and in substantial compliance with all

10  applicable federal and state regulations.

11       Factor 3:  <u>Debtor's Past History of Patient Care</u>.  The District has served the residents of

12  San Jacinto Valley for the past 60 years.  There is no evidence of action taken by any federal,

13  state, or local regulatory authority against the District due to deficiencies in patient care, either

14  prior to or after the petition date.  More importantly, the District has adopted extensive and

15  redundant internal procedures to ensure the highest level of patient care and to resolve

16  expeditiously complaints that may arise concerning patient care.

17       Factors 4, 6 & 8:  <u>Ability of the Patients to Protect Their Rights; The Likelihood of</u>

18  <u>Tension Between the Interests of the Patients and the Debtor; and the Presence and Sufficiency</u>

19  <u>of Internal Safeguards to Ensure Appropriate Level of Care</u>.  The District has implemented

20  extensive internal quality controls and procedures for monitoring patient care at its facilities.

21  Each of the hospitals has internal procedures for processing and resolving complaints concerning

22  patient care.  Patients may report concerns directly to the CDPH, the Centers for Medicare and

23  Medicaid Services (the "CMS," formerly known as HCFA), and the JCAHO.  Complaints

24  directed to the nursing staff that cannot be resolved immediately to the satisfaction of the patient

25  are referred to the nurse manager for the department involved, or ultimately to the House

26  Supervisor or Hospital Administrator.  Complaints by patients after discharge are processed by

27

1  Hospital Administration, which must review each complaint and respond in writing. When a

2  patient tenders a complaint directly to the CDPH, the CDPH investigates the matter, visits the

3  hospital in question, and evaluates the merits of the complaint. In the rare instance a deficiency

4  is found, the CDPH issues a non-compliance letter and the hospital submits a formal plan to

5  correct the deficiency followed by implementation.

6       As part of a proactive regulatory compliance program, the District has implemented

7  periodic Tracers (mini mock-surveys) to identify and correct areas of potential regulatory non-

8  compliance. Compliance issues are identified before a problem arises and reported to the

9  responsible department head, who must formulate and implement a corrective action plan under

10 the supervision of the Hospital Administrator.

11      Each hospital also monitors the quality of patient care through a structure of committees

12 that evaluate performance. Each medical staff department in a hospital that provides clinical

13 services is required meet regularly to discuss issues related to quality of care, and to make

14 improvement recommendations to promote best practices. Quality controls implemented by the

15 department are monitored by the department head to ensure that services are provided in

16 accordance with the hospital's procedures.

17      Reports concerning the quality of patient care and recommendations are made by each

18 department to the hospital's Performance Improvement Committee, an interdisciplinary

19 committee of physicians, administration, nursing, and other department leaders, which focuses

20 on improving the quality and safety of patient care by identifying areas to reduce risk related to

21 patient care. Each hospital's Performance Improvement Committee is responsible for

22 implementing the National Patient Safety Goals formulated by the JCAHO. The Performance

23 Improvement Committee also (a) compares each hospital's performance with the performance of

24 the District's other hospitals in the same categories and takes action to correct any disparity; (b)

25 analyzes patient satisfaction rates, as well as patient complaints, and the resolution thereof, to

26 improve customer service; and (c) adjusts the hospital's safety and quality goals annually to

27

1    coincide with patient expectations, internal policies, best practices, and recommendations by

2    professional organizations on quality such as the Institute of Healthcare Improvement and the

3    National Quality Forum.

4         The Performance Improvement Committee's actions are then reviewed by the hospital's

5    Medical Executive Committee, which has approval authority for patient care-related policies and

6    is composed of the chairs of each medical staff department in the hospital, hospital

7    administrators, and nursing leaders.  The Medical Executive Committee's recommendations for

8    policy approval and the credentialing and privileging of licensed independent practitioners are

9    made to the District's Board of Directors for final approval.  The District's Board of Directors,

10   through its own Performance Improvement Subcommittee, oversees all quality of care issues,

11   manages the various safety and quality programs, and receives reports from each hospital.  The

12   Board's Performance Improvement Subcommittee also receives direct reports from the Director

13   of Risk Management and Performance Improvement, who is charged with the responsibility of

14   monitoring all quality of care issues, reporting major incidents directly to the Board's

15   subcommittee, and working as a liaison between the District and the various external regulatory

16   agencies charged with reviewing patient care issues.  The District's existing procedures and

17   safeguards are comprehensive and redundant, and weigh heavily against the appointment of an

18   ombudsman.

