FILED
FEB 2 0 2008
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY              Deputy Clerk

ENTERED
FEB 2 0 2008
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY              Deputy Clerk

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>VALLEY HEALTH SYSTEM, a<br>California Local Health Care District,<br><br><br><br>          Debtor. | Case No. 6:07-bk-18293-PC<br><br>Chapter 9<br><br>Date:  February 7, 2008<br>Time:  9:30 a.m.<br>Place: United States Bankruptcy Court<br>         Courtroom # 303<br>         3420 Twelfth Street<br>         Riverside, CA 92501 |

## MEMORANDUM DECISION

U.S. Bank National Association, as Indenture Trustee for the holders of the Valley Health System Certificates of Participation (1993 Refunding Project) and the Valley Health System District Revenue Bonds (Refunding and Improvements Project) 1996 Series A ("U.S. Bank"), and SEIU-United Healthcare Workers – West and Local 121 RN (collectively, the "Unions") object to the petition filed by Valley Health System (the "District") under chapter 9 of the Bankruptcy Code.[1] The following appearances were entered at the hearing: Gary E. Klausner and H. Alexander Fisch for the District; William P. Smith and Nathan F. Coco for U.S. Bank; Christian L. Raisner for the Unions; Leonard M. Shulman and Mark Bradshaw for Hemet Community Medical Group, Inc. ("HCMG"); Allan Ickowitz for Kaiser Foundation Health; and Michael S. Winsten for Devida Renal Treatment Center. The court, having considered the objections and the District's response thereto, HCMG's comments, the evidentiary record, and

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

arguments of counsel, makes the following findings of fact and conclusions of law[2] pursuant to Fed. R. Civ. P. 52, as incorporated into Fed. R. Bankr. P. 7052 and made applicable to contested matters by Fed. R. Bankr. P. 9014(c).

## I. STATEMENT OF FACTS

The District is a public agency formed in 1946 under the State of California Local Healthcare District Law.[3] The District encompasses 882 square miles in the San Jacinto Valley in Riverside County, California, and serves a population within the District of nearly 360,000. At its inception, the District operated only an 18-bed hospital purchased from the city of Hemet, California. It now owns and operates the Hemet Valley HealthCare Center (the "Nursing Facility"), a 113-bed skilled nursing facility in Hemet, California, together with three acute hospitals - Hemet Valley Medical Center ("Hemet Hospital"), a 340-bed facility in Hemet, California; Menifee Valley Medical Center ("Menifee Hospital"), an 84-bed facility in Sun City, California; and Moreno Valley Community Hospital ("Moreno Valley Hospital"), a 95-bed facility in Moreno Valley, California. The Moreno Valley Hospital and its primary service area are situated outside the District's boundaries. Each of the hospitals provides comprehensive health services and 24-hour emergency medical services.[4]

---

[2] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

[3] Cal. Health & Safety Code § 32000, et. seq.

[4] Services offered at the Hemet Hospital include the Emory J. Cripe Radiation Therapy Treatment Center for cancer treatment; cardiac care services; inpatient and outpatient surgical services; behavioral health services; speech, physical, and occupational therapy services; and CT imaging and magnetic resonance imaging. The Menifee Hospital provides inpatient and outpatient X-ray services, including mammography, CT scan, and MRI; a critical care unit; inpatient and outpatient surgery; inpatient and outpatient laboratory services; respiratory services; physical therapy services; a joint replacement center; and cataract and retina specialty surgeries. The Moreno Valley Hospital offers inpatient medical, surgical and pediatric services; critical care, post-critical care, and telemetry units; maternity and women's services; obstetrics; inpatient

1  The cost of the District's comprehensive health care system was financed, in large part,
2  by two series of bonds issued by the District (collectively, the "Bonds"): (1) Valley Health
3  System Certificates of Participation (1993 Refunding Project) and (2) Valley Health System
4  District Revenue Bonds (Refunding and Improvements Project) 1996 Series A. There was
5  approximately $84 million in principal and interest outstanding on the Bonds as of the date of the
6  petition.

