1  CHARLES D. AXELROD (STATE BAR NO. 39507)
   GARY E. KLAUSNER (STATE BAR NO. 69077)
2  H. ALEXANDER FISCH (STATE BAR NO. 223211)
3  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
4  1901 Avenue of the Stars
   12th Floor
5  Los Angeles, CA 90067
   Telephone:  (310) 228-5600
6  Telecopy:  (310) 228-5788
7  E-mail:  caxelrod@stutman.com
            gklausner@stutman.com
8            afisch@stutman.com

9  Chapter 9 Counsel for
   Valley Health System
10

11            UNITED STATES BANKRUPTCY COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13                 RIVERSIDE DIVISION

14  In re                          )  Case No. 6:07-bk-18293-PC
                                   )
15  VALLEY HEALTH SYSTEM,          )  Chapter 9
                                   )
16            Debtor,              )  **DISCLOSURE STATEMENT WITH**
                                   )  **RESPECT TO THE PLAN FOR THE**
17                                 )  **ADJUSTMENT OF DEBTS OF VALLEY**
                                   )  **HEALTH SYSTEM DATED NOVEMBER 2,**
18                                 )  **2009**
                                   )
19                                 )      Disclosure Statement Hearing
                                   )
20                                 )  Date:   December 8, 2009
21                                 )  Time:   2:00 p.m.
                                   )  Place:  Hon. Peter H. Carroll
22                                 )          3420 Twelfth St.
                                   )          Courtroom 304
23                                 )          Riverside, CA  92501
                                   )
24                                 )      Disclosure Statement Hearing
25                                 )
                                   )      *To be set.*
26                                 )
                                   )
27  _____       )

28

532519v2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTE:  The Bankruptcy Court Has Not Yet Approved This Disclosure Statement Pursuant To Section 1125(b) Of The Bankruptcy Code For Use In The Solicitation Of The Plan Of Adjustment Of Debts Described Herein.  The Filing And Distribution Of This Disclosure Statement Therefore Is Not Intended As, And Should Not Be Construed To Be, A Solicitation Of Acceptance Or Rejection Of That Plan Or Any Other Plan.**

532519v2

**SUMMARY**

**The following pages summarize certain important information set forth elsewhere in this Disclosure Statement.  Capitalized terms are defined in the text of this Disclosure Statement and in the Plan.**

**The Disclosure Statement contains important information that is not summarized in this Summary and that may influence your decision regarding whether to accept or reject the Plan or otherwise affect your rights.  Please do not rely on this Summary standing alone, and please read all of this document and the accompanying materials thoroughly.**

The "Plan For The Adjustment Of Debts Of Valley Health System, Dated November 2, 2009" (the "Plan") proposed by Valley Health System, a California Local Health Care District (the "Debtor" or "District"), is premised on the Asset Sale Agreement dated October 14, 2009 (the "ASA"), which is attached hereto as Exhibit E, by and between the District and Physicians for Healthy Hospitals, Inc., a Delaware corporation ("PHH").  Two alternative transactions are described in the ASA: (1) the broader Two Hospital Transaction[1] involves the sale of substantially all of the District's assets, and will proceed if Public Approval is obtained in an election to be held December 15, 2009; (2) in the event Public Approval of the Two Hospital Transaction is not obtained, the District will proceed with the Alternative Transaction, whereby only Menifee Valley Medical Center and its related operating assets will be sold, and the District will continue to own and operate the remaining District Assets, which are primarily related to Hemet Valley Medical Center.

The treatment of creditors and the payment of Allowed Claims under the Plan will differ significantly depending on which of the two proposed sale transactions, *i.e.*, the Two Hospital Transaction or the Alternative Transaction, is ultimately consummated.

**Debtor**                                    Valley Health System, a California Local Health Care District

---

[1]    Any capitalized term not otherwise defined in this Disclosure Statement has the meaning ascribed to it in the Plan. Unless otherwise indicated, references in this Disclosure Statement to "Sections" are references to the various enumerated Sections of this Disclosure Statement.

| | |
|---|---|
| **Bankruptcy Court** | United States Bankruptcy Court for the Central District of California, Riverside District<br>The Honorable Peter H. Carroll presiding |
| **Plan** | Plan For The Adjustment Of Debts Of Valley Health System, Dated November 2, 2009 |
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have claims that are impaired under the Plan. Ballots must be returned to and received by the Ballot Tabulator by no later than 4:00 p.m., Pacific Time, on January ___, 2010. |
| **Ballot Tabulator** | Joanne Stern, Paralegal, Stutman, Treister & Glatt PC, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788) |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on _____ __, 2010, commencing at __:___ __.m., Pacific Time.  Objections to confirmation must be filed and served by no later than _____, 2010. |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |

| | | |
|---|---|---|
| Administrative Claims | Paid in full, except to the extent that the holder of an Administrative Claim agrees to different treatment.  In the event that the Two Hospital Transaction is consummated, a substantial amount of the District's Administrative Claims will be assumed by PHH. | |
| Class 1A<br>Holders of the<br>Series 1993 Bonds | If the Two Hospital Transaction is consummated: | Impaired.  Holders of the Series 1993 Bonds will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1A Claims. |
| | If the Alternative Transaction is consummated: | Impaired.  Allowed Claims in Class 1A shall be satisfied as set forth more fully in Section V.A.2. |
| Class 1B<br>Holders of the<br>Series 1996 Bonds | If the Two Hospital Transaction is consummated: | Impaired.  Holders of the Series 1996 Bonds will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1B Claims. |

| | | |
|---|---|---|
| | If the Alternative Transaction is consummated: | Impaired. Allowed Claims in Class 1B shall be satisfied as set forth more fully in Section V.A.2 |
| Class 2A<br>Allowed General Unsecured Claims | If the Two Hospital Transaction is consummated: | Impaired. Holders of Allowed General Unsecured Claims will receive their pro rata share of $17 million or such increased or reduced amount that will be available for payment of such Claims, as more fully set forth in Section V.A.3. Such distributions shall be paid in four equal annual installments, without interest, with the first payment to be made on the first anniversary of the Sale Closing Date, and on each anniversary thereafter. |
| | If the Alternative Transaction is consummated: | Impaired. Holders of Allowed General Unsecured Claims will receive their pro rata share of the Class 2A Annual Cash Payment, as more fully set forth in Section V.A.3. |
| Class 2B<br><br>General Unsecured Claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, LLC and LHIO, and Claims of Constituent Members of Each | If the Two Hospital Transaction is consummated: | Impaired. Upon the Sale Closing Date, PHH will assume the District's obligations relating to all Class 2B Claims. From and after the Sale Closing Date, holders of Allowed Class 2B Claims shall only have a right to collect payment on account of such Claims from PHH, and the District shall thereafter be relieved of any and all liability on account of such Claims. |
| | If the Alternative Transaction is consummated: | Impaired. Holders of Allowed Class 2B Claims shall receive the same treatment as holders of Allowed Class 2A Claims. |
| Class 2C<br><br>Interests of Defined Benefit Plan Participants | Unimpaired. | |
| **Background Information:** | See pages 6 to 13. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Questions:</u>**

Please contact the Debtor's counsel, Charles D. Axelrod, Gary E. Klausner or H. Alex Fisch, Stutman, Treister & Glatt 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067
(phone: 310-228-5600; facsimile:  310-228-5788)

## I.    INTRODUCTION

The District filed a petition under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") on December 13, 2007 (the "Petition Date"), which was designated Case Number 6:07-bk-18293-PC by the clerk of court (the "Chapter 9 Case").  An order for relief[2] was entered on February 20, 2008, and the Chapter 9 Case is currently pending before the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court").

The District is the proponent of the Plan, a copy of which is attached to this Disclosure Statement as Exhibit A.  [At a hearing held on December 8, 2009, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the District to transmit it to holders of impaired claims in connection with the solicitation of votes with respect to the Plan.]

As described more fully elsewhere in this document, the District believes that the Plan provides the greatest and earliest possible recoveries to holders of claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative restructuring or reorganization would result in delay, uncertainty, expense, litigation and, ultimately, smaller or no distributions to creditors.  Accordingly, **the District urges that you cast your ballot in favor of the Plan.**

### A.    The Purpose Of This Disclosure Statement.

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a

---

[2]    In a published decision, the Bankruptcy Court upheld the chapter 9 filing by the District.  The Indenture Trustee for the Bonds had filed an objection to the District's petition, claiming that the District was ineligible for relief under chapter 9 because the District had failed to attempt to negotiate an adjustment of its debts with its major creditors prior to the filing of the petition.  ST&G argued on behalf of the District that such negotiation was impracticable, and presented evidence supporting this contention.  The bankruptcy court agreed with the District and found that negotiations by the District with its creditors was impracticable because voters had rejected the District's measures to refinance its debts or sell substantially all of its assets and there was insufficient time for the District to formulate a realistic standalone plan of adjustment and then negotiate its provisions with its numerous creditors within the context of a continuing liquidity crisis and risk of loss to the District's assets.  Accordingly, the Court declined to dismiss the chapter 9 petition.  *See In re Valley Health Sys.*, 383 B.R. 156 (Bankr. C.D. Cal. 2008).

kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under that plan to make an informed judgment with respect to the plan.  This Disclosure Statement provides such information.  ***Parties in interest should read this Disclosure Statement, the Plan, and all of the exhibits accompanying such documents in their entirety in order to ascertain:***

> 1.    How the Plan will affect their claims against the District;
>
> 2.    Their rights with respect to voting for or against the Plan;
>
> 3.    Their rights with respect to objecting to confirmation of the Plan; and
>
> 4.    How and when to cast a ballot with respect to the Plan.

This Disclosure Statement, however, cannot and does not provide creditors with legal or other advice or inform such parties of all aspects of their rights.  Claimants are advised to consult with their attorneys and/or financial advisors to obtain more specific advice regarding how the Plan will affect them and regarding their best course of action with respect to the Plan.

This Disclosure Statement has been prepared in good faith and in compliance with applicable provisions of the Bankruptcy Code.  Based upon information currently available, the District believes that the information contained in this Disclosure Statement is correct as of the date of its filing.  The Disclosure Statement, however, does not and will not reflect events that occur after November 2, 2009 (and, where indicated, specified earlier dates), and the District assumes no duty and presently does not intend to prepare or distribute any amendments or supplements to reflect such events.

**B.    Summary Of Entities Entitled To Vote On The Plan And Of Certain Requirements Necessary For Confirmation Of The Plan.**

Holders of Allowed Claims in Classes 1A (the Series 1993 Bonds), Class 1B (the Series 1996 Bonds), Class 2A (General Unsecured Claims), and Class 2B[3] (General Unsecured Claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO, and Claims of Constituent Members of Each) (collectively, the "Voting Classes") are entitled

---

[3]    In the event of the Alternative Transaction, Class 2B will vote with Class 2A, as the treatment of both Classes will be identical.

to vote on the Plan, because the Claims in each such Class may be "impaired" under the Plan within the meaning of section 1124 of the Bankruptcy Code under one of the alternative treatments of Claims in such Classes.

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired claims has voted to accept the Plan (without counting the votes of any insiders whose claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to any dissenting Classes. A Class of claims has accepted the Plan only when at least one-half in number <u>and</u> at least two-thirds in amount of the Allowed Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by any of the Voting Classes, the District will request that the Bankruptcy Court confirm the Plan in accordance with those portions of section 1129(b) of the Bankruptcy Code that are applicable to the Chapter 9 Case, which provisions permit confirmation by a process known as "cramdown" notwithstanding such rejection if the Bankruptcy Court finds, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class. Other sections of this Disclosure Statement provide a more detailed description of the requirements for acceptance and confirmation of the Plan.

**C.    Voting Procedures, Balloting Deadline, Confirmation Hearing, And Other Important Dates, Deadlines, And Procedures.**

**1.    Voting Procedures And Deadlines.**

The District has provided copies of this Disclosure Statement and ballots to all known holders of impaired claims in the Voting Classes. Those holders of an Allowed Claim in each Voting Classes who seek to vote to accept or reject the Plan <u>must</u> complete a ballot and return it to the Court-appointed ballot tabulator – Joanne Stern, Paralegal, Stutman, Treister & Glatt Professional Corporation, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788) (the "Ballot Tabulator") – so that their ballots actually are received by no later than the Balloting Deadline (as defined below). Ballots do not constitute proofs of claim and must be returned directly to the Ballot Tabulator, **<u>not</u>** to the Bankruptcy Court.

*All ballots, including ballots transmitted by facsimile, must be completed, signed, returned to, and actually received by the Ballot Tabulator by not later than _____ ___, 2010 (at 4:00 p.m. Pacific Time (the "Balloting Deadline"). Ballots received after the Balloting Deadline, and ballots returned directly to the Bankruptcy Court, shall not be counted in connection with confirmation of the Plan.*

> **2.    Date Of The Confirmation Hearing And Deadlines For Objection To Confirmation Of The Plan.**

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on _____ ___, 2010, at _____ a.m. Pacific Time in the Courtroom of the Honorable Peter H. Carroll, United States Bankruptcy Judge for the Central District of California, Courtroom 304, 3420 Twelfth Street Courtroom 304 Riverside, CA 92501. The Confirmation Hearing may be continued from time to time by announcement in open Court without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities so as to be actually received by no later than _____ ____, 2010: (a) Mr. Joel M. Bergenfeld, Chief Executive Officer of Valley Health System, 1117 East Devonshire Avenue, Hemet, CA 92543; (b) Stutman, Treister & Glatt Professional Corporation, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Attention: Gary E. Klausner (counsel to the District); and (c) Pachulski Stang Ziehl and Jones, 10100 Santa Monica Blvd., Suite 1100, Los Angeles, California 90067, Attention: Sam Maizel, Esq. (counsel to the Official Committee of Unsecured Creditors). Objections that are not timely filed and served may not be considered by the Bankruptcy Court. ***Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.***

**D.    Four Important Notices And Cautionary Statements.**

1.    The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based upon the District's books and records. Although certain professional advisors of the District assisted in the preparation of this Disclosure Statement, in doing so such

professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the District and third parties, much of which has not been audited. *The professional advisors of the District have not independently verified such information and, accordingly, make no representations or warranties as to its accuracy.* Moreover, although reasonable efforts have been made to provide accurate information, the District does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

2.    ***No entity may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan.*** Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the District or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of claims in the Chapter 9 Case.

3.    Certain information included in this Disclosure Statement and its Exhibits contains forward-looking statements within the meaning of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended. The words "believe", "expect", "anticipate" and similar expressions identify such forward-looking statements. The forward-looking statements are based upon information available when such statements are made, and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. A number of those risks and uncertainties are described below. Readers therefore are cautioned not to place undue reliance on the forward-looking statements in this Disclosure Statement. The District undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

4.    ***The Securities and Exchange Commission neither has approved nor disapproved this Disclosure Statement, nor has it determined whether this Disclosure Statement is accurate, truthful, or complete.***

**E.    Additional Information.**

If you have any questions about the procedures for voting on the Plan, desire another copy of a ballot, or seek further information about the timing and deadlines with respect to confirmation of the Plan, please write to counsel for the District as follows: Charles D. Axelrod, Gary E. Klausner or H. Alex Fisch, Stutman, Treister & Glatt Professional Corporation, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788). Please note that counsel for the District cannot and will not provide creditors with any legal advice, including advice regarding how to vote on the Plan or the effect that confirmation of the Plan will have upon claims against the District.

**II.    BACKGROUND INFORMATION**

**A.    The District.**

The District is a public agency, formed under the State of California Local Healthcare District Law, Cal. Health and Safety Code § 32000 *et seq*. At the start of the Chapter 9 Case, the District owned and operated three acute hospitals: (i) Hemet Valley Medical Center, a 340-bed facility located in Hemet ("HVMC"); (ii) Menifee Valley Medical Center, an 84-bed facility located in Sun City ("MVMC" or "Menifee"); and (iii) Moreno Valley Community Hospital, a 95-bed facility located in the city of Moreno Valley ("Moreno"), and the Hemet Valley HealthCare Center a 113- bed skilled nursing facility located in Hemet ("SNF") (HVMC and MVMC are collectively referred to as the "Hospitals"). Moreno was sold to Kaiser Foundation Hospitals in June 2008. In September 2008, the District decided to terminate its long-term care business and close its skilled nursing facility. That process concluded in early-December 2008, and the District continues to use the facility previously occupied by SNF to operate a chemical dependency program and a post-treatment retreat center.

The District encompasses approximately 882 square miles in the San Jacinto Valley in west central Riverside County, including the City of Hemet, the City of San Jacinto, the City of Sun City, and the surrounding unincorporated areas. Approximately 360,000 people reside within the District.

**B.    District's Financial Problems.**

At the time the District's Board of Directors (the "Board") considered filing a chapter 9 petition, the District was facing a liquidity crisis that threatened its continued operations. The Board concluded that filing a chapter 9 was the only available remedy to avoid litigation with and collection action by creditors, while, at the same time, allowing the District to protect its asset values, preserve its business operations and continue providing uninterrupted healthcare services to its patients while it developed a comprehensive business plan. Moreover, the task of restructuring the District was particularly complicated and time consuming because of the multitude of financial and contractual relationships inherent in the hospital business.

The decision to file chapter 9 came only after the District attempted alternatives that would have avoided such a filing. Specifically, voters had previously rejected two local measures intended to resolve the District's financial problems and ensure that the District's facilities remained open as public facilities. On September 16, 2006, voters rejected Riverside County Measure I ("Measure I"), which contemplated the issuance of $485 million in general obligation bonds, secured by property tax revenues, to retire the District's special revenue bond debt, finance necessary capital improvements, and assure the District had the time and capital needed to return to profitability. After the defeat of Measure I, the District, during the summer of 2007, sought to sell substantially all of its assets to enable it to pay its creditors and continue uninterrupted healthcare services in the hands of the buyer, Select HealthCare Solutions ("Select").

Given the nature and scope of the Select transaction, voter approval thereof was required pursuant to California law. In the event that the sale of substantially all of the District's assets was rejected by the electorate, the District was contractually obligated to sell Moreno to Select for $47 million (the "Moreno Transaction"), at the option of Select. On November 6, 2007, voters rejected Riverside County Measure G ("Measure G"), which sought approval of the sale of substantially all of the District's assets to Select for an amount that would have resulted in the full satisfaction of all creditor claims and the continued operation of the Hospitals, albeit as assets of Select.

The District engaged QHR Consulting Services ("QHR") to undertake several tasks intended to stabilize the District's financial situation and enable the formulation of a business plan that would return operations to profitability. Although QHR began this process prior to the Petition Date, the District was not in a position to present a meaningful plan of adjustment as of the Petition Date because of, at least, the following facts:

    (a)    QHR had to complete its analysis of the District's complex, contract driven business and, as of the Petition Date, roughly $250 million annual budget, including the analysis of every material revenue and expense item to ascertain the extent to which profits could be increased by instituting any operational or logistical changes that were feasible and warranted.

    (b)    As of the Petition Date, QHR had not yet implemented a transition from its capitated payor agreements to fee for service payor relationships. The conversion to a fee for service based payor regime would engender an initial severe downturn in cash flow because the District would lose its upfront capitation payments, and there would be a delay inherent in billing on a fee for service basis and collecting the receivables created thereby. The termination of capitation arrangements and the implementation of fee for service arrangements had to be negotiated to replace the extant capitation system. Moreover, many of the capitated relationships were governed by regulations that do not allow expedient modification.[4]

    (c)    Although authorized by the District's Board to solicit interest in the District's non-essential assets and to attempt to sell such assets to generate cash to be used for plan of adjustment purposes, QHR was unable to move forward meaningfully on this mandate until the District's contractual relationship with Select was resolved, given certain liens that were granted in favor of Select to

---

[4] These negotiations were completed during the chapter 9 case and the District weathered the cash flow crisis.

secure the repayment of advances that Select made to the District relating to

the contract negotiated in connection with Measure G.[5]

(d)    The sale of Moreno had not yet occurred, so it was uncertain whether the

benefits inherent thereunder could be factored into the plan promulgation

process.

## III.    ADMINISTRATION OF THE DISTRICT'S CHAPTER 9 CASE

### A.    Formation of the Committee.

Following a formation meeting held on March 26, 2008, the United States Trustee

appointed the members of the Official Committee of Unsecured Creditors (the "Committee").  The

Committee currently consists of the following members:  (a) SEIU-United Healthcare Workers -

West; (b) Universal Health Services of Rancho Springs, Inc.; (c) Hemet Community Medical Group

("HCMG"); (d) Sodexho USA, Inc.; (e) HCR Manor Care; (f) Hemet Healthcare Surgery, Inc.; (g)

Anaheim Memorial Medical Center; and (h) Southland Endoscopy Center.  The Committee is

represented in the Chapter 9 Case by the firm of Pachulski Stang Ziehl & Jones LLP ("PSZ&J") and

receives financial advisory services from Alvarez & Marsal Healthcare Indemnity Group

("AMHIG").  Pursuant to an agreement, the District agreed to pay the reasonable fees and costs

incurred by PSZ&J and AMHIG on a regular basis, provided that such fees and costs not exceed

$40,000 in any one month and that those fees and costs are subject to the disclosure and

reasonableness requirements of section 943(b)(3) of the Bankruptcy Code.

### B.    Sale of Moreno to Kaiser.

In connection with Measure G, the District had entered into a contract to sell

substantially all of its assets to Select subject to obtaining a vote of the electorate approving the sale.

The contract also provided that if the electorate voted down the sale of substantially all of its assets,

the District would nonetheless enter into the Moreno Transaction; however, the Moreno Transaction

was not intended to be documented prior to the rejection of Measure G and Select's election to

continue with the Moreno Transaction.  In early-December 2007, Select tendered notice that it

---

[5]    As a part of the sale of Moreno to Kaiser, Select released its liens.

1  intended to proceed with the Moreno Transaction.  Select had advanced $14 million of the purchase

2  price to the District and, under certain conditions, was entitled to have the advance repaid if the

3  District breached its obligation to sell Moreno to Select.  Select secured repayment of the $14

4  million deposit with deeds of trust on various real property assets of the District.

5          Select was then approached by Kaiser concerning Kaiser's desire to purchase Moreno

6  for more than the $47 million contemplated by the Moreno Transaction.  In turn, Select entered into

7  discussions with the District concerning the District's assumption of the Moreno sale contract,

8  Select's assignment of its rights under the assumed contract to Kaiser and an equitable sharing of the

9  amount that Kaiser was to pay over $47 million, taking into consideration, among other things,

10  Select's out of pocket costs.  Also, with Select's consent, the District and Kaiser had discussions

11  concerning certain shared services and non-competition arrangements that would augment and

12  protect, respectively, the District's remaining operations.

13          Ultimately, the original agreement with Select was amended twice and Moreno was

14  sold to Kaiser on June 20, 2008.  The consideration arising out of and related to the sale (totaling in

15  excess of $53 million) was used, pursuant to the Stipulation dated May 8, 2008 (the "<u>Select</u>

16  <u>Stipulation</u>"), to redeem the Series 1996 Bonds at par (approximately $33.7 million), replenish the

17  reserve fund for the Series 1993 Bonds and then to redeem at par approximately $6.3 million of the

18  Series 1993 Bonds, and to pay $10.4 million owed to Select on its $14 million advance.  Select also

19  received the Select Administrative Note, which is a 5%  promissory note, consistent with the form

20  thereof that appears as Exhibit "A" to the Select Stipulation.

21  **C.    Motions For Relief From The Stay.**

22          Numerous motions requesting relief from the automatic stay have been filed.  When

23  the movant agreed both to liquidate its claim in another forum and not to enforce any claim so

24  liquidated against assets or property that were the District's but rather, to look exclusively to

25  insurance policy proceeds, the District stipulated to relief from the stay being granted.  As of

26  October 30, 2009, the Bankruptcy Court has not granted any motion for stay relief that the District

27  opposed.

28

**D.      SEIU Litigation.**

There are two labor union that have been certified as the bargaining representative for certain of the District's employees: the California Nurses Association ("CNA") and SEIU, United Healthcare Workers – West ("SEIU").  Subsequent to the Petition Date, the District concluded that the prepetition agreements, which had been negotiated between the District and SEIU, and the District and CNA, need to be modified: (1) to reflect current market conditions, and, in particular, those related to wages and healthcare benefits, and (2) to implement changes to the District's business model.  To that end, the District opened a dialogue with both unions concerning the possibility of negotiating modifications to their respective agreements.

In the case of SEIU, the District did not have an executed collective bargaining agreement.  Rather, in 2006, the District and SEIU negotiated the terms of a tentative agreement that would form the basis of a memorandum of understanding.  A memorandum of understanding ("MOU") based on the tentative agreement was drafted, but was never executed.

The District and SEIU conducted several bargaining sessions in an attempt to reach a consensus as to modifications to the MOU.  However, those negotiations broke down in July 2008. As a result of the breakdown in negotiations and because of the need for the District to implement certain essential changes to wages and benefits, to what might have otherwise been required under the MOU, the Board voted to implement certain changes to wages and healthcare benefits at its board meeting on July 28, 2008.

Several months of litigation between the SEIU and the District ensued before the California Public Relations Board, the United States District Court for the Central District of California, and this Court.  The District and the SEIU ultimately resolved their differences consensually.  As a result of that consensual resolution, all pending litigation between SEIU and the District (other than one grievance) was dismissed; the SEIU withdrew the over $3 million claim it had filed in the Chapter 9 Case, which claim was reflected in the Court's registry of claims as claim number 179, except with respect to the single grievance.  The District and SEIU entered into a new MOU.

**E.    CNA Negotiation and New MOU.**

The District also renegotiated the terms and conditions of employment for its employees who are members of CNA during the Chapter 9 Case.  Along with the SEIU, CNA was the subject of the District's Motion For Order (1) Approving Rejection Of Executory Contract With SEIU; (2) Confirming Interim Modifications To Agreements With SEIU And CNA; And (3) Post-Expiration Terms And Conditions Of Employment, filed June 9, 2009, and withdrawn August 10, 2009 after a consensual resolution mooted the Motion.  The renegotiation of the CNA and SEIU agreements resulted in significant cost avoidance and savings for the District.

**F.    Closure of SNF.**

In September 2008, the Board, with the advice of the District's financial advisors, decided to terminate its long-term care business and close its skilled nursing facility.  The SNF had been losing money from operations and was projected to continue to operate at a substantial loss.  In the ensuing months, the District, with the assistance of its counsel and financial advisors, terminated its skilled nursing facility and successfully transitioned all of its patients to other facilities.  That process was concluded in early December 2008.

The District continues to operate a chemical dependency program and a post-treatment retreat center ("HVHC") in the facility formerly occupied by the SNF.

**G.    Aetna Litigation.**

The District initiated an adversary proceeding against Aetna Health of California, Inc., and Aetna Health Management LLC (together, "Aetna") on October 2, 2008 by filing a complaint.  In summary, the complaint asserted that Aetna owed the District $1,598,045.87 for post-petition services, and was in violation of the automatic stay by failing to turnover such funds. Aetna filed its answer on November 4, 2008, in which answer Aetna California asserted a counterclaim against the District.  Aetna's answer and counterclaim asserted, in summary, that Aetna was entitled to retain the funds sought by the District, and requested that Aetna's proof of claim be allowed in the amount set forth it its proof of claim, designated as claim number 181 in the Court's registry of claims, which amount exceeds $3.8 million.

The District and Aetna are presently exploring the possibility of settling their disputes consensually.

**H.    Sale of Hemet Global Services.**

One of the District's assets was its interest in Hemet Global Services ("HGS").  The District decided to liquidate its ownership interest in HGS and successfully concluded a sale of such interest to HCMG for $3.4 million, plus $3.3 million for distributions that would be due the District on account of its interest through June 30, 2008.  The District received $2.5 million in cash at the closing of the sale of its HGS interest, plus a promissory note in the face amount of $4.2 million, payable over sixty months.

**IV.    THE DISTRICT'S LIABILITIES AND ASSETS**

A copy of the District's preliminary financial statements dated as of August 31, 2009 is attached hereto as <u>Exhibit B</u>.  Set forth below is a summary of the liabilities and assets that are relevant to the Plan.

**A.    Liabilities.**

**1.    Proofs of Claim.**

The Bankruptcy Court established August 24, 2008 as the deadline for filing proofs of claim against the District, and by subsequent order, established July 10, 2009 as a supplemental bar date for certain enumerated parties who did not get notice of the initial bar date. Approximately 195 proofs of claim asserting claims aggregating to approximately $23 million, plus "unknown," "to be determined" or "unliquidated" amounts, were filed by the bar date relevant to the claim, with other proofs of claim being filed after the applicable bar date.

The District has engaged in a process aimed at ascertaining the difference between the proof of claim amount and the amount reflected as owing in the District's books and records that resulted in stipulations with claimants that reduced the amount of filed claims by $2,213,306.69, excluding the stipulated withdrawal of SEIU's claim of more than $3 million.  In addition, as a result of the District's process of discussing its reconciliation of proofs of claims with creditors, creditors have amended or withdrawn claims totaling $3,699,590.65.  The District has also filed objections to

four claims totaling $6,534,407.57, of which two, totaling $3,994,841.57, have been sustained.  The remaining two objections are pending, but it appears that the claim filed by Dr. Kali P. Chaudhuri for $1,060,000 will be withdrawn, and the other, filed by KM Strategic Management, LLC, totaling $1,479,566 will not be the responsibility of the District if the Two Hospital Transaction is consummated.

The District believes that when the claims allowance process is completed, no more than $22 million in Class 2A Claims will be allowed.

**2.      Claims of Series 1993 and 1996 Bondholders.**

By stipulation, the District has agreed that the pre-petition secured claims of the Indenture Trustee are allowable claims in the Chapter 9 Case.  There are presently outstanding $40,615,000 and $4,935,000 in allowable Class 1A and Class 1B Claims, respectively.

**3.      Administrative Claim of Select.**

In connection with the sale of Moreno, the District issued to Select the Select Administrative Note, which is an unsecured promissory note in the amount of $7,968,500.  The Select Administrative Note bears interest at a rate of 5% per annum from the date of issuance, with no payment due until the later of November 15, 2009 or plan confirmation.  As of the date hereof, the amount due on the Select Administrative Note is approximately $8.7 million.  The Select Administrative Note will not be the responsibility of the District if the Two Hospital Transaction is consummated.  Under the Alternative Transaction, the Select Administrative Note will be restructured so that there is a two year moratorium, interest only payments for the following three years, and a ratable amortization of principal and interest during the sixth through tenth years following the Sale Closing Date.

**4.      Statement Regarding Liabilities.**

The District disputes a number of the claims that have been asserted against it, and the District's review and analysis of claims is ongoing.  Given the fact and inherent uncertainties in any litigation regarding claims, no assurance can be given regarding the successful outcome of any litigation that may be initiated in objection to such claims or regarding the ultimate amount of unsecured claims that will be allowed against the District.

1    As described below, the Plan enables the District to file objections to claims at any

2    time within one hundred and eighty (180) days after the Effective Date.  The Plan also provides for

3    the District to retain any and all defenses, offset and recoupment rights, and counterclaims that may

4    exist with respect to any disputed claim, whether under section 502, 552, or 558 of the Bankruptcy

5    Code or otherwise.  The District reserves all rights with respect to the allowance and disallowance of

6    any and all claims.  **In voting on the Plan, creditors may not rely on the absence of a reference**

7    **in this Disclosure Statement or the Plan or the absence of an objection to their proofs of claim**

8    **as any indication that the District ultimately will not object to the amount, priority, security, or**

9    **allowability of their claims**.

10   **B.    Assets.**

11   The District's "fixed assets" primarily consist of its Hospitals, the Medical Arts

12   Building located in Hemet (the "MAB"), and raw land in Hemet that was originally conceived of as

13   expansion space.  Attached as Exhibit C is a copy of the most recent independent valuations of the

14   foregoing, prepared by Valuation & Information Group as of August 5, 2009, in the context of a sale

15   of the District's assets as a going concern.  In addition, the District owns cash, accounts receivable,

16   contract rights and leases.

17   Under the Plan, the District will sell to PHH either substantially all of its assets, or, if

18   Public Approval is not obtained, MVMC and certain related additional assets.  The consideration to

19   be provided by PHH differs according to which transaction is ultimately consummated, and such

20   consideration, whether cash or assumption of liabilities, constitutes a significant portion of the

21   funding for the Plan under either scenario.

22   Under the Alternative Transaction, the Plan vests in the District, for pursuit following

23   the Effective Date, any and all claims and causes of action that currently exist in favor of the

24   District.  The District's investigation regarding its potential claims and causes of action are ongoing

25   and not yet completed.

26   Under the Two Hospital Transaction, pursuant to section 1.6.12 of the ASA, all of the

27   District's claims, causes of action, rights of recovery, rights to offset, recoupment rights to refunds

28   and similar rights are transferred to PHH with certain exceptions set forth in section 1.7 of the ASA

or schedule 1.6.12 to the ASA.  Among other things, the District will retain all claims, rights, interests and proceeds with respect to state or local tax refunds resulting from periods prior the Effective Time of the ASA; all rights, claims and choses in action with respect to any Excluded Contracts, as defined in the ASA, certain assets not acquired by PHH; and any affirmative defenses, counterclaims, rights of offset or recoupment, or other defenses in connection with Excluded Liabilities, as defined in the ASA, and as necessary to object to or defend against claims asserted against the District.

**Parties in interest may not rely on the absence of a reference in this Disclosure Statement or Plan as any indication that the District ultimately will not pursue any and all available claims and causes of action against them.  All parties who previously dealt with the District hereby are on notice that the Plan preserves all of the District's rights, actions, claims, and causes of action under the Alternative Transaction, and certain rights, claims, interests and defenses under the Two Hospital Transaction.  The District expects that any and all meritorious claims will be pursued and litigated after the Effective Date to the extent they are remain vested in the District**.

## V.    SUMMARY OF THE PLAN OF ADJUSTMENT

**The discussion of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling.  Holders of claims and other interested parties are urged to read the Plan and its exhibits, copies of which are attached to this Disclosure Statement as <u>Exhibit A</u>, in their entirety so that they may make an informed judgment regarding the Plan.**

The Plan is premised upon the ASA by and between the District and PHH under which PHH would acquire either: (1) substantially all of the operating assets of the Debtor, including HVMC, MVMC, parcels adjacent thereto, HVHC, the MAB and the San Jacinto Property, as well as all accounts receivable, cash, and related assets, via the Two Hospital Transaction, if, at the election set for December 15, 2009, the Public Approval is obtained; or, (2) the assets related to MVMC and two adjacent parcels, if Public Approval is not achieved, via the Alternative Transaction.

The means by which the Plan will be implemented if Public Approval is obtained are set forth in more detail in Section V.C.1. below, but, in summary:

**Under the Two Hospital Transaction**, PHH will:

(i)     cause the Allowed Claims in Classes 1A and 1B, in the approximate net amount of $44.7 million, to be paid in full, in cash at the time of closing;

(ii)     provide the District with $4 million cash to be used for payment of administrative claims that are not being assumed by PHH, as well as additional funds that may be needed to pay administrative expenses;

(iii)     provide $17 million, in four annual installments on each successive anniversary of the Closing to the holders of allowed general unsecured claims against the Debtor, which sum may be adjusted upward or downward, depending on the total amount of administrative claims that are not assumed by PHH;

(iv)     assume substantially all of the District's post-petition obligations, estimated at approximately $31 million as of August 31, 2009;

(v)     cause the Select Administrative Note to be satisfied;

(vi)     pay premiums of "tail" malpractice and error and omissions insurance coverage;

(vii)     pay the District a termination fee of $2 million if it fails to perform under the ASA;

(viii)     pay $400,000 per year for five years to sustain the District as a California Local Health Care District;

(ix)     assume accrued employee "paid time off" obligations estimated to be about $2.7 million;

(x)     honor accrued extended sick leave estimated to be about $3.3 million;

(xi)     maintain core service such as basic emergency services for five years;

(xii)     cause certain claims of its affiliates, which PHH estimates to total approximately $55 million, to be withdrawn in the Chapter 9 Case;

(xiii)     maintain charity care policies consistent with applicable law;

1    (xiv)    assume the extant collective bargaining agreements with the SEIU and CNA;

2    (xv)    employ substantially all off the employees of VHS;

3    (xvi)    permit VHS to retain certain restricted assets such as the Beatrice Brown

4    bequest for "crippled" children's needs of about $807,000;

5    (xvii)    permit Valley Heath System Service Corporation to donate half of its cash

6    (approximately $550,000) to Ramona Community Services Corporation; and

7    (xviii)    provide a defense to certain legal claims if the transaction is challenged.

8    After the Sale Closing, the District would continue to exist as a California Local

9    Health Care District, but, having sold substantially all of its assets, would not operate any hospitals.

10    The means by which the Plan would be implemented if Public Approval is not

11    obtained are described in Section V.C.2. below, but, in summary:

12    **Under the Alternative Transaction**, PHH will:

13    (i)    pay $29 million for MVMC, two parcels of land adjacent to it, and the right to

14    those assets that are actually located and used at, or which are used primarily in connection with the

15    operations of, MVMC;

16    (ii)    obtain modifications of the $15-$18 million of debt owing on the Bonds that

17    would not be paid off by use of the $29 million purchase price, or loan the District the funds

18    necessary to pay off the Bonds with terms and conditions consistent with the proposed

19    modifications;

20    (iii)    assume certain capital leases and other executory contracts and pay the cure

21    costs associated therewith, but retaining the right to terminate the Alternative Transaction if the cure

22    costs exceed $1 million;

23    (iv)    pay all severance and "paid time off" for Menifee employees (estimated to be

24    in the $700,000-$800,000 range) out of the $29 million purchase price; and

25    (v)    cause the Select to restructure the Select Administrative Note so as to require

26    no payments for the twenty-four months following the closing of the Alternative Transaction,

27    interest only payments for the thirty-six months thereafter, and equal monthly payments of principal

28

1    and interest commencing the sixty-first month such that the Select Administrative Note will be

2    satisfied sixty months thereafter.

3            After the Sale Closing, the District will continue to operate HVMC and HVHC, and

4    would retain cash on hand, accounts receivable and choses in action as all the foregoing pertain to

5    HVMC.

6            Accordingly, the Plan sets forth different treatment for the various classes of claims

7    dealt with by the Plan depending on whether the transaction to close is the Two Hospital Transaction

8    or the Alternative Transaction.

9    **A.    Classification And Treatment of Claims.**

10        **1.    Unclassified Claims.**

11            Section II of the Plan governs the treatment of certain claims that are not

12    classified into Classes under the Plan.

13                    **a.    Administrative Expense Claims.**

14            Administrative Expense Claims are claims of the kind described in sections 503(b)

15    and 507(a)(2) of the Bankruptcy Code.  Section II.A. of the Plan provides for the treatment of

16    Administrative Claims.  Throughout the course of the Chapter 9 Case, the District has endeavored to

17    satisfy administrative expenses as they became due.  Accordingly, the District believes that most

18    claims that otherwise would constitute Allowed Administrative Claims previously have been or will

19    be satisfied in the ordinary course of business prior to the Effective Date, or will be included in the

20    PHH Assumed Other Liabilities, under the Two Hospital Transaction, as described below.

21                    **(1)    Two Hospital Transaction.**

22                        **(a)    Treatment of the Select Administrative Claim.**

23            The Plan provides that, pursuant to section 1.2.1(ii) of the ASA, at the closing of the

24    Two Hospital Transaction, the Select Administrative Note shall be satisfied in full or all obligations

25    evidenced thereby shall be assumed by PHH and the District shall be released from any further

26    liability in connection with the Select Administrative Note.  The District understands that Select has

27    agreed to the forgoing treatment.

28

**(b)    Treatment of All Other Administrative Claims
Other Than Professional Claims.**

The Plan provides that, pursuant to section 1.2.1(iii) of the ASA, PHH will, upon

closing of the Two Hospital Transaction, assume and satisfy certain postpetition administrative

claims of the District, which are defined in the ASA as the "Assumed Other Liabilities."  The

Assumed Other Liabilities consist of the "Assumed Current Liabilities" and "Other Liabilities,"

which are both defined in section 1.2.1(iii) of the ASA.  The District believes that substantially all of

its administrative claims, with the exception of professional fees and certain claims arising from the

rejection of certain postpetition executory contracts, will be included in the Assumed Other

Liabilities.  PHH will also contribute additional funds as are necessary to satisfy Administrative

Claims that are not satisfied as a result of being treated as Assumed Other Liabilities ("Covered

Claims," under the ASA), including Professional Claims in the event that the $4 million contributed

at Closing is insufficient to pay such Covered Claims.

To the extent of any Administrative Claims, other than the Assumed Other Liabilities,

and except as provided in Section II.B of the Plan, with respect to Professional Claims, or to the

extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the

District or its agent will pay to each holder of an Allowed Administrative Claim, in full satisfaction,

release and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim

on the later of (i) the Effective Date, (ii) the date on which such claim becomes an Allowed

Administrative Claim, or as soon thereafter as is practicable and (iii) the date funds are to be

available for that purpose under section 1.2.4.3 of the ASA.

From and after the Sale Closing Date, and except for Professional Claims, creditors

holding claims that relate to or arise from, any of the PHH Assumed Current Liabilities and Covered

Claims shall only have a right to collect payment on account of such claims from PHH and the

Administrative Claims Fund, and the District shall thereafter be relieved of any and all liability for

the payment of any and all claims relating to, or arising from, any of the PHH Assumed Current

Liabilities or Covered Claims.

### (2)    The Alternative Transaction.

#### (a)    Select Administrative Note.

The Plan provides that, in the event of the Alternative Transaction, the Select Administrative Note shall be restructured in the following manner:

1.    No payments on the Select Administrative Note shall be due or payable for a period of two years following the Effective Date of the Plan;

2.    The District shall pay to the holder of the Select Administrative Note, interest only, calculated at 5% per annum, for a period of three years, following the two-year payment moratorium provided for in the immediately preceding subparagraph;

3.    The District shall amortize the remaining principal balance of the Select Administrative Note in equal monthly installments during the sixth through tenth year following the Effective Date of the Plan; and

4.    The restructured Select Administrative Note shall be secured by a first position senior lien on (a) the MAB, (b) to the extent not inconsistent with any liens granted to the holders of the Bonds, the excess land portion of the San Jacinto Property.

It is the District's understanding that Select consents to this treatment.

#### (b)    Other Administrative Claims.

Except as provided in Section II.B of the Plan, with respect to Professional Claims, or to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release, and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date of the Plan, (ii) the date on which such claim becomes an Allowed Administrative Claim or as soon thereafter as is practicable, and (iii) to the extent that such Allowed Administrative Claim is an Ordinary Court Administrative Claim, such claim shall be paid in full and honored by the District in the ordinary course of business in accordance with the terms and conditions of the particular transaction and any agreements relating thereto.

b.      **Professional Claims.**

Professional Claims are claims of professionals for services rendered or expenses incurred in rendering such services in the Chapter 9 Case or incident to the Plan.

Section II.C. of the Plan provides that, pursuant to section 943(a)(3) of the Bankruptcy Code, all Professional Claims must be disclosed and be reasonable and that, upon being deemed reasonable, the District or its agent will pay to each holder of a Professional Claim, in full satisfaction, release and discharge of such claim, cash in an amount equal to that portion of such claim that is deemed reasonable, except to the extent such claim previously has been paid or satisfied.

The District has paid the fees of its bankruptcy counsel and other professionals, as well as the fees of the bankruptcy counsel and financial advisor of the Committee, on a regular basis during the Chapter 9 Case.  Payments/invoices from the petition date through September 30, 2009 are summarized as follows:

| Professional | Dates of Employment | Fees/Expenses Invoice Through September 30, 2009 |
|---|---|---|
| Stutman, Treister & Glatt (Bankruptcy Counsel to the District) | 12/13/07 – present | $2,984,304 |
| Pachulski, Stang, Ziehl & Jones (Counsel to Committee) | 4/7/08 - present | $288,007 |
| Shattuck Hammond (Financial Advisors to District) | 12/13/07 - present | $495,623 |
| The Piera Group (Special Transaction Advisor to District) | 7/09 - present | $678,559 |
| Alvarez & Marsal Healthcare (Financial Advisors to District) | 4/7/08 - present | $403,951 |

The District has reserved the right to object to the reasonableness of the fees and expenses of the PSZ&J and Alvarez firms (including the fees and expenses previously paid).

          c.       **Bar Date For Assertion Of Requests For Payment Of Administrative Claims (Other Than Ordinary Course Administrative Claims) And Professional Claims.**

Section II.C. of the Plan provides that all requests for approval of Administrative Expense and Professional Claims must be filed with the Bankruptcy Court and served upon the District no later than thirty (30) days after the date on which the Notice of Effective Date is mailed pursuant to the Plan.

*Any request for payment of an Administrative Claim, and any request for a finding that a Professional Claim is reasonable, that is not timely filed by that deadline will be forever barred, and holders of such claims will be barred from asserting such claims in any manner against the District.*

      **2.**       **Classes  1A and 1B (Claims of the Holders of Series 1993 and 1996 Bonds.).**

The Plan classifies the claims of holders of the Series 1993 Bonds in Class 1A, and the claims of holders of the Series 1996 Bonds in Class 1B.

If the Two Hospital Transaction is Consummated, there will be paid to the Indenture Trustee for the Bonds, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1A and Class 1B Claims, as more specifically described in section 1.2.1 of the ASA.

If the Alternative Transaction is Consummated, the Allowed Class 1A and Class 1B Claims shall be fully satisfied as follows:

The District will use the net sale proceeds to partially pay, in the manner required by the Indenture, Allowed Class 1A and Class 1B Claims.  As to the balance owing on such claims, the ASA requires PHH to:

(i)      obtain, under provisions of the Indenture, the consent of the holders of Allowed Class 1A and 1B claims to a modified payment schedule under the Existing Bonds, which includes the payment of interest only for three (3) years from the Sale Closing Date, with principal re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance ("Payment Forbearance"), after the Sale Closing Date of any claims, actions or other enforcement against the District based on the failure of the District to meet any covenants (the

"Bond Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond Documents")based upon the financial performance or status of the District and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply) including, without limitation, covenants related to the required net income available for debt service or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Case) ("Covenant Forbearance").

(ii)    enter into a new secured loan agreement (the "Alternative Loan") with the District by which PHH will advance, on the District's behalf, funds necessary to pay off the balance of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall become a new loan on substantially the same terms as the Bond Documents, including the Bond Covenants (as modified as set forth in subparagraph (i) above, including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by the "Additional Collateral" defined below:

(A) a second position deed of trust (junior to the modified Select Administrative Note lien) on the MAB and the excess land portion of the San Jacinto Property; and

(B) a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through the District's fiscal year ending June 30, 2012.  In the event that the District is in default of the Bond Covenants as of the end of the District's fiscal year ending June 30, 2011, PHH may, as its sole remedy for a covenant default other than a payment default, require that the District engage a nationally recognized manager ("Manager") with experience in operating hospitals similar to HVMC.  The District will consult with PHH in the selection of such Manager, and such Manager shall be reasonably acceptable to PHH, which acceptance shall not be unreasonably withheld, delayed, or conditioned.  PHH will be entitled to monitor the performance of the Manager and receive monthly reports on the Manager's progress and the financial condition of the District.  The forgoing notwithstanding, the parties understand that MVMC may be competitive with HVMC and that the sharing of certain information may violate federal or state antitrust or unfair competition laws.

3.    **Class 2A (General Unsecured Creditors).**

The Plan classifies most general unsecured claims in Class 2A.

As of the bar dates established by prior orders of the Bankruptcy Court, proofs of claim asserting general unsecured claims totaling approximately $23 million, plus "unknown," "unliquidated" or "to be determined" amounts, excluding claims classified in Class 2B as described below, were timely filed with the Bankruptcy Court.  The District believes that when the objection to claims process has been fully completed, there will be no more than approximately $22 million of allowed general unsecured claims.

If the Two Hospital Transaction is Consummated, the holders of Allowed Claims in Class 2A will receive their pro rata share of $17 million or such increased or reduced amount that will be available for payment of such Claims, as further detailed in this sentence, which distributions shall be paid in four equal annual installments without interest, with the first payment to be made on the first anniversary of the Sale Closing Date, and on each anniversary thereafter; *provided*, *however*, that such $17 million may either be (a) increased by any portion of the $4 million that PHH will deposit into the PHH Administrative Claims Fund after complying with the procedures set forth in Section 1.2.4.3 of the ASA; or (b) reduced, at the time and in the manner set forth in Section 1.2.4.3 of the ASA, by any amount in excess of the $4 million that PHH may be required to deposit into the PHH Administrative Claims Fund to pay Allowed Administrative Claims in full.

If the Alternative Transaction is consummated, the holders of Allowed Claims in Class 2A, as augmented by the Allowed Claims in Class 2B, will receive their pro rata share of any Class 2A Annual Cash Payment.

As more fully set forth in the Plan and ASA, the Class 2A Annual Cash Payment consists of (i) the proceeds from the sale of HVMC, SNF, the Orchard Property and/or the San Jacinto Property and their related assets, after all senior obligations are satisfied upon the sale of such assets, and/or (ii) Excess Cash, consisting of the District's remaining cash, if any, at the end of each fiscal year, after accounting for, among other things, the payment and/or accrual of ordinary course operating expenses, debt service, including amounts that may be owed to the Bondholders

1  and to Select, and amounts set aside as cash reserves for capital expenditures as well as other

2  anticipated expenditures, in reasonable amounts, as necessary.

3       The District has prepared projected financial statements that assume that the Alternate

4  Transaction is consummated, which projected financial statements are attached here as <u>Exhibit D</u>.

5  See Exhibit D to ascertain the amount of the Class 2A Annual Cash Payment projected for calendar

6  years 2010, 2011 and 2012.

7       The Class 2A Annual Cash Payment will be distributed on an annual basis, to the

8  extent such proceeds are available, no later than 90 days after receipt of audited financial statements

9  commencing on the one year anniversary of the Effective Date and continuing through the earlier of:

10  (1) payment of all Allowed Class 2A Claims in full, without interest, or (2) the time at which the

11  Class 2A Annual Cash Payments have aggregated $17 million.

12  **4.  Class 2B (General Unsecured Claims of Hemet Community Medical
       Group, Menifee Valley Community Medical Group, and LHIO And
13      Claims of Constituent Members Thereof).**

14       KM Strategic Management, Inc.; HCMG; Menifee Valley Medical Group; LHIO,

15  LLC have filed proofs of claims, identified as claim numbers 134, 135, 136 and 168 in the

16  Bankruptcy Court's official registry of claims, asserting alleged claims against the District relating to

17  certain alleged breaches and/or rejections by the District.  The Plan classifies these claims, and any

18  claims of constituent members of the forgoing that are derivative of such claims, in Class 2B.  PHH

19  contends that these claims total approximately $55 million.

20       <u>If the Two Hospital Transaction is consummated</u>, upon the Sale Closing Date, PHH

21  will assume or otherwise satisfy all obligations owed to holders of Allowed Class 2B Claims, with

22  the District being fully and completely released from any liability thereunder held harmless from

23  such Claims by PHH, as set forth in section 1.2.1(v) of the ASA.

24       <u>If the Alternative Transaction is consummated</u>, the holders of Allowed Claims

25  classified into Class 2B shall receive the same treatment as the holders of Allowed Class 2A Claims,

26  with the District reserving the right to object to the allowability of any and all Class 2B Claims.

27

28

**5.    Class 2C (Interests of Defined Benefit Plan Participants).**

Under Section 4.8 of the "Valley Health System Retirement Plan Adopted January 1, 1971, as amended, the VHS Retirement Plan was frozen effective May 4, 1999, such that the "Accrued Benefit" of each plan participant was frozen as of this date, and participants have accrued no benefits under the VHS Retirement Plan since such date.

Under the Plan, Defined Benefit Plan Participants will be entitled to the same rights and benefits to which such participants are currently entitled under the VHS Retirement Plan and the MetLife Group Annuity Contract, and such participants shall have no recourse to the District or to any assets of the District, and shall not be entitled to receive any distributions under the Plan. Instead, all unallocated amounts held by MetLife Group, pursuant to the VHS Retirement Plan and the MetLife Group Annuity Contract, will continue to be made available to provide retirement benefits for participants in the manner indicated under the provisions of the VHS Retirement Plan and the MetLife Group Annuity Contract. Accordingly, the treatment of Allowed Class 2C Claim holders set forth in the Plan does not affect any legal, equitable or contractual rights to which the VHS Retirement Plan participants are entitled.

**B.    Treatment Of Executory Contracts And Unexpired Leases.**

**1.    Generally.**

The Bankruptcy Code empowers debtors, subject to the approval of the Bankruptcy Court, to assume or reject the debtors' executory contracts and unexpired leases. An "executory contract" generally means a contract under which material performance other than the payment of money is due by the parties.

If an executory contract or unexpired lease is rejected by the debtor, the rejection operates as a prepetition breach of such agreement. If an executory contract or unexpired lease is assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and damages arising for any subsequent breach of the agreement are treated as administrative expenses.

**2.    Assumption.**

As detailed in the ASA, PHH must notify the District in writing of any executory contract or unexpired lease that PHH has elected to assume. Subject to all conditions set forth in the

1   ASA, the District will include such executory contracts and unexpired leases in the

2   Assumption/Assignment Motion that will seek authority to assume and immediately assign such

3   executory contracts and unexpired leases to PHH.

4           **a.**      **Cure Payments and Future Performance.**

5           After the provision of notice and the opportunity for a hearing on the

6   Assumption/Assignment Motion, the Bankruptcy Court will resolve any disputes regarding: (a) the

7   amount of any cure payment to be made in connection with the assumption of any contract or lease;

8   (b) the ability of PHH to provide "adequate assurance of future performance" within the meaning of

9   section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (c) any other

10   matter pertaining to such assumption and assignment.

11       **3.**    **Rejection.**

12           The District will file the Rejection Motion, pursuant to section 365(a) of the

13   Bankruptcy Code, to seek approval and authorization for the rejection of such executory contracts

14   and unexpired leases that PHH has not elected to assume, which the District, in the exercise of its

15   business judgment, deems warranted.  In the Two Hospital Transaction scenario, the District

16   anticipates rejecting any executory contract and unexpired lease that is not needed for it to continue

17   operating as a local healthcare district.  In the Alternative Transaction scenario, the District

18   anticipates that the Rejection Motion will be narrower since the District would not want to reject any

19   beneficial executory contract or unexpired lease that supports HVMC and the other assets retained

20   by the District after the Sale Closing Date of the Alternative Transaction.

21           **a.**      **Deadline For The Assertion Of Rejection Damage Claims;**
                 **Treatment Of Rejection Damage Claims.**

22
        All proofs of Claims arising from the rejection of executory contracts or unexpired

23   leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30)

24   days after the date on which notice of entry of the order approving the rejection is mailed.  Any

25   Claim for which a proof of Claim is not filed and served within such time will be forever barred and

26   shall not be enforceable against the District or its assets, properties, or interests in property.  Unless

27

28

1  otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein

2  shall be classified into Class 2A and treated accordingly.

3  **C.    Means For Execution And Implementation Of The Plan.**

4      **1.    If Public Approval Is Obtained.**

5          If Public Approval is obtained and the Two Hospital Transaction is consummated,

6  PHH will provide the following combination of cash and assumption of liabilities to enable the

7  District to implement the Plan and satisfy its obligations under the Two Hospital Transaction

8  scenario set forth in the Plan:

9          (1)    An amount of cash sufficient to pay the Allowed Claims in Classes 1A and 1B

10  in full after application of any reserves held internally by the District for payment of interest or

11  principal on Class 1A and Class 1B Claims.

12          (2)    Take responsibility for the Select Administrative Note, and holding the

13  District harmless with respect thereto.

14          (3)    Take responsibility for the PHH Assumed Current Liabilities, estimated at

15  approximately $31 million as of August 31, 2009, and indemnification of the District with respect

16  thereto.

17          (4)    Payment in full of Administrative Claims that are not part of the PHH

18  Assumed Current Liabilities from the $4 million PHH Administrative Claims Fund, or such

19  additional monies as are needed to pay Allowed Administrative Claims, to be funded by PHH

20  pursuant to section 1.2.4 of the ASA.

21          (5)    Contribute $17 million towards payment of Allowed Class 2A Claims in four

22  equal annual payments, with the first distribution to be made on the first anniversary of the Sale

23  Closing Date; provided however, that to the extent the PHH Administrative Claims Fund is

24  insufficient to pay all of the Allowed Administrative Claims in full, PHH may be obligated to

25  advance any such additional amounts as are necessary to pay all Allowed Administrative Claims,

26  and any amount so advanced shall be deducted dollar for dollar from PHH's obligation to contribute

27  $17 million for the payment of Allowed Class 2A General Unsecured Claims while, conversely, to

28

the extent the PHH Administrative Claim Fund is not fully needed to pay Allowed Administrative Claims, such excess shall be added to the $17 million to be paid pro rata to Class 2A.

(6)     Take responsibility for those claims designated in the Bankruptcy Court docket by numbers 134, 135, 136 and 168 and indemnify and hold the District harmless with respect thereto.

(7)     Accept an immediate assignment of the contract and leases that it notifies the District to assume pursuant to the ASA.

(8)     Pay the severance payments owing to those District employees to whom PHH does extend an offer of employment consistent with the terms set forth in the ASA or its Schedules.

(9)     Provide $400,000 per year to the District, commencing on the Sale Closing Date, for a period of five (5) years for use by the District, among other things, to pay its ongoing operating expenses, including payroll and professional fees, and to fund any necessary elections, monitor PHH's performance under the ASA, evaluate, analyze and object to creditor claims and resolve any disputes concerning creditor claims, and make distributions to creditors under this Plan.

(10)     Pay, for a period of five (5) years from the Sale Closing Date, the premiums for (a) the District's directors and offices tail errors and omissions insurance, which is currently estimated at $450,000 and (b) the general liability and medical malpractice tail insurance..

## 2.     If Public Approval Is Not Obtained.

If Public Approval is not obtained, the District and PHH will seek to close the Alternative Transaction, which contemplates a cash purchase price of approximately $29 million, subject to certain deductions, as described below in (i)-(iii), for the transfer to PHH of substantially all of the operating assets used in connection with Menifee, but the District will retain most of its pre-closing liabilities and non-operating assets such as cash, allowed receivables and causes of action.  PHH will pay: (i) cure amounts up to $1 million required to be paid as a condition to assuming any of the District's contracts that PHH has elected to take an assignment of, the amount paid reducing dollar for dollar that $29 million purchase price; (ii) severance payments that may be owed to Menefee employees to whom PHH does not extend an offer of employment; and (iii) PTO payouts owing to the District's employees who are not hired by PHH or who are hired by PHH but

1    do not consent to the transfer of such PTO obligations to PHH.

2    <u>Use of Net Sale Proceeds to Partially Satisfy the Bonds</u>

3    The District will deliver to the Indenture Trustee the net sale proceeds to partially pay

4    Allowed Class 1A and Class 1B Claims, as provided for in the Indenture.  As to the balance owing

5    thereafter on account of the Bonds, the ASA requires PHH to:

6    (i)    obtain under provisions of the Indenture the consent of the holders of

7    Allowed Class 1A and 1B Claims to Payment Forbearance and Covenant Forbearance; or

8    (ii)    enter into the Alternative Loan secured by the Additional Collateral.

9    The Covenant Forbearance shall remain in effect through the District's Fiscal Year

10   ending June 30, 2012.  In the event that the District is in default of the Bond Covenants as of the end

11   of the District's Fiscal Year ending June 30, 2011, PHH may, as its sole remedy for a Covenant

12   Default other than a payment default, require that the District engage a Manager.  The District shall

13   consult with PHH in the selection of such Manager, and such Manager shall be reasonably

14   acceptable to PHH, which acceptance shall not be unreasonably withheld, delayed or conditioned.

15   PHH shall be entitled to monitor the performance of the Manager and receive monthly reports on

16   Manager's progress and the financial condition of the District.  The foregoing notwithstanding, the

17   parties understand that Menifee may be competitive with Hemet and that the sharing of certain

18   information may violate federal or state antitrust or unfair competition Laws.

19   In the event that the District is in default of the Bond Covenants as of the end of the

20   District's fiscal year ending June 30, 2012, PHH shall have rights of enforcement in the same manner

21   as provided in the Bond Documents.

22   Without limiting the preceding, the Covenant Forbearance shall not include a

23   forbearance of any covenants restricting further encumbrances by District (excluding any

24   encumbrances in favor of PHH, encumbrances as permitted in the Bond Documents, or otherwise as

25   contemplated by this Agreement), transfer of the District's assets or merger or restructuring of the

26   District (except in connection with the District's Chapter 9 Proceeding and otherwise consistent with

27   the terms of this Agreement).  The Alternative Loan shall be provided pursuant to documents which,

28   to the extent reasonably applicable, are consistent with the terms of the Bond Documents, and

1    security and other provisions which are customary for commercial real property secured loans (to the

2    extent not inconsistent with the applicable terms under the Bond Documents or this Agreement).

3         Provided that the District is not in default of payments and the Bond Covenants under

4    the Alternative Loan, the Additional Collateral shall be released upon issuance of the District's

5    audited financial statements for the fiscal year ended June 30, 2012.

6    <u>Restructuring of Select Administrative Note</u>

7         The District is advised that Select has agreed, in the event Public Approval is not

8    obtained, to restructure the Select Administrative Note by granting a moratorium for twenty four

9    months, being paid interest only for the next thirty-six months, and accepting payment of principal

10   and interest in equal monthly payments over the next sixty months.  However, the repayment shall

11   be secured by a first priority lien on the MAB and, to the extent consistent with the Indenture, on the

12   excess portion of the San Jacinto Property.

13   <u>Payments to Classes 2A and 2B</u>

14        After consummation of the Alternative Transaction, the District will continue to

15   operate HVMC and HVHC and to own the MAB (subject to a lien in favor of Select), the San

16   Jacinto Property, and the Orchard Property subject to PHH's right to enter into a commercially

17   reasonable 35-year ground lease.  On the Sale Closing Date, the District will have the cash on hand

18   and cash to be generated by collection of accounts receivable of HVMC and the SNF and their future

19   operations, with said cash to be used to pay all Allowed Administrative Claims, the restructured

20   Select Note and any payments remaining due on account of the Allowed Class 1A and Class 1B

21   Claims.

22        All Excess Cash to the extent, if any, available, will be used to make the Class 2A

23   Annual Cash Payments to holders of Allowed Claims in Classes 2A and 2B until the first to occur of

24   the Claims in such Classes being paid in full, without interest, or all Class 2A Annual Cash

25   Payments aggregating $17 million.  Also, to the extent that HVMC, HVHC, the Orchard Property

26   and/or the San Jacinto Property and their related assets are leased or sold, the net proceeds from

27   those transactions will be also be used to fund all of the foregoing, including the Class 2A Annual

28   Cash Payment to the extent of Excess Cash.

3.    **Rights of Action.**

The Plan provides, pursuant to section 1.6.12 of the ASA, that, in the Two Hospital Transaction scenario, all of the District's Claims, causes of action, rights of recovery, rights of offset, recoupment rights to refunds and similar rights are transferred to PHH with certain limited exceptions set forth in the ASA or schedules thereto.  In the Alternative Transaction scenario, all of the District's claims, choses in action, rights of recovery, rights of offset or recoupment, rights to refunds and similar rights are retained by the District, with limited exceptions related to the transfer of MVMC assets and the assignment of related agreements.

The failure to list in this Disclosure Statement any potential or existing Right of Action retained by the District under the Alternative Transaction is not intended to and shall not limit the rights of the District to pursue any such action.  Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in this Plan, the District expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of this Plan or the Effective Date.  In addition, the District expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the District is a defendant or an interested party.

**D.    Distributions.**

The District may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to the Plan, which agents may serve without bond.  The District may provide reasonable compensation to any such agent(s) without further notice or Court approval. All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the District or its agents, unless the District has been notified by such holder in a writing that contains an address for such holder different from the address reflected in its books and records.  All distributions to the Bondholders shall be made in accordance with the operative documents that govern the Bonds.

1. **Undeliverable Distributions.**

*Holding Of Undeliverable Distributions*.  If any distribution to any holders is returned to the District or its agent as undeliverable, no further distributions shall be made to such holder unless and until the District is notified in writing of such holder's then-current address. Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed Property."

*Unclaimed Property*.  If any entity entitled to receive distributions pursuant to the Plan does not present itself on the Effective Date or on such other date on which such entity becomes eligible for distribution, such distributions shall be deemed to be "Unclaimed Property."  Unclaimed Property shall be set aside and held in a segregated account to be maintained by the District pursuant to the terms of the Plan.

On the first anniversary of the Effective Date, the District will file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of holders of the Unclaimed Property; the District otherwise will not be required to attempt to locate any such entity.  On the second anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in the District.

2. **Timeliness Of Payments.**

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within fourteen (14) days after the dates specified in the Plan.  Whenever any distribution to be made under the Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been made on the date due.

3. **Compliance With Tax Requirements.**

The District will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.  In connection with each distribution with respect to which

the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding is required, the District will file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the District, the District at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

### 4.    Time Bar To Cash Payments.

Checks issued by the District on account of allowed claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the District by the holder of the allowed claim with respect to which such check originally was issued.  Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date.  After such date, all claims in respect of voided checks will be discharged and forever barred and the District will retain all moneys related thereto.

### 5.    No *De Minimis* Distributions.

Notwithstanding any other provision of the Plan, no payment of less than ten dollars ($10.00) will be made by the District on account of any allowed claim.

### 6.    No Distributions On Account Of Disputed Claims.

No distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

**7.    No Postpetition Accrual.**

Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, the District will not be required to pay to any holder of a claim any interest, penalty or late charge accruing with respect to such claim on or after the Petition date.

**8.    Insurance Proceeds.**

All distributions under the Plan will be net of any insurance proceeds actually received in payment of any Claim that otherwise is allowed and entitled to a distribution.

**E.    Disputed Claims.**

**1.    Claims Objection Deadline; Prosecution Of Objections.**

The District will have the right to object to the allowance of claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.  Unless otherwise ordered by the Bankruptcy Court, the District must file and serve any such objections to claims by not later than one hundred and eighty (180) days after the Effective Date (or, in the case of claims lawfully filed after the Effective Date, by not later than one hundred and eighty (180) days after the date of filing of such claims).

**2.    Reserves, Payments, And Distributions With Respect To Disputed Claims.**

At such time as a disputed claim becomes an allowed claim, in whole or in part, the District or its agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Such distributions, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy court allowing such disputed claim becomes a Final Order (or such other date as the claim becomes an allowed claim), but in no event more than thirty (30) days thereafter.  Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

**F.    Continuing Jurisdiction Of The Bankruptcy Court.**

The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range of matters relating to the Chapter 9 Case, the Plan, and other related items.  Readers are encouraged

1    to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-

2    Effective Date jurisdiction.

3    **VI.    CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

4    **Because the law with respect to confirmation of a plan of adjustment is complex,**

5    **creditors concerned with issues regarding confirmation of the Plan should consult with their**

6    **own attorneys and financial advisors.**  The following discussion is intended solely for the purpose

7    of providing basic information concerning certain confirmation issues.  The District cannot and does

8    not represent that the discussion contained below is a complete summary of the law on this topic.

9    Many requirements must be met before the Bankruptcy Court may confirm the Plan.

10    Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by

11    the requisite number of creditors, and whether the Plan is in the "best interests" of creditors.  These

12    requirements, however, are not the only requirements for confirmation, and the Bankruptcy Court

13    will not confirm the Plan unless and until it determines that the Plan satisfies <u>all</u> applicable

14    requirements, including requirements not referenced in this Disclosure Statement.

15    **A.    Voting And Right To Be Heard At Confirmation.**

16    **1.    Who May Support Or Object To Confirmation Of The Plan?**

17    Any party in interest may support or object to the confirmation of the Plan.  Even

18    entities who may not have a right to vote (*e.g.*, entities whose claims are classified into an

19    unimpaired Class) may still have a right to support or object to confirmation of the Plan.  (*See*

20    Section I.C.2 for information regarding the applicable deadlines for objecting to confirmation of the

21    Plan).

22    **2.    Who May Vote To Accept Or Reject The Plan?**

23    A creditor generally has a right to vote for or against the Plan if its Claim is both

24    Allowed for purposes of voting and is classified into an impaired Class.  Generally, a claim is

25    deemed allowed if a proof of claim was timely filed, provided, however, that if an objection to a

26    claim has been filed, the claimant cannot vote unless the Bankruptcy Court, after notice and hearing,

27    either overrules the objection or allows the claim for voting purposes.  Thus, **the definition of**

28

**"Allowed Claim" used in the Plan for purpose of determining whether creditors are entitled to receive distributions is different from that used by the Bankruptcy Court to determine whether a particular claim is "allowed" for purposes of voting. Holders of claims are advised to review the definitions of "Allowed," "Claim," and "Disputed" set forth in Section I.A. of the Plan to determine whether they may be entitled to vote on, and/or receive distributions under, the Plan.**

### 3.    Who Is Not Entitled To Vote?

The holders of the following types of claims are not entitled to vote on the Plan: (a) claims that have been disallowed; (b) claims that are subject to a pending objection and which have not been allowed for voting purposes; (c) claims that are not impaired; and (d) Administrative Expense Claims since such claims are not placed in Classes and are required to receive certain treatment specified by the Bankruptcy Code.

### 4.    Vote Necessary To Confirm The Plan.

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cramdown" with respect to any dissenting impaired Class.

A Class of claims is considered to have accepted the Plan when more than one-half in number and at least two-thirds in dollar amount of the claims that actually voted in that Class have voted in favor of the Plan.

## B.    The "Best Interests" Test.

The Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to section 943(b)(7) of the Bankruptcy Code, which in the chapter 9 context means that treatment under the Plan must be better than the only alternative available, which is dismissal of the case. Dismissal permits every creditor to fend for itself in the race to the courthouse, since a court supervised liquidation under chapter 7 is not a permissible chapter 9 alternative.

1    The District submits that the Plan is in the best interests of all creditors because

2    significant payments will be made to all impaired Classes under the Two Hospital Transaction, and

3    at least material payments are expected to be made to all impaired Classes under the Alternative

4    Transaction.  *See* District's Projected Financials at Exhibit D hereto.  The Plan devotes all or nearly

5    all of the consideration obtained on account of those assets that the District is legally entitled to sell

6    to the repayment of the District's creditors.  The District has obtained a fair price for its assets,

7    whether under the Two Hospital Transaction and the Alternative Transaction.  In the case of the Two

8    Hospital Transaction, the Plan will result in the satisfaction of the Bonds, the payment of

9    administrative claims, and payment of a substantial amount on account of allowed unsecured claims,

10   albeit over time.

11   In the case of the Alternative Transaction, the Plan provides a substantial payment to

12   the Bondholders, and a mechanism to satisfy the remaining bonds.  This, with the agreed upon

13   restructuring of the Select Administrative Note, will permit the District to continue to operate

14   HVMC and HVHC and create the opportunity for the District to generate excess cash, if any, which,

15   under the Plan, will be applied to satisfy general unsecured claims.  In short, by implementing the

16   ASA, the District will be able either to convey or preserve a going concern.  As a going concern, the

17   value of the District's assets is enhanced by several factors, including the experience and talent of

18   employees, the value of assembled contracts and equipment, and the connections of the business to

19   the community and other providers.  The Plan allows the District to realize that value, and distribute

20   it to its creditors.

21   In contrast, in the absence of the Plan, the District's creditors would be left to "fend

22   for themselves."  Individual creditor collection actions will likely aggregate, through suits and

23   attachments, to make continued operation of the Hospitals untenable, thus eliminating the value of

24   the District's assets as a going concern.  Without operating health care facilities, the value of the

25   District's assets would consist of only the value of empty buildings, raw land and used equipment.

26   This value would likely not be distributed pro rata.  Instead, those creditors most able to pursue

27   litigation most quickly would benefit at the expense of others, and, indeed, the total value may be

28   insufficient to repay the Bonds.

1      Moreover, while the Plan preserves the availability of healthcare services to patients

2   in the District, whether under the auspices of PHH in the Two Hospital Transaction, or PHH and the

3   District in the Alternative Transaction, the chaotic free-for-all that would occur in the absence of the

4   Plan and ensuing possibility that operations will cease as described above would work to the severe

5   detriment of the District's community.

6   **C.      Feasibility.**

7      To satisfy Bankruptcy Code section 943(b)(7)'s requirement that the Plan be feasible,

8   the District must demonstrate the ability to make the payments required under the Plan and still

9   maintain its operations at the level that it selects as necessary to continued viability of the health care

10  district.

11     The District submits that the Plan is feasible.  Under the Two Hospital Transaction,

12  the ability to make the payments required by the Plan turns on the ability of PHH to close that

13  transaction if Public Approval is obtained, and the ability of PHH to make the lesser payments if

14  Public Approval is not obtained and the Alternative Transaction closes.  No later than noon on

15  December 4, 2009, PHH must disclose to the District's general outside counsel under section 6.8 of

16  the ASA that it has the financial commitments necessary to close both transaction.

17     The District has negotiated a fair price for sale of substantially all of its assets, and

18  will distribute the consideration received as set forth in the Plan.  The District will continue in a

19  limited fashion after consummating the Two Hospital Transaction, which limited operations will be

20  funded by future payments from PHH.  Under the Alternative Transaction, the District will continue

21  to operate HVMC and HVHC.  The District's management and financial advisor have prepared the

22  projections attached as Exhibit D demonstrating that the District will be able, after the Effective

23  Date, to meet its ongoing operating expenses and service its commitments under the Plan. The

24  District submits that it will be able to make all payments required pursuant to the Plan while

25  maintaining its operations at the level that is necessary to continue its viability as a local healthcare

26  district and that, as a result, the Plan is feasible within the meaning of section 943(b)(7).

27

28

**D.    "Cramdown."**

The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired Class of claims accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (a) is "fair and equitable" and (b) does not discriminate unfairly with respect to each Class of claims that is impaired under and has not accepted the Plan.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured Class of claims receives payment in full for its allowed claims, no holder of allowed claims in any Class junior to that Class may receive or retain any property on account of such claims. The "fair and equitable" standard also has been interpreted to prohibit any class senior to a dissenting Class from receiving under a Plan more than 100% of its allowed claims. The District believes that the Plan satisfies the "fair and equitable" standard because, among other things, no classes junior to the classes of unsecured claims are receiving or retaining any property under the Plan, and the holders of Allowed Claims in Classes 2A and 2B are not receiving more than 100% payment of their allowed claims.

The requirement that the plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The District does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

**As noted above, the District has reserved the right to request the Bankruptcy Court to confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(a) and (b)(2)(b). The District also has reserved the right to modify the Plan to the extent, if any, that confirmation of the Plan under sections 943 and 1129(b) of the Bankruptcy Code requires such modifications.**

**E.      Effective Date.**

      **1.      Conditions To The Occurrence Of The Effective Date.**

            The Plan will not become effective and operative unless and until the Effective Date occurs.  Section XII of the Plan sets forth certain conditions to the occurrence of the Effective Date. The District or PHH may waive in whole or in part the condition regarding agreements and instruments contemplated by, or to be entered into pursuant to, the Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

            The Effective Date will occur on the first Business Day after which the conditions set forth in Section XII.B. of the Plan are satisfied or waived; *provided* that the Effective date must occur by no later than on year after the Confirmation Date.

      **2.      Non-Occurrence Of Effective Date.**

            The Plan provides that, if confirmation occurs but the Effective Date does not occur within the period authorized by the Plan (one year after the Confirmation Date), upon notification submitted by the District to the Bankruptcy Court, (a) the Confirmation Order shall be vacated, (b) no distributions under this Plan shall be made, (c) the District and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all of the District's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the District or any other entity or to prejudice in any manner the rights of the District or any entity in any further proceedings involving the District.  The failure of the Effective Date to occur, however, will not affect the validity of any order entered in the Chapter 9 Case other than the Confirmation Order.

**F.      Effect Of Confirmation.**

            Section X of the Plan provides that confirmation of the Plan and the occurrence of the Effective Date will have a number of important and binding effects, some of which are summarized

below.  Readers are encouraged to review Section X of the Plan carefully and in its entirety to assess

the various consequences of confirmation of the Plan.

### 1.    Discharge Of The District.

Pursuant to section 944 of the Bankruptcy Code, on the Effective Date. the District

will be discharged from all debts (as defined in the Bankruptcy Code) of the District and claims

against the District other than (a) any debt specifically and expressly excepted from discharge by the

Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of the

Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

The rights afforded in the Plan and the treatment of claims will be in exchange for

and in complete satisfaction, discharge and release of all claims of any nature whatsoever arising on

or before the Effective Date, known or unknown, including any interest accrued or expenses incurred

thereon from and after the petition date, whether against the District or any of its properties, assets,

or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all claims

against the District will be deemed to be satisfied, discharged and released in full.

### 2.    Injunction.

The Plan provides that all entities who have held, hold or may hold pre-Effective

Date claims will be permanently enjoined, from and after the Effective Date, from (a) commencing

or continuing in any manner any action or other proceeding of any kind with respect to any such pre-

Effective Date claim against the District; (b) enforcing, attaching, collecting, or recovering by any

manner or means any judgment, award, decree or order against the District with respect to such pre-

Effective Date claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind

against the District or its property or interests in property; and (d) asserting any right of setoff,

subrogation or recoupment of any kind against any obligation due to the District with respect to any

such pre-Effective Date claim, except as otherwise permitted by section 553 of the Bankruptcy

Code.

3.    **Term Of Existing Injunctions And Stays.**

The Plan provides that all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of claims against the District should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A.    The Two Hospital Transaction.

The primary risk involved in the Two Hospital Transaction scenario is the risk that PHH will not be able to obtain the financing necessary to close the sale under the ASA. Section 6.8 of the ASA requires PHH to demonstrate its financial ability to close the Two Hospital Transaction by no later than December 4, 2009, subject to an opportunity to cure as set forth in section 6.8 of the ASA. PHH is a newly formed entity created solely for the purposes of effectuating the two transactions contemplated by the Plan. Hence, it does not have an established track record.

It is also possible that Public Approval will not be obtained in the December 15 election. In that event the Two Hospital Transaction will not close.

An additional risk involved in the Two Hospital Transaction scenario is presented by the schedules required by the ASA, which include, among other things, a schedule of all of the District's executory contracts and unexpired leases. The schedules are expected to be voluminous and are presently being finalized. It is possible, though the District does not anticipate, that PHH will terminate the transaction under the ASA upon review of the schedules. In that event, the Plan will not be consummated.

There is also a risk that the amount of allowed administrative expenses, priority claims and general unsecured claims may be greater than currently estimated, in which case distributions to creditors may be reduced.

**B.      The Alternative Transaction.**

The risks described in connection with the Two Hospital Transaction also apply to the Alternative Transaction.  Section 9(a) of schedule 1.3.2 of the ASA requires PHH to demonstrate its financial ability to close the Alternative Transaction.  As in the case of the Two Hospital Transaction, if PHH is financially unable to perform its obligations under the ASA, the Plan will not be consummated.

Additional risks are posed in the Alternative Transaction scenario.  If Public Approval is not obtained, the District will still operate HVMC and HVHC.  As set forth in Exhibit D and described above, the District believes, but cannot assure, that it will operate on a cash flow positive basis after the Alternative Transaction.  Additionally, after the Alternative Transaction, the District will still be subject to $15-18 million in debt owed on account of the Bonds, and the approximately $8.4 million Select Administrative Note, in both cases, on modified terms.  Additionally, the District's remaining assets will be encumbered, as described in schedule 1.3.2 of the ASA, which will impair the District's ability to borrow to meet the forgoing obligations.  Finally, the HVMC building has considerable seismic compliance issues.  The District does not anticipate that it will generate cash sufficient to renovate HVMC, and obtaining continued waivers of seismic compliance cannot be assured.

There is also a risk that the amount of allowed administrative expenses, priority claims and general unsecured claims may be greater than currently estimated, in which case distributions to creditors may be reduced.

**VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

**A.      Introduction.**

The implementation of the Plan may have federal, state, local and foreign tax consequences to District and District's creditors.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

The discussion below addresses the potential material Federal tax consequences of

the Plan to the District and a hypothetical investor typical of the holders of Claims in this case.  This

discussion does not attempt to consider various facts or limitations applicable to any particular

creditor which may modify or alter the consequences described herein. A creditor may find that the

tax consequences of the Plan to such creditor differ materially from the tax consequences discussed

below because of such creditor's facts and circumstances.   This discussion does not address state,

local or foreign tax consequences.

The following discussion is based upon the provisions of the Internal Revenue Code

of 1986, as amended (the "Internal Revenue Code"), the regulations promulgated thereunder,

existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax

law, no assurance can be given that legislative, judicial or administrative changes will not be

forthcoming that would affect the accuracy of the discussion below.  Any such changes could be

material and could be retroactive with respect to the transactions entered into or completed prior to

the enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan are

uncertain due to the lack of applicable legal authority and may be subject to judicial or

administrative interpretations that differ from the discussion below.

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE
CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF
FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR
WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE
PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE
INTERNAL REVENUE CODE, AND (2) SUCH DISCUSSION IS WRITTEN IN
CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN.**

**CREDITORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX
ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO DEBTOR OF
THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL,
STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**B.      Federal Income Tax Consequences to Debtor.**

       **5.      Tax Consequences of Debtor's Sale of Assets.**

      The Plan provides for the sale of District assets to PHH pursuant to the terms of the ASA and the Plan.  A sale generally is a recognition event for federal income tax purposes and requires the seller to recognize and report gain or loss measured by the difference between the amount realized and the adjusted tax basis of the sold assets.  However, Internal Revenue Code section 115 provides that gross income does not include "income derived from . . .the exercise of any essential governmental function and accruing to a State or any political subdivision thereof . . ."  If Internal Revenue Code section 115 applies to the District's sale of assets under the ASA, any income or gain realized by the Debtor upon such sale would be excluded from the District's gross income.

      The District is a political subdivision of the State of California and therefore believes it meets one of the predicates for the application of Internal Revenue Code section 115.  The District also believes, but cannot provide assurances, that its sale of assets pursuant to the ASA and this Plan is an action that constitutes an "exercise of any essential governmental function" within the meaning of Internal Revenue Code section 115 because such sale is compelled by economic and financial necessity and is ancillary to the government function which it performed as a government subdivision.  Consequently, the District believes that any income or gain it may realize upon the sale of assets pursuant to the ASA is excluded from gross income and therefore will not give rise to a federal income tax liability.

      In addition to the exclusion provided by Internal Revenue Code section 115, there is considerable case law and administrative authority supporting the position that any income or gain of the District from the sale of its assets is not taxable under Internal Revenue Code section 11, which applies the income tax to corporations and entities treated as corporations for federal income tax purposes, or is not otherwise subject to federal income tax.  *State of Michigan v. United* States, 40 F.3d 817 (6th Cir. 1994); *Florida Residential Property and Casualty Joint Underwriting Assoc. v. United States*, 207 F.Supp.2d 1344 (N.D. Fla. 2002); Rev. Rul. 87-2, 1987-1 C.B. 18; Rev. Rul. 71-131, 1971-1 C.B. 28; Rev. Rul. 71-132, 1971-1 C.B. 29.  The District believes these authorities

1    significantly strengthen its position that any income or gain it realizes from the sale of assets

2    pursuant to the ASA and the Plan will not give rise to a federal income tax liability.

3            Based upon the foregoing, the District anticipates that it will not report for federal

4    income tax purposes any income, gain, loss, deduction or credit (or item thereof) realized or

5    recognized by it in connection with its sale of assets.  The District also anticipates that, in conformity

6    with past practice, it will not file any federal corporate income tax return with respect to the any tax

7    period in which the sale of assets falls.

8            **6.    Reduction Of Debtor's Indebtedness.**

9            As a result of the Plan's implementation, it is likely that not all creditors holding valid

10   Claims will be paid in full.  The District anticipates that any unpaid balance will be discharged

11   pursuant to Bankruptcy Code section 944.  (Any amount of potential discharged indebtedness for

12   federal income tax purposes will be referred to herein as a "Debt Discharge Amount").  In general,

13   the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must

14   include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent

15   that the Debt Discharge Amount exceeds any consideration given for such discharge.  No income

16   from the discharge of indebtedness is realized to the extent that payment of the liability being

17   discharged would have given rise to a deduction.

18           If a taxpayer is in a title 11 case and the discharge of indebtedness occurs pursuant to

19   a plan approved by the court, such discharge of indebtedness is specifically excluded from gross

20   income (the "Bankruptcy Exception").

21           Accordingly, the District should not be required to include in income any Debt

22   Discharge Amount as a result of Plan transactions.  If it were asserted or determined that, contrary to

23   the analysis described above, such Debt Discharge Amount does not qualify for exclusion based

24   upon the Bankruptcy Exception, Debtor would assert Internal Revenue Code section 115 as an

25   additional basis for excluding any Debt Discharge Amount from income.  Debtor would also take the

26   position that, pursuant to case law and administrative authority, any Debt Discharge Amount is not

27   taxable.  *State of Michigan v. United States*, 40 F.3d 817 (6th Cir. 1994); *Florida Residential*

28   *Property and Casualty Joint Underwriting Assoc. v. United States*, 207 F.Supp.2d 1344 (N.D. Fla.

1  2002); Rev. Rul. 87-2, 1987-1 C.B. 18; Rev. Rul. 71-131, 1971-1 C.B. 28; Rev. Rul. 71-132, 1971-1

2  C.B. 29.

3         The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by

4  the Debt Discharge Amount excluded from income on the basis of Bankruptcy Exception.  Tax

5  attributes are reduced in the following order of priority:  net operating losses and net operating loss

6  carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property

7  of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers.  Tax

8  attributes are generally reduced by one dollar for each dollar excluded from gross income, except

9  that general tax credits, minimum tax credits and foreign tax credits are reduced by 33.3 cents for

10  each dollar excluded from gross income.  Because attribute reduction (including the reduction of

11  NOLs) occurs after the determination of tax for the tax year of the discharge, attribute reduction

12  should not affect District's ability to use its tax attributes, if any, with to respect to income or gain

13  recognized on the sale of assets pursuant to the ASA.  (Such utilization of tax attributes will be

14  completely unnecessary if, as discussed above, income or gain from the sale is excludible from gross

15  income under Internal Revenue Code section 115 or because government subdivisions are not

16  subject to federal corporate income tax).

17         Except as described below, any Claim against a debtor (except a Claim that would

18  give rise to a deduction if paid) that is discharged by payment to a creditor of cash and/or property

19  will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent that the

20  adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of

21  the payment made in cancellation thereof.

22         The District's Debt Discharge Amount may be increased to the extent that unsecured

23  creditors holding unscheduled Claims fail to timely file a proof of Claim and have their Claims

24  discharged on the Confirmation Date pursuant to Bankruptcy Code section 944.

25  **C.    Tax Consequences To Creditors.**

26         The tax consequences of the Plan's implementation to a creditor will depend on

27  whether the creditor is a citizen or resident of the United States, whether the creditor's present debt

28  Claim constitutes a "security" of the District for federal income tax purposes and the type of

consideration received by the creditor in exchange for its Claim, whether the creditor reports income on the cash or accrual method, whether the creditor receives consideration in more than one tax year of the creditor, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction.  The tax consequences upon the receipt of cash or other property allocable to interest are discussed below under "Receipt of Interest."

1.     **Claims of Series 1993 and 1996 Bondholders.**

The Series 1993 Bonds and Series 1996 Bonds are likely tax securities for federal income tax purposes.  Under the Two Hospital Transaction, the payment in full of the Bonds would cause each holder thereof to recognize gain or loss under Internal Revenue Code sections 1001 and 1271 measured by the difference between the amount realized with respect thereto and such holder's adjusted tax basis in the Bonds held by such holder.  The total cash amount received by such a holder would be allocated between principal and interest, with the principal amount so received being treated as the amount realized and the interest amount being treated as discussed below under "Receipt of Interest."

Under the Alternative Transaction, it is likely that a deemed exchange occurs for federal income tax purposes in which the old, unmodified Bonds are deemed to be exchange for Bonds as modified according to the terms of the Plan.  If the District were a privately-held or publicly-owned corporation, such deemed exchange likely would qualify as a recapitalization, resulting in a tax-free exchange pursuant to Internal Revenue Code section 368(a)(1)(E).  However, because of the District's status as a government subdivision, it is unclear to the District whether the deemed exchange can qualify as a recapitalization qualifying under section 368(a)(1)(E), and the District expresses no view with respect to this matter.  If the deemed exchange does not qualify for tax-free exchange treatment as a recapitalization, holders of District Bonds will be required to recognize gain or loss on the transaction.

2.     **Other Creditors Holding Unsecured Claims.**

A tax security generally is an obligation with an original term to maturity of 10 years or more or, possibly, 5 years or more.  Trade Claims generally are not tax securities because they are of short maturity.  An unsecured creditor holding a Claim in Class 2A that is classified as a tax

security likely will be treated for tax purposes in substantially the same manner as the holder of a

Claim based on a Bond under the Alternative Transaction, as described above.  An unsecured

creditor holding a Claim in Class 2A that is not classified as a tax security likely will recognize gain

or loss as a result of the significant modification of such creditor's rights that occurs under the Plan.

### 3.    Character of Recognized Gain or Loss.

In the case of a creditor whose existing Claims constitute capital assets in such

creditor's hands, the gain required to be recognized generally will be classified as a capital gain,

except to the extent of interest (including accrued market discount, if any).  Any gain recognized will

be treated as ordinary income to the extent of accrued market discount.  In this regard, it should be

noted that section 582(c) of the Internal Code provides that the sale or exchange of a bond,

debenture, note or certificate, or other evidence of indebtedness by a bank or certain other financial

institutions shall not be considered the sale or exchange of a capital asset.  Accordingly, any gain

recognized by such creditors as a result of the Plan's implementation will be ordinary income,

notwithstanding the nature of their Claims.  Any capital gain recognized by a creditor will be long-

term capital gain with respect to those Claims for which the creditor's holding period is more than

one year, and short-term capital gain with respect to such Claims for which the creditor's holding

period is one year or less.

### 4.    Receipt of Interest.

Income attributable to accrued but unpaid interest will be treated as ordinary income,

regardless of whether the creditor's existing Claims are capital assets in its hands.

A creditor who, under its accounting method, was not previously required to include

in income accrued but unpaid interest attributable to existing Claims, and who exchanges its interest

Claim for cash, or other property pursuant to the Plan, will be treated as receiving ordinary interest

income to the extent of any consideration so received allocable to such interest, regardless of

whether that creditor realizes an overall gain or loss as a result of the exchange of its existing

Claims.  A creditor who had previously included in income accrued but unpaid interest attributable

to its existing Claims may be able to recognize a loss to the extent such accrued but unpaid interest is

not satisfied in full.  For purposes of the above discussion, "accrued" interest means interest which

was accrued while the underlying Claim was held by the creditor.  The extent to which consideration distributable under the Plan is allocable to such interest is uncertain.

**5.      Other Tax Considerations.**

**a.      Market Discount.**

If a creditor has a lower tax basis in a Debtor obligation than its face amount, the difference may constitute market discount under section 1276 of the Internal Revenue Code. (Certain District obligations are excluded from the operation of this rule, such as obligations with a fixed maturity date not exceeding one year from the date of issue, installment obligations to which Internal Revenue Code section 453B applies and, in all likelihood, demand obligations or instruments).

Holders in whose hands District obligations are market discount bonds will be required to treat as ordinary income any gain recognized upon the exchange of such obligations to the extent of the market discount accrued during the holder's period of ownership, unless the holder has elected to include such market discount in income as it accrued.

**b.      Withholding.**

The District or a disbursing agent will withhold any amounts required by law from payments made to creditors.  This may require payments by certain creditors of the required withholding tax on the non-cash consideration issuable or deemed issuable under the Plan.  In addition, creditors may be required to provide general tax information to the District or a disbursing agent, and any failure by a creditor to comply with such a request may entitle the District to withhold any and all distributions to such creditor until full compliance with the District's request for information is achieved.

**IX.      RECOMMENDATION AND CONCLUSION**

The District believes that confirmation and implementation of the Plan is preferable to all other available and feasible alternatives.  Accordingly, **the District urges holders of impaired claims to vote to accept the Plan by so indicating on their ballots and returning them as specified in this Disclosure Statement and on their ballots.**

1

2   DATED:  November 2, 2009                   VALLEY HEALTH SYSTEM

3

4                                             By:  _____
                                                   Joel M. Bergenfeld,
5                                                  Chief Executive Officer

6

7

8   Submitted By:

9

10  CHARLES D. AXELROD, GARY E.
    KLAUSNER and H. ALEXANDER
11  FISCH, Members of
    STUTMAN, TREISTER & GLATT
12  PROFESSIONAL CORPORATION

13  By:  _____
14       H. Alexander Fisch

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **EXHIBITS**

2

3    **Exhibit A**      Plan of Adjustment of Debts

4    **Exhibit B**      August 31, 2009 Preliminary Financial Statements

5    **Exhibit C**      V&IG Valuation Summaries

6    **Exhibit D**      District's Three Year Projected Financial Statements

7    **Exhibit E**      ASA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

CHARLES D. AXELROD (STATE BAR NO. 39507)
GARY E. KLAUSNER (STATE BAR NO. 69077)
H. ALEXANDER FISCH (STATE BAR NO. 223211)
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067
Telephone:  (310) 228-5600
Telecopy:  (310) 228-5788

Chapter 9 Counsel for
Valley Health System

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No. 6:07-bk-18293-PC |
| VALLEY HEALTH SYSTEM, | Chapter 9 |
| | **PLAN FOR THE ADJUSTMENT OF DEBTS OF VALLEY HEALTH SYSTEM DATED NOVEMBER 2, 2009** |
| | <u>Disclosure Statement Hearing</u> |
| | Date:       December 8, 2009 |
| | Time:       2:00 p.m. |
| | Place:      Courtroom 304 |
| | United States Bankruptcy Court |
| | 3420 Twelfth Street |
| Debtor, | Riverside, California |

**NOTE:  The Bankruptcy Court Has Not Yet Approved A Disclosure Statement With Respect To The Proposed Plan Of Adjustment Of Debts.  The Filing Of This Proposed Plan Is Not Intended To And Should Not Be Construed To Be A Solicitation Of Acceptances Of The Plan.**

532049v2

Valley Health System (the "District"), a California local healthcare district and a

debtor under chapter 9 of the United States Bankruptcy Code, hereby proposes the following Plan of

Adjustment of Debts (this "Plan") pursuant to section 941 of the Bankruptcy Code.[1]

On October 6, 2009, at a special public meeting, the District's Board of Directors

considered and approved the Asset Purchase Agreement, that was ultimately dated October 14, 2009

(the "ASA") by and between the District and Physicians For Healthy Hospitals, Inc., a Delaware

corporation ("PHH") that provides for a sale of substantially all of the District's assets to PHH if

Public Approval is obtained at the election scheduled for December 15, 2009 ("Two Hospital

Transaction") or, if Public Approval is not obtained, the sale of the operating assets associated with

the Menifee Valley Medical Center ("Menifee") (the "Alternative Transaction").  Accordingly, either

the Two Hospital Transaction or the Alternative Transaction is the primary means by which this Plan

will be implemented.

The treatment of creditors and the payment of Allowed Claims under this Plan will

differ significantly depending on whether the Two Hospital Transaction or the Alternative

Transaction is ultimately consummated.  Under the Two Hospitable Transaction, the District will

have a significantly smaller pool of Allowed Claims for which it will be responsible given the

liabilities being assumed by PHH and significantly more cash proceeds with which to pay such

Claims.  Accordingly, where applicable in the Plan, alternate treatments of the impaired classes is

provided, depending on whether the Two Hospital Transaction or the Alternative Transaction closes.

A vote in favor of the Plan constitutes acceptance of such alternative treatment.

Please refer to the accompanying Disclosure Statement for a discussion of the

District's history, operations, and financial condition, and for a summary and analysis of this Plan

and other important information, including the discussion of the alternate treatment of Allowed

Claims under this Plan, depending the sale transaction that is ultimately closed.  A copy of the ASA

shall be posted to the District's website.  The District encourages you to read this Plan and the

Disclosure Statement in their entirety before voting to accept or reject this Plan.  No materials other

---

[1]   The definitions of capitalized terms used throughout this Plan are set forth in Section I.A.

532049v2

than the Disclosure Statement and the various Exhibits and Schedules attached to or incorporated therein have been approved for use in soliciting acceptance or rejections of this Plan.

## I.    DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

### A.    Definitions.

1.    **Administrative Claim** means any Claim for an administrative expense of the kind described in sections 503(b) or 507(a)(2) of the Bankruptcy Code.

2.    **Allowed** means a Claim that:

a.    Is asserted in a proof of Claim filed in compliance with section 501 of the Bankruptcy Code and any applicable orders of the Bankruptcy court and as to which: (i) no objection has been filed within the deadline established pursuant to Section IX; (ii) the Bankruptcy Court has entered a Final Order allowing all or a portion of such Claim (but only in the amount so allowed); or (iii) the Bankruptcy Court has entered a Final Order under section 502(c) of the Bankruptcy Code estimating the amount of the Claim for purposes of allowance;

b.    Is represented by the Select Administrative Note;

c.    Is designated as "allowed" in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) filed with the Bankruptcy Court by the District on or after the Effective Date; or

d.    Is an Administrative Claim as to which the Bankruptcy Court has entered a Final Order allowing all or a portion of such claim (but only in the amount so allowed), or is represented by the Select Administrative Note.

3.    **Alternative Transaction** means that portion of the ASA that can be closed even if Public Approval is not obtained, which transaction contemplates, among other things, the sale of only Menifee and its assets and operations, and the District's continued operation of Hemet and SNF and ownership of the Medical Arts Building, the San Jacinto Property, and the Orchard Property as well as Hemet's cash, accounts receivable and causes of action.

4.    **ASA** means the Asset Sale Agreement dated October 14, 2009 by and between PHH and the District.

-3-

532049v2

5.      **Assumption/Assignment Motion** means the motion to be filed with the Bankruptcy Court prior to the Sale Closing Date, in which the District will seek approval of the assumption and immediate assignment of the executory contracts and unexpired leases as are set forth or provided for in the ASA, pursuant to section 365(a) and (f)(2) of the Bankruptcy Code.

6.      **Ballot** means the ballot(s), in the form(s) approved by the Bankruptcy Court in the Plan Solicitation Order, accompanying the Disclosure Statement and provided to each holder of a Claim entitled to vote to accept or reject this Plan.

7.      **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 9 Case.

8.      **Bankruptcy Court** means the United States Bankruptcy Court for the Central District of California, Riverside Division, or such other court that lawfully exercises jurisdiction over the Chapter 9 Case.

9.      **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 9 Case, together with the local rules of the Bankruptcy Court applicable to the Chapter 9 Case.  Unless otherwise indicated, references in this Plan to "Bankruptcy Rule _____" are to the specifically identified rule of the Federal Rules of Bankruptcy Procedure.

10.      **Bar Date** means the applicable date by which a particular proof of Claim must be filed, as established by the Bankruptcy Court.

11.      **Bondholders** mean the owners of the Bonds.

12.      **Bonds** means, collectively, the Series 1993 Bonds and the Series 1996 Bonds.

13.      **Cash** means cash and cash equivalents, including withdrawable bank deposits, wire transfers, checks, and other similar items.

14.      **Chapter 9 Case** means the case under chapter 9 of the Bankruptcy Code commenced by the District, styled as *In re Valley Health System*, Case No. 6:07-bk-18293-PC, currently pending in the Bankruptcy Court.

15.      **Claim** means a claim against the District or the property of the District within the meaning of section 101(5) of the Bankruptcy Code.

532049v2

16.    **Class** means one of the classes of Claims established under Section III

pursuant to section 1122 of the Bankruptcy Code.

17.    **Class 2A Annual Cash Payment** means the cash payment to be made pro

rata to the holders of Allowed Class 2A Claims in the event the Alternative Transaction closes from:

(i) the proceeds from the sale of Hemet, the Orchard Property and/or the San Jacinto Property and

their related assets, after all senior obligations are satisfied upon the sale of such assets, and/or

(ii) Excess Cash, which payment will be distributed on an annual basis, to the extent such proceeds

are available, no later than 90 days after receipt of audited financial statements commencing on the

one year anniversary of the Effective Date and continuing through the earlier of: (1) payment of all

Allowed Class 2A Claims in full, without interest, or (2) the time at which the Class 2A Annual

Cash Payments have aggregated $17 million.

18.    **Class 2B Claims** means the rejection and postpetition breach claims held by

Hemet Community Medical Group, Menifee Valley Community Medical Group and LHIO,

including claims of constituent members thereof which are derivative from such claims by the

preceding entities, which are currently asserted in an aggregate amount of approximately $55 million

and which claims have been docketed in the claims docket as the Case as claim nos. 134, 135, 136

and 168.

19.    **Committee** means the Official Committee of Unsecured Creditors of Valley

Health System, appointed in the Chapter 9 Case by the Office of the Untied States Trustee pursuant

to section 1102(a)(1) of the Bankruptcy Code as the membership thereof has been reconstituted from

time to time by the Office of the Untied States Trustee.

20.    **Confirmation Date** means the date on which the Clerk of the Bankruptcy

Court enters the Confirmation Order on the docket of the Bankruptcy Court.

21.    **Confirmation Order** means the order of the Bankruptcy Court confirming

this Plan under section 943 of the Bankruptcy Code.

22.    **Defined Benefit Plan Participants** means the participants in the VHS

Retirement Plan

60

532049v2

23.    **Disallowed** means a Claim or portion thereof that has been disallowed by an Order.

24.    **Disclosure Statement** means the disclosure statement, and all exhibits and schedules incorporated therein, that relates to this Plan and that is approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented in accordance with the Bankruptcy Code.

25.    **Disputed Claim** means any Claim or portion thereof that has not become Allowed and that is not Disallowed.  In the event that any part of a Claim is Disputed, except as otherwise provided in this Plan, such Claim shall be deemed Disputed in its entirety for purposes of distribution under this Plan unless the District agrees otherwise in its sole discretion.  Without limiting the foregoing, a Claim that is the subject of a pending application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, reduce, subordinate, or estimate such Claim shall be deemed to be Disputed.

26.    **District** means Valley Health System, a California local healthcare district and the chapter 9 debtor in the Chapter 9 Case.

27.    **District Assets** means all the assets of the District which the District has agreed to transfer to PHH at closing of the Two Hospital Transaction pursuant to the ASA.

28.    **Effective Date** means the first day after the date on which the conditions specified in Section XII.B have been satisfied or waived.

29.    **Excess Cash** means the District's remaining cash, if any, at the end of each fiscal year, after accounting for, among other things, the payment and/or accrual of ordinary course operating expenses, debt service, including amounts that may be owed to the Bondholders and to Select, and amounts set aside as cash reserves for capital expenditures as well as other anticipated expenditures, in reasonable amounts, as necessary, which shall be determined on the basis of the information set forth in the District's annual audited financial statements within 90 days of receipt of such statement.

30.    **Final Order** means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having

532049v2

jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which: (a) the time to appeal or petition for review, rehearing or certiorari has expired and no appeal or petition for review, rehearing or certiorari is then pending; or (b) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

31.    **General Unsecured Claim** means an Unsecured Claim.

32.    **Hemet** means Hemet Valley Medical Center, located in Hemet, California, which is currently owned and operated by the District.

33.    **Indenture Trustee** means U.S. Bank, N.A. when acting in that capacity in respect of the Bonds.

34.    **Kaiser** means Kaiser Foundation Hospitals.

35.    **Medical Arts Building** means the Medical Arts Building located in Hemet, California, which is owned by the District owned free and clear.

36.    **MetLife Group Annuity Contract** means the MetLife Group Annuity Contract No. 884 as amended, pursuant to which the VHS Retirement Plan is administered by MetLife Group.

37.    **Moreno** means Moreno Valley Community Hospital, located in Moreno Valley, California.

38.    **Moreno Asset Purchase Agreement** means the Asset Purchase Agreement dated August 8, 2007 between the District and Select, as such has been amended by the First Amendment to Asset Sale Agreement by and among the District, Select and Kaiser dated February 25, 2008 and as further amended by the Second and Third Amendments thereto and side letter dated May 13, 2008.

39.    **MOU** means the Memorandum of Understanding, dated September 16, 2009, entered into by and between the District and PHH, which sets forth a summary of the salient terms of the PHH Asset Sale Agreement.

532049v2

40. **Menifee** means Menifee Valley Medical Center, located in Menifee Valley, California, which is currently owned and operated by the District, and includes the operations located on the undeveloped land owned by the District and adjacent to the MVMC campus.

41. **Orchard Property** means the orchard property adjacent to the east of MVMC, located in Menifee, California, currently owned by the District.

42. **Ordinary Course Administrative Claim** means an Administrative Claim, other than a Professional Claim, that represents an obligation incurred in the ordinary course of business of the District (as determined by the District in its sole discretion).

43. **Petition Date** means December 13, 2007.

44. **PHH** means Physicians for Healthy Hospitals, Inc., a Delaware corporation, the "Purchaser" under the ASA.

45. **Plan** means this Plan of Adjustment of Debts, together with all Exhibits hereto, each in their present form or as they may be altered, amended or modified from time to time in accordance with the provisions of this Plan, the Confirmation Order, the Bankruptcy Code, and the Bankruptcy Rules.

46. **Plan Solicitation Order** means the Order Approving (I) Adequacy Of Information In Disclosure Statement With Respect To The District's Plan Of Adjustment; (II) Form, Scope And Nature of Solicitation, Balloting, Tabulation And Notices With Respect Thereto; And (III) Related Confirmation Procedures, Deadlines And Notices, by which the Bankruptcy Court approved the Disclosure Statement as containing adequate information for the purpose of dissemination and solicitation of votes on and confirmation of this Plan and established certain rules, deadlines, and procedures for the solicitation of votes with respect to and the balloting on this Plan.

47. **PHH Assumed Other Liabilities** means the liabilities of the District as of the Effective Date that are to be assumed by PHH under Section 1.2.1(a)(iii) of the ASA.

48. **PHH Administrative Claims Fund** means (i) the $4.0 million dollars that PHH is required, pursuant to section 1.2.4.1 of the ASA, to deposit into a separate account designated solely for the payment of Allowed Administrative Claims that are not PHH Assumed

Other Liabilities, and (ii) monies in excess of $4 million that may be payable to the District under Section 1.2.4.3 of the ASA.

49.    **PTO** means accrued, earned and vested claims of District employees for paid time off.

50.    **Public Approval** means the requisite votes obtained in a public election, to be held in accordance with the requirements of California Health & Safety Code Section 32121(p), which would allow the District to consummate the Two Hospital Transaction as contemplated by the ASA.

51.    **Professional Claim** means a Claim required to be filed pursuant to Section II for approval of amounts paid or to be paid for services or expenses in the Chapter 9 Case or incident to this Plan.

52.    **Rejection Motion** means the motion to be filed, pursuant to section 365(a) of the Bankruptcy Court, by the District pursuant to which the District shall seek approval and authorization for the rejection of such executory contracts and unexpired leases as shall be identified in the Rejection Motion.

53.    **Rights of Action** means any rights, claims, or causes of action owned by, accruing to, or assigned to the District pursuant to the Bankruptcy Code or pursuant to any contract, statute, or legal theory, including without limitation any rights to, claims, or causes of action for recovery under any policies of insurance issued to or on behalf of the District.

54.    **Sale Closing Date** means the date that a sale is consummated pursuant to the ASA.

55.    **San Jacinto Property** means the parcels consisting of approximately four (4) acres, fronting Florida Avenue, San Jacinto Avenue, Latham Street, and Laursen Street located in Hemet, California.

56.    **Secured Claim** means a Claim that is secured, in whole or in part, (a) by a lien that is not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law; or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code; but in any event only to the extent of the value, determined in accordance with section 506(a) of the

64

1  Bankruptcy Code, of the holder's interest in the District's interest in property or to the extent of the

2  amount subject to such setoff, as the case may be.

3          57.    **Select** means Select VHS Acquisition Company, LLC.

4          58.    **Select's Allowed Administrative Claim** means the Claim represented by the

5  Select Administrative Note that is entitled to administrative priority in the Chapter 9 Case.

6          59.    **Select Administrative Note** means the 5% unsecured promissory note of the

7  District issued to Select at the closing of the sale of Moreno to Kaiser, with a current approximate

8  balance of $8,400,000, consistent with the form thereof that appears as Exhibit "A" to the Select

9  Stipulation.

10          60.    **Select Stipulation** means the stipulation among the District, Select and the

11  Indenture Trustee that was filed with the Bankruptcy Court and appears on the Docket of the Chapter

12  9 Case as document number 199.

13          61.    **Series 1993 Bonds** means the certificates of participation, in the approximate

14  amount of $61,650,000 pursuant to (i) an installment purchase agreement, dated June 1, 1993,

15  between the Valley Health System Service Corporation (the "Corporation"), and the District, and

16  (ii) a trust agreement, dated June 1, 1993, among the Corporation, the District  and First Interstate

17  Bank as Trustee (predecessor in interest to the Indenture Trustee).  The Bonds designated as Series

18  1993 have a current principal amount of approximately $40,615,000.

19          62.    **Series 1996 Bonds** means the certificates of participation, in the approximate

20  amount of $47,335,000, pursuant to a trust agreement, dated January 1, 1996, between the District

21  and First Interstate Bank as Trustee (predecessor in interest to the Indenture Trustee).  The Bonds

22  designated as Series 1996 have a current principal amount of approximately $4,935,000.

23          63.    **SNF** means Hemet Valley Healthcare Center, located in Hemet California, at

24  which the District currently operates a chemical dependency program and Sage Retreat.

25          64.    **Two Hospital Transaction** means the sale of the District Assets to PHH

26  pursuant to the ASA in the event that Public Approval is obtained.

27          65.    **Unsecured Claim** means any claim that is not a Secured Claim or an

28  Administrative Claim.

-10-

65

532049v2

66.    **VHS Retirement Plan** means the "Valley Health System Retirement Plan Adopted January 1, 1971, as amended.  Under Section 4.8 of the VHS Retirement Plan, the plan was frozen effective May 4, 1999, such that the "Accrued Benefit" of each plan participant was frozen as of this date, and participants have accrued no benefits under the plan since such date.

**B.    Rules of Construction.**

The following rules of construction apply to this Plan:  (a) unless otherwise specified, all references in this Plan to "Sections" and "Exhibits" are to the respective Section in or Exhibit to this Plan, as the same may be amended or modified from time to time; (b) the headings in this Plan are for convenience of reference only and do no limit or otherwise affect the provisions of this Plan; (c) words denoting the singular number include the plural number and vice versa; (d) the rules of construction set forth in section 102 of the Bankruptcy Code apply; (e) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply; and (f) the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular Section, subsection, or clause contained in this Plan.

**II.    TREATMENT AND DEADLINE FOR THE ASSERTION OF ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**A.    Treatment Of Administrative Claims.**

**1.    Two Hospital Transaction.**

a.    Treatment of the Select Administrative Claim.

Pursuant to Section 1.2.1(a)(ii) of the ASA, at the closing of the Two Hospital Transaction, the Select Note shall be satisfied in full or all obligations evidenced thereby shall be assumed by PHH and the District shall be released from any further liability in connection with the Select Administrative Note.  The District understands that Select has agreed to the foregoing treatment.

b.    Treatment of All Other Administrative Claims, Except for Professional Claims.

Pursuant to paragraph 1.2.1(a)(iii) of the ASA, PHH shall, upon closing of the Two Hospital Transaction, assume and satisfy certain postpetition administrative claims of the District

66

532049v2

which are defined therein as the "Assumed Other Liabilities".  The Assumed Other Liabilities consist of the "Assumed Current Liabilities" and "Other Liabilities", both of which are defined in the afore said section of the ASA.  The District believes that substantially all of its administrative claims, with the exception of professional fees and certain claims arising from the rejection of certain postpetition executory contracts, will be included in the Assumed Other Liabilities.  PHH shall also contribute additional funds as are necessary to satisfy other Administrative Claims, including Professional Claims ("Covered Claims", as defined in the ASA) in the event the $4 million contributed at Closing is insufficient to pay such Covered Claims.

To the extent of any administrative claims, other than the Assumed Other Liabilities, and except as provided in Section II.B, with respect to Professional Claims or to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction, release and discharge of such Claim, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date, (ii) the date on which such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable and (iii) the date funds are to be available for that purpose under Section 1.2.4.3 of the ASA.

From and after the Sale Closing Date, and except for Professional Claims, creditors holding Claims that relate to, or arise from, any of the PHH Assumed Other Liabilities and Covered Claims shall only have a right to collect payment on account of such Claims from PHH and the Administrative Claims Fund, and the District shall thereafter be relieved of any and all liability for the payment of any and all Claims relating to, or arising from, any of the PHH Assumed Current Liabilities or Covered Claims.

## 2.    The Alternative Transaction.

a.    <u>Select Administrative Note</u>.

In the event of the Alternative Transaction, the Select Administrative Note shall be restructured in the following manner:

(1)    No payments on the Select Administrative Note shall be due or payable for a period of two years following the Effective Date;

-12-

532049v2

1        (2)      The District shall pay to the holder of the Select Administrative Note, interest

2    only, calculated at 5% per annum, for a period of three years, following the two year payment

3    moratorium provided for in the immediately preceding subparagraph.

4        (3)      The District shall amortize the remaining principal balance of the Select

5    Administrative Note in equal monthly installments during years six-ten, following the Effective

6    Date.

7        (4)      The restructured Select Administrative Note shall be secured by a first

8    position Senior Lien on (a) The Medical Arts Building, (b) to the extent not inconsistent with any

9    liens granted to the holders of the Bonds, the excess land portion of the San Jicinto property.

10        The District understands that Select has agreed to the foregoing treatment.

11        b.      <u>Other Administrative Claims.</u>

12        Except as provided in section II.B, with respect to Professional Claims, or to the

13    extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the

14    District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction,

15    release, and discharge or such Claim, Cash in an amount equal to such Allowed Administrative

16    Claim on the later of (i) the Effective Date, (ii) the date on which such claim becomes an Allowed

17    Administrative Claim or as soon thereafter as is practicable; and (iii) to the extent that such Allowed

18    Administrative Claim is an Ordinary Course Administrative Claim, such claim shall be paid in full

19    and honored by the District in the ordinary course of business in accordance with the terms and

20    conditions of the particular transaction and any agreements relating thereto.

21    **B.**      **Treatment Of Professional Claims.**

22        Pursuant to section 943(a)(3) of the Bankruptcy Code, all amounts paid or to be paid

23    for services or expenses in the Chapter 9 Case or incident to this Plan must be disclosed to the

24    Bankruptcy Court and must be reasonable. There shall be paid to each holder of a Professional

25    Claim, either from the PHH Administrative Claims Fund or the District's cash on hand, in full

26    satisfaction, release and discharge of such Claim, Cash in an amount equal to that portion of such

27    Claim that the Bankruptcy Court approves as reasonable with credit being given to the extent such

28

532049v2

Claim previously has been paid, on or as soon as reasonably practicable following the date on which the Bankruptcy Court enters an Order determining such reasonableness.

**C.    Priority Tax and Other Priority Claims.**

"Priority Tax Claims" are those unsecured income, employment and other taxes, if any, described by section 507(a)(8) of the Bankruptcy Code. "Other Priority Claim" means a Claim other than an Administrative Claim or a Priority Tax Claim which, if allowed, would be entitled to priority under Section 507(a) of the Bankruptcy Code.

Except as otherwise agreed to by the District and the applicable holder of a Priority Tax Claim or an Other Priority Claim, the District shall pay to any Holder of an Allowed Priority Tax Claim or Allowed Other Priority Claim, Cash on the Effective Date in an amount equal to the amount of such Allowed Priority Tax or Other Priority Claim (without penalty of any kind).

The District does not believe that there are any unpaid Priority Tax Claims or Other Priority Claims.

**D.    Deadline For The Filing And Assertion Of Administrative Claims (Other Than Ordinary Course Administrative Claims) And Professional Claims.**

**All requests for payment or any other means of preserving and obtaining payment of Administrative Claims (other than claims under the Select Administrative Note) that have not been paid, released, or otherwise settled, and all requests for approval of Professional Claims, must be filed with the Bankruptcy Court and served upon the District no later than thirty (30) days after the date on which the Notice of Effective Date is mailed.** Any request for payment of an Administrative Claim or a Professional Claim that is not timely filed by such date will be forever barred, and holders of such Claims shall be barred from asserting such Claims in any manner against the District.

**III.    DESIGNATION OF CLASSES OF CLAIM**

Pursuant to section 1122 of the Bankruptcy Code, all Claims other than Administrative Claims and Professional Claims are classified for all purposes, including voting, confirmation, and distribution pursuant to this Plan, as follows:

Class 1A – Claims of the Bondholders of the Series 1993 Bonds

1    Class 1B – Claims of the Bondholders of the Series 1996 Bonds

2    Class 2A – General Unsecured Claims

3    Class 2B - General Unsecured Claims of Hemet Community Medical Group, Menifee

4    Valley Community Medical Group, and LHIO and Claims of Constituent Members Thereof

5    Class 2C – Defined Benefit Plan Claims

6    **IV.    TREATMENT OF CLAIMS**

7    **A.    Class 1A – Claims of the Bondholders of Series 1993 Bonds.**

8    **1.    Impairment And Voting.**

9    Class 1A is impaired by this Plan since some of the potential treatment of this Class

10    would affect the legal, equitable or contractual right to which the holders of Claims in this Class are

11    entitled and, accordingly, this Class is entitled to vote to accept or reject this Plan in accordance with

12    the Plan Solicitation Order.

13    **2.    Treatment.**

14    a.    If the Two Hospital Transaction is Consummated

15    If the Two Hospital Transaction is consummated, there will be paid to the

16    Indenture Trustee for the Series 1993 Bonds, on the Sale Closing Date, a sum sufficient to fully

17    satisfy all Allowed Class 1A Claims.

18    b.    If the Alternative Transaction is Consummated

19    If the Alternative Transaction is consummated, the Allowed Claims in Class

20    1A shall be deemed fully satisfied as follows:

21    The District will use the net sale proceeds to partially pay Allowed Class 1A and

22    Class 1B Claims, allocated to each holder in the manner provided in the Bonds, Indenture and

23    related documents.  As to the then remaining balance owing on such Claims, the ASA requires PHH

24    to:

25    (i)    obtain under provisions of the Indenture the consent of the holders of Allowed

26    Class 1A and 1B claims to a modified payment schedule under the Existing Bonds which includes

27    the payment of interest only for three (3) years from the Closing Date, with principal re-amortized

28    thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance

-15-

70

("Payment Forbearance"), after the Closing Date of any claims, action or other enforcement against the District based on failure of the District to meet any covenants (the "Bond Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond Documents") based upon the financial performance or status of the District and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply) including, without limitation, covenants related to the required net income available for debt service or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Proceeding) ("Covenant Forbearance"); or

(ii)    enter into a new secured loan agreement (the "Alternative Loan") with the District by which PHH will advance, on the District's behalf, funds necessary to pay off the balance of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall become a new loan on substantially the same terms as the Bond Documents, including the bond Covenants (as modified as set forth in subparagraph (i) above including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by (the "Additional Collateral"):

(A)    a second position deed of trust (junior to the modified Select Administrative Note lien) on the Medical Arts Building and the excess land portion of the Florida/San Jacinto, and

(B)    a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through the District's Fiscal Year ending June 30, 2012.  In the event that the District is in default of the Bond Covenants as of the end of the District's Fiscal Year ending June 30, 2011, PHH may, as its sole remedy for a Covenant Default other than a payment default, require that the District engage a nationally recognized Manager ("Manager") with experience in operating hospitals similar to Hemet.  The District shall consult with PHH in the selection of such Manager, and such Manager shall be reasonably acceptable to PHH, which acceptance shall not be unreasonably withheld, delayed or conditioned. PHH shall be entitled to monitor the performance of the Manager and receive monthly reports on Manager's progress and the financial condition of the District.

532049v2

**B.**    **Class 1B – Claims of the Bondholders of the Series 1996 Bonds.**

    **1.**    **Impairment and Voting.**

Class 1B is impaired by this Plan since some of its alternative treatments would affect the legal, equitable or contractual right to which the holders of Claims in this Class are entitled and, accordingly, this Class is entitled to vote to accept or reject this Plan in accordance with the Plan Solicitation Order.

    **2.**    **Treatment.**

        a.    <u>If the Two Hospital Transaction is Consummated</u>

If the Two Hospital Transaction is consummated, there will be paid to the Indenture Trustee for the Series 1996 Bonds, on the Sale Closing Date, a sum sufficient to fully satisfy all Allowed Class 1B Claims.

        b.    <u>If the Alternative Transaction is Consummated</u>

If the Alternative Transaction is consummated, the Allowed Claims in Class 1B shall be fully satisfied as follows:

The District will use the net sale proceeds to partially pay Allowed Class 1A and Class 1B Claims, allocated to each holder in the manner provided in the Bonds, the Indenture and related documents.  As to the then balance owing on such Claims, the ASA requires PHH to:

        (i)    obtain under provisions of the Indenture the consent of the holders of Allowed Class 1A and 1B claims to a modified payment schedule under the Existing Bonds which includes the payment of interest only for three (3) years from the Closing Date, with principal re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance ("Payment Forbearance"), after the Closing Date of any claims, action or other enforcement against the District based on failure of the District to meet any covenants (the "Bond Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond Documents") based upon the financial performance or status of the District and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply) including, without limitation, covenants related to the required net income available for debt service or other debt coverage

requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Proceeding) ("Covenant Forbearance"); or

(ii)    enter into a new secured loan agreement (the "Alternative Loan") with the District by which PHH will advance, on the District's behalf, funds necessary to pay off the balance of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall become a new loan on substantially the same terms as the Bond Documents, including the bond Covenants (as modified as set forth in subparagraph (i) above including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by (the "Additional Collateral"):

(A)    a second position deed of trust (junior to the modified Select Administrative Note lien) on the Medical Arts Building and the excess land portion of the Florida/San Jacinto, and

(B)    a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through the District's Fiscal Year ending June 30, 2012.  In the event that the District is in default of the Bond Covenants as of the end of the District's Fiscal Year ending June 30, 2011, PHH may, as its sole remedy for a Covenant Default other than a payment default, require that the District engage a nationally recognized Manager ("Manager") with experience in operating hospitals similar to Hemet.  The District shall consult with PHH in the selection of such Manager, and such Manager shall be reasonably acceptable to PHH, which acceptance shall not be unreasonably withheld, delayed or conditioned. PHH shall be entitled to monitor the performance of the Manager and receive monthly reports on Manager's progress and the financial condition of the District.

**C.    Class 2A – General Unsecured Claims.**

**1.    Impairment And Voting.**

Class 2A is impaired by this Plan and, accordingly, the holders of Allowed Claims classified into Class 2A are entitled to vote their Allowed General Unsecured Claims to accept or reject this Plan in accordance with the Plan Solicitation Order.

73

2.      **Treatment.**

a.      <u>If the Two Hospital Transaction is Consummated</u>

If the Two Hospital Transaction is consummated, the holders of Allowed Claims classified into Class 2A shall receive their pro rata share of $17 million or such increased or reduced amount that will be available for payment of such Claims, as discussed below, which distributions shall be paid in four equal annual installments without interest, with the first payment to be made on the first anniversary of the Sale Closing Date, and on each anniversary thereafter; provided, however, that such $17 million may either be (a) increased by any unused portion of the $4 million that PHH will deposit into the PHH Administrative Claims Fund; or (b) reduced, at the time and in the manner set forth in Section 1.2.4.3 of the ASA, by any amount in excess of the $4 million that PHH may be required to deposit into the PHH Administrative Claims Fund to pay Allowed Administrative Claims in full.

b.      <u>If the Alternative Transaction is Consummated</u>

If the Alternative Transaction is consummated, the holders of Allowed Claims classified into Class 2A shall receive their pro rata share of any Class 2A Annual Cash Payment.

D.      **Class 2B – General Unsecured Claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO And Claims of Constituent Members Thereof.**

1.      **Impairment And Voting.**

Class 2B is impaired by this Plan and, accordingly, the holders of Claims classified into Class 2B are entitled to vote their General Unsecured Claims to accept or reject this Plan in accordance with the Plan Solicitation Order.

2.      **Treatment.**

a.      <u>If the Two Hospital Transaction is Consummated</u>

If the Two Hospital Transaction is consummated, upon the Sale Closing Date, PHH will assume or otherwise satisfy all obligations owed to holders of Allowed Class 2B Claims, with the District being fully and completely released from any liability thereunder held harmless from such Claims by PHH.

532049v2

            b.      <u>If the Alternative Transaction is Consummated</u>

If the Alternative Transaction is consummated, the holders of Allowed Claims classified into Class 2B shall receive the same treatment as the holders of Allowed Class 2A Claims, with the District reserving the right to object to the allowability of any and all Class 2B Claims.

**E.     Class 2C - Interests of Defined Benefit Plan Participants.**

     **1.     Impairment And Voting.**

Class 2C is unimpaired by this Plan and, accordingly, the Defined Benefit Plan Participants are not entitled to vote such Allowed Claims, if any, as they may have to accept or reject this Plan.

     **2.     Treatment.**

Defined Benefit Plan Participants will be entitled to the same rights and benefits to which such participants are currently entitled under the VHS Retirement Plan and the MetLife Group Annuity Contract, and such participants shall have no recourse to the District or to any assets of the District, and shall not be entitled to receive any distributions under this Plan. Instead, all unallocated amounts held by MetLife Group, pursuant to the VHS Retirement Plan and the MetLife Group Annuity Contract, will continue to be made available to provide retirement benefits for participants in the manner indicated under the provisions of the VHS Retirement Plan and the MetLife Group Annuity Contract.  Accordingly, the treatment of Allowed Class 2C Claim holders set forth herein shall not affect any legal, equitable or contractual rights to which the VHS Retirement Plan participants are entitled.

**V.     ACCEPTANCE OR REJECTION; CRAM DOWN**

     **A.     Voting Of Claims.**

Each holder of an Allowed Claim classified into Classes 1A, 1B, 2A and 2B shall be entitled to vote each such Claim to accept or reject this Plan.

With respect to any impaired Class of Claims that fails to accept this Plan, the District, as proponent of this Plan, intends to request that the Bankruptcy Court nonetheless confirm this Plan pursuant to the so-called "cram down" powers set forth in Bankruptcy Code section 1129(b).

75

532049v2

# VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.    Assumption Of Executory Contracts And Unexpired Leases.

As to any executory contract or unexpired lease that PHH notifies the District in writing that it has duly elected to assume in the manner and in the time period required by the ASA, the District shall make the Assumption/Assignment Motion, which, if granted shall cause the District to assume and assign such contracts and leases to PHH pursuant to order of the Bankruptcy Court.

## B.    Cure Payments.

After the provision of notice and the opportunity for a hearing on the Assumption/Assignment Motion, in accord with the Bankruptcy Rules, the Bankruptcy Court shall resolve all disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (b) the ability of PHH to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (c) any other matter pertaining to such assumption and assignment.  Any party to an executory contract or unexpired lease that is included in the Assumption/Assignment Motion that asserts that any payment or other performance is due as a condition to the proposed assumption shall file with the Bankruptcy Court and serve upon the District a written statement and accompanying declaration in support thereof, specifying the basis for its claim within the such deadline and in the manner established for filing objections as shall be set forth in the Assumption/Assignment Motion. The failure to timely file and serve such a statement in accordance with the instructions set forth in the Assumption/Assignment Motion shall be deemed to be a waiver of any and all objections to the proposed assumption and any claim for cure amounts of the agreement at issue.

## C.    Rejection of Executory Contracts And Unexpired Leases.

The Rejection Motion shall seek authority to reject such executory contracts and unexpired leases that PHH has not elected to assume that the District in the exercise of its business judgment deems warranted.  In the Two Hospital Transaction scenario, the District anticipates rejecting any executory contract and unexpired lease that is not needed for it to continue operating as a healthcare district whereas the scope of rejection in the Alternative Transaction scenario should be

76

532049v2

narrower since the District would not want to reject any beneficial executory contract or unexpired lease that supports Hemet and the other assets retained by the District after the Sale Closing date of the Alternative Transaction.

**Claims Arising From Rejection.**

Proofs of Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after the date on which notice of entry of the order approving the rejection is mailed.  Any Claim for which a proof of Claim is not filed and served within such time will be forever barred and shall not be enforceable against the District or its assets, properties, or interests in property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 2A and treated accordingly.

**VII.    IMPLEMENTATION AND MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.    If Public Approval Obtained.**

If Public Approval is obtained and the Two Hospital Transaction is consummated, PHH will provide the following combination of cash and assumption of liabilities to enable the District to implement this Plan and satisfy its obligations under the Two Hospital Transaction scenario set forth in this Plan:

(1)    An amount of cash sufficient to pay the Allowed Claims in Classes 1A and 1B in full after application of any reserves held internally by the District for payment of interest or principal on Class 1A and Class 1B Claims.

(2)    Assumption of the Select Note.

(3)    Assumption of the PHH Assumed Current Liabilities and indemnification of the District with respect thereto.

(4)    Payment in full of Administrative Claims that are not part of the PHH Assumed Current Liabilities from the $4 million PHH Administrative Claims Fund or such additional monies as are needed to pay Allowed Administrative Claims, to be funded by PHH pursuant to section 1.2.4 of the ASA.

-22-

532049v2

(5)    Contribute $17 million towards payment of Allowed Class 2A Claims in four equal annual payments, with the first distribution to be made on the first anniversary of the Sale Closing Date; provided however, that to the extent the PHH Administrative Claims Fund is insufficient to pay all of the Allowed Administrative Claims in full, PHH shall be obligated to advance any such additional amounts as are necessary to pay all Allowed Administrative Claims, and any amount so advanced shall be deducted dollar for dollar from PHH's obligation to contribute $17 million for the payment of Allowed Class 2A General Unsecured Claims while, conversely, to the extent the PHH Administrative Claim Fund is not fully needed to pay Allowed Administrative Claims, such excess shall be added to the $17 million to be paid pro rata to Class 2A.

(6)    Assume or otherwise satisfy claims designated in the Bankruptcy Court docket by numbers 134, 135, 136 and 168 and indemnify and hold the District harmless with respect thereto.

(7)    Accept assignment of the contract and leases as required by the ASA.

(8)    Pay the severance payments owing to those District employees to whom PHH does extend an offer of employment consistent with the terms set forth in the ASA or its Schedules.

(9)    Provide $400,000 per year to the District, commencing on the Sale Closing Date, for a period of five (5) years for use by the District, among other things, to pay its ongoing operating expenses, including payroll and professional fees, and to fund any necessary elections, monitor PHH's performance under the ASA, evaluate, analyze and object to creditor claims and resolve any disputes concerning creditor claims, and make distributions to creditors under this Plan.

(10)    Pay, for a period of five (5) years from the Sale Closing Date, the premiums for (a) the District's directors and offices tail errors and omissions insurance, which is currently estimated at $450,000 and (b) the general liability and medical malpractice tail insurance currently estimated at $13,750,000.

**B.    If Public Approval Not Obtained.**

If Public Approval is not obtained, the District and PHH will close the Alternative Transaction, which contemplates a cash purchase price of approximately $29 million, subject to certain deductions, as described below in (i)-(iii), for the transfer to PHH of substantially all of the

532049v2

operating assets used in connection with Menifee, but the District will retain most of its pre-closing liabilities and non-operating assets such as cash, allowed receivables and causes of action.  PHH will pay: (i) cure amounts up to $1 million required to be paid as a condition to assuming any of the District's contracts that PHH has elected to take an assignment of (ii) severance payments that may be owed to Menefee employees to whom PHH does not extend an offer of employment, and (iii) PTO payouts owing to the District's employees who are not hired by PHH or who are hired by PHH but do not consent to the transfer of such PTO obligations to PHH.

The District will use the net sale proceeds to partially pay, pro rata, Allowed Class 1A and Class 1B Claims.  As to the balance owing on such Claims, the ASA requires PHH to:

(i)     obtain under provisions of the Indenture the consent of the holders of Allowed Class 1A and 1B claims to a modified payment schedule under the Existing Bonds which includes the payment of interest only for three (3) years from the Closing Date, with principal re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance ("Payment Forbearance"), after the Closing Date of any claims, action or other enforcement against the District based on failure of the District to meet any covenants (the "Bond Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond Documents") based upon the financial performance or status of the District and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply) including, without limitation, covenants related to the required net income available for debt service or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Proceeding) ("Covenant Forbearance"); or

(ii)     enter into a new secured loan agreement (the "Alternative Loan") with the District by which PHH will advance, on the District's behalf, funds necessary to pay off the balance of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall become a new loan on substantially the same terms as the Bond Documents, including the bond Covenants (as modified as set forth in subparagraph (i) above including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by (the "Additional Collateral"):

(A)      a second position deed of trust (junior to the modified Select

Administrative Note lien) on the Medical Arts Building and the excess land portion of the

Florida/San Jacinto, and

(B)      a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through the District's Fiscal Year

ending June 30, 2012.  In the event that the District is in default of the Bond Covenants as of the end

of the District's Fiscal Year ending June 30, 2011, PHH may, as its sole remedy for a Covenant

Default other than a payment default, require that the District engage a nationally recognized

Manager ("Manager") with experience in operating hospitals similar to Hemet.  The District shall

consult with PHH in the selection of such Manager, and such Manager shall be reasonably

acceptable to PHH, which acceptance shall not be unreasonably withheld, delayed or conditioned.

PHH shall be entitled to monitor the performance of the Manager and receive monthly reports on

Manager's progress and the financial condition of the District.  The foregoing notwithstanding, the

parties understand that Menifee may be competitive with Hemet and that the sharing of certain

information may violate federal or state antitrust or unfair competition Laws.

In the event that the District is in default of the Board Covenants as of the end of the

District's Fiscal Year ending June 30, 2012, PHH shall have rights of enforcement in the same

manner as provided in the Bond Documents.

Without limiting the preceding, the Covenant Forbearance shall not include a

forbearance of any covenants restricting further encumbrances by District (excluding any

encumbrances in favor of PHH, encumbrances as permitted in the Bond Documents, or otherwise as

contemplated by this Agreement), transfer of the District's assets or merger or restructuring of the

District (except in connection with the District's Chapter 9 Proceeding and otherwise consistent with

the terms of this Agreement).  The Alternative Loan shall be provided pursuant to documents which,

to the extent reasonably applicable, are consistent with the terms of the Bond Documents, and

security and other provisions which are customary for commercial real property secured loans (to

the extent not inconsistent with the applicable terms under the Bond Documents or this Agreement).

532049v2

1    Provided that the District is not in default of payments and the Bond Covenants under

2    the Alternative Loan, the Additional Collateral shall be released upon issuance of the District's

3    audited financial statements for the fiscal year ended June 30, 2012.

4    After consummation of the Alternative Transaction, the District will continue to

5    operate Hemet and the SNF and to own the Medical Arts Building, the San Jacinto Property, and the

6    Orchard Property subject to PHH's right to enter into a commercially reasonable 35-year ground

7    lease.  On the Sale Closing Date, the District will have the cash on hand and cash to be generated by

8    collection of accounts receivable of Hemet and the SNF and their future operations, with said cash

9    to be used to pay all Allowed Administrative Claims, the restructured Select Note and any payments

10    remaining due on account of the Allowed Class 1A and Class 1B Claims.

11    All Excess Cash to the extent, if any, available, will be used to make the Class 2A

12    Annual Cash Payments until the first to occur of such Claims being paid in full, without interest, or

13    (2) Class 2A Annual Cash Payments aggregating $17 million.  Also, to the extent that Hemet, the

14    SNF, the Orchard Property and/or the San Jacinto Property and their related assets are leased or sold,

15    the net proceeds from those transactions will be also be used to fund all of the foregoing, including

16    the Class 2A Annual Cash Payment to the extent of Excess Cash.

17    **C.    Claims and Causes of Action.**

18    Pursuant to Section 1.6.12 of the ASA, in the Two Hospital Transaction all of

19    the District's Claims, causes of action, rights of recovery, rights of offset, recoupment rights to

20    refunds and similar rights are transferred to PHH with certain limited exceptions set forth in Section

21    1.7 of the ASA or Schedule 1.6.12 to the ASA.

22    In the Alternative Transaction, the District shall retain all of its claims and causes of

23    action which shall revest in the debtor and be fully enforceable.

24    The failure to list in the Disclosure Statement any potential or existing Right of

25    Action retained by the District under the ASA generally or specifically is not intended to and shall

26    not limit the rights of the District to pursue any such action.  Unless a Right of Action is expressly

27    waived, relinquished, released, compromised or settled in this Plan, the District expressly reserves

28    all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the

81

doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of this Plan or the Effective Date.  In addition, the District expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the District is a defendant or an interested party.

## VIII.    DISTRIBUTIONS

### A.    Distribution Agent.

On or after the Effective Date, the District may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to this Plan, which agents may perform without bond.  The District may provide reasonable compensation to any such agent(s) without further notice or Court approval.

### B.    Delivery Of Distributions.

All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the District or its agents, unless the District has been notified by such holder in a writing that contains an address for such holder different from the address reflected in its books and records.  All distributions to the Bondholders shall be made in accordance with the operative documents that govern the Bonds.

### C.    Undeliverable Distributions.

#### 1.    Holding Of Undeliverable Distributions.

If any distribution to any holders is returned to the District or its agent as undeliverable, no further distributions shall be made to such holder unless and until the District is notified in writing of such holder's then-current address.  Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with Section VIII.C.2.

#### 2.    Unclaimed Property.

If any entity entitled to receive distributions pursuant to this Plan does not present itself on the Effective Date or on such other date on which such entity becomes eligible for distribution, such distributions shall be deemed to be "Unclaimed Property."  Unclaimed Property

-27-

shall be set aside and held in a segregated account to be maintained by the District pursuant to the terms of this Plan.

### 3. Notification And Forfeiture Of Unclaimed Property.

On the first anniversary of the Effective Date, the District shall file with the Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and last-known address of holders of the Unclaimed Property; the District otherwise shall not be required to attempt to locate any such entity.  On the second anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon shall be remitted to and vest in the District.

### D. Distributions of Cash.

Any payment of Cash to be made by the District or its agent pursuant to this Plan shall be made by check drawn on a domestic bank or by wire transfer, at the sole option of the District.

### E. Timeliness Of Payments.

Any payments or distributions to be made pursuant to this Plan shall be deemed to be timely made if made within fourteen (14) days after the dates specified in this Plan.  Whenever any distribution to be made under this Plan shall be due on a day that is a Saturday, Sunday, or legal holiday, such distribution instead shall be made, without interest, on the immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to have been made on the date due.

### F. Compliance With Tax Requirements.

The District shall comply with all tax withholding and reporting requirements imposed on it by any government unit, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding is required, the District shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required

-28-

1    by law.  With respect to any entity from whom a tax identification number, certified tax

2    identification number, or other tax information is required by law to avoid withholding has not been

3    received by the District, the District at its sole option, may withhold the amount required and

4    distribute the balance to such entity or decline to make such distribution until the information is

5    received.

6         **G.     Time Bar To Cash Payments.**

7              Checks issued by the District on account of Allowed Claims shall be null and void if

8    not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for

9    reissuance of any check shall be made directly to the District by the holder of the Allowed Claim

10   with respect to which such check originally was issued.  Any claim in respect of such a voided check

11   shall be made on or before the second anniversary of the Effective Date.  After such date, all Claims

12   in respect of voided checks shall be discharged and forever barred and the District shall retain all

13   moneys related thereto.

14        **H.     No *De Minimis* Distributions.**

15             Notwithstanding any other provision of this Plan, no Cash payment of less than ten

16   dollars ($10.00) shall be made by the District on account of any Allowed Claim.

17        **I.     No Distributions On Account Of Disputed Claims.**

18             Notwithstanding anything to the contrary in this Plan, no distributions shall be made

19   on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to

20   the extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were

21   not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have

22   been made as of the Effective Date.

23        **J.     No Postpetition Accrual.**

24             Unless otherwise specifically provided in this Plan or Allowed by order of the

25   Bankruptcy Court, the District shall not be required to pay to any holder of a Claim any interest,

26   penalty or late charge accruing with respect to such Claim on or after the Petition Date.

27

28

532049v2

**IX.    DISPUTED CLAIMS OBJECTIONS TO CLAIMS; PROSECUTION OF OBJECTIONS TO DISPUTED CLAIMS.**

The District shall have the right to object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.  Unless otherwise ordered by the Bankruptcy Court, the District shall file and serve any such objections to Claims by not later than one hundred and eighty (180) days after the Effective Date (or, in the case of Claims lawfully filed after the Effective Date, by not later than one hundred and eighty (180) days after the date of filing of such Claims).

**A.    Reserves, Payments, And Distributions With Respect To Disputed Claims.**

At such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the District or its agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under this Plan.  Such distributions, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order (or such other date as the Claim becomes an Allowed Claim), but in no event more than thirty (30) days thereafter.  Unless otherwise specifically provided in this Plan or Allowed by order of the Bankruptcy Court, no interest shall be paid on Disputed Claims that later become Allowed Claims.

**X.    EFFECT OF CONFIRMATION**

**A.    Discharge Of The District.**

Pursuant to section 944 of the Bankruptcy Code, upon the Effective Date, the District shall be discharged from all debts (as defined in the Bankruptcy Code) of the District and Claims against the District other than (a) any debt specifically and expressly excepted from discharge by this Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of this Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

The rights afforded in this Plan and the treatment of all holders of Claims, be the Claims impaired or unimpaired under this Plan, shall be in exchange for an in complete satisfaction, discharge and release of all Claims of any nature whatsoever arising on or before the Effective Date, known or unknown, including any interest accrued or expenses incurred thereon from and after the

Petition Date, whether against the District or any of its properties, assets or interests in property. Except as otherwise provided herein, upon the Effective Date, all Claims against the District shall be and shall be deemed to be satisfied, discharged and released in full, be they impaired or unimpaired under this Plan.

### B.    Injunction.

Except as otherwise expressly provided in this Plan, all entities who have held, hold or may hold pre-Effective Date Claims shall be permanently enjoined from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such pre-Effective Date Claim against the District or its property; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the District or its property with respect to such pre-Effective Date Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against the District or its property; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to the District with respect to any such pre-Effective Date Claim, except as otherwise permitted by section 553 of the Bankruptcy Code.

### C.    Term Of Existing Injunctions Or Stays.

Unless otherwise provided, all injunctions or stays provided for in the Chapter 9 Case pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## XI.    RETENTION OF JURISDICTION

Following the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matter (x) arising under the Bankruptcy Code and relating to the District, (y) arising in or related to the Chapter 9 Case or this Plan or the Plan Documents, and (z) otherwise for the following:

1.    to resolve any objection duly and timely filed by either PHH or the Committee under Sections 1.2.4.2 or 1.2.4.3 of the ASA to the District's intent to pay a given Claim or Claims that appears on the list of Covered Claim from the PHH Administrative Claims Fund

86

532049v2

or that would make the aggregate amount of Covered Claims paid in excess of the PHH Administrative Claims Fund;

2.      to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the District is a party or with respect to which the District may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of this Plan, and to add any executory contracts or unexpired leases to the Rejection Motion, as necessary;

3.      to enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents related to this Plan;

4.      to determine any and all motions, adversary proceeding, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the District after the Effective Date or that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 Case, whether or not such action initially is filed in the Bankruptcy Court or any other court;

5.      to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

6.      to hear and determine any objections to Claims or to proofs of Claim filed, both before and after the Effective Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

7.      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

8.      to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142(b) of the Bankruptcy Code;

87

532049v2

9.      to consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

10.      to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

11.      to hear and determine all disputes or controversies arising in connection with or relating to this Plan or the Confirmation Order or the interpretation, implementation, or enforcement of this Plan or the Confirmation Order or the extent of any entity's obligations incurred in connection with or released under this Plan or the Confirmation Order;

12.      to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of this Plan;

13.      to determine any other matters that may arise in connection with or are related to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document related to this Plan or the Disclosure Statement (including the Plan Documents);

14.      to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

15.      to hear and determine any Rights of Action retained by the District under the ASA;

16.      to hear and determine any motion made by the Indenture Trustee under paragraph 8 of the Select Stipulation utilizing the standards set forth therein; and

17.      to enter a final decree closing the Chapter 9 Case.

## XII.    CONDITIONS PRECEDENT

### A.    Condition Precedent To Confirmation.

The entry of the Confirmation Order in form and substance satisfactory to the District and PHH shall be a condition precedent to confirmation of this Plan.

-33-

88

532049v2

**B.    Conditions Precedent To Effective Date.**

The "effective date of the plan," as used in section 1129 of the Bankruptcy Code, shall not occur, and this Plan shall be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to the satisfaction (or waiver as set forth in Section XII.C) of the following conditions precedent.

1.    **Confirmation Order.**  The Confirmation Order shall have been entered.

2.    **Plan Documents**.  All agreements and instruments contemplated by, or to be entered into pursuant to, this Plan shall be in form and substance acceptable to the District and PHH and shall have been duly and validly executed and delivered, or deemed executed by the parties thereto, and all conditions to their effectiveness shall have been satisfied or waived.

3.    **Sale Closing.**  The occurrence of the Sale Closing Date with respect either to the Two Hospitals Transaction or the Alternative Transaction.

4.    **Timing**.  The Effective Date shall occur on the first day after which the conditions set forth in Section XII.B. are satisfied or waived; *provided* that, unless otherwise ordered by the Bankruptcy Court, the Effective Date must occur by no later than one year after the Confirmation Date.

**C.    Waiver Of Conditions To Effective Date.**

The District or PHH may waive in whole or in part condition 2 to effectiveness of this Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

**D.    Effect Of Failure Of Conditions.**

In the event that the conditions to effectiveness of this Plan have not been timely satisfied or waived, and upon notification submitted by the District to the Bankruptcy Court, (a) the Confirmation Order shall be vacated, (b) no distributions under this Plan shall be made, (c) the District and all holders of Claims shall be restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (d) all of the

532049v2

District's obligations with respect to the Claims shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the District or any other entity or to prejudice in any manner the rights of the District or any entity in any further proceedings involving the District.

## XIII. MISCELLANEOUS PROVISIONS

### A. Dissolution Of The Committee.

On the Effective Date, the Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 9 Case and the Committee shall be deemed dissolved and its appointment terminated. The professionals retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications by such professionals or committee members for allowance of Professional Claims timely filed after the Effective Date as provided in this Plan.

### B. Severability.

If, prior to the Confirmation Date, any term or provisions of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, with the consent of the District, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

532049v2

C.    **Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an Exhibit hereto or Plan Document provides otherwise, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with the laws of the State of California, without giving effect to principles of conflicts of laws.

D.    **Effectuating Documents And Further Transactions.**

Each of the officials and employees of the District is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions of this Plan.

E.    **Notice Of Effective Date.**

On or before ten (10) days after occurrence of the Effective Date, the District or its agent shall mail or cause to be mailed to all holders of Claims a Notice that informs such holders of (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of the District's executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (d) the deadline established under this Plan for the filing of Administrative Claims; (e) the procedures for changing an address of record pursuant to Section VII.B.; and (f) such other matters as the District deems to be appropriate.

DATED: November 2, 2009

VALLEY HEALTH SYSTEM

By: _____
    Joel M. Bergenfeld
    Chief Executive Officer

Submitted By:

STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
Reorganization Counsel for the District

By: _____
    Charles D. Axelrod
    Gary E. Klausner
    H. Alexander Fisch

-36-

# Exhibit B

**VALLEY HEALTH SYSTEM**
**FISCAL YEAR 2010 - AS OF AUGUST 31, 2009**
**CONSOLIDATED OPERATING FUND BALANCE SHEET**

| | 8/31/2009 | 7/31/2009 | Change from prior month | 6/30/2009 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **CURRENT** | | | | |
| Cash and Short Term Investment | $ 7,647,131 | $ 8,517,009 | $ (869,878) | $ 11,823,978 |
| Short Term Investment: Restricted | 1,308,570 | 1,308,570 | 0 | 1,306,808 |
| Patient Receivables | 82,222,254 | 73,491,580 | 8,730,674 | 74,027,038 |
| Less Retention & Allowances | (57,218,090) | (48,797,073) | (8,421,017) | (50,039,475) |
| Net Patient Receivables | 25,004,164 | 24,694,507 | 309,657 | 23,987,563 |
| Other Receivables | 465,149 | 465,131 | 18 | 570,609 |
| Inventories | 1,902,196 | 1,909,398 | (7,202) | 1,923,690 |
| Prepaid Expenses & Deposits | 1,718,287 | 1,911,057 | (192,770) | 1,867,519 |
| TOTAL CURRENT ASSETS | 38,045,497 | 38,805,672 | (760,175) | 41,480,167 |
| **ASSETS LIMITED TO USE** | | | | |
| Under Indenture agreement - Held by Trustee | 2,381,454 | 2,381,454 | 0 | 2,447,071 |
| **PROPERTY, PLANT & EQUIPMENT** | | | | |
| Land | 7,346,113 | 7,346,113 | 0 | 7,346,113 |
| Land Improvements | 3,239,908 | 3,239,908 | 0 | 3,239,908 |
| Building & Improvements | 77,718,208 | 77,718,208 | 0 | 77,718,208 |
| Equipment | 88,583,563 | 88,137,030 | 446,533 | 87,890,876 |
| TOTAL | 176,887,792 | 176,441,259 | 446,533 | 176,195,105 |
| Less Accumulated Depreciation | (125,692,054) | (125,108,053) | (584,001) | (124,619,836) |
| NET PP&E | 51,195,738 | 51,333,206 | (137,468) | 51,575,269 |
| Construction In Progress | 4,338,858 | 4,311,373 | 27,485 | 4,263,749 |
| TOTAL PROPERTY PLANT & EQUIPMENT | 55,534,596 | 55,644,579 | (109,983) | 55,839,018 |
| Note Receivable | 4,200,000 | 4,200,000 | 0 | 4,200,000 |
| Other Assets | 899,630 | 902,559 | (2,929) | 905,488 |
| TOTAL OTHER ASSETS | 5,099,630 | 5,102,559 | (2,929) | 5,105,488 |
| TOTAL ASSETS | $ 101,061,177 | $ 101,934,264 | $ (873,087) | $ 104,871,744 |

The Financial information presented includes the Consolidation of Valley Health System Service Corporation

**VALLEY HEALTH SYSTEM**
**FISCAL YEAR 2010 - AS OF AUGUST 31, 2009**
**CONSOLIDATED OPERATING FUND BALANCE SHEET**

| | 8/31/2009 | 7/31/2009 | Change from prior month | 6/30/2009 |
|---|---|---|---|---|
| **LIABILITIES AND FUND BALANCE** | | | | |
| **CURRENT** | | | | |
| Accounts Payable | $ 9,740,460 | $ 10,808,913 | $ (1,068,453) | $ 12,316,269 |
| Accrued Payroll | 4,400,509 | 4,425,418 | (24,909) | 5,959,650 |
| Pre-Petition Liabilities | 22,207,551 | 22,207,686 | (135) | 22,557,005 |
| Other Current Liabilities | 1,623,950 | 1,436,130 | 187,820 | 1,255,068 |
| Payable to 3rd Party Payors | 4,997,827 | 5,016,162 | (18,335) | 5,014,736 |
| Current Maturities of Long Term Debt: | | | | |
|   Capitalized Leases | 1,844,886 | 1,844,886 | 0 | 1,844,886 |
|   Notes Payable | 0 | 0 | 0 | 0 |
|   1993 Bonds | 1,635,000 | 1,635,000 | 0 | 1,635,000 |
|   1996 Bonds | 170,000 | 170,000 | 0 | 170,000 |
| TOTAL CURRENT LIABILITIES | 46,620,183 | 47,544,195 | (924,012) | 50,752,614 |
| | | | | |
| Workers' Comp - Long Term | 6,885,047 | 6,704,740 | 180,307 | 6,576,443 |
| Malpractice Liability - Long Term | 2,925,482 | 2,925,482 | 0 | 2,925,482 |
| **LONG TERM DEBT** | | | | |
| Capitalized Leases and Other L/T Debt | 1,614,094 | 1,486,441 | 127,653 | 1,288,773 |
| Select Note | 7,968,500 | 7,968,500 | 0 | 7,968,500 |
| Bonds Payable 1993 | 38,278,927 | 38,275,215 | 3,712 | 38,271,504 |
| Bonds Payable 1996 | 4,616,785 | 4,616,005 | 780 | 4,615,225 |
| TOTAL LONG TERM DEBT | 52,478,306 | 52,346,161 | 132,145 | 52,144,002 |
| **TOTAL LIABILITIES** | 108,909,018 | 109,520,578 | (611,560) | 109,473,059 |
| | | | | |
| FUND BALANCE | (7,546,513) | (7,525,185) | (21,328) | 440,494 |
| INCOME | (301,328) | (61,129) | (240,199) | (7,967,291) |
| **TOTAL LIABILITIES & FUND BALANCE** | $ 101,061,177 | $ 101,934,264 | $ (873,087) | $ 101,946,262 |

The Financial information presented includes the Consolidation of Valley Health System Service Corporation

## VALLEY HEALTH SYSTEM
### CONSOLIDATED
### MTD 2010
### AUGUST 2009

|  | Month Activity | | |
|---|---|---|---|
|  | **Actual** | **Budget** | **Variance** |
| **Statistics:** | | | |
| Discharges - Acute | 1,229 | 1,466 | (237) |
| Discharges - SNF/Sub-Acute | 4 | 4 | - |
| Patient Days - Acute | 5,227 | 5,857 | (630) |
| Patient Days - SNF/Sub-Acute | 695 | 598 | 97 |
| LOS - Acute | 4.25 | 4.00 | 0.26 |
| FTE'S | 1,051.32 | 1,184.15 | (132.83) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 13,622,779 | $ 13,125,101 | $ 497,678 F |
| Other Operating Revenue | 88,371 | 92,974 | (4,603) U |
| **Total Net Revenue** | 13,711,150 | 13,218,075 | 493,075 F |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 5,411,061 | 5,715,680 | 304,619 F |
| Benefits | 1,626,131 | 1,581,450 | (44,681) U |
| Registry | 278,493 | 255,631 | (22,862) U |
| Supplies | 2,225,339 | 2,466,627 | 241,288 F |
| Professional Fees | 416,609 | 394,713 | (21,896) U |
| Restructure Fees | 482,324 | 125,000 | (357,324) U |
| Purchased Services | 1,646,248 | 1,811,376 | 165,128 F |
| Depreciation | 623,334 | 434,462 | (188,872) U |
| Other | 930,022 | 1,049,540 | 119,518 F |
| Corporate Allocation | - | - | - |
| **Total Expenses** | 13,639,561 | 13,834,479 | 194,918 F |
| | | | |
| **Operating Income** | 71,589 | (616,404) | 687,993 F |
| | | | |
| Interest Income | 243 | - | 243 F |
| Interest Expense | (329,298) | (328,023) | (1,275) U |
| Other Non-Operating Income (Expense) | 17,122 | - | 17,122 F |
| **Total Non-Operating Income (Expense)** | (311,933) | (328,023) | 16,090 F |
| | | | |
| **Net Income (Loss)** | $ (240,344) | $ (944,427) | $ 704,083 F |
| | | | |
| Operating Margin | 0.5% | -4.7% | 5.2% |
| OEBITDA Margin | 5.1% | -1.4% | 6.4% |

F= Favorable variance
U= Unfavorable variance

95    3

**VALLEY HEALTH SYSTEM**
**CONSOLIDATED**
**YTD 2010**
**AUGUST 2009**

| | Year-to-Date Activity | | |
| --- | --- | --- | --- |
| | **Actual** | **Budget** | **Variance** |
| **Statistics:** | | | |
| Discharges - Acute | 2,521 | 2,939 | (418) |
| Discharges - SNF/Sub-Acute | 8 | 6 | 2 |
| Patient Days - Acute | 10,617 | 11,527 | (910) |
| Patient Days - SNF/Sub-Acute | 1,364 | 1,231 | 133 |
| LOS - Acute | 4.21 | 3.92 | 0.29 |
| FTE'S | 1,084.02 | 1,180.96 | (96.94) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 27,547,137 | $ 26,996,653 | $ 550,484 F |
| Other Operating Revenue | 146,561 | 185,948 | (39,387) U |
| **Total Net Revenue** | 27,693,698 | 27,182,601 | 511,097 F |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 10,885,534 | 11,361,853 | 476,319 F |
| Benefits | 3,249,397 | 3,194,627 | (54,770) U |
| Registry | 559,358 | 496,916 | (62,442) U |
| Supplies | 4,739,789 | 4,976,621 | 236,832 F |
| Professional Fees | 835,203 | 914,426 | 79,223 F |
| Restructure Fees | 985,289 | 125,000 | (860,289) U |
| Purchased Services | 3,282,629 | 3,941,613 | 658,984 F |
| Depreciation | 1,070,065 | 867,825 | (202,240) U |
| Other | 1,806,773 | 2,089,449 | 282,676 F |
| Corporate Allocation | - | - | - |
| **Total Expenses** | 27,414,037 | 27,968,330 | 554,293 F |
| | | | |
| **Operating Income** | 279,661 | (785,729) | 1,065,390 F |
| | | | |
| Interest Income | 519 | - | 519 F |
| Interest Expense | (632,886) | (656,046) | 23,160 F |
| Other Non-Operating Income (Expense) | 51,233 | - | (51,233) U |
| **Total Non-Operating Income (Expense)** | (581,134) | (656,046) | (27,554) U |
| | | | |
| **Net Income (Loss)** | $ (301,473) | $ (1,441,775) | $ 1,037,836 F |
| | | | |
| Operating Margin | 1.0% | -2.9% | 3.9% |
| OEBITDA Margin | 4.9% | 0.3% | 4.6% |

F= Favorable variance
U= Unfavorable variance

**VALLEY HEALTH SYSTEM**
**HEMET VALLEY MEDICAL CENTER**
**MTD 2010**
**AUGUST 2009**

| | Month Activity | | | | |
|---|---|---|---|---|---|
| | **Actual** | | **Budget** | | **Variance** |
| **Statistics:** | | | | | |
| Discharges - Acute | 898 | | 1,122 | | (224) |
| Discharges - SNF/Sub-Acute | - | | - | | - |
| Patient Days - Acute | 3,892 | | 4,410 | | (518) |
| Patient Days - SNF/Sub-Acute | - | | - | | - |
| LOS - Acute | 4.33 | | 3.93 | | 0.40 |
| FTE'S | 635.08 | | 720.50 | | (85.42) |
| | | | | | |
| **Revenue:** | | | | | |
| Net Patient Revenue | $ 9,898,854 | $ | 9,569,039 | $ | 329,815 F |
| Other Operating Revenue | 77,860 | | 17,523 | | 60,337 F |
| **Total Net Revenue** | 9,976,714 | | 9,586,562 | | 390,152 F |
| | | | | | |
| **Expenses:** | | | | | |
| Salaries & Wages | 3,379,524 | | 3,535,910 | | 156,386 F |
| Benefits | 946,750 | | 956,157 | | 9,407 F |
| Registry | 117,615 | | 145,885 | | 28,270 F |
| Supplies | 1,478,366 | | 1,650,513 | | 172,147 F |
| Professional Fees | 152,206 | | 130,112 | | (22,094) U |
| Restructure Fees | - | | - | | - |
| Purchased Services | 1,159,480 | | 1,169,348 | | 9,868 F |
| Depreciation | 280,676 | | 188,541 | | (92,135) U |
| Other | 598,415 | | 549,213 | | (49,202) U |
| Corporate Allocation | 1,530,011 | | 1,282,755 | | (247,256) U |
| **Total Expenses** | 9,643,043 | | 9,608,434 | | (34,609) U |
| | | | | | |
| **Operating Income** | 333,671 | | (21,872) | | 355,543 F |
| | | | | | |
| Interest Income | - | | - | | - U |
| Interest Expense | (149,746) | | (133,631) | | (16,115) U |
| Other Non-Operating Income (Expense) | 4,622 | | - | | 4,622 F |
| **Total Non-Operating Income (Expense)** | (145,124) | | (133,631) | | (11,493) U |
| | | | | | |
| **Net Income (Loss)** | $ 188,547 | $ | (155,503) | $ | 344,050 F |
| | | | | | |
| Operating Margin | 3.3% | | -0.2% | | 3.6% |
| OEBITDA Margin | 6.2% | | 1.7% | | 4.4% |

5

**VALLEY HEALTH SYSTEM**
**HEMET VALLEY MEDICAL CENTER**
**YTD 2009**
**AUGUST 2009**

| | Year-to-Date Activity | | |
| | Actual | Budget | Variance |
|---|---|---|---|
| **Statistics:** | | | |
| Discharges - Acute | 1,830 | 2,254 | (424) |
| Discharges - SNF/Sub-Acute | - | - | - |
| Patient Days - Acute | 7,911 | 8,738 | (827) |
| Patient Days - SNF/Sub-Acute | - | - | - |
| LOS - Acute | 4.32 | 3.88 | 0.45 |
| FTE'S | 660.00 | 717.22 | -57.22 |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 20,025,596 | $ 19,342,174 | $ 683,422 F |
| Other Operating Revenue | 96,537 | 35,046 | 61,491 F |
| **Total Net Revenue** | 20,122,133 | 19,377,220 | 744,913 F |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 6,816,538 | 7,014,970 | 198,432 F |
| Benefits | 1,884,016 | 1,923,937 | 39,921 F |
| Registry | 248,085 | 289,811 | 41,726 F |
| Supplies | 3,194,227 | 3,328,114 | 133,887 F |
| Professional Fees | 262,063 | 260,224 | (1,839) U |
| Restructure Fees | - | - | - |
| Purchased Services | 2,212,428 | 2,510,544 | 298,116 F |
| Depreciation | 477,104 | 376,257 | (100,847) U |
| Other | 1,087,933 | 1,103,438 | 15,505 F |
| Corporate Allocation | 3,153,820 | 2,676,954 | (476,866) U |
| **Total Expenses** | 19,336,214 | 19,484,249 | 148,035 F |
| | | | |
| **Operating Income** | 785,919 | (107,029) | 892,948 F |
| | | | |
| Interest Income | - | - | - |
| Interest Expense | (291,587) | (267,262) | (24,325) U |
| Other Non-Operating Income (Expense) | 9,197 | - | (9,197) U |
| **Total Non-Operating Income (Expense)** | (282,390) | (267,262) | (33,522) U |
| | | | |
| **Net Income (Loss)** | $ 503,529 | $ (374,291) | $ 859,426 F |
| | | | |
| Operating Margin | 3.9% | -0.6% | 4.5% |
| OEBITDA Margin | 6.3% | 1.4% | 4.9% |

**VALLEY HEALTH SYSTEM**
**MENIFEE VALLEY MEDICAL CENTER**
**MTD 2010**
**AUGUST 2009**

| | Month Activity | | |
|---|---|---|---|
| | **Actual** | **Budget** | **Variance** |
| **Statistics:** | | | |
| Discharges - Acute | 331 | 344 | (13) |
| Discharges - SNF/Sub-Acute | - | - | - |
| Patient Days - Acute | 1,335 | 1,447 | (112) |
| Patient Days - SNF/Sub-Acute | - | - | - |
| LOS - Acute | 4.03 | 4.21 | (0.17) |
| FTE'S | 255.08 | 272.44 | (17.36) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 3,374,330 | $ 3,406,468 | $ (32,138) U |
| Other Operating Revenue | 634 | 3,833 | (3,199) U |
| **Total Net Revenue** | 3,374,964 | 3,410,301 | (35,337) U |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 1,313,520 | 1,340,211 | 26,691 F |
| Benefits | 378,412 | 364,452 | (13,960) U |
| Registry | 142,463 | 105,579 | (36,884) U |
| Supplies | 713,284 | 749,452 | 36,168 F |
| Professional Fees | 105,780 | 72,090 | (33,690) U |
| Restructure Fees | - | - | - |
| Purchased Services | 300,254 | 388,522 | 88,268 F |
| Depreciation | 68,660 | 97,692 | 29,032 F |
| Other | 166,325 | 187,166 | 20,841 F |
| Corporate Allocation | 521,551 | 588,575 | 67,024 F |
| **Total Expenses** | 3,710,249 | 3,893,739 | 183,490 F |
| | | | |
| **Operating Income** | (335,285) | (483,438) | 148,153 F |
| | | | |
| Interest Income | - | - | - U |
| Interest Expense | (105,815) | (99,522) | (6,293) U |
| Other Non-Operating Income (Expense) | 500 | - | 500 F |
| **Total Non-Operating Income (Expense)** | (105,315) | (99,522) | (5,793) U |
| | | | |
| **Net Income (Loss)** | $ (440,600) | $ (582,960) | $ 142,360 F |
| | | | |
| Operating Margin | -9.9% | -14.2% | 4.2% |
| OEBITDA Margin | -7.9% | -11.3% | 3.4% |

**VALLEY HEALTH SYSTEM**
**MENIFEE VALLEY MEDICAL CENTER**
**YTD 2009**
**AUGUST 2009**

| | Year-to-Date Activity | | |
|---|---|---|---|
| | Actual | Budget | Variance |
| **Statistics:** | | | |
| Discharges - Acute | 691 | 685 | 6 |
| Discharges - SNF/Sub-Acute | - | - | - |
| Patient Days - Acute | 2,706 | 2,789 | (83) |
| Patient Days - SNF/Sub-Acute | - | - | - |
| LOS - Acute | 3.92 | 4.07 | (0.16) |
| FTE'S | 258.96 | 272.14 | (13.18) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 6,829,398 | $ 6,959,887 | $ (130,489) U |
| Other Operating Revenue | 3,203 | 7,666 | (4,463) U |
| **Total Net Revenue** | 6,832,601 | 6,967,553 | (134,952) U |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 2,618,236 | 2,673,538 | 55,302 F |
| Benefits | 745,669 | 733,257 | (12,412) U |
| Registry | 268,873 | 198,771 | (70,102) U |
| Supplies | 1,472,688 | 1,503,251 | 30,563 F |
| Professional Fees | 181,387 | 144,180 | (37,207) U |
| Restructure Fees | - | - | - |
| Purchased Services | 562,608 | 756,743 | 194,135 F |
| Depreciation | 137,319 | 195,353 | 58,034 F |
| Other | 396,618 | 378,240 | (18,378) U |
| Corporate Allocation | 1,075,566 | 1,226,942 | 151,376 F |
| **Total Expenses** | 7,458,964 | 7,810,275 | 351,311 F |
| | | | |
| **Operating Income** | (626,363) | (842,722) | 216,359 F |
| | | | |
| Interest Income | - | - | - |
| Interest Expense | (200,376) | (199,044) | (1,332) U |
| Other Non-Operating Income (Expense) | 1,000 | - | (1,000) U |
| **Total Non-Operating Income (Expense)** | (199,376) | (199,044) | (2,332) U |
| | | | |
| **Net Income (Loss)** | $ (825,739) | $ (1,041,766) | $ 214,027 F |
| | | | |
| Operating Margin | -9.2% | -12.1% | 2.9% |
| OEBITDA Margin | -7.2% | -9.3% | 2.1% |

100

8

**VALLEY HEALTH SYSTEM**
**HEMET SUB-ACUTE UNIT**
**MTD 2010**
**AUGUST 2009**

| | Month Activity | | |
|---|---|---|---|
| | Actual | Budget | Variance |
| **Statistics:** | | | |
| Discharges - Acute | - | - | - |
| Discharges - SNF/Sub-Acute | 4 | 4 | - |
| Patient Days - Acute | - | - | - |
| Patient Days - SNF/Sub-Acute | 695 | 598 | 97 |
| LOS - Sub-Acute | 173.75 | 149.50 | 24.25 |
| FTE'S | 44.51 | 51.60 | (7.09) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 349,595 | $ 149,594 | $ 200,001 F |
| Other Operating Revenue | - | - | - |
| **Total Net Revenue** | 349,595 | 149,594 | 200,001 F |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 193,492 | 209,735 | 16,243 F |
| Benefits | 56,095 | 54,932 | (1,163) U |
| Registry | - | - | - U |
| Supplies | 18,075 | 17,313 | (762) U |
| Professional Fees | 1,600 | 1,810 | 210 F |
| Restructure Fees | - | - | - |
| Purchased Services | 13,836 | 9,732 | (4,104) U |
| Depreciation | 609 | 4,890 | 4,281 F |
| Other | 144 | 2,390 | 2,246 F |
| Corporate Allocation | 54,035 | 52,368 | (1,667) U |
| **Total Expenses** | 337,886 | 353,170 | 15,284 F |
| | | | |
| **Operating Income** | 11,709 | (203,576) | 215,285 F |
| | | | |
| Interest Income | - | - | - |
| Interest Expense | - | (2,387) | 2,387 |
| Other Non-Operating Income (Expense) | - | - | - |
| **Total Non-Operating Income (Expense)** | - | (2,387) | 2,387 |
| | | | |
| **Net Income (Loss)** | $ 11,709 | $ (205,963) | $ 217,672 F |
| | | | |
| Operating Margin | 3.3% | -136.1% | 139.4% |
| OEBITDA Margin | 3.5% | -132.8% | 136.3% |

101  9

**VALLEY HEALTH SYSTEM**
**HEMET SUB-ACUTE UNIT**
**YTD 2009**
**AUGUST 2009**

| | Year-to-Date Activity | | |
| | Actual | Budget | Variance |
|---|---|---|---|
| **Statistics:** | | | |
| Discharges - Acute | - | - | - |
| Discharges - SNF/Sub-Acute | 8 | 6 | 2 |
| Patient Days - Acute | - | - | - |
| Patient Days - SNF/Sub-Acute | 1,364 | 1,231 | 133 |
| LOS - Sub-Acute | 170.50 | 205.17 | (34.67) |
| FTE'S | 45.78 | 51.99 | (6.22) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $ 692,141 | $ 694,592 | $ (2,451) U |
| Other Operating Revenue | - | - | - U |
| **Total Net Revenue** | 692,141 | 694,592 | (2,451) U |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 381,589 | 421,705 | 40,116 F |
| Benefits | 115,828 | 112,394 | (3,434) U |
| Registry | - | - | - U |
| Supplies | 33,635 | 34,626 | 991 F |
| Professional Fees | 3,820 | 3,620 | (200) U |
| Restructure Fees | - | - | - |
| Purchased Services | 25,875 | 19,464 | (6,411) U |
| Depreciation | 1,218 | 9,780 | 8,562 F |
| Other | 479 | 4,780 | 4,301 F |
| Corporate Allocation | 108,962 | 109,167 | 205 F |
| **Total Expenses** | 671,406 | 715,536 | 44,130 F |
| | | | |
| **Operating Income** | 20,735 | (20,944) | 41,679 F |
| | | | |
| Interest Income | - | - | - |
| Interest Expense | - | (4,774) | (4,774) U |
| Other Non-Operating Income (Expense) | - | - | - |
| **Total Non-Operating Income (Expense)** | - | (4,774) | (4,774) |
| | | | |
| **Net Income (Loss)** | $ 20,735 | $ (25,718) | $ 36,905 F |
| | | | |
| Operating Margin | 3.0% | -3.0% | 6.0% |
| OEBITDA Margin | 3.2% | -1.6% | 4.8% |

102

**VALLEY HEALTH SYSTEM**
**SYSTEM OFFICE**
**MTD 2010**
**AUGUST 2009**

| | Month Activity | | |
|---|---|---|---|
| | **Actual** | **Budget** | **Variance** |
| **Statistics:** | | | |
| Discharges - Acute | 1,229 | 1,466 | (237) |
| Discharges - SNF/Sub-Acute | 4 | 4 | - |
| Patient Days - Acute | 5,227 | 5,857 | (630) |
| Patient Days - SNF/Sub-Acute | 695 | 598 | 97 |
| LOS - Acute | 4.25 | 4.00 | 0.26 |
| FTE'S | 116.65 | 139.61 | (22.96) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $         - | $         - | $         - |
| Other Operating Revenue | 9,877 | 71,618 | (61,741) U |
| **Total Net Revenue** | 9,877 | 71,618 | (61,741) U |
| | | | |
| **Expenses:** | | | |
| Salaries & Wages | 524,525 | 629,824 | 105,299  F |
| Benefits | 244,874 | 205,909 | (38,965) U |
| Registry | 18,415 | 4,167 | (14,248) U |
| Supplies | 15,614 | 49,349 | 33,735  F |
| Professional Fees | 157,023 | 190,701 | 33,678  F |
| Restructure Fees | 482,324 | 125,000 | (357,324) U |
| Purchased Services | 172,678 | 243,774 | 71,096  F |
| Depreciation | 273,389 | 143,339 | (130,050) U |
| Other | 165,138 | 310,770 | 145,632  F |
| Corporate Allocation | (2,105,597) | (1,923,698) | 181,899  F |
| **Total Expenses** | (51,617) | (20,865) | 30,752  F |
| | | | |
| **Operating Income** | 61,494 | 92,483 | (30,989) U |
| | | | |
| Interest Income | 243 | - | 243  F |
| Interest Expense | (73,737) | (92,483) | 18,746  F |
| Other Non-Operating Income (Expense) | 12,000 | - | 12,000  F |
| **Total Non-Operating Income (Expense)** | (61,494) | (92,483) | 30,989  F |
| | | | |
| **Net Income (Loss)** | $         - | $         - | $         - U |

**VALLEY HEALTH SYSTEM**
**SYSTEM OFFICE**
**YTD 2009**
**AUGUST 2009**

| | Year-to-Date Activity | | |
| --- | --- | --- | --- |
| | **Actual** | **Budget** | **Variance** |
| **Statistics:** | | | |
| Discharges - Acute | 2,521 | 2,939 | (418) |
| Discharges - SNF/Sub-Acute | 8 | 6 | 2 |
| Patient Days - Acute | 10,617 | 11,527 | (910) |
| Patient Days - SNF/Sub-Acute | 1,364 | 1,231 | 133 |
| LOS - Acute | 4.21 | 3.92 | 0.29 |
| FTE'S | 119.29 | 139.61 | (20.33) |
| | | | |
| **Revenue:** | | | |
| Net Patient Revenue | $        - | $        - | $        - |
| Other Operating Revenue | 46,821 | 143,236 | (96,415) U |
| **Total Net Revenue** | 46,821 | 143,236 | (96,415) U |
| | | | |
| **Expenses:** | | | |
| Salaries &  Wages | 1,069,171 | 1,251,640 | 182,469  F |
| Benefits | 503,884 | 425,039 | (78,845) U |
| Registry | 42,400 | 8,334 | (34,066) U |
| Supplies | 39,239 | 110,630 | 71,391  F |
| Professional Fees | 387,933 | 506,402 | 118,469  F |
| Restructure Fees | 985,289 | 125,000 | (860,289) U |
| Purchased Services | 481,718 | 654,862 | 173,144  F |
| Depreciation | 454,424 | 286,435 | (167,989) U |
| Other | 321,743 | 602,991 | 281,248  F |
| Corporate Allocation | (4,338,348) | (4,013,063) | 325,285  F |
| **Total Expenses** | (52,547) | (41,730) | 10,817  F |
| | | | |
| **Operating Income** | 99,368 | 184,966 | (85,598) U |
| | | | |
| Interest Income | 519 | - | 519  F |
| Interest Expense | (140,923) | (184,966) | 44,043  F |
| Other Non-Operating Income (Expense) | 41,036 | - | (41,036) U |
| **Total Non-Operating Income (Expense)** | (99,368) | (184,966) | 3,526  F |
| | | | |
| **Net Income (Loss)** | $        - | $        - | $   (82,072) U |

## VALLEY HEALTH SYSTEM
### August 2009
### PATIENT REVENUE

| | Hemet/Sub-Acute Consolidated | Menifee | VHS Consolidated | % of Total |
|---|---|---|---|---|
| **CURRENT MONTH** | | | | |
| Gross Revenue | $ 41,576,338 | $ 14,701,713 | $ 56,278,051 | |
| Contractual Allowances | (27,972,154) | (10,426,370) | (38,398,524) | |
| Bad Debt/Charity | (3,355,735) | (901,013) | (4,256,748) | |
| Net Revenue | 10,248,449 | 3,374,330 | 13,622,779 | |
| **Net Revenue by Payor** | | | | |
| Medicare | 3,704,927 | 1,194,001 | 4,898,928 | 36.0% |
| Medi-Cal | 1,284,003 | 185,131 | 1,469,134 | 10.8% |
| Senior HMO/PPO | 2,894,940 | 1,258,949 | 4,153,889 | 30.5% |
| HMO/PPO | 1,155,507 | 395,855 | 1,551,362 | 11.4% |
| Senior Capitation | 0 | 0 | 0 | 0.0% |
| Medi-Cal Capitation | 0 | 0 | 0 | 0.0% |
| Commercial Capitation | 0 | 0 | 0 | 0.0% |
| General Insurance | 1,111,848 | 313,506 | 1,425,354 | 10.5% |
| Self Pay / Other | 97,224 | 26,888 | 124,112 | 0.9% |
| | $ 10,248,449 | $ 3,374,330 | $ 13,622,779 | 100% |
| Deductions as % of Gross | 75.35% | 77.05% | 75.79% | |
| **YEAR-TO-DATE** | | | | |
| Gross Revenue | $ 84,785,402 | $ 29,776,488 | $ 114,561,890 | |
| Contractual Allowances | (57,399,090) | (20,998,783) | (78,397,873) | |
| Bad Debt/Charity | (6,668,575) | (1,948,307) | (8,616,882) | |
| Net Revenue | 20,717,737 | 6,829,398 | 27,547,135 | |
| **Net Revenue by Payor** | | | | |
| Medicare | 7,424,729 | 2,567,115 | 9,991,844 | 36.3% |
| Medi-Cal | 2,627,231 | 378,009 | 3,005,240 | 10.9% |
| Senior HMO/PPO | 6,117,780 | 2,459,200 | 8,576,980 | 31.1% |
| HMO/PPO | 2,339,300 | 808,026 | 3,147,326 | 11.4% |
| Senior Capitation | 0 | 0 | 0 | 0.0% |
| Medi-Cal Capitation | 0 | 0 | 0 | 0.0% |
| Commercial Capitation | 0 | 0 | 0 | 0.0% |
| General Insurance | 2,015,262 | 559,089 | 2,574,351 | 9.3% |
| Self Pay / Other | 193,437 | 57,959 | 251,396 | 0.9% |
| | $ 20,717,739 | $ 6,829,398 | $ 27,547,137 | 100% |
| Deductions as % of Gross | 75.56% | 77.06% | 75.95% | |

# Exhibit C

# V&IG VALUATION & INFORMATION GROUP

**An Appraisal of**
**An Acute-Care Hospital**



**Hemet Valley Medical Center**
**1117 East Devonshire Avenue**
**Hemet, California**

**Prepared For**
**Board of Directors**
**Valley Health System**
**1117 East Devonshire Avenue**
**Hemet, California**

**Prepared By**
**Valuation & Information Group**
**6167 Bristol Parkway**
**Suite 430**
**Culver City, California**

# V& VALUATION &
# IG INFORMATION
# GROUP

6167 Bristol Parkway
Suite 430
Culver City, CA 90230
Tel 310.342.0123
Fax 310.342.0147

September 4, 2009

5 Neshaminy Interplex
Suite 215
Trevose, PA 19053
Tel 215.639.7600
Fax 215.639.7605

www.valinfo.com

Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California 92543

RE:  Hemet Valley Medical Center
     1117 East Devonshire Avenue
     Hemet, California

Ladies and Gentlemen:

In accordance with your request, we are pleased to submit this appraisal of the market value of the going concern of the above referenced property. The improvements include a one- to six-story with basement, 336,900-square-foot, concrete and steel acute-care hospital built in phases between 1942 and 2006, and an off-site 7,927-square-foot engineering building built in phases between 1908 and the 1960s. The quality of construction is average to good and the condition of the improvements is average.

The primary purpose of this valuation is to estimate the market value. It is our understanding that this appraisal will be used in connection with the possible sale of the facility. This letter of transmittal is accompanied by an appraisal report in a self-contained format.

The value reported herein is that of the fee simple estate, which includes the land, improvements, personal property and intangible going concern assets. We have not considered any excess net working capital or working capital deficit.

This appraisal investigation included a visit to the property on August 5, 2009, and all necessary investigation and analyses were made by the appraisers. The appraisal was prepared in accordance with Uniform Standards of Professional Appraisal Practice (USPAP).

Based upon the procedures outlined in this report and subject to the attached statement of facts and limiting conditions and critical assumptions, it is estimated that the fee simple market value of the going concern comprising the subject, as of August 5, 2009, is reasonably represented in the following rounded amount:

$27,330,000

108



Board of Directors
Valley Health System
September 4, 2009
Page 2

At the request of our client, in support of their internal planning, we have been asked to provide the value of the offsite parking under separate cover and exclude that area from this appraisal. According to the City of Hemet planning department, the subject requires 327 spaces. The hospital site has 175 parking spaces and the engineering building has nine spaces for a total of 184 spaces. Without the benefit of the offsite parking lot, the subject would be nonconforming and may find its ability to operate constrained, both physically and legally.

This estimate and the report are subject to the statement of facts and limiting conditions that are a critical part of our valuation report. No part of the appraisal report should be published or disseminated without Valuation and Information Group's prior written approval.

Thank you for the opportunity to provide you this service.

Respectfully submitted,

Valuation and Information Group

Jean-Pierre LoMonaco, MAI
President
CA Cert. Gen. AG011111

JPL/BJH/AK:jb
190210



# VALUATION & INFORMATION GROUP

**An Appraisal of**
**An Acute-Care Hospital**
**and Surplus Land Parcels**



**Menifee Valley Medical Center**
**28400 McCall Boulevard**
**Sun City, California**


**Prepared For**
**Board of Directors**
**Valley Health System**
**1117 East Devonshire Avenue**
**Hemet, California**


**Prepared By**
**Valuation & Information Group**
**6167 Bristol Parkway**
**Suite 430**
**Culver City, California**



**VALUATION &
INFORMATION
GROUP**

6167 Bristol Parkway
Suite 430
Culver City, CA 90230
Tel 310.342.0123
Fax 310.342.0147

August 21, 2009

5 Neshaminy Interplex
Suite 215
Trevose, PA 19053
Tel 215.639.7600
Fax 215.639.7605

www.valinfo.com

Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California 92543

RE:    Menifee Valley Medical Center and Surplus Land Parcels
       28400 McCall Boulevard
       Sun City, California

Ladies and Gentlemen:

In accordance with your request, we are pleased to submit this appraisal of the market value of the going concern of the above referenced property.  The improvements include a one- to four-story with basement, 128,340-square-foot, concrete and steel acute-care hospital built in 1989, and a one-story 5,573-square-foot education center built in 1994.  The quality of construction and the condition of the improvements are good.

The primary purpose of this valuation is to estimate the market value. It is our understanding that this appraisal will be used in connection with the possible sale of the facility and related parcels. This letter of transmittal is accompanied by an appraisal report in a self-contained format.

The value reported herein is that of the fee simple estate, which includes the land, improvements, personal property and intangible going concern assets. We have not considered any excess net working capital or working capital deficit.

This appraisal investigation included a visit to the property on August 5, 2009, and all necessary investigation and analyses were made by the appraisers. The appraisal was prepared in accordance with Uniform Standards of Professional Appraisal Practice (USPAP).

Based upon the procedures outlined in this report and subject to the attached statement of facts and limiting conditions and critical assumptions, it is estimated that the fee simple market value of the going concern comprising the subject (hospital facility only), as of August 5, 2009, is reasonably represented in the following rounded amount:

**$25,800,000**



Board of Directors
Valley Health System
August 21, 2009
Page 2

In addition, we have prepared separate valuations of the surplus land parcels adjacent to the north, south and east of the subject. The fee simple market values of these parcels, as of August 5, 2009, are reasonably represented in the following rounded amounts:

| | |
|---|---|
| **Front Surplus Parcel** | **$1,240,000** |
| **Rear Surplus Parcel** | **1,130,000** |
| **Orchard Parcel** | **4,460,000** |

We have not, as part of this valuation, performed an examination or review in the accounting sense of any of the financial information used and, therefore, do not express an opinion or other form of assurance with regard to the same. We have no responsibility to update our report for events and circumstances occurring after the date of this report. The information furnished to us by others is believed to be reliable, but no responsibility for its accuracy is assumed.

Neither the whole, nor any part of this appraisal nor any reference thereto may be included in any document, statement, appraisal or circular without Valuation and Information Group's prior written approval of the form and context in which it appears.

Thank you for the opportunity to provide you this service.

Respectfully submitted,

Valuation and Information Group

Jean-Pierre LoMonaco, MAI
President
CA Cert. Gen. AG011111

JPL/BJH/AK:jb
190210

112

# V&I | G  VALUATION & INFORMATION GROUP

**An Appraisal of
A Skilled Nursing Facility**



**Hemet Valley Healthcare Center
371 North Weston Place
Hemet, California**

**Prepared For
Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California**

**Prepared By
Valuation & Information Group
6167 Bristol Parkway
Suite 430
Culver City, California**



**VALUATION &
INFORMATION
GROUP**

6167 Bristol Parkway
Suite 430
Culver City, CA 90230
Tel 310.342.0123
Fax 310.342.0147

5 Neshaminy Interplex
Suite 215
Trevose, PA 19053
Tel 215.639.7600
Fax 215.639.7605

www.valinfo.com

September 9, 2009

Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California 92543

RE:    Hemet Valley Healthcare Center
       371 North Weston Place
       Hemet, California

Ladies and Gentlemen:

In accordance with your request, we have conducted a market value analysis of the above referenced property. The improvements consist of a one-story, 48,710-square-foot, wood- and steel-framed, stucco siding exterior, skilled nursing facility built in 1989. Approximately 16,236 square feet of the facility has been converted for use as a chemical dependency ward operating as Hemet Valley Recovery Center and as an alcohol/drug dependency treatment center identified as Sage Retreat through a management agreement between Valley Health System and Addiction Medicine Services, Inc. The skilled nursing portion of the facility was closed in November 2008. The quality of construction is average to good and the condition of the improvements is good.

The primary purpose of this valuation is to estimate the market value. It is our understanding that this appraisal will be used in connection with the possible sale of the facility. This letter of transmittal is accompanied by an appraisal report in a self-contained format.

The value reported herein is that of the fee simple estate, which includes the land, real property improvements and personal property assets only. The license is held by Valley Health System as a part of Hemet Valley Medical Center and the going concern and related intangible assets have been valued under separate cover.

This appraisal investigation included a visit to the property on August 5, 2009, and all necessary investigation and analyses were made by the appraisers. The appraisal was prepared in accordance with Uniform Standards of Professional Appraisal Practice (USPAP).

Based upon the procedures outlined in this report, it is estimated that the as is, fee simple market value of the subject, as of August 5, 2009, is reasonably represented in the following rounded amount:

**$4,550,000**

114



Board of Directors
Valley Health System
September 9, 2009
Page 2

This estimate and the report are subject to the statement of facts and limiting conditions that are a critical part of our valuation report.   No part of the appraisal report should be published or disseminated without Valuation and Information Group's prior written approval.

Thank you for the opportunity to provide you this service.

Respectfully submitted,

Valuation and Information Group

Jean-Pierre LoMonaco, MAI
President
CA Cert. Gen. AG011111

JPL/BJH/AK:jb
190210

# V& VALUATION &
# IG INFORMATION
# GROUP

**An Appraisal of
A Medical Office Building**



**Hemet Valley Medical Arts Building
1117 East Devonshire Avenue
Hemet, California**

**Prepared For
Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California**

**Prepared By
Valuation & Information Group
6167 Bristol Parkway
Suite 430
Culver City, California**



**VALUATION &
INFORMATION
GROUP**

6167 Bristol Parkway
Suite 430
Culver City, CA 90230
Tel 310.342.0123
Fax 310.342.0147

5 Neshaminy Interplex
Suite 215
Trevose, PA 19053
Tel 215.639.7600
Fax 215.639.7605

www.valinfo.com

September 8, 2009

Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California 92543

RE:    Hemet Valley Medical Arts Building
       1117 East Devonshire Avenue
       Hemet, California

Ladies and Gentlemen:

In accordance with your request, we have conducted a market value analysis of the above referenced property. The improvements consist of a two-story, 58,716-square-foot, wood-framed, stucco siding exterior medical office building built in 1983. The quality of construction and the condition of the improvements are good.

The primary purpose of this valuation is to estimate the market value. It is our understanding that this appraisal will be used in connection with the possible sale of the facility. This letter of transmittal is accompanied by an appraisal report in a self-contained format.

The value reported herein is that of the leased fee estate, which includes the land and improvements. We have not considered any excess net working capital or working capital deficit.

This appraisal investigation included a visit to the property on August 5, 2009, and all necessary investigation and analyses were made by the appraisers. The appraisal was prepared in accordance with Uniform Standards of Professional Appraisal Practice (USPAP).

Based upon the procedures outlined in this report, it is estimated that the as is, leased fee market value of the subject, as of August 5, 2009, is reasonably represented in the following rounded amount:

**$8,700,000**

117



Board of Directors
Valley Health System
September 8, 2009
Page 2

This estimate and the report are subject to the statement of facts and limiting conditions that are a critical part of our valuation report.   No part of the appraisal report should be published or disseminated without Valuation and Information Group's prior written approval.

Thank you for the opportunity to provide you this service.

Respectfully submitted,

Valuation and Information Group

Jean-Pierre LoMonaco, MAI
President
CA Cert. Gen. AG011111


JPL/BJH/AK:jb
190210

118



# VALUATION & INFORMATION GROUP

**An Appraisal of
Additional Land Parcels
and Five Accessory Buildings**

**Northwest Corner of Florida Avenue and San Jacinto Street,
Northwest Corner of Devonshire Avenue and Weston Place, and
919 Calhoun Place
Hemet, California**

**Prepared For
Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California**

**Prepared By
Valuation & Information Group
6167 Bristol Parkway
Suite 430
Culver City, California**



**VALUATION &
INFORMATION
GROUP**

6167 Bristol Parkway
Suite 430
Culver City, CA 90230
Tel 310.342.0123
Fax 310.342.0147

5 Neshaminy Interplex
Suite 215
Trevose, PA 19053
Tel 215.639.7600
Fax 215.639.7605

www.valinfo.com

August 21, 2009

Board of Directors
Valley Health System
1117 East Devonshire Avenue
Hemet, California 92543

RE:    Five Accessory Buildings and Land
       Northwest Corner of Florida Avenue and San Jacinto Street,
       Northwest Corner of Devonshire Avenue and Weston Place, and
       919 Calhoun Place
       Hemet, California

Ladies and Gentlemen:

In accordance with your request, we have conducted a market value analysis of the above referenced
properties.  The improvements consist of four accessory and support buildings totaling 30,850 square
feet located on the northwest corner of Florida Avenue and San Jacinto Street, a parking lot located
on the northwest corner of Devonshire Avenue and Weston Place, and a 2,100-square-foot child care
center located at 919 Calhoun Place on the southeast corner of Calhoun Place and Santa Fe Street.
The quality of construction of the improvements range from average to good and the condition of the
improvements range from average to good.

The primary purpose of this valuation is to estimate the market value of the identified assets. It is our
understanding that this appraisal will be used in connection with the possible sale of the properties.
This letter of transmittal is accompanied by an appraisal report in a self-contained format.

The value reported herein is that of the fee simple estate, which includes the land and real property
improvements.  This appraisal investigation included a visit to the properties in question on August
5, 2009, and all necessary investigation and analyses were made by the appraisers. The appraisal was
prepared in accordance with Uniform Standards of Professional Appraisal Practice (USPAP).

The following chart summarizes the concluded market value estimates, as of August 5, 2009, for the
identified properties:

120



Board of Directors
Valley Health System
August 21, 2009
Page 2

**Valley Health System**
**Summary of Acessory Property Value Conclusions**

| Property/Building | | Concluded Value |
|---|---|---|
| Parking Lot Weston & Devonshire | | $660,000 |
| Land and Accessory Buildings | | |
|   Land at Florida/San Jacinto | 1,040,000 | |
|   Records Storage Whse - Building Only | 560,000 | |
|   Sodexo Whse - Building Only | 230,000 | |
|   Data Center & "Pantry" - Building Only | 460,000 | |
| Total - Land and Accessory Buildings | | 2,290,000 |
| Child Care Center - Land and Building | | 350,000 |

At the request of our client, in support of their internal planning, we have been asked to provide the value of the parking lot at Western and Devonshire under separate cover (in this report) and exclude that area from the appraisal of Hemet Valley Medical Center (HVMC). According to the city of Hemet planning department, HVMC requires 327 parking spaces. The hospital site has 175 parking spaces and the engineering building has nine spaces for a total of 184 spaces. Without the benefit of the offsite parking lot, HVMC would be non-conforming and may find its ability to operate constrained, both physically and legally. The appraisal of the parking lot at Western and Devonshire can be severed from the HVMC operations and sold separately.

These estimates and the report are subject to the statement of facts and limiting conditions that are a critical part of our valuation report. No part of the appraisal report should be published or disseminated without Valuation and Information Group's prior written approval.

Thank you for the opportunity to provide you this service.

Respectfully submitted,

Valuation and Information Group

Jean-Pierre LoMonaco, MAI
President
CA Cert. Gen. AG011111

JPL/BJH/AK:jb
190210

121

# Exhibit D

## ATTACHMENT A (Sale of Menifee Only)
## HEMET VALLEY MEDICAL CENTER
### PROJECTED STATEMENTS OF REVENUES AND EXPENSES
### CALENDAR YEARS 2010 - 2012

**CALENDAR YEAR PROJECTIONS**

| | 2010 | | | | 2011 | | | | 2012 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | HVMC | DISTRICT | MSA* | TOTAL | HVMC | DISTRICT | MSA* | TOTAL | HVMC | DISTRICT | MSA* | TOTAL |
| **Average Daily Census** | 130 | | | | 132 | | | | 138 | | | |
| **PROJECTED REVENUES** | | | | | | | | | | | | |
| Net Inpatient Rev | $ 115,114,485 | $ - | $ - | $ 115,114,485 | $ 119,201,497 | $ - | $ - | $ 119,201,497 | $ 127,106,439 | $ - | $ - | $ 127,106,439 |
| Net Outpatient Rev | 38,856,214 | 0 | 0 | 38,856,214 | 41,739,972 | 0 | 0 | 41,739,972 | 44,581,008 | 0 | 0 | 44,581,008 |
| Bad Debt | (31,889,530) | 0 | 0 | (31,889,530) | (33,305,741) | 0 | 0 | (33,305,741) | (34,977,046) | 0 | 0 | (34,977,046) |
| Other Oper Revenue | 215,533 | 685,622 | 4,488,976 | 5,390,131 | 226,310 | 719,903 | 4,713,425 | 5,659,637 | 237,625 | 755,898 | 4,949,096 | 5,942,619 |
| **Total Proj Rev** | $ 122,296,702 | $ 685,622 | $ 4,488,976 | $ 127,471,300 | $ 127,862,038 | $ 719,903 | $ 4,713,425 | $ 133,295,365 | $ 136,948,026 | $ 755,898 | $ 4,949,096 | $ 142,653,020 |
| **PROJECTED EXPENSES** | | | | | | | | | | | | |
| Salaries & Wages | $ 42,337,331 | $ 4,765,025 | $ 1,395,715 | $ 48,498,071 | $ 43,974,784 | $ 5,003,276 | $ 1,465,501 | $ 50,443,561 | $ 46,729,733 | $ 5,188,384 | $ 1,538,776 | $ 53,456,893 |
| Employee Benefits | 11,029,310 | 1,601,715 | 472,247 | 13,103,272 | 11,606,074 | 1,747,534 | 495,860 | 13,849,467 | 12,333,299 | 1,812,349 | 520,653 | 14,666,301 |
| Registry | 1,688,317 | 26,460 | 24,794 | 1,739,571 | 1,719,337 | 27,783 | 26,034 | 1,773,154 | 1,895,569 | 28,621 | 27,335 | 1,951,524 |
| Purchased Services | 11,555,131 | 2,352,719 | 878,199 | 14,786,049 | 12,265,255 | 2,023,630 | 922,109 | 15,210,995 | 13,176,743 | 2,065,897 | 968,214 | 16,210,853 |
| Professional Fees | 1,577,301 | 2,035,643 | 281,901 | 3,894,845 | 1,624,604 | 2,090,992 | 295,996 | 4,011,592 | 1,673,342 | 2,147,801 | 310,796 | 4,131,940 |
| Supplies | 18,397,231 | 461,183 | 147,124 | 19,005,538 | 20,745,387 | 450,404 | 154,480 | 21,350,271 | 22,991,847 | 442,680 | 162,204 | 23,596,730 |
| Leases & Rentals | 2,072,137 | 181,592 | 90,286 | 2,344,015 | 2,013,201 | 163,512 | 94,800 | 2,271,513 | 1,957,541 | 145,857 | 99,540 | 2,202,938 |
| Insurance | 535,817 | 410,476 | 0 | 946,292 | 615,296 | 430,702 | 0 | 1,045,999 | 646,061 | 452,237 | 0 | 1,098,299 |
| Other Direct Expenses | 3,771,301 | 2,397,470 | 478,233 | 6,647,004 | 3,934,438 | 2,607,497 | 502,144 | 7,044,079 | 4,052,471 | 2,675,679 | 527,251 | 7,255,401 |
| Depreciation/Amort | 3,109,593 | 1,527,378 | 312,389 | 4,949,360 | 3,547,412 | 1,709,567 | 328,008 | 5,584,986 | 4,244,909 | 1,807,976 | 344,409 | 6,397,294 |
| Interest Expense | 1,125,483 | 756,414 | 0 | 1,881,897 | 618,750 | 398,425 | 0 | 1,017,175 | 618,750 | 349,577 | 0 | 968,326 |
| Bond Issue Costs | 0 | 44,232 | 0 | 44,232 | 0 | 88,464 | 0 | 88,464 | 0 | 88,464 | 0 | 88,464 |
| Home Office Expense | 15,391,681 | (15,391,681) | 0 | 0 | 15,446,475 | (15,446,475) | 0 | 0 | 15,852,791 | (15,852,791) | 0 | 0 |
| **Total Oper Exp** | $ 115,090,633 | $ 1,168,626 | $ 4,080,887 | $ 120,340,146 | $ 118,111,013 | $ 1,295,312 | $ 4,284,932 | $ 123,691,256 | $ 126,173,057 | $ 1,352,732 | $ 4,499,178 | $ 132,024,967 |
| **Profit (Loss) From Ops** | $ 7,206,069 | $ (483,005) | $ 408,089 | $ 7,131,153 | $ 9,751,025 | $ (575,409) | $ 428,493 | $ 9,604,109 | $ 10,774,969 | $ (596,834) | $ 449,918 | $ 10,628,053 |
| Other Non Oper Rev | 0 | 146,916 | 0 | 146,916 | 0 | 146,916 | 0 | 146,916 | 0 | 146,916 | 0 | 146,916 |
| Gain on Sale of Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investment Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Profit (Loss)** | $ 7,206,069 | $ (336,089) | $ 408,089 | $ 7,278,069 | $ 9,751,025 | $ (428,493) | $ 428,493 | $ 9,751,025 | $ 10,774,969 | $ (449,918) | $ 449,918 | $ 10,774,969 |

\* Note:  MSA estimate is based on current District Office service level

Printed on 11/1/2009  2:18 PM

# HEMET VALLEY MEDICAL CENTER
## PROJECTED STATEMENTS OF CASH FLOWS
### CALENDAR YEARS 2010 - 2012

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| **PROJECTED CASH RECEIPTS** | | | |
| Net Patient Rev | $ 124,522,792 | $ 132,741,157 | $ 136,710,401 |
| Other Operating Revenue | 4,997,972 | 5,636,630 | 5,918,462 |
| Non Operating Revenue | 150,416 | 146,916 | 146,916 |
| Proceeds from Sale of Assets | 0 | 0 | 0 |
| Misc | 0 | 0 | 0 |
| **Total Projected Receipts** | $ 129,671,180 | $ 138,524,704 | $ 142,775,779 |
| | | | |
| **PROJECTED DISBURSEMENTS** | | | |
| Payroll & Benefits | $ 61,402,079 | $ 64,046,812 | $ 67,857,043 |
| Purchased Services | 15,428,261 | 15,210,995 | 16,210,854 |
| Professional Services Fees | 8,134,416 | 5,784,746 | 6,083,466 |
| Supplies | 20,384,917 | 21,356,820 | 23,814,082 |
| Capital Expenditures | 7,501,807 | 10,134,851 | 10,189,406 |
| Leases & Rentals | 2,344,015 | 2,271,513 | 2,202,938 |
| Insurance & Taxes | 946,292 | 1,045,999 | 1,098,299 |
| Other Direct expenses | 6,665,879 | 7,044,079 | 7,255,401 |
| Interest Payments | 326,572 | 398,425 | 349,577 |
| Transfers to Bond Payment Funds | | | |
| 96 Bond | 1,031,250 | 1,031,250 | 1,031,250 |
| Reserve Fund Repayment | | | |
| 96 Bond DSR | 2,763,333 | 0 | 0 |
| Payments on LT Debt | 296,588 | 0 | 0 |
| **Total Cash Disbursements** | $ 127,225,409 | $ 128,325,490 | $ 136,092,316 |
| | | | |
| **Net Change in Cash** | $ 2,445,771 | $ 10,199,214 | $ 6,683,463 |
| **Beginning Cash Balance (Before W/C Req.)** | 9,243,108 | 2,204,705 | 2,696,554 |
| **Working Capital Reserve Requirements*** | 9,484,174 | 9,707,365 | 10,325,562 |
| **Excess Available to Unsecured Creditors** | $ 2,204,705 | $ 2,696,554 | $ (945,545) |

\* Disbursements per day times 30 days cash on hand.

# HEMET VALLEY MEDICAL CENTER
# KEY FORECAST ASSUMPTIONS (CALENDAR YEARS 2010 - 2012)

## PATIENT VOLUMES

1    Acute inpatient discharges at Hemet are projected to remain at current levels starting January 2010, to increase 3.5% starting in July 2010 to increase 5% starting in January 2011 and to increase 5% in Calendar 2012. An **Average Daily Census of 130** is the projection for Calendar Year 2010.

Increase in 2011 is based on the re-capturing of patients being sent to other hospitals.

2    VHS management is evaluating a number of other inpatient and outpatient programs as part of its ongoing strategic planning process and would expect to be able to add additional volumes and positive impact to Operating Income, however, we are still in the process of feasibility analysis and have chosen to not incorporate any value associated with programs currently under evaluation.

## NET REVENUES

3    Net revenues have been forecasted based upon current payer rates, future rate increases that have already been negotiated, and expected future rate increases based on recent trends and expectations going forward. Assumed rates of increase for both IP and OP, by payer and month of increase, are set forth below:

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| Medicare (October) | 1.0% | 1.0% | 1.0% |
| Senior HMO (October) | 1.0% | 1.0% | 1.0% |
| Medi-Cal (April) | 1.0% | 1.0% | 1.0% |
| *Commercial HMO/PPO (January) | 2.0% | 5.0% | 5.0% |
| General Insurance (January) | 2.0% | 5.0% | 5.0% |
| Self Pay | 1.0% | 5.0% | 5.0% |

* Opportunity for increased Net Revenue with next contract negotiation

4    The Oct 1, 2009 selected rate increase of approximately 12% is estimated to generate an added $ 2 million per year in Net Revenue. No rate increase is projected for years 2011 and 2012.

5    Approximately $3.2 million has been added to Net Revenue in Calendar 2010 for SB 1383 funds related to the Medi-Cal program. No amount has been added to years 2011 and 2012.

Printed on 11/1/2009  2:18 PM

# HEMET VALLEY MEDICAL CENTER
## KEY FORECAST ASSUMPTIONS (CALENDAR YEARS 2010 - 2012)

6    The 'Distressed Hospital Fund' projected annual amount of $1,000,000 is included in the Net Patient Revenue for 2010, 2011 and 2012.

7    Full implementation of Interqual Management services expected in Calendar 2010.

## OTHER OPERATING REVENUE

8    The Other Operating Revenue that will be generated to cover the outsourcing of District Office expenses to Menifee Valley Medical Center is estimated at approximately $4 million per year for 2010, 2011 and 2012.  Anticipates full allocation of MSA services to Menifee and may vary with actual services provided.

## OPERATING EXPENSES

9    Salaries & Wages

   o   Increases to salaries and wage rates from calendar years 2010 through 2012 are as follows:

| | 2010 | 2011 | 2012 |
|---|---|---|---|
| | 3.0% | 6.0% | 5.0% |

       Due to annual wage increases in July, calendar year 2010 will average 3% with the 6% increase only covering the last 6 months. Bargaining units renegotiations to begin approximately February and March of 2010.

   o   Calendar Year 2010 includes a reduction of approximately $1.3 million in Salaries and Benefits from Corporate office staff reductions.

10   Purchased Services

   o   Reduction in Sodexho contract to save approximately $2.5 million annually.

   o   Transfer of Bio-Pharm night on-call to in-house staff to net approximately $150,000 in savings annually.

   o   Reduction in Transcription Service to net approximately $200,000 annually.

   Restructure Costs

   o   The monthly average of $500,000 for Bankruptcy reorganization costs have been taken out starting in April of 2010.

**HEMET VALLEY MEDICAL CENTER**
**KEY FORECAST ASSUMPTIONS (CALENDAR YEARS 2010 - 2012)**

12    Supplies Expense

    o    Supplies expense is budgeted to increase in all years of the forecast due to inflation: medical supplies at 6%, pharmaceutical supplies at 5%, all other non-clinicals at 3%. Supplies also varies directly with patient volumes.

    o    Change in GPO will project a savings of approximately $500,000 annually.

    o    Savings in orthopedic implants and suture costs are projected at approximately $1 million.

13    Depreciation Expense

    o    Capital Additions for the forecasted years ($000s):

| | **2010** | **2011** | **2012** |
|---|---|---|---|
| | $7,500 | $10,000 | $10,000 |

    o    Due to the increases in Capital Additions, Depreciation Expense increases from original projections are:

| | **2010** | **2011** | **2012** |
|---|---|---|---|
| | $700k | $900k | $1.2 mil |

14    Other Expenses

    o    Potential implementation expenses related to the projected increase in Capital Equipment have not been included in the projections

127

**HEMET VALLEY MEDICAL CENTER**
**KEY FORECAST ASSUMPTIONS (CALENDAR YEARS 2010 - 2012)**

**CASH FLOW**

15    Cash Collections as a % of Net Patient Revenues are as follows:

|  | **2010** | **2011** | **2012** |
|---|---|---|---|
|  | 102% | 104% | 100% |

16    Increases to needed Capital Equipment & Projects will result in the following capital expenditures:
     (excluding any seismic retrofit expenses)

|  | **2010** | **2011** | **2012** |
|---|---|---|---|
|  | $7.5 mil | $10 mil | $10 mil |

17    Payments made to secured creditors for the '96 Bond (remaining estimate at $15 million) will be 'interest only'
     for calendar years 2010 through 2012.

18    Hemet Valley Medical Center will replenish the deficit of approximately $2.7 million for the Bond Reserve Fund.
     The full funding will be made in 2010.

19    Payments on LT Debt includes the Select note estimated at $9,500,000.  This amount is to be paid starting in 3 years, and
     is interest only beginning January, 2012.

128

# **Exhibit E**

TABLE OF CONTENTS

Page

**ARTICLE I - DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING** .......... 1

1.1 Definitions .......... 1
1.2 Purchase Consideration .......... 7
1.3 Closing Date; Closing Escrow .......... 10
1.4 Items to be Delivered by Seller at Closing .......... 12
1.5 Items to be Delivered by Purchaser at Closing .......... 14
1.6 Transfer of Seller Assets .......... 16
1.7 Excluded Assets .......... 18
1.8 Assumed Obligations .......... 20
1.9 Excluded Liabilities .......... 21
1.10 Disclaimer of Warranties .......... 23
1.11 Risk of Loss .......... 25
1.12 Casualty .......... 25
1.13 Condemnation .......... 25
1.14 Development and Review of Schedules, Exhibits and Other Materials .......... 26

**ARTICLE II - REPRESENTATIONS AND WARRANTIES OF SELLER** .......... 27

2.1 Authorization .......... 27
2.2 Binding Agreement .......... 27
2.3 Organization and Good Standing; No Violation .......... 27
2.4 Contracts and Leases .......... 28
2.5 Required Consents .......... 28
2.6 Compliance With Laws and Contracts .......... 29
2.7 Title to Personal property .......... 30
2.8 Hospital Businesses Operations .......... 30
2.9 Brokers and Finders .......... 31
2.10 Financial Statements .......... 31
2.11 Legal Proceedings and Liabilities .......... 33
2.12 Seller Plans .......... 33
2.13 Personnel .......... 34
2.14 Insurance .......... 34
2.15 Taxes .......... 34
2.16 U.S. Persons .......... 34
2.17 Real Property .......... 36
2.18 Accuracy of Documents; Delivery and Inspection .......... 36
2.19 No Negotiations with Third Parties .......... 37
2.20 Statements Not Misleading .......... 37
2.21 Adverse Actions .......... 37
2.22 *[Intentionally Omitted]*
2.23 Continuing Accuracy .......... 37

(i)

1070039.2

P:\Bosan\FINH\FINAL ASA 10.12.09.DOC



# ASSET SALE AGREEMENT

BY AND BETWEEN

**VALLEY HEALTH SYSTEM,**
**a California Local Health Care District**

**"Seller"**

AND

**PHYSICIANS FOR HEALTHY HOSPITALS, INC.,**
**a Delaware corporation**

**"Purchaser"**

**DATED: October 14, 2009**

TABLE OF CONTENTS

Page

5.9    Other Covenants ............................................................................. 52
5.10   No Liens Caused by Purchaser ...................................................... 54
5.11   Purchaser's Costs ........................................................................... 54
5.12   ALTA Survey .................................................................................. 54
5.13   Insurance ......................................................................................... 54
5.14   Releases ........................................................................................... 55
5.15   Plan of Adjustment ......................................................................... 58
5.16   Defense of Claims Challenging Transaction ................................. 58

ARITVLE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER .......59

6.1    Signing and Delivery of Instruments ............................................. 59
6.2    Unfavorable Action or Proceeding ................................................ 59
6.3    Performance of Covenants .............................................................. 59
6.4    Governmental Authorizations ........................................................ 59
6.5    Representations ............................................................................... 60
6.6    Schedules ........................................................................................ 60
6.7    Public Approval .............................................................................. 60
6.8    Capital Requirements ..................................................................... 60
6.9    Plan of Adjustment ......................................................................... 61

ARTICLE VII - CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER..61

7.1    Governmental Authorizations ........................................................ 62
7.2    Signing and Delivery of Instruments ............................................. 62
7.3    Performance of Covenants .............................................................. 62
7.4    Unfavorable Action or Proceeding ................................................ 62
7.5    Material Adverse Effect .................................................................. 62
7.6    Title Insurance Policy .................................................................... 62
7.7    Representations ............................................................................... 62
7.8    Exhibits and Schedules ................................................................... 62
7.9    Permits and Program Participation ................................................ 63
7.10   Tax Matters ..................................................................................... 63
7.11   Public Approval .............................................................................. 63
7.12   Plan of Adjustment ......................................................................... 63

ARTICLE VIII - TERMINATION .......................................................................63

8.1    Termination ..................................................................................... 63
8.2    Termination Consequences ............................................................ 65

ARTICLE IX - POST-CLOSING MATTERS .......................................................66

9.1    Excluded Assets and Excluded Liabilities .................................... 66
9.2    Preservation and Access to Records After the Closing ................. 68

F:\Busn\PHH\FINAL ASA 10.12.09.DOC

(iii)

TABLE OF CONTENTS

Page

ARTICLE III - REPRESENTATIONS AND WARRANTIES OF PURCHASER.......37

3.1    Authorization ................................................................................... 37
3.2    Binding Agreement .......................................................................... 37
3.3    Organization ad Good Standing ..................................................... 38
3.4    No Violation .................................................................................... 38
3.5    Brokers and Finders ....................................................................... 38
3.6    "As Is" ............................................................................................. 38
3.7    Legal Proceedings .......................................................................... 39
3.8    Chapter 9 Proceeding ..................................................................... 39
3.9    Purchaser Knowledge ..................................................................... 39
3.10   Disclosures ..................................................................................... 39
3.11   No Improper Payments or Offers ................................................... 40
3.12   Compliance With Law Laws ........................................................... 40
3.13   Accuracy of Financial and Organization Information .................... 40

ARTICLE IV - COVENANTS OF SELLER .........................................................40

4.1    Access and Information; Inspections ............................................. 40
4.2    Conduct of Business ....................................................................... 41
4.3    Negative Covenants ........................................................................ 41
4.4    Cooperation ..................................................................................... 43
4.5    Contract Consents ........................................................................... 43
4.6    Additional Financial Information ................................................... 43
4.7    No-Shop ........................................................................................... 43
4.8    Seller's Efforts to Close ................................................................. 43
4.9    Title Matters .................................................................................... 44
4.10   Termination of Hospital Businesses' Employees .......................... 44
4.11   Notice of Developments .................................................................. 44
4.12   Termination Cost Reports; Filing Cost Reports; Amounts Due To or
       From Third Party Payors ................................................................ 45
4.13   Tail Insurance Coverage ................................................................ 46
4.14   Public Approval .............................................................................. 47
4.15   Confidentiality ................................................................................ 48
4.16   Plan of Adjustment ......................................................................... 48

ARTICLE V - COVENANTS OF PURCHASER ..................................................48

5.1    Purchaser's Efforts to Close .......................................................... 48
5.2    Required Governmental Approvals ................................................ 48
5.3    Estoppel Certificates ...................................................................... 49
5.4    Certain Employee Matters .............................................................. 49
5.5    Use of Business Names ................................................................... 51
5.6    Excluded Assets .............................................................................. 51
5.7    Confidentiality ................................................................................ 52
5.8    Contract Consents ........................................................................... 52

F:\Busn\PHH\FINAL ASA 10.12.09.DOC

(ii)

131

## ASSET SALE AGREEMENT

This Asset Sale Agreement (the "**Agreement**") is dated effective as of October 14, 2009 (the "**Effective Date**") by and between VALLEY HEALTH SYSTEM, a California Local Health Care District ("**Seller**") and PHYSICIANS FOR HEALTHY HOSPITALS, INC., a Delaware corporation ("**Purchaser**").

### R E C I T A L S:

A.    Seller (i) engages in the business of delivering acute care, skilled nursing, and behavioral health services to the public through the hospitals known as Hemet Valley Medical Center and Menifee Valley Medical Center, and a skilled nursing facility known as Hemet Valley Healthcare Center (the "**SNF**"), at which it currently operates a chemical dependency program and Surge Retreat, as further identified on Schedule A-1 (collectively, the "**Hospitals**"; as to an individual hospital, a "**Hospital**"), (ii) owns one administrative/medical office building, as specifically identified on Schedule A-2, and known as the Medical Arts Building (the "**MAB**"), (iii) owns and operates other healthcare businesses incident to the operation of the Hospitals as specifically identified on Schedule A-3 (the "**Other Businesses**") (the Hospitals, MAB and the Other Businesses are referred to in this Agreement collectively as the "**Hospital Businesses**").

B.    Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the assets with respect to the operation of the Hospital Businesses, for the consideration and upon the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS; SALE AND TRANSFER OF ASSETS;
### CONSIDERATION; CLOSING

**1.1    Definitions.**

**1.1.1    Certain Defined Terms.**  For purposes of this Agreement, and the Related Agreements except as may otherwise be expressly stated therein, the following terms shall have the following meanings (whether or not such term is capitalized when used in this Agreement):

**(a)    "Accounts Receivable"** shall be defined as all accounts and other receivables arising from the rendering of services to, or other rights to payment from, inpatients and outpatients at the Hospitals, the SNF, and the other Hospital Businesses, billed and unbilled, recorded and unrecorded, (without any adjustment to the PEPC whatsoever, including for contractual allowances, bad debt allowances or reserves, and patient credit balances) as of the Effective Time (calculated in a manner consistent with Seller's accounting policies and procedures in effect as of the Closing Date) for services, goods or other items provided by Seller while owner of the Hospital Businesses, including without limitation all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party)

- 1 -    F:\Boed\PHHFINAL ASA 10.12.09.DOC

---

| | | Page |
|---|---|---|
| 9.3 | Provision of Benefits of Certain Contracts; Defense of Related Claims | 70 |
| 9.4 | Closing of Financials | 70 |
| 9.5 | Employee Transition | 71 |
| 9.6 | Medicare Bad Debts | 71 |
| 9.7 | Covenant Not to Compete | 71 |

**ARTICLE X - SURVIVAL AND INDEMNIFICATION** ............................................. **73**

| 10.1 | Survival | 73 |
|---|---|---|
| 10.2 | Indemnification of Purchaser by Seller | 73 |
| 10.3 | Indemnification of Seller by Purchaser | 75 |
| 10.4 | Method of Asserting Claims | 76 |
| 10.5 | Exclusive | 79 |

**ARTICLE XI - TAX AND COST REPORT MATTERS** ........................................ **79**

| 11.1 | Tax Matters; Allocation of PEPC | 79 |
|---|---|---|
| 11.2 | Cost Report Matters | 79 |
| 11.3 | Tax and Medicare Effect | 80 |
| 11.4 | [Intentionally Omitted] | |
| 11.5 | Misdirected Payments, etc. | 80 |

**ARTICLE XII - MISCELLANEOUS PROVISIONS** .......................................... **81**

| 12.1 | Further Assurances and Cooperation | 81 |
|---|---|---|
| 12.2 | Successors and Assigns | 81 |
| 12.3 | Governing Law; Venue | 81 |
| 12.4 | Amendments | 82 |
| 12.5 | Exhibits, Schedules and Disclosure Schedule | 82 |
| 12.6 | Notices | 82 |
| 12.7 | Headings | 83 |
| 12.8 | Confidentiality and Publicity | 83 |
| 12.9 | Fair Meaning | 84 |
| 12.10 | Gender and Number; Construction | 84 |
| 12.11 | Third Party Beneficiary | 85 |
| 12.12 | Expenses and Attorneys' Fees | 85 |
| 12.13 | No Offset | 85 |
| 12.14 | Counterparts | 85 |
| 12.15 | Entire Agreement | 85 |
| 12.16 | No Waiver | 85 |
| 12.17 | Severability | 86 |
| 12.18 | Dispute Resolution | 86 |

**SCHEDULE 1.3.2 - TERM SHEET FOR ALTERNATIVE TRANSACTION** ............... **90**

1070039-2

(iv)

F:\Boed\PHHFINAL ASA 10.12.09.DOC

(j) **"Chapter 9 Proceeding"** shall mean the proceeding filed by Seller pursuant to Chapter 9 of the U.S. Bankruptcy Code on December 13, 2007 in the United States Bankruptcy Court, Central District of California, Riverside Division, Case No. 6:07-bk-18293-PC.

(k) **"Claims Fund"** shall have the meaning set forth at Section 1.2.4.1

(l) **"Controlling Interest"** in another Person shall mean:

(i) in the case where such other Person is a corporation, the Person and/or its Affiliates owns or controls at least a majority of the outstanding shares having the voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time shares of any other class or classes of such corporation might have voting power by reason of the happenings of any contingency, unless the contingency has been satisfied); or

(ii) in the case where such other Person is a general or limited partnership, the Person and/or any of his/her/its Affiliates is a general partner or owns or controls (of record or beneficially) a majority interest in a general partner, or is or owns an interest in a partner that has authority to bind the partnership, in all other cases; or

(iii) in the case where such other Person is a limited liability company, the Person and/or any of its Affiliates (i) is or owns, a managing member or manager of the limited liability company, or (ii) owns or controls at least a majority of the outstanding membership interests having the voting power to elect or appoint the managing member or members, or (iii) in the case of a limited liability company managed by a board of directors, management committee or like body, owns or controls at least a majority of the outstanding membership interests having by the terms thereof ordinary voting power to elect or appoint a majority of the managers or members of such body (irrespective of whether at the time membership units of any other class or classes of such corporation might have voting power by reason of the happening of any contingency, unless the contingency has occurred and then only for as long as it continues); or

(iv) regardless of the form of the entity, such other Person in fact controls the decisions of such entity, directly or indirectly.

(m) **"Current Assets"** shall mean the *Total Current Assets* of Seller as defined and classified on the Baseline Financials.

(n) **"Current Liabilities"** shall consist of *Total Current Liabilities* of Seller as defined and classified on the Baseline Financials other than the line item related to *Pre-Petition Liabilities*.

(o) **"Deposit"** shall have the meaning set forth in Section 1.2.3.

(p) **"Environmental Regulations"** shall mean all Laws and all policies and guidelines relating to the use, handling, treatment, storage, transportation, or Release of Hazardous Substances or otherwise relating to the protection of the environment or industrial

1070039.2   F:\Boa4THIFINAL.ASA 10/12/09.DOC

---

with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Seller or Seller's consultants) and all payments to be received for all disproportionate share Medi-Cal payments (if any) in connection with the Hospitals, but excluding reserves and other amounts held by the Bond Trustees of the Existing Bonds and amounts internally reserved by Seller for payment of the current and long term portion of interest and principal of the Existing Bonds which is payable semi-annually (which shall separately be applied by Seller to pay off the Existing Bonds as detailed in Sections 1.2.1(a)(i) and 1.4.18 and elsewhere in this Agreement).

(b) **"Accrued Paid Time Off Amount"** shall mean the accrued paid time off liabilities of Seller, as of the Closing Date, with respect to its employees, as identified in the Baseline Financials and any subsequently accrued paid time off liabilities to the extent incurred in the ordinary course of business and consistent with the accounting principles utilized in the Baseline Financials.

(c) **"Adjusted Current Liabilities"** shall consist of the current liabilities of Seller as defined and classified on the Baseline Financials other than the line items related to (i) *Pre-Petition liabilities*, and (ii) the current portion of the (A) *Notes Payable*, (B) *1993 Bonds* and (C) *1966 Bonds*.

(d) **"Administrative Claim"** means any claim for an administrative expense of the kind described in Sections 503(b) or 507(a)(2) of the Bankruptcy Code, including professional fees and expenses by any professional entitled to be compensated for services rendered to the Seller.

(e) **"Affiliate"** shall mean any Person directly or indirectly controlling, controlled by or under common control with or of a second Person, including Immediate Family Members of such Persons. The term "control" (including the terms, "controlled by" and "under common control with") means the possession of a Controlling Interest in another Person.

(f) **"Alternative Assets"** and **"Alternative Transaction"** shall have the meaning set forth at Section 1.3.2.

(g) **"Bankruptcy Court"** shall mean the United States bankruptcy court in which Seller's Chapter 9 Proceeding is pending, such court being the United States Bankruptcy Court, Central District of California, Riverside Division.

(h) **"Baseline Financials"** shall mean the preliminary financial statements of the Seller dated as of August 31, 2009 and attached hereto as Schedule 1.1.1(h).

(i) **"Benefit Plan"** shall mean with respect to Seller, a governmental pension plan as defined under Section 3(32) of ERISA or a retirement or pension plan (except for Social Security); the Seller Plan, as defined in Section 2.12, including the defined benefit plan; thrift, savings, medical (including any union-sponsored health and welfare plan), hospitalization, vision, dental, life, disability, training or apprentice plan, or other welfare benefit plan, policy or agreement; deferred compensation, change in control or severance pay plan, policy or agreement, or any other performance, bonus, incentive or benefit plan, policy or agreement, or any similar or related trust, fund, arrangement, policy, agreement or understanding.

1070039.2   F:\Boa4THIFINAL.ASA 10/12/09.DOC

hygiene (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata).

(q) **"Force Majeure"** shall mean an act of God, war declared or undeclared, general army mobilization, blockade, revolution, riot, insurrection, civil commotion, sabotage, lightning, fire, earthquake, storm, flood, explosion, telecommunications disruption, electricity blackout, personnel strike, and any other cause whether of the kind specifically enumerated above or otherwise which is not reasonably within the control of the party affected.

(r) **"General Unsecured Creditors"** shall mean those Persons holding allowed pre-petition, non-priority unsecured claims against Seller.

(s) **"Hazardous Substances"** shall mean any substance, material or waste which is now or any time in the future listed, identified or defined in or pursuant to any Law as "hazardous substances," "hazardous waste," "toxic substances," "toxic pollutant," "infectious waste" or similarly identified substances, materials or mixtures (including, without limitation, medical wastes, asbestos in any form, formaldehyde, radon, radioactive substance, hydrocarbons, petroleum, gasoline, crude oil or any products, by-products or fractions thereof, polychlorinated biphenyls, industrial solvents, flammables, or explosives) or which is either now or anytime in the future: (i) potentially injurious to the public health, safety or welfare of the environment, (ii) potentially injurious to, or may impair the value or beneficial use of, the Real Property (or any improvements thereon), (iii) regulated or monitored by, or required to be remediated at the behest of, any governmental agency, or (iv) a basis for a claim or liability of any owner or operator of the Real Property to any governmental agency or Person under any applicable Law (including the Environmental Regulations).

(t) **"Immediate Family Member"** of an individual shall mean the husband, wife, natural or adoptive parent, child, sibling, stepparent, stepchild, stepbrother, stepsister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild or spouse of a grandparent or grandchild of such individual.

(u) **"Laws"** or **"Legal Requirements"** shall mean the common law and all statutes, rules, regulations, ordinances, orders, codes, permits, licenses, policies, guidelines, and agreements with or of federal, state, and local governmental and regulatory authorities (including, any of the same which terminate, disqualify, or otherwise adversely affect a Person's (including any party hereto) reimbursement or right to payment from, or participation with, any Payor, including the following subset (collectively, **"Health Care Laws"**): the Stark Law (42 U.S.C. § 1395nn), the Medicare and Medicaid Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the False Claim Act (including 31 U.S.C. §§ 3729 et seq. and 18 U.S.C. §§ 2, 371, 666, 3013, and 3571), California's Physicians Ownership and Referral Act of 1993 (California Bus. & Prof. Code §§ 650.01 et seq.), California Business & Professions Code §650 or similar statute and prohibitions against fee splitting, together with all amendments thereto) or any applicable accreditation agencies (including, but not limited to, the Joint Commission) and any order, writ, injunction or decree issued by any court, arbitrator or governmental agency or in connection with any judicial, administrative or other non-judicial proceeding (including, without limitation, arbitration or reference). Laws shall include those Laws now or hereafter in effect and to Laws as amended, consolidated, supplemented or replaced from time to time, and all rules and regulations promulgated thereunder.

(v) **"Liens"** shall mean liens, encumbrances (including security interests of any kind whatsoever), covenants, conditions, restrictions, easements, encroachments, rights of way, charges or other rights, options, claims or interests of any third party whatsoever.

(w) **"Material Adverse Effect"** shall mean any event, occurrence, Force Majeure, or matter, outside Purchaser's sole control, having a material and adverse impact or effect which continues through the Closing relating to the business operations, property, or financial condition of the Hospital Businesses, taken as a whole, or which otherwise materially interferes with Purchaser's ability to operate the Hospital Businesses after Closing or to obtain financing relating to the Transaction, as defined in Section 1.2.3, as a result of the foregoing, all of which is outside the control of Purchaser, but excluding changes in general economic, legislative, or regulatory conditions or changes in the healthcare market affecting hospitals generally or locally, such as limitations on reimbursement through governmental programs or other Payors affecting hospitals generally. However, changes in existing Laws or new Laws which become effective prior to the Effective Time which would prohibit ownership by physicians or medical groups of the Hospital Businesses, or restrict referral by physicians or medical groups to the Hospital Businesses in which such physicians or medical groups have a financial interest (including an ownership interest), in whole or in substantial part, shall constitute a Material Adverse Effect. Purchaser acknowledges that Seller's filing of the Chapter 9 Proceeding is not, in and of itself, a Materially Adverse Effect as defined in this Agreement; provided, that (i) Seller takes no action in the Chapter 9 Proceeding to reject or otherwise terminate this Agreement or any Related Agreement, contrary to its or their terms; and (ii) Seller or the Bankruptcy Court takes no action to interfere with Purchaser's rights under this Agreement, or the orderly Closing of the transactions contemplated herein, or which otherwise causes a Material Adverse Effect. Notwithstanding anything to the contrary in this Agreement, the Parties agree that the failure to obtain Public Approval shall not, in and of itself, constitute a Material Adverse Effect and shall not entitle Purchaser to a refund of any portion of the Deposit. Without limiting the preceding, a Material Adverse Effect shall include a decrease, as of the Closing, by an amount which is greater than $2,000,000, after being normalized, if necessary, for the payroll impact relating to an additional pay period, by which (x) Current Assets exceed Current Liabilities, as compared to the amount by which Current Assets exceed Current Liabilities reflected in the Baseline Financials (which net excess, utilizing the Baseline Financials was $13,632,865).

(w) **"Payor"** shall mean Medicare, Medicaid, TRICARE/CHAMPUS, any other third party payor (including an insurance company or plan administrator), any Person financially responsible for payment of all or any portion of the billings generated by the Hospital Businesses, or any health care provider (such as a health maintenance organization, preferred provider organization, exclusive provider organization, or any other managed care program), or any fiscal intermediary of any of the foregoing.

(y) **"Person"** shall mean any individual (including Immediate Family Member or spouse of such individual), partnership, corporation, limited liability company, trust, unincorporated association, joint venture or any other entity of any kind whatsoever, whether for profit or not for profit, and any governmental agency.

(z) **"Plan of Adjustment"** shall have the meaning set forth in Section 4.16.

(c) References to any agreement, document or instrument are references to that document as amended, consolidated, supplemented or replaced by the parties thereto from time to time;

(d) References to time are references to Pacific time (Standard or Daylight Savings, as applicable);

(e) References to "Parties" are references to Seller and Purchaser and their successors and assigns and such Parties are sometimes referred to individually as a Party;

(f) The gender of all words includes the masculine, feminine and neuter, and the number of all words includes the singular and plural; and

To the extent included in this Agreement, the Table of Contents, the divisions of this Agreement into Articles, Sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**1.2  Purchase Consideration.**

**1.2.1  Purchaser's Estimate of Purchase Consideration.**

(a) The aggregate purchase consideration to be paid and provided by Purchaser to Seller shall consist of the following payments and assumptions of liabilities, the aggregate value of which Purchaser estimates to be approximately One Hundred Sixty-Nine Seven Hundred Seventy Three Million Dollars ($169,773,000) ("**Purchaser's Estimate of Purchase Consideration**" or "**PEPC**"):

(i) Cash Purchase Portion. Payment of an amount sufficient to pay off the Existing Bonds described in Schedule 1.2.1(b), after application of all reserves held by the Bond Trustee in connection with the Existing Bonds and any reserves held internally by Seller for payment of interest and principal on the Existing Bonds. It is the intent of the parties that Purchaser shall pay Seller an amount necessary to pay off the Existing Bonds and to obtain the Bond Releases. As of the date of this Agreement, the outstanding principal and unpaid interest on the Existing Bonds is currently estimated at approximately $44,700,000 less reserves, which are anticipated to be reduced by withdrawals by the Bond Trustee to cover its fees and expenses as incurred (the "**Cash Purchase Portion**"); and

(ii) Select Note Satisfaction. The satisfaction or assumption by Purchaser, of and the full and complete release of Seller from any further liability under, the Select Administrative Note, with a current approximate balance, including accrued interest, of $8,400,000 ("**Select Note Satisfaction**"); and

(iii) Assumed Other Liabilities. Assumption by Purchaser, for the benefit of Seller, of (A) Adjusted Current Liabilities, (B) other liabilities on the Baseline Financials classified under long term debt as *Capitalized Leases and Other L/T Debt* and (C) other liabilities on the Baseline Financials classified as *Workers' Comp - Long Term*, (Section 1.2.1(a)(iii)(B) and Section 1.2.1(a)(iii)(C) are collectively referred to as "**Other Liabilities**"), all of which, based on the Baseline Financials, collectively result in an assumed liability of

1070039.2                                                     F:\Bond\PHHFINAL.ASA 10.12.09.DOC

does not include any material modifications of the terms or conditions of this Agreement, the initiation of litigation or other judicial or administrative process, any change in the organizational structure of an entity, any changes in the officers, directors, members, managers, or the equivalent of an entity, the provision of any consideration to any third party or the suffering of any economic detriment to a party's ongoing operations for the procurement of any consent, authorization or approval required under this Agreement except for (i) the reasonable costs associated with gathering and supplying data or other information or making any filings; (ii) the reasonable fees and expenses of counsel and consultants; and (iii) the reasonable and customary fees and charges of governmental authorities and accreditation organizations.

(bb) "**Release**" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment or as otherwise defined in or pursuant to any Environmental Regulation.

(cc) "**Select Administrative Note**" shall mean that certain Promissory Note, dated June 20, 2008, provided by Seller to Select VHS Acquisition Company, LLC, in the original principal amount of $7,968,500, and approved as an administrative claim in the Chapter 9 Proceeding.

(dd) "**Seller's Knowledge**" shall mean the actual (and not merely constructive) knowledge, without any duty of further inquiry, of (i) William Cherry, the Chairman of the Board of Directors of Seller, (ii) Michelle Bird, Vice President, Human Resources of Seller, (iii) Keith Garrison, Facilities Administrator of Seller, (iv) Mark Palmer, Administrator, Hemet Valley Medical Center of Seller, (v) Richard DiCapo, Administrator, Menifee Valley Medical Center of Seller, (vi) Joel Bergenfeld, Interim Chief Executive Officer of Seller, (vii) Michael Bernstein, Interim Chief Financial Officer of Seller, and (viii) Melanie Van Winkle, Vice President, Finance of Seller, or their successors.

(ee) "**Severance Liabilities**" shall mean any and all severance liabilities of Seller as of the Closing Date pursuant to any severance pay plan, policy, or employment agreement, providing severance benefits or payments to Seller's employees on termination of employment, to the extent scheduled at Schedule 1.1.1(ee).

**1.1.2  Other Defined Terms.** The terms listed in Schedule 1.1.2 are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

**1.1.3  Certain References.** As used in this Agreement, and unless the context requires otherwise:

(a) References to "include" or "including" mean including, without limitation;

(b) References to "hereof," "herein," "hereto" and derivative or similar words refer to this Agreement;

1070039.2                                                     F:\Bond\PHHFINAL.ASA 10.12.09.DOC

approximately $21,000,000 (which amount shall not be subject to offset by Purchaser for any reason whatsoever), subject to payment of up to $4,000,000 or more to pay Seller's Administrative Claims as detailed in Section 1.2.4, with the remainder to be paid to the General Unsecured Creditors not included in Assumed Other Liabilities, over four (4) years in four (4) equal annual payments on each successive anniversary of the Closing ("**Creditors Commitment**"); and

(v)     Assumed Rejection Claims.  The satisfaction or assumption by Purchaser of, and the full and complete release of Seller from any liability under, the rejection and/or breach claims filed by KM Strategic Management, Inc. ("**KM**"), Hemet Community Medical Group ("**HCMG**"), Menifee Valley Community Medical Group ("**MVCMG**"), LHIO, LLC ("**LHIO**"), and any claims of constituent members thereof which are derivative from such rejection and/or breach claims by KM, HCMG, MVCMG or LHIO, which Purchaser contends constitutes an assumption and release of claims worth approximately $55,000,000 ("**Assumed Rejection Claims**") as detailed more fully in claim numbers 134, 135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding Seller harmless with respect to the Assumed Rejection Claims; and

(vi)     Assumed Contracts.  The satisfaction or assumption and release, if such release can be obtained, or indemnification of Seller by Purchaser, of the Assumed Contracts, as defined in Section 1.6.6; and

(vii)     D&O Tail Payment.  Payment by Purchaser, on Seller's behalf, of the premium for Seller's directors and officers tail insurance ("**D&O**") under substantially the same coverage, terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, as customarily modified from claims made to tail coverage in a single premium amount estimated at Four Hundred Fifty Thousand Dollars ($450,000) ("**D&O Tail Payment**"), as provided in Section 4.13(b); and

(viii)     E&O Tail Insurance Payment.  Payment by Purchaser, on Seller's behalf, of the premium for general liability and medical malpractice tail insurance ("**E&O**") under substantially the same coverage, terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, as customarily modified from claims made to tail coverage in a single premium amount estimated at Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) ("**E&O Tail Insurance Payment**") as provided in Section 4.13(a);

(ix)     Annual Support Grants (Community Benefit).  Payment by Purchaser of the Annual Support Grants (as provided in Section 5.9.1(b) of this Agreement) of up to $400,000 per year for five (5) years (total up to $2,000,000), which amount shall not be subject to offset by Purchaser for any reason whatsoever; and

approximately $31,100,000 (collectively, the "**Assumed Other Liabilities**").  In connection with the assumption of the Assumed Other Liabilities, Purchaser also is agreeing to indemnify, defend and hold Seller harmless with respect to the Assumed Other Liabilities; and

(x)     ESL Benefits.  Assumption by Purchaser of the accrued ESL Benefits to Seller's Employees pursuant to Section 1.8.11, estimated at a maximum of approximately $3,373,000.

(b)     If the Transaction does not become the Alternative Transaction and the Agreement is not terminated as provided in Article VIII, the Purchaser shall cause the Escrow to deliver to the Bond Trustees, at Closing, Purchaser's payment of the Cash Purchase Portion on Seller's behalf for all of the existing bond indebtedness to which Seller is subject, or which is secured by or otherwise affects any of the Assets, as further described in Schedule 1.2.1(b) (the "**Existing Bonds**") as needed to obtain the Bond Release; or

(c)     If the Transaction under this Agreement becomes the Alternative Transaction, as detailed in Section 1.3.2 of this Agreement, whereby Purchaser purchases Menifee Valley Medical Center, then the Parties shall execute a separate asset purchase agreement which shall contain those terms set forth in Schedule 1.3.2 (the "**Definitive Alternative Agreement**"); provided, however, if the Parties are unable to reach agreement on the Definitive Alternative Agreement, the terms of this Agreement, including without limitation, Schedule 1.3.2 shall remain legally binding and enforceable on the Parties with respect to the Alternative Transaction addressed in Section 1.3.2.

1.2.2     Opening of Escrow.  Within five (5) business days after the execution of this Agreement, the Parties shall open an escrow with the Bank of Hemet (the "**Escrow**").  The Parties shall also execute and deliver to Escrow mutually acceptable escrow instructions as the Parties determine are necessary in order to consummate such transactions and as the Title Company and the Escrow shall require in order to clarify their respective duties and responsibilities (the "**Escrow Instructions**") along with a duly executed copy of this Agreement.

1.2.3     Deposit.  Within five (5) business days after the opening of Escrow, (i) the Parties shall effect the transfer to the applicable account at Escrow the One Million Dollars ($1,000,000) previously deposited by Purchaser in connection with the exclusive dealing agreement between Seller and Purchaser, and (ii) Purchaser shall wire transfer to Escrow an additional One Million Dollars ($1,000,000), in immediately available funds, which shall collectively constitute the good faith deposit in the amount of Two Million Dollars ($2,000,000) (the "**Deposit**"), all of which shall, in the event of Closing, be credited as part of the PEPC in connection with the transactions contemplated by this Agreement and the Related Agreements (collectively, the "**Transaction**").  The Escrow shall hold the Deposit pursuant to the terms of mutually acceptable Escrow Instructions in substantially the form attached as Exhibit 1.2.3 which Seller, Purchaser and the Title Company shall execute as soon as possible after the execution of this Agreement.  The Escrow Instructions shall be consistent with the terms of this Agreement, and in the event of any conflict between the Escrow Instructions and this Agreement, this Agreement shall prevail.  The Deposit shall be repaid to Purchaser or retained by Seller as provided in Article VIII.

1.2.4     Administrative Claims Fund.

1.2.4.1     Claims Fund.  Concurrent with the Closing, Purchaser shall have deposited $4,000,000 into a segregated interest bearing trust account to be maintained by Seller separate and apart from any other bank accounts, to be used only for the purposes and for the benefit of the parties described in this Section 1.2.4 (the "**Claims Fund**") and to make funds available to

pay Seller's post-petition obligations, including those Administrative Claims which are not included within the Assumed Other Liabilities ("Covered Claims"). "Covered Claims" do not include any claims relating to Seller's defined benefit plan.

1.2.4.2 **Procedure for Payment.** Seller shall provide to Purchaser and to the official committee of unsecured creditors or any post-confirmation representative of the General Unsecured Creditors (collectively, the "Committee") a list of the Covered Claims which Seller proposes to be paid from the Claims Fund. Purchaser and the Committee shall have ten (10) business days from receipt thereof to review such list and to notify Seller, in writing, if Purchaser or the Committee objects to payment of any such claims. Seller and Purchaser or the Committee, as the case may be, shall meet and confer in good faith, within ten (10) business days of receipt of Purchaser's or the Committee's objection, to resolve any such issues. In the event that such dispute cannot be resolved within such period, Seller may notify Purchaser and the Committee, as applicable, in writing, of Seller's intent to pay such claims ten (10) business days after the date of such notice. Purchaser or the Committee may object to such payment by filing an appropriate pleading in the Chapter 9 Proceeding within such ten (10) business day period, seeking adjudication of such dispute by the Bankruptcy Court. Unless Purchaser or the Committee files such an objection with the Bankruptcy Court, Seller shall be entitled to pay any such proposed expenses. If such an objection is filed, such matter shall be resolved by the Bankruptcy Court.

1.2.4.3 **Additional Administrative Claims Fund.** In the event that, after the Closing, the Claims Fund is insufficient to satisfy all Covered Claims, Seller may notify Purchaser and the Committee in writing. Within ten (10) business days after Seller shall have given such notice to Purchaser and the Committee, Purchaser shall agree to deposit such additional funds ("Additional Funds") as may be required to pay all of such Covered Claims, which sum shall be subtracted from the next payments owed pursuant to the Creditors Commitment. Such Additional Funds shall be paid at the time that the next payment becomes due pursuant to the Creditors Commitment. The foregoing notwithstanding, if either Purchaser or the Committee objects to payment of such additional Covered Claims, Purchaser or the Committee may file an objection with the Bankruptcy Court within such ten (10) business day period, seeking adjudication of such dispute by the Bankruptcy Court. Unless Purchaser or the Committee files such an objection with the Bankruptcy Court, Purchaser shall deposit such Additional Funds from the next payments owed pursuant to the Creditors Commitment and Seller may use such Additional Funds to pay such Covered Claims.

1.2.4.4 **Obligations Unconditional.** Purchaser's obligation to pay the Claims Fund and the Additional Funds, up to and including the total amount of the Creditors Commitment, shall be absolute and unconditional, and shall not be subject to any claim or offset which Purchaser may assert against Seller for any reason whatsoever.

1.2.4.5 **Disposition of Remaining Claims Funds.** Upon the expiration of thirty-six (36) months following the Closing Date, any remaining Claims Funds, including all interest earned, as to which Covered Claims are not then pending, shall be paid to the General Unsecured Creditors pursuant to a Bankruptcy Court approved Plan of Adjustment.

1.3 **Closing Date; Closing Escrow.**

1.3.1 If the Approval Election results in the receipt of Public Approval (as these terms are defined in Section 4.14), the Parties shall, after the results of the Approval Election are

- 10 -

certified by the Register of Voters of Riverside County (the "Election Results Date"), seek to proceed to the closing of the transactions contemplated in this Agreement ("Closing") by January 31, 2010, or within forty-five (45) days after the Election Results Date, if later (the date for the Closing shall be referred to in this Agreement as the "Closing Date"), provided that all conditions precedent and other matters required to be completed by or on the Closing Date have been or will be completed by or on the Closing Date. If such conditions and other matters are not completed, such Closing Date shall be extended until such conditions and other matters are completed; provided, however, if the Closing has not occurred on or before April 30, 2010, either Party may terminate this Agreement subject the Parties' termination rights as provided in Article VIII.

1.3.2 If, in the event of an Approval Election, the voters do not vote to provide the Public Approval, then the transactions pursuant to this Agreement will be structured and proceed to Closing as an alternative transaction (the "Alternative Transaction"), as addressed in Section 1.2.1(e) and more fully described in Schedule 1.3.2.

1.3.3 **[Intentionally Omitted]**

1.3.4 **[Intentionally Omitted]**

1.3.5 The Closing with respect to the Assets shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the Hospitals are located) on the day immediately following the Closing Date (the "Effective Time"). The Title Company and/or the Escrow, as the case may be, shall make the deliveries and perform the acts as detailed in the Escrow Instructions, as may be amended, the disbursement agreements, and any other agreements executed by the Parties, which are consistent with the terms of this Agreement.

1.3.6 In the event the Parties are prepared to proceed with the Transaction and Purchaser has not yet obtained a new license from the California Department of Public Health ("CDPH") and Medicare and Medi-Cal certification by the Centers for Medicare Services("CMS") or any other Material Licenses, as defined in Section 5.2.2, by the Closing Date, upon either Party's written election, the Closing shall nevertheless occur, but Seller and Purchaser shall, to the extent legally permissible, enter into (a) a lease of the Seller's Hospital(s) in substantially the form of Exhibit 1.3.6-A attached hereto, whereby Purchaser shall lease such Hospital(s) to Seller (the "Leaseback Agreement"), and (b) a Management Agreement in substantially the form of Exhibit 1.6-B attached hereto, whereby Seller shall engage Purchaser to manage the Hospital(s) (the "Management Agreement"), both of which (the Leaseback Agreement and the Management Agreement together shall be referred to collectively as the "Lease and Management Agreement"), shall remain in effect for the period between the Effective Time and the last to occur of receipt of all CDPH licenses for the Hospitals and Purchaser's receipt of CMS Medicare certification for each of the Hospital(s) ("Lease and Management Termination Events"). The Lease and Management Agreement shall terminate as to each Hospital effective (i) as such Lease/Management Termination Events occur as to each Hospital CDPH licenses and CMS Medicare certification are received, or (ii) nine (9) months from the Closing Date, whichever shall first occur. The Parties agree that the Lease shall be at a rate of $1.00 per month, and the Management Agreement shall provide that Purchaser shall be paid a management fee equivalent to all profits and that Purchaser shall bear all obligations and risks of loss relating to the Hospital(s) and/or Hospital Business(es). Purchaser shall also be responsible for all claims, liabilities and losses incurred by Seller under the Lease and Management

- 11 -

Agreement as well as any insurance necessary to properly cover the Assets, the Personal Property, the Owned Real Property and the Hospital Businesses. The Lease and Management Agreement shall at all times be subject to Seller's obligation, as licensee, to remain ultimately responsible for Hospital operations to the extent legally required so that the Lease and Management Agreement shall not be deemed to constitute a change in ownership. Furthermore, Purchaser agrees under the Lease and Management Agreement to indemnify, defend and hold Seller harmless from any and all losses incurred during the period of the effectiveness of the Lease and Management Agreement. Purchaser and Seller shall reasonably cooperate with each other in seeking any approvals required under applicable Laws in order to undertake the Lease and Management Agreement, if the parties elect to proceed in such fashion. If the CDPH or CMS shall require or request any changes to the Lease and Management Agreement to comply with applicable Laws and to avoid a change in ownership of the Hospitals prior to the Lease/Management Termination Events, then the Parties agree to work cooperatively to revise the Lease and Management Agreement to address such changes while maintaining, to the fullest extent possible, the intent of the parties thereunder. If the Parties enter into the Lease and Management Agreement, then the Licenses, as defined in Section 1.6.4, to the extent assignable, shall be transferred at the termination of the Lease and Management Agreement as opposed to the Closing.

1.4    **Items to be Delivered by Seller at Closing.** At or before the Closing, Seller shall deliver, or cause to be delivered, to Purchaser or to Escrow, the following, duly executed by Seller where appropriate, unless otherwise waived by Purchaser:

1.4.1    General, Assignment, Bill of Sale and Assumption of Liabilities in substantially the form of Exhibit 1.4.1 attached hereto (the **"Bills of Sale"**);

1.4.2    Assignment and Assumption of Real Estate Leases in the form of Exhibit 1.4.2 attached hereto with respect to each Leased Real Property (the **"Real Estate Assignments"**);

1.4.3    Grant Deed(s) in the form of Exhibit 1.4.3 attached hereto (**"Grant Deeds"**);

1.4.4    Favorable original certificate of good standing, or comparable status, of Seller, issued by the California Secretary of State, dated no earlier than a date which is thirty (30) calendar days prior to the Closing Date;

1.4.5    [Intentionally Omitted]

1.4.6    Creation of the trust account for the Claims Fund;

1.4.7    A certificate of the Chairman of the Board of Seller certifying to Purchaser that to the Seller's Knowledge, as of the Closing, (a) there are no facts except as specifically disclosed in writing in such certificate or in other documents delivered to or examined by the Purchaser which would cause Seller to be in material breach of its representations and warranties under this Agreement, (b) Seller is in compliance with Seller's covenants set forth in this Agreement, and (c) that all of the conditions contained in Article VI have been satisfied except those, if any, waived in writing by Seller;

1.4.8    A certificate of the Secretary of the Board of Directors of Seller certifying to Purchaser (a) the incumbency of the officers of Seller on the Effective Date and on the Closing Date

- 12 -

and bearing the authentic signatures of all such officers of Seller who shall execute this Agreement and any additional documents contemplated by this Agreement, and (b) the due adoption and text of the resolutions of Seller authorizing (i) the transfer of the Assets and delegation of the Assumed Obligations by Seller to Purchaser, (ii) the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Seller, and (iii) that Seller's Board of Directors has adopted a special resolution scheduling the election seeking the Public Approval pursuant to Section 4.14, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.4.9    UCC termination statements prepared by Purchaser and acceptable to Seller for any and all financing statements (which do not correspond to an Assumed Obligation) filed with respect to the Assets, including, without limitation, any UCC termination statements required to effectuate the Bond Release, and the release of any capital lease obligations (if any) which are not assumed by Purchaser hereunder;

1.4.10    Limited Power of Attorney prepared by Purchaser and acceptable to Seller for use of pharmacy license, DEA and Other Registration Numbers, and DEA Order Forms, in the form contemplated pursuant to 42 C.F.R. § 1305.05 (the **"Power of Attorney"**);

1.4.11    Copies of all third party consents, or of Bankruptcy Court orders if applicable, which are required to be obtained by Seller in connection with the assignment to and assumption of the Assumed Contracts and Assumed Leases by Purchaser;

1.4.12    The Lease and Management Agreement, executed by Seller, if applicable;

1.4.13    The Post-Closing Seller's Lease, as detailed in Section 5.9.1;

1.4.14    Proof reasonably acceptable to Purchaser that Seller has obtained and has in place the insurance required to be obtained by Seller pursuant to Section 4.13 of this Agreement, provided that Purchaser has paid the related premiums as provided in Sections 1.2.1(a)(vii) and (vii) and Section 4.13 of this Agreement;

1.4.15    Proof reasonably acceptable to Purchaser that Seller has obtained and has in place the required Public Approval, if obtained, to be sought by Seller pursuant to Section 4.14 of this Agreement;

1.4.16    In the event that the required Public Approval has been obtained, payment by the Purchaser (to be deposited and paid from the Escrow, as addressed above) to or as otherwise instructed by the trustees (collectively, the **"Bond Trustee"**) of the Existing Bonds, of the full amount required after application of all remaining reserves to cause Seller and all of the Assets to be fully released from any further obligations under the Existing Bonds, whether by defeasance, redemption or otherwise (**"Bond Release"**) after application of the Cash Purchase Portion and the applicable reserves, and delivery of such other documents as needed to effectuate the Bond Release, to the effect that the Assets shall be free and clear of any security interest on, or related to, the Existing Bonds and the Purchaser shall have no obligation therefore, and Purchaser shall be subject to no covenants or restrictions under, or as a result of, any Seller bond documents, as well as any other documents reasonably requested by Purchaser to effect the foregoing. Such amounts shall be payable by wire transfer, from the Cash Purchase Portion pursuant to the Bond Trustee's reasonable instructions (the **"Bond Release Documents"**). In the event that the Bond Trustee will not give the

- 13 -

Bond Release, Purchaser may rely upon the opinion of Seller's bond counsel that all amounts necessary to release the Existing Bonds have been duly paid or tendered and that the Assets and the proceeds thereof are not subject to any liens or restrictions imposed pursuant to the Existing Bonds;

1.4.17 An opinion of an independent consultant with expertise in methods of appraisal and valuation and in accordance with applicable governmental and industry standards for appraisal and valuation, determining that fair and reasonable consideration is to be received by Seller for the Assets, or Alternative Assets, as applicable, pursuant to California Health & Safety Code Section 32121(p)(1);

1.4.18 Such documents, other than payments, needed to be signed and delivered by Seller in order to effectuate the Bond Release; and

1.4.19 Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms of this Agreement.

For purposes of this Agreement, the deliverable documents referred to in Section 1.4 and elsewhere in this Agreement are collectively referred to in this Agreement as **"Related Agreements."**

1.5 **Items to be Delivered by Purchaser at Closing.** At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller or Escrow the following, duly executed by Purchaser where appropriate, unless otherwise waived in writing by Seller:

1.5.1 The Cash Purchase Portion for the Bond Release pursuant to Section 1.2.1(a)(i) and any Bond Release Documents pursuant to Section 1.4.16 which are required to be signed and delivered by Purchaser, including appropriate escrow instructions regarding disbursement of the funds needed for the Bond Release payment, out of the Cash Purchase Portion funds consistent with the terms of this Agreement.

1.5.2 A certificate of a duly authorized officer of Purchaser certifying to Seller (a) compliance with Purchaser's representations, warranties and covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement or that Purchaser shall agree and execute the Leaseback Agreement and Management Agreement, and (c) that all of the conditions contained in Article VII have been satisfied except those, if any, waived in writing by Purchaser;

1.5.3 A certificate of the Secretary or other officer of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Effective Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Members or Managers of Purchaser authorizing the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Purchaser, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.5.4 **[Intentionally Omitted]**

1.5.5 Favorable original certificates of good standing, or comparable status, of Purchaser issued by the California Secretary of State dated no earlier than a date which is thirty (30) calendar days prior to the Closing Date;

1.5.6 The Bills of Sale;

1.5.7 The Real Estate Assignments;

1.5.8 The Power of Attorney;

1.5.9 Documents reasonably satisfactory to Seller evidencing the assumption and release (as may be applicable pursuant to Sections 5.8 and 9.3) of the Assumed Other Liabilities and Assumed Obligations;

1.5.10 The Lease and Management Agreement, executed by Purchaser, if applicable;

1.5.11 The Post-Closing Seller's Lease as detailed in Section 5.9.1(a);

1.5.12 Payment of the Claims Fund;

1.5.13 An assumption and release (from all holders of the Select Administrative Note) of Seller from any obligations relating to the Select Administrative Note which are reasonably acceptable to Seller;

1.5.14 An assumption and release of Seller relating to the Assumed Rejection Claims, as detailed in Section 1.2.1(a)(v) which are reasonably acceptable to Seller;

1.5.15 Payment of the Annual Support Grants, as detailed in Section 5.9.1(b), by Purchaser for the first year, which amount shall not be subject to offset by Purchaser for any reason whatsoever;

1.5.16 No later than December 4, 2009 (**"First Organizational Update"**), and again five (5) days prior to the Closing Date (**"Second Organizational Update"**), an organizational chart for the Purchaser and each of the Purchasing Group Companies, setting forth its officers, directors and board of directors or managers, as applicable, and a list of all physicians who have invested at least Ten Thousand Dollars ($10,000) in such an entity (**"Listed PHH Physicians"**).

1.5.17 **[intentionally left blank]**

1.5.18 Payment of the D&O and E&O premiums, as detailed in Section 1.2.1(a)(vii) and Section 1.2.1(a)(viii) respectively;

1.5.19 Documentation, in a form reasonably acceptable to Seller, containing Purchaser's absolute and unconditional promise to pay to Seller, the total sum of $21,000,000, reduced by the Claims Fund and the Additional Fund as provided for in Section 1.2.4, payable in four (4) equal annual installments commencing on the first anniversary of the Closing Date, with the

1070092

F:\Board\PHH\FINAL-ASA 10/12/09.DOC

remainder, after the payment of Administrative Claims, to be available to the General Unsecured Creditors; and

1.5.20 Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms of this Agreement.

1.6 **Transfer of Seller Assets.** On the Closing Date, for the consideration and in reliance on the representations and warranties of the Parties set forth in this Agreement, Seller shall sell, assign, transfer, convey, as applicable, and deliver to Purchaser, and Purchaser shall acquire and assume, all of Seller's right, title and interest in and to, and all of Seller's obligations related to, the following assets and properties, as such assets shall exist on the Closing Date with respect to the operation of the Hospital Businesses, such transfer being deemed to be effective at the Effective Time (collectively, the "**Assets**"):

1.6.1 All of the real property that is owned by Seller, including, without limitation, any real property used in connection with the operation of the Hospital Businesses as described in Schedule 1.6.1, together with all buildings, improvements and fixtures located thereupon and all landscaping, utility lines, roads, driveways, fences, parking areas, contiguous and adjacent entry rights, construction in progress, and all other improvements located thereon and all rights, privileges and easements appurtenant to the foregoing, subject to the non-monetary obligations on the preliminary report approved by Purchaser, as detailed in Schedule 1.6.1-A (collectively, the "**Owned Real Property**");

1.6.2 All leases of real property in which Seller is the lessor or lessee, as detailed on Schedule 1.6.2 (the "**Leased Real Property**", which collectively with the Owned Real Property shall hereinafter be referred to as the "**Real Property**");

1.6.3 All of the tangible personal property owned by Seller, including, without limitation, with respect to the operation of the Hospital Businesses, including all equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "**Personal Property**"), including, without limitation, the Personal Property described in Schedule 1.6.3, with the exception of (i) any and all Personal Property described in Sections 1.7 or 1.9 and (ii) any personal property located in the "Board Executive Conference Room," and the "Board Offices" as referenced in Section 5.9.1;

1.6.4 Subject to Section 1.3.6, all of Seller's rights, to the extent lawfully transferable, to all licenses, Medicare, Medicaid and other provider numbers and agreements, permits, approvals, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to such Seller with respect to the operation of the Hospital Businesses and all applications or registrations relating to any of the foregoing (the "**Licenses**"), including, without limitation, as described in Schedule 1.6.4-A except for those Licenses that Purchaser elects prior to the Effective Date, in its sole discretion, not to take or delay assignment of as identified in Schedule 1.6.4-B (the "**Excluded Licenses**");

1.6.5 All of Seller's interest, to the extent lawfully transferable and subject to Section 9.3 of this Agreement, in and to all personal property leases with respect to the operation of the Hospital Businesses, including, without limitation, as described in Schedule 1.6.5 (the "**Personal Property Leases**" which together with the Leased Real Property shall be known as the "**Leases**");

Bankruptcy Code §365, all of Seller's interest, to the extent lawfully transferable (and subject to the related terms at Section 9.3 of this Agreement), in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital Businesses or the Assets (the "**Contracts**") agreed to be assumed by Purchaser as set forth on Schedule 1.6.6 ("**Assumed Contracts**"); provided, however, the term "Assumed Contracts" as used in this Agreement shall exclude any Contracts not listed on Schedule 1.6.6 (the "**Excluded Contracts**");

1.6.7 Except as excluded under Section 1.7, all of Seller's advance payments, prepayments, prepaid expenses, deposits and the like, except for any prepaid insurance premiums, which exist as of the Effective Time, which were made with respect to the operation of any Hospital Businesses which are determined by Purchaser to be useable by and transferable to Purchaser, the categories and amounts of which are set forth on Schedule 1.6.7 (the "**Prepaids**");

1.6.8 Except as excluded under Section 1.7, all of Seller's inventories of supplies, drugs, food, janitorial maintenance, shop and office supplies and other disposables and consumables located at any of the Hospital Businesses, or used with respect to the operation of any of the Hospital Businesses (the "**Inventory**") which are existing as of the Effective Time;

1.6.9 Except as excluded under Section 1.7 and the Leaseback Agreement (if then existing or the termination thereof), all of Seller's documents, records, operating manuals, files and computer software with respect to the operation of any of the Hospital Businesses, to the extent lawfully transferable and subject to privacy issues, the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and Sections 9.3 and 12.8 of this Agreement, including, without limitation, all of Seller's patient records, medical records, employee records, financial records with respect to the operation of any of the Hospital Businesses, equipment records, construction plans and specifications, and medical and administrative libraries, and the Transferred Records, both subject to reasonable and customary records retention requirements and rights of access in order to fulfill Seller's legal obligations, as further addressed in this Agreement;

1.6.10 To the extent transferable and subject to Section 9.3 of this Agreement, all of Seller's unexpired warranties and covenants and covenants not-to-compete received from third parties with respect to the Assets including, without limitation, such warranties and covenants as are set forth in any construction agreement, lease agreement, equipment purchase agreement, consulting agreement, agreement for architectural and engineering services or purchase and sale agreement;

1.6.11 **[Intentionally Omitted]**;

1.6.12 Except as provided under Section 1.7 or Schedule 1.6.12, all of Seller's claims, choses in action, rights of recovery, rights of offset, recoupment, rights to refunds and similar rights pertaining to the Assets;

1.6.13 Except as excluded under Section 1.7, to the extent transferable and subject to Section 9.3 of this Agreement, all proprietary materials, documents, trademarks, patents, information, media, methods, processes, inventions and technology owned by Seller which are functionally related to the Hospital Businesses, and any and all rights to use the same, including, but not limited to, all of Seller's telephone numbers, intangible assets of an intellectual property nature, all proprietary computer software, all clinical and policy and procedure manuals, and all

**1.7.3** The names Valley Health System, VHS or world-wide web addresses (including, without limitation, any world-wide web address containing "valleyhealthsystem.com," "valleyhealthsystem.org," "vhs.com," "vhs.org"), all abbreviations and variations thereof, and trademarks, trade names, service marks, copyrights and any applications therefor, symbols and logos related thereto, including those as detailed in Schedule 5.5, together with any promotional material, stationery, supplies or other items of inventory bearing such names or symbols or abbreviations or variations thereof;

**1.7.4** The portions of Inventory, Prepaids and other Assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and prior to the Effective Time in the ordinary course of business and otherwise in accordance with the terms of this Agreement;

**1.7.5** All claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same;

**1.7.6** All rights, claims and choses in action of Seller and its Affiliates with respect to any Excluded Contracts and investments in Seller's Affiliates which Purchaser does not purchase, as listed at Schedule 1.7.6;

**1.7.7** All of the assets of the Hemet Hospital Foundation, Menifee Valley Medical Center Foundation (aka Foundation for the Menifee Valley Medical Center) and Moreno Valley Community Health Foundation (collectively, the "**Foundations**");

**1.7.8** All assets related to the Hospital auxiliaries, including the Hemet Valley Hospital Auxiliary, the Menifee Valley Medical Center Auxiliary, and the Moreno Valley Community Hospital Auxiliary (collectively, the "**Auxiliaries**");

**1.7.9** All of the corporate minutes and organizational documents relating to Seller, VHSSC, the Foundations or the Auxiliaries, all attorney-client privileged documents relating to Seller;

**1.7.10** Any affirmative defenses, counterclaims, rights of offset or recoupment, or any other defenses to any claims which may be asserted by any Person against Seller in connection with any Excluded Liabilities, as detailed in Section 1.9, or otherwise; provided further that Seller and Purchaser shall each have the non-exclusive right to assert any affirmative defenses, counterclaims, rights of offset or recoupment, or any other defense to any claims that may be asserted against either of them, to the extent that such affirmative defense, counterclaim, offset, recoupment or other defense relates to any asset, contract, right, obligation or interest retained by Seller or transferred to Purchaser, respectively;

**1.7.11** Restricted funds included within Seller's Current Assets, held by Seller from the Estate of Beatrice Brown (of which the current balance is approximately $807,000 which are restricted to charitable use for services to crippled children, and which amount (as adjusted through the Closing Date), which shall be retained by Seller;

**1.7.12** As detailed in Section 1.6.19, one-half of the cash or cash equivalents of VHSSC (which is included within Seller's Current Assets), which as of the date of this Agreement is contemplated to be distributed to RCSC;

- 19 -

---

promotional, marketing and recruiting materials and all applications or registrations relating to any of the foregoing, all subject to any existing limitations;

**1.6.14** To the extent transferable and subject to Section 9.3 of this Agreement, any and all of Seller's rights respecting computer and data processing hardware that are proprietary to Seller and licenses for software which are functionally related to the Hospital Businesses, and any of Seller's computer and data processing hardware, whether or not located at the Hospital, that is part of a computer system used by any of the Hospital Businesses, whether or not the central processing unit therefor is located at the Hospital, all of which are set forth on Schedule 1.6.14;

**1.6.15** All of Seller's other intangible assets related to the Hospital Businesses, not otherwise listed above, including without limitation the goodwill of the businesses evidenced by the Assets and Seller's rights under that certain covenant not to compete provided to Seller by Kaiser Foundation Hospitals ("**Kaiser**") pursuant to that certain First Amendment to Asset Sale Agreement, by and among Seller, Select VHS Acquisition Company, LLC and Kaiser, to the extent that such covenant may be transferable (such covenant is assignable only if Purchaser enters into agreements for the provision of beds to Kaiser patients at mutually agreeable rates);

**1.6.16** All of Seller's insurance proceeds arising in connection with property damage to the Assets occurring after the Effective Date and prior to the Effective Time, to the extent not expended on the repair or restoration of the Assets;

**1.6.17** Except as provided under Section 1.7 below, the Seller's names, symbols and telephone numbers used with respect to the operation of the Hospital Businesses, including, without limitation, the names of the Hospital Businesses set forth on Schedule 1.6.17 and all variants thereof;

**1.6.18** All Accounts Receivable and other Current Assets (with the exception of the items in the Excluded Assets, as detailed in Section 1.7) of Seller with respect to the operation of any of the Hospital Businesses (which are not otherwise specifically described above in this Section 1.6); and

**1.6.19** The assets of VHSSC which are to be transferred by VHSSC to Seller, subject to approval of the VHSSC Board of Directors, including, (i) the stock ownership interest in Professional Medical Management Group, Inc. ("**ProMed**"), subject to applicable contractual rights, and (ii) one half of the cash or cash equivalents of VHSSC. As of the date of this Agreement, it is contemplated that the other one-half of the remaining cash or cash equivalents may be given or otherwise transferred by VHSSC to Ramona Community Services Corporation, a California nonprofit corporation (which does business as Ramona VNA and Hospice) ("**RCSC**"). There shall be no adjustment to the PEPC by reason of such gift or transfer to RCSC.

**1.7** **Excluded Assets.** Notwithstanding anything to the contrary in Section 1.6, Seller shall retain all assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following assets of Seller (collectively, the "**Excluded Assets**");

**1.7.1** All cash and other consideration received by, or promised to, Seller as part of the PEPC;

**1.7.2** Any rights of Seller in Seller's defined benefit plan;

- 18 -

exist by reason of any liability to refund any payment or reimbursement received by Seller from any Payor which is attributable to any period of time, unless such refund resulted from criminally fraudulent or criminally illegal billing practices by Seller;

**1.8.9** All other obligations of Seller which are expressly assumed by Purchaser as part of the PEPC as set forth in Section 1.2.1 or elsewhere in this Agreement;

**1.8.10** All present, future and contingent workers compensation claims of Seller's Employees;

**1.8.11** All accrued extended sick leave and frozen sick pay benefits (the "**ESL Benefits**" for Seller's Employees who become Hired Employees, as defined in Section 5.4.1, under Seller's ESL Benefit plans (which provides for accrual of ESL Benefits separate and apart from Accrued Paid Time Off and is payable only in the event of sickness after exhaustion of Accrued Paid Time Off and is provided on the understanding and condition that the ESL Benefits are not payable to Seller's Employees upon termination of employment of Seller's Employees, and is not carried as a Current Liability on the Baseline Financials);

**1.8.12** Any other obligations and liabilities identified in Schedule 1.8.12 which are mutually agreed upon by the parties.

**1.9** **Excluded Liabilities.** Purchaser shall not assume or become obligated for any obligation or liability of Seller not expressly assumed pursuant to Section 1.8, of any nature whatsoever (whether express or implied, fixed or contingent, liquidated or un-liquidated, known or unknown, due or to become due) (the "**Excluded Liabilities**"), which Excluded Liabilities shall include, without limiting the generality of the foregoing, the following:

**1.9.1** Obligations or liabilities of Seller or any Affiliate of Seller now existing or which may hereafter exist to refund any payment or reimbursement received by Seller from any Payor, based on claims of criminally fraudulent or criminally illegal billing (but not including any improper or allegedly improper billing which is not criminally fraudulent or criminally illegal), which is attributable to any period of time ending prior to the Effective Time;

**1.9.2** Any Severance Liabilities not listed at Schedule 1.1.1.(cc);

**1.9.3** Fines, penalties and interest thereon now existing or which may hereafter exist by reason of any violation of Laws by Seller or by any employee, agent or independent contractor of any of the foregoing, relating to the ownership, use or operation of the Assets prior to the Effective Time;

**1.9.4** Obligations and liabilities of Seller arising from or in connection with any litigation described in Section 2.11 or any claims for personal injury (including sickness, trauma, disease, pain and suffering, loss of future earnings, punitive damages and the like), property damage and any other damage or injury in existence or arising out of an event or circumstance which occurred or existed prior to the Effective Time, whether or not any claim has been made or litigation has been instituted with respect thereto, and whether or not any such claim is covered partially or fully by insurance;

- 21 -

**1.7.13** Any portion of the current or long term debt service reserve funds relating to Seller's Existing Bonds held by or for the benefit of Seller (including all funds held by the Bond Trustees of the Existing Bonds and reserves held internally by Seller for payment of interest and principal on the Existing Bonds during the current semi-annual period) which shall be used to pay off the Existing Bonds; and

**1.7.14** Any assets identified in Schedule 1.7.14, which are mutually agreed upon by the Parties.

**1.8** **Assumed Obligations.** On the Closing Date, Seller shall assign, and Purchaser shall assume and agree to discharge (or if such obligations are not to be discharged at that time, Purchaser shall use its best efforts to obtain a release of Seller from and shall indemnify, defend and hold Seller harmless from) the following liabilities and obligations of Seller, except to the extent included in the list of Excluded Liabilities, below (collectively, the "**Assumed Obligations**"):

**1.8.1** All Assumed Other Liabilities of Seller as of the Closing, including the repayment schedules from Medicare attached hereto as Schedule 1.8.1, but excluding any liabilities related to the Existing Bonds (which are to be paid in full from the Cash Purchase Portion), or as otherwise provided at Sections 1.9.11 or 1.9.12;

**1.8.2** Any Severance Liabilities owing to Seller's Employees to whom Purchaser has not extended an offer of employment, consistent with the terms and conditions of Seller's current severance policy and employment agreements, and any Accrued Paid Time Off Amounts owing to Seller's Employees, as defined in Section 5.4.1, (i.e., for such employees who do not apply, or are not hired by Purchaser, or who are hired by Purchaser but do not consent to the transfer of liability for such Accrued Paid Time Off Amounts to Purchaser);

**1.8.3** All obligations and liabilities of Seller in connection with the Contracts, to the extent that (i) Purchaser obtains a direct or indirect benefit from such Contracts even though not included within Assumed Contracts, as further addressed in Section 9.3.1 or (ii) such Contracts are Assumed Contracts, including any obligations to make cure payments required to be paid under the Chapter 9 Proceeding in order for Purchaser to assume any Contract which Purchaser is required or elects to assume pursuant to this Agreement. Notwithstanding the foregoing, in the event that Purchaser is unable as a matter of law to assume the capital lease obligations which are part of the Assumed Contracts (e.g., such financing is available only to tax exempt entities), Purchaser agrees to refinance or pay in full the capital lease obligations as of the Closing;

**1.8.4** All unpaid real and personal property Taxes, as defined in Section 2.15.1, if any, that are attributable to the Assets;

**1.8.5** All utilities furnished to all of the Assets;

**1.8.6** All obligations and liabilities under the union contracts and memoranda of understanding with the unions which are referenced in Schedule 1.8.6 and Schedule 2.13.2;

**1.8.7** All of the obligations and liabilities relating to the Assets, the Real Property and the operations or practices of the Hospital Businesses which hereafter may exist that in any way are based upon, relate to or arise out of the ownership or operation of the Assets, the Real Property or the Hospital Businesses after the Closing Date;

- 20 -

**1.9.5** Except as provided in Section 1.8.3 (with respect to cure payments), Section 12.12, or elsewhere in this Agreement, obligations and liabilities of Seller incurred in connection with obtaining any required consent, authorization or approval under this Agreement necessary for Seller to sell, convey, assign, transfer or deliver any Asset to Purchaser under this Agreement, subject to Section 9.3;

**1.9.6** Obligations and liabilities of Seller or any Affiliate of Seller now existing or which may hereafter exist, for any Taxes, including, but not limited to any Taxes for which Seller would otherwise be liable that may arise as a result of the consummation of the transactions contemplated by this Agreement or any Related Agreement, except (i) real and personal property Taxes, (ii) sales and use taxes for periods prior to the Closing which are included in the Baseline Financials, and (iii) as otherwise provided in Section 12.12

**1.9.7** All of the obligations and liabilities that are based upon or arise out of the assets or businesses of Seller or any Affiliate of Seller which are not being transferred to Purchaser under this Agreement, including without limitation those related to the Excluded Assets, unless Purchaser is actually receiving the benefit of the assets or businesses not being transferred (e.g., because a third party will not grant a consent), in which case, the Parties agree that Seller shall not be liable for these obligations and liabilities and Purchaser shall indemnify, defend and hold Seller harmless from any liability, obligation or claim related thereto to the extent that Purchaser is receiving a benefit from the asset or business not transferred;

**1.9.8** Except as otherwise provided in Section 1.8 above, liabilities and obligations to any employees of Seller arising out of claims, actions or omissions occurring prior to the Effective Time (i) under any employment, wage and hour, equal opportunity, discrimination, or immigration and naturalization Legal Requirements, including without limitation under the National Labor Relations Act ("**NLRA**"), Title VII of the Civil Rights Act ("**CRA**"), the Fair Labor Standards Act ("**FLSA**"), the Age Discrimination in Employment Act ("**ADEA**"), the Vocational Rehabilitation Act of 1973 ("**VRA**"), the Public Health Service Act ("**PHSA**"), the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") (to the extent applicable to Seller) Worker Adjustment and Retraining Notification Act (and California Assembly Bill AB2957, as codified at California Labor Code Sections 1400 through 1408) (collectively; "**WARN**") (to the extent applicable to Seller), with respect to periods prior to the Closing Date, and any other federal or state employment Legal Requirements; or (ii) under any collective bargaining or labor agreements or labor Legal Requirements or arrangements, except as otherwise expressly provided in this Agreement; provided, however, the Assumed Obligations shall include all present, future and contingent Workers Compensation claims as provided in Section 1.8.10 above;

**1.9.9** All of Seller's liabilities and obligations, if any, relating to Benefit Plans accruing prior to the Effective Time, except as otherwise provided in Section 1.8;

**1.9.10** All Current Liabilities which are not recorded on Seller's books consistent with accounting principles applied to the Baseline Financials, but excluding (i) all obligations under Assumed Contracts, and (ii) all obligations under the ESL Benefits which are assumed by Purchaser as described in Section 1.8.11 above; and

**1.9.11** Any liabilities relating to the Existing Bonds, which Purchaser has agreed to pay as part of the PEPC; and

- 22 -

**1.9.12** Any liability or obligation arising from any attempt by Seller to formally reject in the Chapter 9 Proceeding any Contracts which are not Assumed Contracts, including, without limitation, existing labor agreements, whether or not such liability or obligation arises before or after the Effective Time.

The Excluded Liabilities shall remain the sole responsibility of Seller subject to the limitations provided in this Agreement.

**1.10 Disclaimer of Warranties.**

**1.10.1** As a material part of the consideration and as an inducement to Seller to enter into this Agreement, Purchaser agrees as follows:

Except as expressly set forth elsewhere in this Agreement, the Assets transferred to Purchaser shall be sold by Seller and purchased by Purchaser at the Effective Time "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR OCCUPANCY OR HABITATION, with respect to the Real Property, land, buildings and improvements, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, and with no warranties with respect to the current financial condition of the Hospital Businesses, any and all of which warranties (both express and implied) Seller hereby disclaims.

Seller's Initials: _____    Purchaser's Initials: _____

All of the foregoing real and personal property shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use of the inventory and supplies in the ordinary course of business up to the Effective Time. Notwithstanding anything foregoing and without limiting the various limitations set forth in this Section 1.10, Seller discloses that it has identified the construction projects set forth in Schedule 1.10.1 which Seller believes will require completion during the current fiscal year following the Closing Date.

**1.10.2** Without limiting the foregoing, Purchaser acknowledges that Purchaser will be given the opportunity, at its sole cost and expense, to conduct such environmental inspections and surveys as Purchaser may deem necessary (the "**Environmental Surveys**"). If Purchaser is dissatisfied with the results of any Environmental Survey, or related investigation, conducted by Purchaser, Purchaser shall notify Seller in writing by December 4, 2009 that Purchaser is terminating this Agreement. Failure by Purchaser to give such written notice by December 4, 2009 shall be deemed to constitute approval by Purchaser of the Environmental Surveys, or a waiver by Purchaser of such condition. Seller shall have no obligation to undertake any such environmental remediation work. Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges that a portion of the hospital located in Hemet and the child care center in Hemet were built prior to 1982 and contain asbestos and also may not be in compliance with current applicable seismic Legal Requirements. Purchaser agrees to take the Real Property subject to said conditions and to relieve,

- 23 -

1.10.3    Without limiting the foregoing, Purchaser will be given the opportunity, at its sole cost and expense, to obtain such appraisals as Purchaser and its lenders and other financing sources may deem necessary (the "**Purchaser's Appraisals**"), and to complete such Purchaser's Appraisals no later than the Closing ("**Appraisal Period**"). Seller shall provide Purchaser and its agents reasonable access to the Real Property and the Hospitals as reasonably necessary for conducting the surveys and appraisals. Subject to Section 1.4.17 which the Parties acknowledge is for the protection of Seller, the Parties agree that there shall be no financing contingency applicable to the Transaction.

1.10.4    Except as expressly set forth elsewhere in this Agreement, any and all information and documents furnished to Purchaser by or on behalf of Seller relating to the Real Property shall be deemed furnished as a courtesy to Purchaser but without any warranty of any kind from or on behalf of Seller, except for any representations expressly made by Seller elsewhere in this Agreement. Purchaser hereby represents and warrants to Seller that Purchaser has performed, or will perform, an independent general inspection and investigation of the Real Property and has also investigated and has knowledge of operative or proposed governmental laws and regulations including without limitation, land use laws and regulations to which the Real Property may be subject. Purchaser further represents that, except for any representations expressly made by Seller and any other Purchaser inspection and approval rights set forth elsewhere in this Agreement, and right to receipt of title insurance as addressed elsewhere in this Agreement, it shall acquire the Real Property solely upon the basis of its independent inspection and investigation of the Real Property, including without limitation, (i) the quality, nature, habitability, occupancy, merchantability, use, operation, value, marketability, adequacy or physical condition of the Real Property or any aspect or portion thereof, including, without limitation, structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities, electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, soils, geology and groundwater, or whether the Real Property lies within a special flood hazard area, an area of potential flooding, a very high fire hazard severity zone, a wildland fire area, an earthquake fault zone or a seismic hazard zone or is not structurally or non-structurally in compliance with existing or future applicable seismic law requirements, (ii) the dimensions or lot size of the Real Property or the square footage of the Improvements thereon or of any tenant space therein, (iii) the development or income potential, or rights of or relating to, the Real Property or its use, habitability, occupancy, merchantability, or fitness, or the suitability, value or adequacy of such Real Property for any particular purpose, (iv) the zoning or other legal status of the Real Property or any other public or private restrictions on the use of the Real Property, (v) the compliance of the Real Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or regulatory agency or authority or of any other person or entity (including, without limitation, the Americans With Disabilities Act), (vi) the ability of Purchaser to obtain any necessary governmental approvals, licenses or permits for Purchaser's intended use or development of the Real Property, (vii) the presence or absence of Hazardous Materials on, in, under, above or about the Real Property or any adjoining or neighboring property, (viii) the quality of any labor and materials used in any Improvements, (ix) the condition of title to the Real Property, (x) any other agreements affecting the Real Property or the intentions of any party with respect to the negotiation and/or execution of any lease or contract with respect to the Real Property, (xi) Seller's ownership of the Real Property or

defend, indemnify and hold Seller harmless with respect to any liability related thereto, except to the extent of any liability resulting from Seller's negligence or intentional misconduct.

any portion thereof, or (xii) the economics of, or the income and expenses, revenue or expense projections or other financial matters, relating to the operation of the Real Property.

1.11    **Risk of Loss.** Subject to Sections 1.12 and 1.13, the risk of loss or damage to any of the Assets, including the Personal Property, Real Property, the Hospital Businesses and any other property transfer which is contemplated by this Agreement, shall remain with Seller until the Effective Time. Seller shall maintain its insurance policies covering the Assets, including the Personal Property, Owned Real Property, the Hospital Businesses and all other property through the Effective Time.

1.12    **Casualty.** If prior to the Closing, all or any part of the Assets or the Real Property are destroyed or damaged by fire or the elements or by any other cause where (a) such damage or destruction in the aggregate ("**Aggregate Damage**") does not exceed Two Million Five Hundred Thousand Dollars ($2,500,000.00), whether or not covered in whole or in part by insurance, and (b) such damage or destruction in the aggregate which is not covered by Seller's insurance does not exceed One Million Dollars ($1,000,000) in either case, the "**Damage Threshold**"), the duties and obligations of the Parties under this Agreement shall not be affected, the PEPC shall not be adjusted, and the Closing shall proceed as scheduled pursuant to the terms of this Agreement; provided, however, at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction, but without further adjustment to the PEPC. Solely for purposes of the foregoing determination, "**Aggregate Damage**" shall also include the estimated costs of environmental remediation as set forth in Section 1.10.2. If prior to the Closing, all or any part of the Assets or the Real Property are destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds either Damage Threshold, Purchaser may elect to either (i) purchase the Assets and the Closing shall proceed as scheduled on the terms set forth in this Agreement, without adjustment to the PEPC (provided, however, at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction), or (ii) terminate this Agreement upon written notice to Seller ("**Termination Notice**"), whereupon Purchaser shall be entitled to a refund of the entire Deposit. The Purchaser shall make such election within fifteen (15) business days following the occurrence of the casualty giving rise to such Aggregate Damages. Unless Seller challenges any valuation determinations made by Purchaser under this Agreement within ten (10) business days of Seller's receipt of the same, such valuation determinations shall be deemed to have been accepted by Seller and shall be conclusive and final on Seller. If, however, Seller timely challenges any such determinations, then unless otherwise resolved by agreement of the Parties within ten (10) business days from the date of Seller's challenge, such valuation determination shall be deemed in dispute and shall be resolved pursuant to the dispute resolution provisions of Section 12.18 (except that the provisions of Section 12.18.1 shall not apply).

1.13    **Condemnation.** From the date of this Agreement until the Effective Time, in the event that any portion of the Assets or the Real Property, including access thereto or parking therefor, is taken, reduced or restricted by any pending, threatened or contemplated condemnation or eminent domain proceeding or otherwise, Seller shall promptly notify Purchaser of the same and Purchaser may, in its sole and absolute discretion, within ten (10) days after receipt of notice from Seller (i) terminate this Agreement in its entirety without penalty, in which case the Deposit shall be paid back to Purchaser, or (ii) agree to consummate the transaction notwithstanding such condemnation or eminent domain, in which event, (a) Purchaser shall accept the Assets and Real Property subject to such condemnation or eminent domain proceeding or without the portion of the

# ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed in any of the disclosure schedules related to the following representations or in Schedule 2, as of the Effective Date, as may be amended pursuant to the terms of this Agreement (collectively, the "**Seller's Disclosure Schedule**"), as an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents, warrants and covenants to Purchaser, as to the following matters. Except as otherwise provided in this Agreement, Seller shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date.

2.1 **Authorization.** Except as otherwise provided in Schedule 2.1, Seller has full power and authority to enter into this Agreement and the Related Agreements and full power and authority to carry out the transactions contemplated hereby and thereby, subject only to (i) the requirement to seek and receive the "Public Approval of the transaction contemplated in connection with this Agreement through the holding of an Approval Election, as further addressed at Section 4.14 (the "**Public Approval Requirement**"), and (ii) the requirement that Seller receive, prior to the Closing, an opinion from an independent appraiser that the consideration received by Seller under the terms of this Agreement will constitute fair and reasonable compensation for the Assets pursuant to the requirements of California Health and Safety Code Section 32121(p)(1) and, in accordance with applicable governmental and industry standards for appraisals and valuations. Notwithstanding the receipt of an opinion from an independent appraiser as detailed above, Seller makes no representation or warranty with respect to the value of the Assets or the consideration being delivered by Purchaser with respect to this Transaction. Purchaser acknowledges that it is relying solely on its own evaluation of the Assets, the Transaction and the Alternative Transaction.

2.2 **Binding Agreement.** Except as otherwise provided in Schedule 2.2 and subject to Section 2.1, Seller has the full power and the authority to execute, deliver and perform the obligations and covenants set forth in this Agreement and all Related Agreements to which it is a party and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Related Agreements by Seller and the consummation of the transactions contemplated hereby or thereby have been (or will be by the Closing Date) duly authorized by all necessary action on the part of Seller. Except as set forth in Section 2.1 and Schedule 2.2, no other action on the part of the Seller is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements, all documents necessary to give effect to this Agreement and all transactions contemplated hereby and thereby. Except as set forth in Schedule 2.1 and as provided in Section 2.1, this Agreement and the Related Agreements have been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (i) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of specific performance, injunctive relief, or other equitable remedies.

2.3 **Organization and Good Standing; No Violation.**

2.3.1 Seller is duly organized and validly existing under the laws of the State of California. Except as disclosed in Schedule 2.3.1, Seller (i) has full power and authority to own,

- 27 -

---

Assets or Real Property taken in such proceeding, (b) Purchaser shall retain all of the right, title and interest of Seller, as owner of the Assets or Real Property, as the case may be, in and to such proceeding and the proceeds of the award made in such proceedings, and (c) Seller shall promptly turn over to Purchaser the proceeds of any aware, or payment made pending the making of the award, already received by Seller. If Purchaser does not provide a termination notice to Seller within the ten (10) day period specified above, Purchaser shall be deemed to have elected to consummate the transaction notwithstanding such condemnation or eminent domain proceeding, in which event, Seller shall pay, transfer and assign to Purchaser at Closing, the proceeds, or the right to receive the proceeds, relating to any applicable award as detailed in this Agreement. In no event shall a condemnation result in a reduction of PEPC without the express written approval of Seller.

1.14 **Development and Review of Schedules, Exhibits and Other Materials.** The Parties agree to the further actions and provisions related to this Agreement, which are scheduled to take place during the forty-five (45) days following the Effective Time ("**Schedules Period**"):

1.14.1 During the Schedules Period, Seller shall provide Purchaser with copies of all Contracts (except to the extent that Purchaser and Seller otherwise agree to exclude certain non-material Contracts), as well as the estimated cure payments required under the Chapter 9 Proceeding for each such Contract to be paid in order to assume such Contracts ("**Cure Payments**"). Purchaser shall determine which Contracts it elects to assume and shall notify Seller of the same, in writing, within ten (10) days after the end of the Schedules Period.

1.14.2 Seller shall, within the Schedules Period, estimate the Administrative Claims ("**New Administrative Claims**") which will be incurred by Seller as a result of its rejecting those post-petition Contracts which Purchaser has not elected to assume ("**Rejected Contracts**") and shall notify Purchaser of same in writing. If, as a result of the New Administrative Claims, the Covered Claims are estimated to exceed the original Claims Fund, then Purchaser shall have the right to: (i) nonetheless close the Transaction, and at Closing, Purchaser shall immediately pay the additional amounts needed for the Claims Fund in excess of $4,000,000 to cover the New Administrative Claims; (ii) elect to assume some of the Rejected Contracts sufficient to reduce the New Administrative Claims to bring Covered Claims within the amount of the original Claims Fund; or (iii) elect, by written notice to Seller prior to the end of the Schedules Period, to terminate this Agreement.

1.14.3 Seller will complete and deliver Seller's disclosure schedules, and the remaining diligence materials related thereto and otherwise requested not later than 45 days after the Effective Date. If Purchaser disapproves of any such materials, it may elect to terminate this Agreement by written notice provided to Seller prior to the end of the Schedules Period or 10 days after the last materials are provided to Purchaser under Section 1.14.2.

1.14.4 Seller and Purchaser shall work together diligently to finalize the other Exhibits and Schedules to this Agreement and to develop and agree upon the Definitive Alternative Agreement consistent with Schedule 1.3.2. Once the Parties reach agreement on the form of the Definitive Alternative Agreement, the Parties agree to replace the terms of Schedule 1.3.2 with the form of the Definitive Alternative Agreement, which will govern the Alternative Transaction, if applicable.

- 26 -

operate and lease its properties and to carry on its businesses as now conducted, and (ii) is duly qualified to do business and is in good standing in each jurisdiction in which the property owned or leased by it or the operations of the Hospital Businesses make such qualification necessary. The organization of Seller does not violate any state or federal Law applicable to Seller.

2.3.2 Except as set forth in Sections 2.1 and 2.2 and as provided in Schedule 2.3.2, the execution, delivery and performance of this Agreement and all Related Agreements and the consummation of the transactions contemplated hereby and thereby, to the Seller's Knowledge, does not and will not, with the passage of time or the giving of notice or both (a) violate any state or federal Law applicable to Seller, (b) violate or conflict with, or result in a substantial and material breach of, or constitute a material default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of, any indebtedness, mortgage, Lien, restriction, charge, security interest, claim, right of another, or other encumbrance upon any of the Assets whatsoever, under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, franchise, agreement or other instrument or obligation to which Seller is a party or by which any of the Assets are or will be bound or (c) violate or conflict with any provision of the charter or organizational documents of Seller.

2.4 **Contracts and Leases.**

2.4.1 With the exception of the Excluded Contracts, to Seller's Knowledge, Schedule 2.4.1, which may incorporate various other schedules, taken together as a whole, contains a list of substantially all of the Leases with respect to Real Property or Personal Property which are with a physician or other referral source for any of the Hospitals or are secured by a lien covering material Assets, or which (i) require lease payments by Seller with respect to the operation of any Hospital Businesses of a yearly payment in excess of Fifty Thousand Dollars ($50,000.00), and (ii) either have a remaining term in excess of one (1) year or cannot be terminated by Seller upon notice of one hundred eighty (180) calendar days or less without penalty or acceleration of any obligation (each a "**Material Leases**"; collectively, "**Material Leases**").

2.4.2 With the exception of the Excluded Contracts, to Seller's Knowledge, Schedule 2.4.2 contains a list of substantially all Contracts which is with a physician or other referral source for any of the Hospitals or which is secured by a lien covering material Assets or which (i) require the payment by Seller with respect to the operation of any Hospital Businesses of a yearly payment in excess of Fifty Thousand Dollars ($50,000.00), and (ii) either have a remaining term in excess of one (1) year or cannot be terminated by Seller upon notice of one hundred eighty (180) calendar days or less without penalty or acceleration of any obligation (each a "**Material Contract**"; collectively, "**Material Contracts**").

2.4.3 Schedule 1.2.1(b) contains a complete and accurate list of the Existing Bonds which constitutes all of the bond indebtedness to which Seller is currently subject. Schedule 1.2.1(b) also contains an accurate list, as of the date given on the schedule, of the then current redemption or pay-off amounts, as applicable, for each of such bond issuances.

2.5 **Required Consents.** Except as set forth in Section 2.1, the Liens granted to secure the Existing Bonds, and on Schedule 2.5, to Seller's Knowledge, Seller is not a party to or bound by, nor are any of the Assets subject to, any mortgage, Lien, deed of trust, Material Lease, Material Contract, or any material order, judgment or decree which (a) requires the consent of another to the

- 28 -

execution of this Agreement and the Related Agreements or (b) requires the consent of another to consummate the transactions contemplated by this Agreement and the Related Agreements.

2.6 **Compliance With Laws and Contracts.**

2.6.1 **Compliance With Laws.** Except as set forth in Schedule 2.6.1, to Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, is in material compliance with all applicable substantive Laws, except where the failure to be in such compliance would not have a Material Adverse Effect on the Assets or the business of the Hospital Businesses. Except as set forth in Schedule 2.6.1, to Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, has not been charged with or given notice of, and to the Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, is not under investigation with respect to, any material violation of, or any obligation to take remedial action under, any applicable (i) Law, (ii) material license, certificate or certificate of need issued, or (iii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the Hospital Businesses or the business of the Hospital Businesses. Notwithstanding the foregoing, except as set forth in Section 2.6.2, no provision of this Section 2.6.1 shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws.

2.6.2 **Environmental Laws.** Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, Seller's ownership and operation of the respective Hospital Businesses and the Assets are and have been in material compliance with all Environmental Laws, except where such failure would result in an estimated cost of remediation in excess of $1,000,000. In the event that the estimated cost of remediation exceeds $1,000,000, then the Purchaser shall have the right to terminate this Agreement as its sole remedy. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, Seller has obtained all licenses, permits and approvals necessary or required under all applicable Environmental Laws (the "**Environmental Permits**") for the ownership and operation of its respective Hospitals and the Assets. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, all such Environmental Permits are in effect and, to Seller's Knowledge, no action to revoke or modify any of such Environmental Permits is pending. Except as disclosed in Schedule 2.6.2, to Seller's Knowledge, there is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Hospitals or the Assets. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, there has not been a Release or threatened Release of any Hazardous Substance at, upon, in, under or from the Hospitals or the Assets at any time. For the purposes of this Agreement, the term "**Environmental Laws**" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the handling, storage, transportation, treatment and disposal of medical and biological waste. The foregoing notwithstanding, Purchaser acknowledges that portions of Hemet Valley Medical Center and the Child Care Center in Hemet were constructed prior to 1982 and contain asbestos or asbestos-containing materials ("**ACM**"); provided that, to Seller's Knowledge, the ACM have been handled and managed at all times in compliance with all applicable Laws.

- 29 -

**2.6.3    Compliance With Contracts.** Except as set forth on Schedule 2.6.3, and except for defaults occurring with respect to pre-petition obligations which are the subject of Seller's Chapter 9 Bankruptcy Proceeding and as to which Seller has the benefit of the automatic stay under the Bankruptcy Code, to Seller's Knowledge, (a) Seller has not received written notice that any Person intends to cancel or terminate any Material Contract or exercise any right, remedy or other option thereunder, and (b) Seller has not waived in writing any material right under any Material Contract.

**2.7    Title to Personal Property.**

**2.7.1    Title.** Except for the Personal Property which is leased from third parties by Seller, Seller has good and valid title to its Personal Property and is able to operate the Hospital Businesses in their current form.

**2.7.2    Inventory.** The Inventory, as defined in Section 1.6.8, with respect to each of the Hospital Businesses, is, and at the Closing Date will be, maintained in sufficient quantities to operate the Hospital Businesses in the ordinary course of business as currently conducted.

**2.8    Hospital Businesses Operations.**

**2.8.1    Licensure.** Except as provided in Schedule 2.8.1, to the Seller's Knowledge, all licenses, certifications and certificates of need which are necessary to operate the business of each of the respective Hospital Businesses by Seller are valid and in good standing, except where the failure to have such licenses, certifications and certificates of need would not have a Material Adverse Effect. Seller is duly licensed by the State of California to operate the Hospitals as general acute care hospitals having the number of beds as set forth in each Hospital's current general acute care hospital license (provided, that some of such beds are currently not being utilized), and other Hospital Businesses, as respective businesses, in compliance with applicable licensing requirements.

**2.8.2    The Joint Commission.** Each Hospital and, if required, each of the other Hospital Businesses is duly accredited by the Joint Commission ("**The Joint Commission**") for the period set forth in Schedule 2.8.2.

**2.8.3    Government Payor Programs.** Each Hospital and, if applicable, each of the other Hospital Businesses is certified for participation in the Medicare and Medicaid programs, and has current and valid provider contracts with each of such programs, except where the failure to have such contracts would not have a Material Adverse Effect. Except as set forth in Schedule 2.8.3-A, to the Seller's Knowledge, Seller has not received notices from the regulatory authorities which enforce the statutory or regulatory provisions in respect of any of the Medicare or Medicaid programs of any noncompliance or pending or threatened investigations with respect to the operation of any of the Hospital Businesses. Notices of Program Reimbursement have been issued by the applicable fiscal intermediary with respect to the cost reports of the Hospital Businesses for Medicare and Medicaid (if required) through the periods set forth in Schedule 2.8.3-B. To Seller's Knowledge, Seller has not received notice of any material dispute between any of the Hospital Businesses and the applicable governmental agency or private entity, or their intermediaries or representatives, regarding such cost reports for periods subsequent to the periods specified in Schedule 2.8.3-B. To Seller's Knowledge, there are no pending or threatened material claims by any of such programs against any of the Hospital Businesses with respect to the Audit Periods or any period thereafter, and the Hospital Businesses have not been subject to loss of waiver of liability or

utilization review denials with respect to any such program during the past two years. Schedule 2.8.3-A also contains a description of Seller's policies and procedures for reporting bad debts to Medicare and each other Payor, and for the collection and waiver of co-payments and deductibles of Medicare and each other Payor. Schedule 2.8.3-A also contains the Medicare net book value of each of the Assets (or, if more convenient and reasonably acceptable to Purchaser, category of Assets) as of the date of the 2004 and 2005 Financials and 2006 Financials.

**2.8.4    Medical Staff Investigations.** Except as set forth on Schedule 2.8.4 or with respect to investigations being conducted internally by the medical staff which have not risen to level of disclosure to the Seller, to the Seller's Knowledge, there exists no pending or threatened investigation by Seller of any member of the medical staff of any of the Hospital Businesses for a violation or alleged violation of any policy of Seller.

**2.8.5    Revenues and Properties.** Except as set forth on Schedule 2.8.5, Seller has not granted nor permitted any security interest in or on the revenues, assets or properties of the Assets.

**2.8.6    No Other Assets.** The only material assets or property used in connection with or necessary for the Hospital Businesses which are not being transferred to Purchaser, if any, are set forth on Schedule 2.8.6.

**2.9    Brokers and Finders.** Neither Seller nor any affiliate thereof, nor any officer or director thereof, has engaged any finder or broker in connection with the transactions contemplated under this Agreement and Seller shall be solely responsible for any fees or commissions payable to any such broker, finder or investment banker by reason of the actions (or alleged actions) of Seller, its Affiliates or any of its officers or directors.

**2.10    Financial Statements.**

**2.10.1**    The following have been or will be prepared from the books and records of Seller: the financial statements of Seller with respect to the operation of each of the Hospital Businesses for the years ending June 30, 2007 and June 30, 2008, for which audits are currently in progress but are not completed (the "**2007 & 2008 Financials**"), and the unaudited financial statements of Seller with respect to the operation of each of the Hospital Businesses for the year ending June 30, 2009, and for the unaudited financial statements of Seller with respect to the operation of each of the Hospitals for the months subsequent to June 30, 2009 as made available pursuant to Section 4.6 (the "**Interim Financials**") (the 2007 & 2008 Financials and the Interim Financials are collectively referred to in this Agreement as the "**Financial Statements**"). The 2007 & 2008 and the Interim Financials through August 31, 2009 are attached as Schedule 2.10.1 and Seller acknowledges that, to Seller's Knowledge, the unaudited Baseline Financials are true, correct and accurate in all material respects. Except as provided in Schedule 2.10.1, to the Seller's Knowledge, subject to adjustments and only meant to give a snapshot of the interim period, the Financial Statements have been prepared from, and are in accordance with, the books and records of Seller and, with the exception possibly of the Interim Financials, present fairly the financial position and results of operations of Seller as of the dates and for the periods indicated, except where variations therefrom are noted in footnotes to such financial statements. Purchaser expressly acknowledges that notwithstanding the delivery of such Financial Statements, the future performance of the Hospital Businesses and the Assets are subject to risks and uncertainties that could cause future results to differ from past results. Seller does not undertake any, and specifically

- 30 -

- 31 -

1070039.2    F:\Base\PHH\FINAL ASA 10.12.09.DOC

1070039.2    F:\Base\PHH\FINAL ASA 10.12.09.DOC

147

disclaims any obligation to make any forward-looking financial statements or projections, especially in light of losses which have been suffered by Seller over the past few months.

2.10.2 **Changes Since Interim Financials.** Since August 31, 2009, other than as contemplated or permitted by this Agreement, Seller has conducted the Hospital Businesses and the Assets only in the ordinary and normal course, and except as shown on Schedule 2.10.2, there has not been, to Seller's Knowledge:

(a) Any entry into or termination by Seller of any commitment, contract, agreement or transaction (including, without limitation, any borrowing or lending transaction or capital expenditure) related to the Hospital Businesses or the Assets except for transactions in the ordinary course of business;

(b) Any condemnation, casualty, physical damage, destruction or physical loss respecting, or change in the physical condition of, the Real Property or the Personal Property has had an adverse effect on the prospects, financial condition or results of operation of any of the Hospital Businesses;

(c) Any transfer of, or rights granted under, any contract which would have been an assumed Contract on the date of the Interim Financials, except for transactions in the ordinary course of business;

(d) Other than in the ordinary course of business, (i) any sale or other disposition of any asset included in the Interim Financials having a net book value in excess of Fifty Thousand Dollars ($50,000.00), or (ii) any material mortgage, pledge or imposition of any lien or other encumbrances on any such asset, or (iii) any sale or other extraordinary disposition of Inventory included in the Interim Statements;

(e) Any change, or any request or application for a change in, the provider number of the Hospital Businesses, or any creation, modification or termination of any agreement with any Payor, or any change in the method of accounting with respect to the Hospital Businesses (except as noted in footnotes to such Financial Statements), or any change in or modification of the medical staff bylaws of either Hospital;

(f) Any material amendment (other than general amendments which the carrier makes for a category of policy) or termination of any Insurance Policy or failure to renew any Insurance Policy covering or relating to the Hospital Businesses or the Assets;

(g) Any material breach or default by Seller under any contract that would have been an assumed Contract on the date of the Interim Statements;

(h) Any Material Adverse Effect;

(i) Any increase made in the compensation levels or benefits (severance or otherwise) of the employees of the Hospital Businesses, except in the ordinary course of business; or

(j) Any change in the relationship between the Hospital Businesses, on the one hand, and the medical staff, on the other hand, or any adverse action taken by either of them against the Hospital Businesses.

2.11 **Legal Proceedings and Liabilities.** Except as set forth on Schedule 2.11, and with the exception of Seller's pending Chapter 9 proceeding and the claims, objections and proceedings therein, to Seller's Knowledge, there are no claims, proceedings or investigations pending or, to the Seller's Knowledge, threatened relating to or affecting Seller with respect to the operation of the Hospital Businesses or any of the Assets before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would have a Material Adverse Effect. Except as set forth on Schedule 2.11, to Seller's Knowledge, Seller is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to it or its assets, including the Assets, which would have a Material Adverse Effect. To the Seller's Knowledge, Seller is not subject to any liabilities with respect to the operation of the Hospital Businesses which are not reflected in the Financial Statements. Schedule 2.11-A contains an estimate of Seller's current incurred by not reported liabilities ("**IBNR**"), if any, and an accurate description of the methodology used by Seller to calculate such IBNR, all of which are subject to adjustment by the auditors.

2.12 **Seller Plans.** Schedule 2.12 contains a list of each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller, including Seller's defined benefit plan (collectively, the "**Seller Plans**").

2.13 **Personnel.**

2.13.1 **Hospital Personnel.** Schedule 2.13.1 sets forth a materially complete list (as of the date set forth therein) of positions, designation of the employees identified in Seller's handbook (i.e. full time employees, regular part-time employees, non-benefit employees, irregular part-time employees, temporary employees, per diem employees, and weekend contract employees), and current annual salaries or wage rates, bonus and other compensation and/or benefit arrangements, the paid time of pay, and period of service credited for vesting as of the date thereof of all full-time and part-time employees of Seller with respect to the operation of the Hospital Businesses and indicating whether such employee is a part-time, full-time or per diem employee.

2.13.2 **Employee Relations.** Except as disclosed on Schedule 2.13.2, (a) neither Seller nor any of the Hospital Businesses is a party to any agreement with any union, trade association or other employee organization with respect to the employees of the Hospital Businesses, and (b) to Seller's Knowledge, since June 30, 2008, (i) no demand has been made for recognition by a labor organization with respect to any employees of the Hospital Businesses, (ii) no union organizing activities by or with respect to any such employees are taking place, (iii) there are currently no disputes, grievances, charges, complaints or proceedings involving any of the employees of any of the Hospital Businesses, (iv) the Hospital Businesses have not suffered any strikes (including wildcat strikes), slowdowns, walkouts, or lockouts or any other interruptions or disruptions of operations as a result of labor disturbances with respect to employees of the Hospital Businesses, (v) no union representation question exists with respect to any employees of the Hospital Businesses, and (vi) no collective bargaining agreement is currently being negotiated by Seller with respect to the employees of the Hospital Businesses. Seller shall promptly notify Purchaser of any such actions occurring after the Effective Date and prior to the Closing Date.

**2.13.3   Agreements with Employees.** Schedule 2.13.3 sets forth a complete list of all material agreements or arrangements with individual employees of Seller, including, without limitation, all employment, severance, bonus or retention agreements.

**2.14   Insurance.** To Seller's Knowledge, Seller maintains, and has maintained, without interruption, at all times during Seller's respective ownership of the Hospital Businesses, self-insurance and policies or binders of insurance covering such risks and events, including personal injury, property damage, malpractice and general liability, to provide adequate and sufficient insurance coverage for all the assets and operations of the Hospital Businesses. Schedule 2.14 contains a list of all such insurance maintained by Seller with respect to the operation of the Hospital Businesses as of the Effective Date, and such Schedule shall be modified and supplemented as of the Closing Date.

**2.15   Taxes.**

**2.15.1   Definitions. "Tax Return"** means any return, declaration, report, claim, election, notice, or information return or statement or other document (including, without limitation, any related or supporting information, schedules, or exhibits) filed or required to be filed with any federal, state, local or foreign governmental authority or other authority in connection with any Tax or estimated Tax. **"Tax"** and **"Taxes"** mean any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions, levies and liabilities, including, without limitation, taxes based upon, measured by, or with respect to income, net income, gross income, earnings, profits, or gross receipts, or any sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, environmental, alternative, add-on minimum, custom duties, capital stock, social security (or similar), unemployment, disability, gains, recapture, estimate, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, penalty, and addition thereto.

**2.15.2   Filing and Payment.** To the Seller's Knowledge, Seller has duly filed all federal, state and local Tax Returns required to be filed by it, if any, (all of which are true and correct in all material respects) and has duly paid or made provision for the payment of all Taxes, if any, (including any interest or penalties and amounts due state unemployment authorities) which are due and payable, whether or not in connection with such returns. To Seller's Knowledge, Seller (with respect to the operation of the Hospital Businesses) has withheld proper and accurate amounts from its employees' compensation, and made deposits of all such withholdings, in material compliance with all withholding and similar provisions of the Code and any and all other applicable laws. Except as set forth on Schedule 2.15, there are no liens for Taxes upon the Assets, except for statutory liens for current Taxes not yet due and payable or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings. To Seller's Knowledge, no claim by any taxing authority with respect to the Hospital Businesses (or operation thereof) or the Assets is pending in a jurisdiction where Seller does not file Tax Returns.

**2.16   U.S. Persons.** Seller is not a **"foreign person"** for purposes of Section 1445 of the Code or any other Laws requiring withholding of amounts paid to foreign persons.

**2.17   Real Property.** Except as otherwise set forth in this Agreement, the Schedules to this Agreement, the opinion and appraisals required pursuant to California Health & Safety Code Section 3212.1(p)(1) and referenced in Section 2.1 above, and the reports with respect to seismic compliance,

which reports have been provided to Purchaser, during the preceding five (5) years, Seller has not received any written notice, or to Seller's Knowledge any oral notification, from any federal, state or local regulatory agency, or from any architect or engineer engaged by Seller during such five (5) year period, that (i) any improvements on any of the Real Property (including any construction-in-progress) have not been constructed substantially in accordance with the plans and specifications submitted to any governmental authorities in connection with such construction, (ii) any such improvements are not substantially in accordance with any zoning change applications and any applications for building permits related thereto, (iii) any such improvements are not in compliance with any material environment, safety, building, fire, land use, zoning, parking or access requirements, or (iv) the continued use, occupancy and operation of such improvements as currently used, occupied and operated by Seller does not constitute a prior nonconforming use permitted under such Laws. Purchaser acknowledges, however, that Seller is engaged in ongoing evaluation of requirements for compliance with the Alfred E. Alquist Hospital Seismic Safety Act of 1983 (Health & Safety Code Section 130000 et seq.), and has provided to Purchaser reports relating thereto.

Seller owns fee simple title to the Real Property described on Schedule 1.6.1. On the Closing Date, subject to Section 1.10, Seller shall convey to Purchaser title to the Real Property by means of a grant deed, subject to (i) any title exceptions and survey matters approved (or deemed approved) by Purchaser in accordance with this Agreement, (ii) any title exceptions caused by Purchaser, Purchaser's Affiliates, or its or their agents, representatives or employees, (iii) all real estate taxes and assessments for the then applicable tax fiscal year in which the Closing occurs, and (iv) general real estate taxes and assessments for subsequent years not yet due and payable. Except as disclosed on Schedule 2.17 and subject to Section 1.10, Seller has not created nor may it assert any rights with respect to any Liens that will interfere with Purchaser's use and enjoyment of the Real Property after the Closing and:

**(a)**   to Seller's Knowledge, no work has been performed on any of the Real Property and no materials have been delivered which could give rise to a mechanic's, materialman's or similar lien which has not been paid for or released at the sole cost and expense of Seller by Seller's execution and delivery to Purchaser of an indemnity reasonably satisfactory to Purchaser and recording at Seller's sole cost and expense a release bond in the form and manner required by California Civil Code § 3143;

**(b)**   Seller has not received any written notice and to Seller's Knowledge, has no knowledge of any proceeding or action pending to change the zoning of, or other land use (including parking) restrictions affecting, the Real Property;

**(c)**   to Seller's Knowledge, except as set forth in Schedule 2.17(c), there is no study, investigation or other proceeding pending, or to Seller's Knowledge, threatened by or before any governmental agency or entity, administrative or otherwise, or any nongovernmental entity related to the Real Property, which if commenced or concluded, in any way might or could have any Materially Adverse Effect;

**(d)**   the Real Property comprises all of the real property owned or leased by Seller, including, without limitation, all real property which is associated with or employed in the operation of the Hospital Businesses;

**(e)**   Seller has not received notice of condemnation or similar proceeding relating to the Real Property or any part thereof;

- 34 -

- 35 -

1070039.2

F:\Bowl\PHF\FINAL.ASA 10.12.09.DOC

1070039.2

F:\Bowl\PHF\FINAL.ASA 10.12.09.DOC

(f) to the Seller's Knowledge, except as might be disclosed by the Natural Hazard Expert, no part of the Real Property contains, is located within or abuts any flood plain, navigable water or other body of water, tideland, wetland, marshland or any other area which is subject to special state, federal or municipal regulation, control or protection. Within ten (10) days after the Effective Date, Purchaser agrees to engage the services of a natural hazard disclosure expert (the "**Natural Hazard Expert**"), to examine the maps and other information specifically made available to the public by government agencies for the purposes of enabling Seller to fulfill its disclosure obligations, if and to the extent such obligations exist, with respect to the natural hazards referred to in California Civil Code Section 1102.6a and to report the result of its examination to Purchaser and Seller in writing. The written report prepared by the Natural Hazard Expert regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to in this Agreement, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above;

(g) except for those tenants in possession of the Real Property under Leases or Contracts and as otherwise disclosed on Schedule 2.17(g), to the Seller's Knowledge, there are no Persons in possession of, or claiming any possession to, adverse or not, or other interest in, any portion of the Real Property other than Seller, whether as lessees, tenants at sufferance, trespassers or otherwise;

(h) to Seller's Knowledge, all essential utilities, including water, sewer, gas, electricity and telephone service, are available to the Real Property, as currently developed by Seller, and to Seller's Knowledge there are no conditions existing which could result in the termination or reduction of the current access from the Real Property to existing roadways; and

(i) to Seller's Knowledge, Seller possesses all licenses, permits, and other governmental consents and approvals necessary for the operation of such systems and the portions of the Hospital Businesses not pertaining to the provision of healthcare services (such as the coffee shop and the gift shop).

2.18 **Accuracy of Documents; Delivery and Inspection.** To Seller's Knowledge, Seller has furnished to Purchaser true and complete copies of all agreements, documents and other items listed in the Schedules or requested by Purchaser in writing. All documents delivered to Purchaser for Purchaser's review pursuant to the terms of this Agreement and any Related Agreement are true and complete copies (unless omissions are apparent from the documents so furnished) of all such documents.

2.19 **No Negotiations with Third Parties.** Except as described at Schedule 2.19, Seller has not entered into any negotiations, letters of intent, or understandings which are presently in effect, with any other Person with respect to the sale or other disposition of any of the Assets (other than Inventory in the ordinary course of business). Except as described in Schedule 2.19, Seller is not a party to any presently effective executory agreement with any Person (other than Purchaser) with respect to any such sale or disposition.

- 36 -

2.20 **Statements Not Misleading.** To Seller's Knowledge, no representation or warranty by Seller in this Agreement or any Related Agreement, or any statement of Seller, certificate or schedule furnished or to be furnished to Purchaser pursuant to this Agreement or any Related Agreement at the Closing, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained in this Agreement and therein not misleading. Except as disclosed in this Agreement, to Seller's Knowledge, there have been no events or transactions or facts coming to the attention of Seller which could have a Material Adverse Effect after the Closing, or which should be disclosed in order not to make any statement, representation or warranty contained in this Agreement or in any Related Agreement or any Schedule delivered pursuant hereto misleading.

2.21 **Adverse Actions.** Except as disclosed in Schedule 2.21, neither Seller nor its officers or directors (i) has been subjected to any adverse actions in connection with any licenses or permits issued by any governmental agencies or bodies, including without limitation any license or permits needed to operate an acute care hospital or any of the other Hospital Businesses, or (ii) has been excluded from participation in the Medicare or Medicaid programs or been subject to any adverse actions or sanctions under such programs.

2.22 **[Intentionally omitted]**

2.23 **Continuing Accuracy.** To the Knowledge of Seller, the copy of each certificate, document or other instrument or agreement furnished or to be furnished by Seller is a true, accurate and complete copy of the original thereof. The representations and warranties of Seller set forth in this Article II shall be true and correct on the Closing Date as if made again on and as of the Closing Date. Seller shall be entitled to update the Schedules up to and through the Closing, subject to the termination rights set forth in Article VIII.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Except as otherwise disclosed in any of the disclosure schedules related to the following representations, warranties and covenants of Purchaser or in Schedule 3 (the "**Purchaser's Disclosure Schedules**"), as an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date. In the event of any assignment of any of the rights, duties, obligations or Assets by Purchaser to a third party after the Closing, Purchaser agrees that as party of said assignment, Purchaser's successor or assignee shall be required to make the following representations and warranties for itself.

3.1 **Authorization.** Purchaser has full organizational power and authority to enter into this Agreement and Purchaser has full corporate power and authority to carry out the transactions contemplated hereby.

3.2 **Binding Agreement.** Purchaser has the full power and authority to execute, deliver and perform the obligations and covenants set forth in this Agreement and all Related Agreements and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Related Agreements by Purchaser and the consummation of the transactions contemplated hereby or thereby have been (or will be by the Closing Date) duly

- 37 -

authorized by all necessary action on the part of Purchaser. All organizational and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement and the Related Agreements, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser. No other organizational or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements, all documents necessary to give effect to this Agreement, the Related Agreements and all transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    **Organization and Good Standing.** Purchaser (i) is a Corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) qualified to do business and in good standing in the State of California and wherever else it may do business, and (iii) has full corporate power and authority to own, operate and lease its properties and to carry on its business as now conducted and as contemplated to be conducted after the Closing.

3.4    **No Violation.** The execution, delivery and performance of this Agreement and all Related Agreements and the consummation of the transactions contemplated hereby and thereby to does and will not, with the passage of time or the giving of notice or both (x) violate any state or federal Law applicable to Purchaser, (b) violate or conflict with, or result in a breach of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of, any indebtedness, mortgage, Lien, restriction, charge, security interest, claim, right of another, or other encumbrance upon any of the Assets whatsoever, under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, franchise, agreement or other instrument or obligation to which Purchaser or its Affiliates are a party or by which any of the Assets are or will be bound or (c) violate or conflict with any provision of the charter or organizational documents of Purchaser or its Affiliates.

3.5    **Brokers and Finders.** Except as described on Schedule 3.5, neither Purchaser nor any Affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated under this Agreement.

3.6    **"As Is."** Purchaser acknowledges that it is purchasing the Assets on as "AS IS, WHERE IS" basis (as more particularly described in Section 1.10 and throughout Article 11 and this Agreement), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Prior to Closing, Purchaser and its respective agents will have been given the opportunity to (i) conduct such inspections as Purchaser may have determined to be necessary, (ii) fully observe the physical characteristics and condition of the Assets and Real Property, and (iii) perform such investigations of the suitability of Purchaser's intended use of the Assets and Real Property as Purchaser shall determine to be necessary, including without limitation, the suitability of the topography; the availability of water rights or utilities; any natural hazard of any kind or nature, including without limitation, flood hazard, earthquake fault or seismic hazard, or fire risk or nature; the present and future zoning, subdivision any and and all other land use matters; the condition of the

- 38 -

151

soil, subsoil or groundwater of the Real Property and any and all other environmental matters; the purpose(s) to which the Real Property is suited; drainage; flooding; access to public roads; and proposed routes or roads or extensions relative to the Real Property. Purchaser acknowledges and understand that it will have no recourse whatsoever against Seller or Seller's Affiliates except as otherwise expressly set forth in this Agreement. Additionally, Purchaser and its Affiliates represent and warrant to Seller that notwithstanding the receipt of an opinion from an independent appraiser in respect to the value of the Assets or the consideration being delivered to Purchaser with respect to the Transaction, Purchaser and its Affiliates also acknowledge they are not relying upon any representations or warranties of Seller as to the valuation of the Assets as set forth in the opinion being delivered by the independent appraiser engaged by Seller pursuant to Section 4.15 of this Agreement.

3.7    **Legal Proceedings.** Except as described on Schedule 3.7, to Purchaser's Knowledge, there are no claims, proceedings or investigations pending or, to Purchaser's Knowledge, threatened relating to or affecting Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, or business condition (financial or otherwise) of Purchaser. To Purchaser's Knowledge, Purchaser is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any Affiliate of Purchaser which adversely affects the condition (financial or otherwise), operations or business of Purchaser or any Affiliate of Purchaser.

3.8    **Chapter 9 Proceeding.** Purchaser acknowledges that Seller has filed the Chapter 9 Proceeding, which remains pending as of the Effective Date, and may remain pending as of the Effective Time. Purchaser acknowledges that the filing of the Chapter 9 Proceeding shall not, in and of itself, be deemed to constitute a violation of this Agreement, and that actions taken by Seller in compliance with, or in anticipation of, motions or orders in the Chapter 9 Proceeding shall not constitute violations of Seller's covenant to operate the Hospital Businesses in the ordinary course, nor shall any payment made pursuant to or as authorized by the Bankruptcy Court in such proceeding be deemed to constitute a payment other than in the ordinary course of Seller's business.

3.9    **Purchaser Knowledge.** References in this Agreement to "Purchaser's Knowledge" or "the best Knowledge of Purchaser" or similar terms means the actual (but not merely constructive or imputed) knowledge of the managers and executive officers of Purchaser, after performing a reasonable investigation. Additionally, whenever this Agreement states that Purchaser has received any type of notice, it shall mean that one of the foregoing individuals has received actual notice, and not merely constructive or imputed notice. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

3.10    **Disclosures.** To Purchaser's Knowledge, no representation or warranty by Purchaser in this Agreement, nor any statement, certificate or schedule furnished or to be furnished by or on behalf of Purchaser pursuant to this Agreement, nor any document or certificate delivered to Seller pursuant to this Agreement or in connection with actions contemplated hereby, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not misleading. The copy of each certificate, document or other instrument or agreement furnished or to be furnished by Purchaser is a true, accurate and complete

- 39 -

copy of the original thereof. The representations and warranties of Purchaser set forth in this Article III shall be true and correct on the Closing Date as if made again on and as of the Closing Date.

**3.11    No Improper Payments or Offers.** To Purchaser's Knowledge, no Payments or offers of consideration by Purchaser or its Affiliates to any of Seller's officers, directors or employees have been made in violation of any Legal Requirements or Seller's Conflict of Interest Code in order to induce such officer, director or employee to influence the negotiation or approval of this Agreement.

**3.12    Compliance With Law Laws.** To Purchaser's Knowledge, the organizational structure of Purchaser does not violate applicable Legal Requirements.

**3.13    Accuracy of Financial and Organization Information.** To the Purchaser's Knowledge, the information disclosed by Purchaser concerning its investors and its capital and lending sources after the Effective Date and through the Closing Date is and will be true and correct in all material respects, as detailed in the First Organizational Update and the Second Organizational Update.

## ARTICLE IV
## COVENANTS OF SELLER

**4.1    Access and Information; Inspections.**

**4.1.1    Continuing Access.** From the Effective Date through the Effective Time, Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers, prospective investors and assignees and other consultants and agents of Purchaser) reasonable access during normal business hours to and the right to inspect the plants, properties, books, accounts, records, contracts, commitments, cost reports and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital Businesses including, without limitation, to the extent reasonably needed by Purchaser for purposes of conducting further due diligence and other pre-closing activities with respect to the Assets and Hospital Businesses, possibly including, without limitation, an Environmental Survey, review of documents and instruments regarding the Assets, union, or review of Financial Statements, provided appropriate non-disclosure agreements acceptable to Seller have been executed and any information learned as a result of the due diligence is shared with Seller. From the Effective Date through the Effective Time, Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as Purchaser or its representatives may from time to time reasonably request. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital Businesses. Such access may include consultations with the personnel of Seller upon prior written notice to Seller. Any access granted under this Agreement shall be subject to any limitations imposed by federal or state privacy laws, including but not limited to, HIPAA. If any of such records are not in the possession or control of the Seller, then such access shall be afforded after no less than three (3) business days prior notice. In addition, Seller shall provide such written consents and authorizations as may be necessary for Purchaser to have access to materials on file with governmental agencies. Nothing in the Agreement to the contrary shall in any manner restrict the ability of Purchaser to discuss the business and affairs of the Hospital Businesses with any governmental agency having jurisdiction over the Hospital Businesses and/or this transaction or the fiscal intermediaries administering the Hospital Businesses' Payor programs to the extent legally

permissible. Seller's covenants under this Section are made with the understanding that Purchaser and any other Person provided with access to information under this Section shall use all such information in compliance with all Laws and solely for purposes of evaluating the Transactions contemplated in this Agreement. Neither Purchaser nor any other Person shall have access to employee records, Patient Records or any other records to the extent that the disclosure of such records would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality.

**4.1.2    Consent.** Notwithstanding anything in this Section 4.1 to the contrary, all access and inspection activities contemplated by this Section 4.1 (including, without limitation, Purchaser's contacting any of Seller's tenants) shall be subject to the prior reasonable written approval of Seller (which approval may only be granted by the Seller's Chairman of the Board or by Seller's general counsel). Prior to Purchaser contacting any of Seller's tenants, vendors, other contracting parties, or governmental officials or contractors regarding health care violations or allegations regarding the same, Purchaser shall give Seller prior written notice thereof, including the identity of the company or persons who will perform any interviews or contacts. Seller or its representative(s) may be present at any such interview or meeting and Purchaser will reasonably cooperate and coordinate with Seller to effectuate same.

**4.2    Conduct of Business.** On and after the Effective Date and prior to the Effective Time, Seller shall, with respect to the operation of the Hospital Businesses:

**4.2.1    Carry** on its businesses with respect to the operation of the Hospital Businesses in a reasonable manner under the circumstances and Seller, as further addressed below, shall be permitted to take such actions as may be necessary in order to stem the current losses, comply with orders of the Court in Seller's Chapter 9 Proceeding, and attempt to make the Hospital Businesses profitable, subject at all times to the ultimate discretion and control of Seller's Board of Directors, provided that, in any case, such activities shall be conducted in compliance with all applicable Laws;

**4.2.2    Keep** in full force and effect present insurance policies and other comparable self-insurance plans such as Workers' Compensation; and

**4.2.3    Use** its reasonable efforts to maintain and preserve its respective business organizations intact, and maintain its respective relationships with physicians, suppliers, customers and others having business relationships with each Hospital.

**4.3    Negative Covenants.** Except as otherwise provided in this Agreement, from the Effective Date until the Effective Time, with respect to the operation of the Hospital Businesses, Seller shall not, without prior consent of Purchaser, except as may be required by Law or as ordered by the Bankruptcy Court:

**4.3.1    Except** as otherwise provided in this Agreement or the ordinary course of business, amend or terminate any Material Contract or Material Lease, or enter into any new Material Contract or Material Lease or commitment with respect thereto, or incur or agree to incur any liability pursuant to a Material Contract or Material Lease, except for Material Contracts or Material Leases which are terminable at the Closing or on not more than ninety (90) days notice after the Closing;

- 40 -

- 41 -

1070039.2

1070039.2

4.3.2    Increase compensation payable or to become payable or make any performance based bonus payment to or otherwise enter into one or more bonus agreements with any employee, except as contractually required as of the date of this Agreement or otherwise in the ordinary course of business;

4.3.3    Create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other lien or encumbrance upon any of the Assets in order to meet Seller's ongoing operating expenses or otherwise in the ordinary course of business;

4.3.4    Sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment constituting part of the Assets, except in the ordinary course of business;

4.3.5    Take an action that would result in a Materially Adverse Effect occurring as a result of such action;

4.3.6    Take any action that would have a Materially Adverse Effect on the maintenance in force and effect the policies of insurance held by (or programs of self-insurance maintained by) Seller and currently in effect; or

4.3.7    Except as required by their terms, amend, terminate, fail to renew or renegotiate any Material Contract that would be an Assumed Obligation as of the date of this Agreement, except in the ordinary course of business consistent with past practices, or default (or take or omit to take any action that, with or without the giving of notice or passage of time, would constitute a default) on any of its obligations under any such Material Contracts, provided that, if required for legal reasons, Seller may renew Material Contracts or Material Leases provided they are terminable on not more than ninety (90) days notice after the Closing.

For purposes of this Section 4.3, Seller shall be deemed to have obtained Purchaser's prior consent to undertake the actions otherwise prohibited by this Section 4.3 if Seller gives Purchaser notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Furthermore, in recognition of the fact that Purchaser has a significant interest in the operation of the Hospital Businesses through Closing, but that there is also the possibility that Seller may be unable to obtain Public Approval for this Transaction, the Parties agree to that a joint transition team, comprised of equal representatives of Seller and Purchaser ("Transition Team") shall be formed. Seller shall consult with the Transition Team on a regular basis, not less than weekly, with respect to the day-to-day business affairs of the Hospital Businesses. The Transition Team shall analyze and make recommendations to the Seller's Board of Directors regarding any significant and material changes relating to the Hospital Businesses, including any changes recommended appropriate to improve the operations and practices of the Hospital Businesses. Notwithstanding that Seller agrees to grant the Transition Team the role described above pending the Closing, this does not alter, weaken, displace, or modify the ultimate right and responsibility of the Seller's Board to continue to exercise ultimate direction and control related to the operation of the Hospital Businesses as provided by law, and provided that Purchaser shall retain its termination rights under this Agreement in the event of a Material Adverse Effect as a result of any such Seller actions, as provided elsewhere in this Agreement. It is the intent of the Parties to comply with Government Code Section 1090, which prohibits government officers or employees from having a financial interest in a transaction with the governmental entity for which they act. Accordingly, no officer or employee of Seller who has an expectation to become a Hired Employee or a beneficial owner of any interest in Purchaser

has participated or shall participate in any negotiations with respect to the Transaction set forth in this Agreement.

4.4    **Cooperation.** Seller shall reasonably cooperate with Purchaser and its representatives and attorneys: (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances, certificates of need and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, and (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement; provided, however, that it shall be Purchaser's responsibility to obtain all consents, approvals, authorizations, clearances, certificates of need and licenses required to carry out the transactions contemplated by this Agreement.

4.5    **Contract Consents.** Seller shall use its Reasonable Commercial Efforts to obtain the consents and releases from the third parties under all Material Contracts and Material Leases, which, by the terms of such Material Contract or Material Lease, require such consent to the assignment thereof to Purchaser. To the extent any consents from third parties under any Contracts or Leases are not obtained as of the Closing, Seller and Purchaser shall comply with Section 9.3 and use their Reasonable Commercial Efforts to mitigate any costs, losses or damages associated with the failure to obtain such consents prior to Closing. Notwithstanding the foregoing or any contrary language in this Agreement, Seller's obtaining the consents described in this Section shall not be a condition precedent to either party's obligation to close the transaction contemplated by this Agreement and shall not be considered a breach of Seller's representations

4.6    **Additional Financial Information.** Within fifteen (15) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital Businesses for each month then ended, together with corresponding year-to-date amounts.

4.7    **No-Shop.** Provided that Purchaser is not in material breach or default of this Agreement, for which Seller has provided Purchaser with notice specifying such material breach or default and the reasonable opportunity to cure such material breach or default, Seller shall not, prior to the earlier of the Closing or termination of this Agreement, without the prior written consent of Purchaser: (i) offer for sale, lease or other disposition, the assets of the Hospital Businesses or the Assets (or any portion thereof); (ii) solicit offers or consider unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital Businesses or the Assets.

4.8    **Seller's Efforts to Close.** Seller shall use its Reasonable Commercial Efforts to satisfy all of the conditions precedent set forth in Articles VI and VII to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such condition.

**4.9    Title Matters.**

4.9.1    Seller shall cause the preliminary report of title issued by the Title Company ("**PTR**") and all Title Instruments to be delivered to Purchaser prior to or promptly after the execution of this Agreement which shall be based on an ALTA Extended Coverage Owner's Title Policy and the Surveys conducted by the Purchaser, as addressed at Section 5.12 below. Purchaser shall approve or disapprove of the PTR within ten (10) business days after the receipt of the PTR and all Title Instruments (reflecting the results of the Surveys). Seller shall remove from the title record and have the Title Company insure over any liens or encumbrances of a definite and ascertainable amount, such as mechanics liens, financing liens, bonds or assessments, on or before the Closing Date, other than the Assumed Obligations and items to be removed or prorated at the Closing. In the event of Purchaser's timely disapproval of any exceptions or defects shown on the PTR or of the ALTA Survey, as provided herein, Seller shall have five (5) business days after receipt of Purchaser's objections to give Purchaser notice either that (a) Seller has removed or will remove any objectionable exceptions from title and provide Purchaser with evidence reasonably satisfactory to Purchaser of such removal or provide Purchaser with evidence reasonably satisfactory to Purchaser that said exceptions will be removed on or before the Closing Date, or (b) Seller is unable, using Reasonable Commercial Efforts, to cause such exceptions to be removed. If Seller is unable or unwilling to cause such exceptions to be removed, unless otherwise agreed in writing by the parties, Purchaser may either (i) terminate this Agreement within five (5) business days of receipt of Seller's written notice of unwillingness or inability to cause to be removed, in which case the Deposit shall, unless title failed due to Seller's material breach of this Agreement, be repaid to Purchaser, or (ii) elect to close subject to the exceptions.

4.9.2    Prior to the Closing Date, Seller shall deliver to Purchaser a preliminary binder or title commitment(s) (the "**Title Commitment**") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (referred to in this Agreement as the "**Owner's Title Policy**" or the "**Title Policy**"), issued by Chicago Title Insurance Company, or such other title company as is mutually acceptable (the "**Title Company**"), together with true, correct and legible copies of all instruments referred to therein as conditions or exceptions to title (the "**Title Instruments**") and (if required by Purchaser or Purchaser's lenders or other financing sources as provided in Section 5.12 below) ALTA surveys of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property (the "**Surveys**") obtained by Purchaser. Section 12.12 shall govern which party or parties shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys.

4.10    **Termination of Hospital Businesses' Employees.** Upon the Effective Time, the Hired Employees shall cease to be employees of Seller and shall be removed from such entities' respective payrolls. Notwithstanding any provision to the contrary contained in this Agreement, Seller shall take any steps necessary to comply with WARN requirements, to the extent applicable, and Purchaser shall cooperate with Seller with respect thereto.

4.11    **Notice of Developments.** From the date of this Agreement until the Closing, (a) Seller shall immediately notify Purchaser in writing of any material and adverse problems not previously disclosed by Seller to Purchaser with respect to the prospects, business or operations of the Hospital Businesses or the condition of the Assets of which Seller has knowledge and which specifically affect the Hospital Businesses and the Assets and not to general changes in the Laws or

- 44 -

economy of the United States or matters affecting the healthcare industry in general, and (b) Seller shall promptly upon becoming aware thereof, give detailed written notice to Purchaser of the occurrence of, or the threatened occurrence of, any event which would cause or constitute a material breach, or would have caused or constituted a material breach had such event occurred or been known to Seller prior to the date of this Agreement, of any of Seller's covenants, agreements, representations, or warranties contained or referred to in this Agreement or in any Related Agreement; provided, however, that no such notice shall be deemed to cure or waive any material breach unless Purchaser specifically agrees to a cure or waiver thereof in writing.

4.12    **Termination Cost Reports; Filing Cost Reports; Amounts Due To or From Third Party Payors.**

4.12.1    **Filing Procedures.** Seller shall prepare and timely file all cost reports (including, without limitation, the terminating cost report) and all other filings which are required to be filed with Medicare, any other Payors or any governmental agency with respect to the operations of the Hospital Businesses for any and all periods ending on or prior to the Closing Date; provided, however, that in the event the Lease and Management Agreement are entered into, all references in this Section 4.12 to the "Effective Time" for purposes of such filings, or similar filing or billing issues, shall instead refer to the termination date of the Lease and Management Agreement. Prior to filing any such cost reports and filings, Seller shall deliver a copy of each to Purchaser and, if Purchaser so instructs Seller, shall not file the same without first obtaining Purchaser's approval which shall not be unreasonably withheld, delayed or conditioned. Within a reasonable period of time after filing each such cost report and other filings (but in no event later than ten days following each such filing), Seller shall provide Purchaser a copy of such filed cost report and other filings. Purchaser shall provide Seller with resources and support needed to prepare any remaining cost reports required to be filed by Purchaser as further addressed in Section 11.2.

4.12.2    **Retained Rights and Obligations.** Subject to the assignment and assumption covenants contained in this Agreement, Seller shall retain all rights to any amounts receivable from and remain obligated for all amounts due to Medicare and other third party payors which settle on a cost report basis with respect to cost reports or filings for periods prior to the Closing Date (as reflected thereon or as finally determined by the audit, administrative or judicial appeal, contest or other adjustment of such reports or filings). The parties acknowledge and agree that Purchaser is not hereby being assigned or assuming any of the same, to the extent prohibited by law. Purchaser shall promptly notify Seller of receipt of any notice received from Medicare or such other Payors asserting that any amounts are due to Medicare or such other Payors from Seller, and of any amounts due from Medicare or such other Payors to Seller, by reason of any event or occurrence taking place or otherwise attributable to the operations of the Hospital Businesses and the Assets prior to the Effective Time. Similarly, Seller shall notify Purchaser of any notice received by Seller from Medicare or such other Payors that Seller believes applies to or impacts the reimbursement or payment due to the Purchaser. With respect to any such amounts which may be received by Seller after the Closing Date, Seller shall remit the same to Purchaser within three (3) business days of receipt. With respect to any such amount thereof in sufficient time to pay such amounts without interest or penalty, and Seller shall so remit to Medicare or such other Payor all such amounts received by Seller from Purchaser within sufficient time to avoid the imposition of any interest charges or the withholding of any payment due from Medicare or other Payors to Purchaser. If any such withholding by Medicare or such other Payor has occurred due to the failure of Seller to remit

- 45 -

10700/9.2    F:\BankPHH\FINAL ASA 10.12.09.DOC

(a)    E & O Insurance.  Comprehensive general liability and professional liability insurance coverage with respect to all claims covered thereby attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing, regardless of when any such claims shall be made with coverage in an amount equal to the amount set forth in Schedule 4.13(a) with coverage for general liability and malpractice with substantially the same coverage terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, issued by the insurer which currently issues Seller's insurance or another insurance company reasonably acceptable to Purchaser ("E&O Insurance").  At the Closing, Seller shall cause the insurers to issue and deliver to Purchaser copies of certificates of insurance evidencing each insurance policy maintained by Seller under this Agreement, and Seller shall cause each such insurance policy to contain a clause requiring the insurer to give not less than 30 days prior written notice to Seller and to Purchaser prior to the cancellation or modification of any such policy for any reason whatsoever.  The Parties further agree that they will use their best efforts to research and cooperate in an effort to minimize the cost of obtaining E & O Insurance, either through procuring tail coverage in the name of Seller, or prior acts "nose" coverage maintained by Purchaser, as part of its insurance, for at least two (2) years following the Closing, or some combination thereof; provided, however, that in any case Seller shall obtain a tail policy for obstetric claims, which have a statute of limitations which tolls until the affected child reaches the age of majority.  If split coverage is not available, then Seller shall obtain full tail E & O coverage and at the Closing, Purchaser shall pay for the premiums of the tail insurance procured pursuant to this Section in an amount not to exceed $3,750,000 with coverage for general liability and malpractice with substantially the same coverage terms and conditions and policy limits as exists prior to the Closing Date, issued by the insurer which currently issues Seller's insurance or another insurance company reasonably acceptable to Purchaser, but without any deductibles, and Seller shall take all other steps as may be reasonably necessary to maintain such insurance policies in full force and effect.  Seller shall use its reasonable commercial efforts to avoid invalidating such insurance coverage.

(b)    D&O Insurance.  D&O insurance coverage with respect to all claims covered thereby attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing, regardless of when any such claims shall be made with coverage in an amount equal to the amount set forth in Schedule 4.13(b) issued by an insurance company reasonably acceptable to Purchaser ("D&O Insurance").  At the Closing, Seller shall cause the insurers to issue and deliver to Purchaser copies of certificates of insurance evidencing each insurance policy maintained by Seller under this Agreement, and Seller shall cause each such insurance policy to contain a clause requiring the insurer to give not less than 30 days prior written notice to Seller and to Purchaser prior to the cancellation or modification of any such policy for any reason whatsoever.

4.14    Public Approval.  Seller's Board of Directors has already adopted a resolution to set and schedule a public election sufficient to seek the voter approval ("Public Approval") required by Seller pursuant to Health & Safety Code Section 32121(p) to consummate the Transactions contemplated by this Agreement ("Approval Election"), as further addressed in Schedule 4.14.  The Approval Election shall be scheduled and structured in a legally permissible fashion to enable such Approval Election to take place as expeditiously as possible, and Seller shall keep Purchaser fully informed of its efforts in this regard.  Seller's resolution scheduled the Approval Election to occur on December 15, 2009.  Seller shall use Reasonable Commercial Efforts to obtain the Public Approval, and to do so within the timeframes set forth above, to the extent permitted by applicable Legal Requirements.  Seller shall incur customary costs of an election as

- 47 -

F:\Bank\PHH\FINAL ASA 10.12.09.DOC

such sums received from Purchaser, Seller shall reimburse Purchaser for the full amount of all payments so withheld within three (3) business days of Purchaser's written notice to Seller of such withholding.  In the event that Seller fails to reimburse Purchaser, Purchaser shall have the right, in addition to any other rights which Purchaser may have pursuant to this Agreement, to offset such claim against any amounts which Purchaser may owe to Seller, without regard to the floor or ceiling set forth in Section 10.2.2 of this Agreement.  In the event that any such amount is withheld from Purchaser and asserted against Seller pursuant to the foregoing sentence but is later paid or released to Purchaser, Purchaser shall release or refund to Seller, as applicable, any amount which it has claimed against and received from Seller.  Seller or Purchaser shall have the right to dispute or to appeal any determinations relating to such reports, at Purchaser's cost, provided that Purchaser defends, indemnifies and hold Seller harmless of and from any and all amounts which are determined to be due to Medicare or such other third party payors, including interest and attorneys fees.  Purchaser shall make available such of their Hired Employees as may be necessary in order to provide accounting and other services necessary to deal with any of the foregoing, at no cost to Seller.

4.12.3    Effect on Purchaser; Purchaser's Right to Participate.  Seller and Purchaser hereby acknowledge that any cost reports filed by Seller for periods ending on or prior to the Closing Date may impact Purchaser's reimbursement from such Payor after the Closing Date.  Seller hereby agrees that it will conduct reasonable diligence and otherwise use reasonable efforts to ensure that all such cost reports are accurate and complete in all material respects, and that it will retain all records relating to such cost reports and any settlements for the period of time required by Law.  On request of Purchaser, and at Purchaser's cost, Seller shall provide Purchaser copies of such cost reports and underlying preparation data, which information Purchaser shall maintain as strictly confidential, except with respect to the Payor in question, and further subject to any applicable Laws regarding privacy of medical information.  If at any time Purchaser, in its reasonable discretion, determines that any portion of such cost reports (including, without limitation, any wage index data or other matter) is incorrect or incomplete in any material respects and accordingly may impact Purchaser's reimbursement from any Payor, Seller will, at Purchaser's expense, make any reasonable correction to such report requested by Purchaser prior to the deadline for filing such corrections, provided that Seller will not make any corrections that will result in any expenditure of money by Seller (other than those to be reimbursed or assumed by Purchaser) or result in any loss of reimbursement to Seller or any other adverse economic effect on Seller.  If any cost report is ever challenged, audited or otherwise examined by any Payor in a manner in which wage index data or other matter is called into question, Seller shall give Purchaser notice within a reasonable period of time of the initiation thereof and Purchaser and its representative shall have the right, at its expense, to be present at any meeting with auditors or examiners (but only with respect to such issue), unless the auditors or examiners have stated they do not want Purchaser or its representatives, present, and at any proceedings related to the appeal of such cost report (but only with respect to such issue) and to receive copies of all documents submitted to any Payor with respect thereto (but only with respect to such issue).  In any event, Purchaser shall defend, indemnify and hold Seller harmless of and from any and all claims, amounts, actions and causes of action asserted against Seller in any way relating to such cost reports.

4.13    Tail Insurance Coverage.  At the Closing, and subject to payment by Purchaser of the E&O Tail Insurance Payment and the D&O Tail Insurance Payment, Seller shall have delivered to Purchaser written proof that Seller has obtained from Seller's current or other insurers:

- 46 -

F:\Bank\PHH\FINAL ASA 10.12.09.DOC

155

provided by law. It is understood, however, that while Seller may provide objective information, Seller may not legally expend public funds to advocate the adoption of a ballot measure. Accordingly, Purchaser shall use its Reasonable Commercial Efforts to seek approval of such ballot measure, subject to all applicable Legal Requirements and limitations, at no cost to Seller.

4.15 **Confidentiality.** Seller agrees to comply with the confidentiality provisions contained at Section 12.8, which shall remain in place during the term of this Agreement, and shall survive the Closing or termination hereof. Additionally, Seller shall continue to be bound by that certain Letter Agreement between Seller and Purchaser, dated July 27, 2009 addressing the confidentiality of evaluation materials and exclusive dealing (the **"Confidentiality Agreement"**), which shall also remain in place, to the extent consistent with the terms of this Agreement, during the term of this Agreement, except as may be required of Seller as a public entity pursuant to the Ralph M. Brown Act and the California Public Records Act (Government Code Section 6200 et seq.).

4.16 **Plan of Adjustment.** Seller shall use its best efforts to develop, undertake all necessary filings in connection with, and seek approval of, a plan of adjustment in connection with the Chapter 9 Proceedings, which is consistent with the terms of this Agreement and the transactions contemplated by this Agreement, including without limitation the characteristics, goals and components of this Agreement and the Definitive Alternative Agreement (**"Plan of Adjustment"**). The Plan of Adjustment shall be structured and pursued in the Chapter 9 Proceeding in a legally permissible fashion, to enable the possible approval of the Plan of Adjustment to take place as expeditiously as possible. Seller shall keep Purchaser fully informed of, and shall closely consult and cooperate with, Purchaser in connection with its efforts in this regard, including providing Purchaser the opportunity to review and provide reasonable input to Seller concerning all proposed filings in seeking approval of the Plan of Adjustment and Purchaser will reasonably support and cooperate with Seller on the Plan of Adjustment.

ARTICLE V
COVENANTS OF PURCHASER

5.1 **Purchaser's Efforts to Close.** Purchaser shall use its Reasonable Commercial Efforts to satisfy all of the conditions precedent set forth in Articles VI and VII to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

5.2 **Required Governmental Approvals.**

5.2.1 **Governmental Entities and Authorizations.** For purposes of this Section 5.2, **"Government Authorizations"** shall mean all licenses, permits, certificates, no objection letters, clearances and other authorizations, consents and approvals of any Government Entity which are required to consummate any of the transactions contemplated hereby or to operate the Hospitals as currently operated under any law, including provider agreements with Medicare and Medicaid. **"Government Entities"** shall mean any local, state or federal government, including each of their respective branches, departments, agencies, commissions, boards, bureaus, courts, instrumentalities or other subdivisions, including the California Department of Public Health (**"CDPH"**) and the Center for the Medicare and Medicaid Services (**"CMS"**).

5.2.2 **Material Licenses.** Between the Effective Date and the Closing Date, Purchaser will: (a) use its Reasonable Commercial Efforts to obtain, as promptly as practicable, all material Government Authorizations required of Purchaser to consummate the transactions contemplated hereby; and (b) use its Reasonable Commercial Efforts with Seller in Seller's obtaining, as soon as practicable, all material Government Authorizations required of Seller to consummate the transactions contemplated hereby. Purchaser shall, no later than twenty (20) business days after the Election, submit to Seller for review all applications, licensing packages and other similar documents with all applicable Government Entities (or other third parties) which are a prerequisite to obtaining the general acute care hospital licenses from CDPH and a pharmacy license(s) from the California Board of Pharmacy (the **"Material Licenses"**). Seller shall review the applications for such Material Licenses and return to Purchaser within five (5) days for Purchaser's immediate submission to the appropriate Government Entities. Seller shall have no responsibility or liability for the content of such applications for the Material Licenses.

5.2.3 **Assumption by Purchaser.** Purchaser may, in its reasonable determination, conclude that in order to obtain such Material Licenses, participations or accreditations, or assist Seller in obtaining such assignments, Purchaser must enter into a separate agreement or understanding with the governmental agency, accreditation agency or Payor, or the other party to an assumed Contract, responsible for issuing or granting such Material Licenses or accreditations to Purchaser, or responsible for consenting to the assignment of a contract or agreement to, and the participation or certification of, Purchaser in the Medicare, Medicaid, TRICARE/CHAMPUS or other programs of such agency. Such agreement may require Purchaser to assume for the benefit of such governmental agency, accreditation agency, Payor or the other party to an assumed Contract certain obligations and liabilities of Seller that are Excluded Liabilities or against which Seller is obligated to indemnify, or for which Seller is to otherwise obligated to reimburse, Purchaser. Alternatively, Purchaser may be required by Law to assume, or be deemed by Law to have assumed, such obligations and liabilities of Seller. If Purchaser enters into any such agreement or understanding with any such governmental agency, accreditation agency, Payor or the other party to an assumed Contract, or by Law assumes such obligations and liabilities of Seller, such agreement, understanding or assumption shall not in any manner whatsoever impair Purchaser's rights against Seller, or diminish Seller's obligations to Purchaser, under this Agreement and shall under no circumstances be claimed by Seller as a defense, setoff or waiver, estoppel, consent, operation of Law, or otherwise, against Purchaser's assertion of any claim under this Agreement against Seller, and the rights and obligations of the parties to each other under this Agreement shall be determined as if such agreement or understanding with such governmental or accreditation agency, Payor, or the other party to an assumed Contract did not exist or such assumption was not required by Law.

5.3 **Estoppel Certificates.** Purchaser shall be entitled, but not obligated, to solicit estoppel certificates from any third party to any Lease of Real Property.

5.4 **Certain Employee Matters.**

5.4.1 **Hired Employees.** Employees of the Seller as of the Closing Date are referred to herein as **"Seller's Employees."** Purchaser shall make offers of employment, effective as of the Effective Time, or as otherwise agreed by the Parties, to a substantial portion of Seller's Employees who submit full and complete applications for employment to Purchaser, if required, and successfully pass all screening and background checks as may be required by Purchaser in compliance with all applicable Laws (collectively, **"Hospital Businesses' Employees"**). As used in

(collectively, **"COBRA Coverage"**) (to the extent applicable) with respect to the Hospital Businesses' Employees (and their dependents, if applicable) whose qualifying event occurred prior to the date on which such Hospital Businesses' Employees become Hired Employees. Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hired Employees (and their dependents, if applicable) whose qualifying event occurs on or after the date on which such Hospital Businesses' Employees become Hired Employees. Purchaser shall also be responsible, as a "successor employer" under applicable COBRA Regulations, to provide COBRA coverage to employees of Seller who lose group coverage as a result of Purchaser's decision not to hire such employees (but not for employees of Seller whose employment terminated prior to the Closing Date for reasons unrelated to the purchase of the Assets by Purchaser).

5.4.5 **Cooperation.** After the Closing Date, Purchaser's human resources department will give reasonable assistance to Seller, at no cost to Seller, with respect to Seller's post-Closing administration of Seller's pre-Closing employee pension benefit plans and employee health or welfare benefit plans for the Hospital Businesses' Employees. Within five (5) days after the Closing Date, Purchaser shall provide to Seller a list of all the Hospital Businesses' Employees who were offered employment by Purchaser but refused such employment.

5.4.6 **Labor Contracts.** Purchaser acknowledges Seller is a party to collective bargaining agreements as described on Schedule 2.13.2 (**"Labor Agreements"**). Purchaser shall assume such Labor Agreements, effective as of the Effective Time, and thereafter on and after the Effective Time, Purchaser shall, for the remainder of their current term abide by and comply with Seller's obligations under the Labor Agreements relating to and covering the employees of the Hospitals (whether such employees are employed by Purchaser at the Effective Time or at any time thereafter), as more specifically set forth in Schedule 2.13.2 of this Agreement, subject to all the terms and conditions in such Labor Agreements existing as of the Effective Date. All changes made by Purchaser to the terms and conditions of employment of union represented employees shall be subject to the terms of any Labor Agreements.

5.4.7 **NLRB Compliance.** On and after the Effective Time, Purchaser shall take any and all action that may be necessary to comply with the terms and provisions of the National Labor Relations Act or the Labor Management Relations Act as a result of the consummation of the transactions contemplated by this Agreement, including, without limitation, obligations thereunder to any of the Hired Employees covered by the Labor Agreements. Prior to the Effective Date, Seller shall provide to Purchaser all information requested by Purchaser and reasonably necessary for the Purchaser's understanding and implementation of employee wages, benefits, and other conditions of employment required by those union agreements.

5.5 **Use of Business Names.** Purchaser covenants that it and its affiliates shall not use in their respective trades or businesses the names or symbols described in Schedule 5.5, any abbreviations or variations thereof or service marks, symbols or logos related thereto, nor any promotional material, stationery, supplies or other items of inventory bearing either such names, symbols or abbreviations or variations thereof.

5.6 **Excluded Assets.** As soon as practicable after the Closing Date, Purchaser shall notify Seller or Seller's designee of any Excluded Assets found at any of the Hospital Businesses on and after the Effective Time.

---

the preceding sentence, a "full and complete" application shall include, without limitation, an applicant's written consent to release of personnel files and documents as described in Section 9.2.1. With regard to employees who are represented under a collective bargaining agreement which provides that Seller must require a purchaser to retain all or substantially all of such represented employees, or to recommend that Purchaser hire represented employees in good standing with Seller, Purchaser shall make offers of employment to such represented employees to the extent required under such collective bargaining agreement and such provisions shall supersede the requirements in this Section 5.4.1. Further, to the extent that such collective bargaining agreements require Seller to require Purchaser to offer comparable benefit plans in lieu of benefit plans that are specifically administered by and available only through Seller for the remainder of the term of such agreements, Purchaser shall provide such benefits to the extent so required under such collective bargaining agreements. Purchaser shall request that each union consent on release of its members' employment files to Purchaser in the same manner as non-union employees. Any of the Hospital Businesses' Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the **"Hired Employees."** Purchaser shall make reasonable, good faith efforts to offer the Hired Employees positions with part-time or full-time status comparable to the status they held with Purchaser, and except as required by a collective bargaining agreement, at wages, benefits, and other employment conditions comparable to those provided to those Hired Employees not covered by collective bargaining agreements with Seller.

Purchaser and Seller shall use their best efforts to obtain consents from all Hired Employees to the transfer to Purchaser of the Hired Employees' Accrued Paid Time Off Amounts, to the extent permitted by law. However, Purchaser shall pay at Closing to or for the benefit of Seller, without any offset or reduction of the PEPC, any Accrued Paid Time Off Amounts owing Hospital Businesses' Employees who are not hired by Purchaser, or who are Hired Employees but do not consent to the transfer of such Accrued Paid Time Off Amounts to Purchaser. Purchaser shall also provide to all Hired Employees their ESL Benefits, if any, as provided under Section 1.8.11.

5.4.2 **Seller Plan Disposition.** Seller agrees to comply with all Legal Requirements associated with its Benefit Plans.

5.4.3 **Benefits.** On and after the Effective Time, Hired Employees shall be eligible for a medical and hospital plan sponsored by Purchaser. To the extent permitted by Purchaser's insurers and plan administrators, Purchaser shall use Reasonable Commercial Efforts to obtain coverage providing that Hired Employees shall be given credit for periods of employment with Seller prior to the Effective Time for purposes of determining eligibility to participate and amount of benefits (including vesting of benefits), and preexisting condition limitations shall be waived with respect to Hired Employees and their covered dependents unless such preexisting condition limitations were applicable prior to the Effective Time. In addition, if prior to the Effective Time a Hired Employee or his or her covered dependents paid any amounts towards a deductible or out-of-pocket maximum in Seller's medical and health plan's current fiscal year, Purchaser shall use Reasonable Commercial Efforts to obtain coverage providing that such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's medical and health plan that covers Hired Employees on and after the Effective Time, if permitted by Purchaser's insurer or plan administrator.

5.4.4 **PHSA, COBRA.** Seller shall be responsible to provide continuation coverage pursuant to the requirements of the PHSA (**"PHSA Coverage"**) or under ERISA

**5.7    Confidentiality.** Purchaser agrees to comply with the confidentiality provisions set forth at Section 12.8, and the rights which shall remain in place during the term of this Agreement, and shall survive the Closing or termination hereof. Additionally, Purchaser shall continue to be bound by that certain Confidentiality Agreement, which shall also remain in place, to the extent consistent with the terms of this Agreement, during the term of this Agreement. Disclosure of Seller information by Purchaser to potential investors and financing sources with respect to Purchaser shall be permitted, subject to execution by such financing sources of a reasonable and customary confidentiality agreement.

**5.8    Contract Consents.** Purchaser shall use its Reasonable Commercial Efforts to assist Seller in seeking and obtaining the consents from the third parties under all Material Contracts and Material Leases, which, by the terms of such Material Contract or Material Lease, require such consent to the assignment thereof to Purchaser and, in connection with such consents, seek the release of Seller from any further liability thereunder to the extent of any applicable Assumed Other Liabilities of Purchaser. To the extent any consents from third parties under any Contracts or Leases are not obtained as of the Closing, Seller and Purchaser shall comply with Section 9.3 and use their Reasonable Commercial Efforts to mitigate any costs, losses or damages associated with the failure to obtain such consents prior to Closing. Notwithstanding the foregoing, Seller's obtaining the consents and/or releases described in this Section shall not be a condition precedent to either party's obligation to close the transaction contemplated by this Agreement and shall not be considered a breach of Seller's representations. Purchaser shall use commercially reasonable efforts to obtain, as part of the assumption documents, releases of Seller by the third party obligees under Assumed Obligations, to the extent of the Assumed Obligations for each such obligee. However, receipt of such releases shall not be a condition precedent to either Party's obligation to close. Purchaser shall defend, indemnify and hold Seller harmless from any claims relating to such Assumed Obligations, whether or not the obligee has consented to such assignment.

**5.9    Other Covenants.** Purchaser recognizes that Seller has provided hospital and related services to the community for more than sixty (60) years and that Purchaser's commitment to continue to provide said services constitutes a material part of the consideration and inducement to Seller to enter into this Agreement and the Related Agreements. Accordingly, Purchaser covenants and agrees as follows:

**5.9.1    Post-Closing Lease of Board; Community Benefit Support.**

(a)    **Post-Closing Lease of Board Space.** Seller intends to maintain its existence as a California Local Healthcare District and (i) to provide certain health-related needs of the communities which it serves other than the operation of the Hospitals, and (ii) to take those actions set forth in California Health & Safety Code Section 32121.9. Purchaser desires to continue occasionally to support such services. Accordingly, notwithstanding anything to the contrary in this Agreement, commencing as of the Effective Time, and continuing for a term of at least ten (10) years, Purchaser shall lease to Seller that certain space leased by VHSSC to Seller prior to the Closing of approximately 1,755 square feet plus corridor access which comprises the "Board Executive Conference Room" ("**Board Room**") and the "Board Offices" located on the second floor of the Medical Arts Building and further described at Schedule 5.9.1, which shall be leased by Purchaser to Seller at a cost of $1 per year, including access to phone and internet service connections (but Seller shall maintain its own internet service provider account) and reasonable access to parking for staff and visitors. However, Seller's use of the Board Room

shall be on shared, non-exclusive basis, and the parties will reasonably cooperate with each other concerning scheduling of use of the Board Room, but with reasonable priority given to Seller's use. Seller shall also have the right to utilize the existing Board public meeting room for meetings on an "as available" basis, subject to the reasonable needs of Purchaser and other tenants of Purchaser and any reasonable rules or regulations regarding such use adopted by Purchaser. Prior to the Closing, the parties shall enter into a lease which contains these terms in mutually acceptable, commercially reasonable, form (the "**Post-Closing Seller's Lease**").

(b)    **Community Benefit Support.** In addition, Purchaser agrees to provide Four Hundred Thousand Dollars ($400,000) per year, commencing on the Closing Date, for a period five (5) years ("**Annual Support Grants**"), which amount shall not be subject to offset by Purchaser for any reason whatsoever, for use by Seller in support of Seller's community benefit and to satisfy its legal obligations. To the extent that the Seller obtains financial support from any other sources, the amount of Annual Support Grants payable by Purchaser shall be decreased in the amount equal to such other financial support except that, in any case, Purchaser's commitment shall not be less than Two Hundred Fifty Thousand Dollars ($250,000) per year during the five (5) year period of support.

**5.9.2    Obligations Unconditional.** Purchaser's obligation to provide the Annual Support Grants as provided in this Section 5.9.1 hereof, to make the payments to the unsecured creditors pursuant on the Creditors Commitment as provided in Section 1.2.1(a)(iv) and 1.5.19, and to fund the Claims Funds as provided in Section 1.2.4, shall be absolute, unconditional and not subject to any withholding, deduction, defense, offset, claim or counterclaim relating to any obligation, liability, or claimed breach by Seller of this Agreement.

**5.9.3    Maintenance of Emergency Department; Other Service Commitments.** For a period of at least five (5) years following the Closing Date, Purchaser, Purchaser's Affiliates or each of their respective successors and assigns shall continue to operate and maintain a basic twenty-four hour emergency room (as defined in Title 22, Section 70411 of the California Code of Regulations) as a supplemental licensed service under each of the Hospitals' general acute care hospital licenses, to the extent that it is commercially reasonable and viable to do so in the context of the then applicable health care environment. In the event that Purchaser, Purchaser's Affiliates or any of their respective successors and assigns is no longer operating a basic twenty-four hour emergency room for a period of 12 continuous months (other than as permitted below), then Seller shall have all remedies available at law and in equity (including rights to damages and to specific performance) in connection with such development. In addition, Purchaser shall assume and abide by the existing Seller contractual arrangements related to subacute, obstetric and chemical dependency/rehabilitation services at the Hospitals. For purposes of the foregoing, Purchaser shall not be in breach of these covenants based on a closure of any Hospital, in whole or in part, even if it affects the continued operation of the Hospital's emergency department, including without limitation as the result of any retrofit, remediation, construction or similar project at such Hospital, or the closure of a Hospital provided such closure is for the purpose of replacement with a new acute care hospital. In such event, the five year covenant to operate such service shall be extended for the period of such closure.

**5.9.4    Charity Care Policies.** Purchaser shall maintain charity care policies at the Hospitals which are fully compliant with all applicable laws, as such may change from time to time,

and any operations of the Hospitals shall be conducted in a manner materially consistent with such charity care policies.

**5.9.5  No Flip Covenant.** Purchaser agrees that it will not at any time during the first three (3) years following the Closing Date, enter, sell all, or sell substantially all of, the Assets or sell or consent to the sale of all or substantially all of the ownership interests of Purchaser to any third party; provided, however, that nothing herein shall restrict in any manner (i) any reorganization of Purchaser, including without limitation as may be needed to comply with legal or regulatory requirements, (ii) Purchaser's right to assign any of its rights or obligations hereunder as otherwise permitted in Section 12.2, and (iii) any transfer of Purchaser's assets as part of any the remedies of any secured lender of Purchaser.

**5.10  No Liens Caused by Purchaser.** Prior to the Closing, the Purchaser shall, at all times, in connection with Purchaser and its employees', agents', and representatives' actions, keep the Hospital Businesses and all of the Assets free and clear of any mechanic's or materialman's claims or liens arising out of or relating to any inspections conducted by Purchaser. Upon completion of any test or inspection, Purchaser shall immediately restore the Hospital Businesses and Assets to the condition prior to such tests and inspections. Purchaser agrees to share the results of any tests or inspections with Seller. Purchaser shall also protect, indemnify, defend and hold Seller and officers, directors, managers, employees, representatives and Affiliates harmless from and against any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, causes of action, judgments, liens, costs and legal or other expenses (including but not limited to reasonable attorney's fees) suffered or incurred by Seller or its officers, directors, managers, employees, representatives and Affiliates as a result of, due to, or arising from, any act or omission of the Purchaser and/or its agents or representatives in connection with Purchaser's inspections.

**5.11  Purchaser's Costs.** All costs of Purchaser's inspections shall be borne solely by Purchaser.

**5.12  ALTA Survey.** If Purchaser or Purchaser's lenders or financing sources require that the Title Commitment include Survey endorsements, then immediately upon execution of this Agreement, Purchaser shall have the right to engage a licensed surveyor to conduct and provide an ALTA survey with respect to the Real Property (each an "**ALTA Survey**," collectively, the "**ALTA Surveys**"), in forms reasonably acceptable to Purchaser and its lenders, and sufficient to enable the Title Company to rely thereon in issuing the Title Policy incorporating the ALTA Surveys. Any such ALTA Surveys shall be Purchaser and any lenders which Purchaser may designate in writing, and the Title Company, and shall plot all easements, structures, boundaries, fences, walls, and any encroachments on or by the Real Property, all of Purchaser's and its lenders' reasonable satisfaction. Purchaser shall have the right to undertake the ALTA Surveys provided they are completed no later fifty-five (55) days after the delivery of the PTR with all documents listed in "Schedule B" therein ("**Survey Date**"). Purchaser shall notify Seller in writing within five (5) days after the Survey Date of any defects, exceptions, liens, encroachments or encumbrances shown in the ALTA Survey of which Purchaser disapproves. Any exceptions or defects not so disapproved by Purchaser in writing within five (5) days following the Survey Date shall be deemed approved. Purchaser shall bear the cost of the Surveys.

**5.13  Insurance.** For the period commencing on the Effective Date and ending on the Effective Time, Purchaser shall maintain, and shall ensure that its agents, consultants and contractors maintain, public liability and property damage insurance insuring against any liability arising out of any entry, tests or investigations of the Property pursuant to the provisions of this Agreement. Such insurance maintained by Purchaser and/or its consultants, agents and contractors (as applicable) shall be in the amount of Three Million Dollars ($3,000,000.00) combined single limit for injury to or death of one or more persons in an occurrence, and for damage to tangible property (including loss of use) in an occurrence. The policy maintained by Purchaser shall insure the contractual liability of Purchaser covering the indemnities in this Agreement and shall (i) name the Seller and Seller's successors, assigns and affiliates as additional insureds, (ii) contain a cross-liability provision, and (iii) contain a provision that "the insurance provided by Purchaser under this Agreement shall be primary and non-contributing with any other insurance available to Seller." Purchaser shall provide Seller with evidence of such insurance coverage prior to any entry, tests or investigations of the Real Property. The aforementioned insurance coverage may be obtained under a blanket policy carried by Purchaser or its agents, consultants or contractors, as the case may be. Prior to entering the Property (and on each and every occasion), Purchaser shall deliver to Seller prior written notice thereof to Seller's Chairman of the Board or general counsel and shall afford Seller a reasonable opportunity to have a representative of Seller present to accompany Purchaser while Purchaser performs its evaluations, inspections, tests and other investigations of the physical condition of the Property. If, pursuant to Section 4.13, the Parties determine that the most cost-effect approach to obtain the E&O Insurance addressed therein is to have Purchaser maintain prior acts "nose" coverage, then the insurance policy maintained by Purchaser shall include, for at least two (2) years following the Closing, such prior acts coverage with respect to professional liability for all claims attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing.

**5.14  Releases.** Except for the specific representations and warranties provided in Article II of this Agreement or a fraud committed by Seller, Purchaser, on its own behalf and on behalf of its officers, directors, managers, employees, representatives, property managers, asset managers, agents, attorneys, Purchasing Group Companies, and successors and assigns (collectively, "**Releasors**") agrees that Seller and each of its officers, directors, shareholders, partners, members, managers, trustees, employees, trustees, employees, property managers, asset managers, agents, attorneys, affiliated and related entities, heirs, successors and assigns (collectively, the "**Releasees**") shall be, and are hereby, fully and forever released and discharged from any and all liabilities, losses, claims (including third party claims), demands, damages (of any nature whatsoever), causes of action, costs, penalties, fines, judgments, attorneys' fees, consultants' fees and costs and experts' fees (collectively, the "**Claims**") with respect to any and all Claims, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be concerned with the Real Property including, without limitation, the physical, environmental and structural condition of the Real Property or any law or regulation applicable thereto, including, without limitation, any Claim or matter (regardless of when it first appeared) relating to or arising from (i) any patent or latent defects or deficiencies with respect to the Real Property, (ii) any and all matters related to the Real Property or any portion thereof, including without limitation, the condition and/or operation of the Real Property and each part thereof, and (iii) the presence, release and/or remediation of asbestos and asbestos containing materials in, on or about the Real Property regardless of when such asbestos and asbestos containing materials were first introduced in, on or about the Real Property.

**5.14.1**  Releasors hereby waive and agree not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, including, but not

- 54 -

- 55 -

limited to, a private right of action under the federal superfund laws, 42 U.S.C. Sections 9601 et seq. and California Health and Safety Code Sections 25300 et seq. (as such laws and statutes may be amended, supplemented or replaced from time to time), directly or indirectly, against the Releasees or their agents in connection with Claims described above and expressly waives the provisions of Section 1542 of the California Civil Code provides:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."**

and all similar provisions or rules of law. Releasors elect to and does assume all risk for such Claims heretofore and hereafter arising, whether now known or unknown by Releasors. In this connection and to the greatest extent permitted by law, Releasors hereby agree, represent and warrant that Releasors realize and acknowledge that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Releasors further agree, represent and warrant that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Releasors nevertheless hereby intend to release, discharge and acquit Seller from any such unknown Claims, debts, and controversies which might in any way be included as a material portion of the consideration given to Seller by Releasors in exchange for Seller's performance hereunder. Without limiting the foregoing, (i) Releasors have actual knowledge of (q) a default in any of the covenants, agreements or obligations to be performed by Seller under this Agreement and/or (b) any breach or inaccuracy in any representation or warranty of Seller made in this Agreement, and Releasors nonetheless elects to proceed to Closing, then, upon the consummation of the Closing, Releasors shall be conclusively deemed to have waived any such default and/or breach or inaccuracy and shall have no Claim against Seller or hereunder with respect thereto. Notwithstanding anything to the contrary herein, Seller shall not have any liability whatsoever to Releasors with respect to any matter disclosed to or discovered by Releasors or its agents or representatives prior to the Closing Date.

5.14.2 Without limiting the generality of the foregoing, except for the specific representations and warranties provided in Article 11 of this Agreement by Seller or a fraud committed by a Seller, Releasors hereby expressly waive, release and relinquish any and all claims, causes of action, rights and remedies Releasors may now or hereafter have against the Releasees, whether known or unknown, under any Environmental Law(s) (as defined below), or common law, in equity or otherwise, with respect to (1) any past, present or future presence or existence of Hazardous Materials on, under or about the Real Property (including, without limitation, in the groundwater underlying the Real Property) or (2) any past, present or future violations of any Environmental Laws. For the purposes of this Section, the term "Environmental Laws" means any and all federal, state and local statutes, ordinances, orders, rules, regulations, guidance documents, judgments, governmental authorizations, or any other requirements of governmental authorities, as may presently exist or as may be amended or supplemented, or hereafter enacted or promulgated, relating to the presence, release, generation, use, handling, treatment, storage, transportation or

disposal of Hazardous Materials, or the protection of the environment or human, plant or animal health, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C.A. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Oil Pollution Act (33 U.S.C. § 2701 et seq.), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.), the Porter-Cologne Water Quality Control Act (Cal. Wat. Code § 13020 et seq.), the Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal. Health & Safety Code § 25249.5 et seq.), the Hazardous Waste Control Act (Cal. Health & Safe Code § 25100 et seq.), the Hazardous Materials Release Response Plans & Inventory Act (Cal. Health & Safety Code § 25500 et seq.), and the Carpenter-Presley-Tanner Hazardous Substances Account Act (Cal. Health & Safety Code, § 25300 et seq.). As used herein, the term "**Hazardous Material(s)**" includes, without limitation, any hazardous or toxic material, substance, irritant, chemical or waste, which is (A) defined, classified, designated, listed or otherwise considered under any Environmental Law as a "hazardous waste," "hazardous substance," "hazardous material," "extremely hazardous waste," "acutely hazardous waste," "radioactive waste," "biohazardous waste," "pollutant," "toxic pollutant," "contaminant," "restricted hazardous waste," "infectious waste," "toxic substance," or any other term or expression intended to define, list, regulate or classify substances by reason of properties harmful to health, safety or the indoor or outdoor environment, (B) toxic, ignitable, corrosive, reactive, explosive, flammable, infectious, radioactive, carcinogenic or mutagenic, and which is or becomes regulated by any local, state or federal governmental authority, (C) asbestos, (D) an oil, petroleum, petroleum based product or petroleum additive, derived substance or breakdown product, (E) urea formaldehyde foam insulation, (F) polychlorinated biphenyls (PCBs), (G) freon and other chlorofluorocarbons, (H) any drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources, (I) lead-based paint and (J) mold, rot, fungi and bacterial matter.

5.14.3 Seller has given Releasors material concessions regarding this transaction in exchange for Releasors agreeing to the provisions of this Section 5.14. Seller and Releasors have each initialed this Section 5.14 to further indicate their awareness and acceptance of each and every provision hereof. The provisions of this Section 5.14 shall survive the Closing and shall not be deemed merged into any instrument or conveyance delivered at the Closing.

*SELLER'S INITIALS*          *PURCHASER'S INITIALS*

5.14.4 Releasors specifically acknowledge, covenant, represent and warrant that prior to Closing Date, it and its agents and representatives will have thoroughly inspected the Real Property and observed the physical characteristics and condition of the Real Property. Notwithstanding anything to the contrary contained in this Agreement, Releasors further acknowledge and agree that Releasors is purchasing the Real Property subject to all applicable laws, rules, regulations, codes, ordinances and orders. By Releasors purchasing the Real Property and upon the occurrence of the Closing Date, Releasors waive any and all right or ability to make a claim

of any kind or nature against any of the Releases for any and all deficiencies or defects in the physical characteristics and condition of the Real Property and expressly agrees to acquire the real Property with any and all of such deficiencies and defects and subject to all matters disclosed by Seller herein or in any separate writing with respect to the Real Property. Releasors further acknowledge and agree that except for any representations expressly made by Seller in Article II of this Agreement, neither Seller or any of Seller's employees, agents or representatives have made any representations, warranties or agreements by or on behalf of Seller of any kind whatsoever, whether oral or written, express or implied, statutory or otherwise, as to any matters concerning the Real Property, the condition of the Real Property, the size (including rentable or useable square footage) of the Real Property, the size (including rentable or useable square footage) of the improvements (including without limitation, any discrepancies in the actual rentable square footage of the improvements, including any leased premises within the Improvements), the present use of the Real Property or the suitability of Releasor's intended use of the Real Property.

5.14.5 Without limiting the generality of the foregoing, Releasors expressly acknowledge and agree that Releasors is not relying on any representation or warranty of Seller, nor any officer, director, shareholder, member, manager, partner, employee, attorney, property manager, agent or broker of Seller, whether implied, presumed or expressly provided at law or otherwise, arising by virtue of any statute, common law or other legally binding right or remedy in favor of Releasors except as expressly provided in Article II above. Releasors further acknowledge and agree that, except with respect to matters covered by Seller's representations at Article II of this Agreement, Seller is not under any duty to make any inquiry regarding any matter that may or may not be known to the Seller or any officer, director, shareholder, member, manager, partner, employee, attorney, property manager, agent or broker of Seller.

_SELLER'S INITIALS_         _PURCHASER'S INITIALS_

5.14.6 Notwithstanding the preceding, none of the releases or other provisions set forth in this Section 5.14 (or any subsection thereof) shall eliminate or limit the effect of, or Seller's obligation for, Seller's express representations, warranties and covenants in this Agreement or for fraud. The provisions of this Section 5.14 and its subsections shall survive the Closing and shall not be deemed merged into any instrument or conveyance delivered at the Closing.

5.15 **Plan of Adjustment.** Purchaser shall reasonably cooperate with Seller in connection with developing a Plan of Adjustment and in connection with any filings in the Chapter 9 Proceeding, and other steps, seeking approval of the Plan of Adjustment.

5.16 **Defense of Claims Challenging Transaction.** In the event any litigation is commenced seeking to enjoin or challenge the validity of, or the Seller's authority to enter into or perform pursuant to, the transactions contemplated by the MOU or addressed in this Agreement ("**Challenging Litigation**"), Seller will tender such litigation for coverage by D&O or E&O insurance, to the extent such policies may be applicable. If, however, such Challenging Litigation, which is filed prior to the second anniversary of the Closing Date is not covered by insurance ("**Covered Litigation**"), and/or if the applicable carrier does not promptly agree to provide a defense of such Challenging Litigation, Purchaser agrees to be responsible for the reasonable legal fees and

- 58 -

costs associated with defending against the Covered Litigation; provided that Purchaser shall have the right, at its election, to control and/or participate in the defense of the Covered Litigation, with counsel mutually agreeable to Seller and Purchaser. If Purchaser elects to control the Covered Litigation, then Purchaser will have full control of such defense and proceedings, including any compromise or settlement thereof. Seller may, at its sole cost and expense, participate in, but not control, any defense or settlement of any Covered Litigation controlled by the Purchaser pursuant to this Section to the extent such participation is not prejudicial, in the reasonable judgment of the Purchaser, to the Purchaser or the possible outcome of the Covered Litigation. If requested by Purchaser, Seller agrees to fully cooperate with the Purchaser and its counsel in contesting any Covered Litigation, or, if appropriate and related to the Covered Litigation in question, in making any counterclaim against the person asserting initiating the Covered Litigation, or any cross-complaint against any person (other than the Seller or any of its affiliates). Seller shall not take any such action that is prejudicial to Purchaser or its defense against the Covered Litigation. In connection with the foregoing, Purchaser also agrees to indemnify, defend and hold harmless Seller and Seller's elected directors and officers from any and all damages, liabilities, costs, expenses, obligations, or claims incurred in connection with the Covered Litigation, including but not limited to, injunctive proceedings, and which are not covered by D&O, E&O or other insurance covering Seller and its directors and officers ("**Available Insurance**"). Notwithstanding the preceding, it is agreed that Seller and its directors and officers will tender any claims which are subject to indemnity pursuant to this Section to any insurer(s) providing Available Insurance ("**Available Insurer**") prior to seeking indemnification pursuant to this Section; provided, however, that unless the Available Insurer promptly agrees to provide a defense to or for any claims covered by this indemnification, Purchaser shall immediately defend against such claims in the same manner as provided for defending against Covered Litigation as provided above.

ARTICLE VI
CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

6.1 **Signing and Delivery of Instruments.** Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement and any Related Agreement.

6.2 **Unfavorable Action or Proceeding.** On the Closing Date, no orders, decrees, judgments, temporary restraining orders or injunctions of any court or governmental body shall be in effect, which could prevent the consummation of the transactions contemplated in this Agreement.

6.3 **Performance of Covenants.** Purchaser shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

6.4 **Governmental Authorizations.** Purchaser shall have obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement including reasonable assurances that any material licenses, permits, certificates of need and

- 59 -

authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies). The foregoing notwithstanding, in the event that CDPH approval and CMS certification, or other Material Licenses, have not been obtained prior to the Closing Date, Purchaser and Seller shall nevertheless be required, at the option of either Seller or Purchaser, to complete the purchase of the Assets and the Parties shall enter into the Lease and Management Agreement as and to the extent provided in Section 1.3.6.

6.5    **Representations.** The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects as though such representations and warranties had been made on and as of such date, except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated hereby, when made and on and as of the Closing Date (or the date otherwise specified in this Agreement) as though such representations and warranties had been made on and as of such date.

6.6    **Schedules.** The provisions of the schedules attached to this Agreement that were updated by Purchaser after the Effective Date, if any, shall be acceptable to Seller in its reasonable discretion, provided, however, that Purchaser shall be deemed to have obtained Seller's approval to any such material updates of the schedules if Purchaser gives Seller written notice of an update and Purchaser does not receive from Seller a written notice of objection to such action within ten (10) business days after Seller receives Purchaser's written notice.

6.7    **Public Approval.** Except with respect to the Alternative Transaction, the Seller shall have received Public Approval, through the Approval Election, as legally required for Seller to consummate the transactions contemplated by this Agreement.

6.8    **Capital Requirements.** No later than noon on December 4, 2009, Purchaser shall provide Seller, through its general counsel, John B. Marshall, Esq, as addressed below, evidence reasonably satisfactory to Seller that Purchaser has written Commitments (as defined below) from its lenders and evidence concerning Purchaser's capital investors sufficient to permit Purchaser to fund to close the transactions provided for in this Agreement. For purposes of the preceding, a lender's "Commitment" constitutes a commercially reasonable letter by such lender to make a loan to Purchaser or Purchaser's Affiliate, in such form and with such conditions and qualifications as can be reasonably expected for such a lender letter prior to payment by Purchaser of a commitment fee (which commitment fees Purchaser would not pay until the Public Approval occurs, because of their substantial cost). At Seller's reasonable request, such evidence (collectively, "**Financial Documentation**") shall include (i) the names of the lenders and/or the existing capital investors, (ii) the amount of money such lenders and/or capital investors have committed toward either the Cash Purchase Portion or the Purchaser's working capital, as well as (for any working capital loan Commitment) the general terms upon which Purchaser shall be entitled to draw down and utilize said funds, and (iii) the general terms and conditions upon which the money is being lent (for any Commitments) (collectively, "**Commitment Requirements**"). Seller and Purchaser agree that much of the information to be provided by Purchaser pursuant to this section will be of a confidential and sensitive nature, and may be subject to confidentiality covenants in favor of third parties. Accordingly, it is important for the process contemplated by this section to be one that can protect such confidentiality. Therefore, the parties agree that the Commitments and other evidence required to be provided by Purchaser hereunder shall only be provided for review by (and not for copying by) Seller's general counsel, John B. Marshall, Esq, and he will, unless otherwise approved in writing by

- 60 -

Purchaser, only be authorized to report back to Seller only his conclusions on whether these Commitments and other information and documents reasonably provide the evidence of sufficient capital as required by this Section, and that he will not be authorized to share the details, including without limitation the names of any lenders or capital investors, with Seller or its board members, officers or agents. The parties acknowledge and agree that the evidence of necessary funds may be shown through funds available to Purchaser or any Affiliate of Purchaser which will make such funds available to close the transactions contemplated by this Agreement. If Purchaser is unable, at or prior to Noon on December 4, 2009, to produce documents evidencing the availability of funds constituting the Commitment Requirements as required to close the transactions provided for in this Section which are commercially reasonably satisfactory to Seller, then Seller shall have the right, in its reasonable discretion, to terminate this Agreement upon ten (10) business days prior written notice provided to Purchaser within twenty (20) days after Purchaser has provided Seller the Financial Documentation required by this Section (which notice shall include a detailed description of Seller's basis for concluding that Purchaser has failed to provide the required evidence), during which period Purchaser shall have opportunity to cure by provision of additional evidence commercially reasonably satisfactory to Seller of capital commitments or addressing any deficiency alleged by Seller, without liability and to retain the Termination Fee as further addressed at Section 8.2, unless such failure is caused by Seller's failure to perform its material obligations under Section 4.1.1. If there are any disputes between Seller and Purchaser concerning the compliance by Purchaser with the provisions and requirements of this Section, such dispute shall be resolved pursuant to the dispute resolution provisions set forth at Section 12.18 of this Agreement. There shall be no other financing contingency to Purchaser's obligation to close the transactions contemplated in this Agreement, except as otherwise specifically set forth in this Agreement.

6.9    **Plan of Adjustment.** If, prior to the Closing, Seller has filed a Plan of Adjustment ("**Plan**") in the Chapter 9 Proceeding, as of the Closing, either;

6.9.1    such Plan shall have been confirmed; or

6.9.2    the holders of the Affiliated Claims shall have voted to accept, in writing, such Plan or agreed to accept such Plan; or

6.9.3    the holders of the Affiliated Claims shall have agreed, in writing, not to, directly or indirectly, oppose such Plan and/or sought to influence either the Unsecured Creditors Committee and/or others to vote against or otherwise oppose such Plan, and have, in fact, not done so.

For purposes of the foregoing, "**Affiliated Claims**" shall mean the claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, Inc., and the claims of LHIO, Inc. and any claims of constituent members thereof which are derivative from such claims

### ARTICLE VII
### CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

- 61 -

**7.1 Governmental Authorizations.** Purchaser shall have obtained all material licenses, permits, certificates of need, assumption of provider agreements and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits, certificates of need and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies). The foregoing notwithstanding, in the event that CDPH approval and CMS certification, or other Material Licenses, have not been obtained prior to the Closing Date, Seller and Purchaser shall nevertheless be required, at the option of either Seller and Purchaser, to complete the purchase of the Assets and the Parties shall enter into the Lease and Management Agreement, as and to the extent provided in Section 1.3.6.

**7.2 Signing and Delivery of Instruments.** Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement and the Related Agreements.

**7.3 Performance of Covenants.** Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date.

**7.4 Unfavorable Action or Proceeding.** On the Closing Date, no orders, decrees, judgments, temporary restraining orders or injunctions of any court or governmental body shall be in effect, which could prevent the consummation of the transactions contemplated in this Agreement.

**7.5 Material Adverse Effect.** There has not been a change, or new circumstances, having a Material Adverse Effect.

**7.6 Title Insurance Policy.** Purchaser shall have received or the Title Company shall be irrevocably committed to issuing, a fully effective Title Policy including a customary survey endorsement in favor of Purchaser covering the Owned Real Property in the amount of the full insurable value of the Owned Real Property. The Owner's Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, subject only to: (a) current real estate taxes not yet due and payable; and (b) the permitted title exceptions listed in Schedule 2.6 hereto (the "**Permitted Exceptions**").

**7.7 Representations.** Each of the representations and warranties of Seller contained in this Agreement or a Related Agreement shall be true and correct in all respects when made and on and as of the Closing Date (or the date otherwise specified in this Agreement) as though such representations and warranties had been made on and as of such date, except as to changes occurring in the ordinary course of business of the Hospital Businesses after the date of this Agreement which do not violate any covenant of Seller in this Agreement and have no Material Adverse Effect.

**7.8 Exhibits and Schedules.** The provisions of the Seller's Disclosure Schedule and all schedules attached to this Agreement that were updated by Seller after the Effective Date, if any, shall be acceptable to Purchaser in its reasonable discretion; provided, however, that Seller shall be deemed to have obtained Purchaser's approval to any such updates of the schedules if Seller gives Purchaser written notice of an update and Seller does not receive from Purchaser a written notice of objection to such action within ten (10) business days after Purchaser receives Seller's written notice.

1070059.2                                    F:\Boa4\PH\FINAL\ASA 10.12.09.DOC

**7.9 Permits and Program Participation.** Unless either Party elects to enter into the Lease and Management Agreement as provided elsewhere in this Agreement, Purchaser shall have obtained, or received reasonable assurances that it shall obtain within a reasonable time after the Effective Time (including the scheduling by Purchaser of any required surveys within seven (7) days following the Effective Time), (a) all Material Licenses, Permits and accreditations required for the transfer of the Hospital Businesses to Purchaser and for the operation of each of the Hospital Businesses by Purchaser following the Effective Time in substantially the same manner as currently operated without Purchaser being obligated to comply with any additional Legal Requirements concerning construction, structural integrity or seismic safety as a result of the transfer of the Assets to Purchaser, (b) certification of each component of the Hospital Businesses in Medicare, Medicaid, and TRICARE/CHAMPUS and its continued participation in each such program notwithstanding Purchaser's decision to obtain new provider agreements and provider numbers therefor, (c) certification of participation by each of the Hospital Businesses in the program of any other Payor reasonably required by Purchaser, and (d) certification or confirmation reasonably satisfactory to Purchaser of the Hospital Businesses' ability to continue to qualify for and maintain its exclusion from Medicare's prospective payment system, in each instance effective as of the Closing Date or as soon thereafter as is acceptable to Purchaser, so that within such a period of time after the Closing as is acceptable to Purchaser each component of the Hospital Businesses may participate in and receive reimbursement from all programs described in (b) through (d) effective as of the Closing.

**7.10 Tax Matters.** Seller shall have delivered to Purchaser a duly executed certificate of non-foreign status in the form required by Code § 1445.

**7.11 Public Approval.** The Seller shall have received a Public Approval, through the Approval Election and all such other requirements, as legally required for Seller to consummate the transactions contemplated by this Agreement.

**7.12 Plan of Adjustment.** The Plan of Adjustment shall have been approved by the Bankruptcy Court prior to Closing.

**ARTICLE VIII**
**TERMINATION**

**8.1 Termination.** This Agreement may be terminated at any time prior to Closing only as follows:

**8.1.1** By the mutual written consent of the Parties in which case the Deposit shall be repaid as agreed upon by the Parties;

**8.1.2** By Seller if a material breach or default under this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within thirty (30) days after service by Seller upon Purchaser of a written notice which describes the nature of such breach. In the event this Agreement is terminated based on this Section 8.1.2, Escrow shall pay to Seller the Termination Fee and the Excess Deposit to Purchaser immediately following the effective date of such termination of this Agreement; provided, however, that for purposes of this Section, if Purchaser's performance is prevented, hindered or delayed by reason of any Force Majeure, such performance obligation of Purchaser shall be excused but only for so long as and to the extent that such cause(s) prevent or delay Purchaser's performance. For purposes of this Section 8.1.2, Seller's certification of material

1070059.2                                    F:\Boa4\PH\FINAL\ASA 10.12.09.DOC

breach or default shall be accepted by Escrow, without prejudice to Purchaser's right to contest the same in accordance with the terms of this Agreement.

**8.1.3** By Purchaser if a material breach or default under this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within thirty (30) days after service by Purchaser upon Seller of a written notice which describes the nature of such breach. In the event this Agreement is terminated based on this Section 8.1.3, Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement; provided, however, that , for purposes of this Section, if Seller's performance is prevented, hindered or delayed by reason of any Force Majeure, such performance obligation of Seller shall be excused but only for so long as and to the extent that such cause(s) prevent or delay Seller's performance;

**8.1.4** By Purchaser if any of the conditions in Article VII have not been satisfied as of the Closing Date or if satisfaction of any condition in Article VII is or becomes impossible and Purchaser has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reasons other than (i) the failure of Purchaser to comply with its obligations under this Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date because the Purchaser is not ready, willing and able to close the transaction on the Closing Date). In the event this Agreement is terminated based on this Section 8.1.4, Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination;

**8.1.5** By Seller if any of the conditions in Article VI have not been satisfied as of the Closing Date or if satisfaction of any such condition in Article VI is or becomes impossible and Seller has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reasons other than (i) the failure of Seller to comply with its obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date because Seller is not ready, willing and able to close the transaction on the Closing Date). In the event this Agreement is terminated based on this Section 8.1.5, then Escrow shall pay to Seller the Deposit and the Excess Deposit to Purchaser, immediately following the effective date of such termination of this Agreement

**8.1.6** By Purchaser, upon the delivery of a timely termination by Purchaser in accordance with Sections 1.10.2 (environmental), 1.12 (Casualty), 1.13(Condemnation), and 1.14 (disapprovals during Schedules Period), in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.7** Without limiting Purchaser's other termination rights hereunder, Purchaser may elect to terminate this Agreement, without cause, upon ten (10) days written notice to Seller, in which case the Escrow shall pay the Termination Fee and the Excess Deposit to Seller following the effective date of such termination of this Agreement;

**8.1.8** By Seller, if Seller timely terminates the Agreement pursuant to Section 6.8, in which case the Escrow shall pay the Termination Fee to Seller and the Excess Deposit to Purchaser immediately following the effective date of such termination of this Agreement;

**8.1.9** By Purchaser, if Seller's Disclosure Schedule or other schedules attached to this Agreement are updated by Seller after the end of the Schedules Period, which update is not

- 64 -

acceptable to Purchaser, and Purchaser elects to terminate this Agreement, by written notice provided to Seller within ten (10) business days after Purchaser receives Seller's written notice of the disapproved Schedules update and Seller does not agree to retract the update during the notice period, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.10** By Purchaser, if there has been a change, or new circumstances, having a Material Adverse Effect since the Effective Date, and Purchaser elects to terminate this Agreement by written notice provided to Seller within ten (10) business days after Purchaser receives written notice of the occurrence of such Material Adverse Effect, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.11** By Seller, if at the Closing, the Purchasing Group Companies do not, directly or indirectly, include a cross-section of participating local physicians, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

**8.1.12** By Purchaser, if (i) the actual D&O Tail Payment required to be paid by Purchaser exceeds the estimated amount of Four Hundred Fifty Thousand Dollars ($450,000); (ii) or the E&O Tail Insurance Payment required to be paid by Purchaser exceeds the estimated amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000); or (iii) the Administrative Claims combined with other Covered Claims exceed $4,000,000 and Purchaser chooses not to make the additional payments (from the Creditors Commitment) at Closing to meet those obligations, as addressed in Article I, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement]

**8.1.13** **[intentionally omitted]**

**8.1.14** **[intentionally omitted]**; or

**8.1.15** By either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before April 30, 2010 (the **"Termination Date"**) unless such Termination Date is mutually extended by the Parties. In the event of a termination in accordance with this Section 8.1.15, Escrow will pay to Purchaser the Deposit immediately after the termination takes effect.

**8.2** **Termination Consequences.** If this Agreement is terminated pursuant to Section 8.1, (a) all further obligations of the parties under this Agreement shall terminate, except that the obligations in Sections 5.7 (Confidentiality), 12.3 (Governing Law), 12.8 (Confidentiality and Publicity), 12.12 (Expenses) and any provision in the Agreement regarding disposition of the Deposit, shall survive and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in Section 12.12. Notwithstanding the foregoing to the contrary, if Seller either Party shall have committed any material breach or default, then Purchaser the nonbreaching need not terminate this Agreement but may seek to specifically enforce Seller's the obligations of the nonbreaching Party under this Agreement. If this Agreement is terminated for any reason not based on Seller's or Purchaser's failure to perform any of its respective material obligations under this Agreement, which failure is not cured within the permitted

- 65 -

cure period, then Purchaser agrees to reimburse to Seller the out-of-pocket expenses incurred by Seller to undertake the Approval Election, in an amount not to exceed Fifty Thousand Dollars ($50,000).

8.2.1  NOTWITHSTANDING THE PRECEDING, OR ANY OTHER PROVISION IN THIS AGREEMENT OR THE RELATED AGREEMENTS, IF THE CLOSING DOES NOT OCCUR BASED UPON SELLER'S ELECTION TO TERMINATE IN ACCORDANCE WITH SECTION 8.1.7, OR AS A RESULT OF PURCHASER'S FAILURE TO PERFORM ANY OF ITS MATERIAL OBLIGATIONS UNDER THIS AGREEMENT WHICH FAILURE IS NOT CURED WITHIN ANY PERMITTED CURE PERIOD (OTHER THAN PURCHASER'S FAILURE TO GIVE TIMELY NOTICE OF TERMINATION UNDER SECTION 8.1 WHICH FAILURE TO GIVE NOTICE CANNOT BE CURED), THEN, AS SELLER'S SOLE REMEDY, SELLER SHALL HAVE THE RIGHT TO RECEIVE TWO MILLION DOLLARS ($2,000,000) ("TERMINATION FEE") FROM THE DEPOSIT AND ESCROW SHALL REPAY TO PURCHASER THE DEPOSIT AND ALL INTEREST THEREON IN EXCESS OF SUCH TERMINATION FEE ("EXCESS DEPOSIT").

8.2.2  IN CONNECTION WITH SECTION 8.2.1, PURCHASER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES THAT SELLER MAY SUFFER IN THE EVENT PURCHASER BREACHES THIS AGREEMENT PRIOR TO THE APPROVAL ELECTION. PURCHASER AND SELLER THEREFORE AGREE THAT THE PAYMENT SET FORTH IN SECTION 8.2.1 REPRESENTS A REASONABLE ESTIMATE OF THE NET DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT PURCHASER BREACHED THIS AGREEMENT PRIOR TO SUCH TIME. ACCORDINGLY, SELLER AGREES THAT THE PAYMENT SET FORTH IN SECTION 8.2.1 SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY AT LAW OR IN EQUITY FOR THE PURCHASER'S DEFAULT AS ADDRESSED THEREIN (WHICH SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677) AND SHALL NOT CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369. SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389 WITH RESPECT TO THE PROVISIONS OF THIS AGREEMENT.

PURCHASER INITIALS _____        SELLER INITIALS _____

### ARTICLE IX
### POST-CLOSING MATTERS

9.1  **Excluded Assets and Excluded Liabilities.**

9.1.1  Subject to Section 11.2 of this Agreement, any asset (including Accounts Receivable) or any liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as

F:\Bua4\PHH\FINAL AS4 10.12.09.DOC
1070039.2

determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller at Seller's cost. Until such transfer, assignment and conveyance, Purchaser (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Seller shall hold such asset in trust for the benefit of Seller. Purchaser (and is respective successors-in-interest, assigns or affiliates) shall have neither the right to offset amounts payable to Seller under this Section 9.1 against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller, including, but not limited to, pursuant to the indemnification provisions of Section 10.2. If Purchaser does not remit the Excluded Assets to Seller in accordance with the first sentence of this Section 9.1, such Excluded Assets shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "Excluded Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement. With respect to payment received by Purchaser on account of Transition Services, this Section 9.1 shall be subject to the provisions of Section 11.3. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

9.1.2  Subject to Section 11.2 of this Agreement, any asset (including Accounts Receivable) or any liability, all other remittances and all mail and other communications that is an Asset or an Assumed Obligation (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Seller (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Seller (or its respective successors-in-interest, assigns or affiliates) to Purchaser at Purchaser's cost. Until such transfer, assignment and conveyance, Seller (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Purchaser shall hold such asset in trust for the benefit of Purchaser. Seller (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Purchaser under this Section 9.1 against, nor the right to contest its obligation to transfer, assign and convey to Purchaser because of, outstanding claims, liabilities or obligations asserted by Purchaser against Purchaser, including, but not limited to, pursuant to the indemnification provisions of Section 10.2. If Seller does not remit the Assets to Purchaser in accordance with the first sentence of this Section 9.1, such Assets shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Purchaser (the "Transferred Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Transferred Asset Due Date until payment of the Assets and all interest thereon is made to Purchaser. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement. With respect to payment received by Purchaser on account of Transition Services, this Section 9.1 shall be subject to the provisions of Section 11.3. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

F:\Bua4\PHH\FINAL AS4 10.12.09.DOC
1070039.2

**9.2   Preservation and Access to Records After the Closing.**

**9.2.1   Hospital Businesses' Records.** The term **"Hospital Businesses' Records"** shall mean all records created and/or maintained in connection with the operation of the Hospital Businesses for periods ending on or prior to the Closing Date which are of the types and categories listed in the current version of the **"Recommended Record Retention Schedule"** (**"CHA Retention Schedule"**) of the Records Retention Guide (**"CHA Guide"**) published by the California Healthcare Association, including without limitation all records, documents and other materials which are not confidential or subject to the attorney-client privilege, whether in the possession of Seller, Seller's accountants, Seller's attorneys or other professionals. The CHA Retention Schedule is set forth on Schedule 9.2.1. The term **"Transferred Records"** shall mean all Hospital Businesses' Records consisting of medical, clinical and other records directly or indirectly associated with the admission, care and treatment of patients, patient billing records, personnel records and other business records directly related to continued operations of the Hospital (but excluding the Retained Records) and financial records of the Hospital Businesses and other financial and marketing information including, without limiting the generality of the foregoing, any such records, documents or other material whether or not privileged, except the attorney-client privilege, or confidential and whether in the possession of Seller or in the possession of its attorneys, accountants or other professionals, including the work papers of Seller's accountants. The term **"Retained Records"** shall mean the portion of the Hospital Businesses' Records consisting of Seller's minute book, tax returns and files related thereto and materials which are subject to privilege and which relate solely to the Excluded Assets.

Purchaser's application for employment described in Section 5.4.1 above shall include a request for the Hospital Businesses' Employees completing the application to affirmatively consent in writing to the release to Purchaser, within an indicated timeframe that all of such Hospital Businesses' Employees' personnel files and documents maintained by Seller. The form and content of the consent shall be approved in advance by Seller, which approval shall not be unreasonably withheld or delayed. Seller shall provide Purchaser with the employee personnel files and documents of all applying employees, including, but not limited to (a) Forms I-9 and supporting documentation, and (b) the contents of the personnel file, including disciplinary records and performance evaluations, for those Hospital Employees who consent to the release of such files and documents to Purchaser. Seller may provide Purchaser with true and correct copies of the foregoing documents, provided that Purchaser shall have the right to examine the originals of such documents. Purchaser shall promptly return to Seller all personnel files and documents of any Hospital Businesses' Employees who do not become Hired Employees, which returned files and documents shall not be Transferred Records. Any such files for Hospital Businesses' Employees who do become Hired Employees (and for whom the consents were obtained) shall be included within Transferred Records.

**9.2.2   Retention of Retained Records by Seller.** Seller shall retain the Retained Records until the expiration, for each type and category of record, of the recommended retention period set forth in the CHA Retention Schedule, as amended from time to time. Purchaser shall provide storage space for such records and shall provide personnel to retrieve such records in the any manner reasonably determined by Purchaser, at no cost to Seller. If at the expiration of any such period, any tax or Payor audit or judicial proceeding or any appeal therefrom is in process or the applicable statute of limitations has been extended, all or any portion of the Retained Records affected by such audit, proceeding or extension shall be retained until the audit is completed, a final

- 68 -

judgment is entered in such proceeding, or the relevant statute of limitations has expired, as the case may be (**"Retained Records Retention Period"**).

**9.2.3   Transfer and Retention of Transferred Records by Purchaser.** To the extent and in a manner permitted by Law, upon the Closing, Seller shall be deemed to have assigned and transferred to (or, if necessary, waived and released solely in favor of) Purchaser all Transferred Records and any privilege with respect thereto and shall be deemed to have consented to Purchaser's access to all such records, documents and materials. Purchaser agrees to comply with all applicable federal and state laws concerning privacy, including HIPAA, and shall use its best efforts to retain all applicable privileges. As set forth in Section 1.1.1(i), the Transferred Records are Assets. Purchaser shall retain the Transferred Records at the Hospitals (or at such other locations in Riverside County as Purchaser, in its sole discretion, shall determine from time to time) at Purchaser's cost, until the expiration, for each type and category of record, of the recommended retention period set forth in the CHA Retention Schedule, as amended from time to time. However, if at the expiration of any such period, any tax or Payor audit or judicial proceeding or any appeal therefrom is in process or the applicable statute of limitations has been extended, all or any portion of the Transferred Records affected by such audit, proceeding or extension shall be retained until the audit is completed, a final judgment is entered in such proceeding, or the relevant statute of limitations has expired, as the case may be (**"Transferred Records Retention Period"**).

**9.2.4   Access to Hospital Businesses' Records.** After the Closing each party shall grant to the other party access to the Hospital Businesses' Records in its possession for any lawful purpose approved by the party in possession of such records, which approval shall not be unreasonably withheld, delayed or conditioned; provided that neither party shall have access to any Hospital Businesses' Records, the disclosure of which would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality. Notwithstanding the foregoing to the contrary, Seller, its agents and representatives shall have access to any Hospital Businesses' Records pertaining solely to the Excluded Assets that are in the possession of Purchaser except to the extent such access is prohibited by Law. Any Hospital Businesses' Records delivered to or made available to either party or its representatives shall be treated as strictly confidential and shall not be directly or indirectly divulged, disclosed or communicated to any other Person other than Seller or Purchaser, as the case may be, and its representatives who are reasonably required to have access to such information (unless Seller or Purchaser is compelled to disclose the same by judicial or administrative process), shall be returned to Purchaser or Seller, as the case may be, when such use therefor has terminated and shall not be used to the detriment of Purchaser or Seller, as the case may be. Each party shall instruct its appropriate employees to cooperate in providing access to such records to the other party and its authorized representatives as contemplated in this Agreement. Access to such records shall be, whenever reasonably possible, during normal business hours and with reasonable prior written notice of the time when such access shall be needed. Each party's employees, representatives and agents shall conduct themselves in such a manner so that the normal business activities of the other party shall not be unduly or unnecessarily disrupted.

**9.2.5   Joint Commission.** Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital Businesses and other information required by Seller for reporting to The Joint Commission for the remainder of the applicable period in which the Closing has occurred.

- 69 -

**9.3    Provision of Benefits of Certain Contracts; Defense of Related Claims.**

**9.3.1    Inability to Obtain Consents.** If, as of the Effective Time, Seller is unable to obtain any consent to the assignment of Seller's interest in an Assumed Contract, or under any other consent needed to assign any other intangible right, notwithstanding any term in this Agreement to the contrary or if the Bankruptcy Court fails to approve such assignment, such Assumed Contract shall not be assigned to Purchaser until such consent is obtained or a new contract is obtained by Purchaser prior to or following the Closing, Seller and Purchaser shall use Reasonable Commercial Efforts to cooperate with each other in efforts to obtain any such consent (including any releases of Seller, as contemplated pursuant to Section 5.8) or new contract prior to or following the Closing. Seller also agrees to use its Reasonable Commercial Efforts to provide Purchaser the benefits of any such Assumed Contract, or other intangible interests transferred to Purchaser as part of the Assets, cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, and allow Purchaser to directly enforce such Assumed Contract against the applicable third parties thereto. Purchaser agrees to use Reasonable Commercial Efforts to perform, on behalf of Seller, the obligations of Seller under such Assumed Contract, or other transferred intangible interests, to the extent that Purchaser obtains all of the benefits thereunder, but only to the extent that such action would not result in a material default thereunder or in connection. Notwithstanding anything to the contrary herein, Seller shall not be liable for the failure to obtain any consents unrelated to the Assumed Contracts and Purchaser agrees to indemnify, defend and hold Seller harmless with respect to such Assumed Contracts.

**9.3.1    Defense of Certain Claims.** If, in connection with any proposed Contract assumed by Purchaser, the other party (other than Seller) challenges the proposed assumption of such Contract ("**Assumption Challenge(s)**"), Seller shall not be obligated to litigate such challenges, in order to transfer such Contract, unless Purchaser agrees to cover Seller's reasonable legal fees and costs in connection with such Assumption Challenge; provided that if Purchaser elects to cover such legal fees and costs, it will be given the opportunity to participate in any negotiations or litigation related to the Assumption Challenge, and Seller shall meet, confer and take counsel from Purchaser with respect to the handling and resolution of such litigation. In such event, Purchaser shall defend, indemnify and hold Seller harmless of and from any fees, costs, expenses and other liability with respect to such litigation related to an Assumption Challenge ("**Assumption Litigation**"), including any settlement or judgment therein. If Purchaser elects to control the Assumption Litigation, then Purchaser will have full control of such defense and proceedings, including any compromise or settlement thereof. Seller may, at its sole cost and expense, participate in, but not control, any defense or settlement of any Assumption Litigation controlled by the Purchaser pursuant to this Section to the extent such participation is not prejudicial, in the reasonable judgment of the Purchaser, to the Purchaser or the possible outcome of the Assumption Litigation. If requested by Purchaser, Seller agrees to fully cooperate with the Purchaser and its counsel in contesting any Assumption Litigation, or, if appropriate and related to the Assumption Litigation. Seller agrees that it shall not take any such action that is prejudicial to Purchaser or its defense against the Assumption Litigation.

**9.4    Closing of Financials.** Purchaser shall complete the standardized closing of Seller's financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**"). Purchaser shall use its good faith efforts to complete the Closing of Financials by no later than the date which is sixty (60) days after the Closing Date. Purchaser shall reasonably make available to Seller those employees of

Purchaser who may be necessary to complete the Closing of Financials, at no cost to Seller. Seller shall hold Purchaser harmless for any errors which are made by Seller during the course of the Closing of Financials, provided that such errors are not the result of gross negligence, fraud or intentional misconduct. In addition, Purchaser shall afford to the agents of Seller (which shall include accountants) reasonable access during normal business hours to and the right to inspect the books and records of the Hospital Businesses to verify the Closing of Financials. Seller's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital Businesses.

**9.5    Employee Transition.** Purchaser acknowledges that Seller will, on the Closing Date, provide each of the Hospital Businesses' Employees a payroll check (with respect to all wages, salaries and Accrued Paid Time Off) covering all pay periods through the Closing Date, which check will include an amount based upon an estimate of time worked through the Closing Date (the "**Estimated Payment Amount**"), together with a payment of all other amounts required to be paid to a terminated employee or may be required by Law (including but not limited to the Accrued Paid Time Off-Amount). Within five (5) business days after the Closing Date, Seller shall deliver to Purchaser a statement setting forth, in reasonable detail, the Estimated Payment Amount for each of the Hospital Businesses' Employees. No later than the date of the next immediately following payroll for the Hired Employees which occurs after Purchaser's receipt of such statement, Purchaser shall include in the payroll check for each of the Hospital Businesses' Employees who are among the Hired Employees an amount of pay, if any, based on the actual time worked by each such employee during the applicable payroll cycle ending on the Closing Date, less the Estimated Payment Amount which Seller made to each such employee on the Closing Date (the "**Employee Settle-Up Payments**"). Seller shall reimburse Purchaser the amount of the Employee Settle-Up Payments no later than the date which is thirty (30) days after Purchaser provides a written statement to Seller which details (and evidences the payment of) the Employee Settle-Up Payments.

**9.6    Medicare Bad Debts.**

**9.6.1    With respect to any service provided at the Hospital Businesses as to which Purchaser elects to take assignment of Seller's provider number, Seller shall be entitled to receive Medicare bad debt reimbursement associated with services furnished prior to the Effective Time ("**Seller's Bad Debts**"). Seller shall have the right, in its sole discretion, to require that Purchaser submit a claim for reimbursement to the Centers for Medicare & Medicaid Services ("**CMS**") for a Seller's Bad Debt on Purchaser's cost report(s) for the period in which such Seller's Bad Debt becomes uncollected by Seller.

**9.6.2    If Seller requests that Purchaser submit one or more Seller's Bad Debt claims to CMS, as contemplated by this Section 9.6, Seller shall provide to Purchaser a list of the Seller's Bad Debts to be claimed with a certification reasonably acceptable to Purchaser and Seller.

**9.6.3    Purchaser shall remit to Seller the full amount of reimbursement received by Purchaser for Seller's Bad Debts within ten (10) business days of receipt of payment pursuant to an initial or a revised Notice of Program Reimbursement in which Seller's Bad Debts have been paid.

**9.7    Covenant Not to Compete.** For the twenty (20) year period commencing on the Effective Time, Seller hereby covenants and agrees as follows:

**9.7.1** Except as the parties shall otherwise mutually agree, neither Seller nor any Affiliate of Seller (nor any assignee or successor thereto other than Purchaser) shall own, manage or operate, directly or indirectly, any business, or own, directly or indirectly, any interest in any Person (whether or not such Person is a governmental agency or a not-for-profit organization), which engages in the development, ownership, operation or management of any health care provider for which a technical or facility fee is or could be paid (including, without limiting the generality of the foregoing, (i) general or acute care hospitals or specialty hospitals (ii) skilled nursing facilities or (iii) surgical centers and diagnostic imaging centers) in the territories specified in Section 9.7.3 below (all such entities other than the parties hereto are hereinafter collectively referred to as "**Competitors**" and all such health care providers are hereinafter collectively referred to as "**Healthcare Providers**"). Notwithstanding the preceding, however, Seller shall have the right to continue to provide healthcare outreach, education, non-profit clinics or similar community health support activities which do not involve services which are provided by Healthcare Providers.

**9.7.2** Neither Seller nor any Affiliate (nor any assignee or successor thereto) shall directly or indirectly (i) lend credit or money, other assets or the services of its employees or agents or disclose any information concerning the Hospital Businesses and the Assets pertaining to any period of time on or prior to the Closing for the purposes of assisting another to establish, operate or manage any Competitor or Healthcare Provider including, without limitation, providing physician staffing or management or consulting services for any Competitor or Healthcare Provider, except for those existing educational and research affiliations and institutional working arrangements (and the physician cancer services (by types of cancers being treated) associated therewith) set forth on Schedule 9.7.2 or with an Affiliate of Purchaser, or (ii) on behalf of itself or any Competitor or Healthcare Provider request or advise any present or future referring or admitting physician or supplier of the Hospital Businesses to withdraw, curtail or cancel treatment or business with the Hospital Businesses (except for medical reasons).

**9.7.3** The covenants of Seller under this Section 9.7 shall be limited to cover competition within areas within a thirty (30) mile radius of each of the Hospitals. Anything to the contrary in this Section 9.7 notwithstanding, the following shall not constitute a violation of this Section 9.7: The ownership of not more than 1% of the capital stock of any corporation whose common stock is listed on an established domestic securities market.

**9.7.4** Seller acknowledges and agrees that its covenants set forth in this Section 9.7 form part of the consideration under this Agreement and are among the inducements for Purchaser entering into and consummating this Agreement, that the provisions of this Section 9.7 are necessary to protect the interests of Purchaser and the continued goodwill of the business and operations of the Hospital Businesses, an interest in which the Purchaser is hereby acquiring, that the restrictive covenants set forth in this Agreement are reasonable in scope and duration and that the provisions of this Section 9.7 are for the benefit of, and may be enforced by, Purchaser and its Affiliates and their successors and assigns.

**9.7.5** Seller hereby agrees that a material breach of the covenants contained in this Section 9.7 will result in irreparable harm and damages to Purchaser which cannot be adequately compensated for by a monetary award and that in addition to all other remedies available in law or in equity Purchaser and its Affiliates and their successors and assigns shall be entitled to the remedy of a temporary restraining order, preliminary injunction or such other form or injunctive or equitable relief as may be issued by a court of competent jurisdiction to restrain or enjoin Seller and any

Affiliates of Seller from breaching the provisions of this Section 9.7 or otherwise to specifically enforce the provisions of this Section 9.7.

**9.7.6** Seller agrees that if any restriction contained in this Section 9.7 is held by any court of competent jurisdiction to be unenforceable or unreasonable, a lesser restriction as determined by such court to be enforceable shall be severable therefrom and enforced in its place, and the remaining restrictions contained in this Agreement shall be enforceable independently of each other. If a court or other tribunal determines that the character, duration or geographical scope of such provisions is unreasonable, then it is the intention and the agreement of the parties that such provisions will be construed and/or reformed) in such a manner as to impose only those restrictions on the conduct of a Party that are reasonable in light of the circumstances as they then exist and are as necessary to assure the Purchaser of the intended benefit of this Agreement. The court or tribunal will be authorized to reform the provisions of this section to the extent necessary to eliminate or modify any provisions to the extent it determines them to be unreasonable or unenforceable.

**ARTICLE X**
**SURVIVAL AND INDEMNIFICATION**

**10.1 Survival.** Except as expressly set forth in this Agreement to the contrary, all representations, warranties, covenants, agreements and indemnifications of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Purchaser and Seller, respectively, and such representations, warranties and covenants shall continue to be fully effective and enforceable following the Closing Date for one (1) year and shall not be merged into the documents evidencing the transactions contemplated by this Agreement and the Related Agreements. The foregoing notwithstanding, the following sections and articles shall continue to be fully effective and enforceable following the Closing Date without any time limitation unless otherwise expressly provided in this Agreement or provided under applicable statutes of limitation: (a) the representations contained in Section 2.1 (Seller's authority), Section 2.6.2 (Environmental), Section 2.7 (Title to Personal Property), Section 2.15 (Taxes), Section 3.1 (Purchaser's authority), Section 3.6 (As-Is) and Section 3.8 (Chapter 9 Proceeding); (b) the terms of Sections 4.12, 4.15, 5.4, 5.5, 5.7, 5.9, 5.14, 5.16 and Article IX (post-closing matters, subject to own stated terms of survival, if any) and Article XII (miscellaneous) and Section 11.2 (cost report matters); and (c) the indemnifications contained in Sections 1.3.6, 1.9.7, 1.10.2, 4.12.2, 4.12.3, 5.2.3, 5.9, 5.16, 10.2.1(c), (d), (e), and (f), and 10.3.1(c), (d), (e), (f), and (h) and any indemnification claims contained elsewhere in this Agreement. Furthermore, notwithstanding the preceding or any other term in this Agreement to the contrary, the Parties acknowledge and agree that the post-closing commitments set forth in Sections 5.9 and 5.14, and all subsections there of, shall expire based upon the terms stated therein. However, if there is an outstanding notice of a claim at the end of such period in compliance with the terms of Section 10.4, such applicable period shall not end in respect of such claim until such claim is resolved. All statements contained in any certificate or other instrument delivered pursuant hereto by or on behalf of Seller, or by or on behalf of Purchaser, shall be deemed to be representations and warranties made pursuant to this Agreement by the delivering party.

**10.2 Indemnification of Purchaser by Seller.**

**10.2.1 Indemnification.** Seller shall keep and save Purchaser, and its directors, officers, employees, agents, partners, members and other representatives, forever harmless from and

- 72 -

- 73 -

1070039.2

1070039.2

F:\Bank\PHH\FINAL ASA 10.12.09.DOC

F:\Bank\PHH\FINAL ASA 10.12.09.DOC

Purchaser in obtaining payment in respect of that claim and in recovering that sum from the third party.

10.3   **Indemnification of Seller by Purchaser.**

10.3.1   **Indemnification.** Purchaser shall keep and save Seller, and Seller's respective directors, officers, employees, agents and other representatives, forever harmless from and shall indemnify and defend Seller and Seller's Affiliates against any and all Damages, to the extent connected with or arising or resulting from: (a) any breach of any representation or warranty of Purchaser under this Agreement; (b) any breach or default by Purchaser under any covenant or agreement of Purchaser under this Agreement; (c) cost reports (and all claims with respect thereto) relating to Purchaser or to the Hospital Businesses with respect to Medicare, Medicaid, or any other third-party payor for all periods beginning on and after the Effective Time; (d) the Assumed Obligations, including any liabilities related to Assumed Other Liabilities, (e) any professional liability claim arising out of the business operations of the Hospital Businesses on and after the Effective Time; (f) any act, conduct or omission of Purchaser that has accrued, arisen, occurred or come into existence at any time; (g) any other matter in which indemnification by Purchaser is specifically provided in this Agreement or a Related Agreement; (h) any securities or lender litigation involving (1) Purchaser and/or (2) any financing obtained by Purchaser which is utilized to fund, in whole or in part, the Deposit, other than to the extent arising out of any willful misconduct of Seller or its employees, or intentionally false or intentionally misleading statements of Seller or its employees, or (i) any and all reasonable costs, expenses, and other damages incurred in enforcing Seller's right to indemnification under this Agreement or the Related Agreements. No provision in this Agreement shall prevent Purchaser from pursuing any of its legal or equitable rights or remedies that may be granted to Purchaser by law or in equity against any person or legal entity other than Seller or any Affiliate of Seller.

10.3.2   **Limitations of Purchaser's Liability.** Notwithstanding Section 10.3.1 or any other provision under this Agreement, Purchaser's indemnification obligations in accordance with Section 10.3.1 are limited as follows:

(a)   Purchaser shall have no liability under Section 10.3.1 and no claim under Section 10.3.1 shall be made unless notice thereof shall have been given by or on behalf of Seller to Purchaser under Section 10.4, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests.

(b)   Purchaser shall not be required to indemnify Seller from and against any losses under Section 10.3.1 above (except as it relates to Sections 3.6 and 3.11) unless and until the amount of such losses equals (or is reasonably expected to equal or exceed) the Threshold Amount and shall only be obligated to indemnify Seller with respect to amounts which exceed the Threshold Amount.

(c)   Purchaser shall have no liability under Section 10.3.1 and no claim under Section 10.3.1 shall be made (i) to the extent of any tax savings realized by Seller with respect thereto, (ii) for any losses to the extent of any proceeds received by Seller under an insurance policy covering such loss, or (iii) to the extent that Purchaser can prove that Seller had full knowledge, prior to the Closing, of the issues giving rise to an indemnification claim under Section 10.3.1(a).

- 75 -

1070039-2
F:\Bank\PHH\FINAL ASA 10.12.09.DOC

shall indemnify and defend Purchaser against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees (collectively, **"Damages"**), to the extent connected with or arising or resulting from: (a) any material breach of any representation or warranty of Seller under this Agreement; (b) any material breach or default by Seller of any covenant or agreement of Seller under this Agreement; (c) the Excluded Liabilities; (d) the Excluded Assets; (e) all federal, state and local Taxes relating to Seller (**"Seller Tax Claims"**); (f) any professional liability claim arising out of the business operations of the Hospital Businesses prior to the Effective Time, (h) any and all reasonable costs, expenses, and other damages incurred in enforcing Purchaser's right to indemnification under this Agreement, and (g) any other matter in which indemnification by Seller is specifically provided in this Agreement or a Related Agreement. Seller's obligations under this Section 10.2.1 shall remain subject to, and shall be limited by, the provisions contained in Section 10.2.2. No provision in this Agreement shall prevent Seller from pursuing any of its legal or equitable rights or remedies that may be granted to Seller by law or in equity against any person or legal entity other than Purchaser.

10.2.2   **Limitations of Seller's Liability.** Notwithstanding Section 10.2.1 or any other provision under this Agreement, Seller's indemnification obligations in accordance with Section 10.2.1 are limited as follows:

(a)   Seller shall have no liability under Section 10.2.1 and no claim under Section 10.2.1 shall be made unless notice thereof shall have been given by or on behalf of Purchaser to Seller in the manner provided in Section 10.4, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests.

(b)   Seller shall not be required to indemnify Purchaser from and against any losses under Section 10.2.1(a) above unless and until the amount of all such losses equals (or is reasonably expected to equal or exceed) Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate (the **"Threshold Amount"**) and shall only be obligated to indemnify with respect to amounts that exceed the Threshold Amount.

(c)   Seller shall have no liability under Section 10.2.1 and no claim under Section 10.2.1 shall be made (i) to the extent of any tax savings realized by Purchaser with respect thereto, (ii) for any losses to the extent of any proceeds received by Purchaser under an insurance policy covering such loss, or (iii) to the extent that Seller can prove that Purchaser had full knowledge, prior to Closing, of the issues giving rise to an indemnification claim under Section 10.2.1(a).

10.2.3   **Claims Against Third Parties.** If Purchaser is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Seller under this Agreement, Purchaser shall use its Reasonable Commercial Efforts to recover such sum from such third party and any sum so recovered will reduce the amount of the claim. If Seller pays to Purchaser an amount in respect of a claim, and Purchaser subsequently recovers from a third party a sum which is referable to that claim, Purchaser shall forthwith repay to Seller so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by

- 74 -

1070039-2
F:\Bank\PHH\FINAL ASA 10.12.09.DOC

**10.3.3  Claims Against Third Parties.**  If Seller is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Purchaser under this Agreement, Seller shall use its Reasonable Commercial Efforts to recover such sum from such third party and any sum recovered will reduce the amount of the claim. If Purchaser pays to Seller an amount in respect of a claim, and Seller subsequently recovers from a third party a sum which is referable to that claim, Seller shall forthwith repay to Purchaser so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Seller in obtaining payment in respect of that claim and in recovering that sum from the third party.

**10.4  Method of Asserting Claims.**  All claims for indemnification by any person entitled to indemnification (the "Indemnified Party") under this Article X will be asserted and resolved as follows:

**10.4.1  Third Party Claims.**  In the event any claim or demand, for which a party hereto (an "Indemnifying Party") would be liable for the Damages to an Indemnified Party, is asserted against or sought to be collected from such Indemnified Party by a person other than Seller, Purchaser or their affiliates (a "Third Party Claim"), the Indemnified Party shall deliver a notice of its claim (a "Claim Notice") to the Indemnifying Party within thirty (30) calendar days after the Indemnified Party receives written notice of such Third Party Claim; provided, that notice shall be provided to the Indemnifying Party within fifteen (15) calendar days after receipt of a complaint, petition or institution of other formal legal action by the Indemnified Party. The Indemnified Party shall provide the Indemnifying Party with a copy of such claim and other documents received from third parties (or if such claim is not based on a claim from a Third Party, the Claim Notice shall state the basis for which indemnification is sought), and shall upon request otherwise make available to the Indemnifying Party all relevant information material to the defense of such claim and within the Indemnified Party's possession. If the Indemnified Party fails to provide the Claim Notice within such applicable time period after the Indemnified Party receives written notice of such Third Party Claim and thereby materially impairs the Indemnifying Party's ability to protect its interests, the Indemnifying Party will not be obligated to indemnify the Indemnified Party within thirty (30) calendar days after receipt of the Claim Notice (the "Notice Period") whether the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

(a)  **Indemnifying Party Control.**  If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Section 10.4.1(a), then the Indemnifying Party will have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party. The Indemnifying Party will have full control of such defense and proceedings, including any compromise or settlement thereof; Notwithstanding the foregoing, the Indemnified Party may at its sole cost and expense, file during the Notice Period any motion, answer or other pleadings that the Indemnified Party may deem necessary or appropriate to protect its interests or those of the Indemnifying Party and which is not prejudicial, in its reasonable judgment of the Indemnifying Party, to the Indemnifying Party. Except as provided in Section 10.4.1(b) of this Agreement, if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is

adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations under this Agreement with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action. If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnified Party or any of its affiliates). The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 10.4.1(a), and, except as specifically provided in this Section 10.4.1(a), the Indemnified Party will bear its own costs and expenses with respect to such participation.

(b)  **Indemnified Party Control.**  If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section 10.4.1, or if the Indemnifying Party gives such notice but fails to prosecute diligently or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be promptly and reasonably prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party. The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that if requested by the Indemnified Party, the Indemnifying Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnifying Party or any of its affiliates). Notwithstanding the foregoing provisions of this Section 10.4.1(b), if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this Section 10.4.1(b) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation. Subject to the above terms of this Section 10.4.1(b), the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 10.4.1(b), and the Indemnifying Party will bear its own costs and expenses with respect to such participation. The Indemnified Party shall give sufficient prior notice to the Indemnifying Party of the initiation of any discussions relating to the settlement of a Third Party Claim to allow the Indemnifying Party to participate therein.

(c)  **Settlements.**  Where the Indemnifying Party has assumed control of the defense as provided above, the Indemnifying Party shall have the right to settle or compromise any such claim in its sole and absolute discretion and without consultation with the Indemnified Party so long as such settlement or compromise does not impose any obligations on the Indemnified Party (except with respect to providing releases of the third party and receiving a release from the third party). The Indemnified Party shall not settle or compromise the claim without satisfying one of the following conditions (otherwise the Indemnifying Party shall be released from all

indemnification obligations under this Agreement to the Indemnified Party with respect to such claim): (a) the Indemnified Party shall first obtain the written consent of the Indemnifying Party, or (b) the Indemnifying Party shall have failed, after written notice to it of such suit, to take action to defend the same within the 15-day period described above.

10.4.2 Non-Third Party Claims. In the event any Indemnified Party should have a claim against any Indemnifying Party under this Agreement that either (i) does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party or (ii) is a Seller Tax Claim, the Indemnified Party shall deliver an Indemnity Notice (as hereinafter defined) to the Indemnifying Party. (The term "Indemnity Notice" shall mean written notification of a claim for indemnity under Article X of this Agreement (which claim does not involve a Third Party Claim or is a Seller Tax Claim) by an Indemnified Party to an Indemnifying Party pursuant to this Section 10.4, specifying the nature of and specific basis for such claim and the amount or the estimated amount of such claim.) The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights under this Agreement except to the extent that an Indemnifying Party demonstrates that it has been prejudiced thereby.

10.4.3 Deemed Liability. If the Indemnifying Party does not notify the Indemnified Party within sixty (60) calendar days following its receipt of a Claim Notice or an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party under this Agreement, such claim specified by the Indemnified Party will be conclusively deemed a liability of the Indemnifying Party under this Agreement and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or on such later date (i) in the case of a Third Party Claim, as the Indemnified Party suffers the Damages in respect of such Third Party Claim, (ii) in the case of an Indemnity Notice in which the amount of the claim is estimated, when the amount of such claim becomes finally determined or (iii) in the case of a Seller Tax Claim, within fifteen (15) calendar days following final determination of the item giving rise to the claim for indemnity. If the Indemnifying Party has timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party agree to proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations, such dispute will be resolved by adjudication by a court or similar tribunal.

10.4.4 Access. The Indemnified Party agrees to give the Indemnifying Party reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought under this Agreement, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations under this Agreement.

10.4.5 Assistance. The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any person or entity in connection with the subject matter of any litigation subject to indemnification under this Agreement. In addition, the Indemnified Party shall, upon request by the Indemnifying Party or counsel selected by the Indemnifying Party (without payment of any fees or expenses to the Indemnified Party or an employee thereof), attend hearings and trials, assist in the securing and giving of evidence, assist in obtaining the presence or cooperation of witnesses, and make available to its own personnel; and shall do whatever else is reasonably necessary and appropriate in connection with such litigation. The Indemnified Party shall not make any demand upon the Indemnifying Party or counsel for the

- 78 -

indemnification obligations under this Agreement in connection with any litigation subject to indemnification under this Agreement, except a general demand for indemnification as provided under this Agreement. If the Indemnified Party shall fail to perform such obligations as Indemnified Party under this Agreement or to cooperate with the Indemnifying Party in Indemnifying Party's defense of any suit or proceeding, such cooperation to include, without limitation, attendance at all depositions and the provision of all documents relevant to the defense of any claim, then, except where such failure does not have a Material Adverse Effect on the Indemnifying Party's defense of such claims, the Indemnifying Party shall be released from all of its obligations under this Agreement with respect to that suit or proceeding and any other claims which had been raised in such suit or proceeding.

10.5 Exclusive. Other than claims for fraud or equitable relief (which equitable relief claims are nevertheless subject to Section 10.1), any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any party as a result of the actions or failure to act by any other party shall, unless otherwise specifically stated in this Agreement, be governed solely and exclusively by the provisions of this Article X. If Seller and Purchaser cannot resolve such claim by mutual written agreement, such claim shall be determined in accordance with Section 12.18.

ARTICLE XI
TAX AND COST REPORT MATTERS

11.1 Tax Matters; Allocation of PEPC.

11.1.1 Tax Matters. After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax allocation and reporting. The Parties shall also make available to each other as reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters.

11.1.2 Allocation of PEPC. Purchaser will prepare the schedule allocating the PEPC among each category of Assets. To the extent that such allocation by Purchaser in consistent with applicable Laws, the Parties agree to be bound by all such reasonable allocations by Purchaser to account for and report the purchase and sale of the Assets contemplated hereby for federal and state tax purposes in accordance with such allocations, and not to take a position in tax returns, tax audits, or other tax proceedings), which is inconsistent with such allocations without the prior written consent of the other parties.

11.2 Cost Report Matters.

11.2.1 Final Cost Reports. Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, Blue Cross and other third party payors which settle on a cost report basis (the "Seller Cost Reports"). It is understood that, while pursuant to applicable Laws, Seller shall remain responsible for all such payments and may not assign to Purchaser any such receivable Purchaser is acquiring, all of Seller's other Accounts Receivable and assuming, as Assumed Obligations, all of Seller's obligations, and that Purchaser shall reimburse Seller all amounts which may be due and shall be entitled to the benefit of all amounts received by Seller, and shall

- 79 -

1070039.2                                                                F:\Book\PHI\FINAL-ASA 10.12.09.DOC

immediately remit to Purchaser any amounts received, and shall pursuant to Section 4.12.2 of this Agreement. Accordingly, Purchaser shall make available to Seller such or the Hired Employees as may be necessary in order to provide accounting and other services necessary to complete such Seller Cost Reports, at no cost to Seller. Purchaser shall also engage such outside consultants as may be necessary in order to properly deal with reviews and audits by such payors with respect to such Seller Cost Reports, consistent with prior practice of Seller, at no cost to Seller. Purchaser shall forward to Seller any and all correspondence relating to the Accounts Receivable, the Seller Cost Reports or rights to settlements and retroactive adjustments on the Seller Cost Reports ("**Agency Settlements**") within five (5) business days of receipt by Purchaser. Purchaser shall not reply to any such correspondence without Seller's written approval, which shall not be unreasonably withheld. Seller shall remit to Purchaser all amounts received with respect to periods prior to the Closing Date, and Purchaser shall remit to Seller all amounts required to be paid with respect to periods prior to the Closing Date, as provided in Section 4.12.2 of this Agreement.

11.2.2 **Right to Funds.** Seller shall retain all rights to the Seller Cost Reports and to the Accounts Receivable including, without limitation, any payables resulting therefrom or receivables relating thereto and the right to appeal any Medicare determinations relating to the Agency Settlements and the Seller Cost Reports. Seller will furnish copies of the Receivables Records to Purchaser upon request and allow Purchaser and its representatives reasonable access to such documents.

11.2.3 **Cooperation.** Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in regard to the preparation, filing, handling, and appeals of the Seller Cost Reports. Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relating to governmental program reimbursement. Such cooperation shall include, at no cost to Seller, obtaining files at the Hospital Businesses and Purchaser's provision to Seller of data and statistics, including, without limitation, the items set forth on Schedule 11.2.3, and the coordination with Seller pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings.

11.3 **Tax and Medicare Effect.** Except as otherwise provided in this Agreement, neither party (nor such party's counsel or accountant) has made or is making any representation to the other party (nor such party's counsel or accountant) concerning any of the Tax or Medicare effects arising by reason of the transactions provided for in this Agreement or any Related Agreement, as each party has obtained independent professional advice with respect thereto and upon which it has solely relied. Except as otherwise provided in this Agreement, no party shall be liable or in any way responsible to any other party because of any Tax or Medicare effect resulting from the transactions provided for in this Agreement or any Related Agreement, and each party shall be responsible for the payment of any Tax or Medicare related charge or payment for which it becomes liable by reason of the consummation of the transactions provided for in this Agreement and any Related Agreement.

11.4 **[Intentionally omitted]**

11.5 **Misdirected Payments, etc.** Within thirty (30) days of receipt, Seller shall remit to Purchaser any monies received by the Seller constituting or in respect of the Assets and Assumed Obligations. Within thirty (30) days of receipt, Purchaser shall remit to Seller any monies received by Purchaser constituting or in respect of the Excluded Assets and Excluded Liabilities, provided,

- 80 -

however, (i) Purchaser shall only be obligated to remit such monies twice per calendar month during the first ninety days after the Closing Date and only once per calendar month thereafter, and (ii) for any time period while the Lease and Management Agreement is in effect, the obligation to remit such monies received by Purchaser shall be governed by the terms and provisions of the Lease and Management Agreement. If Purchaser suffers any deduction to or offset against amounts due Purchaser of funds previously paid or credited to Seller or the Hospital Businesses in respect of Excluded Liabilities, Seller shall immediately pay to Purchaser the amounts so billed or offset upon demand from Purchaser.

ARTICLE XII
MISCELLANEOUS PROVISIONS

12.1 **Further Assurances and Cooperation.** Each Party shall execute, acknowledge and deliver to the other any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by the other and shall take any and all other actions reasonably requested by the other for the purpose of consummating the Transaction or more effectively assigning, transferring, granting, conveying and confirming the transfer of Assets to the Purchaser of effecting or preserving any right of a Party. After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2 **Successors and Assigns.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by and against the respective successors and assigns of the Parties. Neither Party, however, may assign, in whole or in part, any of its rights or delegate any of its duties under this Agreement or a Related Agreement without the prior written consent of the other Party. Seller acknowledges that Purchaser may finance the purchase of the Assets through a purchasing group which will include one or more real estate companies and operating companies for each of the Hospitals, which companies (collectively, the "**Purchasing Group Companies**") are expected to include other investors, including real estate investment trusts, other real estate investors and a cross section of participating local physicians. Accordingly, Seller agrees that Purchaser may assign some or all of its rights, duties and obligations under this Agreement and the Related Agreements to one or more Purchasing Group Companies, provided that, prior to any such assignment occurring or taking effect, (i) Purchaser shall provide written notice to Seller detailing the terms and conditions relating to such assignment, including the local physicians participating in the Purchasing Group Companies, (ii) the applicable Purchasing Group Companies sign and deliver to Seller an agreement pursuant to which the Purchaser and the Purchasing Group Companies all agree to be jointly and severally responsible for each and every obligation, duty and right of Purchaser under this Agreement and the Related Agreements, which agreement shall be (i) in form and substance reasonably acceptable to Seller, and (iii) executed by Purchaser and the applicable Purchasing Group Companies.

12.3 **Governing Law; Venue.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as applied to contracts made and performed within the State of California. The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of California and applicable federal Laws described under Laws as applicable in the Chapter 9

- 81 -

Proceeding shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement. Subject to Section 12.18.2, venue shall be in the County of Riverside, State of California.

12.4 **Amendments.** This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5 **Exhibits, Schedules and Disclosure Schedule.** The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference in this Agreement. From the Effective Date until the Closing, the Parties agree that Seller may update the Disclosure Schedule subject to Article VIII. Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply.

12.6 **Notices.** Any notice, demand or communication required, permitted, or desired to be given under this Agreement shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

If to Purchaser:

> Physicians for Healthy Hospitals, Inc.
> 1525 West Florida, Suite A
> Hemet, California 92543
> Attention: Sreenivasa Nakka, M.D., President

With a simultaneous copies to:

> Steven Wade
> 400 N. Mountain Ave., Suite 214B
> Upland, California 91786
> Telephone: (909) 985-6500
> Facsimile: (909) 985-2865
>
> and
>
> Todd Swanson
> Hooper, Lundy & Bookman, Inc.
> 1875 Century Park East, Suite 1600
> Los Angeles, California 90067
> Telephone: (310) 551-8195
> Facsimile: (310) 551-8181

If to Seller:

> Chairman of the Board
> Valley Health System
> 1117 East Devonshire Avenue
> Hemet, CA 92543
> Telephone: (951) 765-4844
> Facsimile: (951) 765-4745

With a simultaneous copy to

> John B. Marshall, Esq.
> Lewitt, Hackman, Shapiro, Marshall & Harlan
> 16633 Ventura Blvd., Suite 1100
> Encino, CA 91436
> Telephone: (818) 907-3228
> Facsimile: (818) 981-4764

or at such other address as one party may designate by notice under this Agreement to the other parties.

12.7 **Headings.** The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

12.8 **Confidentiality and Publicity.** Any information that a Party or its Affiliates, agents or representatives furnish to another Party in connection with the transactions contemplated pursuant to this Agreement, whether furnished before or after the Effective Date, and all notes, analyses, compilations, studies and other documents, whether prepared by the receiving Party or others, which incorporate, summarize, contain or otherwise reflect or refer to such information shall be referred to collectively as "Confidential Material". The term "Confidential Material" does not include information which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its affiliates or representatives, (ii) was rightfully available to the receiving Party on a non-confidential basis prior to its disclosure to the receiving Party by the disclosing Party, (iii) becomes rightfully available to the receiving Party on a non-confidential basis from a source other than the disclosing Party, provided that such source is not bound by a confidentiality agreement with any of said Parties or otherwise prohibited from transmitting the information to the receiving Party by a contractual, legal or fiduciary obligation, or (iv) any information which Seller's counsel deems to be covered by the California Public Records Law (Government Code Section 64000 et seq) or the Ralph M. Brown Act (Government Code Section 56000 et seq.).

12.8.1 Each receiving Party shall treat the Evaluation Material it receives under this Agreement confidentially in accordance with the terms of this Agreement, subject to Seller's obligations under the California open records laws (Govt. Code §§6250 et seq) and open meetings laws (Govt. Code §§54950 et seq). Each receiving Party shall not, and shall direct its directors, officers, agents and employees who become privy to Evaluation Material not to, disclose any of the Evaluation Material relating to the disclosing Party to any person who is not a direct participant in the evaluation or consummation of the transactions contemplated hereby. The term "person" as used in this Section 12.8 shall be broadly interpreted to include, without limitation, any corporation, company, partnership, trust or individual. Each receiving Party shall not, and shall direct its Affiliates, directors, officers, employees and representatives who become privy to Evaluation Material not to, use any of the Evaluation Material relating to the disclosing Party for any reason or purpose other than to evaluate or consummate the transactions pursuant to this Agreement.

12.8.2 In the event a termination of this Agreement, at the request of a disclosing Party at any time, a receiving Party shall as requested either destroy or return to the disclosing party all Evaluation Material, except that each Party may retain a single copy of the Evaluation Material in

12.11 **Third Party Beneficiary.** None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

12.12 **Expenses and Attorneys' Fees.** Each party shall bear and pay its own costs and expenses relating to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement. In determining the costs and expenses of each party under this Agreement, the following rules shall apply: (a) all costs of the Preliminary Title Reports, and a Title Policy shall be paid by Seller up to an amount equal to the amount Seller would have incurred if the Title Policy were a standard coverage owner's policy of title insurance (that deleted survey exceptions) at an insurable value not to exceed the fair market value of the Real Property as set forth in the appraisal obtained by Seller as described in Section 1.4.17 and the remaining costs of the Title Policy, if any, shall be borne by Purchaser; (b) all costs of the Title Surveys shall be borne by Purchaser; (c) all costs of the Environmental Surveys (including Phase I and Phase II Assessments, if Purchaser so elects) shall be borne by Purchaser, (d) all documentary transfer taxes, recording fees, and other transfer taxes shall be paid by Purchaser, (e) all filing fees payable in connection with submissions to governmental agencies relating to the approval of the transactions contemplated hereby shall be paid by Purchaser, (f) all escrow charges and related fees shall be borne by Purchaser, (g) all sales and use taxes shall be borne by Purchaser, and (h) all other costs, charges and expenses shall, except as otherwise provided in this Agreement, be allocated between Purchaser and Seller in accordance with the customs of Riverside County, which is the County in which the Real Property is located.

12.13 **No Offset.** Neither Purchaser nor Seller (and their respective successors, assigns and affiliates) shall have the right to offset amounts payable under this Agreement against, nor shall Purchaser or Seller have the right to contest an obligation to transfer, satisfy, release, pay-off, assign and convey to Seller or Purchaser or Purchaser's behalf because of, outstanding claims, liabilities or obligations asserted by Purchaser or Seller including but not limited to pursuant to the indemnification provisions of Section 10.2.

12.14 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes of this Agreement and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought under this Agreement.

12.15 **Entire Agreement.** This Agreement, the Related Agreements, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated herein and supersede all prior or contemporaneous agreements, letters of intent, understandings, representations and statements, oral or written, between the parties on the subject matter of this Agreement (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

12.16 **No Waiver.** Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition. The subsequent acceptance of performance under this Agreement by a party shall not be deemed to be a waiver of any preceding material breach

- 85 -

---

a confidential business archive in accord with prudent recordkeeping practice and for use in resolving potential disputes under this Agreement. Notwithstanding the foregoing, in the event that this Agreement is terminated and the Alternative Transaction shall be effected, then the Purchaser shall return all managed care and insurance contracts provided to it by Seller and all pricing material related to the sale of goods or services of Hemet Valley Medical Center to Seller, and such other materials delivered by Seller to Purchaser or compilation or summaries of same prepared by Purchaser that are related to competitive matters as Seller may reasonably designate shall be further delivered or destroyed as Seller may request prior to the consummation of the Alternative Transaction.

12.8.3 In the event that a receiving Party or any of its Affiliates are requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process or by applicable laws and regulations or stock exchange rules or by a governmental authority) to disclose any information supplied to it in the course of its dealings with the disclosing Party or any of such disclosing Party's agents or representatives, such receiving Party shall provide the disclosing Party with prompt notice of such request(s) or requirement(s) so that the disclosing Party may seek an appropriate protective order and assert any legal privilege against disclosure and/or waive such receiving Party's compliance with the provisions of this Agreement. If in the absence of a protective order or of the receipt of a waiver under this Agreement, such receiving Party is nonetheless, in the reasonable opinion of its counsel, compelled to disclose information concerning the disclosing Party or else stand liable for contempt or suffer other censure or penalty, after so advising the disclosing party, the receiving Party may disclose such information without liability under this Agreement.

12.8.4 Notwithstanding the preceding, Purchaser may continue to communicate with its existing investors and existing and prospective funding sources, including without limitation real estate investment trusts or other real property investors/lenders, provided that they shall accept the confidentiality provisions of this Section 12 in writing.

12.8.5 Because this Agreement will be subject to the California Public Records Act (California Government Code Section 6250, et seq) and because some of the information to be contained in the Schedules to this Agreement may contain confidential information exempt from disclosure pursuant to the California Public Records Act (e.g. certain personnel information, patient medical records, medical peer review committee records, medical quality improvement records, confidential attorney-client communications, and other matters exempted from disclosure under the California Public Records Act), certain Schedules may not be attached to this Agreement but shall instead be provided separately, and shall be subject to and exempt from disclosure under the California Public Records Act and the California Evidence Code, to the extent provided thereunder.

12.9 **Fair Meaning.** This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10 **Gender and Number; Construction.** All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable. Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

- 84 -

174

or default by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding material breach at the time of acceptance of such performance. The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

**12.17   Severability.** If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**12.18   Dispute Resolution.** Subject to the exclusions set forth in Section 12.18.5 below, in the event any disagreement, dispute or claim arises between or among the parties hereto (collectively, a "**Dispute**") with respect to the enforcement or interpretation of any term or provision of this Agreement or any Related Agreement or with respect to whether an alleged material breach or default under this Agreement or Related Agreement has or has not occurred, or with respect to any other matter related to or arising out of this Agreement or any Related Agreement, or the relationship or transactions contemplated hereby or thereby, such Dispute shall be resolved in accordance with the following procedures:

**12.18.1   Meet-and-Confer.** In the event of a Dispute between the parties hereto, either party may give written notice to the other party setting forth the nature of such Dispute ("**Dispute Notice**"). The parties shall meet and confer to discuss the Dispute in good faith within 30 days of the other party's receipt of the Dispute Notice in an attempt to resolve the Dispute. All representatives shall meet at such dates and times as are mutually convenient to the representatives of each party within such 30-day period.

**12.18.2   Arbitration of Disputes.** Except as set forth below, any Dispute which cannot be resolved by the parties hereto within 30 days after either party's receipt of a Dispute Notice may be submitted at the option of either party to binding arbitration, which arbitration shall be conducted in accordance with the following provisions:

(a)   **Venue.** The arbitration shall be conducted in Riverside County, State of California, unless the parties mutually determine that another venue would be more convenient for the parties.

(b)   **Law.** The governing law shall be the substantive law of the State of California as provided in Section 12.3.

(c)   **Selection.** A single disinterested third party arbitrator shall be selected by mutual written agreement of the parties, or if they are unable to mutually select an arbitrator within fifteen (15) days after either party notifies the other of its desire to arbitrate the Dispute, then by JAMS/Endispute (JAMS) in accordance with its then-current Rules of Practice and Procedure.

(d)   **Administration.** The arbitration shall be administered by JAMS.

- 86 -

(e)   **Rules.** The rules of arbitration shall be the Rules of Practice and Procedure of JAMS as may be modified by the parties to the arbitration by mutual written agreement at the time of the arbitration, except that the provisions of California Code of Civil Procedure § 1283.05 are incorporated into and made applicable to this agreement to arbitrate, unless the parties agree otherwise at such time. For good cause shown and on order of the arbitrator, depositions may be taken and discovery may be obtained in accordance with California Code of Civil Procedure § 1283.05.

(f)   **Award.** The decision of the arbitrator shall be final and binding as to any matters submitted hereunder; provided, however, the arbitrator shall not have the power to commit errors of law or legal reasoning, and the arbitration award shall be vacated or corrected by a court of competent jurisdiction for any such error. Judgment upon the award may be entered in any court of competent jurisdiction in the United States. The award shall include written findings of fact, a summary of the evidence and reasons underlying the decision and conclusions of law. The arbitrator shall have the power to award equitable relief, including specific performance of the terms and conditions of this Agreement and/or injunctive relief, consistent with the terms and limits set forth in this Agreement.

(g)   **Fees and Costs.** As part of the award, the arbitrator may award reasonable and necessary costs actually incurred by the prevailing party, as determined by the arbitrator in his or her award, including that party's share of the arbitrators' fees, costs and expenses, as well as any administration fees. The arbitrator may also include reasonable attorneys' fees in an award of costs to the prevailing party and such fees and costs shall be recoverable by the prevailing party in any appeal.

**NOTICE:** By initiating the space below the parties hereto are agreeing to have any Dispute arising out of the matters included in this "arbitration of disputes" provision decided by neutral arbitration as provided by California law (provided that such Dispute has not been resolved through the meet-and-confer discussions and mediation procedures described above) and the parties are giving up any rights they might possess to have the Dispute litigated in a court or jury trial. By initiating the space below the parties hereby agree to give up their judicial rights to discovery and appeal, unless these rights are specifically included in this "arbitration of disputes" provision. If either party refuses to submit to arbitration after agreeing to this provision, such party may be compelled to arbitrate under the authority of the California Code of Civil Procedure.

**12.18.3   Injunctive Relief.** Nothing in this Agreement shall be interpreted to limit either party's right to pursue preliminary or provisional equitable relief pending the arbitration award, including, without limitation, specific performance or a temporary restraining order or preliminary injunctive relief, from a court of competent jurisdiction at any time. By way of example, the foregoing provisions of this Section shall not be interpreted to require either party to

| Purchaser _____ | Seller _____ |
|---|---|

- 87 -

**[Signature Page to Asset Sale Agreement]**

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

PURCHASER:

**Physicians for Healthy Hospitals, Inc.**

By: _____

Name: _____

Its: _____

SELLER:

**Valley Health System**

By: _____

Name: _____

Its: _____

- 89 -

1070039.2

F:\Boot\PHH\FINAL ASA 10.12.09.DOC

---

submit to meet-and-confer or arbitration prior to exercising such party's right to pursue preliminary equitable relief to protect trade secrets or prevent irreparable harm.

**12.18.4 Selection of Alternative Arbitrator.** In the event that JAMS is not in existence at the time of commencement of the arbitration proceeding, as applicable, then the Commercial Panel of the American Arbitration Association ("AAA") shall administer such proceeding. In such case, all references to JAMS in this Agreement shall instead refer to the AAA, and all references to the Rules of Practice and Procedure of JAMS in this Agreement shall instead refer to a reference to the then-current commercial arbitration rules of the AAA.

**12.18.5 Post-Closing Disputes.** If the Closing occurs and a Dispute arises with respect to the enforcement or interpretation of any term or provision of this Agreement or of any Related Agreement, with respect to whether an alleged material breach of this Agreement or such Related Agreement has or has not occurred, or with respect to the manner or time by which such breach shall be cured, then in addition to the foregoing provisions of this Section 12.18 the following provisions shall apply to the resolution of such Dispute:

**(a)** If either party (the "**Complaining Party**") believes the other party (hereinafter referred to as the potentially non-performing party or "**NPP**") is in default in the performance of any duty or obligation to be performed by the NPP hereunder, then the Complaining Party shall give the NPP a Dispute Notice which shall state the grounds for the Complaining Party's belief that a default has occurred and which shall describe with sufficient specificity the nature of the alleged default.

**(b)** The Complaining Party shall not commence an arbitration action pursuant to Section 12.18.2 or any judicial action pursuant to Section 12.18.3 if the NPP commences to cure the events which constitute the grounds for the Complaining Party's assertion of a default by the NPP. The NPP shall have sixty (60) days to cure the material breach specified in the Default Notice; however, if such breach cannot reasonably be cured within such 60-day period, then the NPP shall promptly commence to cure such default and diligently pursue such cure to completion. Moreover, if the grounds constituting the events of a material breach are incapable of cure, no action pursuant to Section 12.18.2 or 12.18.3 shall be commenced if the NPP takes such corrective actions as are reasonably necessary to prevent the occurrence of such grounds of material breach in the future.

**(c)** If the NPP disagrees with the Dispute Notice delivered under this subsection (f) or if the Complaining Party asserts a Dispute with respect to the manner or time by which the NPP is attempting to cure the material breach set forth in such Dispute Notice, then the same shall be resolved pursuant to Sections 12.18.1, 12.18.2 and 12.18.3 except that if the arbitration award concludes that a material breach by the NPP occurred (or that such breach was not properly or timely cured), then the award shall also include a description of corrective actions that shall be undertaken to cure or prevent the occurrence in the future of the basis for the Dispute and a recommended reasonable time to complete such cure or corrective action.

**(d)** Notwithstanding the foregoing to the contrary, the NPP shall bear no responsibility for, and have no duty to cure, a material breach set forth in the Dispute Notice delivered under this subsection (f) to the extent such breach results from the acts or omissions of the Complaining Party or any of its Affiliates and their respective officers, directors, trustees, employees, agents or representatives.

- 88 -

1070039.2

F:\Boot\PHH\FINAL ASA 10.12.09.DOC

## SCHEDULE 1.3.2
### TERM SHEET FOR ALTERNATIVE TRANSACTION

The terms and conditions of the asset sale agreement for the Alternative Transaction ("Definitive Alternative Agreement") shall be similar to the asset sale agreement to which this is attached ("Agreement") except as it needs to be modified to be consistent with the Alternative Purchase Consideration and other terms of the Alternative Transaction as summarized below.

1. Alternative Purchase Consideration. The purchase consideration in connection with the Alternative Transaction shall be Twenty-Nine Million Dollars ($29,000,000) in immediately available funds (the "Alternative Purchase Consideration"), subject to adjustment as provided below.

2. Purchased Alternative Assets. The purchased Alternative Assets shall include substantially all of the assets used only in connection with the operation of Menifee Valley Medical Center ("MVMC"), consisting of the following:

(a) All of the real estate, and improvements thereto, owned or leased by Seller and used in connection with the operation of MVMC, including without limitation, fee title to the real property commonly known as 28400 McCall Boulevard, Sun City, CA 92586 and all vacant land owned by Seller adjacent to the Hospital but excluding the Orchard Property located immediately to the east of MVMC, under Schedule 1.6.1-A, all as defined on Addendum 2(a) ("Menifee Land"), including:

(i) All rights, privileges and easements appurtenant to and for the benefit of the Menifee Land, including, without limitation, all minerals, oil, gas and other hydrocarbon substances on and/or under the Menifee Land, as well as all development rights, air rights, water, water rights and water stock relating to the Menifee Land and any other easements, rights of way or appurtenances relating to or used in connection with the ownership, operation, use, occupancy or enjoyment of the Menifee Land, subject to covenants, easements and other restrictions of record;

(ii) All improvements, structures, buildings and fixtures located on the Menifee Land, including, without limitation, all fixtures located on and/or used in connection with the ownership, operation, use, occupancy or enjoyment of the improvements (such as heating and air conditioning, systems, and facilities used to provide any utility services, parking services, refrigeration, ventilation, garbage disposal, recreation or other services thereto); and any and all computers and/or computer systems used for or in connection with any building operating systems, elevator systems, irrigation systems, climate control systems and security systems; and

(b) All other tangible assets and equipment, including without limitation all assets of the type included within the definition of Assets in the Agreement, actually located and used at, or which are used primarily in connection with the operations of, MVMC, as provided in these Disclosure Schedules.

The Parties shall develop Schedules, Exhibits and other materials with respect to the Alternative Transaction within forty-five (45) days in the same manner as provided in Section 1.14 of the Agreement. Seller may supplement, modify or correct any such certificate, document or other instrument, by reason of the discovery or change outside the control of Seller occurring between the

Effective Date and the Closing Date in the same manner as provided in Section 2.23 of the Agreement.

The Parties understand that Seller may be subject to certain agreements covering multiple facilities, including MVCH, such as managed care and other provider agreements, and that Purchaser may enter into managed care and other provider agreements. In order to satisfy the obligations of Seller and Purchaser under any such agreements and so as to avoid or limit any claims which might arise from the termination or modification of pre-existing agreements to the extent and only for so long as is necessary to satisfy such obligations and avoid such claims, the Parties agree to cooperate and to negotiate provider agreements between themselves to provide services to patients who are subject to such agreements with the other Party, at commercially reasonable rates, which shall be reciprocal and on terms consistent with applicable Laws.

The purchased assets shall include only those assets described above, and such assets shall be purchased "AS IS-WHERE IS WITH ALL FAULTS" as detailed in the Agreement but shall be subject to the same representations and warranties and limitations thereon to the extent applicable to the Alternative Transaction, and to other express requirements which are contained in the Agreement, including receipt of good and marketable title to the Alternative Assets, except for exceptions as provided for in the Agreement.

3. Alternative Excluded Assets. The following assets of Seller shall be excluded from the purchased Alternative Assets; provided, however, the Parties agree that the following list is not meant to be an exhaustive list ("Alternative Excluded Assets") (but may be augmented by mutually acceptable additional Alternative Excluded Assets of the type customarily excluded in transactions of the type contemplated by this term sheet):

(a) All of Seller's cash, cash equivalents, cash in bank accounts, certificates of deposit, treasury bills, notes, and marketable securities;

(b) All of Seller's accounts receivable, including all claims, contract rights, or any other right of Seller to payment from all sources whatsoever, including governmental reimbursement programs;

(c) All of Seller's claims, choses in action, rights of recovery, rights of offset, recoupment, rights to refunds and similar rights pertaining to the Alternative Assets;

(d) Any records of Seller which by law Seller is required to retain in its possession, other than medical records at MVMC, which Purchaser shall maintain thereat, and as to which Seller shall have reasonable rights of access for appropriate purposes;

(e) All of Seller's assets located at Seller's home office and at Seller's other hospital facilities and which are used by Seller for the majority of their use in connection with any businesses, operations and activities other than MVMC;

(f) All of Seller's credits, prepaid expenses, deferred charges, sums or fees, advance payments, security deposits, prepaid items, and all prepaid insurance premiums;

(g) Seller's pension or other funded Employee Benefit Plan assets; and

(b) Certain intangible property utilized in connection with the operation of MVMC, including non-severable Seller information technology (including use of computer programs and of the Seller telephone system); provided, however, Seller agrees to permit Purchaser to utilize such assets, some of which may be subject to a licensing agreement between the Parties, for which Purchaser shall pay Seller a fee at the fair market value for the use of such intangible property and for such services.

4.    Alternative Assumed Liabilities.  Purchaser shall assume post-closing liabilities associated with MVMC except with respect to the Existing Bonds and the excluded liabilities addressed below (the "Alternative Assumed Liabilities") in addition to payment of Alternative Purchase Consideration.  The Alternative Assumed Liabilities shall relate only to the categories of Assumed Obligations set forth in Section 1.8 of the Agreement to the extent applicable to the Alternative Assets, and the operations, contracts and employees applicable to MVMC.

5.    Excluded Liabilities.  The Alternative Assumed Liabilities shall exclude all of the types of Excluded Liabilities described in the Agreement, as applicable to the Alternative Transaction and Alternative Assets.  In addition, the Alternative Assumed Liabilities shall exclude:

(a) All liabilities associated with any assets of the Seller other than the Alternative Assets transferred to Purchaser; and

(b) All Current Liabilities of Seller, and all other liabilities of Seller, arising out of or relating to any act, omission, event or occurrence, connected with the Hospital Businesses prior to the Effective Time, including without limitation all liabilities in connection with claims of professional malpractice or other tortious conduct, overpayments by governmental or other payors, and all liabilities and responsibilities under Benefit Plans, or otherwise related to any of Seller's employees, to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time.

6.    Covenants of Seller.

(a) The covenants of Seller at Article IV of the Agreement shall apply in the Definitive Alternative Agreement, to the extent applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC.

(b) Purchaser shall have the right, in its sole discretion, to enter into a commercially reasonable, long-term (35 year) ground lease of the Orchard Property, to the fullest extent legally permissible, for which Purchaser shall pay to Seller fair market rental value as determined by independent appraisal.  Such ground lease shall contain commercially reasonable and customary terms and conditions.  In any case, however, Purchaser will be granted, at Closing a commercially reasonable right of first refusal to purchase the Orchard Property to the extent permitted by law.

7.    Covenants of Purchaser.

(a) The covenants of Purchaser at Article V of the Agreement shall apply in the Definitive Alternative Agreement to the extent reasonably applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC.

(b) Purchaser shall, as a condition to taking assignment of any contracts which it has elected to assume, pay any payments required to be paid under Section 365 of the Bankruptcy Code in order for Purchaser to assume such contracts, which amount shall be credited to the Alternative Purchase Consideration; provided, however, that such adjustment to the Alternative Purchase Consideration shall not, in any case, exceed One Million Dollars ($1,000,000).  In the event that such amount exceeds One Million Dollars ($1,000,000), Purchaser may either (i) pay such additional amount, which shall not be credited to the Alternative Purchase Consideration, or (ii) terminate the Alternative Transaction and receive a refund of Purchaser's Deposit.

(c) In the event that Purchaser determines not to assume any Contracts entered into post-petition relating to MVMC, and such determination results in an administrative claim by the contracting party for breach of such agreement, Purchaser shall defend, indemnify and hold Seller harmless of and from such damage claim based upon such breach (excluding amounts accrued and due to such creditor for good or services rendered prior to the Closing Date other than as a result of such breach claims).

(d) The employee related covenants of Purchaser set forth at Section 5.4 of the Agreement shall relate only to the Hospital Businesses' Employees engaged with respect to MVMC businesses ("Seller's MVMC Employees").  Purchaser shall pay or assume the Accrued Paid Time Off Amounts of Hired Employees in connection with the Alternative Transaction in the same manner as provided in Section 9.5 of the Agreement; provided that the Alternative Purchase Consideration shall be adjusted to deduct the amount of such assumed Accrued Paid Time Off Amounts.  Purchaser shall also pay any severance payments owing to those Seller's MVMC Employees to whom Purchaser has not extended an offer of employment with Purchaser and any Accrued Paid Time Off Amounts owing to Seller's MVMC Employees who are not hired by Purchaser or who do not consent to the transfer of such Accrued Paid Time Off Amounts provided that the Alternative Purchase Consideration shall be adjusted to deduct the amount of such severance and Accrued Paid Time Off Amounts paid by Purchaser and Accrued Paid Time Off Amount obligations assumed by Purchaser.  Purchaser shall also credit to each of Seller's MVMC Employees who become Hired Employee such employee's accrued ESL Benefits (as defined in the Agreement), on the same terms and conditions as Seller's ESL Benefit plans, which obligation shall not be credited to the Alternative Purchase Consideration.

(e) Purchaser will assume responsibilities arising after the Effective Time for all union contracts related to MVMC employees, as of the Closing Date.  Seller will retain liability for accrued paid time off, severance obligations, if any, and all other amounts owing, and liabilities, to employees preceding the Effective Time, unless otherwise agreed by the parties, and subject to customary purchase consideration adjustment.

of 5% per annum and be repaid in monthly payments of interest only commencing twenty-four (24) months after Closing (with interest accruing and added to principal from the Closing Date until such twenty-fourth month) and continuing for a period of thirty-six (36) months thereafter, whereupon equal monthly payments of principal and interest shall commence in an amount sufficient to fully amortize the balance of principal and interest over a period of sixty (60) months thereafter. As a condition to such modification, the Select Administrative Note, as modified, shall be secured by a first position a Deed(s) of Trust with Chicago Title as trustee and utilizing Chicago Title's standard Long Form Deed of Trust, upon the real properties commonly known as the Medical Arts Building and, to the extent not inconsistent with Existing Bond covenants unless waived by the bondholders, the excess land portion of the Florida/San Jacinto property ("**Excess Land**").

(c)    Bond Actions: The Parties must obtain a Bond Release prior to Closing; provided, however, if the holders of (or the Trustees of) the Existing Bonds do not provide the consents necessary for the Bond Release required under this Agreement in response to such payment, Purchaser will purchase or cause to be purchased such Existing Bonds as necessary to obtain consent to the Bond Release, or will make the Alternative Loan as provided below.  In addition, as of the Closing Date, Purchaser shall either:

(i)    Obtain the consent of the Existing Bonds to a modified payment schedule under the Existing Bonds which includes the payment of interest only for three (3) years from the Closing Date, with principal re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance ("**Payment Forbearance**"), after the Closing Date of any claims, actions or other enforcement against Seller based on failure of Seller to meet any covenants (the "**Bond Covenants**") in the Indentures or other documents relating to the Existing Bonds ("**Bond Documents**") based upon the financial performance or status of Seller and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply, including without limitation covenants related to the required net income available for debt service or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Proceeding) ("**Covenant Forbearance**"); or

(ii)    Enter into a new secured loan agreement (the "**Alternative Loan**") with Seller by which Purchaser will advance, on Seller's behalf, funds necessary to pay off the balance of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall become a new loan on substantially the same terms as the Bond Documents, including the Bond Covenants (as modified as set forth in subparagraph (i) above including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by (the "**Additional Collateral**");

- 95 -

providing services at, or primarily associated with, the operations at MVMC  campus consistent with the provisions of the Agreement.

(g)    Purchaser and Seller will enter into an agreement or agreements whereby Purchaser shall purchase certain administrative and support services from Seller, or enter into shared services arrangements, including those which may be necessary for the operation of MVMC (i.e. finance, IT, HR, telephones, internet, etc.) as mutually agreed, at the agreed fair market value for such services.

(h)    The covenants set forth at Sections 5.9.3 to 5.9.5 of the Agreement shall only apply with respect to MVMC. The covenants set forth at Section 5.9.1 and 5.9.2 shall not apply to the Alternative Transaction. Purchaser shall maintain all medical records on behalf of Seller as required by law, and will make them available to Seller if needed in the future.

8.    Closing.

(a)    The Closing of the Alternative Transaction shall occur by the Closing Date as set forth in the Agreement.

(b)    The Parties shall cause the Escrow to deliver to the Bond Trustees of the Existing Bonds, at Closing, such funds from the Alternative Purchase Consideration as required, and shall use their best efforts to obtain the Bond Release, as applicable to the Alternative Assets, subject to the special covenants set forth below in the event such Bond Release is not obtained and related to required forbearance of certain covenants.

(c)    Since licensing and Medicare approvals may not be feasible prior to the Closing, Seller and Purchaser will enter into a Lease and a Management Agreement consistent with the terms of the Agreement, but covering only MVMC  and the Alternative Assets to the extent and in the manner legally permissible.  Purchaser will own MVMC, Seller will be the tenant, Seller will continue to hold the license, Medicare/Medi-Cal certification, and payor contracts, and Seller will contract with Purchaser to provide management services at essentially a "no gain/no loss" to Seller, all as consistent with the provisions set forth at Section 1.3.6 of the Agreement.  When licensing and Medicare and Medi-Cal certification is complete, the Lease and the Management Agreement will terminate, in the same manner as provided in Section 1.3.6 of the Agreement.

9.    Seller's Conditions to Close.

(a)    The conditions precedent to obligations of Seller, as set forth at Article VI of the Agreement, shall apply in Definitive Alternative Agreement only to the extent applicable to the Alternative Assets and Alternative Transaction.  Without limiting the preceding, the conditions precedent in the following Sections of the Agreement shall not apply in the event of the Alternative Transaction:  6.7 and 6.8 (to the extent of requirements greater than needed for just the acquisition and working capital for MVMC ).

(b)    In the event of the Alternative Transaction, Purchaser will cause the Select Administrative Note to be modified, as of the Closing Date, to continue bear interest at the rate

- 94 -

179

(A)  a second position deed of trust (junior to the modified Select Administrative Note lien) on the Medical Arts Building and the excess land portion of the Florida/San Jacinto, and

(B)  a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through Seller's Fiscal Year ending June 30, 2012. In the event that Seller is in default of the Bond Covenants as of the end of Seller's Fiscal Year ending June 30, 2011, Purchaser may, as its sole remedy for a Covenant Default other than a payment default, require that Seller engage a nationally recognized Manager ("**Manager**") with experience in operating hospital similar to HVMC. Seller shall consult with Purchaser in the selection of such Manager, and such Manager shall be reasonably acceptable to Purchaser, which acceptance shall not be unreasonably withheld, delayed or conditioned. Purchaser shall be entitled to monitor the performance of the Manager and receive monthly reports on Manager's progress and the financial condition of Seller. The foregoing notwithstanding, the parties understand that MVMC may be competitive with HVMC and that the sharing of certain information may violate federal or state antitrust or unfair competition Laws.

Further, the Manager may become aware of confidential information, including rates under managed care contracts, matters covered by the attorney-client privilege, attorney work-product privilege, matters covered by quality assurance and peer review, and other matters covered by applicable privileges. The Manager may also become aware of matters which are confidential pursuant to contractual arrangements with unaffiliated third parties. The Manager may also become aware of matters discussed by Seller's Board of Directors in closed session, which matters are not subject to public disclosure. Accordingly, in the event that Manager obtains such information which Seller's Board of Directors or counsel reasonably determines is confidential or privileged information, Seller may require that Manager maintain such matters in confidence. Purchaser also agrees that, to the extent that Purchaser obtains information from Seller which is confidential or privileged as provided above, Purchaser shall maintain such information in confidence to the fullest extent permitted by law. The foregoing notwithstanding, in the event that Purchaser in good faith deems its interests are materially and adversely affected by a matter which is disclosed in confidence, Purchaser shall notify Seller in writing and may seek release from such restriction through appropriate application to a court of competent jurisdiction.

In the event that Seller is in default of the Bond Covenants as of the end of Seller's Fiscal Year ending June 30, 2012, Purchaser shall have rights of enforcement in the same manner as provided in the Bond Documents.

Without limiting the preceding, the Covenant Forbearance shall not include a forbearance of any covenants restricting further encumbrances by Seller (excluding any encumbrances in favor of PHH, encumbrances as permitted in the Bond Documents, or otherwise as contemplated by this Agreement), transfer of Seller's assets or merger or restructuring of Seller (except in connection with Seller's Chapter 9 proceeding and otherwise consistent with the terms of this Agreement). The Alternative Loan shall be provided pursuant to documents which, to the extent reasonably applicable, are consistent with the terms of the Bond Documents, and security and other provisions which are customary for commercial real property

- 96 -

F:\Bond\PHH\FINAL.8Sd 10.12.09.DOC

1070039.2

secured loans (to the extent not inconsistent with the applicable terms under the Bond Documents or this Agreement). The Medical Arts Building and Excess Land are further identified in Schedule 1.6.1-A.

Provided that Seller is not in default of payments and the Bond Covenants under the Alternative Loan, the Additional Collateral shall be released upon issuance of Seller's audited financial statements for the fiscal year ended June 30, 2012.

(d)  Plan of Adjustment: If, prior to the Closing, Seller shall have filed a Plan of Adjustment ("**Plan**"), in the Chapter 9 Proceeding, either;

(i)  such Plan shall have been confirmed; or

(ii)  the holders of the Affiliated Claims shall have voted to accept such Plan or agreed, in writing, to accept such Plan; or

(iii)  the holders of the Affiliated Claims shall have agreed, in writing, not to, directly or indirectly, oppose such Plan and/or sought to influence either the Unsecured Creditors Committee and/or others to vote against or otherwise oppose such Plan, and have, in fact, not done so.

For purposes of the foregoing, "**Affiliated Claims**" shall mean the claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, Inc., and the claims of LHIO, Inc. and any claims of constituent members thereof which are derivative from such claims.

10.  **Purchaser's Conditions to Close.**  The conditions precedent to obligations of Purchaser, as set forth at Article VII of the Agreement, shall apply in Definitive Alternative Agreement only to the extent applicable to the Alternative Assets and Alternative Transaction. Without limiting the preceding, the conditions precedent in the following Sections of the Agreement shall not apply in the event of the Alternative Transaction:  7.11 and 7.12.

11.  **Post-Closing Covenants.**  The post-closing covenants contained at Article IX of the Agreement, including without limitation covenants set forth at Sections 9.2 (preservation and access to records,) 9.3 (provision of benefits of certain contracts) and 9.5 (employee transition) shall apply only to the extent applicable to the Alternative Assets, and the operations, contracts and employees applicable to MVMC. In addition, without limiting the preceding, Seller's covenant not to compete shall apply only with respect to MVMC.

12.  **Termination.**  The bases for termination, and the application of the Deposit and the Termination Fee, as provided at Section 8 of the Agreement shall apply with respect to the Alternative Transaction to the extent of the terms and conditions of the Alternative Transaction.

13.  **Assignment.**  Purchaser shall have the right to assign its rights and obligations under the Alternative Transaction, subject to the terms of Section 12.2 of the Agreement.

- 97 -

F:\Bond\PHH\FINAL.8Sd 10.12.09.DOC

1070039.2

180