1  CHARLES D. AXELROD (STATE BAR NO. 39507)
   GARY E. KLAUSNER (STATE BAR NO. 69077)
2  H. ALEXANDER FISCH (STATE BAR NO. 223211)
   NEETA MENON (STATE BAR NO. 254736)
3  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
4  1901 Avenue of the Stars
5  12th Floor
   Los Angeles, CA 90067
6  Telephone:  (310) 228-5600
   Telecopy:  (310) 228-5788
7  E-mail:  caxelrod@stutman.com
8          gklausner@stutman.com
           afisch@stutman.com
9          nmenon@stutman.com

10 Chapter 9 Counsel for
   Valley Health System
11

12

13             **UNITED STATES BANKRUPTCY COURT**

14             **CENTRAL DISTRICT OF CALIFORNIA**

15                    **RIVERSIDE DIVISION**

16 In re                          )  Case No. 6:07-bk-18293-PC
                                  )
17 VALLEY HEALTH SYSTEM,          )  Chapter 9
                                  )
18            Debtor,             )  **FIRST AMENDED DISCLOSURE**
                                  )  **STATEMENT WITH RESPECT TO THE**
19                                )  **PLAN FOR THE ADJUSTMENT OF DEBTS**
                                  )  **OF VALLEY HEALTH SYSTEM DATED**
20                                )  **DECEMBER 17, 2009**
                                  )
21                                )     Disclosure Statement Hearing
                                  )
22                                )  Date:   December 17, 2009
                                  )  Time:   2:00 p.m.
23                                )  Place:  Hon. Peter H. Carroll
                                  )          3420 Twelfth St.
24                                )          Courtroom 304
                                  )          Riverside, CA  92501
25                                )
                                  )
26                                )     Confirmation Hearing
                                  )
27                                )  *To be set.*
                                  )
28 _____    )

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTE:  The Bankruptcy Court Has Not Yet Approved This Disclosure Statement Pursuant To Section 1125(b) Of The Bankruptcy Code For Use In The Solicitation Of The Plan Of Adjustment Of Debts Described Herein.  The Filing And Distribution Of This Disclosure Statement Therefore Is Not Intended As, And Should Not Be Construed To Be, A Solicitation Of Acceptance Or Rejection Of That Plan Or Any Other Plan.**

533833v2

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................1

    A.    The Purpose Of This Disclosure Statement. ................................................1

    B.    Summary Of Entities Entitled To Vote On The Plan And Of Certain
        Requirements Necessary For Confirmation Of The Plan...........................2

    C.    Voting Procedures, Balloting Deadline, Confirmation Hearing, And
        Other Important Dates, Deadlines, And Procedures. ................................3

        1.    Voting Procedures And Deadlines. ................................................3

        2.    Date Of The Confirmation Hearing And Deadlines For
            Objection To Confirmation Of The Plan....................................4

    D.    Four Important Notices And Cautionary Statements. ...............................5

    E.    Additional Information. ..............................................................................6

II.    BACKGROUND INFORMATION ..................................................................6

    A.    The District.................................................................................................6

    B.    District's Financial Problems......................................................................7

III.    ADMINISTRATION OF THE DISTRICT'S CHAPTER 9 CASE ..................9

    A.    Formation of the Committee. ......................................................................9

    B.    Sale of Moreno to Kaiser. .........................................................................10

    C.    Motions For Relief From The Stay. ...........................................................11

    D.    SEIU Litigation. ........................................................................................11

    E.    CNA Negotiation and New MOU...............................................................12

    F.    Closure of SNF..........................................................................................12

    G.    Aetna Litigation.........................................................................................12

    H.    Sale of Hemet Global Services...................................................................13

    I.    Pending Litigation Matters Challenging Consummation of Sale
        Pursuant to ASA to be Resolved As Part of Plan Confirmation. ...........13

    J.    Prime's Expressed Interest in Purchasing The District's Assets.................18

IV.    THE DISTRICT'S LIABILITIES AND ASSETS ............................................18

A.    Liabilities................................................................................................18

    1.    Proofs of Claim. .............................................................................18

    2.    General Unsecured Claims.............................................................19

    3.    Priority Unsecured Claims.............................................................20

    4.    Class 2B - General Unsecured Claims of KM Strategic
        Management, Inc., Hemet Community Medical Group,
        Menifee Valley Community Medical Group, and LHIO and
        Claims of Constituent Members Thereof ......................................22

    5.    Claims of Series 1993 and 1996 Bondholders. .............................22

    6.    Administrative Claim of Select. ....................................................22

    7.    Statement Regarding Liabilities. ...................................................23

B.    Assets. ....................................................................................................23

V.    SUMMARY OF THE PLAN OF ADJUSTMENT ...........................................24

A.    Classification And Treatment of Claims.................................................26

    1.    Unclassified Claims. .....................................................................26

        a.    Administrative Expense Claims. ..........................................26

            (1)    Treatment of the Select Administrative Claim.....................26

            (2)    Treatment of All Other Administrative Claims
                Other Than Professional Claims. .........................................27

        b.    Professional Claims. .............................................................28

        c.    Bar Date For Assertion Of Requests For Payment Of
           Administrative Claims (Other Than Ordinary Course
           Administrative Claims) And Professional Claims. ...........29

    2.    Classes 1A and 1B (Claims of the Holders of Series 1993
        COPs and 1996 Bonds.). ...............................................................29

    3.    Classes 1C (Other Secured Claims). .............................................29

    4.    Class 2A (General Unsecured Creditors). .....................................30

    5.    Class 2B (General Unsecured Claims of KM Strategic
        Management, Inc., Hemet Community Medical Group,
        Menifee Valley Community Medical Group, and LHIO And
        Claims of Constituent Members Thereof)......................................31

    6.    Class 2C (Interests of Defined Benefit Plan Participants)............31

B.    Treatment Of Executory Contracts And Unexpired Leases....................32

533833v2

| | | | |
|---|---|---|---|
| | 1. | Generally. | 32 |
| | 2. | Assumption. | 32 |
| | | a. Cure Payments and Future Performance. | 33 |
| | 3. | Rejection. | 33 |
| | | a. Deadline For The Assertion Of Rejection Damage Claims; Treatment Of Rejection Damage Claims. | 33 |
| C. | Means For Execution And Implementation Of The Plan. | | 33 |
| | 1. | Rights of Action. | 35 |
| D. | Distributions. | | 35 |
| | 1. | Undeliverable Distributions. | 36 |
| | 2. | Timeliness Of Payments. | 36 |
| | 3. | Compliance With Tax Requirements. | 37 |
| | 4. | Time Bar To Cash Payments. | 37 |
| | 5. | No *De Minimis* Distributions. | 37 |
| | 6. | No Distributions On Account Of Disputed Claims. | 37 |
| | 7. | No Postpetition Accrual. | 38 |
| | 8. | Insurance Proceeds. | 38 |
| E. | Disputed Claims. | | 38 |
| | 1. | Claims Objection Deadline; Prosecution Of Objections. | 38 |
| | 2. | Reserves, Payments, And Distributions With Respect To Disputed Claims. | 38 |
| F. | Continuing Jurisdiction Of The Bankruptcy Court. | | 39 |
| VI. | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | 39 |
| A. | Voting And Right To Be Heard At Confirmation. | | 39 |
| | 1. | Who May Support Or Object To Confirmation Of The Plan? | 39 |
| | 2. | Who May Vote To Accept Or Reject The Plan? | 40 |
| | 3. | Who Is Not Entitled To Vote? | 40 |
| | 4. | Vote Necessary To Confirm The Plan. | 40 |
| B. | The "Best Interests" Test. | | 41 |

533833v2

C.    Feasibility..........................................................................................42

D.    "Cramdown."....................................................................................42

E.    Effective Date....................................................................................43

    1.    Conditions To The Occurrence Of The Effective Date.................43

    2.    Non-Occurrence Of Effective Date..........................................44

F.    Effect Of Confirmation. ....................................................................44

    1.    Discharge Of The District. ...................................................44

    2.    Injunction.........................................................................45

    3.    Term Of Existing Injunctions And Stays. ................................45

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED.......................................45

VIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES ...............................46

A.    Introduction. .....................................................................................46

B.    Federal Income Tax Consequences to the District................................48

    1.    Tax Consequences of the District's Sale of Assets......................48

    2.    Reduction of the District's Indebtedness. ................................49

C.    Tax Consequences To Creditors. .........................................................51

    1.    Claims of Series 1993 and 1996 Bondholders. .........................51

    2.    Other Creditors Holding Unsecured Claims. ...........................51

    3.    Character of Recognized Gain or Loss.....................................52

    4.    Receipt of Interest. .............................................................52

    5.    Other Tax Considerations.....................................................53

        a.    Market Discount. .......................................................53

        b.    Original Issue Discount. .............................................53

        c.    Withholding.............................................................53

IX.    RECOMMENDATION AND CONCLUSION .................................................54

533833v2

# TABLE OF AUTHORITIES

## CASES

*Florida Residential Property and Casualty Joint Underwriting Assoc. v. United States,*
    207 F.Supp.2d 1344 (N.D. Fla. 2002)................................................................. 48, 50

