1    The District has reserved the right to object to the reasonableness of the fees and

2    expenses of the PSZ&J and AMHIG firms (including the fees and expenses previously paid).

3            **c.        Bar Date For Assertion Of Requests For Payment Of
                        Administrative Claims (Other Than Ordinary Course**
4                        **Administrative Claims) And Professional Claims.**

5    Section II.C. of the Plan provides that all requests for approval of Administrative

6    Expense and Professional Claims must be filed with the Bankruptcy Court and served upon the

7    District no later than thirty (30) days after the date on which the Notice of Effective Date is mailed

8    pursuant to the Plan.

9            *Any request for payment of an Administrative Claim, and any request for a finding*

10   *that a Professional Claim is reasonable, that is not timely filed by that deadline will be forever*

11   *barred, and holders of such claims will be barred from asserting such claims in any manner*

12   *against the District.*

13       **2.    Classes  1A and 1B (Claims of the Holders of Series 1993 COPs and 1996
                Bonds.).**
14

15   The Plan classifies the claims of holders of the Series 1993 COPs in Class 1A, and

16   the claims of holders of the Series 1996 Bonds in Class 1B.

17   The Indenture Trustee for the Bonds will be paid, on the Sale Closing Date, a sum

18   sufficient to fully satisfy at closing all outstanding principal, accrued interest, and unpaid fees and

19   expenses of the Indenture Trustee and its attorneys and advisors to which the Indenture Trustee is

20   entitled, with respect to the Allowed Class 1A and Class 1B Claims, as more specifically described

21   in section 1.2.1 of the ASA.

22       **3.    Classes 1C (Other Secured Claims).**

23   The Plan classifies the Secured Claims filed by all creditors holding Secured Claims,

24   other than those filed by holders of the Series 1993 COPs and the claims of holders of the Series

25   1996 Bonds, in Class 1C.

26   Aside from the Bondholders' claims, the District received 10 claims that were filed as

27   Secured Claims.  As soon as practicable after the Effective Date, each claimant holding an Allowed

28

533833v2

1    Class 1C Claim will receive, at the election of the District, in its discretion, one of the following

2    treatments in full satisfaction, discharge, exchange and release of its Allowed Class 1C Claim:

3        (a)    The Holder of the Class 1C Claim will receive the Collateral in which that

4            Holder has a security interest; or

5        (b)    The Holder of the Class 1C Claim will receive any proceeds actually

6            received by the District from the sale or disposition of the Collateral in which

7            that Holder has a security interest; or

8        (c)    The Holder of the Class 1C Claim will receive Cash in the amount of that

9            Holder's Allowed Class 1C Claim; or

10        (d)    The Holder of the Class 1C Claim will receive such other distributions or

11            treatment as are necessary to leave the rights of said Holder Unimpaired or as

12            are necessary to otherwise satisfy those requirements of chapter 11 that are

13            incorporated into chapter 9 of the Bankruptcy Code.

14        The District will have fourteen (14) days after the date on which the Class 1C Claim

15    is determined to be an Allowed Claim, to elect which treatment to provide to such holder of an

16    Allowed Class 1C Claim.

17        4.    **Class 2A (General Unsecured Creditors).**

18        The Plan classifies most general unsecured claims in Class 2A.

19        As of the bar dates established by prior orders of the Bankruptcy Court, proofs of

20    claim asserting general unsecured claims totaling approximately $58.7 million, plus "unknown,"

21    "unliquidated" or "to be determined" amounts, excluding claims classified in Class 2B as described

22    below, were timely filed with the Bankruptcy Court. For a further discussion of these claims, please

23    refer to Section IV.A.1 above.

24        The holders of Allowed Claims in Class 2A will receive their pro rata share of $17

25    million or such increased or reduced amount that will be available for payment of such Claims, as

26    further detailed in this sentence, which distributions shall be paid in four equal annual installments

27    without interest, with the first payment to be made on the first anniversary of the Sale Closing Date,

28    and on each anniversary thereafter; *provided, however*, that such $17 million may either be (a)

533833v2

1    increased by any portion of the $4 million that PHH will deposit into the PHH Administrative

2    Claims Fund after complying with the procedures set forth in Section 1.2.4.3 of the ASA; or (b)

3    reduced, at the time and in the manner set forth in Section 1.2.4.3 of the ASA, by any amount in

4    excess of the $4 million that PHH may be required to deposit into the PHH Administrative Claims

5    Fund to pay Allowed Administrative Claims in full.

6            **5.**       **Class 2B (General Unsecured Claims of KM Strategic Management, Inc.,**
       **Hemet Community Medical Group, Menifee Valley Community Medical**
7      **Group, and LHIO And Claims of Constituent Members Thereof).**

8           KM Strategic Management, Inc., HCMG, Menifee Valley Medical Group and LHIO,

9    LLC have filed proofs of claims, identified as claim numbers 134, 135, 136 and 168 in the

10   Bankruptcy Court's official registry of claims, asserting alleged claims against the District relating to

11   certain alleged breaches and/or rejections by the District.  The Plan classifies these claims, and any

12   claims of constituent members of the forgoing that are derivative of such claims, in Class 2B.  PHH

13   contends that these claims total approximately $55 million.  The claims assert damages for future

14   lost profits based on the District's alleged breaches of certain agreements, with two based on risk

15   sharing agreements with independent physician associations, one based on a long-term technology

16   sharing agreement relating to information necessary in order to maximize Medicare payments, and

17   one based on the District's alleged use of certain proprietary software programs.  Because the District

18   disputes these liabilities and the claimed damages are speculative, these claims will be vigorously

19   contested.  Accordingly, the District believes that, if the Two Hospital Transaction does not close, it

20   will have substantial defenses to these claims, although the there is no assurance as to whether the

21   District will be successful in eliminating or reducing these claims.

22          Upon the Sale Closing Date, PHH will assume or otherwise satisfy all obligations

23   owed to holders of Allowed Class 2B Claims, with the District being fully and completely released

24   from any liability thereunder and held harmless from such Claims by PHH, as set forth in section

25   1.2.1(v) of the ASA.

