# **Exhibit E**



**ASSET SALE AGREEMENT**

BY AND BETWEEN

VALLEY HEALTH SYSTEM,
a California Local Health Care District

"Seller"

AND

PHYSICIANS FOR HEALTHY HOSPITALS, INC,
a Delaware corporation

"Purchaser"

DATED: October 14, 2009

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I - DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING | | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Purchase Consideration | 7 |
| 1.3 | Closing Date; Closing Escrow | 10 |
| 1.4 | Items to be Delivered by Seller at Closing | 12 |
| 1.5 | Items to be Delivered by Purchaser at Closing | 14 |
| 1.6 | Transfer of Seller Assets | 16 |
| 1.7 | Excluded Assets | 18 |
| 1.8 | Assumed Obligations | 20 |
| 1.9 | Excluded Liabilities | 21 |
| 1.10 | Disclaimer of Warranties | 23 |
| 1.11 | Risk of Loss | 23 |
| 1.12 | Casualty | 25 |
| 1.13 | Condemnation | 25 |
| 1.14 | Development and Review of Schedules, Exhibits and Other Materials | 26 |
| ARTICLE II - REPRESENTATIONS AND WARRANTIES OF SELLER | | 27 |
| 2.1 | Authorization | 27 |
| 2.2 | Binding Agreement | 27 |
| 2.3 | Organization and Good Standing; No Violation | 27 |
| 2.4 | Contracts and Leases | 28 |
| 2.5 | Required Consents | 28 |
| 2.6 | Compliance With Laws and Contracts | 29 |
| 2.7 | Title to Personal property | 30 |
| 2.8 | Hospital Businesses Operations | 30 |
| 2.9 | Brokers and Finders | 31 |
| 2.10 | Financial Statements | 31 |
| 2.11 | Legal Proceedings and Liabilities | 33 |
| 2.12 | Seller Plans | 33 |
| 2.13 | Personnel | 33 |
| 2.14 | Insurance | 34 |
| 2.15 | Taxes | 34 |
| 2.16 | U.S. Persons | 34 |
| 2.17 | Real Property | 34 |
| 2.18 | Accuracy of Documents; Delivery and Inspection | 36 |
| 2.19 | No Negotiations with Third Parties | 36 |
| 2.20 | Statements Not Misleading | 37 |
| 2.21 | Adverse Actions | 37 |
| 2.22 | [Intentionally Omitted] | |
| 2.23 | Continuing Accuracy | 37 |

(i)

1090052

F/9446/0007/9644.doc 10/13/2009

TABLE OF CONTENTS

|  | Page |
|---|---|
| **ARTICLE III - REPRESENTATIONS AND WARRANTIES OF PURCHASER** | 37 |
| 3.1 Authorization | 37 |
| 3.2 Binding Agreement | 37 |
| 3.3 Organization and Good Standing | 38 |
| 3.4 No Violation | 38 |
| 3.5 Brokers and Finders | 38 |
| 3.6 "As Is" | 38 |
| 3.7 Legal Proceeding | 39 |
| 3.8 Chapter 9 Proceeding | 39 |
| 3.9 Purchaser Knowledge | 39 |
| 3.10 Disclosures | 39 |
| 3.11 No Improper Payments or Offers | 39 |
| 3.12 Compliance With Law Laws | 40 |
| 3.13 Accuracy of Financial and Organization Information | 40 |
| **ARTICLE IV - COVENANTS OF SELLER** | 40 |
| 4.1 Access and Information; Inspections | 40 |
| 4.2 Conduct of Business | 41 |
| 4.3 Negative Covenants | 41 |
| 4.4 Cooperation | 43 |
| 4.5 Contract Consents | 43 |
| 4.6 Additional Financial Information | 43 |
| 4.7 No-Shop | 43 |
| 4.8 Seller's Efforts to Close | 44 |
| 4.9 Title Matters | 44 |
| 4.10 Termination of Hospital Businesses Employees | 44 |
| 4.11 Notice of Development | 44 |
| 4.12 Termination Cost Reports; Filing Cost Reports; Amounts Due To or From Third Party Payors | 45 |
| 4.13 Tail Insurance Coverage | 46 |
| 4.14 Public Approval | 47 |
| 4.15 Confidentiality | 48 |
| 4.16 Plan of Adjustment | 48 |
| **ARTICLE V - COVENANTS OF PURCHASER** | 48 |
| 5.1 Purchaser's Efforts to Close | 48 |
| 5.2 Required Governmental Approvals | 48 |
| 5.3 Estoppel Certificates | 49 |
| 5.4 Certain Employee Matters | 49 |
| 5.5 Use of Business Names | 51 |
| 5.6 Excluded Assets | 51 |
| 5.7 Confidentiality | 52 |
| 5.8 Contract Consents | 52 |

|  | Page |
|---|---|
| 5.9 Other Covenants | 52 |
| 5.10 No Liens Caused by Purchaser | 54 |
| 5.11 Purchaser's Costs | 54 |
| 5.12 ALTA Survey | 54 |
| 5.13 Insurance | 54 |
| 5.14 Releases | 55 |
| 5.15 Plan of Adjustment | 58 |
| 5.16 Defense of Claims Challenging Transaction | 58 |
| **ARTICLE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER** | 59 |
| 6.1 Signing and Delivery of Instruments | 59 |
| 6.2 Unfavorable Action or Proceeding | 59 |
| 6.3 Performance of Covenants | 59 |
| 6.4 Governmental Authorizations | 59 |
| 6.5 Representations | 60 |
| 6.6 Schedules | 60 |
| 6.7 Public Approval | 60 |
| 6.8 Capital Requirements | 60 |
| 6.9 Plan of Adjustment | 61 |
| **ARTICLE VII - CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER** | 61 |
| 7.1 Governmental Authorizations | 62 |
| 7.2 Signing and Delivery of Instruments | 62 |
| 7.3 Performance of Covenants | 62 |
| 7.4 Unfavorable Action or Proceeding | 62 |
| 7.5 Material Adverse Effect | 62 |
| 7.6 Title Insurance Policy | 62 |
| 7.7 Representations | 62 |
| 7.8 Exhibits and Schedules | 62 |
| 7.9 Permits and Program Participation | 63 |
| 7.10 Tax Matters | 63 |
| 7.11 Public Approval | 63 |
| 7.12 Plan of Adjustment | 63 |
| **ARTICLE VIII - TERMINATION** | 63 |
| 8.1 Termination | 63 |
| 8.2 Termination Consequences | 65 |
| **ARTICLE IX - POST-CLOSING MATTERS** | 66 |
| 9.1 Excluded Assets and Excluded Liabilities | 66 |
| 9.2 Preservation and Access to Records After the Closing | 68 |

(ii)

(iii)

1070282

1070282

P:\bw\MM\FINAL.624 10.18.01.DOC

P:\bw\MM\FINAL.624 10.18.01.DOC

EXHIBIT E

133

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 9.3 | Provision of Benefits of Certain Contracts; Defense of Related Claims | 70 |
| 9.4 | Closing of Financials | 70 |
| 9.5 | Employee Transition | 71 |
| 9.6 | Medicare Bad Debts | 71 |
| 9.7 | Covenant Not to Compete | 71 |

**ARTICLE X - SURVIVAL AND INDEMNIFICATION** ... 73

| 10.1 | Survival | 73 |
| 10.2 | Indemnification of Purchaser by Seller | 73 |
| 10.3 | Indemnification of Seller by Purchaser | 75 |
| 10.4 | Method of Asserting Claims | 76 |
| 10.5 | Exclusive | 79 |

**ARTICLE XI - TAX AND COST REPORT MATTERS** ... 79

| 11.1 | Tax Matters; Allocation of PEPC | 79 |
| 11.2 | Cost Report Matters | 79 |
| 11.3 | Tax and Medicare Effect | 80 |
| 11.4 | [Intentionally Omitted] | |
| 11.5 | Misdirected Payments, etc. | 80 |

**ARTICLE XII - MISCELLANEOUS PROVISIONS** ... 81

| 12.1 | Further Assurances and Cooperation | 81 |
| 12.2 | Successors and Assigns | 81 |
| 12.3 | Governing Law; Venue | 81 |
| 12.4 | Amendments | 82 |
| 12.5 | Exhibits, Schedules and Disclosure Schedule | 82 |
| 12.6 | Notices | 82 |
| 12.7 | Headings | 83 |
| 12.8 | Confidentiality and Publicity | 83 |
| 12.9 | Fair Meaning | 84 |
| 12.10 | Gender and Number; Construction | 84 |
| 12.11 | Third Party Beneficiary | 85 |
| 12.12 | Expenses and Attorneys' Fees | 85 |
| 12.13 | No Offset | 85 |
| 12.14 | Counterparts | 85 |
| 12.15 | Entire Agreement | 85 |
| 12.16 | No Waiver | 86 |
| 12.17 | Severability | 86 |
| 12.18 | Dispute Resolution | 86 |

**SCHEDULE 1.3.2 - TERM SHEET FOR ALTERNATIVE TRANSACTION** ... 90

(iv)

## ASSET SALE AGREEMENT

This Asset Sale Agreement (the "Agreement") is dated effective as of October 14, 2009 (the "Effective Date") by and between VALLEY HEALTH SYSTEM, a California Local Health Care District ("Seller") and PHYSICIANS FOR HEALTHY HOSPITALS, INC., a Delaware corporation ("Purchaser").

## R E C I T A L S:

A.   Seller (i) engages in the business of delivering acute care, skilled nursing, and behavioral health services to the public through the hospitals known as Hemet Valley Medical Center and Menifee Valley Medical Center, and a skilled nursing facility known as Hemet Valley Healthcare Center (the "SNF"), at which it currently operates a chemical dependency program and Sage Retreat, as further identified on Schedule A.1 (collectively, the "Hospital", as to an individual hospital, a "Hospital"), (ii) owns one administrative/medical office building, as specifically identified on Schedule A.2 and known as the Medical Arts Building (the "MAB"), (iii) owns and operates other healthcare businesses incident to the operation of the Hospitals as specifically identified on Schedule A.3 (the "Other Businesses"). The Hospitals, MAB and the Other Businesses are referred to in this Agreement collectively as the "Hospital Businesses").

B.   Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the assets with respect to the operation of the Hospital Businesses, for the consideration and upon the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1   Definitions.

1.1.1   Certain Defined Terms.   For purposes of this Agreement, and the Related Agreements except as may otherwise be expressly stated therein, the following terms shall have the following meanings (whether or not such terms is capitalized when used in this Agreement):

(a)   "Accounts Receivable" shall be defined as all accounts and other receivables arising from the rendering of services to, or order rights to payment from, inpatients and outpatients at the Hospitals, the SNF, and the other Hospital Businesses, billed and unbilled, recorded and unrecorded, including any adjustment to the PEPC whatsoever, including for contractual allowances, bad debt allowances or reserves, and patient credit balances) as of the Effective Time (calculated in a manner consistent with Seller's accounting policies and procedures in effect as of the Closing Date) for services, goods or other items provided by Seller while owner of the Hospital Businesses, including without limitation all claims, rights, interest and proceeds (whether received in cash or by credit to amounts otherwise due to a third party)

- 1 -

with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Seller or Seller's consultants) and all payments to be received for all disproportionate share Medi-Cal payments (if any) in connection with the Hospitals, but excluding reserves and other amounts held by the Bond Trustees of the Existing Bonds and amounts internally reserved by Seller for payment of the current and long term, portion of interest and principal of the Existing Bonds which is payable semi-annually (which shall separately be applied by Seller to pay off the Existing Bonds as detailed in Sections 1.2.1(a)(i) and 1.4.18 and elsewhere in this Agreement).

(b)    "Accrued Paid Time Off Amount" shall mean the accrued paid time off liabilities of Seller, as of the Closing Date, with respect to its employees, as identified in the Baseline Financials and any subsequently accrued paid time off liabilities to the extent incurred in the ordinary course of business and consistent with the accounting principles utilized in the Baseline Financials.

(c)    "Adjusted Current Liabilities" shall consist of the current liabilities of Seller as defined and classified on the Baseline Financials other than the line items related to (i) *Pre-Petition Liabilities*, and (ii) the current portion of the (A) *Notes Payable*, (B) *1993 Bonds* and (C) *1996 Bonds*.

(d)    "Administrative Claim" means any claim for an administrative expense of the kind described in Sections 503(b) or 507(a)(2) of the Bankruptcy Code, including professional fees and expenses by any professional entitled to be compensated for services rendered to the Seller.

(e)    "Affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with or of a second Person, including Immediate Family Members of such Persons. The term "control" (including the terms "controlled by" and "under common control with") means the possession of a Controlling Interest in another Person.

(f)    "Alternative Assets" and "Alternative Transaction" shall have the meaning set forth at Section 1.3.2.

(g)    "Bankruptcy Court" shall mean the United States bankruptcy court in which Seller's Chapter 9 Proceeding is pending, such court being the United States Bankruptcy Court, Central District of California, Riverside Division.

(h)    "Baseline Financials" shall mean the preliminary financial statements of the Seller dated as of August 31, 2009 and attached hereto as Schedule 1.1.(h).

(i)    "Benefit Plan" shall mean with respect to Seller, a governmental pension plan as defined under Section 3(32) of ERISA or a retirement or pension plan (except for Social Security); the Seller Plan, as defined in Section 2.12, including the defined benefit plan; thrift, savings, medical (including any union-sponsored health and welfare plan), hospitalization, vision, dental, life, disability, training or apprentice plan, or other welfare benefit plan, pooling or agreement, deferred compensation, change in control or severance pay plan, policy or agreement, or any other performance, bonus, incentive or benefit plan, policy or agreement, or any similar or related trust, fund, arrangement, policy, agreement or understanding.

1070092.1

F:\Docs\WSRP\FINAL.LB1.011226.DOC

(j)    "Chapter 9 Proceeding" shall mean the proceeding filed by Seller pursuant to Chapter 9 of the U.S. Bankruptcy Code on December 13, 2007 in the United States Bankruptcy Court, Central District of California, Riverside Division, Case No. 6:07-bk-18293-PC.

(k)    "Claims Fund" shall have the meaning set forth at Section 1.2.4.1

(l)    "Controlling Interest" in another Person shall mean:

(i)    in the case where such other Person is a corporation, the Person and/or its Affiliates owns or controls at least a majority of the outstanding shares having the voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time shares of any other class or classes of such corporation might have voting power by reason of the happenings of any contingency, unless the contingency has been satisfied); or

(ii)    in the case where such other Person is a general or limited partnership, the Person and/or any of his/her/its Affiliates is a general partner or owns or controls (of record or beneficially) a majority interest in a general partner, or is or owns an interest in a partner that has authority to bind the partnership, in all other cases; or

(iii)    in the case where such other Person is a limited liability company, the Person and/or its Affiliates (i) is or owns, a managing member or manager of the limited liability company, or (ii) owns or controls at least a majority of the outstanding membership interests having by the terms thereof voting power to elect or appoint the managing member or members, or (iii) in the case of a limited liability company managed by a board of directors, management committees or like body, owns or controls at least a majority of the outstanding membership interests having by the terms thereof ordinary voting power to elect or appoint a majority of the managers or members of such body (irrespective of whether at the time membership units of any other class or classes of such corporation might have voting power by reason of the happening of any contingency, unless the contingency has occurred and then only for as long as it continues); or

(iv)    regardless of the form of the entity, such other Person in fact controls the decisions of such entity, directly or indirectly.

(m)    "Current Assets" shall mean the *Total Current Assets* of Seller as defined and classified on the Baseline Financials.

(n)    "Current Liabilities" shall consist of *Total Current Liabilities* of Seller as defined and classified other than the line item related to *Pre-Petition Liabilities*.

(o)    "Deposit" shall have the meaning set forth in Section 1.2.3.

(p)    "Environmental Regulations" shall mean all Laws and all policies and guidelines relating to the use, handling, treatment, storage, transportation, or Release of Hazardous Substances or otherwise relating to the protection of the environment or industrial

1070092

F:\Docs\WSRP\FINAL.LB1 011226.DOC

hygiene (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata).

(q) "Force Majeure" shall mean an act of God, war declared or undeclared, general army mobilization, blockade, revolution, riot, insurrection, civil commotion, sabotage, lightning, fire, earthquake, storm, flood, explosion, telecommunications disruption, electricity blackout, personnel strike, and any other cause whether of the kind specifically enumerated above or otherwise which is not reasonably within the control of the party affected.

