(e)    **E & O Insurance.** Comprehensive general liability and professional liability insurance coverage with respect to all claims covered thereby attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing, regardless of when any such claims shall be made with coverage in an amount equal to the amount set forth in Schedule 4.13(a) with coverage for general liability and malpractice with substantially the same coverage terms and conditions and policy limits as exists prior to the Closing Date, but without deductibles, issued by the insurer which currently issues Seller's insurance or another insurance company reasonably acceptable to Purchaser ("E&O Insurance"). At the Closing, Seller shall cause the insurers to issue and deliver to Purchaser copies of certificates of insurance evidencing each insurance policy maintained by Seller under this Agreement, and Seller shall cause each such insurance policy to contain a clause requiring the insurer to give not less than 30 days prior written notice to Seller and to Purchaser prior to the cancellation or modification of any such policy for any reason whatsoever. The Parties further agree that they will use their best efforts to research and cooperate in an effort to minimize the cost of obtaining E & O Insurance, either through procuring "tail coverage in the name of Seller, or prior acts "nose" coverage maintained by Purchaser, as part of its insurance, for at least two (2) years following the Closing, or some combination thereof; provided, however, that in any case Seller shall obtain a tail policy for obstetric claims, which have a statute of limitations which tolls until the affected child reaches the age of majority.    If split coverage is not available, then Seller shall obtain full tail E & O coverage and at the Closing, Purchaser shall pay for the premiums of the tail insurance to this Section in an amount not to exceed $3,750,000 with coverage for general liability and malpractice with substantially the same coverage terms and conditions and policy limits as exists prior to the Closing Date, issued by the insurer which currently issues Seller's insurance or another insurance company reasonably acceptable to Purchaser, but without any deductibles, and Seller shall take all other steps as may be reasonably necessary to maintain such insurance policies in full force and effect. Seller shall use its reasonable commercial efforts to avoid invalidating such insurance coverage.

(b)    **D&O Insurance.** D&O insurance coverage with respect to all claims covered thereby attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing, regardless of when any such claims shall be made with coverage in an amount equal to the amount set forth in Schedule 4.13(b) issued by an insurance company reasonably acceptable to Purchaser ("D&O Insurance"). At the Closing, Seller shall cause the insurers to issue and deliver to Purchaser copies of certificates of insurance evidencing each insurance policy maintained by Seller under this Agreement, and Seller shall cause each such insurance policy to contain a clause requiring the insurer to give not less than 30 days prior written notice to Seller and to Purchaser prior to the cancellation or modification of any such policy for any reason whatsoever.

4.14    **Public Approval.** Seller's Board of Directors has already adopted a resolution to set and schedule a public election sufficient to seek the voter approval ("Public Approval") required by Health & Safety Code Section 32121(b) to consummate the Transactions contemplated by this Agreement. Seller shall further use its reasonable best efforts to enable such Approval Election shall be scheduled and structured in a legally permissible fashion to enable such Approval Election to take place as expeditiously as possible, and Seller shall keep Purchaser fully informed of its efforts in this regard. Seller's resolution scheduled the Approval Election to occur on December 15, 2009. Seller shall use Reasonable Commercial Efforts to obtain the Public Approval, and to do so within the timeframes set forth above, to the extent permitted by applicable Legal Requirements. Seller shall incur customary costs of any election as

-47-

such sums received from Purchaser, Seller shall reimburse Purchaser for the full amount of all payments so withheld within three (3) business days of Purchaser's written notice to Seller of such withholding. In the event that Seller fails to reimburse Purchaser, Purchaser shall have the right, in addition to any other rights which Purchaser may have pursuant to this Agreement, to offset such claim against any amounts which Purchaser may owe to Seller, without regard to the floor or ceiling set forth in Section 10.2.2 of this Agreement. In the event that any such amount is withheld from Purchaser and asserted against Seller pursuant to the foregoing sentence but is later paid or released to Purchaser, Purchaser shall release or refund to Seller, as applicable, any amount which it has claimed against and received from Seller. Seller shall have the right to dispute or to appeal any determinations relating to such reports, at Purchaser's cost, provided that Purchaser defends, indemnifies and hold Seller harmless of and from any and all amounts which are determined to be due to Medicare or such other third party payors, including interest and attorneys fees. Purchaser shall make available such of the Hired Employees as may be necessary in order to provide accounting and other services necessary to deal with any of the foregoing, at no cost to Seller.

4.12.3    **Effect on Purchaser; Purchaser's Right to Participate.** Seller and Purchaser hereby acknowledge that any cost reports filed by Seller for periods ending on or prior to the Closing Date may impact Purchaser's reimbursement from such Payor after the Closing Date. Seller hereby agrees that it will conduct reasonable diligence and otherwise use reasonable efforts to ensure that all such cost reports are accurate and complete in all material respects, and that it will retain all records relating to such cost reports and any settlements for the period of time required by Law.    On request of Purchaser, and at Purchaser's cost, Seller shall provide Purchaser copies of such cost reports and underlying preparation data, which information Purchaser shall strictly confidential, except with respect to the Payor in question, and further subject to any applicable Laws regarding privacy of medical information. If at any time Purchaser, in its reasonable discretion, determines that any portion of such cost reports (including, without limitation, any wage index data or other matter) is incorrect or incomplete in any material respects and accordingly may impact Purchaser's reimbursement from any Payor, Seller will, at Purchaser's express, make any reasonable correction to such cost report requested by Purchaser prior to the deadline for filing such corrections, provided that Seller will not make any corrections that will result in any expenditure of money by reimbursement to Seller or any other adverse economic effect on Seller. If any cost report is over challenged, audited or otherwise examined by any Payor (in a manner in which wage index data or other matter is called into question, Seller shall give Purchaser notice within a reasonable period of time of the initiation thereof and Purchaser and its representative shall have the right, at its expense, to be present at any meeting with auditors or examiners (but only with respect to such issue), unless the auditors or examiners have stated they do not want Purchaser or its representatives, present, and at any proceedings related to the disputed such cost report (but only with respect to such issue) and to receive copies of all documents submitted to any Payor with respect thereto (but only with respect to such issue). In any event, Purchaser shall defend, indemnify and hold Seller harmless from any and all claims, amounts, actions and causes of action asserted against Seller in any way relating to such cost reports.

4.13    **Trail Insurance Coverage.** At the Closing, and subject to payment by Purchaser of the E&O Trail Insurance Payment, and the D&O Trail Insurance Payment, Seller shall have delivered to Purchaser written proof that Seller has obtained from Seller's current or other insurers:

-46-

1070032

1070032.2    FOR###/WWW/###.###.##.######.DOC

provided by law. It is understood, however, that while Seller may provide objective information, Seller may not legally expend public funds to advocate the adoption of a ballot measure. Accordingly, Purchaser shall use its Reasonable Commercial Efforts to seek approval of such ballot measure, subject to all applicable Legal Requirements and limitations, at no cost to Seller.

**4.15   Confidentiality.** Seller agrees to comply with the confidentiality provisions contained in Section 12.8, which shall remain in place during the term of this Agreement, and shall survive the Closing or termination hereof. Additionally, Seller shall continue to be bound by that certain Letter Agreement between Seller and Purchaser, dated July 27, 2009 addressing the confidentiality of evaluation materials and exclusive dealing (the "Confidentiality Agreement"), which shall also remain in place, to the extent consistent with the terms of this Agreement, during the term of this Agreement, except as may be required of Seller as a public entity pursuant to the Ralph M. Brown Act and the California Public Records Act (Government Code Section 6200 et seq.).

**4.16   Plan of Adjustment.** Seller shall use its best efforts to develop, undertake all necessary filings in connection with, and seek approval of, a plan of adjustment in connection with the Chapter 9 Proceedings, which is consistent with the terms of this Agreement and the transactions contemplated by this Agreement, including without limitation the characteristics, goals and components of this Agreement and the Definitive Alternative Agreement ("Plan of Adjustment"). The Plan of Adjustment shall be structured and pursued in the Chapter 9 Proceeding in a legally permissible fashion, to enable the possible approval of the Plan of Adjustment to take place as expeditiously as possible. Seller shall keep Purchaser fully informed of, and shall closely consult and cooperate with, Purchaser in connection with its efforts in this regard, including providing Purchaser the opportunity to review and provide reasonable input to Seller concerning all proposed filings in seeking approval of the Plan of Adjustment and Purchaser will reasonably support and cooperate with Seller on the Plan of Adjustment.

## ARTICLE V
## COVENANTS OF PURCHASER

**5.1    Purchaser's Efforts to Close.** Purchaser shall use its Reasonable Commercial Efforts to satisfy all of the conditions precedent set forth in Articles VI and VII to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

**5.2    Required Governmental Approvals.**

**5.2.1    Governmental Entities and Authorizations.** For purposes of this Section 5.2, "Government Authorizations" shall mean all licenses, permits, certificates, no objection letters, clearances and other authorizations, consents and approvals of any Government Entity which are required to consummate any of the transactions contemplated hereby or to operate the Hospitals as currently operated under any law, including provider agreements with Medicare and Medicaid. "Government Entities" shall mean any local, state or federal government, including each of their respective branches, departments, agencies, commissions, boards, bureaus, courts, instrumentalities or other subdivisions, including the California Department of Public Health ("CDPH") and the Center for the Medicare and Medicaid Services ("CMS").

- 48 -

Purchaser will: (a) use its Reasonable Commercial Efforts to obtain, as promptly as practicable, all material Government Authorizations required of Purchaser to consummate the transactions contemplated hereby; and (b) use its Reasonable Commercial Efforts with Seller in Seller's obtaining, as soon as practicable, all material Government Authorizations required of Seller to consummate the transactions contemplated hereby. Purchaser shall, no later than twenty (20) business days after the Election, submit to Seller for review all applications, licensing packages and other similar documents with all applicable Government Entities (or other third parties) which are a prerequisite to obtaining the general acute care hospital licenses from CDPH and a pharmacy license(s) from the California Board of Pharmacy (the "Material Licenses"). Seller shall review the applications for such Material Licenses and return to Purchaser within five (5) days for Purchaser's immediate submission to the appropriate Governmental Entities. Seller shall have no responsibility or liability for the content of such applications for the Material Licenses.

**5.2.2    Material Licenses.** Between the Effective Date and the Closing Date, Purchaser may, in its reasonable determination, conclude that in order to obtain such Material Licenses, participations or accreditations, or assist Seller in obtaining such assignments, Purchaser must enter into a separate agreement or understanding with the governmental agency, accreditation agency or Payor, or the other party to an assumed Contract, responsible for issuing or granting such Material Licenses or accreditations to Purchaser, or responsible for consenting to the assignment of a contract or agreement to, and the participation or certification of, Purchaser in the Medicare, Medicaid, TRICARE/CHAMPUS or other programs of such agency. Such agreement may require Purchaser to assume for the benefit of such governmental agency, accreditation agency, Payor or the other party to an assumed Contract certain obligations and liabilities of Seller that are Excluded Liabilities or against which Seller is obligated to indemnify, or for which Seller is to otherwise be obligated to reimburse, Purchaser. Alternatively, Purchaser may be required by Law to have assumed, or understood to have assumed, such obligations and liabilities of Seller. If Purchaser enters into any such agreement or understanding with any such governmental agency, accreditation agency, Payor or the other party to an assumed Contract, or by Law assumes such obligations and liabilities of Seller, such agreement, understanding or assumption shall not in any manner whatsoever impair Purchaser's rights against an assumed Contract, or by Law assumes such obligations and liabilities of Seller, such agreement, understanding or assumption shall not in any manner whatsoever impair Purchaser's rights against Seller, or diminish Seller's obligations to Purchaser, under this Agreement and shall under no circumstances be claimed by Seller as a defense, whether of waiver, estoppel, consent, operation of Law, or otherwise, against Purchaser's assertion of any claim under this Agreement against Seller, and the rights and obligations of the parties to each other under this Agreement shall be determined as if such agreement or understanding with such governmental or accreditation agency, Payor, or the other party to an assumed Contract did not exist or such assumption was not required by Law.

**5.2.3    Assumptions by Purchaser.**

**5.3    Estoppel Certificates.** Purchaser shall be entitled, but not obligated, to solicit estoppel certificates from any third party to any Lease of Real Property.

**5.4    Certain Employee Matters.**

**5.4.1    Hired Employees.** Employees of the Seller as of the Closing Date are referred to herein as "Seller's Employees." Purchaser shall make offers of employment, effective as of the Effective Time, or as otherwise applicable by the Parties, to a substantial portion of Seller's Employees who shall fail and complete applications for employment with Purchaser, if required, and successfully pass all screening and background checks as may be required by Purchaser in compliance with all applicable Laws (collectively, "Hospital Businesses' Employees"). As used in

- 49 -

the preceding sentence, a "full and complete" application shall include, without limitation, an applicant's written consent to release of personnel files and documents as described in Section 9.2.1. With respect to employees who are represented under a collective bargaining agreement which provides that Seller must require a purchaser to hire an offer to hire substantially all of such represented employees, or to recommend that Purchaser hire represented employees in good standing with Seller, Purchaser shall make offers of employment to such represented employees as required under such collective bargaining agreement and such provisions shall supersede the requirements in this Section 5.4.1. Further, to the extent that such collective bargaining agreements require Seller to require Purchaser to offer comparable benefit plans in lieu of benefit plans that are specifically administered by and available only through Seller for the remainder of such collective bargaining agreements, Purchaser shall provide or require under such collective bargaining agreements. Purchaser shall request that each such member consent to release such member's employment files to Purchaser in the same manner as nonunion employees. Any of the Hospital Businesses' Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees." Purchaser shall make reasonable, good faith efforts to offer the Hired Employees positions with part-time or full-time status comparable to the status they held with Purchaser, and except or as required by a collective bargaining agreement, at wages, benefits, and other employment conditions comparable to those provided to those Hired Employees not covered by collective bargaining agreements with Seller.

Purchaser and Seller shall use their best efforts to obtain consents from all Hired Employees to the transfer of the Hired Employees' Accrued Paid Time Off Amounts, to the extent permitted by law. However, Purchaser shall pay at Closing to or for the benefit of Seller, without any transfer of reduction of the PEPC, any Accrued Paid Time Off Amounts owing Hospital Businesses' Employees who are not hired by Purchaser, or who are Hired Employees but do not consent to the transfer of such Accrued Paid Time Off Amounts. Purchaser shall also provide to all Hired Employees their ESL Benefits, if any, as provided under Section 1.8.11.

5.4.2   Seller Plan Disposition. Seller agrees to comply with all Legal Requirements associated with its Benefit Plans.

5.4.3   Benefits. On and after the Effective Time, Hired Employees shall be eligible for a medical and hospital plan sponsored by Purchaser. To the extent permitted by Purchaser's insurers and plan administrators, Purchaser shall use Reasonable Commercial Efforts to obtain coverage providing that Hired Employees shall be given credit for periods of employment with Seller prior to the Effective Time for purposes of determining eligibility to participate and amount of benefits (including vesting of benefits), and preexisting condition limitations will be waived with respect to Hired Employees and their covered dependents unless such preexisting condition limitations were applicable prior to the Effective Time. In addition, if prior to the Effective Time a Hired Employee or his or her covered dependents has met all or a portion of any annual or out-of-pocket maximum in Seller's medical and health plan's current fiscal year, Purchaser shall use Reasonable Commercial Efforts to obtain coverage providing that such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's medical and health plan that covers Hired Employees on and after the Effective Time, if permitted by Purchaser's insurer or plan administrator.

5.4.4   PHSA, COBRA. Seller shall be responsible to provide continuation coverage pursuant to the requirements of the PHSA ("PHSA Coverage") or under ERISA

-50-

(collectively, "COBRA Coverage") (to the extent applicable) with respect to the Hospital Businesses' Employees (and their dependents, if applicable) whose qualifying event occurred prior to the date on which such Hospital Businesses' Employees become Hired Employees. Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hired Employees (and their dependents, if applicable) whose qualifying event occurs on or after the date on which such Hospital Businesses' Employees become Hired Employees. Purchaser shall also be responsible, as a "successor employer" under applicable COBRA Regulations, to provide COBRA coverage to employees of Seller who lose group coverage as a result of Purchaser's decision not to hire such employees (but not for employees of Seller whose employment terminated prior to the Closing Date for reasons unrelated to the purchase of the Assets by Purchaser).

5.4.5   Cooperation. After the Closing Date, Purchaser's human resources department will give reasonable assistance to Seller, at no cost to Seller, with respect to Seller's post-Closing administration of Seller's pre-Closing employee pension benefit plans and employee health or welfare benefit plans for the Hospital Businesses' Employees. Within five (5) days after the Closing Date, Purchaser shall provide to Seller a list of all the Hospital Businesses' Employees who were offered employment by Purchaser but refused such employment.