19        Factor 5: <u>Level of Dependency of Patients on the Facility</u>.  The District's facilities

20   include the Nursing Facility (113-bed skilled nursing facility), Hemet Hospital (a 340-bed

21   facility), Menifee Hospital (an 84-bed facility), and Moreno Valley Hospital (a 95-bed facility).

22   Given the range of services offered by the hospitals and skilled nursing facility, the patients

23   under the District's care and supervision are highly dependent on the District for their health,

24   safety and welfare.

25        Factor 7: <u>Potential Injury to Patients if the Debtor Drastically Reduced its Level of</u>

26   <u>Patient Care</u>.  The Hemet Hospital offers cancer treatment; cardiac care services; and inpatient

27

- 10 -

1  and outpatient surgical services.  The Menifee Hospital provides, among other things, inpatient

2  and outpatient surgery; critical care; and cataract and retina specialty surgeries.  The Moreno

3  Valley Hospital offers inpatient medical, surgical and pediatric services; critical care; post-

4  critical care; obstetrics; and inpatient and outpatient surgery.  Due to the nature of these services,

5  a drastic reduction in the quality of care creates a significant risk for patients.  Moreover, a

6  cessation of operations at any one of the District's hospitals would require a transfer of patients

7  to another facility.  Because the potential risk to patients if the District reduced its level of care is

8  high, this factor weighs heavily in favor of the appointment of an ombudsman.

9      Factor 9:  Impact of the Cost of an Ombudsman on the Likelihood of a Successful

10  Reorganization.  The appointment of a patient care ombudsman may result in substantial

11  administrative expense to the estate.[10]  The UST reasons that "if patients within the [District's]

12  operations are truly safe, the ombudsman's duties will be facilitated and costs against the estate

13

14  [10] Section 330(a)(1) authorizes the court, after notice and a hearing and subject to §§ 326, 328

15  and 329, to award an ombudsman appointed under § 333 reasonable compensation for actual,
    necessary services rendered by the ombudsman and reimbursement for actual, necessary

16  expenses.  11 U.S.C. § 330(a)(1).  Compensation and reimbursement awarded under § 330(a) is
    an administrative expense under § 503(b)(2) entitled to second priority under § 507(a)(2).  11

17  U.S.C. §§ 503(b)(2) & 507(a)(2).  Sections 503 and 507(a)(2) are incorporated into chapter 9 by
    virtue of § 901(a), but § 901(a) does not incorporate either § 330 or § 333.  11 U.S.C. § 901; see,

18  e.g., In re E. Shoshone Hosp. Dist., 226 B.R. 430, 431 (Bankr. D. Idaho 1998) (holding that a
    chapter 9 debtor was not required to obtain court approval for the employment of counsel

19  because §§ 327, 328, 330, and 331 are not incorporated into § 901); In re County of Orange, 179
    B.R. 195, 200 (Bankr. C.D. Cal. 1995) (holding that the court had no authority to order the

20  payment of interim compensation to professionals without the chapter 9 debtor's consent
    because § 331, which governs interim payments to professionals, is not incorporated into chapter

21  9).  But see In re Castle Pines N. Metro. Dist., 129 B.R. 233, 234 (Bankr. D. Colo. 1991)
    ("Congress, by specifically referring to § 507(a)(1) in § 943(a)(5), has necessarily included §

22  503(b), which, in turn, includes § 330(a).  The symmetry is complete by the specific inclusion of
    §§ 1102, 1103 and 503 in § 901(a).  Thus, by reason of § 901(b), the District's argument [that §

23  330 is inapplicable to chapter 9] fails").  Chapter 9 contemplates payment of professional fees
    and expenses at the end of the case.  11 U.S.C. § 943(b)(3) & (5); see County of Orange, 179

24  B.R. at 199.  Arguably, an ombudsman's fees and expenses could accrue through confirmation of
    a chapter 9 plan, but ultimately not be subject to the standards governing the allowance of fees

25  and expenses set forth in § 330(a).

26

27

1  will be minimal."  However, § 333 would require that a court-appointed ombudsman, at a

2  minimum, interview patients and physicians at the District's four facilities, and report to the

3  court at intervals not less frequently than every 60-days regarding the continuing quality of

4  patient care.  Given the level of internal controls and oversight by federal, state, local, and

5  professional organizations, the services of a patient care ombudsman would be redundant.

6  Appointment of an ombudsman at this time would largely duplicate the efforts of the District's

7  hospitals, the CDPH, JCAHO and others, at the expense of the District and its creditors, and

8  "would merely add another layer of bureaucracy to an already heavily regulated and supervised"

9  entity.  See Alternate Family Care, 377 B.R. at 761.