7  On December 13, 2007, the District filed a voluntary petition under chapter 9 in this case
8  disclosing not more than 5,000 creditors holding claims in excess of $100 million. In
9  conjunction with its petition, the District filed a Statement of Qualifications Under 11 U.S.C. §
10  109(c) ("Statement") certifying under penalty of perjury that it was eligible to be a debtor under
11  chapter 9. In paragraph 5 of the Statement, the District declared:

> The District believes it has been unable, prior to filing its chapter 9 petition, to negotiate with creditors to reach an agreement with the holders of at lease [sic] a majority in amount of each class to be impaired under the plan of adjustment ("Plan") because such negotiation is impracticable given the numerosity of the envisaged classes to be impaired under the Plan and the holders of claims in certain of those classes.[5]

15  On December 17, 2007, an order was entered directing notice of the commencement of the case,
16  approving the form of the notice, and setting a deadline of January 17, 2008, for filing objections
17  to the petition.[6] On January 16, 2008, U.S Bank timely filed an objection to the District's

---

and outpatient surgery; the Spine Center of Excellence program; cardiopulmonary services; and physical rehabilitation services.

[5] Statement of Qualifications Under 11 U.S.C. § 109(c), p.2, l.1-5.

[6] Section 923 of the Code states:

> There shall be given notice of the commencement of a case under this chapter, notice of an order for relief under this chapter, and notice of the dismissal of a case under this chapter. Such notice shall also be published at least once a week for three successive weeks in at least one newspaper of general circulation published within the district in which the case is commenced, and in such other newspaper having a general circulation among bond dealers and bondholders as the court designates.

petition asserting that the District is ineligible for relief under chapter 9. U.S. Bank seeks dismissal of the petition on the grounds that the District has failed to establish that negotiation of an adjustment of its debt prior to the filing of the petition was impracticable as required by § 109(c)(5)(C). In its limited objection filed on January 17, 2008, the Unions do not question the District's eligibility to be a chapter 9 debtor nor its good faith in filing the petition, but simply ask that "the Court reject any premise that the bankruptcy resulted from the existence of the [collective bargaining agreement] or the District obligations to [Valley Health System] workers."[7]

On February 1, 2008, the District filed a reply to the objections of U.S. Bank and the Unions arguing that negotiations with its creditors prior to the filing of the petition would have been not only impracticable, but pointless given the liquidity crisis that threatened the District's continued operations and its inability to formulate a viable business plan upon which a meaningful plan of adjustment could be structured prior to the petition date. On February 4, 2008, HCMG, an unsecured creditor holding claims of approximately $4.5 million, filed a response stating that it did not support a dismissal of the petition and requested that the court set a deadline for the filing of a plan pursuant to § 941. On February 7, 2008, the court conducted a

---

11 U.S.C. § 923. On December 14, 2007, the court signed an Order (1) Directing and Approving Form of Notice, and (2) Setting Deadline for Filing Objections to District's Petition approving the District's proposed Notice of Commencement of Chapter 9 Case; Deadline for Objections to Petition; and Related Matters dated December 13, 2007 ("Notice"), and directing service of the Notice by first class mail on the United States trustee and all entities identified on the District's List of Creditors, together with publication of the Notice on at least 3 occasions in the Press Enterprise and The Bond Buyer, pursuant to § 923. The court also set a deadline of January 17, 2008, for filing objections to the petition pursuant to § 921(c) and (d). On January 23, 2008, the District filed proof of publication of the Notice in the Press Enterprise and The Bond Buyer in accordance with the court's order, together with an affidavit establishing service of the Notice by United States mail, first class mail, postage prepaid, on 2,775 creditors or other parties in interest in the case.

[7] Limited, Protective Objection of Unions to Chapter 9 Petition of Valley Health System, p.3, l.12-14.

1  hearing on the objections at which time the Unions conceded that they were not seeking
2  dismissal of the District's petition. At the conclusion of the hearing, the matter was taken under
3  submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

Section 921(c) states that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title." 11 U.S.C. § 921(c). If the court does not dismiss the petition under § 921(c), then it must order relief under chapter 9. 11 U.S.C. § 921(d). Despite the permissive language of the statute, § 921(c) has been construed as requiring dismissal of a petition filed by a debtor who is not eligible for relief under chapter 9. In re County of Orange, 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995) ("Although the language of § 921(c) is permissive, the case law indicates that § 921(c) 'must be given a mandatory effect if the defect in the filing is in the debtor's eligibility to file Chapter 9.'" (citation omitted)). See generally 6 Collier on Bankruptcy ¶ 921.04[4] at 921-7 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2007) [hereinafter Collier].