*State of Michigan v. United States,*
    40 F.3d 817 (6th Cir. 1994)................................................................................ 48, 50

*In re Valley Health Sys.,*
    383 B.R. 156 (Bankr. C.D. Cal. 2008) .......................................................................... 1

## STATUTES

11 U.S.C. § 105 ................................................................................................................ 45
11 U.S.C. § 362 ................................................................................................................ 45
11 U.S.C. § 507(a) ........................................................................................................... 21
11 U.S.C. § 922 ................................................................................................................ 45
11 U.S.C. § 943(a) ........................................................................................................... 28
11 U.S.C. § 943(b) ........................................................................................................... 41
11 U.S.C. § 944 ................................................................................................... 44, 49, 50
11 U.S.C. § 1124 ................................................................................................................ 3
11 U.S.C. § 1125 ................................................................................................................ 1
11 U.S.C. § 1129(b) ..................................................................................................... 3, 42
28 U.S.C. § 1452 .......................................................................................................... 1, 17
I.R.C. § 115 ....................................................................................................... 48, 49, 50
I.R.C. § 453B .................................................................................................................... 53
I.R.C. § 582(c) .................................................................................................................. 52
I.R.C. § 1001 .................................................................................................................... 51
I.R.C. § 1271 .................................................................................................................... 51
I.R.C. § 1272(a)(2)(A) ...................................................................................................... 53
I.R.C. § 1276 .................................................................................................................... 53
Cal. Health and Safety Code § 32000 *et seq* ..................................................................... 6
California Government Code § 1090 ........................................................................... 16, 17
California Public Resources Code § 21000 *et seq* ........................................................... 15

## RULES

Rev. Rul. 71-131, 1971-1 C.B. 28 ................................................................................ 49, 50
Rev. Rul. 71-132, 1971-1 C.B. 29 ................................................................................ 49, 50
Rev. Rul. 87-2, 1987-1 C.B. 18 .................................................................................... 49, 50

533833v2

1

## SUMMARY

2       **The following pages summarize certain important information set forth**

3   **elsewhere in this Disclosure Statement. Capitalized terms are defined in the text of this**

4   **Disclosure Statement and in the Plan.**

5       **The Disclosure Statement contains important information that is not**

6   **summarized in this Summary and that may influence your decision regarding whether to**

7   **accept or reject the Plan or otherwise affect your rights. Please do not rely on this Summary**

8   **standing alone, and please read all of this document and the accompanying materials**

9   **thoroughly.**

10      The "First Amended Plan For The Adjustment Of Debts Of Valley Health System,

11  Dated December 17, 2009" (the "Plan") proposed by Valley Health System, a California Local

12  Health Care District (the "Debtor" or "District"), is premised on the "Asset Sale Agreement" dated

13  October 14, 2009 (the "ASA"), which is attached hereto as Exhibit E, by and between the District

14  and Physicians for Healthy Hospitals, Inc., a Delaware corporation ("PHH").

15      The ASA contains two alternate sale transactions because, at the time the ASA was

16  negotiated and executed, the District did not have authority to agree to sell substantially all of the

17  District's assets to PHH (the "Two Hospital Transaction"), without first obtaining Public Approval.[1]

18  Having no assurance that Public Approval would be obtained, the District and PHH agreed to an

19  alternative sale transaction  (the "Alternative Transaction") that consisted of the sale of only the

20  operating assets associated with the Menifee Valley Medical Center ("Menifee") in the event voters

21  did not approve the broader sale transaction. However, on December 15, 2009, an election was held

22  and the Riverside County Measure P ("Measure P") ballot proposition, approving the sale of the

23  District Assets to PHH pursuant to the Two Hospital Transaction, was passed by the voters.

24  Accordingly, the Plan will be based on the Two Hospital Transaction, which is discussed in detail

25  herein.

26

27  [1]   Any capitalized term not otherwise defined in this Disclosure Statement has the meaning
    ascribed to it in the Plan. Unless otherwise indicated, references in this Disclosure Statement to
28  "Sections" are references to the various enumerated Sections of this Disclosure Statement.

533833v2

1    There are also several actions that are currently pending in the Bankruptcy Court and

2  in the Superior Court for the County of Riverside (the "Superior Court"), which relate to the Public

3  Vote on Measure P and the ASA, as discussed in further detail in Section III.I below.  It is the

4  District's position that the Bankruptcy Court's adjudication of the issues raised in connection with

5  these "Challenge Actions" must be resolved on a full and final basis as part of the Plan confirmation

6  process in order to ensure that the Plan is confirmed and thereafter effectively and timely

7  implemented.

8

| | |
|---|---|
| **Debtor** | Valley Health System, a California Local Health Care District |
| **Bankruptcy Court** | United States Bankruptcy Court for the Central District of California, Riverside District<br>The Honorable Peter H. Carroll presiding |
| **Plan** | Plan For The Adjustment Of Debts Of Valley Health System, Dated November 2, 2009 |
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have claims that are impaired under the Plan. Ballots must be returned to and received by the Ballot Tabulator by no later than 4:00 p.m., Pacific Time, on January ___, 2010. |
| **Ballot Tabulator** | Kendra A. Johnson, Paralegal, Stutman, Treister & Glatt PC, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788) |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on _____ __, 2010, commencing at __:___ __.m., Pacific Time.  Objections to confirmation must be filed and served by no later than _____, 2010. |
| **Treatment of Claims** | If the Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |

533833v2

| | |
|---|---|
| Administrative Claims | Paid in full, except to the extent that the holder of an Administrative Claim agrees to different treatment. A substantial amount of the District's Administrative Claims will be assumed by PHH. |
| Class 1A Holders of the Series 1993 Bonds | Impaired. Holders of the Series 1993 COPs will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1A Claims. |
| Class 1B Holders of the Series 1996 Bonds | Impaired. Holders of the Series 1996 Bonds will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1B Claims. |
| Class 1C Other Secured Claims | Unimpaired. Holders of Allowed Class 1C Claims will, at the election of the District, receive one of the following treatments: (a) The Holder of the Class 1C Claim will receive the Collateral in which that Holder has a security interest; or (b) the Holder of the Class 1C Claim will receive any proceeds actually received by the District from the sale or disposition of the Collateral in which that Holder has a security interest; or (c) the Holder of the Class 1C Claim will receive Cash in the amount of that Holder's Allowed Class 1C Claim; or (d) the Holder of the Class 1C Claim will receive such other distributions or treatment as are necessary to leave the rights of said Holder Unimpaired or as are necessary to otherwise satisfy those requirements of chapter 11 that are incorporated into chapter 9 of the Bankruptcy Code. |
| Class 2A Allowed General Unsecured Claims | Impaired. Holders of Allowed General Unsecured Claims will receive their pro rata share of $17 million or such increased or reduced amount that will be available for payment of such Claims, as more fully set forth in Section V.A.3. Such distributions shall be paid in four equal annual installments, without interest, with the first payment to be made on the first anniversary of the Sale Closing Date, and on each anniversary thereafter. |

| | |
|---|---|
| Class 2B | Impaired.  Upon the Sale Closing Date, PHH will assume the District's obligations relating to all Class 2B Claims.  From and after the Sale Closing Date, holders of Allowed Class 2B Claims shall only have a right to collect payment on account of such Claims from PHH, and the District shall thereafter be relieved of any and all liability on account of such Claims. |
| General Unsecured Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO, and Claims of Constituent Members of Each | |
| Class 2C | Unimpaired. |
| Interests of Defined Benefit Plan Participants | |

**Background Information:**    See pages 6 to 18.

**Questions:**    Please contact the Debtor's counsel, Charles D. Axelrod, Gary E. Klausner or H. Alexander Fisch, Stutman, Treister & Glatt 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067
(phone: 310-228-5600; facsimile:  310-228-5788)

To the extent that there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description in the Disclosure Statement, the terms of the Plan (including the Exhibits and supplements to the Plan) will govern.

533833v2

## I.    INTRODUCTION

The District filed a petition under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") on December 13, 2007 (the "Petition Date"), which was designated Case Number 6:07-bk-18293-PC by the clerk of court (the "Chapter 9 Case"). An order for relief[2] was entered on February 20, 2008, and the Chapter 9 Case is currently pending before the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court").

The District is the proponent of the Plan, a copy of which is attached to this Disclosure Statement as Exhibit A. [At a hearing held on December 17, 2009, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the District to transmit it to holders of impaired claims in connection with the solicitation of votes with respect to the Plan.]