26           **6.**       **Class 2C (Interests of Defined Benefit Plan Participants).**

27          Under Section 4.8 of the "Valley Health System Retirement Plan Adopted January 1,

28   1971, as amended, the VHS Retirement Plan was frozen effective May 4, 1999, such that the

533833v2

1  "Accrued Benefit" of each plan participant was frozen as of this date, and participants have accrued

2  no benefits under the VHS Retirement Plan since such date.

3        Under the Plan, Defined Benefit Plan Participants will be entitled to the same rights

4  and benefits to which such participants are currently entitled under the VHS Retirement Plan and the

5  MetLife Group Annuity Contract, and such participants shall have no recourse to the District or to

6  any assets of the District, and shall not be entitled to receive any distributions under the Plan.

7  Instead, all unallocated amounts held by MetLife Group, pursuant to the VHS Retirement Plan and

8  the MetLife Group Annuity Contract, will continue to be made available to provide retirement

9  benefits for participants in the manner indicated under the provisions of the VHS Retirement Plan

10  and the MetLife Group Annuity Contract.  Accordingly, the treatment of Allowed Class 2C Claims

11  set forth in the Plan does not affect any legal, equitable or contractual rights to which the VHS

12  Retirement Plan participants are entitled.

13  **B.**    **Treatment Of Executory Contracts And Unexpired Leases.**

14      **1.**    **Generally.**

15      The Bankruptcy Code empowers debtors, subject to the approval of the Bankruptcy

16  Court, to assume or reject the debtors' executory contracts and unexpired leases.  An "executory

17  contract" generally means a contract under which material performance other than the payment of

18  money is due by the parties.

19      If an executory contract or unexpired lease is rejected by the debtor, the rejection

20  operates as a prepetition breach of such agreement.  If an executory contract or unexpired lease is

21  assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and

22  damages arising for any subsequent breach of the agreement are treated as administrative expenses.

23      **2.**    **Assumption.**

24      As detailed in the ASA, PHH must notify the District in writing of any executory

25  contract or unexpired lease that PHH has elected to assume.  Subject to all conditions set forth in the

26  ASA, the District will include such executory contracts and unexpired leases in the

27  Assumption/Assignment Motion that will seek authority to assume and immediately assign such

28  executory contracts and unexpired leases to PHH.

533833v2

### a.    Cure Payments and Future Performance.

After the provision of notice and the opportunity for a hearing on the Assumption/Assignment Motion, the Bankruptcy Court will resolve any disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (b) the ability of PHH to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (c) any other matter pertaining to such assumption and assignment.

### 3.    Rejection.

The District will file the Rejection Motion, pursuant to section 365(a) of the Bankruptcy Code, to seek approval and authorization for the rejection of such executory contracts and unexpired leases that PHH has not elected to assume, which the District, in the exercise of its business judgment, deems warranted. The District anticipates rejecting any executory contract and unexpired lease that is not needed for it to continue operating as a local healthcare district.

### a.    Deadline For The Assertion Of Rejection Damage Claims; Treatment Of Rejection Damage Claims.

All proofs of Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after the date on which notice of entry of the order approving the rejection is mailed. Any Claim for which a proof of Claim is not filed and served within such time will be forever barred and shall not be enforceable against the District or its assets, properties, or interests in property. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be classified into Class 2A and treated accordingly.

### C.    Means For Execution And Implementation Of The Plan.

Upon consummation of the Two Hospital Transaction, PHH will provide the following combination of cash and assumption of liabilities to enable the District to implement the Plan and satisfy its obligations under the Plan:

533833v2

(1)    An amount of cash sufficient to pay the outstanding principal, accrued interest, and fees and expenses of the Indenture Trustee and its attorneys and advisors to which the Indenture Trustee is entitled, with respect to the Allowed Claims in Classes 1A and 1B in full at closing after application of any reserves held internally by the District for payment of interest or principal on Class 1A and Class 1B Claims.

(2)    Take responsibility for the Select Administrative Note, and holding the District harmless with respect thereto.

(3)    Take responsibility for the PHH Assumed Current Liabilities, estimated at approximately $31 million as of August 31, 2009, and indemnification of the District with respect thereto.

(4)    Payment in full of Administrative Claims that are not part of the PHH Assumed Current Liabilities from the $4 million PHH Administrative Claims Fund, or such additional monies as are needed to pay Allowed Administrative Claims, to be funded by PHH pursuant to section 1.2.4 of the ASA.

(5)    Contribute $17 million towards payment of Allowed Class 2A Claims in four equal annual payments, with the first distribution to be made on the first anniversary of the Sale Closing Date; provided however, that to the extent the PHH Administrative Claims Fund is insufficient to pay all of the Allowed Administrative Claims in full, PHH may be obligated to advance any such additional amounts as are necessary to pay all Allowed Administrative Claims, and any amount so advanced shall be deducted dollar for dollar from PHH's obligation to contribute $17 million for the payment of Allowed Class 2A General Unsecured Claims while, conversely, to the extent the PHH Administrative Claim Fund is not fully needed to pay Allowed Administrative Claims, such excess shall be added to the $17 million to be paid pro rata to Class 2A.

(6)    Take responsibility for those claims designated in the Bankruptcy Court docket by numbers 134, 135, 136 and 168 and indemnify and hold the District harmless with respect thereto.

(7)    Accept an immediate assignment of the executory contracts and leases that it notifies the District to assume pursuant to the ASA.