(r) "General Unsecured Creditors" shall mean those Persons holding allowed pre-petition, non-priority unsecured claims against Seller.

(s) "Hazardous Substances" shall mean any substance, material or waste which is now or at any time in the future listed, identified or defined in or pursuant to any Law as "hazardous substance", "hazardous waste", "toxic substance", "toxic pollutant," "infectious waste" or similarly identified substances, materials or mixtures (including, without limitation, medical wastes, asbestos in any form, formaldehyde, radon, radioactive substance, hydrocarbons, petroleum, gasoline, crude oil or any products, by-products or fractions thereof, polychlorinated biphenyls, industrial solvents, flammables, or explosives) or which is either now or at anytime in the future: (i) potentially injurious to the public health, safety or welfare of the environment, (ii) potentially injurious to, or may impair the value or beneficial use of, the Real Property (or any improvements thereon) or required to be remediated at the behest of any governmental agency, or (iv) a basis for a claim or liability of any owner or operator of the Real Property to any governmental agency or Person under any applicable Law (including the Environmental Regulations).

(t) "Immediate Family Member" of an individual shall mean the husband, wife, natural or adoptive parent, child, sibling, stepparent, stepchild, stepbrother, stepsister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild or spouse of a grandparent or grandchild of such individual.

(u) "Laws" or "Legal Requirements" shall mean the common law and all statutes, rules, regulations, ordinances, orders, codes, permits, licenses, policies, guidelines, and agreements with or of federal, state, and local governmental and regulatory authorities (including any of the same which terminate, disqualify, or otherwise adversely affect a Person (or any improvements thereto)) or reimbursement or right to payment from, or participation with, any Payor, including the following subset (collectively "Health Care Laws"): the Stark Law (42 U.S.C. § 1395nn), the Medicare and Medicaid Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the False Claim Act (including 31 U.S.C. §§ 3729 et seq. and 18 U.S.C. §§ 2, 371, 666, 1013, and 3571), California's Physicians Ownership and Referral Act of 1993 (California Bus. & Prof Code §§ 650.01 et seq.), California Business & Professions Code §650, or similar statutes and prohibitions against fee splitting, together with all amendments thereto) or any rules, regulations, agreements (including, but not limited to, the Joint Commission) and any order, writ, injunction or decree issued by, entered by, or handed down by any court or governmental agency or in connection with any judicial, administrative or other non-judicial proceeding (including, without limitation, arbitration or reference). Laws shall include those Laws now or hereafter in effect and to Laws as amended, consolidated, supplemented or replaced from time to time, and all rules and regulations promulgated thereunder.

- 4 -

interests of any kind whatsoever), covenants, conditions, restrictions, easements, encroachments, rights of way, charges or other rights, options, claims or interests of any third party whatsoever.

(v) "Material Adverse Effect" shall mean any event, occurrence, or effect which continues through the Closing relating to the business, operation, property, or financial condition of the Hospital Businesses, taken as a whole, or which otherwise materially interferes with Purchaser's ability to operate the Hospital Businesses after Closing or to obtain financing relating to the Transaction, as defined in Section 1.2.3, as a result of the foregoing, all of which is outside the control of Purchaser, but excluding changes in general economic, legislative, or regulatory conditions or changes in the healthcare market affecting hospitals generally or locally, such as limitations on reimbursement through governmental programs or other Payors affecting hospitals generally. However, changes in existing Laws or new Laws which become effective prior to the Effective Time which would prohibit ownership by physicians or medical groups of the Hospital Businesses, or restrict referral by physicians or medical groups to the Hospital Businesses in which such physicians or medical groups have a financial interest (including an ownership interest), in whole or in substantial part, shall constitute a Material Adverse Effect. Purchaser acknowledges that Seller's filing of the Chapter 9 Proceeding is not, in and of itself, a Materially Adverse Effect as defined in this Agreement; provided, that (i) Seller takes no action in the Chapter 9 Proceeding to reject or otherwise terminate this Agreement or any Related Agreement, contrary to the or their terms; and (ii) Seller or the Bankruptcy Court takes no action to interfere with Purchaser's rights under this Agreement, or the orderly Closing of the transactions contemplated herein, or which otherwise causes a Material Adverse Effect. Notwithstanding anything to the contrary in this Agreement, the Parties agree that the failure to obtain Public Approval shall not, in and of itself, constitute a Material Adverse Effect and shall not be a basis for Purchaser to avoid any of any portion of the Deposit. Without limiting the preceding, a Material Adverse Effect shall include a decrease, as of the Closing, by an amount which is greater than $2,000,000, after being normalized, if necessary, for the payroll impact relating to an additional pay period, by which (x) Current Assets, exceed (y) Current Liabilities, as compared to the amount by which Current Assets exceed Current Liabilities reflected in the Baseline Financials, (which net excess), utilizing the Baseline Financials was $13,632,865).

(x) "Payor" shall mean Medicare, Medicaid, TRICARE/CHAMPUS, any other third party payor (including an insurance company or plan administrator), any Person financially responsible for payment of all or any portion of the billings generated by the Hospital Businesses, or any health care provider (such as a health maintenance organization, preferred provider organization, exclusive provider organization, or any other managed care program), or any fiscal intermediary of any of the foregoing.

(y) "Person" shall mean any individual (including Immediate Family Members of such individual), partnership, corporation, limited liability company, trust, unincorporated association, joint venture, or any other entity of any kind whatsoever, whether for profit or not for profit, and any government agency.

(z) "Plan of Adjustment" shall have the meaning set forth as Section 4.16.

- 5 -

(aa)  "Reasonable Commercial Efforts" or "Reasonable Efforts" does not include any material modifications of the terms or conditions of this Agreement, the initiation of litigation or other judicial or administrative process, any change in the organizational structure of an entity, any changes in the officers, directors, members, managers, or the equivalent of an entity, the provision of any consideration to any third party or the suffering of any economic detriment to a party's ongoing operations for the procurement of any consent, authorization or approval required under this Agreement except for (i) the reasonable costs associated with gathering and supplying data or other information or making any filings; (ii) the reasonable fees and expenses of counsel and consultants; and (iii) the reasonable and customary fees and charges of governmental authorities and accreditation organizations.

(bb)  "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment or as otherwise defined in or pursuant to any Environmental Regulation.

(cc)  "Select Administrative Note" shall mean that certain Promissory Note, dated June 20, 2008, provided by Seller to Select VHS Acquisition Company, LLC, in the original principal amount of $7,968,500, and approved as an administrative claim in the Chapter 9 Proceeding.

(dd)  "Seller's Knowledge" shall mean the actual (and not merely constructive) knowledge, without any duty of further inquiry, of (i) William Cherry, the Chairman of the Board of Directors of Seller, (ii) Michelle Bird, Vice President, Human Resources of Seller, (iii) Keith Garrison, Facilities Administrator of Seller, (iv) Mark Palmer, Administrator, Hemet Valley Medical Center of Seller, (v) Richard DiCapo, Administrator, Menifee Valley Medical Center of Seller, (vi) Joel Bergenfeld, Interim Chief Executive Officer of Seller, (vii) Michael Bernstein, Interim Chief Financial Officer of Seller, and (viii) Melanie Van Winkle, Vice President, Finance of Seller, or their successors.

(ee)  "Severance Liabilities" shall mean any and all severance liabilities of Seller as of the Closing Date pursuant to any severance pay plan, policy, or employment agreement, providing severance benefits or payments to Seller's employees on termination of employment, to the extent scheduled in Schedule 1.1(ee).

1.1.2  Other Defined Terms.  The terms listed in Schedule 1.1.2 are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

1.1.3  Certain References.  As used in this Agreement, and unless the context requires otherwise:

(a)  References to "include" or "including" mean including, without limitation;

(b)  References to "hereof," "herein," "hereto" and derivative or similar words refer to this Agreement;

- 6 -

10700/9.2                                                   P:\law\WBN\FINAL\A2 10.10.08.DOC

---

(c)  References to any agreement, document or instrument are references to that document as amended, consolidated, supplemented or replaced by the parties thereto from time to time;

(d)  References to time are references to Pacific time (Standard or Daylight Savings, as applicable);

(e)  References to "Parties" are references to Seller and Purchaser and their successors and assigns and such Parties are sometimes referred to individually as a Party;

(f)  The gender of all words includes the masculine, feminine and neuter, and the number of all words includes the singular and plural; and

(g)  To the extent included in this Agreement, the Table of Contents, the divisions of this Agreement into Articles, Sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

1.2  Purchase Consideration.

1.2.1  Purchaser's Estimate of Purchase Consideration.

(a)  The aggregate purchase consideration to be paid and provided by Purchaser to Seller shall consist of the following payments and assumptions of liabilities, the aggregate value of which Purchaser estimates to be approximately One Hundred Sixty-Nine Seven Hundred Seventy Three Million Dollars ($169,773,000) ("Purchaser's Estimate of Purchase Consideration" or "PEPC");

(i)  Cash Purchase Portion.  Payment of an amount sufficient to pay off the Existing Bonds described in Schedule 1.2(i), after application of all reserves held by the Bond Trustee in connection with the Existing Bonds and any reserves held internally by Seller for payment of interest and principal on the Existing Bonds. It is the intent of the parties that Purchaser shall pay Seller an amount necessary to pay off the Existing Bonds and to obtain the Bond Releases. As of the date of this Agreement, the outstanding principal and unpaid interest on the Existing Bonds is currently estimated at approximately $44,700,000 less reserves, which are anticipated to be reduced by withdrawals by the Bond Trustee to cover its fees and expenses as incurred (the "Cash Purchase Portion"); and

(ii)  Select Note Satisfaction.  The satisfaction or assumption by Purchaser of, and the full and complete release of Seller from any further liability under, the Select Administrative Note, with a current approximate balance, including accrued interest, of $8,400,000 ("Select Note Satisfaction"); and

(iii)  Assumed Other Liabilities.  Assumption by Purchaser, for the benefit of Seller, of (A) Adjusted Current Liabilities, (B) other liabilities on the Baseline Financials classified under long term debt as Capitalized Leases and Other L/T Debt and (C) other liabilities on the Baseline Financials classified as Workers' Comp Long-Term, (Section 1.2.1(a)(iii)(B) and Section 1.2.1(a)(iii)(C) are collectively referred to as "Other Liabilities"), all of which, based on the Baseline Financials, collectively result in an assumed liability of

- 7 -

10700/9.2                                                   P:\law\WBN\FINAL\A2 10.10.08.DOC

approximately $31,100,000 (collectively, the "Assumed Other Liabilities"). In connection with the assumption of the Assumed Other Liabilities, Purchaser also is agreeing to indemnify, defend and hold Seller harmless with respect to the Assumed Other Liabilities; and

(iv)    Creditors Commitment. A commitment by Purchaser in the total amount of $21,000,000 (which amount shall not be subject to offset by Purchaser for any reason whatsoever), subject to payment of up to $4,000,000 or more to pay Seller's Administrative Claims as detailed in Section 1.2.4, with the remainder to be paid to the General Unsecured Creditors not included in Assumed Other Liabilities, over (4) years in four (4) equal annual payments on each successive anniversary of the Closing ("Creditors Commitment"); and

(v)    Assumed Rejection Claims. The satisfaction or assumption by Purchaser of, and the full and complete release of Seller from any liability under, the rejection and/or breach claims filed by KM Strategic Management, Inc. ("KM"), Hemet Community Medical Group ("HCMG"), Menifee Valley Community Medical Group ("MVCMG"), LHIO, LLC ("LHIO"), and any claims of constituent members thereof which are derivative from such rejection and/or breach claims by KM, HCMG, MVCMG or LHIO, which Purchaser contends constitutes an assumption and release of claims worth approximately $55,000,000 ("Assumed Rejection Claims") as detailed more fully in claim numbers 134, 135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding Seller harmless with respect to the Assumed Rejection Claims; and

(vi)    Assumed Contracts. The satisfaction or assumption and release, if such release can be obtained, or indemnification of Seller by Purchaser, of the Assumed Contracts, as defined in Section 1.6.6; and

(vii)    D&O Tail Payment. Payment by Purchaser, on Seller's behalf, of the premium for Seller's directors and officers tail insurance ("D&O") under substantially the same coverage, terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, as customarily modified from claims made to tail coverage in a single premium amount estimated at Four Hundred Fifty Thousand Dollars ($450,000) ("D&O Tail Payment"), as provided in Section 4.13(b); and

(viii)    E&O Tail Insurance Payment. Payment by Purchaser, on Seller's behalf, of the premium for general liability and medical malpractice tail insurance ("E&O") under substantially the same coverage, terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, as customarily modified from claims made to tail coverage in a single premium amount estimated at Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) ("E&O Tail Insurance Payment") as provided in Section 4.13(a); and

(ix)    Annual Support Grants (Community Benefit). Payment by Purchaser of the Annual Support Grants (as provided in Section 5.9.1(b) of this Agreement) of up to $400,000 per year for five (5) years (total up to $2,000,000), which amount shall not be subject to offset by Purchaser for any reason whatsoever; and

1070091.2
F:\BofA\PWW\FINAL.651.10.1109.DOC

- 8 -

(x)    ESL Benefits. Assumption by Purchaser of the accrued ESL Benefits to Seller's Employees pursuant to Section 1.8.11, estimated at a maximum of approximately $3,373,000.

(b)    If the Transaction does not become the Alternative Transaction and the Agreement is not terminated as provided in Article VIII, then Purchaser shall cause the Escrow to deliver to the Bond Trustees, at Closing, Purchaser's payment of the Cash Purchase Portion on Seller's behalf for all of the existing bond indebtedness to which Seller is subject, or which is secured by or otherwise affects any of the Assets, as further described in Schedule 1.2.1(b) (the "Existing Bonds") as needed to obtain the Bond Release; or

(c)    If the Transaction under this Agreement becomes the Alternative Transaction, as detailed in Section 1.3.2 of this Agreement, whereby Purchaser purchases Menifee Valley Medical Center, then the Parties shall execute a separate asset purchase agreement which shall contain those terms set forth in Schedule 1.2.2 (the "Definitive Alternative Agreement"); provided, however, if the Parties are unable to reach agreement on the Definitive Alternative Agreement, the terms of this Agreement, including without limitation, Schedule 1.3.2 shall remain legally binding and enforceable on the Parties with respect to the Alternative Transaction addressed in Section 1.3.2.

1.2.2    Opening of Escrow. Within five (5) business days after the execution of this Agreement, the Parties shall open an escrow with the Bank of Hemet (the "Escrow"). The Parties shall also execute and deliver to Escrow mutually acceptable escrow instructions as the Parties determine are necessary in order to consummate such transactions and as the Title Company and the Escrow shall require in order to clarify their respective duties and responsibilities (the "Escrow Instructions") along with a duly executed copy of this Agreement.

1.2.3    Deposit. Within five (5) business days after the opening of Escrow, (i) the Parties shall effect the transfer to the applicable account at Escrow the One Million Dollars ($1,000,000) previously deposited by Purchaser in connection with the exclusive dealing agreement between Seller and Purchaser, and (ii) Purchaser shall wire transfer to Escrow an additional One Million Dollars ($1,000,000), in immediately available funds, which shall collectively constitute the good-faith deposit in the amount of Two Million Dollars ($2,000,000) (the "Deposit"), all of which shall, in the event of Closing, be credited as part of the PEPC in connection with the transactions contemplated by this Agreement and the Related Agreements (collectively, the "Transaction"). The Escrow shall hold the Deposit pursuant to the terms of mutually acceptable Escrow Instructions in substantially the form attached as Exhibit 1.2.3 which Seller, Purchaser and the Title Company shall execute as soon as possible after the execution of this Agreement. The Escrow Instructions shall be consistent with the terms of this Agreement, and in the event of any conflict between the Escrow Instructions and this Agreement, this Agreement shall prevail. The Deposit shall be repaid to Purchaser or retained by Seller as provided in Article VIII.