5.4.6   Labor Contracts. Purchaser acknowledges Seller is a party to collective bargaining agreements as described in Schedule 3.12 ("Labor Agreements"). Purchaser shall assume such Labor Agreements, effective as of the Effective Time, and thereafter on and after the Effective Time, Purchaser shall, for the remainder of their current terms abide by and comply with Seller's obligations under the Labor Agreements relating to or and covering the employees of the Hospitals (whether such employees are employed by Purchaser at the Effective Time or at any time thereafter), as more specifically set forth in Schedule 2.13.2 of this Agreement, subject to all the terms and conditions in such Labor Agreements existing as of the Effective Time. All changes made by Purchaser in the terms and conditions of employment of union represented employees shall be subject to the terms of any Labor Agreements.

5.4.7   NLRB Compliance. On and after the Effective Time, Purchaser shall take any and all action that may be necessary to comply with the terms and provisions of the National Labor Relations Act or the Labor Management Relations Act as a result of the consummation of the transactions contemplated by this Agreement, including, without limitation, obligations thereunder to any of the Hired Employees covered by the Labor Agreements. Prior to the Effective Date, Seller shall provide to Purchaser all information requested by Purchaser reasonably necessary for the Purchaser's understanding and implementation of employee wages, benefits, and other conditions of employment required by these union agreements.

5.5   Use of Business Names. Purchaser covenants that it and its affiliates shall not use in their respective trade or businesses the names or symbols described in Schedule 5.5, any abbreviations or any variations thereof, the marks, symbols or logos related thereto, nor any promotional material, stationery, supplies or other items of inventory bearing other such names, symbols or abbreviations or variations thereof.

5.6   Excluded Assets. As soon as practicable after the Closing Date, Purchaser shall notify Seller or Seller's designee of any Excluded Assets found at any of the Hospital Businesses on and after the Effective Time.

-51-

5.7    Confidentiality. Purchaser agrees to comply with the confidentiality provisions set forth at Section 12.8, and the rights which shall remain in place during the term of this Agreement, and shall survive the Closing or termination hereof. Additionally, Purchaser shall continue to be bound by that certain Confidentiality Agreement, which shall also remain in place, to the extent consistent with the terms of this Agreement, during the term of this Agreement. Disclosure of Seller information by Purchaser to potential investors and financing sources with respect to the Hospital shall be permitted, subject to execution by such financing sources of a reasonable and customary confidentiality agreement.

5.8    Contract Consents. Purchaser shall use its Reasonable Commercial Efforts to assist Seller in seeking and obtaining the consents from the third parties under all Material Contracts and Material Leases, which, by the terms of such Material Contract or Material Lease, require such consent to the assignment thereof to Purchaser and, in connection with such consents, seek the release of Seller from any further liability thereunder to the extent of any applicable Assumed Other Liabilities of Purchaser. To the extent any consents from third parties under any Contracts or Leases are not obtained as of the Closing, Seller and Purchaser shall comply with Section 9.3 and use their Reasonable Commercial Efforts to mitigate any costs, losses or damages associated with the failure to obtain such consents prior to Closing. Notwithstanding the foregoing, Seller's obtaining the consents and/or releases described in this Section shall not be a condition precedent to either party's obligation to close the transaction contemplated by this Agreement and shall not be considered a breach of Seller's representations. Purchaser shall use commercially reasonable efforts to obtain, as part of the assumption documents, releases of Seller by the third party obligees under Assumed Obligations, to the extent of the Assumed Obligations for each such obligee. However, receipt of such releases shall not be a condition precedent to either Party's obligation to close. Purchaser shall defend, indemnify and hold Seller harmless from any claims relating to such Assumed Obligation, whether or not the obligee has consented to such assignment.

5.9    Other Covenants. Purchaser recognizes that Seller has provided hospital and related services to the community for more than sixty (60) years and that Purchaser's commitment to continue to provide said services constitutes a material part of the consideration and inducement to Seller to enter into this Agreement and the Related Agreements. Accordingly, Purchaser covenants and agrees as follows:

5.9.1    Post-Closing Lease of Board; Community Benefit Support.

(a)    Post-Closing Lease of Board Space. Seller intends to maintain its existence as a California Local Healthcare District and (i) to provide certain health-related needs of the communities which it serves other than the operation of the Hospitals, and (ii) to take those actions set forth in California Health & Safety Code Section 32121.9. Purchaser desires to continue to support such activities. Accordingly, notwithstanding anything to the contrary in this Agreement upon consummation of the Effective Time, and continuing for a period of at least ten (10) years, Purchaser shall lease to Seller that certain space leased by VHSSC to Seller prior to the Closing of approximately 1,755 square feet plus corridor access which comprises the "Board Executive Conference Room" ("Board Room") and the "Board Offices" located on the second floor of the Medical Arts Building and the "Board Offices", which shall be leased by Purchaser to Seller at a cost of $1 per year, including access to phone and internet service connections (but Seller shall maintain its own internet service provider account) and reasonable access to parking for staff and visitors. However, Seller's use of the Board Room

- 52 -

shall be on shared, non-exclusive basis, and the parties will reasonably cooperate with each other concerning scheduling of use of the Board Room, but with reasonable priority given to Seller's use. Seller shall also have the right to utilize the existing Board public meeting room for meetings of Purchaser and any reasonable rules or regulations regarding such use as adopted by Purchaser. Prior to the Closing, the parties shall enter into a lease which contains these terms in mutually acceptable, commercially reasonable, form (the "Post-Closing Seller's Lease").

(b)    Community Benefit Support. In addition, Purchaser agrees to provide Four Hundred Thousand Dollars ($400,000) per year, commencing on the Closing Date, for a period five (5) years ("Annual Support Grants"), which amount shall not be subject to offset by Purchaser for any reason whatsoever, for use by Seller in support of Seller's community benefit and to satisfy its legal obligations. To the extent that the Seller obtains financial support from any other sources, the amount of Annual Support Grants shall be decreased in the amount equal to such other financial support except that, in any case, Purchaser's commitment shall not be less than Two Hundred Fifty Thousand Dollars ($250,000) per year during the five (5) year period of support.

5.9.2    Obligations Unconditional. Purchaser's obligation to provide the Annual Support Grants as provided in this Section 5.9.1 hereof, to make the payments to the unsecured creditors pursuant to the Creditors Commitment as provided in Section 1.2.1(a)(iv) and 1.5.19, and to fund the Claims Funds as provided in Section 1.2.4, shall be absolute, unconditional and not subject to any withholding, deduction, defense, offset, claim or counterclaim relating to any obligation, liability, or claimed breach by Seller of this Agreement.

5.9.3    Maintenance of Emergency Department; Other Services Commitments. For period of at least five (5) years following the Closing Date, Purchaser, Purchaser's Affiliates or each of their respective successors and assigns (other than as permitted below), then Seller shall have the right (including rights to damages and to specific performance) in connection with such non-performance). In addition, Purchaser shall assume and abide by the existing Seller contractual arrangements related to subacute, obstetric and chemical dependency rehabilitation services at the Hospitals. For purposes of the foregoing, Purchaser shall not be in breach of these covenants based on a closure of any Hospital, in whole or in part, even if it effects the continued operation of the Hospital's emergency department, including without limitation as the result of any retrofit, remediation, construction or similar project at such Hospital, or the closure of a Hospital provided such closure is for the purpose of replacement with a new acute care Hospital. In such event, the five year covenant to operate such service shall be extended for the period of such closure.

5.9.4    Charity Care Policies. Purchaser shall maintain charity care policies at the Hospitals which are fully compliant with all applicable laws, as such may change from time to time,

- 53 -

and any operations of the Hospitals shall be conducted in a manner materially consistent with such charity care policies.

**5.9.5    No Flip Covenant.**  Purchaser agrees that it will not at any time during the first three (3) years following the Closing Date, enter, sell all, or sell substantially all of, the Assets or sell or content to the sale of all or substantially all of the ownership interests of Purchaser to any third party; provided, however, that nothing herein shall restrict in any manner (i) any reorganization of Purchaser, including without limitation as may be needed to comply with legal or regulatory requirements, (ii) Purchaser's right to assign any of its rights or obligations hereunder as otherwise permitted in Section 12.2, and (iii) any transfer of Purchaser's assets as part of any the remedies of any secured lender of Purchaser.

**5.10    No Liens Caused by Purchaser.**  Prior to the Closing, the Purchaser shall, at all times, in connection with Purchaser and its employees', agents', and representatives' actions, keep the Hospital Businesses and all of the Assets free and clear of any mechanic's or materialman's claims or liens arising out of or relating to any inspections conducted by Purchaser. Upon completion of any test or inspection, Purchaser shall immediately restore the Hospital Businesses and Assets to that condition prior to such test and inspection. Purchaser agrees to schedule the results of any tests or inspections with Seller. Purchaser shall also protect, indemnify, defend and hold Seller and officers, directors, managers, employees, representatives and Affiliates harmless from and against any and all losses, damages (whether general, punitive or otherwise), liabilities, claims, causes of action, judgments, liens, costs and legal or other expenses (including but not limited to reasonable attorney's fees) suffered or incurred by Seller or its officers, directors, managers, employees, representatives and Affiliates as a result of, due to, or arising from, any act or omission of the Purchaser and/or its agents or representatives in connection with Purchaser's inspections.

**5.11    Purchaser's Costs.**  All costs of Purchaser's inspections shall be borne solely by Purchaser.

**5.12    ALTA Survey.**  If Purchaser or Purchaser's lenders or financing sources require that the Title Commitment include Survey endorsements, then immediately upon execution of this Agreement, Purchaser shall have the right to engage a licensed surveyor to conduct and provide an ALTA survey with respect to the Real Property (each an "ALTA Survey," collectively, the "ALTA Surveys"), in forms reasonably acceptable to Purchaser and its lenders, and sufficient to enable the Title Company to rely thereon in issuing the Title Policy incorporating the ALTA Surveys. Any such ALTA Surveys shall be Purchaser and any lender which Purchaser may designate in writing, and the Title Company, and shall plot all easements, structures, boundaries, fences, walls, and any encroachments on or by the Real Property, all to Purchaser's and its lenders' reasonable satisfaction. Purchaser shall have the right to undertake the ALTA Surveys provided they are completed no later fifty-five (55) days after the delivery of the PTR with all documents listed in "Schedule B" therein ("Survey Date"). Purchaser shall notify Seller in writing within five (5) days after the Survey Date of any defects, exceptions, liens, encroachments or encumbrances shown in the ALTA Survey of which Purchaser disapproves. Any exceptions or defects not so disapproved by Purchaser in writing within five (5) days following the Survey Date shall be deemed approved. Purchaser shall bear the cost of the Surveys.

**5.13    Insurance.**  For the period commencing on the Effective Date and ending on the Effective Time, Purchaser shall maintain, and shall ensure that its agents, consultants and contractors

maintain, public liability and property damage insurance insuring against any liability arising out of any entry, tests or investigations of the Property pursuant to the provisions of this Agreement. Such insurance maintained by Purchaser and/or its consultants, agents and contractors (as applicable) shall be in the amount of Three Million Dollars ($3,000,000.00) combined single limit for injury to or death of one or more persons in an occurrence, and for damage to tangible property (including loss of use) in an occurrence. The policy or policies maintained by Purchaser (and the sub-contractual liability of Purchaser covering the indemnities in this Agreement and shall (i) name the Seller and Seller's successors, assigns and affiliates as additional insureds, (ii) contain a cross-liability provision, and (iii) contain a provision that "the insurance provided by Purchaser under this Agreement shall be primary and non-contributing with any other insurance available to Seller." Purchaser shall provide Seller with evidence of such insurance coverage prior to any entry, tests or investigations of the Real Property. The aforementioned insurance coverage may be obtained under a blanket policy carried by Purchaser or its agents, consultants or contractors, as the case may be. Prior to entering the Property (and on each and every occasion), Purchaser shall deliver to Seller prior written notice thereof to Seller's Chairman of Board or general counsel and shall afford Seller a reasonable opportunity to have a representative of Seller present to accompany Purchaser while Purchaser performs its evaluations, inspections, tests and other investigations of the physical condition of the Property. If, pursuant to Section 4.13, the Parties determine that the most cost-effect approach to obtain the E&O insurance addressed therein is to have Purchaser maintain prior sole "loss" coverage, then the insurance policy maintained by Purchaser shall include, for at least two (2) years following the closing, such prior "loss" coverage with respect to professional liability for all claims attributable to or arising out of the operation of the Hospital Businesses or the Assets by Seller on or before the Closing.

**5.14    Releases.**  Except for the specific representations and warranties provided in Article II of this Agreement by Seller or a fraud committed by Seller, Purchaser, on its own behalf and on behalf of its officers, directors, managers, employees, representatives, property managers, asset managers, agents, attorneys, affiliated and related entities, heirs, successors and assigns (collectively, "Releasors") agrees that Seller and each of its officers, directors, shareholders, partners, members, managers, trustees, employees, representatives, property managers, asset managers, agents, attorneys, affiliated and related entities, heirs, successors and assigns (collectively, the "Releasees") shall be, and are hereby, fully and forever released and discharged from any and all liabilities, losses, claims (including third party claims), demands, damages (of any nature whatsoever), causes of action, costs, penalties, fines, judgments, attorneys' fees, consultants' fees and expenses and other expenses (collectively, the "Claims") with respect to any and all Claims, whether direct or indirect, known or unknown, foreseen or unforeseen, that Releasors have or may have on account of or in any way be connected with the Real Property including, without limitation, the physical, environmental and structural condition of the Real Property or any Claim or matter (regardless of when it first appeared) relating to or arising from (i) any patent or latent defects or deficiencies with respect to the Real Property, (ii) any and all matters related to the Real Property or any portion thereof, including without limitation, the condition and/or operation of the Real Property and each part thereof, and (iii) the presence, release and/or remediation of asbestos and asbestos containing materials in, on or about the Real Property regardless of when such asbestos and asbestos containing materials were first introduced in, on or about the Real Property.

**5.14.1**   Releasors hereby waive and agree not to commence any action, legal proceeding, cause of action or suits in law or equity, of whatever kind or nature, including, but not

- 54 -

- 55 -

limited to, a private right of action under the federal superfund laws, 42 U.S.C. Sections 9601 et seq. and California Health and Safety Code Sections 25300 et seq. (as such laws and statutes may be amended, supplemented or replaced from time to time), directly or indirectly, against the Releasors or their agents in connection with Claims described above and expressly waives the provisions of Section 1542 of the California Civil Code which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

and all similar provisions or rules of law. Releasors elect to and does assume all risk for such Claims heretofore and hereafter arising, whether now known or unknown by Releasors. In this connection and to the greatest extent permitted by law, Releasors hereby agree, represent and warrant that Releasors realize and acknowledge that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Releasors further agree, represent and warrant that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Releasors nevertheless hereby intend to release, discharge and acquit Seller from any such unknown Claims, debts, and controversies which might in any way be included as a material portion of the consideration given to Seller by Releasors in exchange for Seller's performance hereunder. Without limiting the foregoing, if Releasors have actual knowledge of (a) a default in any of the covenants, agreements or obligations to be performed by Seller under this Agreement and/or (b) any breach or inaccuracy in any representation or warranty of Seller made in this Agreement, and Releasors nonetheless elects to proceed to Closing, then, upon the consummation of the Closing, Releasors shall be conclusively deemed to have waived any such default and/or breach or inaccuracy and shall have no Claim against Seller or hereunder with respect thereto. Notwithstanding anything to the contrary herein, Seller shall not have any liability whatsoever to Releasors with respect to any matter disclosed to or discovered by Releasors or its agents or representatives prior to the Closing Date.

5.14.2   Without limiting the generality of the foregoing, except for the specific representations and warranties provided in Article II of this Agreement by a Fraud committed by a Seller, Releasors hereby expressly waive, release and relinquish any and all claims, causes of action, rights and remedies Releasors may now or hereafter have against the Releasees, whether known or unknown, under any Environmental Law(s) (as defined below), or common law, in equity or otherwise, with respect to (1) any past, present or future presence or existence of Hazardous Materials on, under or about the Real Property (including, without limitation, in the groundwater underlying the Real Property) or (2) any past, present or future violations of any Environmental Laws. For the purposes of this Agreement, the term "Environmental Laws" means any and all federal, state and local statutes, ordinances, rules, regulations, orders, guidance documents, judgments, governmental authorizations, or any other requirements of governmental authorities, as may presently exist or as may be amended or supplemented, or hereafter enacted or promulgated, relating to the presence, release, generation, use, handling, treatment, storage, transportation or

- 56 -

disposal of Hazardous Materials, or the protection of the environment or human, plant or animal health, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C.A. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Oil Pollution Act (33 U.S.C. § 2701 et seq.), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.), the Porter-Cologne Water Quality Control Act (Cal. Wat. Code § 13020 et seq.), the Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal. Health & Safety Code § 25249.5 et seq.), and the Carpenter-Presley-Tanner Hazardous Substances Account Act (Cal. Health & Safety Code, § 25300 et seq.). As used herein, the term "Hazardous Material(s)" includes, without limitation, any hazardous or toxic material, substance, irritant, chemical or waste, which is (A) defined, classified, designated, listed or otherwise considered under any Environmental Law as a "hazardous waste," "hazardous substance," "hazardous material," "extremely hazardous waste," "acutely hazardous waste," "radioactive waste," "biohazardous waste," "pollutant," "toxic pollutant," "contaminant," "restricted hazardous waste," "infectious waste," "toxic substance," or any other term or expression intended to define, list, regulate or classify substances by reason of properties harmful to health, safety or the indoor or outdoor environment, (B) toxic, ignitable, corrosive, reactive, explosive, flammable, infectious, radioactive, carcinogenic or mutagenic, and which is or becomes regulated by any local, state or federal governmental authority, (C) asbestos, (D) an oil, petroleum, petroleum based product or petroleum additive, derived substance or breakdown product, (E) urea formaldehyde foam insulation, (F) polychlorinated biphenyls (PCBs), (G) freon and other chlorofluorocarbons, (H) any drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources, (I) lead-based paint and (J) mold, rot, fungi and bacterial matter.