10       While two factors tip in favor of an ombudsman, the balance of the Alternate Family

11  Care factors weigh against the immediate appointment of a patient care ombudsman pursuant to

12  § 333(a)(1) under the specific facts and circumstances of this case.

13       In its response in opposition to the motion, the UST argues that "an independent

14  ombudsman is required not only to monitor the quality of patient care and to report to the Court,

15  but to warn the Court if patient care is declining or being compromised" and that "[t]here is no

16  other party in this case that can fill this role."  (emphasis in original).  The UST reasons that

17  internal controls and external oversight common to all sophisticated health care businesses are

18  insufficient to protect patients' rights upon bankruptcy, and that the District, having filed a

19  chapter 9 petition, must be subject to additional  scrutiny under § 333(a)(1) "precisely because

20  its financial situation is one which required a bankruptcy filing and therefore puts patients at

21  greater risk."  According to the UST, an inherent tension exists between a health care business

22  and its patients rising to the level of a conflict of interest when the health care business slips into

23  bankruptcy; and if left to its own devices, a health care business in bankruptcy may not provide

24  comprehensive, safe, and effective care to its patients absent the oversight of an ombudsman

25  appointed pursuant to § 333(a)(1).  "However well-qualified the Debtor's in-house monitors may

26  be" argues the UST, "[e]mployees of the Debtor do not have an undivided loyalty to patient

27

- 12 -

1   interests and are plainly not 'disinterested' under the Bankruptcy Code's definition."

2        The UST has not offered any evidence to suggest that the quality of patient care or

3   preservation of patient privacy is an issue at any of the District's facilities, or that the District

4   will be unable to maintain the highest quality of patient care given its extensive and redundant

5   internal policies and procedures and the current level of oversight by federal, state, local, and

6   private entities.  Nor has the UST submitted evidence of any existing tension between the

7   interests of the patients and the District or actual conflicting interests of the Districts' employees

8   resulting in a reduced level of patient care.  Finally, there is nothing in the language of §

9   333(a)(1) that requires the court to make a preliminary finding that the debtor's existing internal

10  controls are administered by one or more individuals who meet the definition of a "disinterested

11  person" under § 101(14) before it can find that appointment of an ombudsman is not necessary

12  for the protection of patients under the specific facts and circumstances of a case.

13  <center>III. CONCLUSION</center>

14       Although the District is a "health care business" as that term is defined in § 101(27A),

15  the appointment of a patient care ombudman pursuant to § 333(a)(1) is not necessary at this time

16  under the specific facts of this case.  Notwithstanding the foregoing, the court, on motion of the

17  UST or any party in interest, may order the appointment of a patient care ombudsman at any

18  time during the pendency of this case if the court finds a change in circumstances or newly

19  discovered evidence that demonstrates the necessity of an ombudsman to monitor the quality of

20  patient care and protect the interests of patients.[11]

21

22

23

----

24  [11] Rule 2007.2(b) provides, in pertinent part, that "[i]f the court has ordered that the appointment

25  of an ombudsman is not necessary . . . the court, on motion of the United States trustee or a party
    in interest, may order the appointment at any time during the case if the court finds that the

26  appointment of an ombudsman has become necessary to protect patients."  Fed. R. Bankr. P.
    2007.2(b).

27

<center>- 13 -</center>

1        A separate order will be entered consistent with this opinion.

2   Dated: January 11, 2008

3                                        PETER H. CARROLL
                                         United States Bankruptcy Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

- 14 -

**NOTE TO USERS OF THIS FORM:**
*Physically attach this form as the last page of the proposed Order or Judgment.*
*Do **not** file this form as a separate document.*

| | |
|---|---|
| In re VALLEY HEALTH SYSTEM,<br><br>Debtor. | CHAPTER 9<br><br>CASE NUMBER RS 07-18293 PC |

## NOTICE OF ENTRY OF JUDGMENT OR ORDER
## AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:

1.    You are hereby notified, pursuant to Local Bankruptcy Rule 9021-1(a)(1)(E), that a judgment or order entitled *(specify)*: MEMORANDUM DECISION

was entered on *(specify date)*:  JAN 1 5 2008

2.    I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment to the persons and entities on the attached service list on *(specify date)*:  JAN 1 5 2008

Dated:    JAN 1 5 2008

JON D. CERETTO
**Clerk of the Bankruptcy Court**

By: _____
*Deputy Clerk*

Service List


Valley Health System
1117 East Devonshire Avenue
Hemet, CA 92543


H. Alexander Fisch
Stutman Treister & Glatt PC
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067


United States Trustee
3685 Main Street, Ste. 300
Riverside, CA 92501