To qualify for relief under chapter 9, an entity must meet the statutory criteria set forth in § 109(c) which states:

An entity may be a debtor under chapter 9 of this title if and only if such entity –

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

- 5 -

    (5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

    (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

    (C) is unable to negotiate with creditors because such negotiation is impracticable; or

    (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c). The burden of establishing eligibility under § 109(c) is on the debtor. See County of Orange, 183 B.R. at 599 ("The burden of proving eligibility under § 109(c) is on the party filing the petition."); In re Sullivan County Reg'l Refuse Disposal Dist., 165 B.R. 60, 72-73 (Bankr. D.N.H. 1994) ("To qualify for Chapter 9 protection, the debtor must affirmatively establish it meets each of the requirements of 11 U.S.C. § 109(c) . . . .").

    Neither U.S. Bank nor the Unions question specifically the District's good faith in filing the petition.[8] Nor is there an issue as to whether the District has satisfied the eligibility requirements of § 109(c)(1), (2), (3) or (4), i.e., that the District (1) is a municipality; (2) was authorized under California law to file a petition for relief under chapter 9; (3) was insolvent on the petition date; and (4) desires to effect a plan to adjust its debts. The sole issue before the court is whether the District has satisfied § 109(c)(5)(C), i.e., whether the District was "unable to negotiate with creditors" prior to the filing of the petition "because such negotiation [was] impracticable". See 11 U.S.C. § 109(c)(5)(C).

---

[8] However, the absence of good faith prepetition negotiations is a factor that may be considered in determining whether a chapter 9 petition was filed in good faith. See 6 Collier ¶ 921.04[2], at 921-6 ("The facts that may be relevant in a good faith inquiry include (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems." (citations omitted)).

1     Section 109(c)(5) is intended to promote pre-petition negotiations between a municipality
2 and its creditors concerning a plan of adjustment. The District admits that it did not engage in
3 negotiations with its creditors regarding a plan of adjustment prior to the filing of the petition.
4 U.S. Bank argues that the District was required by § 109(c)(5)(C) to attempt good faith
5 negotiations with its creditors concerning the terms of a plan of adjustment before concluding
6 that such negotiation was impracticable, citing Sullivan and In re Cottonwood Water and
7 Sanitation Dist., 138 B.R. 973 (Bankr. D. Colo. 1992). U.S. Bank reasons that § 109(c)(5) was
8 designed by Congress to limit a municipality's access to the bankruptcy court, compel
9 negotiation, and "protect creditors from capricious bankruptcy filings by municipalities."[9]

10     U.S. Bank reads Cottonwood and Sullivan far too broadly. In Cottonwood, the debtor
11 alleged that it had negotiated in good faith with creditors but had failed to secure the consent of
12 at least a majority in amount of the claims of each class that it intended to impair under a plan of
13 adjustment. 138 B.R. at 974. The central issue in Cottonwood was not impracticability under §
14 109(c)(5)(C), but whether the debtor had satisfied the requirement of § 109(c)(5)(B). Id. ("[The
15 objectors] argue that the Debtor is not entitled to the benefit of an order for relief because it
16 failed to comply with the provisions of section 105(c)(5)(B) of the Bankruptcy Code.").
17 Cottonwood and its progeny stand for the proposition that a municipality seeking to establish
18 eligibility under § 109(c)(5)(B) "must be prepared to show that it engaged in good faith
19 negotiations with its creditors concerning the possible terms of a plan to be effected pursuant to
20 section 941 of the Bankruptcy Code." Id. at 979; see Sullivan, 165 B.R. at 79 (concluding that
21 the debtors "failed to meet their burden of showing that they did negotiate in good faith with
22 regard to a plan within the meaning and purpose of § 109(c)(5)(B) of the Bankruptcy Code").
23     Next, U.S. Bank argues that Congress enacted § 109(c)(5)(C)'s impracticability
24 requirement "to address the problems that very large municipalities would face in negotiating

25 ———————————

26 [9] Objection of U.S. Bank as Indenture Trustee to Chapter 9 Petition of Valley Health System, p.6, l.1-2.
27

-7-

with numerous bondholders"[10] and that § 109(c)(5)(C) was intended by Congress to be applied narrowly. See Sullivan, 165 B.R. at 79 n.55 (observing that § 105(c)(5)(C) "was enacted in 1976 during the time of an impending municipal bankruptcy filing by the City of New York and was intended to cover situations in which a very large body of creditors would render prefiling negotiations impractical"). According to U.S. Bank, a municipality should be permitted to invoke § 105(c)(5)(C) only when it has reached an impasse after extensive pre-petition negotiations with its creditors or, alternatively, when pre-petition negotiations are impracticable due to the substantial number of its creditors. Any other interpretation, says U.S. Bank, would render §§ 109(c)(5)(A) and (B) meaningless.