As described more fully elsewhere in this document, the District believes that the Plan provides the greatest and earliest possible recoveries to holders of claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative restructuring or reorganization would result in delay, uncertainty, expense, litigation and, ultimately, smaller or no distributions to creditors. Accordingly, **the District urges that you cast your ballot in favor of the Plan.**

### A.    The Purpose Of This Disclosure Statement.

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a

---

[2]  In a published decision, the Bankruptcy Court upheld the chapter 9 filing by the District. The Indenture Trustee for the Bonds had filed an objection to the District's petition, claiming that the District was ineligible for relief under chapter 9 because the District had failed to attempt to negotiate an adjustment of its debts with its major creditors prior to the filing of the petition. ST&G argued on behalf of the District that such negotiation was impracticable, and presented evidence supporting this contention. The bankruptcy court agreed with the District and found that negotiations by the District with its creditors was impracticable because voters had rejected the District's measures to refinance its debts or sell substantially all of its assets and there was insufficient time for the District to formulate a realistic standalone plan of adjustment and then negotiate its provisions with its numerous creditors within the context of a continuing liquidity crisis and risk of loss to the District's assets. Accordingly, the Court declined to dismiss the chapter 9 petition. *See In re Valley Health Sys.*, 383 B.R. 156 (Bankr. C.D. Cal. 2008).

1    kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under

2    that plan to make an informed judgment with respect to the plan. This Disclosure Statement

3    provides such information. *Parties in interest should read this Disclosure Statement, the Plan, and*

4    *all of the exhibits accompanying such documents in their entirety in order to ascertain:*

5          1.     How the Plan will affect their claims against the District;

6          2.     Their rights with respect to voting for or against the Plan;

7          3.     Their rights with respect to objecting to confirmation of the Plan; and

8          4.     How and when to cast a ballot with respect to the Plan.

9         This Disclosure Statement, however, cannot and does not provide creditors with legal

10    or other advice or inform such parties of all aspects of their rights. Claimants are advised to consult

11    with their attorneys and/or financial advisors to obtain more specific advice regarding how the Plan

12    will affect them and regarding their best course of action with respect to the Plan.

13         This Disclosure Statement has been prepared in good faith and in compliance with

14    applicable provisions of the Bankruptcy Code. Based upon information currently available, the

15    District believes that the information contained in this Disclosure Statement is correct as of the date

16    of its filing. The Disclosure Statement, however, does not and will not reflect events that occur after

17    December 17, 2009 (and, where indicated, specified earlier dates), and the District assumes no duty

18    and presently does not intend to prepare or distribute any amendments or supplements to reflect such

19    events.

20       **B.**    **Summary Of Entities Entitled To Vote On The Plan And Of Certain**
            **Requirements Necessary For Confirmation Of The Plan.**

21

22         Holders of Allowed Claims in Classes 1A (the Series 1993 COPs), Class 1B (the

23    Series 1996 Bonds), Class 2A (General Unsecured Claims), and Class 2B[3] (General Unsecured

24    Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley

25    Community Medical Group, and LHIO, and Claims of Constituent Members of Each) (collectively,

26

27    [3]  In the event of the Alternative Transaction, Class 2B will vote with Class 2A, as the treatment of

28    both Classes will be identical.

1   the "Voting Classes") are entitled to vote on the Plan, because the Claims in each such Class may be

2   "impaired" under the Plan within the meaning of section 1124 of the Bankruptcy Code under the

3   treatment of Claims in such Classes.

4         The Bankruptcy Court may confirm the Plan only if at least one Class of impaired

5   claims has voted to accept the Plan (without counting the votes of any insiders whose claims are

6   classified within that Class) and if certain statutory requirements are met as to both non-consenting

7   members within a consenting Class and as to any dissenting Classes. A Class of claims has accepted

8   the Plan only when at least one-half in number <u>and</u> at least two-thirds in amount of the Allowed

9   Claims actually voting in that Class vote in favor of the Plan.

10         In the event of a rejection of the Plan by any of the Voting Classes, the District will

11   request that the Bankruptcy Court confirm the Plan in accordance with those portions of section

12   1129(b) of the Bankruptcy Code that are applicable to the Chapter 9 Case, which provisions permit

13   confirmation by a process known as "cramdown" notwithstanding such rejection if the Bankruptcy

14   Court finds, among other things, that the Plan "does not discriminate unfairly" and is "fair and

15   equitable" with respect to each rejecting Class. Other sections of this Disclosure Statement provide

16   a more detailed description of the requirements for acceptance and confirmation of the Plan.

17      **C.**     **Voting Procedures, Balloting Deadline, Confirmation Hearing, And Other Important Dates, Deadlines, And Procedures.**

18

19        **1.**     **Voting Procedures And Deadlines.**

20         The District has provided copies of this Disclosure Statement and ballots to all known

21   holders of impaired claims in the Voting Classes. Those holders of an Allowed Claim in each of the

22   Voting Classes who seek to vote to accept or reject the Plan <u>must</u> complete a ballot and return it to

23   the Court-appointed ballot tabulator – Kendra A. Johnson, Paralegal, Stutman, Treister & Glatt

24   Professional Corporation, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067

25   (facsimile: 310-228-5788) (the "Ballot Tabulator") – so that their ballots actually are received by no

26   later than the Balloting Deadline (as defined below). Ballots do not constitute proofs of claim and

27   must be returned directly to the Ballot Tabulator, **<u>not</u>** to the Bankruptcy Court.

28

1    *The record holders of the Bonds (including, without limitation, any brokers,*

2    *dealers, commercial banks, trust companies or other agents of nominees (each a "Nominee") are*

3    *directed to forward this Disclosure Statement, the Ballots and other solicitation materials to the*

4    *beneficial owners of such Bonds. The District shall reimburse such Nominee's reasonable, actual*

5    *and necessary out-of-pocket expenses associated with the distribution of such solicitation*

6    *materials to the beneficial owners of the Bonds, based upon applicable securities exchange*

7    *guidelines.*

8    *All ballots, including ballots transmitted by facsimile, must be completed, signed,*

9    *returned to, and actually received by the Ballot Tabulator by not later than _____ ___,*

10    *2010, at 4:00 p.m. Pacific Time (the "Balloting Deadline"). Ballots received after the Balloting*

11    *Deadline, and ballots returned directly to the Bankruptcy Court, shall not be counted in*

12    *connection with confirmation of the Plan.*

13    **2.    Date Of The Confirmation Hearing And Deadlines For Objection
To Confirmation Of The Plan.**

14

15    The hearing to determine whether the Bankruptcy Court will confirm the Plan (the

16    "Confirmation Hearing") will commence on _____ ___, 2010, at _____ a.m. Pacific Time in

17    the Courtroom of the Honorable Peter H. Carroll, United States Bankruptcy Judge for the Central

18    District of California, Courtroom 304, 3420 Twelfth Street Courtroom 304 Riverside, CA 92501.

19    The Confirmation Hearing may be continued from time to time by announcement in open Court

20    without further notice.

21    Any objections to confirmation of the Plan must be filed with the Bankruptcy Court

22    and served on the following entities so as to be actually received by no later than _____

23    _____, 2010: (a) Mr. Joel M. Bergenfeld, Chief Executive Officer of Valley Health System, 1117 East

24    Devonshire Avenue, Hemet, CA 92543; (b) Stutman, Treister & Glatt Professional Corporation,

25    1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Attention: Gary E. Klausner,

26    Esq. (counsel to the District); and (c) Pachulski Stang Ziehl and Jones, 10100 Santa Monica Blvd.,

27    Suite 1100, Los Angeles, California 90067, Attention: Sam Maizel, Esq. (counsel to the Official

28    Committee of Unsecured Creditors). Objections that are not timely filed and served may not be

533833v2

considered by the Bankruptcy Court. *Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.*

**D.    Four Important Notices And Cautionary Statements.**

1.    The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based upon the District's books and records.  Although certain professional advisors of the District assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the District and third parties, much of which has not been audited. *The professional advisors of the District have not independently verified such information and, accordingly, make no representations or warranties as to its accuracy.*  Moreover, although reasonable efforts have been made to provide accurate information, the District does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

2.    *No entity may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan.*  Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the District or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of claims in the Chapter 9 Case.

3.    Certain information included in this Disclosure Statement and its Exhibits contains forward-looking statements within the meaning of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended.  The words "believe", "expect", "anticipate" and similar expressions identify such forward-looking statements.  The forward-looking statements are based upon information available when such statements are made, and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements.  A number of those risks and uncertainties are described below.  Readers therefore are

1   cautioned not to place undue reliance on the forward-looking statements in this Disclosure

2   Statement. The District undertakes no obligation to publicly update or revise any forward-looking

3   statements, whether as a result of new information, future events or otherwise.

4          4.    *The Securities and Exchange Commission neither has approved nor*

5   *disapproved this Disclosure Statement, nor has it determined whether this Disclosure Statement is*

6   *accurate, truthful, or complete.*

7       E.    **Additional Information.**

8          If you have any questions about the procedures for voting on the Plan, desire another

9   copy of a ballot, or seek further information about the timing and deadlines with respect to

10  confirmation of the Plan, please write to counsel for the District as follows: Charles D. Axelrod,

11  Gary E. Klausner or H. Alex Fisch, Stutman, Treister & Glatt Professional Corporation, 1901

12  Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788). Please

13  note that counsel for the District cannot and will not provide creditors with any legal advice,

14  including advice regarding how to vote on the Plan or the effect that confirmation of the Plan will

15  have upon claims against the District.