533833v2

(8)    Pay the severance payments owing to those District employees to whom PHH does extend an offer of employment consistent with the terms set forth in the ASA or its Schedules.

(9)    Provide $400,000 per year to the District, commencing on the Sale Closing Date, for a period of five (5) years for use by the District to, among other things, pay its ongoing operating expenses, including payroll and professional fees, and fund any necessary elections, monitor PHH's performance under the ASA, evaluate, analyze and object to creditor claims and resolve any disputes concerning creditor claims, and make distributions to creditors under the Plan.

(10)    Pay, for a period of five (5) years from the Sale Closing Date, the premiums for (a) the District's directors and officers tail errors and omissions insurance, which is currently estimated at $450,000 and (b) the general liability and medical malpractice tail insurance.

**1.    Rights of Action.**

The Plan provides, pursuant to section 1.6.12 of the ASA, all of the District's Claims, causes of action, rights of recovery, rights of offset, recoupment rights to refunds and similar rights are transferred to PHH with certain limited exceptions set forth in the ASA or schedules thereto. Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in this Plan, the District expressly reserves all Rights of Action for later adjudication and, as a result, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Rights of Action upon or after the confirmation or consummation of this Plan or the Effective Date.  In addition, the District expressly reserves the right to pursue or adopt against any other entity any claims alleged in any lawsuit in which the District is a defendant or an interested party.

**D.    Distributions.**

The District may retain one or more agents to perform or assist it in performing the distributions to be made pursuant to the Plan, which agents may serve without bond.  The District may provide reasonable compensation to any such agent(s) without further notice or Court approval. All distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth in the books and records of the District or its agents, unless the District has been notified by such holder in a writing that contains an address for such holder different from the address reflected

1    in its books and records. All distributions to the Bondholders shall be made in accordance with the

2    operative documents that govern the Bonds.

3             **1.**      **Undeliverable Distributions.**

4         *Holding Of Undeliverable Distributions.* If any distribution to any holders is

5    returned to the District or its agent as undeliverable, no further distributions shall be made to such

6    holder unless and until the District is notified in writing of such holder's then-current address.

7    Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed

8    Property."

9         *Unclaimed Property.* If any entity entitled to receive distributions pursuant to the

10    Plan does not present itself on the Effective Date or on such other date on which such entity becomes

11    eligible for distribution, such distributions shall be deemed to be "Unclaimed Property." Unclaimed

12    Property shall be set aside and held in a segregated account to be maintained by the District pursuant

13    to the terms of the Plan.

14         On the first anniversary of the Effective Date, the District will file with the

15    Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and

16    last-known address of holders of the Unclaimed Property; the District otherwise will not be required

17    to attempt to locate any such entity. On the second anniversary of the Effective Date, all remaining

18    Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in

19    the District.

20             **2.**      **Timeliness Of Payments.**

21         Any payments or distributions to be made pursuant to the Plan shall be deemed to be

22    timely made if made within fourteen (14) days after the dates specified in the Plan; provided,

23    however, that all distributions on the Class 1A and Class 1B Claims will be paid at the Sale Closing

24    Date. Whenever any distribution to be made under the Plan shall be due on a day that is a Saturday,

25    Sunday, or legal holiday, such distribution instead shall be made, without interest, on the

26    immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to

27    have been made on the date due.

28

533833v2

### 3.    Compliance With Tax Requirements.

The District will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.  In connection with each distribution with respect to which the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or withholding is required, the District will file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the District, the District at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

### 4.    Time Bar To Cash Payments.

Checks issued by the District on account of allowed claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the District by the holder of the allowed claim with respect to which such check originally was issued.  Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date.  After such date, all claims in respect of voided checks will be discharged and forever barred and the District will retain all moneys related thereto.

### 5.    No *De Minimis* Distributions.

Notwithstanding any other provision of the Plan, no payment of less than ten dollars ($10.00) will be made by the District on account of any allowed claim.

### 6.    No Distributions On Account Of Disputed Claims.

No distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed).  Distributions made after the

1    Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later

2    became Allowed) shall be deemed to have been made as of the Effective Date.

3    **7.    No Postpetition Accrual.**

4    Unless otherwise specifically provided in the Plan or allowed by order of the

5    Bankruptcy Court, the District will not be required to pay to any holder of a claim any interest,

6    penalty or late charge accruing with respect to such claim on or after the Petition Date.  Pursuant to

7    the Plan, all post-Petition Date interest on the Series 1993 COPs and Series 1996 Bonds will be paid

8    through the Sale Closing Date (solely with respect to those holders who do not agree to restructure

9    their Bonds).

10    **8.    Insurance Proceeds.**

11    All distributions under the Plan will be net of any insurance proceeds actually

12    received in payment of any Claim that otherwise is allowed and entitled to a distribution.

13    **E.    Disputed Claims.**

14    **1.    Claims Objection Deadline; Prosecution Of Objections.**

15    The District will have the right to object to the allowance of claims filed with the

16    Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.  Unless

17    otherwise ordered by the Bankruptcy Court, the District must file and serve any such objections to

18    claims by not later than one hundred and eighty (180) days after the Effective Date (or, in the case of

19    claims lawfully filed after the Effective Date, by not later than one hundred and eighty (180) days

20    after the date of filing of such claims).