1.2.4    Administrative Claims Fund.

1.2.4.1    Claims Fund. Concurrent with the Closing, Purchaser shall have deposited $4,000,000 into a segregated interest bearing trust account to be maintained by Seller separate and apart from any other bank accounts, to be used only for the purposes and for the benefit of the parties described in this Section 1.2.4 (the "Claims Fund") and to make funds available to

1070092
F:\BofA\PWW\FINAL.651.10.1109.DOC

- 9 -

pay Seller's post-petition obligations, including those Administrative Claims which are not included within the Assumed Other Liabilities ("Covered Claims"). "Covered Claims" do not include any claims relating to Seller's defined benefit plan.

1.2.4.2 Procedure for Payment. Seller shall provide to Purchaser and to the official committee of unsecured creditors or any post-confirmation representative of the General Unsecured Creditors (collectively, the "Committee") a list of the Covered Claims which Seller proposes to be paid from the Claims Fund. Purchaser and the Committee shall have ten (10) business days from receipt thereof to review such list and to notify Seller, in writing, if Purchaser or the Committee objects to payment of any such claims. Seller and Purchaser or the Committee, as the case may be, shall meet and confer in good faith, within ten (10) business days of receipt of Purchaser's or the Committee's objection, to resolve any such issues. In the event that such dispute cannot be resolved within such period, Seller may notify Purchaser and the Committee, as applicable, in writing, of Seller's intent to pay such claims ten (10) business days after the date of such notice. Purchaser or the Committee may object to such payment by filing an appropriate pleading in the Chapter 9 Proceeding within such ten (10) business day period, seeking adjudication of such dispute by the Bankruptcy Court. Unless Purchaser or the Committee files such an objection with the Bankruptcy Court, Seller shall be entitled to pay any such proposed expenses. If such an objection is filed, such matter shall be resolved by the Bankruptcy Court.

1.2.4.3 Additional Administrative Claims Fund. In the event that, after the Closing, the Claims Fund is insufficient to satisfy all Covered Claims, Seller may notify Purchaser and the Committee in writing. Within ten (10) business days after Seller shall have given such notice to Purchaser and the Committee, Purchaser shall agree to deposit such additional funds ("Additional Funds") as may be required to pay all of such Covered Claims, which sum shall be subtracted from the next payments owed pursuant to the Creditors Commitment. Such Additional Funds shall be paid at the time that the next payment becomes due pursuant to the Creditors Commitment. The foregoing notwithstanding, if either Purchaser or the Committee objects to payment of such additional Covered Claims, Purchaser or the Committee may file an objection with the Bankruptcy Court within such ten (10) business day period, seeking adjudication of such dispute by the Bankruptcy Court. Unless Purchaser or the Committee files such an objection with the Bankruptcy Court, Purchaser shall deposit such Additional Funds from the next payments owed pursuant to the Creditors Commitment and Seller may use such Additional Funds to pay such Covered Claims.

1.2.4.4 Obligations Unconditional. Purchaser's obligation to pay the Claims Fund and the Additional Funds, up to and including the total amount of the Creditors Commitment, shall be absolute and unconditional, and shall not be subject to any claim or offset which Purchaser may assert against Seller for any reason whatsoever.

1.2.4.5 Disposition of Remaining Claims Funds. Upon the expiration of thirty-six (36) months following the Closing Date, any remaining Claims Funds, including all interest earned, as to which Covered Claims are not then pending, shall be paid to the General Unsecured Creditors pursuant to a Bankruptcy Court approved Plan of Adjustment.

1.3 Closing Date; Closing Escrow.

1.3.1 If the Approval Election results in the receipt of Public Approval (as these terms are defined in Section 4.14), the Parties shall, after the results of the Approval Election are

certified by the Registrar of Voters of Riverside County (the "Election Results Date"), seek to proceed to the closing of the transactions contemplated in this Agreement ("Closing") by January 31, 2010, or within forty-five (45) days after the Election Results Date, if later (the date for the Closing shall be referred to in this Agreement as the "Closing Date"), provided that all conditions precedent and other matters required to be completed by or on the Closing Date have been or will be completed by or on the Closing Date. If such conditions and other matters are not completed, such Closing Date shall be extended until such conditions and other matters are completed; provided, however, if the Closing has not occurred on or before April 30, 2010, either Party may terminate this Agreement subject the parties' termination rights as provided in Article VIII.

1.3.2 If, in the Approval Election, the voters do not vote to provide the Public Approval, then the transactions pursuant to this Agreement will be structured so as to proceed to Closing as an alternative transaction (the "Alternative Transaction"), as addressed in Section 1.2.1(o) and more fully described in Schedule 1.3.2.

1.3.3 [Intentionally Omitted]

1.3.4 [Intentionally Omitted]

1.3.5 The Closing with respect to the Assets shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the Hospitals are located) on the day immediately following the Closing Date (the "Effective Time"). The Title Company and/or the Escrow, as the case may be, shall make the deliveries and perform the acts as detailed in the Escrow Instructions, as may be amended, the disbursement of agreements, and any other agreements executed by the Parties, which are consistent with the terms of this Agreement.

1.3.6 In the event the Parties are prepared to proceed with the Transaction and Purchaser has not yet obtained a new license from the California Department of Public Health ("CDPH") and Medicare and Medi-Cal certification by the Centers for Medicare Services ("CMS") or any other Material Licenses, as defined in Section 5.2.2, by the Closing Date, upon either Party's written election, the Closing shall nevertheless occur, but Seller and Purchaser shall, to the extent legally permissible, enter into (a) a lease of the Seller's Hospital(s) in substantially the form of Exhibit 1.3.6A attached hereto, whereby Purchaser shall lease such Hospital(s) to Seller (the "Leaseback Agreement"), and (b) a Management Agreement in substantially the form of Exhibit 1.3.6B attached hereto, whereby Seller shall engage Purchaser to manage the Hospital(s) (the "Management Agreement"), both of which (the Leaseback Agreement and the Management Agreement together shall be referred to collectively as the "Lease and Management Agreement"), shall remain in effect for the period between the Effective Time and the last to occur of receipt of all CDPH licenses for the Hospital(s) and Purchaser's new CCN-CMS Medicare certification for each of the Hospital(s) ("Lease/Management Termination Events"). The Lease and Management Agreement shall terminate as to each Hospital effective (i) as such Lease/Management Termination Events occur for such Hospital CDPH licenses and CMS Medicare certification are received, or (ii) nine (9) months from the Closing Date, whichever shall first occur. The Parties agree that the Lease shall be at a rate of $1.00 per month, and the Management Agreement shall provide that Purchaser shall be paid a management fee equivalent to all profits and that Purchaser shall also be responsible for all claims, liabilities and losses incurred by Seller under the Lease and Management

Agreement as well as any insurance necessary to properly cover the Assets, the Personal Property, the Owned Real Property and the Hospital Businesses. The Lease and Management Agreement shall at all times be subject to Seller's obligation, as licensee, to remain ultimately responsible for Hospital operations to the extent legally required so that the Lease and Management Agreement shall not be deemed to constitute a change in ownership. Furthermore, Purchaser agrees under the Lease and Management agreements to indemnify, defend and hold Seller harmless from any and all losses incurred during the period of the effectiveness of the Lease and Management Agreement. Purchaser and Seller shall reasonably cooperate with each other in seeking any approvals required under applicable Laws in order to undertake the Lease and Management Agreement, if the parties elect to proceed in such fashion. If the CDPH or CMS shall require or request any changes to the Lease and Management Agreement to comply with applicable Laws and to avoid a change in ownership of the Hospital prior to the Lease/Management Termination Events, then the Parties agree to work cooperatively to revise the Lease and Management Agreement to address such changes while maintaining, to the fullest extent possible, the intent of the parties thereunder. If the Parties enter into the Lease and Management Agreement, then the Licenses, as defined in Section 1.6.4, to the extent assignable, shall be transferred at the termination of the Lease and Management Agreement as opposed to the Closing.

1.4    Items to be Delivered by Seller at Closing. At or before the Closing, Seller shall deliver, or cause to be delivered, to Purchaser or to Escrow, the following, duly executed by Seller where appropriate, unless otherwise waived by Purchaser:

1.4.1    General Assignment, Bill of Sale and Assumption of Liabilities in substantially the form of Exhibit 1.4.1 attached hereto (the "Bills of Sale");

1.4.2    Assignment and Assumption of Real Estate Leases in the form of Exhibit 1.4.2 attached hereto with respect to each Leased Real Property (the "Real Estate Assignment");

1.4.3    Grant Deed(s) in the form of Exhibit 1.4.3 attached hereto ("Grant Deeds");

1.4.4    Favorable original certificate of good standing, or comparable status, of Seller, issued by the California Secretary of State, dated no earlier than a date which is thirty (30) calendar days prior to the Closing Date;

1.4.5    [Intentionally Omitted]

1.4.6    Creation of the trust account for the Claims Fund;

1.4.7    A certificate of the Chairman of the Board of Seller certifying to Purchaser that to the Seller's Knowledge, as of the Closing, (a) there are no facts except as specifically disclosed in writing to Purchaser that would cause Seller to be in violation of or as examined by the Purchaser which would cause Seller to be in material breach of its representations and warranties under this Agreement, (b) Seller is in compliance with Seller's covenants set forth in this Agreement, and (c) that all of the conditions contained in Article VI have been satisfied except those, if any, waived in writing by Seller;

1.4.8    A certificate of the Secretary of the Board of Directors of Seller certifying to Purchaser (a) the incumbency of the officers of Seller on the Effective Date and on the Closing Date

- 12 -

and bearing the authentic signatures of all such officers of Seller who shall execute this Agreement and any additional documents contemplated by this Agreement, and (b) the due adoption and text of the resolutions of Seller authorizing (i) the transfer of the Assets and delegation of the Assumed Obligations by Seller to Purchaser, (ii) the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Seller, and (iii) that Seller's Board of Directors has adopted a special resolution scheduling the election seeking the Public Approval pursuant to Section 4.14, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.4.9    UCC termination statements prepared by Purchaser and acceptable to Seller for any and all financing statements (which do not correspond to an Assumed Obligation) filed with respect to the Assets, including, without limitation, any UCC termination statements required to effectuate the Bond Release, and the release of any capital lease obligations (if any) which are not assumed by Purchaser hereunder;

1.4.10    Limited Power of Attorney prepared by Purchaser and acceptable to Seller for use of pharmacy license, DEA and Other Registration Numbers, and DEA Order Forms, in the form contemplated pursuant to 42 C.F.R. § 1305.05 (the "Power of Attorney");

1.4.11    Copies of all third party consents, or of Bankruptcy Court orders if applicable, which are required to be obtained by Seller in connection with the assignment to and assumption of the Assumed Contracts and Assumed Leases by Purchaser;

1.4.12    The Lease and Management Agreement, executed by Seller, if applicable;

1.4.13    The Post-Closing Seller's Lease, as detailed in Section 5.9.1;

1.4.14    Proof reasonably acceptable to Purchaser that Seller has obtained and has in place the insurance required to be obtained by Seller pursuant to Section 4.13 of this Agreement, provided that Purchaser has paid the related premiums as provided in Sections 1.2.1(a)(vii) and (viii) and Section 4.13 of this Agreement;

1.4.15    Proof reasonably acceptable to Purchaser that Seller has obtained and has in place the required Public Approval, if obtained, to be sought by Seller pursuant to Section 4.14 of this Agreement;

1.4.16    In the event that the required Public Approval has been obtained, payment by the Purchaser (to be deposited and paid from the Escrow, as addressed above) to or as otherwise instructed by the trustees (collectively, the "Bond Trustee") of the Existing Bonds, of the full amount required after application of all remaining reserves to cause Seller and all of the Assets to be fully released from any further obligations under the Existing Bonds, whether by defeasance, redemption or otherwise ("Bond Release") after application of the Cash Purchase Portion and the applicable reserves, and delivery of such other documents as needed to effectuate the Bond Release, to the effect that the Assets shall be free and clear of any security interest on, or related to, the Existing Bonds and the Purchaser shall have no obligation therefore, and Purchaser shall be subject to no covenants or restrictions under, or as a result of, any Seller bond documents, as well as any other documents reasonably requested by Purchaser to effect the foregoing. Such amounts shall be payable by wire transfer, from the Cash Purchase Portion pursuant to the Bond Trustee's reasonable instructions (the "Bond Release Documents"). In the event that the Bond Trustee will not give the

- 13 -

Bond Release, Purchaser may rely upon the opinion of Seller's bond counsel that all amounts necessary to release the Existing Bonds have been duly paid or tendered and that the Assets and the proceeds thereof are not subject to any liens or restrictions imposed pursuant to the Existing Bonds;

1.4.17  An opinion of an independent consultant with expertise in methods of appraisal and valuation and in accordance with applicable governmental and industry standards for appraisal and valuation, determining that fair and reasonable consideration is to be received by Seller for the Assets, or Alternative Assets, as applicable, pursuant to California Health & Safety Code Section 32121(b)(1);

1.4.18  Such documents, other than payments, needed to be signed and delivered by Seller in order to effectuate the Bond Release; and

1.4.19  Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms of this Agreement.

For purposes of this Agreement, the deliverable documents referred to in Section 1.4 and elsewhere in this Agreement are collectively referred to in this Agreement as "Related Agreements."

1.5  Items to be Delivered by Purchaser at Closing. At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller or Escrow the following, duly executed by Purchaser where appropriate, unless otherwise waived in writing by Seller:

1.5.1  The Cash Purchase Portion for the Bond Release pursuant to Section 1.2.1(o)(i) and any Bond Release Documents pursuant to Section 1.4.16 which are required to be signed and delivered by Purchaser, including appropriate escrow instructions regarding disbursement of the funds needed for the Bond Release payment, out of the Cash Purchase Portion funds consistent with the terms of this Agreement;

1.5.2  A certificate of a duly authorized officer of Purchaser certifying to Seller (a) compliance with Purchaser's representations, warranties and covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement or that Purchaser shall agree and execute the Leaseback Agreement and Management Agreement, and (c) that all of the conditions contained in Article VII have been satisfied except those, if any, waived in writing by Purchaser;

1.5.3  A certificate of the Secretary or other officer of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Effective Date and on the Closing Date and bearing the authentic signatures of such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the adoption and text of the resolutions of the Members or Managers of Purchaser authorizing the execution, delivery and performance of this Agreement and all ancillary documents and instruments by Purchaser, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

- 14 -

739348/PHX/FINAL 484 11/13.EDOC

1.5.4  [Intentionally Omitted]

1.5.5  Favorable original certificates of good standing, or comparable status, of Purchaser issued by the California Secretary of State dated no earlier than a date which is thirty (30) calendar days prior to the Closing Date;

1.5.6  The Bills of Sale;

1.5.7  The Real Estate Assignments;

1.5.8  The Power of Attorney;

1.5.9  Documents reasonably satisfactory to Seller evidencing the assumption and release (as may be applicable pursuant to Sections 5.8 and 9.3) of the Assumed Other Liabilities and Assumed Obligations;

1.5.10  The Lease and Management Agreement, executed by Purchaser, if applicable;

1.5.11  The Post-Closing Seller's Lease as detailed in Section 5.9.1(k);

1.5.12  Payment of the Claims Fund;

1.5.13  An assumption and release (from all holders of the Select Administrative Note) of Seller from any obligations relating to the Select Administrative Note which are reasonably acceptable to Seller;

1.5.14  An assumption and release of Seller relating to the Assumed Rejection Claims, as detailed in Section 1.2.1(o)(v) which are reasonably acceptable to Seller;

1.5.15  Payment of the Annual Support Grants, as detailed in Section 5.9.1(k), by Purchaser for the first year, which amount shall not be subject to offset by Purchaser for any reason whatsoever;

1.5.16  No later than December 4, 2009 ("First Organizational Update"), and again five (5) days prior to the Closing Date ("Second Organizational Update"), an organizational chart for the Purchaser and each of the Purchasing Group Companies, setting forth its officers, directors and board of directors or managers, as applicable, and a list of all physicians who have invested at least Ten Thousand Dollars ($10,000) in such an entity ("Listed PHH Physicians");

1.5.17  [Intentionally left blank]

1.5.18  Payment of the D&O and E&O premiums, as detailed in Section 1.2.1(o)(vii) and Section 1.2.1(o)(viii) respectively;

1.5.19  Documentation, in a form reasonably acceptable to Seller, containing Purchaser's absolute and unconditional promise to pay to Seller, the total sum of $21,000,000, reduced by the Claims Fund and the Additional Fund as provided for in Section 1.2.4, payable in four (4) equal annual installments commencing on the first anniversary of the Closing Date, within

- 15 -

739348/PHX/FINAL 484 11/13.EDOC

remainder, after the payment of Administrative Claims, to be available to the General Unsecured Creditors; and

1.5.20    Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms of this Agreement.