5.14.3   Seller has given Releasors material concessions regarding this transaction in exchange for Releasors agreeing to the provisions of this Section 5.14, Seller and Releasors have each initialed this Section 5.14 to further indicate their awareness and acceptance of each and every provision hereof. The provisions of this Section 5.14 shall survive the Closing and shall not be deemed merged into any instrument or conveyance delivered at the Closing.

*SELLER'S INITIALS*          *PURCHASER'S INITIALS*

5.14.4   Releasors specifically acknowledge, covenant, represent and warrant that prior to Closing Date, is and its agents and representatives will have thoroughly inspected the Real Property and observed the physical characteristics and condition of the Real Property. Notwithstanding any provision to the contrary contained in this Agreement, Releasors further acknowledge and agree that Releasors is purchasing the Real Property subject to all applicable laws, rules, regulations, codes, ordinances and orders. By Releasors purchasing the Real Property and upon the occurrence of the Closing Date, Releasors waive any and all right or ability to make a claim

- 57 -

of any kind or nature against any of the Releasees for any and all deficiencies or defects in the physical characteristics and condition of the Real Property and condition of the real Property with any and all of such deficiencies and defects and subject to all matters disclosed by Seller herein or in any separate writing with respect to the Real Property. Releasors further acknowledge and agree that except for any representations expressly made by Seller in Article II of this Agreement, neither Seller or any of Seller's employees, agents or representatives have made any representations, warranties or agreements by or on behalf of Seller of any kind whatsoever, whether oral or written, express or implied, statutory or otherwise, as to any matters concerning the Real Property, the condition of the Real Property, the size (including rentable or useable square footage) of the Real Property, the size (including rentable or useable square footage) of the improvements (including without limitation, any discrepancies in the actual rentable square footage of the improvements, including any leased premises within the Improvements), the present use of the Real Property or the suitability of Releasor's is intended use of the Real Property.

5.14.5 Without limiting the generality of the foregoing, Releasors expressly acknowledge and agree that Releasors is not relying on any representation or warranty of Seller, nor any officer, director, shareholder, member, manager, partner, employee, attorney, property manager, agent or broker of Seller, whether implied, presumed or expressly provided at law or otherwise, arising by virtue of any statute, common law or other legally binding right or remedy in favor of Releasors except as expressly provided in Article II above. Releasors further acknowledge and agree that, except with respect to matters covered by Seller's representations at Article II of this Agreement, Seller is not under any duty to make any inquiry regarding any matter that may or may not have arisen with the Seller or any officer, director, shareholder, member, manager, partner, employee, attorney, property manager, agent or broker of Seller.

SELLER'S INITIALS                    PURCHASER'S INITIALS

5.14.6 Notwithstanding the preceding, none of the releases or other provisions set forth in this Section 5.14 (or any subsection thereof) shall eliminate or limit the effect of, or Seller's obligation for, Seller's express representations, warranties and covenants in this Agreement or for fraud. The provisions of this Section 5.14 and its subsections shall survive the Closing and shall not be deemed merged into any instrument or conveyance delivered at the Closing.

5.15 Plan of Adjustment. Purchaser shall reasonably cooperate with Seller in connection with developing a Plan of Adjustment and in connection with any filings in the Chapter 9 Proceeding, and other steps, seeking approval of the Plan of Adjustment.

5.16 Defense of Claims Challenging Transaction. In the event any litigation is commenced seeking to enjoin or challenge the validity of, or the Seller's authority to enter into or perform pursuant to, the transactions contemplated by the MOU or addressed in this Agreement ("Challenging Litigation"), Seller will tender such litigation for coverage by D&O or E&O insurance, to the extent such policies may be applicable. If, however, such Challenging Litigation, which is filed prior to the second anniversary of the Closing Date is not covered by insurance ("Covered Litigation") and/or if the applicable carrier does not promptly agree to provide a defense of such Challenging Litigation, Purchaser agrees to be responsible for the reasonable legal fees and

costs associated with defending against the Covered Litigation; provided that Purchaser shall have the right, at its election, to control and/or participate in the defense of the Covered Litigation, with counsel mutually agreeable to Seller and Purchaser. If Purchaser elects to control the Covered Litigation, then Purchaser will have full control of such defense and proceedings, including any compromise or settlement thereof. Seller may, at its sole cost and expense, participate in, but not control, any defense or settlement of any Covered Litigation pursuant to the Purchaser pursuant to this Section, to the extent such participation is not prejudicial, in the reasonable judgment of the Purchaser, to the Purchaser or the possible outcome of the Covered Litigation. If requested by Purchaser, Seller agrees to fully cooperate with the Purchaser and its counsel in contesting any Covered Litigation, or, if appropriate and related to the Covered Litigation in question, in making any counterclaim against the person asserting the Covered Litigation, or any cross-complaint against any person (other than the Seller or any of its affiliates). Seller shall not take any such action that is prejudicial to Purchaser or its defense against the Covered Litigation. In connection with the foregoing, Purchaser also agrees to indemnify, defend and hold harmless Seller and Seller's elected directors and officers from any and all damages, liabilities, costs, expenses, obligations, or claims incurred in connection with the Covered Litigation, including but not limited to, injunctive proceedings, and which are not covered by D&O, E&O or other insurance covering Seller and its directors and officers ("Available Insurance"). Notwithstanding the preceding, it is agreed that Seller and its directors and officers will render any claims which are subject to indemnify pursuant to this Section to any insurer(s) providing Available Insurance ("Available Insurer") prior to seeking indemnification pursuant to this Section; provided, however, that unless the Available Insurer promptly agrees to provide a defense to or for any claims covered by this indemnification, Purchaser shall immediately defend against such claims in the same manner as provided for defending against Covered Litigation as provided above.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

6.1 Signing and Delivery of Instruments. Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement and any Related Agreement.

6.2 Unfavorable Action or Proceeding. On the Closing Date, no orders, decrees, judgments, temporary restraining orders or injunctions of any court or governmental body shall be in effect, which could prevent the consummation of the transactions contemplated in this Agreement.

6.3 Performance of Covenants. Purchaser shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

6.4 Governmental Authorizations. Purchaser shall have obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement including reasonable assurances that any material licenses, permits, certificates of need and

- 58 -
1090092
1090092.DOC

- 59 -
1090092
1090092.DOC

authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies). The foregoing notwithstanding, in the event that CDPH approval and OSHPD certification, or other Material Licenses, have not been obtained prior to the Closing Date, Purchaser and Seller shall nevertheless be required, at the option of either Seller or Purchaser, to complete the purchase of the Assets and the Parties shall enter into the Lease and Management Agreement as and to the extent provided in Section 1.6.

6.5    Representations.  The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects as though such representations and warranties had been made on and as of such date, except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated hereby, when made and on and as of the Closing Date (or the date otherwise specified in this Agreement) as though such representations and warranties had been made on and as of such date.

6.6    Schedules.  The provisions of the schedules attached to this Agreement that were updated by Purchaser after the Effective Date, if any, shall be acceptable to Seller in its reasonable discretion; provided, however, that Purchaser shall be deemed to have obtained Seller's approval to any such material updates of the schedules if Purchaser gives Seller written notice of an update and Purchaser does not receive from Seller a written notice of objection to such section within ten (10) business days after Seller receives Purchaser's written notice.

6.7    Public Approval.  Except with respect to the Alternative Transaction, the Seller shall have received Public Approval, through the Approval Election, as legally required for Seller to consummate the transactions contemplated by this Agreement.

6.8    Capital Requirements.  No later than noon on December 4, 2009, Purchaser shall provide Seller, through its general counsel, John B. Marshall, Esq. as addressed below, evidence reasonably satisfactory to Seller that Purchaser has written Commitments (as defined below) from its lenders and evidence concerning Purchaser's capital investors sufficient to permit Purchaser to fund to close the transactions provided for in this Agreement.  For purposes of the preceding, a lender's "Commitment" constitutes a commercially reasonable letter by such lender to make a loan to Purchaser or Purchaser's Affiliate, in such form and with such conditions and qualifications as can be reasonably expected for such a lender letter prior to payment by Purchaser of a commitment fee (which commitment fees Purchaser would not pay until the Public Approval occurs, because of their substantial cost).  As Seller's is reasonable request, such evidence (collectively, "Financial Documentation") shall include the names of the lenders and/or the existing capital investors, (i) the amount of money such lenders and/or capital investors have committed toward the Cash Purchase Portion of the Purchaser's working capital, as well as (for any working capital loan Commitment) the general terms upon which Purchaser shall be entitled to draw down and utilize said funds; and (iii) the general terms and conditions upon which such section will be of a confidential nature (collectively, "Commitment Requirements"), Seller and Purchaser agree that such of the information to be provided by Purchaser pursuant to this section will be of a confidential nature, and may be subject to confidentiality covenants in favor of third parties. Accordingly, it is important for the protection of the parties that this section can protect such confidentiality.  Therefore, the parties agree that the Commitments and other evidence required to be provided by Purchaser hereunder shall only be provided for review by (and not for copying by) Seller's general counsel, John B. Marshall, Esq, and he will, unless otherwise approved in writing by

Purchaser, only be authorized to report back to Seller only his conclusions on whether, these Commitments and other information and documents reasonably provide the evidence of sufficient capital as required by this Section, and that he will not be authorized to share the details, including without limitation the names of any lenders or capital investors, with Seller or its board members, officers or agents.  The parties acknowledge and agree that the evidence of necessary funds may be shown through funds available to Purchaser or any Affiliate of Purchaser which will make such funds available to close the transactions contemplated herein.  If Purchaser is unable, at or prior to Noon on December 4, 2009, to produce documents evidencing the availability of funds constituting the Commitment Requirements as required to close the transactions contemplated for in this Section which are commercially reasonably satisfactory to Seller, then Seller shall have the right, in its reasonable discretion, to terminate this Agreement upon ten (10) business days prior written notice provided to Purchaser within twenty (20) days after Purchaser has provided Seller the Financial Documentation required by this Section (which notice shall include a detailed description of Seller's basis for concluding that Purchaser has failed to provide the required evidence), during which period Purchaser shall have opportunity to cure by provision of additional evidence commercially reasonably satisfactory to Seller of capital commitments to addressing any deficiency alleged by Seller, without liability and to retain the Termination Fee as further addressed at Section 8.2, unless such failure is caused by Seller's failure to perform its material obligations under Section 4.11.  If there are any disputes between Seller and Purchaser concerning the compliance by Purchaser with the provisions and requirements of this Section, such dispute shall be resolved pursuant to the dispute resolution provisions set forth at Section 12.18 of this Agreement. There shall be no other financing contingency to Purchaser's obligations to close the transactions contemplated in this Agreement, except as otherwise specifically set forth in this Agreement.

6.9    Plan of Adjustment. If, prior to the Closing, Seller has filed a Plan of Adjustment ("Plan") in the Chapter 9 Proceeding, as of the Closing, either;

6.9.1    such Plan shall have been confirmed, or

6.9.2    the holders of the Affiliated Claims shall have voted to accept, in writing, such Plan or agreed to accept such Plan; or

6.9.3    the holders of the Affiliated Claims shall have agreed, in writing, not to, directly or indirectly, oppose such Plan and/or sought to influence either the Unsecured Creditors Committee and/or others to vote against or otherwise oppose such Plan, and have, in fact, not done so.

For purposes of the foregoing, "Affiliated Claims" shall mean the claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, Inc., and the claims of LHIG, Inc. and any claims of constituent members thereof which are derivative from such claims.

ARTICLE VII
CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

- 60 -

- 61 -

7.1 Governmental Authorizations. Purchaser shall have obtained all material licenses, permits, certificates of need, assumption of provider agreements and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits, certificates of need and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies). The foregoing notwithstanding, in the event that CDPH approval and CMS certification, or other Material Licenses, have not been obtained prior to the Closing Date, Seller and Purchaser shall nevertheless be required, at the option of either Seller and Purchaser, to complete the purchase of the Assets and the Parties shall enter into the Lease and Management Agreement, as and to the extent provided in Section 1.5.6.

7.2 Signing and Delivery of Instruments. Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement and the Related Agreements.

7.3 Performance of Covenants. Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date.

7.4 Unfavorable Action or Proceeding. On the Closing Date, no orders, decrees, judgments, temporary restraining orders or injunctions of any court or governmental body shall be in effect, which could prevent the consummation of the transactions contemplated in this Agreement.

7.5 Material Adverse Effect. There has not been a change, or new circumstances, having a Material Adverse Effect.

7.6 Title Insurance Policy. Purchaser shall have received or the Title Company shall be irrevocably committed to issuing, a fully effective Title Policy including a customary survey endorsement in favor of Purchaser covering the Owned Real Property in the amount of the full insurable value of the Owned Real Property. The Owner's Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, subject only to (a) current real estate taxes not yet due and payable, and (b) the permitted title exceptions listed in Schedule 7.6 hereto (the "Permitted Exceptions").

7.7 Representations. Each of the representations and warranties of Seller contained in this Agreement or a Related Agreement shall be true and correct in all respects when made and on and as of the Closing Date (or the date otherwise specified in this Agreement) as though such representations and warranties had been made on and as of such date, except as to changes occurring in the ordinary course of business of the Hospital Businesses after the date of this Agreement which do not violate any covenant of Seller in this Agreement and do not have a Material Adverse Effect.

7.8 Exhibits and Schedules. The provisions of the Seller's Disclosure Schedule and all schedules attached to this Agreement that were updated by Seller after the Effective Date, if any, shall be acceptable to Purchaser in its reasonable discretion; provided, however, that Seller shall be deemed to have obtained Purchaser's approval to any such updates of the schedules if Seller gives Purchaser written notice of an update and Seller does not receive from Purchaser a written notice of objection to such action within ten (10) business days after Purchaser receives Seller's written notice.

- 62 -

7.9 Permits and Program Participation. Unless either Party elects to enter into the Lease and Management Agreement as provided elsewhere in this Agreement, Purchaser shall have obtained, or received reasonable assurances that it shall obtain within a reasonable time after the Effective Time (including the scheduling by Purchaser of any required surveys within seven (7) days following the Effective Time), (a) all Material Licenses, Permits and accreditations required for the transfer of the Hospital Businesses to Purchaser and the operation of each of the Hospital Businesses by Purchaser following the Effective Time in substantially the same manner as currently operated without Purchaser being obligated to comply with any additional Legal Requirements concerning construction, structural integrity or seismic safety as a result of the transfer of the Assets to Purchaser, (b) certification of each component of the Hospital Businesses in Medicare, Medicaid, and TRICARE/CHAMPUS and its continued participation in each such program notwithstanding Purchaser's decision to obtain new provider agreements and provider numbers therefor, (c) certification of participation by each of the Hospital Businesses in the program of any other Payor reasonably required by Purchaser, and (d) verification or confirmation reasonably satisfactory to Purchaser of the Hospital Businesses' ability to continue to qualify for and maintain its exclusion from Medicare's prospective payment system, in each instance effective as of the Closing Date or as soon thereafter as is acceptable to Purchaser, so that within such a period of time after the Closing as is acceptable to Purchaser each component of the Hospital Businesses may participate in and receive reimbursement from all programs described in (b) through (c) effective as of the Closing.

7.10 Tax Matters. Seller shall have delivered to Purchaser a duly executed certificate of non-foreign status in the form required by Code § 1445.

7.11 Public Approval. The Seller shall have received a Public Approval, through the Approval Election and all such other requirements, as legally required for Seller to consummate the transactions contemplated by this Agreement.

7.12 Plan of Adjustment. The Plan of Adjustment shall have been approved by the Bankruptcy Court prior to Closing.

ARTICLE VIII
TERMINATION

8.1 Termination. This Agreement may be terminated at any time prior to Closing only as follows:

8.11 By the mutual written consent of the Parties, in which case the Deposit shall be repaid as agreed upon by the Parties;

8.12 By Seller if a material breach or default under this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within thirty (30) days after service by Seller upon Purchaser of written notice which describes the nature of such breach. In the event this Agreement is terminated based on this Section 8.1.2, Escrow shall pay to Seller the Termination Fee and the Excess Deposit to Purchaser immediately following the effective date of such termination of this Agreement; provided, however, that for purposes of this Section, if Purchaser's performance is prevented, hindered or delayed by reason of any Force Majeure, such performance obligation of Purchaser shall be excused but only for so long as and to the extent that such cause(s) prevent or delay Purchaser's performance. For purposes of this Section 8.1.2, Seller's certification of material

- 63 -

breach or default shall be accepted by Escrow, without prejudice to Purchaser's right to contest the same in accordance with the terms of this Agreement.