First, U.S. Bank attempts to circumscribe the statutory text by pointing to its legislative history. There is a "strong presumption" that plain and unambiguous statutory language expresses congressional intent. Ardestani v. INS, 502 U.S. 129, 135 (1991). Where the statute's language is plain, "'the sole function of the courts is to enforce it according to its terms.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)). Any judicial inquiry into the purpose, background or legislative history of the statute is foreclosed unless a literal application of the statute produces "a result demonstrably at odds with the intentions of its drafters." Id. at 242. Moreover, a statute written in the disjunctive is construed as setting out separate and distinct alternatives. Tillema v. Long, 253 F.3d 494, 499-500 (9th Cir. 2001); Towers v. United States (In re Pac.-Atl. Trading Co.), 64 F.3d 1292, 1302 (9th Cir. 1995). Because § 109(c)(5) is written in the disjunctive, a debtor has four options to satisfy the requirement for negotiation: "[1] it may obtain the agreement of creditors holding a majority in amount of claims in each class [; (2)] it may show that it has negotiated with its creditors in good faith but has failed to obtain their agreement [; (3)] it may show that it is unable to negotiate with creditors because negotiation is impracticable

---

[10] Id. at p.7, l.23-24.

- 8 -

[; or (4)] it may demonstrate that it reasonably believe[s] that a creditor may attempt to obtain a preferential transfer." In re Ellicott Sch. Bldg. Auth., 150 B.R. 261, 265-66 (Bankr. D. Colo. 1992). There is nothing in the language of § 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case.

Congressional intent can be divined by giving the words used their ordinary meaning. United States v. LaBonte, 520 U.S. 751, 757 (1997). "Impracticable" means "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." Webster's New International Dictionary 1136 (3d ed. 2002). In the legal context, "impracticability" is defined as "a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty." Black's Law Dictionary 772 (8th ed. 2004). Hence, the ordinary meaning of the word "impracticable" belies any notion that the reach of § 109(c)(5)(C) is limited to the two fact situations suggested by U.S. Bank.

Second, U.S. Bank's interpretation of § 109(c)(5)(C) is not supported by the case law which suggests that creditor numerosity is not the only circumstance under which the impracticability requirement might be satisfied. "The impracticality requirement <u>may</u> be satisfied based on the sheer number of creditors involved." County of Orange, 183 B.R. at 607 (emphasis added); see In re Villages at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ("It certainly was impracticable for [debtor] to have included several hundred Series D bondholders in these conceptual discussions."). Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets. See County of Orange, 183 B.R. at 607-08 ("The OCIP had no time to enter into negotiations with its participants before acting to protect its portfolio assets."); see also 2 Collier ¶ 109.04[3][e][iii], at 109-35 ("[W]here it is necessary to

1  file a chapter 9 case to preserve the assets of a municipality, delaying the filing to negotiate with

2  creditors and risking, in the process, the assets of the municipality makes such negotiations

3  impracticable.").

4        Finally, U.S. Bank's construction of § 109(c)(5)(C) is not supported by the purpose of

5  chapter 9. Section 109(c)'s eligibility requirements "are to be construed broadly to provide

6  access to relief in furtherance of the Code's underlying policies." <u>Hamilton Creek Metro. Dist. v.</u>

7  <u>Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)</u>, 143 F.3d 1381, 1384 (10th

8  Cir. 1998). Chapter 9 affords a municipality temporary protection from debt collection efforts so

9  that it may establish a plan of adjustment with its creditors. <u>Id.</u> at 1386; <u>In re Addison Comm.</u>

10 <u>Hosp. Auth.</u>, 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994).

11       In this case, the evidence supports a finding that the District filed its chapter 9 petition in

12 the good faith belief that it was the only means to preserve the value of its assets, continue its

13 business operations, and facilitate continued and uninterrupted healthcare services to its patients

14 while simultaneously developing a viable, comprehensive business plan that would provide the

15 basis for a plan of adjustment and meaningful negotiations with all classes, including U.S. Bank

16 and the Unions. The District did not view the requirements of chapter 9 lightly.