16  **II.    BACKGROUND INFORMATION**

17      A.    **The District.**

18          The District is a public agency, formed under the State of California Local Healthcare

19  District Law, Cal. Health and Safety Code § 32000 *et seq.* At the start of the Chapter 9 Case, the

20  District owned and operated three acute hospitals: (i) Hemet Valley Medical Center, a 340-bed

21  facility located in Hemet ("HVMC"); (ii) Menifee Valley Medical Center, an 84-bed facility located

22  in Sun City ("MVMC" or "Menifee"); and (iii) Moreno Valley Community Hospital, a 95-bed

23  facility located in the city of Moreno Valley ("Moreno"), as well as the Hemet Valley HealthCare

24  Center a 113- bed skilled nursing facility located in Hemet ("SNF") (HVMC and MVMC are

25  collectively referred to as the "Hospitals"). Moreno was sold to Kaiser Foundation Hospitals in June

26  2008. In September 2008, the District decided to terminate its long-term care business and close its

27  skilled nursing facility. That process concluded in early-December 2008, and the District continues

28

533833v2

1    to use the facility previously occupied by SNF to operate a chemical dependency program and a

2    post-treatment retreat center.

3         The District encompasses approximately 882 square miles in the San Jacinto Valley

4    in west central Riverside County, including the City of Hemet, the City of San Jacinto, the City of

5    Sun City, and the surrounding unincorporated areas. Approximately 360,000 people reside within

6    the District.

7    **B.    District's Financial Problems.**

8         At the time the District's Board of Directors (the "Board") considered filing a

9    chapter 9 petition, the District was facing a liquidity crisis that threatened its continued operations.

10   The Board concluded that filing a chapter 9 was the only available remedy to avoid litigation with

11   and collection action by creditors, while, at the same time, allowing the District to protect its asset

12   values, preserve its business operations and continue providing uninterrupted healthcare services to

13   its patients while it developed a comprehensive business plan. Moreover, the task of restructuring

14   the District was particularly complicated and time consuming because of the multitude of financial

15   and contractual relationships inherent in the hospital business.

16        The decision to file chapter 9 came only after the District attempted alternatives that

17   would have avoided such a filing. Specifically, voters had previously rejected two local measures

18   intended to resolve the District's financial problems and ensure that the District's facilities remained

19   open as public facilities. On September 16, 2006, voters rejected Riverside County Measure I

20   ("Measure I"), which contemplated the issuance of $485 million in general obligation bonds, secured

21   by property tax revenues, to retire the District's special revenue bond debt, finance necessary capital

22   improvements, and assure the District had the time and capital needed to return to profitability.

23   After the defeat of Measure I, the District, during the summer of 2007, sought to sell substantially all

24   of its assets to enable it to pay its creditors and continue uninterrupted healthcare services in the

25   hands of the buyer, Select HealthCare Solutions ("Select").

26        Given the nature and scope of the Select transaction, voter approval thereof was

27   required pursuant to California law. In the event that the sale of substantially all of the District's

28   assets was rejected by the electorate, the District was contractually obligated to sell Moreno to Select

533833v2

1   for $47 million (the "<u>Moreno Transaction</u>"), at the option of Select.  On November 6, 2007, voters

2   rejected Riverside County Measure G ("<u>Measure G</u>"), which sought approval of the sale of

3   substantially all of the District's assets to Select for an amount that would have resulted in the full

4   satisfaction of all creditor claims and the continued operation of the Hospitals, albeit as assets of

5   Select.

6           The District engaged QHR Consulting Services ("<u>QHR</u>") to undertake several tasks

7   intended to stabilize the District's financial situation and enable the formulation of a business plan

8   that would return operations to profitability.  Although QHR began this process prior to the Petition

9   Date, the District was not in a position to present a meaningful plan of adjustment as of the Petition

10   Date because of, at least, the following facts:

11         (a)     QHR had to complete its analysis of the District's complex, contract driven

12                business and, as of the Petition Date, roughly $250 million annual budget,

13                including the analysis of every material revenue and expense item to ascertain

14                the extent to which profits could be increased by instituting any operational or

15                logistical changes that were feasible and warranted.

16         (b)     As of the Petition Date, QHR had not yet implemented a transition from its

17                capitated payor agreements to fee for service payor relationships.  The

18                conversion to a fee for service based payor regime would engender an initial

19                severe downturn in cash flow because the District would lose its upfront

20                capitation payments, and there would be a delay inherent in billing on a fee

21                for service basis and collecting the receivables created thereby.  The

22                termination of capitation arrangements and the implementation of fee for

23                service arrangements had to be negotiated to replace the extant capitation

24                system.  Moreover, many of the capitated relationships were governed by

25                regulations that do not allow expedient modification.[4]

26

27

28

---

[4]  These negotiations were completed during the chapter 9 case and the District weathered the cash
flow crisis.

533833v2

1         (c)    Although authorized by the District's Board to solicit interest in the District's

2                non-essential assets and to attempt to sell such assets to generate cash to be

3                used for plan of adjustment purposes, QHR was unable to move forward

4                meaningfully on this mandate until the District's contractual relationship with

5                Select was resolved, given certain liens that were granted in favor of Select to

6                secure the repayment of advances that Select made to the District relating to

7                the contract negotiated in connection with Measure G.[5]

8         (d)    The sale of Moreno had not yet occurred, so it was uncertain whether the

9                benefits inherent thereunder could be factored into the plan promulgation

10               process.

## III. ADMINISTRATION OF THE DISTRICT'S CHAPTER 9 CASE

### A. Formation of the Committee.

Following a formation meeting held on March 26, 2008, the United States Trustee appointed the members of the Official Committee of Unsecured Creditors (the "Committee"). The Committee currently consists of the following members: (a) SEIU-United Healthcare Workers - West; (b) Universal Health Services of Rancho Springs, Inc.; (c) Hemet Community Medical Group ("HCMG"); (d) Sodexho USA, Inc.; (e) HCR Manor Care; (f) Hemet Healthcare Surgery, Inc.; (g) Anaheim Memorial Medical Center; and (h) Southland Endoscopy Center. The Committee is represented in the Chapter 9 Case by the firm of Pachulski Stang Ziehl & Jones LLP ("PSZ&J") and receives financial advisory services from Alvarez & Marsal Healthcare Industry Group, LLC ("AMHIG"). Pursuant to an agreement, the District agreed to pay the reasonable fees and costs incurred by PSZ&J and AMHIG on a regular basis, provided that such fees and costs not exceed $40,000 in any one month and that those fees and costs are subject to the disclosure and reasonableness requirements of section 943(b)(3) of the Bankruptcy Code.

---

[5]  As a part of the sale of Moreno to Kaiser, Select released its liens.

533833v2

**B.**    **Sale of Moreno to Kaiser.**

In connection with Measure G, the District had entered into a contract to sell substantially all of its assets to Select subject to obtaining a vote of the electorate approving the sale. The contract also provided that if the electorate voted down the sale of substantially all of its assets, the District would nonetheless enter into the Moreno Transaction; however, the Moreno Transaction was not intended to be documented prior to the rejection of Measure G and Select's election to continue with the Moreno Transaction. In early-December 2007, Select tendered notice that it intended to proceed with the Moreno Transaction. Select had advanced $14 million of the purchase price to the District and, under certain conditions, was entitled to have the advance repaid if the District breached its obligation to sell Moreno to Select. Select secured repayment of the $14 million deposit with deeds of trust on various real property assets of the District.

Select was then approached by Kaiser concerning Kaiser's desire to purchase Moreno for more than the $47 million contemplated by the Moreno Transaction. In turn, Select entered into discussions with the District concerning the District's assumption of the Moreno sale contract, Select's assignment of its rights under the assumed contract to Kaiser and an equitable sharing of the amount that Kaiser was to pay in excess of $47 million, taking into consideration, among other things, Select's out of pocket costs. Also, with Select's consent, the District and Kaiser had discussions concerning certain shared services and non-competition arrangements that would augment and protect, respectively, the District's remaining operations.

Ultimately, the original agreement with Select was amended twice and Moreno was sold to Kaiser on June 20, 2008. The consideration arising out of and related to the sale (totaling in excess of $53 million) was used, pursuant to the Stipulation dated May 8, 2008 (the "Select Stipulation"), to redeem the Series 1996 Bonds at par (approximately $33.7 million), replenish the reserve fund for the Series 1993 COPs and then to redeem at par approximately $6.3 million of the Series 1993 COPs, and to pay $10.4 million owed to Select on its $14 million advance. Select also received the Select Administrative Note, which is a 5% promissory note, consistent with the form thereof that appears as Exhibit "A" to the Select Stipulation.

533833v2

10

**C.    Motions For Relief From The Stay.**

Numerous motions requesting relief from the automatic stay have been filed.  When the movant agreed both to liquidate its claim in another forum and not to enforce any claim so liquidated against assets or property that were the District's but rather, to look exclusively to insurance policy proceeds, the District stipulated to relief from the stay being granted.  As of October 30, 2009, the Bankruptcy Court has not granted any motion for stay relief that the District opposed.