21    **2.    Reserves, Payments, And Distributions With Respect To Disputed
       Claims.**

22

23    At such time as a disputed claim becomes an allowed claim, in whole or in part, the

24    District or its agent will distribute to the holder thereof the distributions, if any, to which such holder

25    is then entitled under the Plan.  Such distributions, if any, will be made as soon as practicable after

26    the date that the order or judgment of the Bankruptcy Court allowing such disputed claim becomes a

27    Final Order (or such other date as the claim becomes an allowed claim), but in no event more than

28    thirty (30) days thereafter.  Unless otherwise specifically provided in the Plan or allowed by order of

533833v2

1    the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed

2    Claims.

3    **F.    Continuing Jurisdiction Of The Bankruptcy Court.**

4    The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range

5    of matters relating to the Chapter 9 Case, the Plan, and other related items.  Readers are encouraged

6    to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-

7    Effective Date jurisdiction.

8    **VI.    CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

9    **Because the law with respect to confirmation of a plan of adjustment is complex,**

10   **creditors concerned with issues regarding confirmation of the Plan should consult with their**

11   **own attorneys and financial advisors.**  The following discussion is intended solely for the purpose

12   of providing basic information concerning certain confirmation issues.  The District cannot and does

13   not represent that the discussion contained below is a complete summary of the law on this topic.

14   Many requirements must be met before the Bankruptcy Court may confirm the Plan.

15   Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by

16   the requisite number of creditors, and whether the Plan is in the "best interests" of creditors.  These

17   requirements, however, are not the only requirements for confirmation, and the Bankruptcy Court

18   will not confirm the Plan unless and until it determines that the Plan satisfies all applicable

19   requirements, including requirements not referenced in this Disclosure Statement.

20   **A.    Voting And Right To Be Heard At Confirmation.**

21   **1.    Who May Support Or Object To Confirmation Of The Plan?**

22   Any party in interest may support or object to the confirmation of the Plan.  Even

23   entities who may not have a right to vote (*e.g.*, entities whose claims are classified into an

24   unimpaired Class) may still have a right to support or object to confirmation of the Plan.  (*See*

25   Section I.C.2 for information regarding the applicable deadlines for objecting to confirmation of the

26   Plan).

27

28

533833v2

1

### 2.    Who May Vote To Accept Or Reject The Plan?

A creditor generally has a right to vote for or against the Plan if its Claim is both Allowed for purposes of voting and is classified into an impaired Class.  Generally, a claim is deemed allowed if a proof of claim was timely filed, provided, however, that if an objection to a claim has been filed, the claimant cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes.  Thus, **the definition of "Allowed Claim" used in the Plan for purpose of determining whether creditors are entitled to receive distributions is different from that used by the Bankruptcy Court to determine whether a particular claim is "allowed" for purposes of voting.  Holders of claims are advised to review the definitions of "Allowed," "Claim," and "Disputed" set forth in Section I.A. of the Plan to determine whether they may be entitled to vote on, and/or receive distributions under, the Plan.**

### 3.    Who Is Not Entitled To Vote?

The holders of the following types of claims are not entitled to vote on the Plan: (a) claims that have been disallowed; (b) claims that are subject to a pending objection and which have not been allowed for voting purposes; (c) claims that are not impaired; and (d) Administrative Expense Claims, since such claims are not placed in Classes and are required to receive certain treatment specified by the Bankruptcy Code.

### 4.    Vote Necessary To Confirm The Plan.

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cramdown" with respect to any dissenting impaired Class.

A Class of claims is considered to have accepted the Plan when more than one-half in number and at least two-thirds in dollar amount of the claims that actually voted in that Class have voted in favor of the Plan.

533833v2

**B.    The "Best Interests" Test.**

The Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to section 943(b)(7) of the Bankruptcy Code, which in the chapter 9 context means that treatment under the Plan must be better than the only alternative available, which is dismissal of the case. Dismissal permits every creditor to fend for itself in the race to the courthouse, since a court supervised liquidation under chapter 7 is not a permissible chapter 9 alternative.

The District submits that the Plan is in the best interests of all creditors because significant payments will be made to all impaired Classes. *See* District's Projected Financials at Exhibit D hereto. The Plan devotes all or nearly all of the consideration obtained on account of those assets that the District is legally entitled to sell to the repayment of the District's creditors. The District has obtained a fair price for its assets under the Two Hospital Transaction, and the Plan will therefore result in the satisfaction of the Bonds, the payment of administrative claims, and payment of a substantial amount on account of allowed unsecured claims, albeit over time. By implementing the ASA, the District will be able to convey its hospital assets as a going concern. As a going concern, the value of the District's assets is enhanced by several factors, including the experience and talent of employees, the value of assembled contracts and equipment, and the connections of the business to the community and other providers. The Plan allows the District to realize that value, and distribute it to its creditors.

In contrast, in the absence of the Plan, the District's creditors would be left to "fend for themselves." Individual creditor collection actions will likely aggregate, through suits and attachments, to make continued operation of the Hospitals untenable, thus eliminating the value of the District's assets as a going concern. Without operating health care facilities, the value of the District's assets would consist of only the value of empty buildings, raw land and used equipment. This value would likely not be distributed pro rata. Instead, those creditors able to pursue litigation most quickly would benefit at the expense of others, and, indeed, the total value may be insufficient to repay the Bonds.

1        Moreover, the Plan preserves the availability of healthcare services to patients in the

2    District under the auspices of PHH in the Two Hospital Transaction, while the chaotic free-for-all

3    that would occur in the absence of the Plan and ensuing possibility that operations will cease as

4    described above would work to the severe detriment of the District's community.

5        **C.    Feasibility.**

6        To satisfy the requirement set forth in Bankruptcy Code section 943(b)(7) that the

7    Plan be feasible, the District must demonstrate the ability to make the payments required under the

8    Plan and still maintain its operations at the level that it deems necessary to the continued viability of

9    the health care district.

10        The District submits that the Plan is feasible.  Under the Two Hospital Transaction,

11    the ability to make the payments required by the Plan turns on the ability of PHH to close that

12    transaction now that Public Approval has been obtained.  On December 4, 2009, PHH disclosed to

13    the District's general counsel its equity and lender commitments pursuant to section 6.8 of the ASA.