1.6    Transfer of Seller Assets. On the Closing Date, for the consideration and in reliance on the representations and warranties of the Parties set forth in this Agreement, Seller shall sell, assign, transfer, convey, as applicable, and deliver to Purchaser, and Purchaser shall acquire and assume, all of Seller's right, title and interest in and to, and all of Seller's obligations related to, the following assets and properties, as such assets shall exist on the Closing Date with respect to the operation of the Hospital Businesses, such Transfer being deemed to be effective at the Effective Time (collectively, the "Assets"):

1.6.1    All of the real property that is owned by Seller, including, without limitation, any real property used in connection with the operation of the Hospital Businesses as described in Schedule 1.6.1, together with all buildings, improvements and fixtures located thereupon and all landscaping, utility lines, roads, driveways, fences, parking areas, contiguous and adjacent entry rights, construction in progress, and all other improvements located thereon and all rights, privileges and easements appurtenant to the foregoing, subject to the non-monetary obligations on the preliminary report approved by Purchaser, as detailed in Schedule 1.6.1.A (collectively, the "Owned Real Property");

1.6.2    All leases of real property in which Seller is the lessor or lessee, as detailed on Schedule 1.6.2 (the "Leased Real Property" which collectively with the Owned Real Property shall herein after be referred to as the "Real Property");

1.6.3    All of the tangible personal property owned by Seller, including, without limitation, with respect to the operation of the Hospital Businesses, including all equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "Personal Property"), including, without limitation, the Personal Property described in Schedule 1.6.3, with the exception of (i) any and all Personal Property described in Sections 1.7 or 1.9 and (ii) any personal property located in the "Board Executive Conference Room," and the "Board Office" as referenced in Section 5.9.1;

1.6.4    Subject to Section 1.3.6, all of Seller's rights, to the extent lawfully transferable, to all licenses, Medicare, Medicaid and other provider numbers and agreements, permits, approvals, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to such Seller with respect to the operation of the Hospital Businesses and all applications or registrations relating to any of the foregoing (the "Licenses"), including, without limitation, as described in Schedule 1.6.4.A except for those Licenses that Purchaser elects prior to the Effective Time, in its sole discretion, not to take or delay assignment of as identified in Schedule 1.6.4.B (the "Excluded Licenses");

1.6.5    All of Seller's interest, to the extent lawfully transferable and subject to Section 9.3 of this Agreement, in and to all personal property leases with respect to the operation of the Hospital Businesses, including, without limitation, as described in Schedule 1.6.5 (the "Personal Property Leases" which together with the Leased Real Property shall be known as the "Leases");

-16-

1.6.6    Subject to the entry of an order of the Bankruptcy Court pursuant to related terms at Section 9.3 of this Agreement), in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital Businesses or the Assets (the "Contract") agreed to be assumed by Purchaser as set forth on Schedule 1.6.6 ("Assumed Contracts") provided, however, the term "Assumed Contracts" as used in this Agreement shall exclude any Contracts not listed on Schedule 1.6.6 (the "Excluded Contracts");

1.6.7    Except as excluded under Section 1.7, all of Seller's advance payments, prepayments, prepaid expenses, deposits and the like, except for any prepaid insurance premiums, which exist as of the Effective Time, which were made with respect to the operation of any Hospital Businesses which are determined by Purchaser to be useable by and transferable to Purchaser, the categories and amounts of which are set forth on Schedule 1.6.7 (the "Prepaids");

1.6.8    Except as excluded under Section 1.7, all of Seller's inventories of supplies, drugs, food, janitorial maintenance, shop and office supplies and other disposables and consumables located at any of the Hospital Businesses, or used with respect to the operation of any of the Hospital Businesses (the "Inventory") which are existing as of the Effective Time;

1.6.9    Except as excluded under Section 1.7 and the Leaseback Agreement (if then existing or the termination thereof), all of Seller's documents, records, operating manuals, files and computer software with respect to the operation of any of the Hospital Businesses, to the extent lawfully transferable and subject to privacy issues, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and Sections 9.3 and 12.8 of this Agreement, including, without limitation, all of Seller's patient records, medical records, employee records, financial records with respect to the operation of any of the Hospital Businesses, equipment records, construction plans and specifications, and medical and administrative libraries, and the Transferred Records, both subject to reasonable and customary records retention requirements and rights of access in order to fulfill Seller's legal obligations, as further addressed in this Agreement;

1.6.10    To the extent transferable and subject to Section 9.3 of this Agreement, all of Seller's unexpired warranties and covenants not to compete received from third parties with respect to the Assets including, without limitation, such warranties and covenants as are set forth in any construction agreement, lease agreement, equipment purchase agreement, consulting agreement, agreement for architectural and engineering services or purchase and sale agreement;

1.6.11    [Intentionally Omitted];

1.6.12    Except as provided under Section 1.7 or Schedule 1.6.12, all of Seller's claims, choses in action, rights of recovery, rights of offset, recoupment, rights to refunds and similar rights pertaining to the Assets;

1.6.13    Except as excluded under Section 1.7, to the extent transferable and subject to Section 9.3 of this Agreement, all proprietary materials, documents, trademarks, patents, information, media, methods, processes, inventions and technology owned by Seller which are functionally related to the Hospital Businesses, including, but not limited to, all of Seller's telephone numbers, intangible assets of an intellectual property nature, all proprietary computer software, all clinical and policy and procedure manuals, and all

-17-

promotional, marketing and recruiting materials and all applications or registrations relating to any of the foregoing, all subject to any existing limitations;

1.6.14 To the extent transferable and subject to Section 9.3 of this Agreement, any and all of Seller's rights respecting computer and data processing hardware that are proprietary to Seller and licenses for software which are functionally related to the Hospital Businesses, and any of Seller's computer and data processing hardware, whether or not located at the Hospital, that is part of a computer system used by any of the Hospital Businesses, whether or not the central processing unit therefor is located at the Hospital, all of which are set forth on Schedule 1.6.14;

1.6.15 All of Seller's other intangible assets related to the Hospital Businesses, not otherwise listed above, including without limitation the goodwill of the business evidenced by the Assets and Seller's rights under that certain covenant not to compete provided to Seller by Kaiser Foundation Hospitals ("Kaiser") pursuant to that certain First Amendment to Asset Sale Agreement, by and among Seller, Select VHS Acquisition Company, LLC and Kaiser, to the extent that such covenant may be transferable (such covenant is assignable only if Purchaser enters into agreements for the provision of beds to Kaiser patients at mutually agreeable rates);

1.6.16 All of Seller's insurance proceeds arising in connection with property damage to the Assets occurring after the Effective Date and prior to the Effective Time, to the extent not expended to the repair or restoration of the Assets;

1.6.17 Except as provided under Section 1.7 below, the Seller's names, symbols and telephone numbers used with respect to the operation of the Hospital Businesses, including, without limitation, the names of the Hospital Businesses set forth on Schedule 1.6.17 and all variants thereof;

1.6.18 All Accounts Receivable and other Current Assets (with the exception of the items in the Excluded Assets, as detailed in Section 1.7) of Seller with respect to the operation of any of the Hospital Businesses (which are not otherwise specifically described above in this Section 1.6); and

1.6.19 The assets of VHSSC which are to be transferred by VHSSC to Seller, subject to approval of the VHSSC Board of Directors, including, (i) the stock ownership interest in Professional Medical Management Group, Inc. ("ProMed"), subject to applicable contractual rights, and (ii) one half of the cash or cash equivalents of VHSSC. As of the date of this Agreement, it is contemplated that the other one-half of the remaining cash or cash equivalents may be given or otherwise transferred by VHSSC to Ramona Community Services Corporation, a California nonprofit corporation (which does business as Ramona VNA and Hospice) ("RCSC"). There shall be no adjustment to the PEPC by reason of such gift or transfer to RCSC.

1.7 Excluded Assets. Notwithstanding anything to the contrary in this Section 1.6, Seller shall retain all assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following assets of Seller (collectively, the "Excluded Assets"):

1.7.1 All cash and other consideration received by, or promised to, Seller as part of the PEPC;

1.7.2 Any rights of Seller in Seller's defined benefit plan;

- 18 -

1.7.3 The names Valley Health System, VHS or world-wide web addresses (including, without limitation, any world-wide web address containing "valleyhealthsystem.com," "valleyhealthsystem.org," "Vhs.com," "vhs.org"), all abbreviations and variations thereof, and trademarks, trade names, service marks, copyrights and any applications therefor, symbols and logos related thereto, including those as detailed in Schedule 1.1, together with any promotional material, stationery, supplies or other items of inventory bearing such names or symbols or abbreviations or variations thereof;

1.7.4 The portions of inventory, Prepaids and other Assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and prior to the Effective Time in the ordinary course of business and otherwise in accordance with the terms of this Agreement;

1.7.5 All claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same;

1.7.6 All rights, claims and choses in action of Seller and its Affiliates with respect to any Excluded Contracts and investments in Seller's Affiliates which Purchaser does not purchase, as listed in Schedule 1.7.6;

1.7.7 All of the assets of the Hemet Hospital Foundation, Menifee Valley Medical Center Foundation (aka Foundation for the Menifee Valley Medical Center) and Moreno Valley Community Health Foundation (collectively, the "Foundations");

1.7.8 All assets related to the Hospital auxiliaries, including the Hemet Valley Hospital Auxiliary, the Menifee Valley Medical Center Auxiliary, and the Moreno Valley Community Hospital Auxiliary (collectively, the "Auxiliaries");

1.7.9 All of the corporate minutes and organizational documents relating to Seller, VHSSC, the Foundations or the Auxiliaries, all attorney-client privileged documents relating to Seller;

1.7.10 Any affirmative defenses, counterclaims, rights of offset or recoupment, or any other defenses to any claims which may be asserted by any Person against Seller in connection with any Excluded Liabilities, as detailed in Section 1.9, or otherwise; provided further that Seller and Purchaser shall each have the non-exclusive right to assert any affirmative defenses, counterclaims, rights of offset or recoupment, or any other defense to any claims that may be asserted against either of them, to the extent that such affirmative defense, counterclaim, offset, recoupment or other defense relates to any asset, contract, right, obligation or interest retained by Seller or transferred to Purchaser, respectively;

1.7.11 Restricted funds included within Seller's Current Assets, held by Seller from the Estate of Beatrice Brown (of which the current balance is approximately $807,000 which are restricted to charitable use for services to crippled children, and which amount (as adjusted through the Closing Date), which shall be retained by Seller;

1.7.12 As detailed in Section 1.6.19, one-half of the cash or cash equivalents of VHSSC (which is included within Seller's Current Assets), which as of the date of this Agreement is contemplated to be distributed to RCSC;

- 19 -

1.7.13  Any portion of the current or long term debt service reserve funds relating to Seller's Existing Bonds held by or for the benefit of Seller (including all funds held by the Trustees of the Existing Bonds and reserves held internally by Seller for payment of interest and principal on the Existing Bonds during the current semi-annual period) which shall be used to pay off the Existing Bonds; and

1.7.14  Any assets identified in Schedule 1.7.14, which are mutually agreed upon by the Parties.

1.8  Assumed Obligations. On the Closing Date, Seller shall assign, and Purchaser shall assume and agree to discharge (if then outstanding) those obligations at that time, Purchaser shall use its best efforts to obtain a release of Seller from and shall indemnify, defend and hold Seller harmless from) the following liabilities and obligations of Seller, except to the extent included in the list of Excluded Liabilities, below (collectively, the "Assumed Obligations"):

1.8.1  All Assumed Other Liabilities of Seller as of the Closing, including the repayment schedules from Medicare attached hereto as Schedule 1.8.1, but excluding any liabilities related to the Existing Bonds (which are to be paid in full from the Cash Purchase Portion), or as otherwise provided in Sections 1.9.11 or 1.9.12;

1.8.2  Any Severance Liabilities owing to Seller's Employees to whom Purchaser has not extended an offer of employment, consistent with the terms and conditions of Seller's current severance policy and employment agreements, and any Accrued Paid Time Off Amounts owing to Seller's Employees, as defined in Section 3.4.1, (i.e., for such employees who become Hired Employees, or who are hired by Purchaser but do not consent to the transfer of liability for such Accrued Paid Time Off Amounts to Purchaser);

1.8.3  All obligations and liabilities of Seller in connection with the Contracts, to the extent that (i) Purchaser obtains a direct or indirect benefit from such Contracts even though not included within Assumed Contracts, as further addressed in Section 9.3.1 or (ii) such Contracts are Assumed Contracts, including any obligations to make one or more payments required to be paid under the Chapter or Assumed Contracts, including any obligations to make one or more payments required to be paid under the Chapter (which are to be paid on any Contract which Purchaser is required or elects to assume pursuant to this Agreement. Notwithstanding the foregoing, in the event that Purchaser is unable as a matter of law to assume the capital lease obligations which are part of the Assumed Contracts (e.g., such financing is available only to tax exempt entities), Purchaser agrees to refinance or pay in full the capital lease obligations at the Closing;

1.8.4  All unpaid real and personal property Taxes, as defined in Section 2.15.1, if any, that are attributable to the Assets;

1.8.5  All utilities furnished to all of the Assets;

1.8.6  All obligations and liabilities under the union contracts and memoranda of understanding with the unions which are referenced in Schedule 1.8.6 and Schedule 2.12.2;

1.8.7  All of the obligations and liabilities relating to the Assets, the Real Property and the operations or practices of the Hospital Businesses which hereafter may exist that in any way are based upon, relate to or arise out of the ownership or operation of the Assets, the Real Property or the Hospital Businesses after the Closing Date;

- 20 -

F:\docs\9090\9041.621.18.1230.DOC

1.8.8  All obligations and liabilities of Seller now existing or which may hereafter exist by reason of any liability to refund any payment or reimbursement received by Seller from any Payor which is held internally by Seller for payment of time, unless such refund resulted from criminally fraudulent or criminally illegal billing practices by Seller;

1.8.9  All other obligations of Seller which are expressly assumed by Purchaser as part of the PEPC as set forth in Section 1.2.1 or elsewhere in this Agreement;

1.8.10  All present, future and contingent workers compensation claims of Seller's Employees;

1.8.11  All accrued extended sick, leave and frozen sick pay benefits (the "ESL Benefits") for Seller's Employees who become Hired Employees, as defined in Section 5.4.1, under Seller's ESL Benefits plans (which provides for accrual of ESL Benefits separate and apart from Accrued Paid Time Off and is payable only in the event of sickness after exhaustion of Accrued Paid Time Off and is provided on the understanding and condition that the ESL Benefits are not payable to Seller's Employees upon termination of employment of Seller's Employees, and is not carried as a Current Liability on the Baseline Financials);

1.8.12  Any other obligations and liabilities identified in Schedule 1.8.12 which are mutually agreed upon by the parties.