8.1.3    By Purchaser if a material breach or default under this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within thirty (30) days after service by Purchaser upon Seller of a written notice which describes the nature of such breach. In the event this Agreement is terminated based on this Section 8.1.3, Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement; provided, however, that, for purposes of this Section, if Seller's performance is prevented, hindered or delayed by reason of any Force Majeure, such performance obligation of Seller shall be excused but only for so long as and to the extent that such cause(s) prevent or delay Seller's performance;

8.1.4    By Purchaser if any of the conditions in Article VII have not been satisfied as of the Closing Date or if satisfaction of any such condition in Article VII is or becomes impossible and Purchaser has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has not occurred by reasons other than (i) the failure of Purchaser to comply with its obligations under this Agreement, or (ii) Seller's failure to provide its closing deliveries on the Closing Date because the Purchaser is not ready, willing and able to close the transaction on the Closing Date). In the event this Agreement is terminated based on this Section 8.1.4, Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination;

8.1.5    By Seller if any of the conditions in Article VII have not been satisfied as of the Closing Date or if satisfaction of any such condition in Article VII is or becomes impossible and Seller has not waived such condition in writing on or before the Closing Date (provided that the failure to satisfy the applicable condition or conditions has not occurred by reasons other than (i) the failure of Seller to comply with its obligations under this Agreement, or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date because Seller is not ready, willing and able to close the transaction on the Closing Date). In the event this Agreement is terminated based on this Section 8.1.5, then Escrow shall pay to Seller the Deposit and the Excess Deposit to Purchaser, immediately following the effective date of such termination of this Agreement

8.1.6    By Purchaser, upon the delivery of a timely termination by Purchaser in accordance with Sections 1.10.2 (environmental), 1.12 (Casualty), 1.13(Condemnation), and 1.14 (disapprovals during Schedules Period), in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

8.1.7    Without limiting Purchaser's other termination rights hereunder, Purchaser may elect to terminate this Agreement, without cause, upon ten (10) days written notice to Seller, in which case the Escrow shall pay the Termination Fee and the Excess Deposit to Seller following the effective date of such termination of this Agreement;

8.1.8    By Seller (if Seller timely terminates the Agreement pursuant to Section 6.8, in which case the Escrow shall pay the Termination Fee to Seller and the Excess Deposit to Purchaser immediately following the effective date of such termination of this Agreement);

8.1.9    By Purchaser, if Seller's Disclosure Schedule or other schedules attached to this Agreement are updated by Seller after the end of the Schedules Period, which update is not

- 64 -

acceptable to Purchaser, and Purchaser elects to terminate this Agreement, by written notice provided to Seller within ten (10) business days after Purchaser receives Seller's written notice of the disapproved Schedules update and Seller does not agree to retract the update during the notice period, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

8.1.10    By Purchaser, if there has been a change, or new circumstances, having a Material Adverse Effect since the Effective Date, and Purchaser elects to terminate this Agreement by written notice provided to Seller within ten (10) business days after Purchaser receives written notice of the occurrence of such Material Adverse Effect, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

8.1.11    By Seller, if at the Closing, the Purchasing Group Companies do not, directly or indirectly, include a cross-section of participating local physicians, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

8.1.12    By Purchaser, if (i) the actual D&O Tail Payment required to be paid by Purchaser exceeds the estimated amount of Four Hundred Fifty Thousand Dollars ($450,000), (ii) or the E&O Tail Insurance Payment required to be paid by Purchaser exceeds the estimated amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), or (iii) the Administrative Claims combined with other Covered Claims exceed $4,000,000 and Purchaser chooses not to make the additional payments (from the Creditors Commitment) at Closing to meet those obligations, as addressed in Article I, in which case Escrow shall pay to Purchaser the Deposit immediately following the effective date of such termination of this Agreement;

8.1.13    [Intentionally omitted]

8.1.14    [Intentionally omitted]; or

8.1.15    By either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before April 30, 2010 (the "Termination Date") unless such Termination Date is mutually extended by the Parties. In the event of a termination in accordance with this Section 8.1.15, Escrow shall pay to Purchaser the Deposit immediately after the termination takes effect.

8.2    Termination Consequences.   If this Agreement is terminated pursuant to Section 8.1, (a) all further obligations of the parties under this Agreement shall terminate, except that the obligations in Sections 5.7 (Confidentiality), 12.3 (Governing Law), 12.8 (Confidentiality and Publicity), 12.12 (Expenses) and any provision in this Agreement regarding disposition of the Deposit, shall survive and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in Section 12.12. Notwithstanding the foregoing to the contrary, if Seller either Party shall have committed any material breach or default, then Purchaser the nonbreaching need not terminate this Agreement but may seek to specifically enforce Seller's the obligations of the nonbreaching Party under this Agreement. If this Agreement is terminated for any reason, not based on Seller's or Purchaser's failure to perform any of its respective material obligations under this Agreement, which failure is not cured within any permitted

- 65 -

cure period, then Purchaser agrees to reimburse to Seller the out-of-pocket expenses incurred by Seller to undertake the Approval Election, in an amount not to exceed Fifty Thousand Dollars ($50,000).

8.2.1   NOTWITHSTANDING THE PRECEDING, OR ANY OTHER PROVISION OF THIS AGREEMENT OR THE RELATED AGREEMENTS, IF THE CLOSING DOES NOT OCCUR BASED UPON SELLER'S ELECTION TO TERMINATE IN ACCORDANCE WITH SECTION 8.1.1 AS A RESULT OF PURCHASER'S FAILURE TO PERFORM ANY OF ITS MATERIAL OBLIGATIONS UNDER THIS AGREEMENT WHICH FAILURE IS NOT CURED WITHIN ANY PERMITTED CURE PERIOD (OTHER THAN PURCHASER'S FAILURE TO GIVE TIMELY NOTICE OF TERMINATION UNDER SECTION 8.1 WHICH FAILURE TO GIVE NOTICE CANNOT BE CURED), THEN, AS SELLER'S SOLE REMEDY, SELLER SHALL HAVE THE RIGHT TO RECEIVE TWO MILLION DOLLARS ($2,000,000) ("TERMINATION FEE") FROM THE DEPOSIT AND ESCROW SHALL REPAY TO PURCHASER THE DEPOSIT AND ALL INTEREST THEREON IN EXCESS OF SUCH TERMINATION FEE ("EXCESS DEPOSIT").

8.2.2   IN CONNECTION WITH SECTION 8.2.1, PURCHASER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES THAT SELLER MAY SUFFER IN THE EVENT PURCHASER BREACHES THIS AGREEMENT PRIOR TO THE APPROVAL ELECTION. PURCHASER AND SELLER THEREFORE AGREE THAT THE PAYMENT SET FORTH IN SECTION 8.2.1 REPRESENTS A REASONABLE ESTIMATE OF THE NET DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT THAT PURCHASER BREACHED THIS AGREEMENT PRIOR TO SUCH TIME. ACCORDINGLY, SELLER AGREES THAT THE PAYMENT SET FORTH IN SECTION 8.2.1 SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY AT LAW OR IN EQUITY FOR THE PURCHASER'S DEFAULT AS ADDRESSED THEREIN (WHICH SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677) AND SHALL NOT CONSTITUTE A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTION 3275 OR 3369. SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389 WITH RESPECT TO THE PROVISIONS OF THIS AGREEMENT.

PURCHASER INITIALS _____        SELLER INITIALS _____

## ARTICLE IX
## POST-CLOSING MATTERS

9.1   Excluded Assets and Excluded Liabilities.

9.1.1   Subject to Section 11.2 of this Agreement, any asset (including Accounts Receivable) or any liability, and all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement, or (c) absent such agreement, as

- 56 -

determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller at Seller's cost. Until such transfer, assignment and conveyance, Purchaser (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Seller shall hold such asset in trust for the benefit of Seller. Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Seller under this Section 9.1 against, nor the right to contact its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller, including, but not limited to, pursuant to the indemnification provisions of Section 10.2. If Purchaser does not remit the Excluded Assets to Seller in accordance with the first sentence of this Section 9.1, such Excluded Assets shall bear interest at the Prime Rate in effect on the calendar day after the Excluded Assets is made to Seller (the "Excluded Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement. With respect to payment received by Purchaser on account of Transition Services, this Section 9.1 shall be subject to the provisions of Section 11.3. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

9.1.2   Subject to Section 11.2 of this Agreement, any asset (including Accounts Receivable) or any liability, all other remittances and all mail and other communications that is an Asset or an Assumed Obligation (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Seller (or its respective successors-in-interest, assigns or affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Seller (and its respective successors-in-interest, assigns and affiliates) to Purchaser at Purchaser's cost. Until such transfer, assignment and conveyance, Seller (and its respective successors-in-interest, assigns and affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Purchaser shall hold such asset in trust for the benefit of Purchaser. Seller (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Purchaser under this Section 9.1 against, nor the right to contest its obligation to transfer, assign and convey to Purchaser because of, outstanding claims, liabilities or obligations asserted by Purchaser against Purchaser, including, but not limited to, pursuant to the indemnification provisions of Section 10.2. If Seller does not remit the Assets to Purchaser in accordance with the first sentence of this Section 9.1, such Assets shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Purchaser (the "Transferred Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Transferred Asset Due Date until payment of the Assets and all interest thereon is made to Purchaser. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement. With respect to payment received by Purchaser on account of Transition Services, this Section 9.1 shall be subject to the provisions of Section 11.3. The terms of this Article IX shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

- 57 -

**9.2 Preservation and Access to Records After the Closing.**

**9.2.1 Hospital Businesses' Records.** The term "Hospital Businesses' Record" shall mean all records created and/or maintained in connection with the operation of the Hospital Businesses for periods ending on or prior to the Closing Date which are of the types and categories listed in the current version of the "Recommended Record Retention Schedule" ("CHA Retention Schedule") of the Records Retention Guide ("CHA Guide") published by the California Healthcare Association, including without limitation all records, documents and other materials which are not confidential nor subject to the attorney-client privilege, whether in the possession of Seller, Seller's accountants, Seller's attorneys or other professionals. The CHA Retention Schedule is set forth on Schedule 9.2.1. The term "Transferred Records" shall mean all Hospital Businesses' Records consisting of medical, clinical and other records directly or indirectly associated with the admission, care and treatment of patients, patient billing records, personnel records and other business records directly related to continued operations of the Hospital (but excluding the Retained Records) and all financial records of the Hospital Businesses and other financial and marketing information including, without limiting the generality of the foregoing, any such records, documents or other material which are not privileged, except the attorney-client privilege, or confidential and whether in the possession of Seller or in the possession of its attorneys, accountants or other professionals, including the work papers of Seller's accountants. The term "Retained Record" shall mean the portion of the Hospital Businesses' Records consisting of Seller's minute book, tax returns and files related thereto and materials which are subject to privilege and which relate solely to the Excluded Assets.

Purchaser's application for employment described in Section 5.4.1 above shall include a request from the Hospital Businesses' Employees completing the application to affirmatively consent in writing to the release to Purchaser, within an indicated timeframe that all of such Hospital Businesses' Employees' personnel files and documents maintained by Seller. The form and content of the consent shall be approved in advance by Seller, which approval shall not be unreasonably withheld or delayed. Seller shall provide Purchaser with the employee personnel files and documents of all applying employees, including, but not limited to (a) Forms I-9 and supporting documentation, and (b) the contents of the personnel file, including disciplinary records and documentation, for those Hospital Businesses' Employees who consent to the release of such files and documents to Purchaser. Seller may provide Purchaser with true and correct copies of the foregoing documents, provided that Purchaser shall have the right to examine the originals of such documents. Purchaser shall promptly return to Seller all personnel files and documents of any Hospital Businesses' Employees who do not become Hired Employees, which returned files and documents shall not be Transferred Records. Any such files for Hospital Businesses' Employees who do become Hired Employees (and for whom the consents were obtained) shall be included within Transferred Records.

**9.2.2 Retention of Retained Records by Seller.** Seller shall retain the Retained Records until the expiration, for each type and category of record, of the recommended retention period set forth in the CHA Retention Schedule, as amended from time to time. Purchaser shall provide storage space for such records and shall provide personnel to retrieve such records in the any manner reasonably documented by Purchaser, at no cost to Seller. If at the expiration of any such period, any tax or Payor audit or judicial proceeding or any appeal therefrom is in process or the applicable statute of limitations has been extended, all or any portion of the Retained Records affected by such audit, proceeding or extension shall be retained until the such proceeding or extension is completed, a final

judgment is entered in such proceeding, or the relevant statute of limitations has expired, as the case may be ("Retained Records Retention Period").

**9.2.3 Transfer and Retention of Transferred Records by Purchaser.** To the extent and in a manner permitted by Law, upon the Closing, Seller shall be deemed to have assigned and transferred to (or, if necessary waived and released) to Purchaser all Transferred Records and any privilege with respect thereto and shall be deemed to have consented to Purchaser's retention of all such records, documents and materials. Purchaser agrees to comply with all applicable federal and state laws concerning privacy, including HIPAA, and shall use its best efforts to retain all applicable privileges. As set forth in Section 1.1.1(l), the Transferred Records are Assets. Purchaser shall retain the Transferred Records at the Hospitals (or as such other locations in Riverside County as Purchaser, in its sole discretion, shall determine from time to time) at Purchaser's cost, until the expiration, for each type and category of record, of the recommended retention period set forth in the CHA Retention Schedule, as amended from time to time. However, if at the expiration of any such period, any tax or Payor audit or judicial proceeding or any appeal therefrom is in process or the applicable statute of limitations has been extended, all or any portion of the Transferred Records affected by such audit, proceeding or extension shall be retained until the audit is completed, a final judgment is entered in such proceeding, or the relevant statute of limitations has expired, as the case may be ("Transferred Records Retention Period").

**9.2.4 Access to Hospital Businesses' Records.** After the Closing each party shall grant to the other party access to the party in possession of such records, which approval shall not be unreasonably withheld, delayed or conditioned, provided that neither party shall have access to any Hospital Businesses' Records, the disclosure of which would be prohibited by any Law, accreditation standard, rule or agreement (express or implied) of confidentiality. Notwithstanding the foregoing, in the event such access is prohibited by Law, Any Hospital Businesses' Records pertaining solely to the Excluded Assets that are in the possession of Purchaser except to the extent such access is prohibited by Law. Any Hospital Businesses' Records delivered to or made available to either party or its representatives shall be treated as strictly confidential and shall not be directly or indirectly divulged, disclosed or communicated to any other Person other than Seller or Purchaser, as the case may be, and its representatives who are reasonably required to have access to such information (unless Seller or Purchaser is compelled to disclose the same by judicial or administrative process), shall be returned to Purchaser or Seller, as the case may be, when such use therefor has terminated and shall not be used to the detriment of Purchaser or Seller, as the case may be. Each party shall instruct its appropriate employees to cooperate in providing access to such records to the other party and its authorized representatives as contemplated in this Agreement. Access to such records shall be, whenever reasonably possible, during normal business hours and with reasonable prior written notice of the time when such access shall be needed. Each party's employees, representatives and agents shall conduct themselves in such a manner so that the normal business activities of the other party shall not be unduly or unnecessarily disrupted.

**9.2.5 Joint Commission.** Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital Businesses and other information required by Seller for reporting to The Joint Commission, for the remainder of the applicable period in which the Closing has occurred.

- 68 -

- 69 -

10/30/2 2
F:\Data\WP\WP\ALLEA 10.30.DOC

10/30/2 2
F:\Data\WP\WP\ALLEA 10.30.DOC

**9.3    Provision of Benefits of Certain Contracts; Defense of Related Claims.**

9.3.1    Inability to Obtain Consents. If, as of the Effective Time, Seller is unable to obtain any consent to the assignment of Seller's interest in an Assumed Contract, or under any other consent needed to assign any other intangible right, notwithstanding any term in this Agreement to the contrary or the Bankruptcy Court fails to approve such assignment, such Assumed Contract shall not be assigned to Purchaser until such consent is obtained or new contract is obtained or a new contract is obtained by Purchaser prior to or following the Closing, Seller and Purchaser shall use Reasonable Commercial Efforts to cooperate with each other in efforts to obtain any such consent (including any release of Seller, as contemplated pursuant to Section 5.8) or new contract prior to or following the Closing. Without limiting the obligation of Seller to use its Reasonable Commercial Efforts to provide Purchaser the benefits of any such Assumed Contract, or other intangible interest transferred to Purchaser as part of the Assets, cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, and allow Purchaser to directly enforce such Assumed Contract against the applicable third parties thereto. To the extent that Purchaser shall use Reasonable Commercial Efforts to perform, on behalf of Seller, the obligations of Seller under such Assumed Contract, or other transferred intangible interests, to the extent that Purchaser obtains all of the benefits thereunder, but only to extent that such action would not result in a material default thereunder or in connection. Notwithstanding anything to the contrary herein, Seller shall have the right to obtain any consents unrelated to the Assumed Contracts and Purchaser agrees to indemnify, defend and hold Seller harmless with respect to such Assumed Contracts.