17       Prior to the filing of the petition, the District communicated with its major creditors,

18 including U.S. Bank and the Unions, advised them of its intention to seek relief under chapter 9,

19 and assured them that it would negotiate a plan of adjustment consistent with the requirements of

20 chapter 9 once it developed a viable business plan. The District's Board of Directors approved

21 the chapter 9 filing only after a public meeting, noticed in accordance with state law, at which

22 attendees were advised of the Board's intention to file a chapter 9 petition and given the

23 opportunity to question the Board and its professionals and to be heard on the issue. The

24 District's decision "was made only after a careful review of all options and strategies and with

25 the input and guidance of consultants with expertise in healthcare restructuring, corporate

26

27

counsel, bond counsel, and bankruptcy counsel."[11]

The District had exhausted its efforts to solve its financial problems through the restructuring of debt or the sale of assets. Two years earlier, the District sought to restructure its debt through Riverside County Measure I ("Measure I") which contemplated the issuance of $485 million in general obligations bonds, secured by property tax revenues, to retire the District's special revenue bond debt, finance necessary capital improvements, and provide the District the time and capital required to return to profitability. Measure I was rejected by the voters on September 16, 2005. The District then attempted to improve its liquidity through the sale of assets. On August 8, 2007, the District approved a sale of substantially all of its assets to Select HealthCare Solutions ("Select"), subject to voter approval in accordance with California law. Select and the District further agreed that, in the event the sale was not approved by the voters, then Select would have the opportunity to purchase the Moreno Valley Hospital from the District for $47 million. Voters rejected Riverside County Measure G ("Measure G"), which sought approval of the asset sale to Select, on November 6, 2007 - 37 days before the District filed its chapter 9 petition.

On October 15, 2007, the District retained QHR Consulting Services ("QHR"), a turnaround specialist, to analyze the District's operations and complex contractual relationships, stabilize the District's financial situation, and ultimately formulate a business plan to return the District to profitability. QHR examined the District's $250 million annual budget before undertaking the task of framing a meaningful plan of adjustment. Based on its preliminary findings, QHR recommended operational changes to increase the District's revenues by approximately $12 million without materially increasing expenses and to eliminate approximately $20 million in annual expenses with no degradation to the quality of the District's

---

[11] District's Reply to Objection of U.S. Bank as Indenture Trustee and Limited Objection of SEIU-United Healthcare Workers – West and Local 121 RN to Chapter 9 Petition of Valley Health System, p.3, l.1-3.

operations. However, QHR determined that the key to returning the District to profitability hinges upon (1) securing fee for service agreements to replace its capitation contracts; and (2) consummating a sale of the Moreno Valley Hospital.

Prior to the filing of the petition, the District derived its revenue from a complicated system of capitation and sub-capitation agreements. The District was losing money under its capitation contracts, as well as the associated capitation risk pools formed with certain physician groups. QHR estimated that the unpaid risk pool liability alone was in excess of $16 million on the petition date, and no funds had been reserved for payment of these liabilities. QHR concluded that the District must negotiate fee for service agreements to replace its capitation arrangements. Since the filing of the petition, the District has renegotiated its contracts with Blue Cross, Health Net, PacifiCare (United Health Care), Secure Horizons (United Health Care), Inter Valley, Inland Empire Health Plan, and SCAN resulting in an estimated $1.2 million per month reduction in operational losses. Because the loss of upfront capitation payments would create a significant reduction in cash flow, the District filed its chapter 9 petition to preserve the value of its assets and to facilitate a transition from the complex capitation structure to fee for service agreements without a degradation in the quality of patient care or an interruption in healthcare services.

The fate of the Moreno Valley Hospital was unknown on December 13, 2007. The Moreno Valley Hospital was generating losses of between $300,000 to $500,000 per month on the date of the petition and Select had not pursued its opportunity to purchase the hospital from the District. Since the filing, the District has been negotiating with Select and Kaiser Permanente for the sale of the Moreno Valley Hospital to Kaiser for more than $47 million. QHR estimates that the sale of the Moreno Valley Hospital will substantially reduce the District's operating losses, increase monthly revenues by approximately $250,000, and reduce the District's indebtedness to its bondholders by approximately $31.5 million.