**D.    SEIU Litigation.**

There are two labor union that have been certified as the bargaining representative for certain of the District's employees: the California Nurses Association ("CNA") and SEIU, United Healthcare Workers – West ("SEIU").  Subsequent to the Petition Date, the District concluded that the prepetition agreements, which had been negotiated between the District and SEIU, and the District and CNA, needed to be modified: (1) to reflect current market conditions, and, in particular, those related to wages and healthcare benefits, and (2) to implement changes to the District's business model.  To that end, the District opened a dialogue with both unions concerning the possibility of negotiating modifications to their respective agreements.

In the case of SEIU, the District did not have an executed collective bargaining agreement.  Rather, in 2006, the District and SEIU negotiated the terms of a tentative agreement that would form the basis of a memorandum of understanding.  A memorandum of understanding ("MOU") based on the tentative agreement was drafted, but was never executed.

The District and SEIU conducted several bargaining sessions in an attempt to reach a consensus as to modifications to the MOU.  However, those negotiations broke down in July 2008.  As a result of the breakdown in negotiations, and because of the need for the District to implement certain essential changes to wages and benefits that might have otherwise been required under the MOU, the Board voted to implement certain changes to wages and healthcare benefits at its board meeting on July 28, 2008.

Several months of litigation between the SEIU and the District ensued before the California Public Relations Board, the United States District Court for the Central District of

533833v2

11

1  California, and this Court. The District and the SEIU ultimately resolved their differences

2  consensually. As a result of that consensual resolution, all pending litigation between SEIU and the

3  District (other than one grievance) was dismissed; the SEIU withdrew the over $3 million claim it

4  had filed in the Chapter 9 Case, which claim was reflected in the Court's registry of claims as claim

5  number 179, except with respect to the single grievance. The District and SEIU entered into a new

6  MOU.

7      **E.    CNA Negotiation and New MOU.**

8          The District also renegotiated the terms and conditions of employment for its

9  employees who are members of CNA during the Chapter 9 Case. Along with the SEIU, CNA was

10  the subject of the District's Motion For Order (1) Approving Rejection Of Executory Contract With

11  SEIU; (2) Confirming Interim Modifications To Agreements With SEIU And CNA; And (3) Post-

12  Expiration Terms And Conditions Of Employment, filed June 9, 2009, and withdrawn August 10,

13  2009 after a consensual resolution mooted the Motion. The renegotiation of the CNA and SEIU

14  agreements resulted in significant cost avoidance and savings for the District.

15      **F.    Closure of SNF.**

16          In September 2008, the Board, with the advice of the District's financial advisors,

17  decided to terminate its long-term care business and close its skilled nursing facility. The SNF had

18  been losing money from operations and was projected to continue to operate at a substantial loss. In

19  the ensuing months, the District, with the assistance of its counsel and financial advisors, terminated

20  its skilled nursing facility and successfully transitioned all of its patients to other facilities. That

21  process was concluded in early December 2008.

22          The District continues to operate a chemical dependency program and a post-

23  treatment retreat center ("HVHC") in the facility formerly occupied by the SNF.

24      **G.    Aetna Litigation.**

25          The District initiated an adversary proceeding against Aetna Health of California,

26  Inc., and Aetna Health Management LLC (together, "Aetna") on October 2, 2008 by filing a

27  complaint. In summary, the complaint asserted that Aetna owed the District $1,598,045.87 for post-

28  petition services, and was in violation of the automatic stay by failing to turnover such funds. Aetna

533833v2

1    filed its answer on November 4, 2008, in which answer Aetna California asserted a counterclaim

2    against the District. Aetna's answer and counterclaim asserted, in summary, that Aetna was entitled

3    to retain the funds sought by the District, and requested that Aetna's proof of claim be allowed in the

4    amount set forth it its proof of claim, designated as claim number 181-3 in the Court's registry of

5    claims, which amount exceeds $3.8 million.

6          The District and Aetna are presently exploring the possibility of settling their disputes

7    consensually.

8      **H.**      **Sale of Hemet Global Services.**

9          One of the District's assets was its interest in Hemet Global Services ("HGS"). The

10    District decided to liquidate its ownership interest in HGS and successfully concluded a sale of such

11    interest to HCMG for $3.4 million, plus $3.3 million for distributions that would be due the District

12    on account of its interest through June 30, 2008. The District received $2.5 million in cash at the

13    closing of the sale of its HGS interest, plus a promissory note in the face amount of $4.2 million,

14    payable over sixty months.

15      **I.**      **Pending Litigation Matters Challenging Consummation of Sale Pursuant**
16          **to ASA to be Resolved As Part of Plan Confirmation.**

17          Shortly after the District's Board of Directors approved the ASA and scheduled the

18    election to obtain voter approval, certain parties[6] initiated proceedings relating to the proposed sale

19    transaction in which they sought either directly to prevent the transaction from taking place or other

20    relief which would have precluded the sale to PHH from closing or the election regarding Measure P

21    from going forward. These challenges included the following:

22      a.      **The Measure P Action ("Measure P Action").** The Measure P Action was

23    initiated by Albert L. Lewis, Jr., on October 15, 2009, whereby Mr. Lewis brought a lawsuit in the

24

---

6    The parties involved in bringing various litigation tactics in an effort to derail the ASA sale
process are comprised of some, or all, of the following parties: Prime Healthcare Services, Inc., a
Delaware corporation; Prime Healthcare Management, Inc., a California corporation; Save Hemet
Valley Hospitals, Inc., a California corporation, Albert L. Lewis, Jr. a taxpayer and resident of the
VHS local health care district; John Lloyd, a taxpayer and resident of the VHS local health care
district; and Edward J. Fazekas, a taxpayer and resident of the VHS local health care district
(collectively, referred to herein as "Prime").

533833v2

1  Superior Court against Barbara Dunmore, named as the defendant in the action in light of her alleged

2  role as the duly appointed Registrar of Voters for the County of Riverside, State of California, who

3  serves as Riverside County's Chief Electorate Officer.  The lawsuit named VHS and William Cherry,

4  M.D., Chairman of Board of Directors of VHS, as the "Real Parties in Interest".  In his complaint,

5  Mr. Lewis generally alleged that the language of Measure P, as adopted by the District's Board of

6  Directors, was false and misleading.  The primary claims were that Measure P (a) falsely

7  represented that the sale to PHH was necessary to retain access to acute service at HCMG and

8  Menifee by not disclosing that other buyers expressed an interest in purchasing these hospitals, (b)

9  failed to state that PHH would not be required to continue to provide acute and emergency services

10  under certain circumstances, and (c) failed to advise voters that a "No" vote on Measure P would

11  mean the implementation of the Alternative Transaction.  Based on these allegations, Mr. Lewis

12  sought (i) declaratory relief declaring Measure P to be false and/or misleading, (ii) injunctive relief

13  requiring the defendant to amend the language of Measure P, and (iii) a temporary restraining order

14  and preliminary injunction restraining and enjoining Ms. Dunmore from placing the current version

15  of Measure P on the ballot, the county's website or within any ballot pamphlets to be distributed to

16  the electorate.  Mr. Lewis's request for an Order Shortening time on the hearing and trial was denied

17  by the Superior Court at a hearing held on October 23, 2009.  Currently, there is a case management

18  conference hearing set in this matter for April 14, 2010.  However, the District anticipates that the

19  Measure P Action has become moot in light of the fact that the Registrar issued and printed the

20  ballot and the election was in fact held on December 15, 2009, and that the transaction should

21  therefore be dismissed or taken off of the Superior Court's calendar for this reason.

22        b.    **The Public Records Act Action ("<u>PRA Action</u>")**.  On or about October 27,

23  2009, Prime filed a "Notification of Intent to File State Court Action Against Debtor for Violation of

24  Public Records Act."  On the same day, Prime filed its "Verified Petition for Writ of Mandate;

25  Complaint for Injunctive Relief", alleging that VHS committed postpetition violations of the

26  California Public Records Act contrary to California Code of Civil Procedure sections 526, 1060,

27  1085, and 1094.5, as well as California Government Code sections 6258 and 6259.  Prime asserted

28  that the causes of action were not subject to the automatic stay because they related to postpetition

533833v2

14

1    acts that occured on or after September 21, 2009, when Prime submitted Public Records Act requests

2    to VHS.[7]  At the hearing held on an expedited basis on November 23, 2009, the Superior Court

3    ordered the District to produce certain reports prepared by the Peira Group to Prime by December 4,

4    2009.  The District then filed a Petition for Writ of Mandate with the California Court of Appeal,

5    seeking to overturn a portion of the Order of the Superior Court.  On December 3, 2009, the

6    Appellate Court issued a stay of the Superior Court's ruling and requested additional briefing by

7    Prime.  The District has responded to such additional briefing and is awaiting a determination by the

8    Appellate Court.  A case management conference is currently scheduled for April 26, 2010.

9                        c.       **The CEQA Action ("CEQA Action").**

10                        As a further effort to challenge and overturn VHS's approval of the ASA, on

11    November 3, 2009, Prime filed a "Notification of Intent to File State Court Action Against Debtor

12    for Violation of the California Environmental Quality Act", in which Prime alleged that VHS

13    committed postpetition violations of the California Environmental Quality Act, California Public

14    Resources Code section 21000 *et seq.* ("CEQA") and that it did not require relief from stay to pursue

15    the action.  Thereafter, on November 6, 2009, Prime filed a "Verified Petition for Writ of Mandate;

16    Complaint for Declaratory Relief and Injunctive Relief," in which it asserted that VHS's approval of

17    the ASA was "procedurally and substantively illegal" because (a) in the event Public Approval was

18    obtained, it was likely that PHH would develop the agricultural property adjacent to Menifee but it

19    did not obtain the requisite approvals for such development, and/or (b) in the event Public Approval

20    was not obtained, and PHH purchased only Menifee under the Alternative Transaction, it was likely

21    that HVMC would close, thereby causing urban blight in Hemet.  Under either circumstance, Prime

22    has alleged that the proposed sale to PHH constitutes a "project" requiring compliance with the

23    California Environmental Quality Act, California Public Resources Code section 21000 *et seq.*

24    ("CEQA") and that the District has failed to comply.  On December 3, 2009, the District filed with

25

26    _____

27    [7]     While the District has taken the position that the relief sought in connection with both the Measure P Action and CEQA Action (as both are hereinafter defined) requires the Bankruptcy Court to grant relief from stay, and that therefore those actions were filed in violation of the automatic stay, the District has not taken that position with regard to the PRA Action.