14    Such disclosures were made pursuant to the confidentiality provisions set forth in Section 6.8 of the

15    ASA.  Although both the equity and lender commitments reviewed by the District's general counsel

16    are subject to commercially customary contingencies, including compliance with federal and state

17    securities laws and satisfaction of conditions in the ASA, the District's general counsel has reported

18    back to the District his conclusion that the information and documents reviewed reasonably provide

19    the evidence of sufficient capital to close both transaction, as required by Section 6.8 of the ASA .

20        The District has negotiated a fair price for sale of substantially all of its assets, and

21    will distribute the consideration received as set forth in the Plan.  The District will continue in a

22    limited fashion after consummating the Two Hospital Transaction, which limited operations will be

23    funded by future payments from PHH.

24        **D.    "Cramdown."**

25        The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of

26    adjustment that is not accepted by all impaired classes if at least one impaired Class of claims

27    accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A)

28    and (b)(2)(B) of the Bankruptcy Code are satisfied.  The Plan may be confirmed under the

533833v2

1    cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the

2    Bankruptcy Code, it (a) is "fair and equitable", and (b) does not discriminate unfairly with respect to

3    each Class of claims that is impaired under and has not accepted the Plan.

4          The "fair and equitable" standard, also known as the "absolute priority rule," requires,

5    among other things, that unless a dissenting unsecured Class of claims receives payment in full for

6    its allowed claims, no holder of allowed claims in any Class junior to that Class may receive or

7    retain any property on account of such claims.  The "fair and equitable" standard also has been

8    interpreted to prohibit any class senior to a dissenting Class from receiving more than 100% of its

9    allowed claims under a plan.  The District believes that the Plan satisfies the "fair and equitable"

10   standard because, among other things, no classes junior to the classes of unsecured claims are

11   receiving or retaining any property under the Plan, and the holders of Allowed Claims in Classes 2A

12   and 2B are not receiving more than 100% payment of their allowed claims.

13         The requirement that the plan not "discriminate unfairly" means, among other things,

14   that a dissenting Class must be treated substantially equally with respect to other Classes of equal

15   rank.  The District does not believe that the Plan unfairly discriminates against any Class that may

16   not accept or otherwise consent to the Plan.

17   **As noted above, the District has reserved the right to request the Bankruptcy**

18   **Court to confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(a)**

19   **and (b)(2)(b).  The District also has reserved the right to modify the Plan to the extent, if any,**

20   **that confirmation of the Plan under sections 943 and 1129(b) of the Bankruptcy Code requires**

21   **such modifications.**

22       **E.**    **Effective Date.**

23         **1.**    **Conditions To The Occurrence Of The Effective Date.**

24         The Plan will not become effective and operative unless and until the Effective Date

25   occurs.  Section XII of the Plan sets forth certain conditions to the occurrence of the Effective Date.

26   The District or PHH may waive in whole or in part the condition regarding agreements and

27   instruments contemplated by, or to be entered into pursuant to, the Plan.  Any such waiver of a

28   condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and

533833v2

43

1  without any formal action, other than the filing of a notice of such waiver with the Bankruptcy

2  Court.

3         The Effective Date will occur on the first Business Day after which the conditions set

4  forth in Section XII.B. of the Plan are satisfied or waived; *provided* that the Effective Date must

5  occur by no later than one year after the Confirmation Date.

6         **2.**      **Non-Occurrence Of Effective Date.**

7         The Plan provides that, if confirmation occurs but the Effective Date does not occur

8  within the period authorized by the Plan (one year after the Confirmation Date), upon notification

9  submitted by the District to the Bankruptcy Court: (a) the Confirmation Order shall be vacated;

10  (b) no distributions under this Plan shall be made; (c) the District and all holders of Claims shall be

11  restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the

12  Confirmation Date never occurred; and (d) all of the District's obligations with respect to the Claims

13  shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or

14  release of any claims by or against the District or any other entity or to prejudice in any manner the

15  rights of the District or any entity in any further proceedings involving the District.  The failure of

16  the Effective Date to occur, however, will not affect the validity of any order entered in the Chapter

17  9 Case other than the Confirmation Order.

18        **F.**      **Effect Of Confirmation.**

19         Section X of the Plan provides that confirmation of the Plan and the occurrence of the

20  Effective Date will have a number of important and binding effects, some of which are summarized

21  below.  Readers are encouraged to review Section X of the Plan carefully and in its entirety to assess

22  the various consequences of confirmation of the Plan.

23        **1.**      **Discharge Of The District.**

24         Pursuant to section 944 of the Bankruptcy Code, on the Effective Date. the District

25  will be discharged from all debts (as defined in the Bankruptcy Code) of the District and claims

26  against the District other than (a) any debt specifically and expressly excepted from discharge by the

27  Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of the

28  Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

533833v2

44

1    The rights afforded in the Plan and the treatment of claims will be in exchange for

2    and in complete satisfaction, discharge and release of all claims of any nature whatsoever arising on

3    or before the Effective Date, known or unknown, including any interest accrued or expenses incurred

4    thereon from and after the Petition Date, whether against the District or any of its properties, assets,

5    or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all claims

6    against the District will be deemed to be satisfied, discharged and released in full.