1.9  Excluded Liabilities. Purchaser shall not assume or become obligated to pay any obligation or liability of Seller not expressly assumed pursuant to Section 1.8, of any nature whatsoever (whether express or implied, fixed or contingent, liquidated or un-liquidated, known or unknown, due or to become due) (the "Excluded Liabilities"), which Excluded Liabilities shall include, without limiting the generality of the foregoing, the following:

1.9.1  Obligations or liabilities of Seller or any Affiliate of Seller now existing or which may hereafter exist to refund any payment or reimbursement received by Seller from any Payor, based on claims of criminally fraudulent or criminally illegal billing (but not including any improper or allegedly improper billing which is not criminally fraudulent or criminally illegal), which is attributable to any period of time ending prior to the Effective Time;

1.9.2  Any Severance Liabilities not listed at Schedule 1.1.1.(ee);

1.9.3  Fines, penalties and interest thereon now existing or which may hereafter exist by reason of any violation of Laws by Seller or by any employee, agent or independent contractor of any of the foregoing, relating to the ownership, use or operation of the Assets prior to the Effective Time;

1.9.4  Obligations and liabilities of Seller arising from or in connection with any litigation described in Section 2.11 or any claims for personal injury (including sickness, trauma, disease, pain and suffering, loss of future earnings, punitive damages and the like), property damage and any other damage or injury in existence or arising out of an event or circumstance which occurred or existed prior to the Effective Time, whether or not any claim has been made or litigation has been instituted with respect thereto, and whether or not any such claim is covered partially or fully by insurance;

- 21 -

F:\docs\9090\9041.621.18.1230.DOC

1.9.5 Except as provided in Section 1.8.3 (with respect to cure payments), Section 12.12, or elsewhere in this Agreement, obligations and liabilities of Seller incurred in connection with obtaining any required consent, authorization or approval under this Agreement necessary for Seller to sell, convey, assign, transfer or deliver any Asset to Purchaser under this Agreement, subject to Section 9.3;

1.9.6 Obligations and liabilities of Seller or any Affiliate of Seller now existing or which may hereafter exist, that may arise as a result of the consummation of the transactions contemplated by this Agreement or any Related Agreement, except (i) real and personal property Taxes, (ii) sales and use taxes for periods prior to the Closing which are included in the Baseline Financials, and (iii) as otherwise provided in Section 12.12

1.9.7 All of the obligations and liabilities that are based upon or arise out of the assets or businesses of Seller or any Affiliate of Seller which are not being transferred to Purchaser under this Agreement, including without limitation those related to the Excluded Assets, unless Purchaser is actually receiving the benefit of the assets or businesses not being transferred (e.g. because a third party will not grant a consent), in which case, the Parties agree that Seller shall not be liable for these obligations and liabilities and Purchaser shall indemnify, defend and hold Seller harmless from any liability, obligation or claim related thereto to the extent that Purchaser is receiving a benefit from the asset or business not transferred;

1.9.8 Except as otherwise provided in Section 1.8 above, liabilities and obligations to any employees of Seller arising out of claims, actions or omissions occurring prior to the Effective Time (i) under any employment, wage and hour, equal opportunity, discrimination, or immigration and naturalization Legal Requirements, including without limitation under the National Labor Relations Act ("NLRA"), Title VII of the Civil Rights Act ("CRA"), the Fair Labor Standards Act ("FLSA"), the Age Discrimination in Employment Act ("ADEA"), the Vocational Rehabilitation Act of 1973 ("VRA"), the Public Health Service Act ("PHSA"), the Consolidated Omnibus Budget Reconciliation Act ("COBRA") (to the extent applicable to Seller) Worker Adjustment and Retraining Notification Act (and California Labor Code Sections 1400 through 1408) (collectively, "WARN") (to the extent applicable to Seller), with respect to periods prior to the Closing Date, and any other federal or state employment Legal Requirements; or (ii) under any collective bargaining or labor agreement or labor Legal Requirements or arrangements, except as otherwise expressly provided in this Agreement; provided, however, the Assumed Obligations shall include all present, future and contingent Workers Compensation claims as provided in Section 1.8.10 above;

1.9.9 All of Seller's liabilities and obligations, if any, relating to Benefit Plans accruing prior to the Effective Time, except as otherwise provided in Section 1.8;

1.9.10 All Current Liabilities which are not recorded on Seller's books consistent with accounting principles applied to the Baseline Financials, but excluding (i) all obligations under Assumed Contracts, and (ii) all obligations under the ESL Benefits which are assumed by Purchaser as described in Section 1.8.11 above; and

1.9.11 Any liabilities relating to the Existing Bonds, which Purchaser has agreed to pay as part of the PEPC; and

- 22 -

reject in the Chapter 9 Proceeding any Contracts which are not Assumed Contracts, including without limitation, existing labor agreements, whether or not such liability or obligation arises before or after the Effective Time.

The Excluded Liabilities shall remain the sole responsibility of Seller subject to the limitations provided in this Agreement.

1.10 Disclaimer of Warranties.

1.10.1 As a material part of the consideration and as an inducement to Seller to enter into this Agreement, Purchaser agrees as follows:

Except as expressly set forth elsewhere in this Agreement, the Assets transferred to Purchaser shall be sold by Seller and purchased by Purchaser as of the Effective Time "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR OCCUPANCY OR HABITATION, with respect to the Real Property, land, buildings and improvements, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, and with no warranties with respect to the current financial condition of the Hospital Businesses, any and all of which warranties (both express and implied) Seller hereby disclaims.

Seller's Initials: _____     Purchaser's Initials: _____

All of the foregoing real and personal property shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use of the inventory and supplies in the ordinary course of business up to the Effective Time. Notwithstanding the foregoing and without limiting the various limitations set forth in this Section 1.10, Seller discloses that it has identified the construction projects set forth in Schedule 1.10.1 which Seller believes will require completion during the current fiscal year following the Closing Date.

1.10.2 Without limiting the foregoing, Purchaser acknowledges that Purchaser will be given the opportunity, at its sole cost and expense, to conduct such environmental inspections and surveys as Purchaser may deem necessary (the "Environmental Surveys"). If Purchaser is dissatisfied with the results of any Environmental Survey, or related investigation, conducted by Purchaser, Purchaser shall notify Seller in writing by December 4, 2009 that Purchaser is terminating this Agreement. Failure by Purchaser to give such written notice by December 4, 2009 shall be deemed to constitute approval by Purchaser of the Environmental Surveys, or a waiver by Purchaser of such condition. Seller shall have no obligation to undertake any such environmental remediation work. Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges that a portion of the hospital located in Hemet and the child care center in Hemet were built prior to 1982 and contain asbestos and also may not be in compliance with current applicable seismic Legal Requirements. Purchaser agrees to take the Real Property subject to said conditions and to relieve,

- 23 -

any portion thereof, or (xii) the economics of, or the income and expenses, revenue or expense projections or other financial matters, relating to the operation of the Real Property.

1.11   Risk of Loss. Subject to Sections 1.12 and 1.13, the risk of loss or damage to any of the Assets, including the Personal Property, Real Property, the Hospital Businesses and any other property transfer which is contemplated by this Agreement, shall remain with Seller until the Effective Time. Seller shall maintain its insurance policies covering the Assets, including the Personal Property, Owned Real Property, the Hospital Businesses and all other property through the Effective Time.

1.12   Casualty. If prior to the Closing, all or any part of the Assets or the Real Property are destroyed or damaged by fire or the elements or by any other cause where (a) such damage or destruction in the aggregate ("Aggregate Damage") does not exceed Two Million Five Hundred Thousand Dollars ($2,500,000.00), whether or not covered in whole or in part by insurance, and (b) such damage or destruction in the aggregate which is not covered by Seller's insurance does not exceed One Million Dollars ($1,000,000) (in either case, the "Damage Threshold"), the duties and obligations of the Parties under this Agreement shall not be affected, the PEPC shall not be adjusted, and the Closing shall proceed as scheduled pursuant to the terms of this Agreement; provided, however, at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction, but without further adjustment to the PEPC. Solely for purposes of the foregoing determination, "Aggregate Damage" shall also include the estimated costs of environmental remediation as set forth in Section 1.10.2. If prior to the Closing, all or any part of the Assets or the Real Property are destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds either Damage Threshold, Purchaser may elect to either (i) purchase the Assets and the Real Property as set forth in this Agreement, without adjustment to the PEPC (provided, however, at the Closing, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction), or (ii) terminate this Agreement upon written notice to Seller ("Termination Notice"), whereupon Purchaser shall be entitled to a refund of the entire Deposit. The Purchaser shall make such election within fifteen (15) business days following the occurrence of the casualty giving rise to such Aggregate Damages. Unless Seller challenges any valuation determination made by Purchaser under this Agreement within ten (10) business days of Seller's receipt of the same, such valuation determinations shall be deemed to have been accepted by Seller and shall be conclusive and final on Seller. If, however, Seller timely challenges such determinations, then unless otherwise resolved by agreement of the Parties within ten (10) business days from the date of Seller's challenge, such valuation determination shall be deemed in dispute and shall be resolved pursuant to the dispute resolution provisions of Section 12.18 (except that the provisions of Section 12.18.1 shall not apply).

1.13   Condemnation. From the date of this Agreement until the Effective Time, in the event that any portion of the Assets or the Real Property, including access thereto or parking therefor, is taken, reduced or restricted by any pending, threatened or contemplated condemnation or eminent domain proceeding or otherwise, Seller shall promptly notify Purchaser of the same and Purchaser may, in its sole and absolute discretion, within ten (10) days after receipt of notice from Seller (i) terminate this Agreement in its entirety without penalty, in which case the Deposit shall be paid back to Purchaser, or (ii) agree to consummate the transaction notwithstanding such condemnation or eminent domain, in which event, (a) Purchaser shall accept the Assets and Real Property subject to such condemnation or eminent domain proceeding or without the portion of the

- 25 -

defend, indemnify and hold Seller harmless with respect to any liability related thereto, except to the extent of Seller's negligence or intentional misconduct.

1.10.3   Without limiting the foregoing, Purchaser will be given the opportunity, at its sole cost and expense, to obtain such appraisals at Purchaser and its lenders and other financing sources may deem necessary (the "Purchaser's Appraisals"), and to complete such Purchaser's Appraisals no later than the Closing ("Appraisal Period"). Seller shall provide such Purchaser and its agents reasonable access to the Real Property and the Hospital as reasonably necessary for conducting the Purchaser's Appraisals. Subject to Section 1.4.17 which the Parties acknowledge is for the protection of Seller, the Parties agree that there shall be no financing contingency applicable to the Transaction.

1.10.4   Except as expressly set forth elsewhere in this Agreement, any and all information and documents furnished to Purchaser by or on behalf of Seller relating to the Real Property shall be deemed furnished as a courtesy to Purchaser but without any warranty of any kind from or on behalf of Seller, except for any representations expressly made by Seller elsewhere in this Agreement. Purchaser hereby represents and warrants to Seller that Purchaser has also, at this Agreement, performed, an independent general inspection and investigation of the Real Property and has also investigated and has knowledge of operative or proposed governmental laws and regulations including without limitation, land use laws and regulations to which the Real Property may be subject. Purchaser further represents that, except for any representations expressly made by Seller and any other Purchaser inspection and approval rights set forth elsewhere in this Agreement, and right or receipt of this insurance, as addressed elsewhere in this Agreement, it shall acquire the Real Property solely upon the basis of its independent inspection and investigation of the Real Property, including without limitation, (i) the quality, nature, habitability, occupancy, merchantability, use, operation, value, marketability, adequacy or physical condition of the Real Property or any aspect or portion thereof, including, without limitation, structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities, electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, soils, geology and groundwater, and the other legal status of the Real Property or any particular purpose, (iv) the zoning or other legal status of the Real Property or any other public or private restrictions on the use of the Real Property, (v) the compliance of the Real Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or regulatory agency or authority or of any other person or entity (including, without limitation, the Americans With Disabilities Act), (vi) the ability of Purchaser to obtain any necessary governmental approvals, licenses or permits for Purchaser's intended use or development of the Real Property, (vii) the presence or absence of Hazardous Materials on, in, under, above or about the Real Property or any adjoining or neighboring property, (viii) the quality of any labor and materials used in any Improvements, (ix) the condition of title to the Real Property, (x) any other agreements affecting the Real Property or the intentions of any party with respect to the negotiation and/or execution of any lease or contract with respect to the Real Property, (xi) Seller's ownership of the Real Property or

- 24 -

Assets or Real Property taken in such proceeding, (b) Purchaser shall retain all of the right, title and interest of Seller, as owner of the Assets or Real Property, as the case may be, in and to such proceeding and the proceeds of the award made in such proceedings, and (c) Seller shall promptly turn over to Purchaser the proceeds of any award, or payment made pending the making of the award, already received by Seller. If Purchaser does not provide a termination notice to Seller within the ten (10) day period specified above, Purchaser shall be deemed to have elected to consummate the transaction notwithstanding such condemnation or eminent domain proceeding, in which event, Seller shall pay, transfer and assign to Purchaser at Closing, the proceeds, or the right to receive the proceeds, relating to any applicable award as detailed in this Agreement. In no event shall a condemnation result in a reduction of PEPC without the express written approval of Seller.

1.14   Development and Review of Schedules, Exhibits and Other Materials. The Parties agree to the further actions and provisions related to this Agreement, which are scheduled to take place during the forty-five (45) days following the Effective Time ("Schedules Period"):

1.14.1   During the Schedules Period, Seller shall provide Purchaser with copies of all Contracts (except to the extent that Purchaser and Seller otherwise agree to exclude certain non-material Contracts), as well as the estimated cure payments required under the Chapter 9 Proceeding for each such Contract to be paid in order to assume such Contracts ("Cure Payments"). Purchaser shall determine which Contracts it elects to assume and shall notify Seller of the same, in writing, within ten (10) days after the end of the Schedules Period.

1.14.2   Seller shall, within the Schedules Period, estimate the Administrative Claims ("New Administrative Claims") which will be incurred by Seller as a result of the rejecting those post-petition Contracts which Purchaser has not elected to assume ("Rejected Contracts") and shall notify Purchaser of same in writing. If, as a result of the New Administrative Claims, the Covered Claims are estimated to exceed the original Claims Fund, then Purchaser shall have the right to: (i) nonetheless close the Transaction, and at Closing, Purchaser shall immediately pay the additional amounts needed for the Claims Fund in excess of $4,000,000 to cover the New Administrative Claims; (ii) elect to assume some of the Rejected Contracts sufficient to reduce the New Administrative Claims so to bring Covered Claims within the amount of the original Claims Fund; or (iii) elect, by written notice to Seller prior to the end of the Schedules Period, to terminate this Agreement.

1.14.3   Seller will complete and deliver Seller's disclosure schedules, and the the remaining diligence materials related thereto and otherwise requested not later than 45 days after the Effective Date. If Purchaser disapproves of any such materials, it may elect to terminate this Agreement by written notice provided to Seller prior to the end of the Schedules Period or 10 days after the last materials are provided to Purchaser under Section 1.14.2.

1.14.4   Seller and Purchaser shall work together diligently to finalize the other Exhibits and Schedules to this Agreement and to develop and agree upon the Definitive Alternative Agreement consistent with Schedule 1.3.2. Once the Parties reach agreement on the form of the Definitive Alternative Agreement, the Parties agree to replace the terms of Schedule 1.3.2 with the form the Definitive Alternative Agreement, which will govern the Alternative Transaction, if applicable.

10700293                                        - 26 -

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as disclosed in any of the disclosure schedules related to the following representations or in Schedule 2.1, as of the Effective Date, as may be amended pursuant to the terms of this Agreement (collectively, the "Seller's Disclosure Schedules"), and in order to induce Purchaser to enter into this Agreement and to consummate the transactions contemplated under this Agreement, Seller hereby represents, warrants and covenants to Purchaser, as to the following matters. Except as otherwise provided in this Agreement, Seller shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date.

2.1   Authorization. Except as otherwise provided in Schedule 2.1, Seller has full power and authority to enter into this Agreement and the Related Agreements and full power and authority to carry out the transactions contemplated hereby and thereby, subject only to (i) the requirement to seek and receive the Public Approval of the transaction contemplated in connection with this Agreement through the holding of an Approval Election, as further addressed at Section 4.14 (the "Public Approval Requirement"), and (ii) the requirement that Seller receive, prior to the Closing, an opinion from an independent appraiser that the consideration received by Seller under the terms of this Agreement will constitute fair and reasonable compensation for the Assets pursuant to the requirements of California Health and Safety Code Section 32121(p)(1) and in accordance with applicable governmental and industry standards for appraisals and valuations. Notwithstanding the receipt of an opinion from an independent appraiser as detailed above, Seller makes no representation or warranty with respect to the value of the Assets or the consideration being delivered by Purchaser with respect to this Transaction. Purchaser acknowledges that it is relying solely on its own evaluation of the Assets, the Transaction and the Alternative Transaction.

2.2   Binding Agreement. Except as otherwise provided in Schedule 2.2 and subject to Section 2.1, Seller has the full power and the authority to execute, deliver and perform the obligations and covenants set forth in this Agreement and all Related Agreements to which it is a party and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Related Agreements by Seller and the consummation of the transactions contemplated hereby or thereby have been (or will be by the Closing Date) duly authorized by all necessary action on the part of Seller. Except as set forth in Section 2.1 and Schedule 2.2, no other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements, all documents necessary to give effect to this Agreement and all transactions contemplated hereby and thereby. Except as set forth in Schedule 2.1 and as provided in Section 2.1, this Agreement and the Related Agreements have been duly executed and delivered by Seller, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally, from time to time in effect and (b) limitations on the enforcement of specific performance, injunctive relief, or other equitable remedies.