9.3.1    Defense of Certain Claims. If, in connection with my proposed Contract assumed by Purchaser, the other party (other than Seller) challenges the proposed assumption of such Contract ("Assumption Challenge(s)"), Seller shall not be obligated to litigate such challenges, in order to transfer such Contract, unless Purchaser agrees to cover Seller's reasonable legal fees and costs in connection with any Assumption Challenge; provided that if Purchaser elects to proceed with such legal fees and costs, it will be given the opportunity to participate in any negotiations or litigation related to the Assumption Challenge, and Seller shall meet, confer and take counsel from Purchaser with respect to the handling and resolution of such litigation. In such event, Purchaser shall defend, indemnify and hold Seller harmless of and from any fees, costs, expenses and other liability with respect to any litigation related to an Assumption Challenge ("Assumption Litigation"), including any settlement of an Assumption Litigation of Purchaser to participate in the Assumption Litigation, then Purchaser will have full control of such defense and proceedings, including any compromise or settlement thereof. Seller may, at its sole cost and expense, participate in, but not control, any defense or settlement of any Assumption Litigation controlled by the Purchaser pursuant to this Section to the extent such participation is not prejudicial, in the reasonable judgment of the Purchaser, to the Purchaser or the possible outcome of the Assumption Litigation. If requested by Purchaser, Seller agrees to fully cooperate with the Purchaser and its counsel in contesting any Assumption Challenge and/or in defending or prosecuting any Assumption Litigation, Seller agrees that it shall not take any such action that is prejudicial to Purchaser or its defense against the Assumption Litigation.

9.4    Closing of Financials. Purchaser shall complete the standardized closing of Seller's financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "Closing of Financials"). Purchaser shall use its good faith efforts to complete the Closing of Financials by no later than the date which is sixty (60) days after the Closing Date. Purchaser shall reasonably make available to Seller those employees of

Purchaser who may be necessary to complete the Closing of Financials, at no cost to Seller. Seller shall hold Purchaser harmless for any errors which are made by Seller during the course of the Closing of Financials, provided that such errors are not the result of gross negligence, fraud or intentional misconduct. In addition, Purchaser shall afford to the agents of Seller (which shall include accountants) reasonable access during normal business hours to and the right to inspect the books and records of the Hospital Businesses to verify the Closing of Financials. Seller's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital Businesses.

9.5    Employee Transition. Purchaser acknowledges that Seller will, on the Closing Date, provide each of the Hospital Businesses' Employees a payroll check (with respect to all wages, salaries and Accrued Paid Time Off) covering all pay periods through the Closing Date, which check will include an amount based upon an estimate of time worked through the Closing Date (the "Estimated Payment Amount"), together with a payment of all other amounts required to be paid to a terminated employee or may be required by Law (including but not limited to the Accrued Paid Time Off-Amount). Within five (5) business days after the Closing Date, Seller shall deliver to Purchaser a statement setting forth, in reasonable detail, the Estimated Payment Amount for each of the Hospital Businesses' Employees. No later than the date of the next immediately following payroll for the Hired Employees which occurs after Purchaser's receipt of such statement, Purchaser shall include in the payroll check for each of the Hospital Businesses' Employees who are among the Hired Employees an amount of pay, if any, based on the actual time worked by each such employee during the applicable payroll cycle ending on the Closing Date, less the Estimated Payment Amount which Seller made to each such employee on the Closing Date (the "Employee Settle-Up Payments"). Seller shall reimburse Purchaser the amount of the Employee Settle-Up Payments no later than the date which is thirty (30) days after Purchaser provides a written statement to Seller which details and evidences the payment of) the Employee Settle-Up Payments.

9.6    Medicare Bad Debts.

9.6.1    With respect to any service provided at the Hospital Businesses as to which Purchaser elects to take assignment of Seller's provider number, Seller shall be entitled to receive Medicare bad debt reimbursement associated with services furnished prior to the Effective Time ("Seller's Bad Debt"). Seller shall have the right, in its sole discretion, to require that Purchaser submit a claim for reimbursement to the Centers for Medicare & Medicaid Services ("CMS") for a Seller's Bad Debt on Purchaser's cost report(s) for the period in which such Seller's Bad Debt becomes uncollectible by Seller.

9.6.2    If Seller requests that Purchaser submit one or more Seller's Bad Debt claims to CMS, as contemplated by this Section 9.6, Seller shall provide to Purchaser a list of the Seller's Bad Debts to be claimed with a certification reasonably acceptable to Purchaser and Seller.

9.6.3    Purchaser shall remit to Seller the full amount of reimbursement received by Purchaser for Seller's Bad Debts within ten (10) business days of receipt of payment pursuant to an initial or a revised Notice of Program Reimbursement in which Seller's Bad Debts have been paid.

9.7    Covenant Not to Compete. For the twenty (20) year period commencing on the Effective Time, Seller hereby covenants and agrees as follows:

9.7.1 Except as the parties shall otherwise mutually agree, neither Seller nor any Affiliate of Seller (nor any assignee or successor thereto other than Purchaser) shall own, manage or operate, directly or indirectly, any business, or own, directly or indirectly, any interest in any Person (whether or not such Person is a governmental agency or a not-for-profit organization), which engages in the development, ownership, operation or management of any health care provider for which a technical or facility fee is or could be paid (including, without limiting the generality of the foregoing, (i) general or acute care hospitals (ii) skilled nursing facilities or (iii) surgical centers and diagnostic imaging centers) in the territories specified in Section 9.7.3 below (all such entities other than the parties hereto are hereinafter collectively referred to as "Competitors" and all such health care providers are hereinafter collectively referred to as "Healthcare Providers"); provided, however, Seller shall have the right to continue to provide healthcare outreach, education, non-profit clinics or similar community health support activities which do not involve services which are provided by Healthcare Providers.

9.7.2 Neither Seller nor any Affiliate (nor any assignee or successor thereto) shall directly or indirectly (i) lend credit or money, or other assets or the services of its employees or agents or disclose any information concerning the Hospital Businesses and the Assets pertaining to any period of time on or prior to the Closing for the purpose of assisting another to establish, operate or manage any Competitor or Healthcare Provider including, without limitation, providing physician staffing or management or consulting services for any Competitor or Healthcare Provider, except for those existing educational and research affiliations and institutional working arrangements (and the physician cancer services (by types of cancers being treated) associated therewith) set forth on Schedule 9.7.2 or with an Affiliate of Purchaser, or (ii) on behalf of itself or any Competitor or Healthcare Provider request or advise any present or future referrer or admitting physician or supplier of the Hospital Businesses to withdraw, curtail or cancel treatment or business with the Hospital Businesses (except for medical reasons).

9.7.3 The covenants of Seller under this Section 9.7 shall be limited to cover competition within areas within a thirty (30) mile radius of each of the Hospitals. Anything to the contrary in this Section 9.7 notwithstanding, the following shall not constitute a violation of this Section 9.7: The ownership of not more than 1% of the capital stock of any corporation whose common stock is listed on an established domestic securities market.

9.7.4 Seller acknowledges and agrees that its covenants set forth in this Section 9.7 form part of the consideration under this Agreement and are among the inducements for Purchaser entering into and consummating this Agreement, that the provisions of this Section 9.7 are necessary to protect the interests of Purchaser and the continued goodwill of the business and operations of the Hospital Businesses, that, interest in which the Purchaser is hereby acquiring, that the restrictive covenants set out in this Section 9.7 are reasonable and that the provisions of this Section 9.7 are for the benefit of, and may be enforced by, Purchaser and its Affiliates and their successors and assigns.

9.7.5 Seller hereby agrees that a material breach of the covenants contained in this Section 9.7 will result in irreparable harm and damages to Purchaser which cannot be adequately compensated for by a monetary award and that in addition to all other remedies available in law or in equity Purchaser and its Affiliates and their successors and assigns shall be entitled to the remedy of a temporary restraining order, preliminary injunction or such other form or injunctive or equitable relief as may be issued by a court of competent jurisdiction to restrain or enjoin Seller and any

1570039.3   P:\M\MPRINTVAL\624.19.1.050.DOC

Affiliates of Seller from breaching the provisions of this Section 9.7 or otherwise to specifically enforce the provisions of this Section 9.7.

9.7.6 Seller agrees that if any restriction contained in this Section 9.7 is held by any court of competent jurisdiction to be unenforceable or unreasonable, such a lesser restriction as determined by such court to be enforceable shall be severable therefrom and enforced in its place, and the remaining restrictions contained in this Agreement shall be enforceable independently of each other. If a court or other tribunal determines that the character, duration or geographical scope of such provisions is unreasonable, then it is the intention and the agreement of the parties that such provisions will be construed and reformed in such a manner as to impose only those restrictions on the conduct of a Party that are reasonable in light of the circumstances as they then exist and as are necessary to assure the Purchaser of the intended benefit of this Agreement. The court or tribunal will be authorized to reform the provisions of this section to the extent necessary to eliminate or modify any provisions in order to render them to be unreasonable or unenforceable.

ARTICLE X
SURVIVAL AND INDEMNIFICATION

10.1 Survival. Except as expressly set forth in this Agreement to the contrary, all representations, warranties, covenants, agreements and indemnifications of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall be deemed to be material and to have been relied upon by Purchaser and Seller, respectively, and such representations, warranties and covenants shall continue to be fully effective and enforceable following the Closing Date for one (1) year and shall not be merged into the documents evidencing the transactions contemplated by this Agreement and the Related Agreements. The foregoing notwithstanding, the following sections and articles shall continue to be fully effective and enforceable following the Closing Date without any time limitation unless otherwise expressly provided in this Agreement or provided under applicable statutes of limitation: (a) the representations contained in Section 2.1 (Seller's authority), Section 2.6.2 (Environmental), Section 2.7 (Title to Personal Property), Section 2.15 (Taxes), Section 3.1 (Purchaser's authority), Section 3.6 (AS-IS) and Section 3.8 (Chapter 7 Proceeding); (b) the terms of Sections 4.12, 4.15, 5.4, 5.5, 5.7, 5.9, 5.14, 5.16 and Article IX (post-closing obligations, subject to their own stated terms of survival, if any) and Article XII (miscellaneous); and Section 11.2 (cost report matters); and (c) the indemnification contained in Sections 1.3.6, 1.9.7, 1.10.2, 4.12.2, 4.12.3, 5.2.3, 5.9, 5.16, 10.2, 10(b), (d), and (f), and 10.3, (e), (g), (f), and (h) and any indemnification claims contained elsewhere in this Agreement. Furthermore, notwithstanding the preceding or any other term in this Agreement to the contrary, the Parties acknowledge and agree that the post-closing commitments set forth in Sections 5.9 and 5.14, and all subsections thereof, shall expire based upon the stated terms therein. However, if there is an outstanding notice of a claim at the end of such period in compliance with the terms of Section 10.4, such applicable period will expire until such claim until such claim is resolved. All statements contained in any certificate or instrument delivered pursuant hereto by or on behalf of Seller, or by or on behalf of Purchaser, shall be deemed to be representations and warranties made pursuant to this Agreement by the delivering party.

10.2 Indemnification of Purchaser by Seller.

10.2.1 Indemnification. Seller shall keep and save Purchaser, and its directors, officers, employees, agents, partners, members and other representatives, forever harmless from and

1570039.3   P:\M\MPRINTVAL\624.19.1.050.DOC

shall indemnify and defend Purchaser against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees (collectively, "**Damages**"), to the extent connected with or arising or resulting from: (i) any material breach of any representation or warranty of Seller under this Agreement; (c) the Excluded Liabilities; (d) any Federal, state and local Taxes relating to Seller ("**Seller Tax Claims**"); (f) any professional liability claim arising out of the business operations of the Hospital Businesses prior to the Effective Time, (h) any and all reasonable costs, expenses, and other damages incurred in enforcing Purchaser's right to indemnification under this Agreement, and (g) any other matter in which indemnification by Seller is specifically provided in this Agreement or a Related Agreement. Seller's obligations under this Section 10.2.1 shall remain subject to, and shall be limited by, the provisions contained in Section 10.2.2. No provision in this Agreement shall prevent Seller from pursuing any of its legal or equitable rights or remedies that may be granted to Seller by law or in equity against any person or legal entity other than Purchaser.

10.2.2   Limitations of Seller's Liability. Notwithstanding Section 10.2.1, or any other provision under this Agreement, Seller's indemnification obligations in accordance with Section 10.2.1 are limited as follows:

(a)   Seller shall have no liability under Section 10.2.1 and no claim under Section 10.2.1 shall be made unless notice thereof shall have been given by or on behalf of Purchaser to Seller in the manner provided in Section 10.4, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests.

(b)   Seller shall not be required to indemnify Purchaser from and against any losses under Section 10.2.1(a) above unless and until the amount of all such losses equals (or is reasonably expected to equal or exceed) Fifty Thousand and 00/100 Dollars ($50,000.00), (the "**Threshold Amount**") and shall only be obligated to indemnify with respect to amounts that exceed the Threshold Amount.

(c)   Seller shall have no liability under Section 10.2.1 and no claim under Section 10.2.1 shall be made (i) to the extent of any tax savings realized by Purchaser with respect thereto, (ii) for any losses to the extent of any proceeds received by Purchaser under an insurance policy covering such loss, or (iii) to the extent that Purchaser can prove that Purchaser had full knowledge, prior to Closing, of the issues giving rise to an indemnification claim, under Section 10.2.1(c).

10.2.3   Claims Against Third Parties. If Purchaser is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Seller under this Agreement, Purchaser shall use its Reasonable Commercial Efforts to recover such sum from such third party and any such sum recovered will reduce the amount of the claim. If Seller pays to Purchaser an amount in respect of a claim, and Purchaser subsequently recovers from a third party a sum which is referable to that claim, Purchaser shall forthwith repay to Seller so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by

- 74 -

Purchaser in obtaining payment in respect of that claim and in recovering that sum from the third party.

10.3   Indemnification by Purchaser. Purchaser shall keep and save Seller, and Seller's respective directors, officers, employees, agents and other representatives, forever harmless from and shall indemnify and defend Seller and Seller's Affiliates against any and all Damages, to the extent connected with or arising or resulting from: (a) any breach of any representation or warranty of Purchaser under this Agreement; (b) any breach or default by Purchaser under any covenant or agreement of Purchaser under this Agreement; (c) cost reports (and all claims with respect thereto) relating to the Hospital Businesses with respect to Medicare, Medicaid, or any other third-party payor for all periods beginning on or after the Effective Time; (d) the Assumed Obligations, including any liabilities related to Assumed Other Liabilities, (e) any professional liability claim arising out of the business operations of the Hospital Businesses on and after the Effective Time; (f) any act, conduct or omission of Purchaser that has accrued, arisen, occurred or come into existence at any time; (g) any other matter in which indemnification by Purchaser is specifically provided in this Agreement or a Related Agreement; (h) any securities or lender litigation involving (1) Purchaser and/or (2) any financing obtained by Purchaser which is utilized to fund, in whole or in part, the Deposit, other than to the extent arising out of any willful misconduct of Seller or its employees, or intentionally false or intentionally misleading statements of Seller or its employees, or (i) any and all reasonable costs, expenses, and other damages incurred in enforcing Seller's right to indemnification under this Agreement or the Related Agreements. No provision in this Agreement shall prevent Purchaser from pursuing any of its legal or equitable rights or remedies that may be granted to Purchaser by law or in equity against any person or legal entity other than Seller or any Affiliate of Seller.

10.3.2   Limitations of Purchaser's Liability. Notwithstanding Section 10.3.1 or any other provision under this Agreement, Purchaser's indemnification obligations in accordance with Section 10.3.1 are limited as follows:

(a)   Purchaser shall have no liability under Section 10.3.1 and no claim under Section 10.3.1 shall be made unless notice thereof shall have been given by or on behalf of Seller to Purchaser in the manner provided in Section 10.6, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests.

(b)   Purchaser shall not be required to indemnify Seller from and against any losses under Section 10.3.1 above (except as it relates to Sections 3.6 and 3.11) unless and until the amount of such losses equals (or is reasonably expected to equal or exceed) the Threshold Amount and shall only be obligated to indemnify Seller with respect to amounts which exceed the Threshold Amount.

(c)   Purchaser shall have no liability under Section 10.3.1 and no claim under Section 10.3.1 shall be made (i) to the extent of any tax savings realized by Seller with respect thereto, (ii) for any losses to the extent of any proceeds received by Seller under an insurance policy covering such loss, or (iii) to the extent that Purchaser can prove that Purchaser had full knowledge, prior to the Closing, of the issues giving rise to an indemnification claim under Section 10.3.1(c).