Finally, the District has a substantial number of creditors. The District's petition

discloses not more than 5,000 creditors holding claims in excess of $100 million. Notice of the commencement of the case was sent to 2,775 creditors and other parties in interest. QHR believes "at least eleven classes of claims would be required under any plan of adjustment."[12] Negotiation with creditors was not practicable during the 37 days following voter rejection of Measure G given the District's liquidity crisis, the number of its creditors, the risk of loss to its assets, and its resulting inability to construct a realistic plan of adjustment.

Meaningful negotiation is infeasible, if not impossible, absent a plan of adjustment predicated upon a comprehensive business plan to return a municipality to profitability. "Even if QHR had unlimited time in which to concentrate on a business plan, any plan of adjustment based thereon prior to resolving the Select issues, understanding and improving the District's operational inefficiencies, and renegotiating the District's payor relationships, would have [been] extremely speculative and of limited usefulness."[13]

### III. CONCLUSION

Based upon the foregoing, the court concludes that the District was unable to negotiate with creditors prior to the filing of its chapter 9 petition in this case because negotiation was impracticable within the meaning of § 109(c)(5)(C). Accordingly, the objections of U.S. Bank and the Unions to the District's chapter 9 petition will be overruled and U.S. Bank's request for dismissal of the petition will be denied.

Separate orders will be entered consistent with this opinion.

Dated: February 20, 2008

PETER H. CARROLL
United States Bankruptcy Judge

---

[12] Declaration of Hubert U. King in support of District's Reply to Objection of U.S. Bank as Indenture Trustee and Limited Objection of SEIU-United Healthcare Workers – West and Local 121 RN to Chapter 9 Petition of Valley Health System, p.26, l.27 to p.27, l.1.

[13] Id. at p.27, l.23 to p.28, l.1.

**NOTE TO USERS OF THIS FORM:**
*Physically attach this form as the last page of the proposed Order or Judgment.*
*Do **not** file this form as a separate document.*

| In re VALLEY HEALTH SYSTEM, | CHAPTER 9 |
|---|---|
| Debtor. | CASE NUMBER RS 07-18293 PC |

# NOTICE OF ENTRY OF JUDGMENT OR ORDER
# AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:

1. You are hereby notified, pursuant to Local Bankruptcy Rule 9021-1(a)(1)(E), that a judgment or order entitled *(specify)*: MEMORANDUM DECISION

   was entered on *(specify date)*:

   FEB 2 0 2008

2. I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment to the persons and entities on the attached service list on *(specify date)*:

   FEB 2 0 2008

Dated:    FEB 2 0 2008

**JON D. CERETTO**
**Clerk of the Bankruptcy Court**

By: _____
    Deputy Clerk

---

Rev. 1/01   This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.    **F 9021-1.1**

Service List

Valley Health System
1117 East Devonshire Avenue
Hemet, CA 92543

H. Alexander Fisch, Esq.
Stutman, Treister & Glatt
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067

Timothy J. Farris, Esq.
United States Trustee
3685 Main Street, Ste. 300
Riverside, CA 92501

Michael S. Winsten, Esq.
Winstein Law Group
28202 Cabot Road, Suite 630
Laguna Niguel, CA 92677

Q. Scott Kaye, Esq.
McDermott, Will & Emery LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90012-3218

Paul R. Glassman, Esq.
Adam M. Starr, Esq.
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

William P. Smith, Esq.
Nathan F. Coco, Esq.
McDermott, Will & Emery LLP
227 West Monroe Street
Chicago, IL 60606-5096

Shari L. Heyen, Esq.
Jana K. Terry, Esq.
Greenberg Traurig, LLP
1000 Louisiana, Suite 1800
Houston, TX 77002

Leonard M. Shulman, Esq.
Mark Bradshaw, Esq.
Shulman Hodges & Bastian LLP
26632 Towne Centre Drive, Suite 300
Foothill Ranch, CA 92610

Allan H. Ickowitz, Esq.
Nossaman, Guthner, Knox & Elliott, LLP
445 S. Figueroa Street, 31st Floor
Los Angeles, CA 90071-1602

Christian L. Raisner, Esq.
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

Joseph M. Galosic, Esq.
Law Offices of Joseph M. Galosic
26632 Towne Centre Drive, Suite 300
Foothill Ranch, CA 92610-2808