28

533833v2

1   the Superior Court a Notice of Removal, removing this action to the Bankruptcy Court. The

2   Bankruptcy Court has scheduled a status conference on the removed CEQA Action for January 19,

3   2010 at 9:30 a.m. The District disputes the allegations that the sale constitutes a "project" requiring

4   compliance with CEQA and has engaged counsel with expertise in CEQA matters. The District

5   intends to oppose the CEQA Action on both procedural and substantive grounds.

6               **d.**    **The Government Code Section 1090 Action ("Section 1090 Action").**

7          On October 13, 2009, Prime filed a motion seeking relief from the automatic stay to

8   pursue an action against the District (the "Section 1090 Stay Relief Motion"), the purpose of which

9   was to seek orders nullifying or invalidating the ASA and thereby preventing the District from

10   proceeding with the ASA and enjoining the election.[8]  Specifically, the Section 1090 Stay Relief

11   Motion was based on allegations that, among other things: (i) the VHS Board of Directors illegally

12   approved a rush sale of its assets to PHH, without adequately acknowledging the interest of other

13   potential purchasers; (ii) certain conflicts of interest exist relating to the approval of the ASA

14   because certain of the members of the VHS Board of Directors are financially interested, as they are

15   employed by, or derive financial benefits from, Dr. Kali Chaudhuri (one of the principals of PHH),

16   in violation of California Government Code Section 1090, which prohibits any board member from

17   being "financially interested in any contract made by them in their official capacity, or by any body

18   or board of which they are members"; and (iii) VHS failed to apply to the proper local government

19   authorities for approval of its decision to exit the hospital business, in violation of the Cortese-Knox-

20   Hertzberg Local Government Reorganization Action of 2000, which requires VHS to apply to the

21   Riverside Local Area Formation Commission for approval of the sale of substantially all of its

22   assets. The Section 1090 Stay Relief Motion was heard by the Bankruptcy Court on November 12,

23   2009, and was denied in its entirety, without prejudice, by order dated November 23, 2009 (the

24   "Section 1090 Stay Relief Order"). Accordingly, the Section 1090 Action was not filed in the

25   Superior Court.

26

27   [8]  Prime did not attach a copy of its proposed complaint to its moving papers, however, a copy of
the complaint was filed in a supplemental pleading shortly before the hearing (the "Section 1090

28   Action").

e.    **Current Status of CEQA Action and Section 1090 Action Litigation.**

On or about November 20, 2009, Prime filed a "Renewed Motion for Relief from Stay" (the "Renewed Stay Motion"), in which it once again requested that the Bankruptcy Court (i) allow it to file the Section 1090 Action, and (ii) annul the automatic stay and permit Prime to proceed with the previously filed CEQA Action. Concurrent with the filing of its Renewed Stay Motion, Prime requested that the Bankruptcy Court shorten time to expedite the hearing on the motion, which application the Bankruptcy Court denied by order dated November 30, 2009.

On December 3, 2009, the District, acting pursuant to 28 U.S.C. Section 1452, exercised its right to remove the CEQA action to the Bankruptcy Court.

Thereafter, on December 7, 2009, Prime filed its "Notice of Appeal" of the 1090 Stay Relief Order and elected to have the District Court hear the appeal of the order. On December 14, 2009, Prime noticed its Renewed Stay Motion for hearing on January 7, 2010 at 9:30 a.m.

f.    **Resolution of Pending "Challenge Actions" At Confirmation.**

As matters now stand: (1) the CEQA Action is pending in the Bankruptcy Court; (2) the Measure P Action is pending in the Superior Court; (3) the PRA Action is pending in the Superior Court; and (4) the Section 1090 Action (collectively, hereinafter referred to as the "Challenge Actions"), has not been filed.

The District has concluded that a full and final resolution of all of the various issues that have been raised in the Challenge Actions is critical to both the confirmation and the implementation of the Plan. Once the Plan is confirmed, the District believes that the Two Hospital Transaction will only close if the obstacles to the sale posed by the Challenge Actions are removed. Indeed, it seems unlikely that PHH will want to proceed with the closing of a sale pursuant to the ASA until all challenges and concerns regarding the legality and enforceability of the Public Vote and the ASA are adjudicated on a final basis or otherwise resolved.

Accordingly, the District intends to present evidence in connection with the hearing to confirm the Plan which will address all of the issues that have been raised in the Challenge Actions and will request that the Bankruptcy Court make findings of fact and conclusions of law and adjudicate all of the issues pertaining to the Challenge Actions as part of the confirmation of the

533833v2

1    Plan.   It is the District's position that the Bankruptcy Court's adjudication of the issues raised in

2    connection with the Challenge Actions will fully and finally resolve all of those issues such that any

3    pending or threatened actions relating to the subject matter thereof will be subject to dismissal or

4    judgment in favor of the District based on applications of the principles of collateral estoppel and *res*

5    *judicata*.

6    **J.    Prime's Expressed Interest in Purchasing The District's Assets.**

7              On November 19, 2009, Prime sent a letter (the "Prime Letter") to Dr. William

8    Cherry expressing an interest in purchasing substantially all of the District Assets on terms and

9    conditions that were generally outlined in the letter.   At the time the District received the Prime

10   Letter: (i) VHS was subject to an exclusivity agreement with PHH which precludes the District from

11   negotiating with other potential purchasers during the exclusivity period; (ii) the District had already

12   executed the ASA and was further contractually prevented from engaging with Prime regarding a

13   sale of its assets; and (iii) the District had already filed its plan and disclosure statement based on the

14   ASA and its agreement with PHH.   Accordingly, the District did not engage in any formal

15   discussions or negotiations with Prime with regard to the offer set forth in the Prime Letter.

16   **IV.    THE DISTRICT'S LIABILITIES AND ASSETS**

17              Copies of the District's preliminary financial statements dated as of August 31, 2009,

18   and dated as of October 31, 2009 are attached hereto as Exhibit B.   Set forth below is a summary of

19   the liabilities and assets that are relevant to the Plan.

20   **A.    Liabilities.**

21        **1.    Proofs of Claim.**

22              The Bankruptcy Court established August 25, 2008 as the deadline for filing proofs of

23   claim against the District.   By subsequent order, the Bankruptcy Court established July 10, 2009 as

24   the supplemental bar date for claims filed by certain enumerated parties who did not get notice of the

25   August 25, 2008 bar date.

26

27

28

533833v2

1    A total of approximately 263 proofs of claim[9] were filed as general unsecured claims

2  and unsecured priority claims – which number includes 47 proofs of claim that amend previously

3  filed claims – such that approximately 216 distinct claims have been filed against the District.  The

4  distinct claims comprise an aggregate of approximately $65.9 million in general unsecured and

5  unsecured priority claims filed against the District, in addition to approximately $91 million in

6  secured claims (which claimed amount does not reflect the amounts paid to the Bondholders since

7  the Petition Date after the Moreno sale).   The District's books and records show approximately $17

8  million[10] owing to prepetition ordinary course unsecured creditors.

9       **2.       General Unsecured Claims.**

10    A total of approximately 241 proofs of claim were filed as general unsecured claims –

11  which number includes 46 proofs of claim that amend previously filed claims – such that

12  approximately 195 distinct general unsecured claims have been filed against the District (the "Filed

13  General Unsecured Claims").  Of the Filed General Unsecured Claims, 183 proofs of claim assert

14  aggregate obligations of approximately $57 million, and 12 claims were filed in "unknown," "to be

15  determined" or "unliquidated" amounts.