7    **2.    Injunction.**

8    The Plan provides that all entities who have held, hold or may hold pre-Effective

9    Date claims will be permanently enjoined, from and after the Effective Date, from (a) commencing

10    or continuing in any manner any action or other proceeding of any kind with respect to any such pre-

11    Effective Date claim against the District; (b) enforcing, attaching, collecting, or recovering by any

12    manner or means any judgment, award, decree or order against the District with respect to such pre-

13    Effective Date claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind

14    against the District or its property or interests in property; and (d) asserting any right of setoff,

15    subrogation or recoupment of any kind against any obligation due to the District with respect to any

16    such pre-Effective Date claim, except as otherwise permitted by section 553 of the Bankruptcy

17    Code.

18    **3.    Term Of Existing Injunctions And Stays.**

19    The Plan provides that all injunctions or stays provided for in the Chapter 9 Case

20    pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the

21    Confirmation Date, will remain in full force and effect until the Effective Date.

22    **VII.    CERTAIN RISK FACTORS TO BE CONSIDERED**

23    Holders of claims against the District should read and consider carefully the factors

24    set forth below, as well as the other information set forth in this Disclosure Statement and the

25    documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting

26    to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the

27    only risks involved in connection with the Plan and its implementation.

28

533833v2

45

1    One of the risks involved in the Two Hospital Transaction is that PHH will not be

2    able to obtain the financing necessary to close the sale under the ASA. Section 6.8 of the ASA

3    required PHH to demonstrate its financial ability to close the Two Hospital Transaction by no later

4    than December 4, 2009, subject to an opportunity to cure as set forth in section 6.8 of the ASA.

5    PHH is a newly formed entity created solely for the purposes of effectuating the two transactions

6    contemplated by the Plan. Hence, it does not have an established track record.[11]

7    The Indenture Trustee has notified the District and PHH that it will urge the holders

8    of Class 1A and Class 1B Claims to reject the Plan unless PHH demonstrates to the Indenture

9    Trustee's satisfaction, on or before the date which is fourteen (14) days prior to the Ballot deadline,

10   that PHH has the financial ability to close the Two Hospital Transaction as and when required under

11   the ASA.

12   An additional risk involved in the Two Hospital Transaction scenario is presented by

13   the schedules required by the ASA, which include, among other things, a schedule of all of the

14   District's executory contracts and unexpired leases. The schedules are expected to be voluminous

15   and are presently being finalized. It is possible, though the District does not anticipate it, that PHH

16   will terminate the transaction under the ASA upon review of the schedules. In that event, the Plan

17   will not be consummated.

18   There is also a risk that the amount of allowed administrative expenses, priority

19   claims and general unsecured claims may be greater than currently estimated, in which case

20   distributions to creditors may be reduced.

21   **VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

22   **A.    Introduction.**

23   The implementation of the Plan may have federal, state, local and foreign tax

24   consequences to the District and it's creditors. No tax opinion has been sought or will be obtained

25   with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and

26

27

28   [11]   Please refer to the discussion of feasibility in Section V.C above.

533833v2

1  is not intended to constitute either a tax opinion or tax advice to any person, and the summary

2  contained herein is provided for informational purposes only.

3          The discussion below addresses the potential material federal tax consequences of the

4  Plan to the District and a hypothetical investor typical of the holders of Claims in this case. This

5  discussion does not attempt to consider various facts or limitations applicable to any particular

6  creditor which may modify or alter the consequences described herein. A creditor may find that the

7  tax consequences of the Plan to such creditor differ materially from the tax consequences discussed

8  below because of such creditor's facts and circumstances. This discussion does not address state,

9  local or foreign tax consequences.

10         The following discussion is based upon the provisions of the Internal Revenue Code

11  of 1986, as amended (the "Internal Revenue Code"), the regulations promulgated thereunder,

12  existing judicial decisions and administrative rulings. In light of the rapidly-changing nature of tax

13  law, no assurance can be given that legislative, judicial or administrative changes will not be

14  forthcoming that would affect the accuracy of the discussion below. Any such changes could be

15  material and could be retroactive with respect to the transactions entered into or completed prior to

16  the enactment or promulgation thereof. The tax consequences of certain aspects of the Plan are

17  uncertain due to the lack of applicable legal authority and may be subject to judicial or

18  administrative interpretations that differ from the discussion below.

19         **TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE**

20  **CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF**

21  **FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR**

22  **WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE**

23  **PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE**

24  **INTERNAL REVENUE CODE, AND (2) SUCH DISCUSSION IS WRITTEN IN**

25  **CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN.**

26         **CREDITORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX**

27  **ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE**

28

533833v2

1  DISTRICT OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING

2  FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

3      **B.**    **Federal Income Tax Consequences to the District.**

4          **1.**    **Tax Consequences of the District's Sale of Assets.**

5          The Plan provides for the sale of District assets to PHH pursuant to the terms of the

6  ASA and the Plan. A sale generally is a recognition event for federal income tax purposes and

7  requires the seller to recognize and report gain or loss measured by the difference between the

8  amount realized and the adjusted tax basis of the sold assets. However, Internal Revenue Code

9  section 115 provides that gross income does not include "income derived from . . .the exercise of any

10  essential governmental function and accruing to a State or any political subdivision thereof . . ." If

11  Internal Revenue Code section 115 applies to the District's sale of assets under the ASA, any income

12  or gain realized by the District upon such sale would be excluded from the District's gross income.

13          The District is a political subdivision of the State of California and therefore believes

14  it meets one of the predicates for the application of Internal Revenue Code section 115. The District

15  also believes, but cannot provide assurances, that its sale of assets pursuant to the ASA and this Plan

16  is an action that constitutes an "exercise of any essential governmental function" within the meaning

17  of Internal Revenue Code section 115 because such sale is compelled by economic and financial

18  necessity and is ancillary to the government function which it performed as a government

19  subdivision. Consequently, the District believes that any income or gain it may realize upon the sale

20  of assets pursuant to the ASA is excluded from gross income and therefore will not give rise to a

21  federal income tax liability.