2.3   Organization and Good Standing; No Violation.

2.3.1   Seller is duly organized and validly existing under the laws of the State of California. Except as disclosed in Schedule 2.1.1, Seller (i) has full power and authority to own,

10700293                                        - 27 -

operate and lease its properties and to carry on its businesses as now conducted, and (ii) is duly qualified to do business and is in good standing in each jurisdiction in which the property owned or leased by it or the operations of the Hospital Businesses make such qualification necessary. The organization of Seller does not violate any state or federal Law applicable to Seller.

2.3.2    Except as set forth in Sections 2.1 and 2.2 and as provided in Schedule 2.3.2, the execution, delivery and performance of this Agreement and all Related Agreements and the consummation of the transactions contemplated hereby and thereby, to the Seller's Knowledge, does not and will not, with the passage of time or the giving of notice or both (a) violate any state or federal Law applicable to Seller, (b) violate or conflict with, or result in a substantial and material breach of, or constitute a material default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any indebtedness, mortgage, Lien, restriction, charge, security interest, claim, right of another, or other encumbrance upon any of the Assets whatsoever, under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, franchise, agreement or other instrument or obligation to which Seller is a party or by which any of the Assets are or will be bound or (c) violate or conflict with any provision of the charter or organizational documents of Seller.

2.4    Contracts and Leases.

2.4.1    With the exception of the Excluded Contracts, to Seller's Knowledge, Schedule 2.4.1, which may incorporate various other schedules, taken together as a whole, contains a list of substantially all of the Leases with respect to Real Property or Personal Property which are with a physician or other referral source for any of the Hospitals or are secured by a lien covering material Assets, or which (i) require lease payments by Seller with respect to the operation of any Hospital Businesses of a yearly payment in excess of Fifty Thousand Dollars ($50,000.00), and (ii) either have a remaining term in excess of one (1) year or cannot be terminated by Seller upon notice of one hundred eighty (180) calendar days or less without penalty or acceleration of any obligation (each a "Material Lease", collectively, "Material Leases").

2.4.2    With the exception of the Excluded Contracts, to Seller's Knowledge, Schedule 2.4.2 contains a list of substantially all Contracts which is with a physician or other referral source for any of the Hospitals or which is secured by a lien covering material Assets or which (i) require the payment by Seller with respect to the operation of any Hospital Businesses a yearly payment in excess of Fifty Thousand Dollars ($50,000.00), and (ii) either have a remaining term in excess of one (1) year or cannot be terminated by Seller upon notice of one hundred eighty (180) calendar days or less without penalty or acceleration of any obligation (each a "Material Contract", collectively, "Material Contracts").

2.4.3    Schedule 1.2.1(a) contains a complete and accurate list of the Existing Bonds which constitutes all of the bond indebtedness to which Seller is currently subject. Schedule 1.2.1(a) also contains an accurate list, as of the date given on the schedule, of the then current redemption or pay-off amounts, as applicable, for each of such bond issuances.

2.5    Required Consents. Except as set forth in Section 2.1, the Liens granted to secure the Existing Bonds, and on Schedule 2.5, to Seller's Knowledge, Seller is not a party to or bound by, nor are any of the Assets subject to, any mortgage, Lien, deed of trust, Material Lease, Material Contract, or any material order, judgment or decree which (a) requires the consent of another to the

- 28 -

execution of this Agreement and the Related Agreements or (b) requires the consent of another to consummate the transactions contemplated by this Agreement and the Related Agreements.

2.6    Compliance With Laws and Contracts.

2.6.1    Compliance With Laws. Except as set forth in Schedule 2.6.1, to Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, is in material compliance with all applicable substantive Laws, except where the failure to be in such compliance would not have a Material Adverse Effect on the Assets or the business of the Hospital Businesses. Except as set forth in Schedule 2.6.1, to Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, has not been charged with, or given notice of, and to the Seller's Knowledge, Seller, with respect to the operation of the Hospital Businesses, is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any applicable (i) Law, (ii) material license, certificate of need issued, or (iii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the Hospital Businesses or the business of the Hospital Businesses. Notwithstanding the foregoing, except as set forth in Section 2.6.2, no provision of this Section 2.6.1 shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws.

2.6.2    Environmental Laws. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, Seller's ownership and operation of the respective Hospital Businesses and the Assets are and have been in material compliance with all Environmental Laws, except where such failure would result in an estimated cost of remediation in excess of $1,000,000. In the event that the estimated cost of remediation exceeds $1,000,000, then the Purchaser shall have the right to terminate this Agreement as its sole remedy. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, Seller has obtained all licenses, certificates and approvals necessary or required under all applicable Environmental Laws (the "Environmental Permits") for the ownership and operation of its respective Hospitals and the Assets. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, all such Environmental Permits are in effect and, to Seller's Knowledge, no action to revoke or modify any of such Environmental Permits is pending. Except as disclosed in Schedule 2.6.2, to Seller's Knowledge, there is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Hospitals or the Assets. Except as disclosed in Schedule 2.6.2 or in any Phase I or Phase II study done by the Purchaser, to Seller's Knowledge, there has not been a Release or threatened Release of any Hazardous Substance at, upon, in, under or from the Hospitals or the Assets at any time. For the purposes of this Agreement, the term "Environmental Laws" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the handling, storage, transportation, treatment and disposal of medical and biological waste. The foregoing notwithstanding, Purchaser acknowledges that portions of Hemet Valley Medical Center and of the Child Care Center in Hemet were constructed prior to 1982 and contain asbestos or asbestos-containing materials ("ACM"); provided that, to Seller's Knowledge, the ACM have been handled and managed at all times in compliance with all applicable Laws.

- 29 -

2.6.3   Compliance With Contracts. Except as set forth on Schedule 2.6.3 and except for defaults occurring with respect to pre-petition obligations which are the subject of Seller's Chapter 11 bankruptcy Proceeding and as to which Seller has the benefit of the automatic stay under the Bankruptcy Code, to Seller's Knowledge, (a) Seller has not received written notice that any Person intends to cancel or terminate any Material Contract or exercise or not exercise any right, remedy or other option thereunder, and (b) Seller has not waived in writing any material right under any Material Contract.

2.7   Title to Personal Property.

2.7.1   Title. Except for the Personal Property which is leased from third parties by Seller, Seller has good and valid title to the Personal Property and is able to operate the Hospital Businesses in their current form.

2.7.2   Inventory. The Inventory, as defined in Section 1.6.8, with respect to each of the Hospital Businesses, is, and at the Closing Date will be, maintained in sufficient quantities to operate the Hospital Businesses in the ordinary course of business as currently conducted.

2.8   Hospital Businesses Operations.

2.8.1   Licensure. Except as provided in Schedule 2.8.1, to the Seller's Knowledge, all licenses, certifications and certificates of need which are necessary to operate the business of each of the respective Hospital Businesses by Seller are valid and in good standing, except where the failure to have such licenses, certifications and certificates of need would not have a Material Adverse Effect. Seller is duly licensed by the State of California to operate the Hospitals as general acute care hospitals having the number of beds as set forth in each Hospital's current general acute care hospital license (provided, that some of such beds are currently not being utilized), and other Hospital Businesses, as respective businesses, in compliance with applicable licensing requirements.

2.8.2   The Joint Commission. Each Hospital and, if required, each of the other Hospital Businesses is duly accredited by the Joint Commission ("The Joint Commission") for the period set forth in Schedule 2.8.2.

2.8.3   Government Payor Programs. Each Hospital and, if applicable, each of the other Hospital Businesses is certified for participation in the Medicare and Medicaid programs, and has current and valid provider contracts with such programs, except where the failure to have such contracts would not have a Material Adverse Effect, as set forth in Schedule 2.8.3.A, to the Seller's Knowledge, Seller has not received notices from the regulatory authorities which enforce the statutory or regulatory provisions in respect of the Medicare or Medicaid programs of any noncompliance or pending or threatened investigations with respect to the operation of any of the Hospital Businesses. Notices of Program Reimbursement have been issued by the applicable fiscal intermediary with respect to the cost reports of the Hospital Businesses for Medicare and Medicaid (if applicable) through the periods set forth in Schedule 2.8.3.B. To Seller's Knowledge, Seller has not received notice of any material dispute between any of the Hospital Businesses and the applicable governmental agency or private entity, or their intermediaries or representatives, regarding such cost reports for periods subsequent to the periods specified in Schedule 2.8.3.B. To Seller's Knowledge, there are no pending or threatened material claims by any of such programs against any of the Hospital Businesses with respect to the Audit Periods or any period thereafter, and the Hospital Businesses have not been subject to loss of waiver of liability or

-30-

utilization review denials with respect to any such program during the past two years. Schedule 2.8.3.A also contains a description of Seller's policies and procedures for reporting bad debts to Medicare and each other Payor, and for the collection and waiver of co-payments and deductibles to Medicare and each other Payor. Schedule 2.8.3.A also contains the Medicare net book value of each of the Assets (or, if more convenient and reasonably acceptable to Purchaser, category of Assets) as of the date of the 2004 and 2005 Financials.

2.8.4   Medical Staff Investigations. Except as set forth on Schedule 2.8.4 or with respect to investigations being conducted internally by the medical staff which have not risen to level of disclosure to the Seller, to the Seller's Knowledge, there exists no pending or threatened investigation by Seller of any member of the medical staff of any of the Hospital Businesses for a violation or alleged violation of any policy of Seller.

2.8.5   Revenues and Properties. Except as set forth on Schedule 2.8.5, Seller has not granted nor permitted any security interest in or on the revenues, assets or properties of the Assets.

2.8.6   No Other Assets. The only material assets of property used in connection with or necessary for the Hospital Businesses which are not being transferred to Purchaser, if any, are not set forth on Schedule 2.8.6.

2.9   Brokers and Finders. Neither Seller nor any affiliate thereof, nor any officer or director thereof, has engaged any finder or broker in connection with the transactions contemplated under this Agreement and Seller shall be solely responsible for any fees or commissions payable to any such broker, finder or investment banker by reason of the actions (or alleged actions) of Seller, its Affiliates or any of their officers or directors.

2.10   Financial Statements.

2.10.1   The following have been or will be prepared from the books and records of Seller: the financial statements of Seller with respect to the operation of each of the Hospital Businesses for the years ending June 30, 2007 and June 30, 2008, for which audits are currently in progress but are not completed (the "2007 & 2008 Financials"), and the unaudited financial statements of Seller with respect to the operation of each of the Hospital Businesses for the year ending June 30, 2009, and for the unaudited financial statements of Seller with respect to the operation of each of the Hospitals for the months subsequent to June 30, 2009 as made available pursuant to Section 4.6 (the "Interim Financial") (the 2007 & 2008 Financials and the Interim Financials are collectively referred to in this Agreement as the "Financial Statements"). The 2007 & 2008 Financials and the Interim Financials through August 31, 2009 are attached as Schedule 2.10.1 and Seller acknowledges that, to Seller's Knowledge, the unaudited financials are true, correct and accurate in all material respects. Except as provided in Schedule 2.10.1 to the Seller's Knowledge, subject to adjustments and only meant to give a snapshot of the interim period, the Financial Statements have been prepared from, and are in accordance with, the books and records of Seller and, with the exception possibly of the Interim Financials, present fairly the financial position and results of operations of Seller as of the dates and for the periods indicated, except where variations therefrom are noted in footnotes to such financial statements. Purchaser expressly acknowledges that notwithstanding the delivery of such Interim Statements, the future performance of the Hospital Businesses and the Assets are subject to risks and uncertainties that could cause future results to differ from past results. Seller does not undertake any, and specifically

-31-

disclaims any obligation to make any forward-looking financial statements or projections, especially in light of losses which have been suffered by Seller over the past few months.

2.10.2   Changes Since Interim Financials. Since August 31, 2009, other than as contemplated or permitted by this Agreement, Seller has conducted the Hospital Businesses and the Assets only in the ordinary and normal course, and except as shown on Schedule 2.10.2, there has not been, to Seller's Knowledge:

(a)   Any entry into or termination by Seller of any commitment, contract, agreement or transaction (including, without limitation, any borrowing or lending transaction or capital expenditure) related to the Hospital Businesses or the Assets except for transactions in the ordinary course of business;

(b)   Any condemnation, casualty, physical damage, destruction or physical loss respecting, or change in the physical condition of, the Real Property or the Personal Property has had an adverse effect on the prospects, financial condition or results of operation of any of the Hospital Businesses;

(c)   Any transfer of, or rights granted under, any contract which would have been an assumed Contract on the date of the Interim Financials, except for transactions in the ordinary course of business;

(d)   Other than in the ordinary course of business, (i) any sale or other disposition of any asset included in the Interim Financials having a net book value in excess of Fifty Thousand Dollars ($50,000.00), or (ii) any material mortgage, pledge or imposition of any lien or other encumbrances on any such asset, or (iii) any sale or other extraordinary disposition of Inventory included in the Interim Financials;

(e)   Any change, or any request or application for a change in, the provider number of the Hospital Businesses, or any creation, modification or termination of any agreement with any Payor, or any change in the method of accounting with respect to the Hospital Businesses (except as noted in footnotes to such Financial Statements), or any change to or modification of the medical staff bylaws of either Hospital;

(f)   Any material amendment (other than general amendments which the carrier makes for a category of policy) or termination of any Insurance Policy or failure to renew any Insurance Policy covering or relating to the Hospital Businesses or the Assets;

(g)   Any material breach or default by Seller under any contract that would have been an assumed Contract on the date of the Interim Statements;

(h)   Any Material Adverse Effect;

(i)   Any increase made in the compensation levels or benefits (severance or otherwise) of the employees of the Hospital Businesses, except in the ordinary course of business; or

- 32 -

10700393
P:\bank\MTN\MTN\A.SA/10/13/09.DOC

(j)   Any change in the relationship between the Hospital Businesses, on the one hand, and the medical staff, on the other hand, or any adverse action taken by either of them against the Hospital Businesses.

2.11   Legal Proceedings and Liabilities. Except as set forth on Schedule 2.11, and with the exception of Seller's pending Chapter 11 proceeding and the claims, objections and proceedings therein, to Seller's Knowledge, there are no claims, proceedings or investigations pending or, to the Seller's Knowledge, threatened relating to or affecting Seller with respect to the operation of the Hospital Businesses or any of the Assets before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would have a Material Adverse Effect. Except as set forth on Schedule 2.11, to Seller's Knowledge, Seller, is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generally) applicable to it or its assets, including the Assets, which would have a Material Adverse Effect. To the Seller's Knowledge, Seller is not subject to any liabilities with respect to the operation of the Hospital Businesses which are not reflected in the Financial Statements. Schedule 2.11A contains an estimate of Seller's current incurred by not reported liabilities ("IBNR"), if any, and an accurate description of the methodology used by Seller to calculate such IBNR, all of which are subject to adjustment by the auditors.

2.12   Seller Plans. Schedule 2.12 contains a list of each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller, including Seller's defined benefit plan (collectively, the "Seller Plans").

2.13   Personnel.

2.13.1   Hospital Personnel. Schedule 2.13.1 sets forth a materially complete list (as of the date set forth therein) of positions, designation of the employees identified in Seller's handbook (i.e. full time employees, regular part-time employees, non-benefit employees, irregular part-time employees, temporary employees, per diem employees, and weekend contract employees), and current annual salaries or wage rates, bonus and other compensation and/or benefit arrangements, the paid time off pay, and period of service credited for vesting as of the date thereof of all full-time and part-time employees of Seller with respect to the operation of the Hospital Businesses and indicating whether such employee is a part-time, full-time or per diem employee.