- 75 -

10.3.3  Claims Against Third Parties.  If Seller is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Purchaser under this Agreement, Seller shall use its Reasonable Commercial Efforts to recover such sum from such third party and any sum recovered will reduce the amount of the claim. If Purchaser pays to Seller an amount in respect of a claim, and Seller subsequently recovers from a third party a sum which is referable to that claim, Seller shall forthwith repay to Purchaser so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Seller in obtaining payment in respect of that claim and in recovering that sum from the third party.

10.4  Method of Asserting Claims.  All claims for indemnification by any person entitled to indemnification (the "Indemnified Party") under this Article X will be asserted and resolved as follows:

10.4.1  Third Party Claims.  In the event any claim or demand, for which a party hereto (an "Indemnifying Party") would be liable for the Damages to an Indemnified Party, is asserted against or sought to be collected from such Indemnified Party by a person other than Seller, Purchaser or their affiliates (a "Third Party Claim"), the Indemnified Party shall deliver a notice of its claim ("Claim Notice") to the Indemnifying Party within thirty (30) calendar days after the Indemnified Party receives written notice of such Third Party Claim; provided, however, that notice shall be provided to the Indemnifying Party within fifteen (15) calendar days after receipt of a complaint, petition or institution of other formal legal action by the Indemnified Party. The Indemnified Party shall provide the Indemnifying Party with a copy of such claim and other documents referred to therein (and of all documents in its possession relating thereto) that the Indemnified Party has received in connection with the same. If the Claim Notice is not based on a claim from a Third Party, the Claim Notice shall state the basis for which indemnity is sought and, upon request otherwise make available to the Indemnifying Party all relevant information material to the defense of such claim and within the Indemnified Party's possession. If the Indemnified Party fails to provide the Claim Notice within such applicable time period after the Indemnified Party receives written notice of such Third Party Claim and thereby materially impairs the Indemnifying Party's ability to protect its interests, the Indemnifying Party will not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim. The Indemnifying Party will notify the Indemnified Party within thirty (30) calendar days after receipt of the Claim Notice (the "Notice Period") whether the Indemnifying Party desires, at its sole cost and expense of the Indemnifying Party to defend the Indemnified Party against such Third Party Claim.

(a)  Indemnifying Party Control.  If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party with respect to such Third Party Claim pursuant to this Section 10.4.1(a), then the Indemnifying Party will have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party. The Indemnifying Party will have full control of such defense and proceedings, including any compromise or settlement thereof. Notwithstanding the foregoing, the Indemnifying Party, at its sole cost and expense, file during the Notice Period any motion, answer or other pleadings that the Indemnified Party may deem necessary or appropriate to protect its interest or those of the Indemnifying Party and which is not prejudicial, in the reasonable judgment of the Indemnifying Party, to the Indemnifying Party. Except as provided in Section 10.4.1(b) of this Agreement, if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is

adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations under this Agreement with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action. If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-claim against any person. The Indemnifying Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 10.4.1(a), and except as specifically provided in this Section 10.4.1(a), the Indemnified Party will bear its own costs and expenses with respect to such participation.

(b)  Indemnified Party Control.  If the Indemnified Party fails to notify the Indemnifying Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section 10.4.1, or if the Indemnifying Party gives such notice but fails to prosecute diligently or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be promptly and reasonably prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party. The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that the Indemnified Party, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnifying Party or any of its affiliates). Notwithstanding the foregoing provisions of this Section 10.4.1(b), if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party in the manner provided in Section 10.4.1(b) of this Agreement, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this Section 10.4.1(b) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation. Subject to the foregoing, under this Section 10.4.1(b), the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 10.4.1(b), and the Indemnifying Party will bear its own costs and expenses with respect to such participation. The Indemnified Party shall give sufficient prior notice to the Indemnifying Party of the initiation of any discussions relating to the settlement of a Third Party Claim to allow the Indemnifying Party to participate therein.

(c)  Settlements.  Where the Indemnifying Party has assumed control of the defense as provided above, the Indemnifying Party shall have the right to settle or compromise any such claim in its sole and absolute discretion and without consultation with the Indemnified Party so long as such settlement or compromise does not impose any obligations on the Indemnified Party (except with respect to providing releases of the third party and receiving a release from the third party). The Indemnified Party shall not settle or compromise the claim without satisfying one of the following conditions (otherwise the Indemnifying Party shall be released from all

- 75 -

- 77 -

Indemnification obligations under this Agreement to the Indemnified Party with respect to such claim): (a) the Indemnified Party shall fail to obtain the written consent of the Indemnifying Party, or (b) the Indemnifying Party shall have failed, after written notice to perform such obligations, to take action to defend the same within the 15-day period described above.

10.4.2  Non-Third Party Claims. In the event any Indemnified Party should have a claim against any Indemnifying Party under this Agreement that either (i) does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnifying Party or (ii) is a Seller Tax Claim, the Indemnified Party shall deliver an Indemnity Notice (as hereinafter defined) to the Indemnifying Party. The Indemnity Notice shall mean written notification of a claim for indemnity under Article X of this Agreement (which does not involve a Third Party Claim or is a Seller Tax Claim) by an Indemnified Party to an Indemnifying Party pursuant to Section 10.4, specifying the nature of and specific basis for such claim and the amount or the estimated amount of such claim). The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights under this Agreement except to the extent that an Indemnifying Party demonstrates that it has been prejudiced thereby.

10.4.3  Deemed Liability. If the Indemnifying Party does not notify the Indemnified Party within sixty (60) calendar days following its receipt of a Claim Notice or an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party under this Agreement, such claim specified by the Indemnified Party will be conclusively deemed a liability of the Indemnifying Party under this Agreement and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or on such later date (i) in the case of a Third Party Claim, as the Indemnified Party suffers the Damages in respect of such Third Party Claim, (ii) in the case of a Indemnity Notice, in which the amount of the claim is estimated, when the amount of such claim becomes finally determined or (iii) in the case of a Seller Tax Claim, within fifteen (15) calendar days following final determination of the Party giving rise to the claim for indemnity. If the Indemnifying Party timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party agree to proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations, such dispute will be resolved by adjudication by a court or similar tribunal.

10.4.4  Access. The Indemnified Party agrees to give the Indemnifying Party reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought under this Agreement, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations under this Agreement.

10.4.5  Assistance. The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any person or entity in connection with the subject matter of any litigation subject to indemnification under this Agreement. In addition, the Indemnified Party shall, upon request by the Indemnifying Party or counsel selected by the Indemnifying Party (without payment of any fees or expenses to the Indemnified Party or an employee thereof), attest meetings and trials, assist in the securing and giving of evidence, assist in obtaining the attendance or cooperation of witnesses, and make available its own personnel; and shall do whatever else is reasonably necessary and appropriate in connection with such litigation. The Indemnified Party shall not make any demand upon the Indemnifying Party or counsel for the

- 78 -

Indemnifying Party in connection with any litigation subject to indemnification under this Agreement, except a general demand for indemnification as provided under this Agreement. If the Indemnified Party shall fail to perform such obligations as Indemnified Party under this Agreement or to cooperate with the Indemnifying Party in Indemnifying Party's defense of any suit or proceeding, such cooperation to include, without limitation, attendance at all depositions and the provision of all documents relevant to the defense of any claim, then, except where such failure does not have a Material Adverse Effect on the Indemnifying Party's defense of such claims, the Indemnifying Party shall be released from all of its obligations under this Agreement with respect to that suit or proceeding and any other claims which had been raised in such suit or proceeding.

10.5  Exclusive. Other than claims for fraud or equitable relief (which equitable relief claims are nevertheless subject to Section 10.1), any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any party as a result of the actions or failure to act by any other party shall, unless otherwise specifically stated in this Agreement, be governed solely and exclusively by the provisions of this Article X. If Seller and Purchaser cannot resolve such claim by mutual written agreement, such claim shall be determined in accordance with Section 12.18.

## ARTICLE XI
## TAX AND COST REPORT MATTERS

11.1  Tax Matters; Allocation of PEPC.

11.1.1  Tax Matters. After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax allocation and reporting. The Parties shall also make available to each other as reasonably requested, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters.

11.1.2  Allocation of PEPC. Purchaser will prepare the schedule allocating the PEPC among each category of Assets. To the extent that such allocation by Purchaser is consistent with applicable Laws, the Parties agree to be bound by all such reasonable allocations by Purchaser to account for and report the purchase and sale of the Assets contemplated hereby for federal and state tax purposes in accordance with such allocations, and not to take a position in tax returns, tax audits, or other tax proceeding(s), which is inconsistent with such allocations without the prior written consent of the other parties.

11.2  Cost Report Matters.

11.2.1  Final Cost Reports. Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, Blue Cross and other third party payors which settle on a cost report basis (the "Seller Cost Reports"). It is understood that, while pursuant to applicable Laws, Seller shall remain responsible for all such payments and may not assign to Purchaser any such receivable Purchaser is acquiring, all of Seller's other Accounts Receivable and, as Assumed Obligations, all of Seller's obligations, and that Purchaser shall reimburse Seller all amounts which may be due and shall be entitled to the benefit of all amounts received by Seller, and shall

- 79 -

immediately remit to Purchaser any amounts received, and shall pursuant to Section 4.1.2.2 of this Agreement. Accordingly, Purchaser shall make available to Seller such of the Hired Employees as may be necessary in order to provide accounting and other services necessary to remit such Seller Cost Reports, at no cost to Seller. Purchaser shall also engage such outside consultants as may be necessary in connection to properly deal with reviews and audits by such governmental bodies to such Seller Cost Reports, consistent with prior practice of Seller, at no cost to Seller. Purchaser shall forward to Seller any and all correspondence relating to the Accounts Receivable, the Seller Cost Reports or rights to settlements and retroactive adjustments on the Seller Cost Reports ("Agency Settlements") within five (5) business days of receipt by Purchaser. Purchaser shall reply to any such correspondence without Seller's written approval, which shall not be unreasonably withheld. Seller shall remit to Purchaser all amounts received with respect to periods prior to the Closing Date, and Purchaser shall remit to Seller all amounts required to be paid with respect to periods prior to the Closing Date, as provided in Section 4.1.2.2 of this Agreement.

11.2.2 Right to Funds. Seller shall retain all rights to the Seller Cost Reports and to the Accounts Receivable, including, without limitation, any payables resulting therefrom or receivables relating thereto and the right to appeal any Medicare determinations relating to the Agency Settlements and the Seller Cost Reports. Seller will furnish copies of the Receivables Records to Purchaser upon request and allow Purchaser and its representatives reasonable access to such documents.

11.2.3 Cooperation. Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in regard to the preparation, filing, handling, and appeals of the Seller Cost Reports. Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relative to governmental program reimbursement. Such cooperation shall include, at no cost to Seller, obtaining files in the Hospital Businesses and Purchaser's provision to Seller of data and statistics, including, without limitation, the items set forth on Schedule 11.2.3 and the coordination with Seller pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings.

11.3 Tax and Medicare Effect. Except as otherwise provided in this Agreement, neither party (nor such party's counsel or accountant) has made or is making any representation to the other party (or such party's counsel or accountant) concerning any of the Tax or Medicare effects arising by reason of the transactions provided for in this Agreement or any Related Agreement, as such party has obtained independent professional advice with respect thereto and upon which it has solely relied. Except as otherwise provided in this Agreement, no party shall be liable or in any way responsible to any other party because of any Tax or Medicare effect resulting from the transactions provided for in this Agreement or any Related Agreement, and each party shall be responsible for the payment of any Tax or Medicare related charge or payment for which it becomes liable by reason of the consummation of the transactions provided for in this Agreement and any Related Agreement.

11.4 [Intentionally omitted]

11.5 Misdirected Payments, etc. Within thirty (30) days of receipt, Seller shall remit to Purchaser any monies received by the Seller constituting or in respect of the Assets and Assumed Obligations. Within thirty (30) days of receipt, Purchaser shall remit any monies received by Purchaser constituting or in respect of the Excluded Assets and Excluded Liabilities, provided,

- 80 -

however, (i) Purchaser shall only be obligated to remit such monies twice per calendar month during the first ninety days after the Closing Date and only once per calendar month thereafter, and (ii) for any time period while the Lease and Management Agreement is in effect, the obligation to remit such monies received by Purchaser shall be governed by the terms and provisions of the Lease and Management Agreement. If Purchaser suffers any deduction to or offset against amounts due Purchaser of funds previously paid or credited to Seller or the Hospital Businesses in respect of Excluded Liabilities, Seller shall immediately pay to Purchaser the amounts so billed or offset upon demand from Purchaser.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

12.1 Further Assurances and Cooperation. Each Party shall execute, acknowledge and deliver to the other any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by the other and shall take any and all other actions reasonably requested by the other for the purpose of consummating the Transaction or more effectively assigning, transferring, granting, conveying and confirming the transfer of Assets to the Purchaser or effecting or preserving any right of a Party. After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2 Successors and Assigns. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of, and be enforceable by and against the respective successors and assigns of the Parties. Neither Party, however, may assign, in whole or part, any of its rights or delegate any of its duties under this Agreement or a Related Agreement without the prior written consent of the other Party, provided that Purchaser may finance the purchase of the Assets through a purchasing group which will include one or more real estate companies and operating companies for each of the Hospital, which companies (collectively, the "Purchasing Group Companies") are expected to include other investors, including real estate investment trusts, other real estate investors and a cross section of participating local physicians. Accordingly, Seller agrees that Purchaser may assign some or all of its rights, duties and obligations under this Agreement and the Related Agreements to one or more Purchasing Group Companies, provided that, prior to any such assignment occurring or taking effect, (i) Purchaser shall provide written notice to Seller detailing the terms and conditions relating to such assignment, including the local physicians participating in the Purchasing Group Companies, (ii) the applicable Purchasing Group Companies sign and deliver to Seller an agreement pursuant to which the Purchaser and the Purchasing Group Companies all agree to be jointly and severally responsible for each and every obligation, duty and right of Purchaser under said Agreement and the Related Agreements, which agreement shall be (i) in form and substance reasonably acceptable to Seller, and (iii) executed by Purchaser and the applicable Purchasing Group Companies.

12.3 Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California as applied to contracts made and performed within the State of California. The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of California and applicable federal Laws described under Laws or as applicable in the Chapter 9

- 81 -

Proceeding shall apply to such dispute, and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement. Subject to Section 12.18.2, venue shall be in the County of Riverside, State of California.

12.4    Amendments. This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5    Exhibits, Schedules and Disclosure Schedule. The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference in this Agreement. From the Effective Date until the Closing, the Parties agree that Seller may update the Disclosure Schedule subject to Article VIII. Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply.

12.6    Notices. Any notice, demand or communication required, permitted, or desired to be given under this Agreement shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

If to Purchaser:

    Physicians for Healthy Hospitals, Inc.
    1525 West Florida, Suite A
    Hemet, California 92543
    Attention: Sreenivas Nakka, M.D., President

With a simultaneous copies to:

    Steven Wade
    400 N. Mountain Ave., Suite 214B
    Upland, California 91786
    Telephone: (909) 985-6500
    Facsimile: (909) 985-2865

and

    Todd Swanson
    Hooper, Lundy & Bookman, Inc.
    1875 Century Park East, Suite 1600
    Los Angeles, California 90067
    Telephone: (310) 551-8195
    Facsimile: (310) 551-8181

If to Seller:

    Chairman of the Board
    Valley Health System
    1117 East Devonshire Avenue
    Hemet, CA 92543
    Telephone: (951) 765-4844
    Facsimile: (951) 765-4745

- 82 -

10700393.2                                P:\Rush\MWN\FINAL.654.10.13.08.DOC

---

With a simultaneous copy to

    John B. Marshall, Esq.
    Lewitt, Hackman, Shapiro, Marshall & Harlan
    16633 Ventura Blvd., Suite 1100
    Encino, CA 91436
    Telephone: (818) 907-3228
    Facsimile: (818) 981-4764

or at such other address as one party may designate by notice under this Agreement to the other parties.

12.7    Headings. The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

12.8    Confidentiality and Publicity. Any information that a Party or its Affiliates, agents or representatives furnish to another Party in connection with the transactions contemplated pursuant to this Agreement, whether furnished before or after the Effective Date, and all notes, analyses, compilations, studies and other documents, whether prepared by the receiving Party or others, which incorporate, summarize, contain or otherwise reflect or refer to such information shall be referred to collectively as "Confidential Material". The term "Confidential Material" does not include information which (i) becomes generally available to the public other than as a result of a disclosure by the receiving Party or its affiliates or representatives, (ii) was rightfully available to the receiving Party on a non-confidential basis prior to its disclosure to thereceiving Party by the disclosing Party, (iii) becomes rightfully available to the receiving Party on a non-confidential basis from a source other than the disclosing Party, provided that such source is not bound by a confidentiality agreement with any of said Parties or otherwise prohibited from transmitting the information to the receiving Party by a contractual, legal or fiduciary obligation, or (iv) any information which Seller's counsel deems to be covered by the California Public Records Law (Government Code Section 54000 et seq.) or the Ralph M. Brown Act (Government Code Section 56000 et seq.).