16    The District has engaged in a process aimed at ascertaining the differences between

17  the amounts asserted in the Filed General Unsecured Claims and the amounts reflected as owing to

18  the claimants in the District's books and records or as otherwise evaluated by the District.  To date,

19  the District has reduced the pool of Filed General Unsecured Claims by (i) approximately $1.24

20  million by reaching agreements with claimants pursuant to which such claimants amended their

21  original claims to reflect reduced amounts, plus (ii) approximately $4 million by successfully

22  objecting to claims, plus (iii) approximately $4.64 million through the process of negotiating

23  withdrawals of claims, including  (a) the withdrawal of a general unsecured claim filed by Mark

---

[9]    Some of the proofs of claims are composed of both a general unsecured claim and claim for an
asserted priority and/or secured amount. These claims may therefore be included in the
discussion of both the Filed General Unsecured Claims and Filed Priority Claims (as hereinafter
defined).

[10]   The $17 million in payables showing on the District's books and records does not include any
amounts that the District may owe on account of deficiency claims that may be asserted by
secured creditors, including the Bondholders.

1    O'Leary and Deborah O'Leary in the amount of approximately $2 million, and (b) the withdrawal of

2    a general unsecured claim in the amount of approximately $1.06 million filed by Dr. Kali P.

3    Chaudhuri. [The District has also secured stipulations withdrawing five additional unliquidated

4    claims that were filed as general unsecured claims for which claimants' recovery is restricted to

5    insurance proceeds, and is on the verge of obtaining additional stipulated withdrawals on this basis

6    and others as part of its ongoing claim resolution efforts.]

7              In furtherance of its continuing claims analysis and resolution process, the District is

8    currently preparing to file a series of additional one-off objections as well as omnibus objections to

9    the Filed General Unsecured Claims, through which process the District expects to eliminate an

10   additional approximately $2,058,000 in claims because the claims were filed after the applicable bar

11   date and/or as duplicate claims.  In addition, the District intends to file substantive objections to

12   approximately $9.27 million of the Filed General Unsecured Claims that were filed in amounts that

13   are different from the amounts showing as owing to such creditors in the District's books and

14   records.  Finally, the District intends to object to approximately $20 million of the Filed General

15   Unsecured Claims that are based on obligations for which the District contends it is not liable.

16   Although the District is confident with regard to many of its defenses relating to the disputed Filed

17   General Unsecured Claims, it is important to note there is no assurance as to whether or not the

18   District will be successful in eliminating or reducing any or all of these claims.

19        3.        **Priority Unsecured Claims.**

20             A total of approximately 22 proofs of claim were filed as priority unsecured claims –

21   which number includes 4 proofs of claim that amend previously filed claims – such that

22   approximately 18 distinct claims have been filed against the District as unsecured priority claims

23   (the "Filed Priority Claims").  Of the Filed Priority Claims, 17 assert an aggregate of approximately

24   $6.7 million in obligations against the District, and one claim was filed in an "unknown" amount.

25             To date, the District has been able to reduce the pool of Filed Priority Claims by

26   approximately $3.1 million through the process of negotiating withdrawals by claimants of six Filed

27   Priority Claims.  Included in this figure is the stipulated withdrawal of SEIU's priority claim, filed in

28   an amount exceeding $3 million (as discussed in Section III.D above).  Accordingly, only twelve

533833v2

20

1    Filed Priority Claims in an aggregate amount of approximately $3.5 million remain, which amount

2    the District believes it may be able reduce to as little as $40,000 for the following reasons.

3                    First, approximately $1.6 million of the $3.5 million in Filed Priority Claims pertains

4    to the adversary proceeding between Aetna and the District (as discussed in Section III.G above), in

5    which settlement discussions are ongoing. The District believes that Aetna's claim will be settled or

6    otherwise resolved by the Bankruptcy Court in a manner that does not require the District to go out

7    of pocket beyond giving up monies it believes it is owed by Aetna. If the District is correct

8    regarding its analysis of the Aetna claim, only approximately $1.9 million in Filed Priority Claims

9    will remain.

10                    Next, because Chapter 9 only incorporates administrative claims allowed under

11    section 507(a)(2), which are Administrative Claims discussed in Section V.A.1.a below, the District

12    believes that most, if not all, of the Filed Priority Claims are not actually entitled to priority status

13    under chapter 9. Accordingly, the District intends to object to a $886,179 claim, which seeks

14    priority under section 507(a)(5) of the Bankruptcy Code, which the District believes was filed by a

15    Defined Benefit Plan Participant. Because chapter 9 only incorporates administrative claims

16    allowed under section 507(a)(2), this Defined Benefit Plan Claim is not entitled to priority status and

17    should instead be treated as an unsecured Class 2C Claim under the Plan. Accordingly, the District

18    hopes that this objection and reclassification will bring down the priority claim pool down to slightly

19    in excess of $1 million. The approximately $1 million amount should be further reduced by

20    objections to made to three proofs of claim aggregating approximately $828,000, which seek priority

21    based on rent that has come due since the Petition Date and presumably has been paid by the District

22    on a current basis postpetition. Finally, the District believes it has additional objections to the

23    remaining $187,000 of Filed Priority Claims, which, if the District prevails, will reduce the Allowed

24    priority claim pool to approximately $40,000.

25

26

27

28

533833v2

4.  **Class 2B - General Unsecured Claims of KM Strategic Management, Inc.,**
    **Hemet Community Medical Group, Menifee Valley Community Medical**
    **Group, and LHIO and Claims of Constituent Members Thereof**

As discussed in Section V.A.5 below, upon the Sale Closing Date, PHH will assume or otherwise satisfy all obligations related to four claims filed by HCMG, Menifee Valley Community Medical Group, and LHIO, LLC asserting unliquidated alleged claims against the District relating to certain alleged breaches and/or rejections by the District. The Plan classifies these claims, and any claims of constituent members of the forgoing that are derivative of such claims, in Class 2B. PHH contends that these claims total approximately $55 million. The District believes that, if the Two Hospital Transaction does not close, it will have substantial defenses to these claims, although there is similarly no assurance as to whether the District will be successful in eliminating or reducing these claims.

5.  **Claims of Series 1993 and 1996 Bondholders.**

By stipulation, the District has agreed that the prepetition secured claims of the Indenture Trustee are allowable claims in the Chapter 9 Case. The Class 1A and Class 1B Claims are outstanding in the principal amounts of $40,615,000 and $4,935,000, respectively, plus accrued interest thereon and any unpaid fees and expenses of the Indenture Trustee and its attorneys and advisors to which the Indenture Trustee is entitled. The Class 1A and Class 1B Claims are secured by a first-priority perfected pledge of the District Revenues (as defined in the Bond Documents) to the Indenture Trustee, and the Indenture Trustee contends that the pledge of revenues will encumber the sale proceeds from the Two Hospital Transaction.

6.  **Administrative Claim of Select.**

In connection with the sale of Moreno, the District issued to Select the Select Administrative Note, which is an unsecured promissory note in the amount of $7,968,500. The Select Administrative Note bears interest at a rate of 5% per annum from the date of issuance, with no payment due until the later of November 15, 2009 or plan confirmation. As of the date hereof,

533833v2

1    the amount due on the Select Administrative Note is approximately $8.7 million. The Select

2    Administrative Note will not be the responsibility of the District upon confirmation of the Plan.

3         **7.      Statement Regarding Liabilities.**

4              The District disputes a number of the claims that have been asserted against it, and

5    the District's review and analysis of claims is ongoing.  Given the fact and inherent uncertainties in

6    any litigation regarding claims, no assurance can be given regarding the successful outcome of any

7    litigation that may be initiated in objection to such claims or regarding the ultimate amount of

8    unsecured claims that will be allowed against the District.

9              As described below, the Plan enables the District to file objections to claims at any

10   time within one hundred and eighty (180) days after the Effective Date.  The Plan also provides for

11   the District to retain any and all defenses, offset and recoupment rights, and counterclaims that may

12   exist with respect to any disputed claim, whether under section 502, 552, or 558 of the Bankruptcy

13   Code or otherwise.  The District reserves all rights with respect to the allowance and disallowance of

14   any and all claims. **In voting on the Plan, creditors may not rely on the absence of a reference**

15   **in this Disclosure Statement or the Plan or the absence of an objection to their proofs of claim**

16   **as any indication that the District ultimately will not object to the amount, priority, security, or**

17   **allowance of their claims.**

18        **B.      Assets.**

19              The District's "fixed assets" primarily consist of its Hospitals, the Medical Arts

20   Building located in Hemet (the "MAB"), and raw land in Hemet that was originally conceived of as

21   expansion space.  Attached as Exhibit C is a copy of the most recent independent valuations of the

22   foregoing, prepared by Valuation & Information Group as of August 5, 2009, in the context of a sale

23   of the District's assets as a going concern.  In addition, the District owns cash, accounts receivable,

24   contract rights, and leases.

25              Under the Plan, the District will sell to PHH substantially all of its assets certain

26   related additional assets.  The consideration to be provided by PHH differs according to which

27   transaction is ultimately consummated, and such consideration, whether cash or assumption of

28   liabilities, constitutes a significant portion of the funding for the Plan under either scenario.

1          The District's investigation regarding its potential claims and causes of action are

2    ongoing and not yet completed.