22          In addition to the exclusion provided by Internal Revenue Code section 115, there is

23  considerable case law and administrative authority supporting the position that any income or gain of

24  the District from the sale of its assets is not taxable under Internal Revenue Code section 11 (which

25  applies the income tax to corporations and entities treated as corporations for federal income tax

26  purposes) or is not otherwise subject to federal income tax. *State of Michigan v. United* States, 40

27  F.3d 817 (6th Cir. 1994); *Florida Residential Property and Casualty Joint Underwriting Assoc. v.*

28

533833v2

1 | *United States*, 207 F.Supp.2d 1344 (N.D. Fla. 2002); Rev. Rul. 87-2, 1987-1 C.B. 18; Rev. Rul. 71-

2 | 131, 1971-1 C.B. 28; Rev. Rul. 71-132, 1971-1 C.B. 29.  The District believes these authorities

3 | significantly strengthen its position that any income or gain it realizes from the sale of assets

4 | pursuant to the ASA and the Plan will not give rise to a federal income tax liability.

5 | Based upon the foregoing, the District anticipates that it will not report for federal

6 | income tax purposes any income, gain, loss, deduction or credit (or item thereof) realized or

7 | recognized by it in connection with its sale of assets.  The District also anticipates that, in conformity

8 | with past practice, it will not file any federal corporate income tax return with respect to the tax

9 | period in which the sale of assets falls.

10 | **2.    Reduction of the District's Indebtedness.**

11 | As a result of the Plan's implementation, it is likely that not all creditors holding valid

12 | Claims will be paid in full.  The District anticipates that any unpaid balance will be discharged

13 | pursuant to Bankruptcy Code section 944.  (Any amount of potential discharged indebtedness for

14 | federal income tax purposes will be referred to herein as a "Debt Discharge Amount").  In general,

15 | the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must

16 | include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent

17 | that the Debt Discharge Amount exceeds any consideration given for such discharge.  No income

18 | from the discharge of indebtedness is realized to the extent that payment of the liability being

19 | discharged would have given rise to a deduction.

20 | If a taxpayer is in a title 11 case and the discharge of indebtedness occurs pursuant to

21 | a plan approved by the court, such discharge of indebtedness is specifically excluded from gross

22 | income (the "Bankruptcy Exception").

23 | Accordingly, the District should not be required to include in income any Debt

24 | Discharge Amount as a result of Plan transactions.  If it were asserted or determined that, contrary to

25 | the analysis described above, such Debt Discharge Amount does not qualify for exclusion based

26 | upon the Bankruptcy Exception, the District would assert Internal Revenue Code section 115 as an

27 | additional basis for excluding any Debt Discharge Amount from income.  The District would also

28 |

533833v2

1  take the position that, pursuant to case law and administrative authority, any Debt Discharge Amount

2  is not taxable. *State of Michigan v. United* States, 40 F.3d 817 (6th Cir. 1994); *Florida Residential*

3  *Property and Casualty Joint Underwriting Assoc. v. United States*, 207 F.Supp.2d 1344 (N.D. Fla.

4  2002); Rev. Rul. 87-2, 1987-1 C.B. 18; Rev. Rul. 71-131, 1971-1 C.B. 28; Rev. Rul. 71-132, 1971-1

5  C.B. 29.

6          The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by

7  the Debt Discharge Amount excluded from income on the basis of the Bankruptcy Exception.  Tax

8  attributes are reduced in the following order of priority: (i)  net operating losses and net operating

9  loss carryovers; (ii) general business credits; (iii) minimum tax credits; (iv) capital loss carryovers;

10  (v) basis of property of the taxpayer; (vi) passive activity loss or credit carryovers; and (vii) foreign

11  tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded

12  from gross income, except that general tax credits, minimum tax credits and foreign tax credits are

13  reduced by 33.3 cents for each dollar excluded from gross income.  Because attribute reduction

14  (including the reduction of NOLs) occurs after the determination of tax for the tax year of the

15  discharge, attribute reduction should not affect the District's ability to use its tax attributes, if any,

16  with respect to income or gain recognized on the sale of assets pursuant to the ASA.  (Such

17  utilization of tax attributes will be completely unnecessary if, as discussed above, income or gain

18  from the sale is excludable from gross income under Internal Revenue Code section 115 or because

19  government subdivisions are not subject to federal corporate income tax).

20          Except as described below, any Claim against the District (except a Claim that would

21  give rise to a deduction if paid) that is discharged by payment to a creditor of cash and/or property

22  will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent that the

23  adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of

24  the payment made in cancellation thereof.

25          The District's Debt Discharge Amount may be increased to the extent that unsecured

26  creditors holding unscheduled Claims fail to timely file a proof of Claim and have their Claims

27  discharged on the Confirmation Date pursuant to Bankruptcy Code section 944.

28

533833v2

**C.    Tax Consequences To Creditors.**

The tax consequences of the Plan's implementation to a creditor will depend on whether the creditor is a citizen or resident of the United States, whether the creditor reports income on the cash or accrual method, whether the creditor receives consideration in more than one tax year of the creditor, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction. The tax consequences upon the receipt of cash or other property allocable to interest are discussed below under "Receipt of Interest."

**1.    Claims of Series 1993 and 1996 Bondholders.**

Under the Two Hospital Transaction, the payment in full of the Series 1993 Bonds and Series 1996 Bonds (collectively, the "District Bonds") should cause each holder thereof to recognize gain or loss under Internal Revenue Code sections 1001 and 1271 measured by the difference between the amount realized with respect thereto and such holder's adjusted tax basis in the District Bonds held by such holder. The total cash amount received by such a holder would be allocated between principal and interest, with the principal amount so received being treated as the amount realized and the interest amount being treated as discussed below under "Receipt of Interest."