2.13.2   Employee Relations. Except as disclosed on Schedule 2.13.2, (a) neither Seller nor any of the Hospital Businesses is a party to any agreement with any union, trade association or other employee organization with respect to the employees of the Hospital Businesses, and (b) to Seller's Knowledge, since June 30, 2008, (i) no demand has been made for recognition by a labor organization with respect to any employees of the Hospital Businesses, (ii) no union organizing activities by or with respect to any such employees are taking place, (iii) there are currently no disputes, grievances, charges, complaints or proceedings involving any of the employees of any of the Hospital Businesses, (iv) the Hospital Businesses have not suffered any strikes (including wildcat strikes), slowdowns, walkouts, or lockouts or any other interruptions or disruptions of operations as a result of labor disturbances with respect to employees of the Hospital Businesses, (v) no union representation question exists with respect to any employees of the Hospital Businesses, and (vi) no collective bargaining agreement is currently being negotiated by Seller with respect to the employees of the Hospital Businesses. Seller shall promptly notify Purchaser of any such actions occurring after the Effective Date and prior to the Closing Date.

- 33 -

10700393
P:\bank\MTN\MTN\A.SA/10/13/09.DOC

2.13.3  Agreements with Employees. Schedule 2.13.3 sets forth a complete list of all material agreements or arrangements with individual employees of Seller, including, without limitation, all employment, severance, bonus or retention agreements.

2.14  Insurance. To Seller's Knowledge, Seller maintains, and has maintained, without interruption, at all times during Seller's respective ownership of the Hospital Businesses, self-insurance and policies or binders of insurance covering such risks and events, including personal injury, property damage, malpractice and general liability, to provide adequate and sufficient insurance coverage for all the assets and operations of the Hospital Businesses. Schedule 2.14 contains a list of all such insurance maintained by Seller with respect to the operations of the Hospital Businesses as of the Effective Date, and such Schedule shall be modified and supplemented as of the Closing Date.

2.15  Taxes.

2.15.1  Definitions. "Tax Return" means any return, declaration, report, claim, election, notice, or information return or statement or other document (including, without limitation, any related or supporting information, schedules, or exhibits) filed or required to be filed with any federal, state, local or foreign governmental authority or other authority in connection with any Tax or estimated Tax. "Tax" and "Taxes" mean any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions, levies and liabilities, including, without limitation, taxes based upon, measured by, or with respect to income, net income, gross income, earnings, profits, or gross receipts, or any sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, environmental, alternative, add-on minimum, custom duties, capital stock, social security (or similar), unemployment, disability, gains, recapture, estimate, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, penalty, and addition thereto.

2.15.2  Filing and Payment. To the Seller's Knowledge, Seller has duly filed all federal, state and local Tax Returns required to be filed by it, if any, (all of which are true and correct in all material respects) and has duly paid or made provision for the payment of all Taxes, if any, (including any interest or penalties and amounts due state unemployment authorities) which are due and payable, whether or not in connection with such returns. To Seller's Knowledge, Seller (with respect to the operation of the Hospital Businesses) has withheld proper and accurate amounts from its employees' compensation, and made deposits of all such withholdings, in material compliance with all withholding and similar provisions of the Code and any and all other applicable laws. Except as set forth in Schedule 2.15.2, there are no liens for Taxes upon the Assets, except for statutory liens for current Taxes not yet due and payable or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings. To Seller's Knowledge, no claim by any taxing authority with respect to the Hospital Businesses (or operation thereof) or the Assets is pending in a jurisdiction where Seller does not file Tax Returns.

2.16  U.S. Persons. Seller is not a "foreign person" for purposes of Section 1445 of the Code or any other Laws requiring withholding of amounts paid to foreign persons.

2.17  Real Property. Except as otherwise set forth in this Agreement, the Schedules to this Agreement, the opinion and appraisals required pursuant to California Health & Safety Code Section 32121(p)(1) and referenced in Section 2.1 above, and the reports with respect to seismic compliance,

1070053.3                                                  - 34 -                       F:\0mn\0PP\0VALLEY.51.13.13.DOC

which reports have been provided to Purchaser, during the preceding five (5) years, Seller has not received any written notice, or to Seller's Knowledge any oral notification, from any federal, state or local regulatory agency, or from any architect or engineer engaged by Seller during such five (5) year period, that (i) any improvements on any of the Real Property (including any construction-in-progress) have not been constructed substantially in accordance with the plans and specifications submitted to any governmental authorities in connection with such construction, (ii) any such improvements are not substantially in accordance with any zoning change applications and any applications for building permits related thereto, (iii) any such improvements are not in compliance with any material environment, safety, building, fire, land use, zoning, parking or access requirements, or (iv) the continued use, occupancy and operation of such improvements as currently used, occupied and operated by Seller does not constitute a prior nonconforming use permitted under such Laws. Purchaser acknowledges, however, that Seller is engaged in ongoing evaluation of requirements for compliance with the Alfred E. Alquist Hospital Seismic Safety Act of 1983 (Health & Safety Code Section 130000 et seq.), and has provided to Purchaser reports relating thereto.

Seller owns fee simple title to the Real Property described on Schedule 1.6.1. On the Closing Date, subject to Section 1.10, Seller shall convey to Purchaser title to the Real Property by means of a grant deed, subject to (i) any title exceptions and survey matters approved (or deemed approved) by Purchaser in accordance with this Agreement, (ii) any title exceptions caused by Purchaser, Purchaser's Affiliates, or its or their agents, representatives or employees, (iii) all real estate taxes and assessments for the then applicable tax fiscal year in which the Closing occurs, and (iv) general real estate taxes and assessments for subsequent years not yet due and payable. Except as disclosed on Schedule 2.17 and subject to Section 1.10, Seller has not created nor may it assert any rights with respect to any Liens that will interfere with Purchaser's use and enjoyment of the Real Property after the Closing and:

(a)  to Seller's Knowledge, no work has been performed on any of the Real Property and no materials have been delivered which could give rise to a mechanic's, materialman's or similar lien which has not been paid for or released at the sole cost and expense of Seller by Seller's execution and delivery to Purchaser of an indemnity reasonably satisfactory to Purchaser and recording an a title company's release bond in the form and manner required by California Civil Code § 3143;

(b)  Seller has not received any written notice and to Seller's Knowledge, has no knowledge of any proceeding or action pending to change the zoning of, or other land use (including parking) restrictions affecting, the Real Property;

(c)  to Seller's Knowledge, except as set forth in Schedule 2.17(c), there is no study, investigation or other proceeding pending, or in the Seller's Knowledge, threatened by or before any governmental agency or authority, administrative or judicial, or any non-governmental entity related to the Real Property, which if commenced or concluded, in any way might or could have any Materially Adverse Effect;

(d)  the Real Property comprises all of the real property owned or leased by Seller, including, without limitation, all real property which is associated with or employed in the operation of the Hospital Businesses;

(e)  Seller has not received notice of condemnation or similar proceeding relating to the Real Property or any part thereof;

1070053.3                                                  - 35 -                       F:\0mn\0PP\0VALLEY.51.13.13.DOC

EXHIBIT E

151

2.20 Statements Not Misleading. To Seller's Knowledge, no representation or warranty by Seller in this Agreement or any Related Agreement, or any statement of Seller, certificate or schedule furnished or to be furnished to Purchaser pursuant to this Agreement or any Related Agreement at the Closing, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained in this Agreement and therein not misleading. Except as disclosed in this Agreement, to Seller's Knowledge, there have been no events or transactions or facts coming to the attention of Seller which could have a Material Adverse Effect after the Closing, or which should be disclosed in order not to make any statement, representation or warranty contained in this Agreement or in any Related Agreement or any Schedule delivered pursuant hereto misleading.

2.21 Adverse Actions. Except as disclosed in Schedule 2.21, neither Seller nor its officers or directors (b) has been subjected to any adverse actions in connection with any licenses or permits issued by any governmental agencies or bodies, including without limitation any license or permits needed to operate an acute care hospital or any of the other Hospital Businesses, or (ii) has been excluded from participation in the Medicare or Medicaid programs or been subject to any adverse actions or sanctions under such programs.

2.22 [Intentionally omitted]

2.23 Continuing Accuracy. To the Knowledge of Seller, the copy of each certificate, document or other instrument or agreement furnished or to be furnished by Seller is a true, accurate and complete copy of the original thereof. The representations and warranties of Seller set forth in this Article III shall be true and correct on the Closing Date as if made again on and as of the Closing Date. Seller shall be entitled to update the Schedules up to and through the Closing, subject to the termination rights set forth in Article VIII.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as otherwise disclosed in any of the disclosure schedules related to the following representations, warranties and covenants of Purchaser or in Schedule 3 (the "Purchaser's Disclosure Schedules"), as an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date. In the event of any assignment of any of the rights, duties, obligations or Assets by Purchaser to a third party after the Closing, Purchaser as party of said assignment, Purchaser's successor or assignee shall be required to make the following representations and warranties for itself.

3.1 Authorization. Purchaser has full organizational power and authority to enter into this Agreement and Purchaser has full corporate power and authority to carry out the transactions contemplated hereby.

3.2 Binding Agreement. Purchaser has the full power and authority to execute, deliver and perform the obligations and covenants set forth in this Agreement and all Related Agreements and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Related Agreements by Purchaser and the consummation of the transactions contemplated hereby or thereby have been (or will be by the Closing Date) duly

- 37 -

---

(f) to the Seller's Knowledge, except as might be disclosed by the Natural Hazard Expert, no part of the Real Property contains, is located within or abuts any flood plain, navigable water or other body of water, (wetland, wetland, marshland or any other area which is subject to special state, federal or municipal regulation, control or protection. Within ten (10) days after the Effective Date, Purchaser agrees to engage the services of natural hazard disclosure expert (the "Natural Hazard Expert"), to examine the maps and other information specifically made available to the public by government agencies for the purposes of enabling Seller to fulfill its disclosure obligations, (if and to the extent such obligations exist, with respect to the natural hazards referred to in California Civil Code Section 1102.6a and to report the result of its examination to Purchaser and Seller in writing. The written report prepared by the Natural Hazard Expert regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to in this Agreement, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and if the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above;

(g) except for those tenants in possession of the Real Property under Leases or Contracts and as otherwise disclosed on Schedule 2.17(g), to the Seller's Knowledge, there are no Persons in possession of, or claiming any possession to, adverse or not, or other interest in, any portion of the Real Property other than Seller, whether as lessees, tenants at sufferance, trespassers or otherwise;

(h) to Seller's Knowledge, all essential utilities, including water, sewer, gas, electricity and telephone service, are available to the Real Property as currently developed by Seller, and to Seller's Knowledge there are no conditions existing which could result in the termination or reduction of the current access from the Real Property to existing roadways; and

(i) to Seller's Knowledge, Seller possesses all licenses, permits and other governmental consents and approvals necessary for the operation of such systems and the portions of the Hospital Businesses not pertaining to the provision of healthcare services (such as the coffee shop and the gift shop).

2.18 Accuracy of Document(s); Delivery and Inspection. To Seller's Knowledge, Seller has furnished to Purchaser true and complete copies of all agreements, documents and other items listed in the Schedules or requested by Purchaser in writing. All documents delivered to Purchaser for Purchaser's review pursuant to the terms of this Agreement and any Related Agreement are true and complete copies (unless omissions are apparent from the documents so furnished) of all such documents.

2.19 No Negotiations with Third Parties. Except as described at Schedule 2.19, Seller has not entered into any negotiation, letters of intent, or understandings which are presently in effect, with any other Person with respect to the sale or other disposition of any of the Assets (other than inventory in the ordinary course of business). Except as described in Schedule 2.19, Seller is not a party to any presently effective executory agreement with any Person (other than Purchaser) with respect to any such sale or disposition.

- 36 -

authorized by all necessary action on the part of Purchaser. All organizational and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement and the Related Agreements, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser. No other organizational or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement and the Related Agreements, all documents necessary to give effect to this Agreement and the Related Agreements, and all transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    Organization and Good Standing. Purchaser (i) is a Corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) qualified to do business and in good standing in the State of California and wherever else it may do business, and (iii) has full corporate power and authority to own, operate and lease its properties and to carry on its business as now conducted and as contemplated to be conducted after the Closing.

3.4    No Violation. The execution, delivery and performance of this Agreement and all Related Agreements and the consummation of the transactions contemplated hereby and thereby to does not and will not, with the passage of time or the giving of notice or both (a) violate any state or federal law applicable to Purchaser, (b) violate or conflict with, or result in a breach of, or constitute a default under, or give rise to a right of termination, cancellation or acceleration under, or result in the acceleration of, or the creation of any indebtedness, mortgage, Lien, restriction, claim, security interest, claim, right of another, or other encumbrance upon any of the Assets whatsoever, under any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, lease, license, franchise, agreement or other instrument or obligation to which Purchaser or its Affiliates are a party or by which any of the Assets are or will be bound or (c) violate or conflict with any provision of the charter or organizational documents of Purchaser or its Affiliates.

3.5    Brokers and Finders. Except as described in Schedule 3.5, neither Purchaser nor any Affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated under this Agreement.

3.6    "As Is." Purchaser acknowledges that it is purchasing the Assets on as "AS IS, WHERE IS" basis (as more particularly described in Section 1.10 and throughout Article II and this Agreement, and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Prior to Closing, Purchaser and its respective agents will have been given the opportunity to (i) conduct such inspections as Purchaser may have determined to be necessary, (ii) fully observe the physical characteristics and condition of the Assets and Real Property, and (iii) perform such investigations of the suitability of Purchaser's intended use of the Assets and Real Property as Purchaser shall determine to be necessary, including without limitation, the suitability of the topography, the availability of water rights or utilities; any natural hazard of any kind or nature, including without limitation, flood hazard, earthquake fault or seismic hazard, or fire risk or hazard; the present and future zoning, subdivision and any and all other land use matters; the condition of the

- 38 -

soil, subsoil or groundwater of the Real Property and any and all other environmental matters; the purpose(s) to which the Real Property is suited; drainage; flooding; access to public roads; and proposed routes or roads or extensions relative to the Real Property. Purchaser acknowledges and understand that it will have no recourse whatsoever against Seller or Seller's Affiliates except as otherwise expressly set forth in this Agreement. Additionally, Purchaser and its Affiliates represent and warrant to Seller that nothing in this Agreement, the receipt of an opinion from an independent appraiser as respect to the value of the Assets or the consideration being delivered to Purchaser with respect to the Transaction. Purchaser and its Affiliates also acknowledge they are not relying upon any representations or warranties of Seller as to the valuation of the Assets as set forth in the opinion being delivered by the independent appraiser engaged by Seller pursuant to Section 4.15 of this Agreement.

3.7    Legal Proceedings. Except as described on Schedule 3.7, to Purchaser's Knowledge, there are no claims, proceedings or investigations pending or, to Purchaser's Knowledge, threatened relating to or affecting Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, or business condition (financial or otherwise) of Purchaser. To Purchaser's Knowledge, Purchaser is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generally) applicable to Purchaser or any Affiliate of Purchaser which adversely affects the condition (financial or otherwise), operations or business of Purchaser or any Affiliate of Purchaser.

3.8    Chapter 9 Proceeding. Purchaser acknowledges that Seller has filed the Chapter 9 Proceeding, which remains pending as of the Effective Date, and may remain pending as of the Effective Time. Purchaser acknowledges that the filing of the Chapter 9 Proceeding shall not, in and of itself, be deemed to constitute a violation of this Agreement, and that actions taken by Seller in compliance with, or in anticipation of, motions or orders in the Chapter 9 Proceeding shall not constitute violations of Seller's covenant to operate the Hospital Business in the ordinary course, nor shall any payment made pursuant to or as authorized by the Bankruptcy Court in such proceeding be deemed to constitute a payment other than in the ordinary course of Seller's business.

3.9    Purchaser Knowledge. References in this Agreement to "Purchaser's Knowledge" or "the best Knowledge of Purchaser" or similar terms means the actual (but not merely constructive or imputed) knowledge of the managers and executive officers of Purchaser, after performing a reasonable investigation. Additionally, whenever this Agreement states that Purchaser has received any type of notice, it shall mean that one of the foregoing individuals has received actual notice, and not merely constructive or imputed notice. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

3.10    Disclosures. To Purchaser's Knowledge, no representation or warranty by Purchaser in this Agreement, nor any statement, certificate or schedule furnished or to be furnished by or on behalf of Purchaser pursuant to this Agreement, nor any document or certificate delivered to Seller pursuant to this Agreement or in connection with actions contemplated hereby, contains or shall contain any untrue statement of material fact or omits a material fact necessary to make the statements contained therein not misleading. The copy of each certificate, document or other instrument or agreement furnished or to be furnished by Purchaser is a true, accurate and complete

- 39 -

copy of the original thereof. The representations and warranties of Purchaser set forth in this Article III shall be true and correct on the Closing Date as if made again on and as of the Closing Date.