12.8.1    Each receiving Party shall treat the Evaluation Material it receives under this Agreement confidentially in accordance with the terms of this Agreement, subject to Seller's obligations under the California open records laws (Govt. Code §§6250 et seq) and open meetings laws (Govt. Code §§54950 et seq). Each receiving Party shall not, and shall direct its directors, officers, agents and employees who become privy to Evaluation Material not to, disclose any of the Evaluation Material relating to the disclosing Party to any person who is not a direct participant in the evaluation or consummation of the transactions contemplated hereby. The term "person" issued in this Section 12.8 shall be broadly interpreted to include, without limitation, any corporation, company, partnership, trust or individual. Each receiving Party shall direct its Affiliates, directors, officers, employees and representatives who become privy to Evaluation Material not to, use any of the Evaluation Material relating to the disclosing Party for any reason or purpose other than to evaluate or consummate the transactions contemplated pursuant to this Agreement.

12.8.2    In the event a termination of this Agreement, at the request of a disclosing Party, a receiving Party shall return or destroy or return to the disclosing party all Evaluation Material, except that each Party may retain a single copy of the Evaluation Material in

- 83 -

10700393.2                                P:\Rush\MWN\FINAL.654.10.13.08.DOC

**12.11 Third Party Beneficiary.** None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

**12.12 Expenses and Attorneys' Fees.** Each party shall bear and pay its own costs and expenses relating to the transactions contemplated by, or in performance of or compliance with any condition or covenant set forth in, this Agreement. In determining the costs and expenses of each party under this Agreement, the following rules shall apply: (a) all costs of the Preliminary Title Reports, and a Title Policy shall be paid by Seller up to an amount equal to the amount Seller would have incurred if the Title Policy were a standard coverage owner's policy of title insurance (that deleted survey exceptions) at an insurable value not to exceed the fair market value of the Real Property as set forth in the appraisal obtained by Seller as described in Section 1.4.17 and the remaining costs of the Title Policy, if any, shall be borne by Purchaser; (b) all costs of the Title Surveys shall be borne by Purchaser; (c) all costs of the Environmental Surveys (including Phase I and Phase II Assessments, if Purchaser so elects) shall be borne by Purchaser; (d) all documentary transfer taxes, recording fees, and other transfer taxes shall be paid by Purchaser; (e) all filing fees payable in connection with submissions to governmental agencies relating to the approval of the transactions contemplated hereby shall be paid by Purchaser; (f) all escrow charges and related fees shall be borne by Purchaser; (g) all sales and use taxes shall be borne by Purchaser; and (h) all other costs, charges and expenses shall, except as otherwise provided in this Agreement, be allocated between Purchaser and Seller in accordance with the customs of Riverside County, which is the County in which the Real Property is located.

**12.13 No Offset.** Neither Purchaser nor Seller (and their respective successors, assigns and affiliates) shall have the right to offset amounts payable under this Agreement against, nor shall Purchaser or Seller have the right to contest an obligation to transfer, satisfy, release, pay-off, assign and convey to Seller or Purchaser or Purchaser's behalf because of outstanding claims, liabilities or obligations asserted by Purchaser or Seller including but not limited to pursuant to the indemnification provisions of Section 10.2.

**12.14 Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes of this Agreement and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought under this Agreement.

**12.15 Entire Agreement.** This Agreement, the Related Agreements, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, letters of intent, understandings, representations and statements, oral or written, between the parties on the subject matter of this Agreement (the "Superseded Agreements"), which Superseded Agreements shall be of no further force or effect.

**12.16 No Waiver.** Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition. The subsequent acceptance of performance under this Agreement by a party shall not be deemed to be a waiver of any preceding material breach

- 85 -

a confidential business archive in accord with prudent recordkeeping practice and for use in resolving potential disputes under this Agreement. Notwithstanding the foregoing, in the event that this Agreement is terminated and the Alternative Transaction shall be effected, then the Purchaser shall return all managed care and insurance contracts provided to it by Seller and all pricing material related to the sale of goods or services of Hemet Valley Medical Center to Seller, and such other materials delivered by Seller to Purchaser or compilation or summaries of same prepared by Purchaser that are related to competitive matters as Seller may reasonably designate shall be further delivered or destroyed as Seller may request prior to the consummation of the Alternative Transaction.

12.8.3 In the event that a receiving Party or any of its Affiliates are requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process or by applicable laws and regulations or stock exchange rules or by a governmental authority) to disclose any information supplied to it in the course of its dealings with the disclosing Party or any of such disclosing Party's agents or representatives, such receiving Party shall provide the disclosing Party with prompt notice of such request(s) or requirement(s) so that the disclosing Party may seek an appropriate protective order and assert any legal privilege against disclosure and/or waive such receiving Party's full compliance with the provisions of this Agreement. If in the absence of a protective order or of the receipt of a waiver under this Agreement, such receiving Party is nonetheless, in the reasonable opinion of its counsel, compelled to disclose information concerning the disclosing Party or else stand liable for contempt or suffer other censure or penalty, after so advising the disclosing party, the receiving Party may disclose such information without liability under this Agreement.

12.8.4 Notwithstanding the preceding, Purchaser may continue to communicate with its existing investors and existing and prospective funding sources, including without limitation real estate investment trusts or other real property investors/lenders, provided that they shall accept the confidentiality provisions of this Section 12 in writing.

12.8.5 Because this Agreement will be subject to the California Public Records Act (California Government Code Section 6250, et seq) and because some of the information to be contained in the Schedules to this Agreement, and the documents contained in them, may be subject to disclosure pursuant to the California Public Records Act (e.g. certain personnel information, patient medical records, medical peer review committee records, medical quality improvement records, confidential attorney-client communications, and other matters exempted from disclosure under the California Public Records Act), certain Schedules may not be attached to this Agreement but shall instead be provided separately, and shall be subject to and exempt from disclosure under the California Public Records Act and the California Evidence Code, to the extent provided thereunder.

12.9 Fair Meaning. This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10 Gender and Number; Construction. All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable. Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

- 84 -

or default by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding material breach at the time of acceptance of such performance. The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

11.47 Severability. If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstances shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.48 Dispute Resolution. Subject to the exclusions set forth in Section 12.18.9 below, in the event any disagreement, dispute or claim arises between or among the parties hereto (collectively, a "Dispute") with respect to the enforcement or interpretation of any term or provision of this Agreement or any Related Agreement or with respect to whether an alleged material breach or default under this Agreement or Related Agreement has or has not occurred, or with respect to any other matter related to or arising out of this Agreement or any Related Agreement, or the relationship or transactions contemplated hereby or thereby, such Dispute shall be resolved in accordance with the following procedures:

12.18.1 Meet-and-Confer. In the event of a Dispute between the parties hereto, either party may give written notice to the other party setting forth the nature of such Dispute ("Dispute Notice"). The parties shall meet and confer to discuss the Dispute in good faith within 30 days of the other party's receipt of the Dispute Notice in an attempt to resolve the Dispute. All representatives shall meet at such dates and times as are mutually convenient to the representatives of each party within such 30-day period.

12.18.2 Arbitration of Disputes. Except as set forth below, any Dispute which cannot be resolved by the parties hereto within 30 days after either party's receipt of a Dispute Notice may be submitted at the option of either party to binding arbitration, which arbitration shall be conducted in accordance with the following provisions:

(a) Venue. The arbitration shall be conducted in Riverside County, State of California, unless the parties mutually determine that another venue would be more convenient for the parties.

(b) Law. The governing law shall be the substantive law of the State of California as provided in Section 12.3.

(c) Selection. A single disinterested third party/arbitrator shall be selected by mutual written agreement of the parties, or if they are unable to mutually select an arbitrator within fifteen (15) days after either party notifies the other of its desire to arbitrate the Dispute, then by JAMS/Endispute (JAMS) in accordance with its then-current Rules of Practice and Procedure.

(d) Administration. The arbitration shall be administered by JAMS.

- 86 -

1070092                                    PAServ/NNW/061.AR 16.1288.DOC

Procedure of JAMS as may be modified by the parties to the arbitration by mutual written agreement at the time of the arbitration, except that the provisions of California Code of Civil Procedure § 1283.05 are incorporated into and made applicable to this agreement to arbitrate, unless the parties agree otherwise at such time. For good cause shown and on order of the arbitrator, depositions may be taken and discovery may be obtained in accordance with California Code of Civil Procedure § 1283.05.

(e) Rules. The rules of arbitration shall be the Rules of Practice and

(f) Award. The decision of the arbitrator shall be final and binding as to any matters submitted hereunder; provided, however, the arbitrator shall not have the power to commit errors of law or legal reasoning, and the arbitration award shall be vacated or corrected by a court of competent jurisdiction for any such error. Judgment upon the award may be entered in any court of competent jurisdiction in the United States. The award shall include written findings of fact, a summary of the evidence and reasons underlying the decision and conclusions of law. The arbitrator shall have the power to award equitable relief, including specific performance of the terms and conditions of this Agreement and/or injunctive relief, consistent with the terms and limits set forth in this Agreement.

(g) Fees and Costs. As part of the award, the arbitrator may award reasonable and necessary costs actually incurred by the prevailing party, as determined by the arbitrator in his or her award, including that party's share of the arbitrator's fees, costs and expenses, as well as any administration fees. The arbitrator may also include reasonable attorneys' fees in an award of costs to the prevailing party and such fees and costs shall be recoverable by the prevailing party in any appeal.

NOTICE: By initialing in the space below the parties hereto are agreeing to have any Dispute arising out of the matters included in this "arbitration of disputes" provision decided by neutral arbitration as provided by California law (provided that such Dispute has not been resolved through the meet-and-confer discussions and mediation procedures described above) and the parties are giving up any rights they might possess to have the Dispute litigated in a court or jury trial. By initialing the space below the parties hereby agree to give up their judicial right to discovery and appeal, unless those rights are specifically included in this "arbitration of disputes" provision. If either party refuses to submit to arbitration after agreeing to this provision, such party may be compelled to arbitrate under the authority of the California Code of Civil Procedure.

Purchaser _____        Seller _____

12.18.3 Injunctive Relief. Nothing in this Agreement shall be interpreted to limit either party's right to pursue preliminary or provisional equitable relief pending the arbitration award, including, without limitation, specific performance or a temporary restraining order or preliminary injunctive relief, from a court of competent jurisdiction at any time. By way of example, the foregoing provisions of this Section shall not be interpreted to require either party to

- 87 -

1070092                                    PAServ/NNW/061.AR 16.1288.DOC

submit to meet-and-confer or arbitration prior to exercising such party's right to pursue preliminary equitable relief to protect trade secrets or prevent irreparable harm.

12.18.4  Selection of Alternative Arbitrator.  In the event that JAMS is not in existence at the time of commencement of the arbitration proceeding, as applicable, then the Commercial Panel of the American Arbitration Association ("AAA") shall administer such proceeding. In such case, all references to JAMS in this Agreement shall instead refer to the AAA, and all references to the Rules of Practice and Procedure of JAMS in this Agreement shall instead refer to a reference to the then-current commercial arbitration rules of the AAA.

12.18.5  Post-Closing Disputes.  If the Closing occurs and a Dispute arises with respect to the enforcement or interpretation of any term or provision of this Agreement or of any Related Agreement, with respect to whether an alleged material breach of this Agreement or such Related Agreement has or has not occurred, or with respect to the manner or time by which such breach shall be cured, then in addition to the foregoing provisions of this Section 12.18 the following provisions shall apply to the resolution of such Dispute:

(a)  If either party (the "Complaining Party") believes the other party (hereinafter referred to as the potentially non-performing party or "NPP") is in default in the performance of any duty or obligation to be performed by the NPP thereunder, then the Complaining Party shall give the NPP a Dispute Notice which shall state the grounds for the Complaining Party's belief that a default has occurred and which shall describe with sufficient specificity the nature of the alleged default.

(b)  The Complaining Party shall not commence an arbitration action pursuant to Section 12.18.2 or any judicial action pursuant to Section 12.18.3 if the NPP commences to cure the events which constitute the grounds for the Complaining Party's assertion of default by the NPP. The NPP shall have sixty (60) days to cure the material breach specified in the Default Notice; however, if such breach cannot reasonably be cured within such 60-day period, then the NPP shall promptly commence to cure such default and diligently pursue such cure to completion. Moreover, if the grounds constituting the events of a material breach are incapable of cure, no action pursuant to Section 12.18.2 or 12.18.3 shall be commenced if the NPP takes such corrective actions as are reasonably necessary to prevent the occurrence of such grounds of material breach in the future.

(c)  If the NPP disagrees with the Dispute Notice delivered under this subsection (f) or if the Complaining Party asserts a Dispute with respect to the manner or time by which the NPP is attempting to cure the material breach set forth in such Dispute Notice, then the same shall be resolved pursuant to Sections 12.18.1, 12.18.2 and 12.18.3 except that if the arbitration award concludes that a material breach by the NPP occurred (or that such breach was not properly or timely cured), then the award shall also include a description of corrective actions that shall be undertaken to cure or prevent the occurrence in the future of the basis for the Dispute and a recommended reasonable time to complete such cure or corrective action.

(d)  Notwithstanding the foregoing to the contrary, the NPP shall bear no responsibility for, and have no duty to cure, a material breach set forth in the Dispute Notice delivered under this subsection (f) to the extent such breach results from the acts or omissions of the Complaining Party or any of its Affiliates and their respective officers, directors, trustees, employees, agents or representatives.

1070019.2                                                              F:\hss\FINAL424.16.1140.DOC

- 88 -

---

[Signature Page to Asset Sale Agreement]

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

PURCHASER:

Physicians for Healthy Hospitals, Inc.

By: _____

Name: _____

Its: _____

SELLER:

Valley Health System

By: _____

Name: _____

Its: _____

1070019.2                                                              F:\hss\FINAL424.16.1140.DOC

- 89 -

## SCHEDULE 1.1.2
## TERM SHEET FOR ALTERNATIVE TRANSACTION.

The terms and conditions of the asset sale agreement for the Alternative Transaction ("Definitive Alternative Agreement") shall be similar to the asset sale agreement to which this is attached ("Agreement") except as it needs to be modified to be consistent with the Alternative Purchase Consideration and other terms of the Alternative Transaction as summarized below.

1. Alternative Purchase Consideration. The purchase consideration in connection with the Alternative Transaction shall be Twenty-Nine Million Dollars ($29,000,000) in immediately available funds (the "Alternative Purchase Consideration"), subject to adjustment as provided below.

2. Purchased Alternative Assets. The purchased Alternative Assets shall include substantially all of the assets used only in connection with the operation of Menifee Valley Medical Center ("MVMC"), consisting of the following:

(a) All of the real estate, and improvements thereto, owned or leased by Seller and used in connection with the operation of MVMC, including without limitation, fee title to the real property commonly known as 28400 McCall Boulevard, Sun City, CA 92586 and all vacant land owned by Seller adjacent to the Hospital but excluding the Orchard Property located immediately available to the Hospital adjacent to MVMC, under Schedule 1.6.1-A, all as defined on Addendum 2(a) ("Menifee Land"), including:

(i) All rights, privileges and easements appurtenant to and for the benefit of the Menifee Land, including, without limitation, all minerals, oil, gas and other hydrocarbon substances and/or under the Menifee Land, as well as all development rights, air rights, water, water rights and water stock relating to the Menifee Land and any other easements, rights of way or appurtenances existing or used in connection with the ownership, operation, use, occupancy or enjoyment of the Menifee Land, subject to covenants, easements and other restrictions of record;

(ii) All improvements, structures, buildings and fixtures located on the Menifee Land, including, without limitation, all fixtures located on and/or used in connection with the ownership, operation, use, occupancy or enjoyment of the improvements (such as heating and air conditioning systems, and facilities used to provide any utility services, parking services, immediately to the east of MVMC disposal, recreation or other services thereto), and any and all computers and/or computer systems used for or in connection with any building operating systems, elevator systems, irrigation systems, climate control systems and security systems; and

(b) All other tangible assets and equipment, including without limitation all assets of the type included within the definition of Assets in the Agreement, actually located and used in, or which are used primarily in connection with the operations of MVMC, as provided in these Disclosure Schedules.

The Parties shall develop Schedules, Exhibits and other materials with respect to the Alternative Transaction within forty-five (45) days in the same manner as provided in Section 1.14 of the Agreement. Seller may supplement, modify or correct any such certificate, document or other instrument, by reason of the discovery or change occurring outside the control of Seller occurring between the

- 90 -

Effective Date and the Closing Date in the same manner as provided in Section 2.23 of the Agreement.