3          Pursuant to section 1.6.12 of the ASA, all of the District's claims, causes of action,

4    rights of recovery, rights to offset, recoupment rights to refunds and similar rights are transferred to

5    PHH with certain exceptions set forth in section 1.7 of the ASA or schedule 1.6.12 to the ASA.

6    Among other things, the District will retain: (i) all claims, rights, interests and proceeds with respect

7    to state or local tax refunds resulting from periods prior to the Effective Time of the ASA; (ii) all

8    rights, claims and choses in action with respect to any Excluded Contracts, as defined in the ASA,

9    (iii) certain assets not acquired by PHH; and (iv) any affirmative defenses, counterclaims, rights of

10    offset or recoupment, or other defenses in connection with Excluded Liabilities, as defined in the

11    ASA, and as necessary to object to or defend against claims asserted against the District.

12          **Parties in interest may not rely on the absence of a reference in this Disclosure**

13    **Statement or Plan as any indication that the District ultimately will not pursue any and all**

14    **available claims and causes of action against them. All parties who previously dealt with the**

15    **District hereby are on notice that the Plan preserves certain of the District's rights, claims,**

16    **interests and defenses. The District expects that any and all meritorious claims will be pursued**

17    **and litigated after the Effective Date to the extent they remain vested in the District.**

18    **V.    SUMMARY OF THE PLAN OF ADJUSTMENT**

19          **The discussion of the Plan set forth below is qualified in its entirety by reference**

20    **to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are**

21    **controlling. Holders of claims and other interested parties are urged to read the Plan and its**

22    **exhibits, copies of which are attached to this Disclosure Statement as Exhibit A, in their**

23    **entirety so that they may make an informed judgment regarding the Plan.**

24          The Plan is premised upon the ASA by and between the District and PHH under

25    which PHH will acquire substantially all of the operating assets of the Debtor, including HVMC,

26    MVMC, parcels adjacent thereto, HVHC, the MAB, and the parcels consisting of approximately

27

28

533833v2

24

1    four (4) acres, fronting Florida Avenue, San Jacinto Avenue, Latham Street, and Laursen Street

2    located in Hemet, as well as all accounts receivable, cash, and related assets.

3          The means by which the Plan will be implemented are set forth in more detail in

4    Section V.C.1. below, but, in summary, PHH will:

5          (i)     cause the Allowed Claims in Classes 1A and 1B, in the approximate amount

6    of $44.7 million (net of reserves held by the District), to be paid in full, in cash at the time of

7    closing;

8          (ii)     provide the District with $4 million cash to be used for payment of

9    administrative claims that are not being assumed by PHH, as well as additional funds that may be

10    needed to pay administrative expenses;

11          (iii)     provide $17 million, in four annual installments on each successive

12    anniversary of the Closing to the holders of allowed general unsecured claims against the Debtor,

13    which sum may be adjusted upward or downward, depending on the total amount of administrative

14    claims that are not assumed by PHH;

15          (iv)     assume substantially all of the District's post-petition obligations, estimated at

16    approximately $31 million as of August 31, 2009;

17          (v)     cause the Select Administrative Note to be satisfied;

18          (vi)     pay premiums of "tail" malpractice and error and omissions insurance

19    coverage;

20          (vii)     pay the District a termination fee of $2 million if it fails to perform under the

21    ASA;

22          (viii)     pay $400,000 per year for five years to sustain the District as a California

23    Local Health Care District;

24          (ix)     assume accrued employee "paid time off" obligations estimated to be about

25    $2.7 million;

26          (x)     honor accrued extended sick leave estimated to be about $3.3 million;

27          (xi)     maintain core services such as basic emergency services for five years;

28

533833v2

1   (xii)   cause certain claims of its affiliates, which PHH estimates to total

2   approximately $55 million, to be withdrawn in the Chapter 9 Case;

3   (xiii)   maintain charity care policies consistent with applicable law;

4   (xiv)   assume the extant collective bargaining agreements with the SEIU and CNA;

5   (xv)   employ substantially all of the employees of VHS;

6   (xvi)   permit VHS to retain certain restricted assets such as the Beatrice Brown

7   bequest for "crippled" children's needs of about $807,000;

8   (xvii)   permit Valley Heath System Service Corporation to donate half of its cash

9   (approximately $550,000) to Ramona Community Services Corporation; and

10   (xviii)   provide a defense to certain legal claims if the transaction is challenged.

11   After the Sale Closing, the District would continue to exist as a California Local

12   Health Care District, but, having sold substantially all of its assets, would not operate any hospitals.

13   **A.    Classification And Treatment of Claims.**

14   **1.    Unclassified Claims.**

15   Section II of the Plan governs the treatment of certain claims that are not

16   classified into Classes under the Plan.

17   **a.    Administrative Expense Claims.**

18   Administrative Expense Claims are claims of the kind described in sections 503(b)

19   and 507(a)(2) of the Bankruptcy Code. Section II.A. of the Plan provides for the treatment of

20   Administrative Claims. Throughout the course of the Chapter 9 Case, the District has endeavored to

21   satisfy administrative expenses as they became due. Accordingly, the District believes that most

22   claims that otherwise would constitute Allowed Administrative Claims previously have been or will

23   be satisfied in the ordinary course of business prior to the Effective Date, or will be included in the

24   PHH Assumed Other Liabilities as described below.

25   **(1)    Treatment of the Select Administrative Claim.**

26   The Plan provides that, pursuant to section 1.2.1(ii) of the ASA, at the closing of the

27   Two Hospital Transaction, the Select Administrative Note shall be satisfied in full or all obligations

28   evidenced thereby shall be assumed by PHH and the District shall be released from any further

533833v2

1    liability in connection with the Select Administrative Note.  The District understands that Select has

2    agreed to the forgoing treatment.

3                          (2)    **Treatment of All Other Administrative Claims
                                  Other Than Professional Claims.**

4

5              The Plan provides that, pursuant to section 1.2.1(iii) of the ASA, PHH will, upon

6    closing of the Two Hospital Transaction, assume and satisfy certain postpetition administrative

7    claims of the District, which are defined in the ASA as the "Assumed Other Liabilities."  The

8    Assumed Other Liabilities consist of the "Assumed Current Liabilities" and "Other Liabilities,"

9    which are both defined in section 1.2.1(iii) of the ASA.  The District believes that substantially all of

10   its administrative claims, with the exception of professional fees and certain claims arising from the

11   rejection of certain postpetition executory contracts, will be included in the Assumed Other

12   Liabilities.  PHH will also contribute additional funds as are necessary to satisfy Administrative

13   Claims that are not satisfied as a result of being treated as Assumed Other Liabilities ("Covered

14   Claims," under the ASA), including Professional Claims in the event that the $4 million contributed

15   at Closing is insufficient to pay such Covered Claims.

16             To the extent of any Administrative Claims, other than the Assumed Other Liabilities,

17   and except as provided in Section II.B of the Plan, with respect to Professional Claims, or to the

18   extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the

19   District or its agent will pay to each holder of an Allowed Administrative Claim, in full satisfaction,

20   release and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim

21   on the later of (i) the Effective Date, (ii) the date on which such claim becomes an Allowed

22   Administrative Claim, or as soon thereafter as is practicable, and (iii) the date funds are to be

23   available for that purpose under section 1.2.4.3 of the ASA.

24             From and after the Sale Closing Date, and except for Professional Claims, creditors

25   holding claims that relate to or arise from, any of the PHH Assumed Current Liabilities and Covered

26   Claims shall only have a right to collect payment on account of such claims from PHH and the

27   Administrative Claims Fund, and the District shall thereafter be relieved of any and all liability for

28

533833v2

1  the payment of any and all claims relating to, or arising from, any of the PHH Assumed Current

2  Liabilities or Covered Claims.

### b.    Professional Claims.

4  Professional Claims are claims of professionals for services rendered or expenses

5  incurred in rendering such services in the Chapter 9 Case or incident to the Plan.

6  Section II.C. of the Plan provides that, pursuant to section 943(a)(3) of the

7  Bankruptcy Code, all Professional Claims must be disclosed and be reasonable and that, upon being

8  deemed reasonable, the District or its agent will pay to each holder of a Professional Claim, in full

9  satisfaction, release and discharge of such claim, cash in an amount equal to that portion of such

10  claim that is deemed reasonable, except to the extent such claim previously has been paid or

11  satisfied.

12  The District has paid the fees of its bankruptcy counsel and other professionals, as

13  well as the fees of the bankruptcy counsel and financial advisor of the Committee, on a regular basis

14  during the Chapter 9 Case.  Payments/invoices from the petition date through September 30, 2009

15  are summarized as follows:

| Professional | Dates of Employment | Fees/Expenses Invoice Through November 30, 2009 |
|---|---|---|
| Stutman, Treister & Glatt (Bankruptcy Counsel to the District) | 12/13/07 – present | $3,187,400.79 |
| Pachulski, Stang, Ziehl & Jones (Counsel to the Committee) | 4/7/08 - present | $208,007.00 |
| Shattuck Hammond (Financial Advisors to District) | 12/13/07 - present | $488,279.72 |
| The Piera Group (Special Transaction Advisor to District) | 7/09 - present | $680,054.21 |
| AMHIG (Financial Advisors to the Committee) | 4/7/08 - present | $396,025.40 |

533833v2