**2.    Other Creditors Holding Unsecured Claims.**

An unsecured creditor holding a Claim in Class 2A likely will recognize gain or loss pursuant to Internal Revenue Code section 1001 and Treasury Regulation section 1.1001-3 as a result of the significant modification of such creditor's rights that occurs under the Plan and, consequently, a deemed exchange of such Claim for rights under the Plan to receive four annual installment payments. Gain or loss will be measured by the difference between the amount realized by a holder of a Class 2A Claim on such exchange and such holder's adjusted tax basis in such Claim. The amount realized by a holder of a Class 2A Claim will be the "issue price" of the Plan-created obligation to pay such Claim over a period of four years without interest. Such issue price likely will be determined under Internal Revenue Code section 1274.

Certain creditors holding Class 2A Claims may be entitled to report income or gain

1   recognized on the deemed exchange described above on the installment method. (The installment

2   method does not apply to recognized losses). Holders of Class 2A Claims should consult with their

3   tax advisors to determine if the installment method is applicable to income or gains recognized by

4   them by reason of the deemed exchange described above.

5          The District anticipates that original issue discount will accrete with respect to the

6   four year installment obligation to holders of Class 2A Claims under the Plan. The tax consequences

7   of original issue discount accretion are discussed below.

8         **3.**     **Character of Recognized Gain or Loss.**

9          In the case of a creditor whose existing Claims constitute capital assets in such

10   creditor's hands, the gain required to be recognized generally will be classified as a capital gain,

11   except to the extent of interest (including accrued market discount, if any). In this regard, it should

12   be noted that Section 582(c) of the Internal Revenue Code provides that the sale or exchange of a

13   bond, debenture, note or certificate, or other evidence of indebtedness by a bank or certain other

14   financial institutions shall not be considered the sale or exchange of a capital asset. Accordingly,

15   any gain recognized by such creditors as a result of the Plan's implementation will be ordinary

16   income, notwithstanding the nature of their Claims. Any capital gain recognized by a creditor will

17   be long-term capital gain with respect to those Claims for which the creditor's holding period is more

18   than one year, and short-term capital gain with respect to such Claims for which the creditor's

19   holding period is one year or less.

20         **4.**     **Receipt of Interest.**

21          Income attributable to accrued but unpaid interest will be treated as ordinary income,

22   regardless of whether the creditor's existing Claims are capital assets in its hands. The extent to

23   which consideration distributable under the Plan is allocable to such interest is uncertain. The

24   District anticipates that such income will be tax exempt to the holders of District Bonds. Holders of

25   Class 2A Claims should consult with their tax advisors to determine whether any such interest is

26   excludable from gross income pursuant to Internal Revenue Code section 103 as interest on an

27   obligation of a political subdivision of a State.

28

533833v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.    Other Tax Considerations.

#### a.    Market Discount.

If a creditor has a lower tax basis in a District obligation than its face amount, the difference may constitute market discount under section 1276 of the Internal Revenue Code. (Certain District obligations are excluded from the operation of this rule, such as tax-exempt obligations, obligations with a fixed maturity date not exceeding one year from the date of issue, installment obligations to which Internal Revenue Code section 453B applies and, in all likelihood, demand obligations or instruments).

Holders in whose hands the District obligations are market discount bonds will be required to treat as ordinary income any gain recognized upon the exchange of such obligations to the extent of the market discount accrued during the holder's period of ownership, unless the holder has elected to include such market discount in income as it accrued. Holders of Claims should consult with their tax advisors to determine whether the market discount rules do not apply to such Claims by reason of the District's status as a political subdivision.

#### b.    Original Issue Discount.

Original issue discount will accrete on the four year installment obligation payable under the Plan to holders of Class 2A Claims. Although a holder generally is required to include accreted original issue discount in gross income pursuant to Internal Revenue Code section 1272, the status of the obligor as a political subdivision of a State may render such original issue discount exempt from federal income taxation. I.R.C. § 1272(a)(2)(A). Holders should consult with their tax advisors to determine whether such original issue discount is includible in or excludable from their gross income.

#### c.    Withholding.

The District or a disbursing agent will withhold any amounts required by law from payments made to creditors. This may require payments by certain creditors of the required withholding tax on the non-cash consideration issuable or deemed issuable under the Plan. In addition, creditors may be required to provide general tax information to the District or a disbursing

533833v2

1  agent, and any failure by a creditor to comply with such a request may entitle the District to withhold

2  any and all distributions to such creditor until full compliance with the District's request for

3  information is achieved.

4  **IX.      RECOMMENDATION AND CONCLUSION**

5              The District believes that confirmation and implementation of the Plan is preferable

6  to all other available and feasible alternatives.  Accordingly, **the District urges holders of impaired**

7  **claims to vote to accept the Plan by so indicating on their ballots and returning them as**

8  **specified in this Disclosure Statement and on their ballots.**

9

10  DATED:  December 16, 2009                    VALLEY HEALTH SYSTEM

11

12                                              By:    /s/ Joel M. Bergenfeld
                                                       Joel M. Bergenfeld
13                                                     Chief Executive Officer

14  Submitted By:

15

16  _____
    CHARLES D. AXELROD, GARY E.
17  KLAUSNER, H. ALEXANDER FISCH
    and NEETA MENON , Members of
18  STUTMAN, TREISTER & GLATT
    PROFESSIONAL CORPORATION
19
20  By:           /s/ Neeta Menon
                  Neeta Menon
21

22

23

24

25

26

27

28

533833v2

1

## EXHIBITS

2

3    **Exhibit A**    Plan of Adjustment of Debts

4    **Exhibit B**    August 31, 2009 Preliminary Financial Statements and October 31, 2009 Financial

5    Statements

6    **Exhibit C**    V&IG Valuation Summaries

7    **Exhibit D**    District's Three Year Projected Financial Statements

8    **Exhibit E**    ASA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

533833v2