3.11 No Improper Payments or Offers. To Purchaser's Knowledge, no Payments or offers of consideration by Purchaser or its Affiliates to any of Seller's officers, directors or employees have been made in violation of any Legal Requirements or Seller's Conflict of Interest Code in order to induce such officer, director or employee to influence the negotiation or approval of this Agreement.

3.12 Compliance With Law Laws. To Purchaser's Knowledge, the organizational structure of Purchaser does not violate applicable Legal Requirements.

3.13 Accuracy of Financial and Organization Information. To the Purchaser's Knowledge, the information disclosed by Purchaser concerning its investors and its capital and lending sources after the Effective Date and through the Closing Date is and will be true and correct in all material respects, as detailed in the First Organizational Update and the Second Organizational Update.

ARTICLE IV
COVENANTS OF SELLER

4.1 Access and Information; Inspections.

4.1.1 Continuing Access. From the Effective Time, Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers, prospective investors and assignees and other consultants and agents of Purchaser) reasonable access during normal business hours to and the right to inspect the plants, properties, books, accounts, records, contracts, commitments, cost reports and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital Businesses including, without limitation, to the extent reasonably needed by Purchaser for purposes of conducting further due diligence and other pre-closing activities with respect to the assets and Hospital Businesses, possibly including, without limitation, an Environmental Survey, review of documents and instruments regarding the Assets, and review of Financial Statements, provided appropriate non-disclosure agreements acceptable to Seller have been executed and any information learned as a result of the due diligence is shared with Seller. From the Effective Time through the Effective Time, Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to business and properties of the Hospital Businesses as Purchaser or its representatives may from time to time reasonably request. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital Businesses. Such access may include consultations with the personnel of Seller upon prior written notice to Seller. Any access granted under this Agreement shall be subject to any limitations imposed by federal or state privacy laws, including but not limited to, HIPAA. If any of such records are not in the possession or control of the Seller, then such access shall be afforded after no less than three (3) business days prior notice to Purchaser. In addition, Seller shall provide such written consents and authorizations as may be necessary for Purchaser to have access to materials on file with governmental agencies. Nothing in the Agreement to the contrary shall in any manner restrict the ability of Purchaser to discuss the business and affairs of the Hospital Businesses with any governmental agencies having jurisdiction over the Hospital Businesses and/or this transaction or the fiscal intermediaries administering the Hospital Businesses' Payor programs to the extent legally

- 40 -

permissible. Seller's covenants under this Section are made with the understanding that Purchaser and any other Person provided with access to information under this Section shall use all such information in compliance with all Laws and solely for purposes of evaluating the Transactions contemplated in this Agreement. Neither Purchaser nor any other Person shall have access to information contemplated in this Agreement, Patient Records or any other records to the extent that the disclosure of such records would be prohibited by any Law, accreditation standards, or rule or agreement (express or implied) of confidentiality.

4.1.2 Consent. Notwithstanding anything in this Section 4.1 to the contrary, all access and inspection activities contemplated by this Section 4.1 (including, without limitation, Purchaser's contacting any of Seller's tenants) shall be subject to the prior reasonable written approval of Seller (which approval may only be granted by the Seller's Chairman of the Board or by Seller's general counsel). Prior to Purchaser contacting any of Seller's tenants, vendors, other contracting parties, or governmental officials or employees regarding health care violations or allegations regarding the same, Purchaser shall give Seller prior written notice thereof, including the identity of the company or persons who will perform any interviews or contacts. Seller or its representative(s) may be present at any such interview or meeting and Purchaser will reasonably cooperate and coordinate with Seller to effectuate same.

4.2 Conduct of Business. On and after the Effective Date and prior to the Effective Time, Seller shall, with respect to the operation of the Hospital Businesses:

4.2.1 Carry on its businesses with respect to the operation of the Hospital Businesses in a reasonable manner under the circumstances and Seller, as further addressed below, shall be permitted to take such actions as may be necessary in order to stem the current losses, comply with orders of the Court in Seller's Chapter 11 Proceeding, and attempt to make the Hospital Businesses profitable, subject at all times to the ultimate discretion and control of Seller's Board of Directors, provided that, in any case, such activities shall be conducted in compliance with all applicable Laws;

4.2.2 Keep in full force and effect present insurance policies and other comparable self-insurance plans such as Workers' Compensation; and

4.2.3 Use its reasonable efforts to maintain and preserve its respective business organizations intact, and maintain its respective relationships with physicians, suppliers, customers and others having business relationships with each Hospital.

4.3 Negative Covenants. Except as otherwise provided in this Agreement, from the Effective Date until the Effective Time, with respect to the operation of the Hospital Businesses, the Seller shall not, without prior consent of Purchaser, except as may be required by Law or as ordered by the Bankruptcy Court:

4.3.1 Except as otherwise provided in this Agreement or in the ordinary course of business, amend or terminate any Material Contract or Material Lease, or enter into any new Material Contract or Material Lease or commitment with respect thereto, or incur or agree to incur any liability pursuant to a Material Contract or Material Lease, except for Material Contracts or Material Leases which are terminable at the Closing or on not more than ninety (90) days notice after the Closing;

- 41 -

4.3.2  Increase compensation payable or to become payable or make any performance-based bonus payment to or otherwise enter into one or more bonus agreements with any employee, except as contractually required as of the date of this Agreement or otherwise in the ordinary course of business;

4.3.3  Create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other lien or encumbrance upon any of the Assets in order to meet Seller's ongoing operating expenses or otherwise in the ordinary course of business;

4.3.4  Sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment constituting part of the Assets, except in the ordinary course of business;

4.3.5  Take an action that would result in a Materially Adverse Effect occurring as a result of such action;

4.3.6  Take any action that would have a Materially Adverse Effect on the maintenance in force and effect the policies of insurance held by (or programs of self-insurance maintained by) Seller and currently in effect; or

4.3.7  Except as required by their terms, amend, terminate, fail to renew or renegotiate any Material Contract that would be an Assumed Obligation as of the date of this Agreement, except in the ordinary course of business consistent with past practices, or default (or take or omit to take any action that, with or without the giving of notice or passage of time, would constitute a default) on any of its obligations under any such Material Contracts, provided that, if required for legal reasons, Seller may renew Material Contracts or Material Leases provided they are terminable on not more than ninety (90) days notice after the Closing.

For purposes of this Section 4.3, Seller shall be deemed to have obtained Purchaser's prior consent to undertake the actions otherwise prohibited by this Section 4.3 if Seller gives Purchaser notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Furthermore, in recognition of the fact that Purchaser has a significant interest in the operation of the Hospital Businesses through Closing, but that there is also the possibility that Seller may be unable to obtain Public Approval for this Transaction, the Parties agree to that a joint transition team, comprised of equal numbers of Seller and Purchaser ("Transition Team") shall be formed. Seller shall consult with the Transition Team on a regular basis, no less than weekly, with respect to the day-to-day business affairs of the Hospital Businesses. The Transition Team shall analyze and make recommendations to the Seller's Board of Directors regarding any significant and material changes relating to the Hospital Businesses, including any changes recommended appropriate to improve the operations and practices of the Hospital Businesses. Notwithstanding that Seller agrees to grant the Transition Team the role described above pending the Closing, this does not alter, waive, displace, or modify the ultimate right and responsibility of the Seller's Board to continue to exercise ultimate management and control and to operate the Hospital Businesses as provided by law, and provided that Purchaser shall retain the termination rights under this Agreement in the event of a Material Adverse Effect as a result of any such Seller actions, as provided elsewhere in this Agreement. It is the intent of the Parties to comply with Government Code Section 1090, which prohibit government officers or employees from having a financial interest in a transaction with the governmental entity for which they act. Accordingly, no officer or employee of Seller who has an expectation to become a Hired Employee or a beneficial owner of any interest in Purchaser

- 42 -

has participated or shall participate in any negotiations with respect to the Transaction set forth in this Agreement.

4.4  Cooperation. Seller shall reasonably cooperate with Purchaser and its representatives and attorneys (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances, certificates of need and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, and (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement; provided, however, that it shall be Purchaser's responsibility to obtain all consents, approvals, authorizations, clearances, certificates of need and licenses required to carry out the transactions contemplated by this Agreement.

4.5  Contract Consents. Seller shall use its Reasonable Commercial Efforts to obtain the consents and releases from the third parties under all Material Contracts and Material Leases, which, by the terms of such Material Contract or Material Leases, require such consent to the assignment thereof to Purchaser. To the extent any consents from third parties under any Contracts or Leases are not obtained as of the Closing, Seller and Purchaser shall comply with Section 9.3 and use their Reasonable Commercial Efforts to mitigate any costs, losses or damages associated with the failure to obtain such consents prior to Closing. Notwithstanding the foregoing or any contrary language in this Agreement, Seller's obtaining the consents described in this Section shall not be a condition precedent to either party's obligation to close the transaction contemplated by this Agreement and shall not be considered a breach of Seller's representations.

4.6  Additional Financial Information. Within fifteen (15) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital Businesses for each month then ended, together with corresponding year-to-date amounts.

4.7  No-Shop. Provided that Purchaser is not in material breach or default of this Agreement, for which Seller has provided Purchaser with notice specifying such material breach or default and the reasonable opportunity to cure such material breach or default, Seller shall not, prior to the earlier of the Closing or termination of this Agreement, without the prior written consent of Purchaser: (i) offer for sale, lease or other disposition, the sale of the Hospital Businesses or the Assets (or any part thereof); (ii) solicit offers or consider unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital Businesses or the Assets.

4.8  Seller's Efforts to Close. Seller shall use its Reasonable Commercial Efforts to satisfy all of the conditions precedent set forth in Articles VI and VII to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such condition.

- 43 -

4.9   Title Matters.

4.9.1   Seller shall cause the preliminary report of title issued by the Title Company ("PTR") and all Title Instruments to be delivered to Purchaser prior to or promptly after the execution of this Agreement which shall be based on an ALTA Extended Coverage Owner's Title Policy and the Surveys conducted by the Purchaser, as addressed in Section 5.12 below, Purchaser shall approve or disapprove of the PTR within five (5) business days after the receipt of the PTR and have the Title Instruments (reflecting the condition of the title to the Owned Real Property) and have the Title Company insure over any liens or encumbrances of a definite and ascertainable amount, such as mechanics liens, financing liens, bonds or assessments, on or before the Closing Date, other than the Assumed Obligations and items to be removed or prorated at the Closing. In the event of Purchaser's timely disapproval of any exceptions or defects shown on the PTR or of the ALTA Survey, as provided herein, Seller shall have five (5) business days after receipt of Purchaser's objections to give Purchaser notice either that (i) Seller has removed or will remove any objectionable exceptions from title and provide Purchaser with evidence reasonably satisfactory to Purchaser of such removal or provide Purchaser with evidence reasonably satisfactory to Purchaser that said exceptions will be removed on or before the Closing Date, Seller shall use commercially Reasonable Commercial Efforts, to cause such exceptions to be removed. If Seller is unable or unwilling to cause such exceptions to be removed, unless otherwise agreed in writing by the parties, Purchaser may either (i) terminate this Agreement within five (5) business days of receipt of Seller's written notice of unwillingness or inability to cause to be removed, in which case the Deposit shall, unless title failed due to Seller's breach of this Agreement, be repaid to Purchaser, or (ii) elect to close subject to the exceptions.

4.9.2   Prior to the Closing Date, Seller shall deliver to Purchaser a preliminary binder or title commitment(s) (the "Title Commitment") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (referred to in this Agreement as the "Owner's Title Policy" or the "Title Policy"), issued by Chicago Title Insurance Company, or such other title company as is mutually acceptable (the "Title Company"), together with true, correct and legible copies of all instruments referred to therein as conditions or exceptions to title (the "Title Instruments") and (if required by Purchaser or Purchaser's lenders or other financing sources as provided in Section 5.12 below) an ALTA survey of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property (the "Surveys") obtained by Purchaser. Section 12.12 shall govern which party or parties shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys.

4.10   Termination of Hospital Businesses' Employees. Upon the Effective Time, the Hired Employees shall cease to be employees of Seller and shall be removed from such entities' respective payrolls. Notwithstanding any provision to the contrary contained in this Agreement, Seller shall take any steps necessary to comply with WARN requirements, to the extent applicable, and Purchaser shall cooperate with Seller with respect thereto.

4.11   Notice of Developments. From the date of this Agreement until the Closing, (a) Seller shall immediately notify Purchaser in writing of any material and adverse problems not previously disclosed by Seller to Purchaser with respect to the prospects, business or operations of the Hospital Businesses or the condition of the Assets of which Seller has knowledge and which specifically affect the Hospital Businesses and the Assets and not to general changes in the Laws or

-44-

economy of the United States or matters affecting the healthcare industry in general, and (b) Seller shall promptly upon becoming aware thereof, give detailed written notice to Purchaser of the occurrence of, or the threatened occurrence of, any event which would cause or constitute a material breach, or would have caused or constituted a material breach had such event occurred or been known to Seller prior to the date of this Agreement, of any of Seller's covenants, agreements, representations, or warranties contained or referred to in this Agreement or in this Agreement; provided, however, that no such notice shall be deemed to cure or waive any material breach unless Purchaser specifically agrees to a cure or waiver thereof in writing.

4.12   Termination Cost Reports; Filing Cost Reports; Amounts Due To or From Third Party Payors.

4.12.1   Filing Procedures. Seller shall prepare and timely file all cost reports (including, without limitation, the terminating cost report) and all other filings which are required to be filed with Medicare, any other Payors or any governmental agency with respect to the operations of the Hospital Businesses for any and all periods ending on or prior to the Closing Date; provided, however, that in the event the Lease and Management Agreement are entered into, all references in this Section 4.12 to the "Effective Time" for purposes of such filings, or similar filing or billing issues, shall instead refer to the termination of such filings. Prior to filing any such cost reports and filings, Seller shall deliver a copy of each to Purchaser and, if Purchaser so instructs Seller, shall not file the same without first obtaining Purchaser's approval which shall not be unreasonably withheld, delayed or conditioned. Within a reasonable period of time after filing each such cost report and other filings (but in no event later than ten days following each such filing), Seller shall provide Purchaser with a copy of such filed cost report and other filings. Purchaser shall provide Seller with resources and support needed to prepare any remaining cost reports required to be filed by Seller as further addressed in Section 1.2.

4.12.2   Retained Rights and Obligations. Subject to the assignment and assumption covenants contained in this Agreement, Seller shall retain all rights to any amounts receivable from and remain obligated for all amounts due to Medicare and other third party payors (it being the intent of the parties that, except to cost reports or filings for periods prior to the Closing, Seller shall settle on a cost report basis with respect to cost reports or filings for periods prior to the Closing Date), and to the extent therein or as finally determined by the audit, administrative or judicial appeal, contest or other adjustment of such reports or filings). The parties acknowledge and agree that Purchaser is not hereby being assigned or assuming any of the foregoing (except to the extent prohibited by law). Purchaser shall promptly notify Seller of receipt of any notice received from Medicare or such other Payors asserting that any amounts are due to Medicare or such other Payors from Seller, and of any amounts due from Medicare or such other Payors to Seller, by reason of any event or occurrence taking place or otherwise attributable to the operations of the Hospital Businesses and the Assets prior to the Effective Time. Similarly, Seller shall notify Purchaser of any notice received by Seller from Medicare or such other Payors that believes applies to or impacts the reimbursement of payment due to the Purchaser. With respect to any such amounts payable to or received by Seller after the Closing Date, Seller shall remit the same to Purchaser within three (3) business days of receipt. With respect to any such amounts for which Seller may become liable for payment, Purchaser shall remit to Seller the amount thereof in sufficient time to pay such amounts without interest or penalty, and Seller shall so remit to Medicare or such other Payor all such amounts received by Seller from Purchaser within sufficient time to avoid the imposition of any interest charges or the withholding of any payment due from Medicare or other Payors to Purchaser. If any such withholding by Medicare or such other Payor has occurred due to the failure of Seller to remit

-45-