The Parties understand that Seller may be subject to certain agreements covering multiple facilities, including MVMC, such as managed care and other provider agreements, and that Purchaser may enter into managed care and other provider agreements. In order to satisfy the obligations of Seller and Purchaser under any such agreements and so as to avoid or limit any claims which might arise from the termination or modification of pre-existing agreements to the extent and only for so long as is necessary to satisfy such obligations and avoid such claims, the Parties agree to cooperate and to negotiate provider agreements between themselves to provide services to patients who are subject to such agreements with the other Party, at commercially reasonable rates, which shall be reciprocal and on terms consistent with applicable Laws.

The purchased assets shall include only those assets described above, and such assets shall be purchased "AS IS/WHERE IS/WITH ALL FAULTS" as detailed in the Agreement but shall be subject to the same representations and warranties and limitations thereon to the extent applicable to the Alternative Transaction, and to other express requirements which are contained in the Agreement, including receipt of good and marketable title to the Alternative Assets, except for exceptions as provided for in the Agreement.

3. Alternative Excluded Assets. The following assets of Seller shall be excluded from the purchased Alternative Assets; provided, however, the Parties agree that the following list is not meant to be an exhaustive list ("Alternative Excluded Assets") (but may be augmented by mutually acceptable additional Alternative Excluded Assets of the type customarily excluded in transactions of the type contemplated by this term sheet):

(a) All of Seller's cash, cash equivalents, cash in bank accounts, certificates of deposit, treasury bills, notes, and marketable securities;

(b) All of Seller's accounts receivable, including all claims, contract rights, or any other right of Seller to payment from all sources whatsoever, including governmental reimbursement programs;

(c) All of Seller's claims, choses in action, rights of recovery, rights of offset, recoupment, rights to refunds and similar rights pertaining to the Alternative Assets;

(d) Any records of Seller which by law Seller is required to retain in its possession, other than medical records at MVMC, which Purchaser shall maintain therein, and as to which Seller shall have reasonable rights of access for appropriate purposes;

(e) All of Seller's assets located at Seller's home office and at Seller's other hospital facilities and which are used by Seller for the majority of their use in connection with any businesses, operations and activities other than MVMC;

(f) All of Seller's credits, prepaid expenses, deferred charges, sums or fees, advance payments, security deposits, prepaid items, and all prepaid insurance premiums;

(g) Seller's pension or other funded Employee Benefit Plan assets; and

- 91 -

MVMC, including non-severable Seller information technology (including use of computer programs and of the Seller telephone system); provided, however, Seller agrees to permit Purchaser to utilize such assets, some of which may be subject to a licensing agreement between the Parties, for which Purchaser shall pay Seller a fee at the fair market value for the use of such intangible property and for such services.

4.    Alternative Assumed Liabilities. Purchaser shall assume post-closing liabilities associated with MVMC except with respect to the Existing Bonds and the excluded liabilities addressed below (the "Alternative Assumed Liabilities") in addition to payment of Alternative Purchase Consideration. The Alternative Assumed Liabilities shall relate only to the categories of Assumed Obligations set forth in Section 1.8 of the Agreement to the extent applicable to the Alternative Assets, and the operations, contracts and employees applicable to MVMC.

5.    Excluded Liabilities. The Alternative Assumed Liabilities shall exclude all of the types of Excluded Liabilities described in the Agreement, as applicable to the Alternative Transaction and Alternative Assets. In addition, the Alternative Assumed Liabilities shall exclude:

(a)    All liabilities associated with any assets of the Seller other than the Alternative Assets transferred to Purchaser; and

(b)    All Current Liabilities of Seller, and all other liabilities of Seller, arising out of or relating to any act, omission, event or occurrence, connected with the Hospital Businesses prior to the Effective Time, including without limitation all liabilities in connection with claims of professional malpractice or other tortious conduct, overpayments by governmental or other payors, and all liabilities and responsibilities under Benefit Plans, or otherwise related to any of Seller's employees, to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time.

6.    Covenants of Seller.

(a)    The covenants of Seller at Article IV of the Agreement shall apply in the Definitive Alternative Agreement to the extent applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC.

(b)    Purchaser shall have the right, in its sole discretion, to enter into a commercially reasonable, long-term (35 year) ground lease of the Orchard Property, to the fullest extent legally permissible, for which Purchaser shall pay to Seller fair market rental value as determined by independent appraisal. Such ground lease shall contain commercially reasonable and customary terms and conditions. In any case, however, Purchaser will be granted, at Closing a commercially reasonable right of first refusal to purchase the Orchard Property to the extent permitted by law.

- 92 -

7.    Covenants of Purchaser.

(a)    The covenants of Purchaser at Article V of the Agreement shall apply in the Definitive Alternative Agreement to the extent reasonably applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC.

(b)    Purchaser shall, as a condition to taking assignment of any contracts which it has elected to assume, pay any payments required to be paid under Section 365 of the Bankruptcy Code in order for Purchaser to assume such contracts, which amount shall be credited to the Alternative Purchase Consideration; provided, however, that such adjustment to the Alternative Purchase Consideration shall not, in any case, exceed One Million Dollars ($1,000,000). In the event that such amount exceeds One Million Dollars ($1,000,000), Purchaser may either (i) pay such additional amount, which shall not be credited to the Alternative Purchase Consideration, or (ii) terminate the Alternative Transaction and receive a refund of Purchaser's Deposit.

(c)    In the event that Purchaser determines not to assume any Contracts entered into post-petition relating to MVMC, and such determination results in an administrative claim by the contracting party for breach of such agreement, Purchaser shall defend, indemnify and hold Seller harmless of and from such damage claim based upon such breach (excluding amounts accrued and due to such creditor for goods or services rendered prior to the Closing Date other than as a result of such breach claim).

(d)    The employee related covenants of Purchaser set forth at Section 5.4 of the Agreement shall relate only to the Hospital Businesses' Employees engaged with respect to MVMC businesses ("Seller's MVMC Employees"). Purchaser shall pay or assume the Accrued Paid Time Off Amounts of Hired Employees in connection with the Alternative Transaction in the same manner as provided in Section 9.5 of the Agreement; provided that the Alternative Purchase Consideration shall be adjusted to deduct the amount of such assumed Accrued Paid Time Off Amounts. Purchaser shall also pay any severance payments owing to those Seller's MVMC Employees to whom Purchaser has not extended an offer of employment with Purchaser and any Accrued Paid Time Off Amounts owing to MVMC Employees who are not hired by Purchaser or who do not consent to the transfer of such Accrued Paid Time Off Amounts to Purchaser; provided that the Alternative Purchase Consideration shall be adjusted to deduct the amount of such severance and Accrued Paid Time Off Amounts paid by Purchaser and Accrued Paid Time Off Amount obligations assumed by Purchaser. Purchaser shall also credit to each of Seller's MVMC Employees who become Hired Employee such employee's accrued ESL Benefits (as defined in the Agreement), on the same terms and conditions as Seller's ESL Benefit plans, which obligation shall not be credited to the Alternative Purchase Consideration.

(e)    Purchaser will assume responsibilities arising after the Effective Time for all union contracts related to MVMC employees, as of the Closing Date. Seller will retain liability for accrued paid time off, severance obligations, if any, and all other amounts owing, and liabilities, to employees preceding the Effective Time, unless otherwise agreed by the parties, and subject to customary purchase consideration adjustment.

- 93 -

EXHIBIT E

180

(f)   Purchaser will offer available positions to a substantial portion employees providing services at, or primarily associated with, the operations at MVMC campus consistent with the provisions of the Agreement.

(g)   Purchaser and Seller will enter into an agreement or agreements whereby Purchaser shall purchase certain administrative and support services from Seller, or enter into shared services arrangements, including those which may be necessary for the operation of MVMC (i.e. finance, IT, HR, telephones, internet, etc.) as mutually agreed, at the agreed fair market value for such services.

(h)   The covenants set forth in Sections 5.9.3 to 5.9.5 of the Agreement shall only apply with respect to MVMC. The covenants set forth at Section 5.9.1 and 5.9.2 shall not apply to the Alternative Transaction. Purchaser shall maintain all medical records on behalf of Seller as required by law, and will make them available to Seller if needed in the future.

8.   Closing.

(a)   The Closing of the Alternative Transaction shall occur by the Closing Date as set forth in the Agreement.

(b)   The Parties shall cause the Escrow to deliver to the Bond Trustees of the Existing Bonds, at Closing, such funds from the Alternative Purchase Consideration as required, and shall use their best efforts to obtain the Bond Release, as applicable to the Alternative Assets, subject to the special covenants set forth below in the event such Bond Release is not obtained and related to required forbearance of certain covenants.

(c)   Since licensing and Medicare approvals may not be feasible prior to the Closing, Seller and Purchaser will enter into a Lease and a Management Agreement consistent with the terms of the Agreement, but covering only MVMC and the Alternative Assets to the extent and in the manner legally permissible. Purchaser will own, MVMC, Seller will be the tenant, Seller will continue to hold the license, Medicare/Medi-Cal certification, and payor contracts, and Seller will contract with Purchaser to provide management services at essentially a "no gain/no loss" to Seller, all as consistent with the provisions set forth at Section 1.3.6 of the Agreement. When licensing and Medicare and Medi-Cal certification is complete, the Lease and the Management Agreement will terminate, in the same manner as provided in Section 1.3.6 of the Agreement.

9.   Seller's Conditions to Close.

(a)   The conditions precedent to obligations of Seller, as set forth at Article VI of the Agreement, shall apply to the Alternative Assets and Alternative Transaction. Without limiting the preceding, the conditions precedent in the following Sections of the Agreement shall not apply in the event of the Alternative Transaction: 6.7 and 6.8 (to the extent of requirements greater than needed for just the acquisition and working capital for MVMC).

(b)   In the event of the Alternative Transaction, Purchaser will cause the Select Administrative Note to be modified, as of the Closing Date, to continue bear interest at the rate

of 5% per annum and be repaid in monthly payments of interest only commencing twenty-four (24) months after Closing (with interest accruing and added to principal from the Closing Date until such twenty-fourth month) and continuing for a period of thirty-six (36) months thereafter, whereupon equal monthly payments of principal and interest shall commence in an amount sufficient to fully amortize the balance of principal and interest due on the Select Administrative Note over a period of sixty (60) months thereafter. As a condition to such modification, the Select Administrative Note, as modified, shall be secured by a first position in a Deed(s) of Trust with Chicago Title as trustee and utilizing Chicago Title's standard Long Form Deed of Trust, upon the real properties commonly known as, the Medical Arts Building and, to the extent not inconsistent with Existing Bond covenants unless waived by the bondholders, the excess land portion of the Florida/San Jacinto property ("Excess Land").

(e)   Bond Actions: The Parties must obtain a Bond Release prior to Closing; provided, however, if the holders of (or the Trustees of) the Existing Bonds do not provide the consents required for the Bond Release required under this Agreement in response to such payment, Purchaser will purchase or cause to be purchased such Existing Bonds as necessary to obtain consent to the Bond Release, or will make the Alternative Loan as provided below. In addition, as of the Closing Date, Purchaser shall either:

(i)   Obtain the consent of the Existing Bonds to a modified payment schedule under the Existing Bonds which includes the payment of interest only for three (3) years from the Closing Date, with principal re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for forbearance ("Payment Forbearance"), after the Closing Date of any claims, actions or other enforcement against Seller based on failure of Seller to meet any covenants (the "Bond Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond Documents") based upon the financial performance or status of Seller and its operations (but excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply, including without limitation covenants related to the required net income available for debt service or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent it would be violated by the existing Chapter 9 Proceeding) ("Covenant Forbearance"); or

(ii)   Enter into a new secured loan agreement (the "Alternative Loan") with Seller by which Purchaser will advance, on Seller's behalf, funds necessary to pay off the balance of Existing Bonds (which loan shall become a new loan on substantially the same terms as the Bond Documents, including the Bond Covenants (as modified as set forth in subparagraph (i) above including the Payment Forbearance and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and additionally secured by (the "Additional Collateral");

- 94 -

- 95 -

(A)   a second position deed of trust (junior to the modified Select Administrative Note lien) on the Medical Arts Building and the excess land portion of the Florida/San Jacinto; and

(B)   a first position lien on the Orchard Property.

The Covenant Forbearance shall remain in effect through Seller's Fiscal Year ending June 30, 2012. In the event that Seller is in default of the Bond Covenants as of the end of Seller's Fiscal Year ending June 30, 2011, Seller may, as its sole remedy for a Covenant Default other than a payment default, require that Seller engage a nationally recognized Manager ("Manager") with experience in operating hospital similar to HVMC. Seller shall consult with Purchaser in the selection of such Manager, and such Manager shall be reasonably acceptable to Purchaser, which acceptance shall not be unreasonably withheld, delayed or conditioned. Purchaser shall be entitled to monitor the performance of the Manager and receive monthly reports on Manager's progress and the financial condition of Seller. The foregoing notwithstanding, the parties understand that MVMC may be competitive with HVMC and that the sharing of certain information may violate federal or state antitrust or unfair competition Laws.

Further, the Manager may become aware of confidential information, including rates under managed care contracts, matters covered by the attorney-client privilege, attorney work-product privilege, matters covered by quality assurance and peer review, and other matters covered by applicable privileges. The Manager may also become aware of matters which are confidential pursuant to contractual arrangements with unaffiliated third parties. The Manager may also become aware of matters discussed by Seller's Board of Directors in closed session, which matters are not subject to public disclosure. Accordingly, in the event that Manager obtains such information which Seller's Board of Directors or counsel reasonably determines is confidential or privileged information, Seller may require that Manager maintain such matters in confidence. Purchaser also agrees that, to the extent that Purchaser obtains information from Seller which is confidential or privileged as provided above, Purchaser shall maintain such information in confidence to the fullest extent permitted by law. The foregoing notwithstanding, in the event that Purchaser in good faith deems its interest are materially and adversely affected by a matter which is disclosed in confidence, Purchaser may notify Seller in writing and may seek release from such restriction through appropriate application to a court of competent jurisdiction.

In the event that Seller is in default of the Bond Covenants as of the end of Seller's Fiscal Year ending June 30, 2012, Purchaser shall have rights of enforcement in the same manner as provided in the Bond Documents.

Without limiting the preceding, the Covenant Forbearance shall not include a forbearance of any covenants restricting further encumbrances by Seller (excluding any encumbrances in place under PFHA, encumbrances as permitted in the Bond Documents, or otherwise as contemplated by this Agreement), transfer of Seller's assets or merger or restructuring of Seller (except in connection with Seller's Chapter 9 proceeding and otherwise consistent with the terms of this Agreement). The Alternative Loan shall be provided pursuant to documents which, to the extent reasonably applicable, are consistent with the terms of the Bond Documents, and security and other provisions which are customary for commercial real property

- 96 -

1070039.2

---

secured loans (to the extent not inconsistent with the applicable terms under the Bond Documents or this Agreement). The Medical Arts Building and Excess Land are further identified in Schedule 1.6.1-A.

Provided that Seller is not in default of payments and the Bond Covenants under the Alternative Loan, the Additional Collateral shall be released upon issuance of Seller's audited financial statements for the fiscal year ended June 30, 2012.

(d)   Plan of Adjustment: If, prior to the Closing, Seller shall have filed a Plan of Adjustment ("Plan"), in the Chapter 9 Proceeding, either:

(i)   such Plan shall have been confirmed; or

(ii)   the holders of the Affiliated Claims shall have voted to accept such Plan or agreed, in writing, to accept such Plan; or

(iii)   the holders of the Affiliated Claims shall have agreed, in writing, not to, directly or indirectly, oppose such Plan and/or sought to influence either the Unsecured Creditors Committee and/or others to vote against or otherwise oppose such Plan, and have, in fact, not done so.

For purposes of the foregoing, "Affiliated Claims" shall mean the claims of Hemet Community Medical Group, Menifee Valley Community Medical Group, KM Strategic Management, Inc., and the claims of LHIO, Inc., and any claims of constituent members thereof which are derivative from such claims.

10.   Purchaser's Conditions to Close. The conditions precedent to obligations of Purchaser, as set forth in Article VII of the Agreement, shall apply in Definitive Alternative Agreement only to the extent applicable to the Assets and Alternative Transaction. Without limiting the preceding, the conditions precedent in the following Sections of the Agreement shall not apply in the event of the Alternative Transaction: 7.11 and 7.12.

11.   Post-Closing Covenants. The post-closing covenants contained at Article IX of the Agreement, including without limitation covenants set forth at Sections 9.2 (cross-creation and access to records), 9.3 (provision of benefits of certain contracts) and 9.5 (employee transition) shall apply only to the extent applicable to the Alternative Assets and the operations, contracts and employees applicable to MVMC. In addition, without limiting the preceding, Seller's covenant not to compete shall apply only with respect to MVMC.

12.   Termination. The bases for termination, and the application of the Deposit and the Termination Fee, as provided at Section 8 of the Agreement shall apply with respect to the Alternative Transaction to the extent of the terms and conditions of the Alternative Transaction.

13.   Assignment. Purchaser shall have the right to assign its rights and obligations under the Alternative Transaction, subject to the terms of Section 12.2 of the Agreement.

- 57 -

1070039.2