1  CHARLES D. AXELROD (STATE BAR NO. 39507)
   GARY E. KLAUSNER (STATE BAR NO. 69077)
2  H. ALEXANDER FISCH (STATE BAR NO. 223211)
   NEETA MENON (STATE BAR NO. 254736)
3  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
4  1901 Avenue of the Stars
   12th Floor
5  Los Angeles, CA 90067
   Telephone:  (310) 228-5600
6  Telecopy:  (310) 228-5788

7  Chapter 9 Counsel for
   Valley Health System

8

9

10                    UNITED STATES BANKRUPTCY COURT

11                    CENTRAL DISTRICT OF CALIFORNIA

12                          RIVERSIDE DIVISION

13  In re                          )  Case No. 6:07-bk-18293-PC
                                   )
14  VALLEY HEALTH SYSTEM,          )  Chapter 9
                                   )
15                                 )  NOTICE OF SUBMISSION OF REDLINE
                                   )  COMPARING (1) "FIRST AMENDED
16                                 )  DISCLOSURE STATEMENT WITH
                                   )  RESPECT TO THE PLAN FOR THE
17                                 )  ADJUSTMENT OF DEBTS OF VALLEY
                                   )  HEALTH SYSTEM DATED DECEMBER
18                                 )  17, 2009" TO (2) "DISCLOSURE
                                   )  STATEMENT WITH RESPECT TO THE
19                                 )  PLAN FOR THE ADJUSTMENT OF
                                   )  DEBTS OF VALLEY HEALTH SYSTEM
20              Debtor,            )  DATED NOVEMBER 2, 2009"
                                   )
21                                 )
                                   )
22                                 )  Disclosure Statement Hearing
                                   )
23                                 )  Date:     December 17, 2009
                                   )  Time:     2:00 p.m.
24                                 )  Place:    Courtroom 304
                                   )            United States Bankruptcy Court
25  _____  )            3420 Twelfth Street
                                                Riverside, California
26

27

28

534258v1

1    **TO THE HONORABLE PETER CARROLL, UNITED STATES BANKRUPTCY JUDGE**

2    **AND ALL OTHER PARTIES IN INTEREST:**

3          Valley Health System (the "Debtor"), the debtor and debtor in possession in the

4    above-captioned case, hereby submits a redline, attached hereto as Exhibit 1, comparing (a) the

5    "First Amended Disclosure Statement With Respect to the Plan for the Adjustment of Debts of

6    Valley Health System Dated December 17, 2009" (the "First Amended Disclosure Statement"),

7    being filed concurrently herewith, with (b) the "Disclosure Statement With Respect to the Plan for

8    the Adjustment of Debts of Valley Health System Dated November 2, 2009" (the "Original

9    Disclosure Statement"), which was filed with this Court on November 2, 2009 [Docket No. 614].

10   Attached as Exhibit A to the First Amended Disclosure Statement is a redline comparing (a) the

11   "First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17,

12   2009" (the "First Amended Plan"), with (b) the "Plan for the Adjustment of Debts of Valley Health

13   System Dated November 2, 2009", which was filed with the Court as Exhibit A to the Original

14   Disclosure Statement.  The only other change to the exhibits attached to the First Amended

15   Disclosure Statement is the addition to Exhibit B of the "Valley Health Systems Financial

16   Statements for the Four Months Ended October 31, 2009", which is attached hereto as Exhibit 2.

17         The changes to the First Amended Plan and the First Amended Disclosure Statement

18   primarily reflect the fact that, on December 15, 2009, an election was held on the Riverside County

19   "Measure P ballot proposition regarding the sale of substantially all of the District's assets (the "Two

20   Hospital Transaction"), to Physicians for Healthy Hospitals, Inc., a Delaware corporation ("PHH"),

21   pursuant to the "Asset Sale Agreement" dated October 14, 2009, between the District and PHH.

22   Although the election results have not yet been officially certified, the preliminary election results

23   show that the voters approved the proposed Two Hospital Transaction by an overwhelming majority.

24   In light of the District's having obtained Public Approval[1] to pursue the Two Hospital Transaction,

25

26

27      [1]  All capitalized terms not defined herein shall have the meaning set forth in the First Amended
Plan and First Amended Disclosure Statement.

28

1    the Alternative Transaction has been deleted from the First Amended Plan and First Amended

2    Disclosure Statement.

3

4    Dated:  December 16, 2009            */s/ Neeta Menon*

                                        Neeta Menon, a Member of

5                                         STUTMAN, TREISTER & GLATT

                                        PROFESSIONAL CORPORATION

6                                         Bankruptcy Counsel for Debtor

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

534258v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 1**

534258v1

EXHIBIT 1                                        4

CHARLES D. AXELROD (STATE BAR NO. 39507)
GARY E. KLAUSNER (STATE BAR NO. 69077)
H. ALEXANDER FISCH (STATE BAR NO. 223211)
NEETA MENON (STATE BAR NO. 254736)
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067
Telephone:  (310) 228-5600
Telecopy:  (310) 228-5788
E-mail:  caxelrod@stutman.com
        gklausner@stutman.com
        afisch@stutman.com
        nmenon@stutman.com

Chapter 9 Counsel for
Valley Health System

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re | ) Case No. 6:07-bk-18293-PC |
| | ) |
| VALLEY HEALTH SYSTEM, | ) Chapter 9 |
| | ) |
| Debtor, | ) **FIRST AMENDED DISCLOSURE** |
| | ) **STATEMENT WITH RESPECT TO THE** |
| | ) **PLAN FOR THE ADJUSTMENT OF DEBTS** |
| | ) **OF VALLEY HEALTH SYSTEM DATED** |
| | ) ~~NOVEMBER 2,~~ **DECEMBER 17, 2009** |
| | ) |
| | )        Disclosure Statement Hearing |
| | ) |
| | ) Date:    December ~~8,~~ 17, 2009 |
| | ) Time:    2:00 p.m. |
| | ) Place:   Hon. Peter H. Carroll |
| | )          3420 Twelfth St. |
| | )          Courtroom 304 |
| | )          Riverside, CA  92501 |
| | ) |
| | ) |
| | )        ~~Disclosure Statement~~ Confirmation Hearing |
| | ) |
| | )          *To be set.* |
| | ) |
| | ) |
| | ) |
| | ) |

533251/533833v2

EXHIBIT 1                                                    5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTE:  The Bankruptcy Court Has Not Yet Approved This Disclosure Statement Pursuant To Section 1125(b) Of The Bankruptcy Code For Use In The Solicitation Of The Plan Of Adjustment Of Debts Described Herein.  The Filing And Distribution Of This Disclosure Statement Therefore Is Not Intended As, And Should Not Be Construed To Be, A Solicitation Of Acceptance Or Rejection Of That Plan Or Any Other Plan.**

~~253281953~~533833v2

EXHIBIT 1                                                                                    6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# SUMMARY

The following pages summarize certain important information set forth elsewhere in this Disclosure Statement.  Capitalized terms are defined in the text of this Disclosure Statement and in the Plan.

The Disclosure Statement contains important information that is not summarized in this Summary and that may influence your decision regarding whether to accept or reject the Plan or otherwise affect your rights.  Please do not rely on this Summary standing alone, and please read all of this document and the accompanying materials thoroughly.

The "First Amended Plan For The Adjustment Of Debts Of Valley Health System, Dated ~~November 2,~~December 17, 2009" (the "Plan") proposed by Valley Health System, a California Local Health Care District (the "Debtor" or "District"), is premised on the "Asset Sale Agreement" dated October 14, 2009 (the "ASA"), which is attached hereto as Exhibit E, by and between the District and Physicians for Healthy Hospitals, Inc., a Delaware corporation ("PHH").  ~~Two alternative transactions are described in the ASA: (1)~~

The ASA contains two alternate sale transactions because, at the time the ASA was negotiated and executed, the District did not have authority to agree to sell substantially all of the District's assets to PHH (the ~~broader~~ "Two Hospital Transaction["]"), without first obtaining Public Approval.[1] ~~involves the sale of substantially all of the District's assets, and will proceed if Public Approval is obtained in an election to be held December 15, 2009; (2) in the event Public Approval of the Two Hospital Transaction is not obtained, the District will proceed with the Alternative Transaction, whereby only~~Having no assurance that Public Approval would be obtained, the District and PHH agreed to an alternative sale transaction  (the "Alternative Transaction") that consisted of the sale of only the operating assets associated with the Menifee Valley Medical Center ~~and its related operating assets will be sold, and the District will continue to own and operate the remaining~~

---

[1]   Any capitalized term not otherwise defined in this Disclosure Statement has the meaning ascribed to it in the Plan. Unless otherwise indicated, references in this Disclosure Statement to "Sections" are references to the various enumerated Sections of this Disclosure Statement.

Summary  1

~~532514~~533833v2

EXHIBIT 1

7

1    ~~District Assets, which are primarily related to Hemet Valley Medical Center~~("Menifee") in the event

2    voters did not approve the broader sale transaction. However, on December 15, 2009, an election

3    was held and the Riverside County Measure P ("Measure P") ballot proposition, approving the sale

4    of the District Assets to PHH pursuant to the Two Hospital Transaction, was passed by the voters.

5    Accordingly, the Plan will be based on the Two Hospital Transaction, which is discussed in detail

6    herein.

7            There are also several actions that are currently pending in the Bankruptcy Court and

8    in the Superior Court for the County of Riverside (the "Superior Court"), which relate to the Public

9    Vote on Measure P and the ASA, as discussed in further detail in Section III.I below. It is the

10    District's position that the Bankruptcy Court's adjudication of the issues raised in connection with

11    these "Challenge Actions" must be resolved on a full and final basis as part of the Plan confirmation

12    process in order to ensure that the Plan is confirmed and thereafter effectively and timely

13    implemented.

14            ~~The treatment of creditors and the payment of Allowed Claims under the Plan will~~

15    ~~differ significantly depending on which of the two proposed sale transactions, *i.e.*, the Two Hospital~~

16    ~~Transaction or the Alternative Transaction, is ultimately consummated.~~

17

18

19    **Debtor**                          Valley Health System, a California Local Health Care District

20    **Bankruptcy Court**                United States Bankruptcy Court for the Central District of
                                          California, Riverside District
21                                        The Honorable Peter H. Carroll presiding

22    **Plan**                            Plan For The Adjustment Of Debts Of Valley Health System,
                                          Dated November 2, 2009
23
      **Purpose of the Disclosure**       To provide information of a kind, and in sufficient detail, that
24    **Statement**                       would enable a typical holder of claims in a class impaired
                                          under the Plan to make an informed judgment with respect to
25                                        voting on the Plan.

26    **Balloting Information**           Ballots have been provided with this Disclosure Statement to
27                                        creditors known to have claims that are impaired under the Plan.
                                          Ballots must be returned to and received by the Ballot Tabulator
28

~~53251~~9533833v2

EXHIBIT 1                                                      8

| | | |
|---|---|---|
| | | by no later than 4:00 p.m., Pacific Time, on January ___, 2010. |
| **Ballot Tabulator** | | ~~Joanne Stern~~Kendra A. Johnson, Paralegal, Stutman, Treister & Glatt PC, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788) |
| **Confirmation Hearing and Confirmation Objections** | | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on _____ __, 2010, commencing at __:___ __.m., Pacific Time. Objections to confirmation must be filed and served by no later than _____, 2010. |
| **Treatment of Claims** | | If the Court confirms the Plan and the Plan becomes effective, claims will be treated as follows: |
| | Administrative Claims | Paid in full, except to the extent that the holder of an Administrative Claim agrees to different treatment. ~~In the event that the Two Hospital Transaction is consummated, a~~A substantial amount of the District's Administrative Claims will be assumed by PHH. |
| | Class 1A Holders of the Series 1993 Bonds | ~~If~~Impaired. Holders of the ~~Two Hospital Transaction is consummated:~~Series 1993 COPs will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1A Claims. |

Impaired. Holders of the Series 1993 Bonds will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1A Claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Class 1B Holders of the Series 1996 Bonds | ~~If~~Impaired. Holders of ~~the Two Hospital Transaction is consummated:~~Series 1996 Bonds will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1B Claims. | ~~Impaired. Holders of the Series 1996 Bonds will be paid, on the Effective Date, a sum sufficient to fully satisfy all Allowed Class 1B Claims.~~ |
| | ~~Unimpaired. Holders of Allowed Class 1C Claims will, at the election of the District, receive one of the following treatments: (a) The Holder of the Class 1C Claim will receive the Collateral in which that Holder has a security interest; or (b) the Holder of the Class 1C Claim will receive any proceeds actually received by the District from the sale or disposition of the Collateral in which that Holder has a security interest; or (c) the Holder of the Class 1C Claim will receive Cash in the amount of that Holder's Allowed Class 1C Claim; or (d) the Holder of the Class 1C Claim will receive such other distributions or treatment as are necessary to leave the rights of said Holder Unimpaired or as are necessary to otherwise satisfy those requirements of chapter 11 that are incorporated into chapter 9 of the Bankruptcy Code.~~ | |
| | ~~If the Alternative Transaction is consummated:~~ | ~~Impaired. Allowed Claims in Class 1A shall be satisfied as set forth more fully in Section V.A.2.~~ |
| ~~If the Alternative Transaction is consummated:~~ | | ~~Impaired. Allowed Claims in Class 1B shall be satisfied as set forth more fully in Section V.A.2~~ |

| | | | |
|---|---|---|---|
| 1 | Class 2A Allowed General Unsecured Claims | ~~If~~Impaired.  Holders of Allowed General Unsecured Claims will receive their pro rata share of $17 million or such increased or reduced amount that will be available for payment of such Claims, as more fully set forth in Section V.A.3.  Such distributions shall be paid in four equal annual installments, without interest, with the ~~Two-Hospital Transaction is consummated:~~first payment to be made on the first anniversary of the Sale Closing Date, and on each anniversary thereafter. | ~~Impaired.  Holders of Allowed General Unsecured Claims will receive their pro rata share of $17 million or such increased or reduced amount that will be available for payment of such Claims, as more fully set forth in Section V.A.3.  Such distributions shall be paid in four equal annual installments, without interest, with the first payment to be made on the first anniversary of the Sale Closing Date, and on each anniversary thereafter.~~ |
| | | ~~If the Alternative Transaction is consummated:~~ | ~~Impaired.  Holders of Allowed General Unsecured Claims will receive their pro rata share of the Class 2A Annual Cash Payment, as more fully set forth in Section V.A.2.~~ |

Summary  5

| | | | |
|---|---|---|---|
| 1 | Class 2B | ~~If~~Impaired. Upon the ~~Two Hospital~~ ~~Transaction is consummated:~~Sale Closing Date. PHH will assume the District's obligations relating to all Class 2B Claims. From and after the Sale Closing Date, holders of Allowed Class 2B Claims shall only have a right to collect payment on account of such Claims from PHH, and the District shall thereafter be relieved of any and all liability on account of such Claims. | ~~Impaired. Upon the Sale Closing Date, PHH will assume the District's obligations relating to all Class 2B Claims. From and after the Sale Closing Date, holders of Allowed Class 2B Claims shall only have a right to collect payment on account of such Claims from PHH, and the District shall thereafter be relieved of any and all liability on account of such Claims.~~ |
| 2 | General Unsecured Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community Medical Group, ~~KM Strategic Management, LLC~~ and LHIO, and Claims of Constituent Members of Each | | |

| | | |
|---|---|---|
| ~~If the Alternative Transaction is consummated:~~ | ~~Impaired. Holders of Allowed Class 2B Claims shall receive the same treatment as holders of Allowed Class 2A Claims.~~ |

Unimpaired. Class 2C

Interests of Defined Benefit Plan Participants

~~Background Information:~~Unimpaired.

~~Questions:~~See pages 6 to 18.

Please contact the Debtor's counsel, Charles D. Axelrod, Gary E. Klausner or H. Alexander Fisch, Stutman, Treister & Glatt 1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (phone: 310-228-5600; facsimile: 310-228-5788)

Summary 6

1        To the extent that there is any inconsistency between the Plan (including the Exhibits

2 and any supplements to the Plan) and the description in the Disclosure Statement, the terms of the

3 Plan (including the Exhibits and supplements to the Plan) will govern.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

~~I.~~
~~I.~~ ~~II.~~  **INTRODUCTION**

The District filed a petition under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") on December 13, 2007 (the "Petition Date"), which was designated Case Number 6:07-bk-18293-PC by the clerk of court (the "Chapter 9 Case"). An order for relief[2] was entered on February 20, 2008, and the Chapter 9 Case is currently pending before the United States Bankruptcy Court for the Central District of California, Riverside Division (the "Bankruptcy Court").

The District is the proponent of the Plan, a copy of which is attached to this Disclosure Statement as Exhibit A. [At a hearing held on December ~~8,~~17, 2009, the Bankruptcy Court determined that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the District to transmit it to holders of impaired claims in connection with the solicitation of votes with respect to the Plan.]

As described more fully elsewhere in this document, the District believes that the Plan provides the greatest and earliest possible recoveries to holders of claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative restructuring or reorganization would result in delay, uncertainty, expense, litigation and, ultimately, smaller or no distributions to creditors. Accordingly, **the District urges that you cast your ballot in favor of the Plan.**

    A.    **The Purpose Of This Disclosure Statement.**

The Bankruptcy Code generally requires that the proponent of a plan of adjustment prepare and file with the Bankruptcy Court a "disclosure statement" that provides information of a

---

[2]  In a published decision, the Bankruptcy Court upheld the chapter 9 filing by the District. The Indenture Trustee for the Bonds had filed an objection to the District's petition, claiming that the District was ineligible for relief under chapter 9 because the District had failed to attempt to negotiate an adjustment of its debts with its major creditors prior to the filing of the petition. ST&G argued on behalf of the District that such negotiation was impracticable, and presented evidence supporting this contention. The bankruptcy court agreed with the District and found that negotiations by the District with its creditors was impracticable because voters had rejected the District's measures to refinance its debts or sell substantially all of its assets and there was insufficient time for the District to formulate a realistic standalone plan of adjustment and then negotiate its provisions with its numerous creditors within the context of a continuing liquidity crisis and risk of loss to the District's assets. Accordingly, the Court declined to dismiss the chapter 9 petition. *See In re Valley Health Sys.*, 383 B.R. 156 (Bankr. C.D. Cal. 2008).

1  kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under

2  that plan to make an informed judgment with respect to the plan.  This Disclosure Statement

3  provides such information.  ***Parties in interest should read this Disclosure Statement, the Plan, and***

4  ***all of the exhibits accompanying such documents in their entirety in order to ascertain:***

5        1.    How the Plan will affect their claims against the District;

6        2.    Their rights with respect to voting for or against the Plan;

7        3.    Their rights with respect to objecting to confirmation of the Plan; and

8        4.    How and when to cast a ballot with respect to the Plan.

9        This Disclosure Statement, however, cannot and does not provide creditors with legal

10  or other advice or inform such parties of all aspects of their rights.  Claimants are advised to consult

11  with their attorneys and/or financial advisors to obtain more specific advice regarding how the Plan

12  will affect them and regarding their best course of action with respect to the Plan.

13        This Disclosure Statement has been prepared in good faith and in compliance with

14  applicable provisions of the Bankruptcy Code.  Based upon information currently available, the

15  District believes that the information contained in this Disclosure Statement is correct as of the date

16  of its filing.  The Disclosure Statement, however, does not and will not reflect events that occur after

17  ~~November 2,~~December 17, 2009 (and, where indicated, specified earlier dates), and the District

18  assumes no duty and presently does not intend to prepare or distribute any amendments or

19  supplements to reflect such events.

      **B.**      **Summary Of Entities Entitled To Vote On The Plan And Of Certain
Requirements Necessary For Confirmation Of The Plan.**

22        Holders of Allowed Claims in Classes 1A (the Series 1993 ~~Bonds~~COPs), Class 1B

23  (the Series 1996 Bonds), Class 2A (General Unsecured Claims), and Class 2B[3] (General Unsecured

24  Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley

25  Community Medical Group, and LHIO, and Claims of Constituent Members of Each) (collectively,

26  the "Voting Classes") are entitled to vote on the Plan, because the Claims in each such Class may be

27  [3]   In the event of the Alternative Transaction, Class 2B will vote with Class 2A, as the treatment of

28  both Classes will be identical.

1    "impaired" under the Plan within the meaning of section 1124 of the Bankruptcy Code under ~~one of~~

2    the ~~alternative treatments~~treatment of Claims in such Classes.

3            The Bankruptcy Court may confirm the Plan only if at least one Class of impaired

4    claims has voted to accept the Plan (without counting the votes of any insiders whose claims are

5    classified within that Class) and if certain statutory requirements are met as to both non-consenting

6    members within a consenting Class and as to any dissenting Classes.  A Class of claims has accepted

7    the Plan only when at least one-half in number _and_ at least two-thirds in amount of the Allowed

8    Claims actually voting in that Class vote in favor of the Plan.

9            In the event of a rejection of the Plan by any of the Voting Classes, the District will

10   request that the Bankruptcy Court confirm the Plan in accordance with those portions of section

11   1129(b) of the Bankruptcy Code that are applicable to the Chapter 9 Case, which provisions permit

12   confirmation by a process known as "cramdown" notwithstanding such rejection if the Bankruptcy

13   Court finds, among other things, that the Plan "does not discriminate unfairly" and is "fair and

14   equitable" with respect to each rejecting Class.  Other sections of this Disclosure Statement provide a

15   more detailed description of the requirements for acceptance and confirmation of the Plan.

16

      C.    **Voting Procedures, Balloting Deadline, Confirmation Hearing, And**
17            **Other Important Dates, Deadlines, And Procedures.**

18            1.    **Voting Procedures And Deadlines.**

19            The District has provided copies of this Disclosure Statement and ballots to all known

20   holders of impaired claims in the Voting Classes.  Those holders of an Allowed Claim in each_of the_

21   Voting Classes who seek to vote to accept or reject the Plan _must_ complete a ballot and return it to

22   the Court-appointed ballot tabulator – ~~Joanne Stern~~Kendra A. Johnson, Paralegal, Stutman, Treister

23   & Glatt Professional Corporation, 1901 Avenue of the Stars, 12th Floor, Los Angeles, California

24   90067 (facsimile: 310-228-5788) (the "Ballot Tabulator") – so that their ballots actually are received

25   by no later than the Balloting Deadline (as defined below).  Ballots do not constitute proofs of claim

26   and must be returned directly to the Ballot Tabulator, **not** to the Bankruptcy Court.

27

28

1        *The record holders of the Bonds (including, without limitation, any brokers,*

2    *dealers, commercial banks, trust companies or other agents of nominees (each a "Nominee")) are*

3    *directed to forward this Disclosure Statement, the Ballots and other solicitation materials to the*

4    *beneficial owners of such Bonds. The District shall reimburse such Nominee's reasonable, actual*

5    *and necessary out-of-pocket expenses associated with the distribution of such solicitation*

6    *materials to the beneficial owners of the Bonds, based upon applicable securities exchange*

7    *guidelines.*

8        *All ballots, including ballots transmitted by facsimile, must be completed, signed,*

9    *returned to, and actually received by the Ballot Tabulator by not later than _____ ___,*

10    *2010 (2010, at 4:00 p.m. Pacific Time (the "Balloting Deadline"). Ballots received after the*

11    *Balloting Deadline, and ballots returned directly to the Bankruptcy Court, shall not be counted in*

12    *connection with confirmation of the Plan.*

13

        **2.**    **Date Of The Confirmation Hearing And Deadlines For Objection**

14            **To Confirmation Of The Plan.**

15        The hearing to determine whether the Bankruptcy Court will confirm the Plan (the

16    "Confirmation Hearing") will commence on _____ ___, 2010, at _____ a.m. Pacific Time in

17    the Courtroom of the Honorable Peter H. Carroll, United States Bankruptcy Judge for the Central

18    District of California, Courtroom 304, 3420 Twelfth Street Courtroom 304 Riverside, CA 92501.

19    The Confirmation Hearing may be continued from time to time by announcement in open Court

20    without further notice.

21        Any objections to confirmation of the Plan must be filed with the Bankruptcy Court

22    and served on the following entities so as to be actually received by no later than _____

23    _____, 2010: (a) Mr. Joel M. Bergenfeld, Chief Executive Officer of Valley Health System, 1117 East

24    Devonshire Avenue, Hemet, CA 92543; (b) Stutman, Treister & Glatt Professional Corporation,

25    1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Attention: Gary E. Klausner,

26    Esq. (counsel to the District); and (c) Pachulski Stang Ziehl and Jones, 10100 Santa Monica Blvd.,

27    Suite 1100, Los Angeles, California 90067, Attention: Sam Maizel, Esq. (counsel to the Official

28

1  Committee of Unsecured Creditors).  Objections that are not timely filed and served may not be

2  considered by the Bankruptcy Court. *Please refer to the accompanying notice of the Confirmation*

3  *Hearing for specific requirements regarding the form and nature of objections to confirmation of*

4  *the Plan.*

5

### D.    Four Important Notices And Cautionary Statements.

6       1.    The historical financial data relied upon in preparing the Plan and this

7  Disclosure Statement is based upon the District's books and records.  Although certain professional

8  advisors of the District assisted in the preparation of this Disclosure Statement, in doing so such

9  professionals relied upon factual information and assumptions regarding financial, business, and

10  accounting data provided by the District and third parties, much of which has not been audited. *The*

11  *professional advisors of the District have not independently verified such information and,*

12  *accordingly, make no representations or warranties as to its accuracy.*  Moreover, although

13  reasonable efforts have been made to provide accurate information, the District does not warrant or

14  represent that the information in this Disclosure Statement, including any and all financial

15  information and projections, is without inaccuracy or omissions, or that actual values or distributions

16  will comport with the estimates set forth herein.

17       2.    *No entity may rely upon the Plan or this Disclosure Statement or any of the*

18  *accompanying exhibits for any purpose other than to determine whether to vote in favor of or*

19  *against the Plan.*  Nothing contained in such documents constitutes an admission of any fact or

20  liability by any party, and no such information will be admissible in any proceeding involving the

21  District or any other party, nor will this Disclosure Statement be deemed evidence of the tax or other

22  legal effects of the Plan on holders of claims in the Chapter 9 Case.

23       3.    Certain information included in this Disclosure Statement and its Exhibits

24  contains forward-looking statements within the meaning of the Securities Act of 1933, as amended,

25  and the Securities Exchange Act of 1934, as amended.  The words "believe", "expect", "anticipate"

26  and similar expressions identify such forward-looking statements.  The forward-looking statements

27  are based upon information available when such statements are made, and are subject to risks and

28

1   uncertainties that could cause actual results to differ materially from those expressed in the

2   statements. A number of those risks and uncertainties are described below. Readers therefore are

3   cautioned not to place undue reliance on the forward-looking statements in this Disclosure

4   Statement. The District undertakes no obligation to publicly update or revise any forward-looking

5   statements, whether as a result of new information, future events or otherwise.

6        4.    ***The Securities and Exchange Commission neither has approved nor***

7   ***disapproved this Disclosure Statement, nor has it determined whether this Disclosure Statement is***

8   ***accurate, truthful, or complete.***

9

10       **E.    Additional Information.**
         If you have any questions about the procedures for voting on the Plan, desire another

11   copy of a ballot, or seek further information about the timing and deadlines with respect to

12   confirmation of the Plan, please write to counsel for the District as follows: Charles D. Axelrod,

13   Gary E. Klausner or H. Alex Fisch, Stutman, Treister & Glatt Professional Corporation, 1901

14   Avenue of the Stars, 12th Floor, Los Angeles, California 90067 (facsimile: 310-228-5788). Please

15   note that counsel for the District cannot and will not provide creditors with any legal advice,

16   including advice regarding how to vote on the Plan or the effect that confirmation of the Plan will

17   have upon claims against the District.

18   **II.~~III.~~  BACKGROUND INFORMATION**

19

20       **A.    The District.**
         The District is a public agency, formed under the State of California Local Healthcare

21   District Law, Cal. Health and Safety Code § 32000 *et seq.* At the start of the Chapter 9 Case, the

22   District owned and operated three acute hospitals: (i) Hemet Valley Medical Center, a 340-bed

23   facility located in Hemet ("HVMC"); (ii) Menifee Valley Medical Center, an 84-bed facility located

24   in Sun City ("MVMC" or "Menifee"); and (iii) Moreno Valley Community Hospital, a 95-bed

25   facility located in the city of Moreno Valley ("Moreno"), ~~and~~as well as the Hemet Valley HealthCare

26   Center a 113- bed skilled nursing facility located in Hemet ("SNF") (HVMC and MVMC are

27   collectively referred to as the "Hospitals"). Moreno was sold to Kaiser Foundation Hospitals in June

28

~~53251~~9533833v1

6

EXHIBIT 1

19

1    2008.  In September 2008, the District decided to terminate its long-term care business and close its

2    skilled nursing facility.  That process concluded in early-December 2008, and the District continues

3    to use the facility previously occupied by SNF to operate a chemical dependency program and a post-

4    treatment retreat center.

5            The District encompasses approximately 882 square miles in the San Jacinto Valley

6    in west central Riverside County, including the City of Hemet, the City of San Jacinto, the City of

7    Sun City, and the surrounding unincorporated areas.  Approximately 360,000 people reside within

8    the District.

9

**B.    District's Financial Problems.**

10            At the time the District's Board of Directors (the "Board") considered filing a chapter

11   9 petition, the District was facing a liquidity crisis that threatened its continued operations.  The

12   Board concluded that filing a chapter 9 was the only available remedy to avoid litigation with and

13   collection action by creditors, while, at the same time, allowing the District to protect its asset

14   values, preserve its business operations and continue providing uninterrupted healthcare services to

15   its patients while it developed a comprehensive business plan.  Moreover, the task of restructuring

16   the District was particularly complicated and time consuming because of the multitude of financial

17   and contractual relationships inherent in the hospital business.

18            The decision to file chapter 9 came only after the District attempted alternatives that

19   would have avoided such a filing.  Specifically, voters had previously rejected two local measures

20   intended to resolve the District's financial problems and ensure that the District's facilities remained

21   open as public facilities.  On September 16, 2006, voters rejected Riverside County Measure I

22   ("Measure I"), which contemplated the issuance of $485 million in general obligation bonds, secured

23   by property tax revenues, to retire the District's special revenue bond debt, finance necessary capital

24   improvements, and assure the District had the time and capital needed to return to profitability.

25   After the defeat of Measure I, the District, during the summer of 2007, sought to sell substantially all

26   of its assets to enable it to pay its creditors and continue uninterrupted healthcare services in the

27   hands of the buyer, Select HealthCare Solutions ("Select").

28

~~532519533833~~v2

7

EXHIBIT 1

20

1    Given the nature and scope of the Select transaction, voter approval thereof was

2  required pursuant to California law.  In the event that the sale of substantially all of the District's

3  assets was rejected by the electorate, the District was contractually obligated to sell Moreno to Select

4  for $47 million (the "Moreno Transaction"), at the option of Select.  On November 6, 2007, voters

5  rejected Riverside County Measure G ("Measure G"), which sought approval of the sale of

6  substantially all of the District's assets to Select for an amount that would have resulted in the full

7  satisfaction of all creditor claims and the continued operation of the Hospitals, albeit as assets of

8  Select.

9    The District engaged QHR Consulting Services ("QHR") to undertake several tasks

10  intended to stabilize the District's financial situation and enable the formulation of a business plan

11  that would return operations to profitability.  Although QHR began this process prior to the Petition

12  Date, the District was not in a position to present a meaningful plan of adjustment as of the Petition

13  Date because of, at least, the following facts:

14    (a)    QHR had to complete its analysis of the District's complex, contract driven

15      business and, as of the Petition Date, roughly $250 million annual budget,

16      including the analysis of every material revenue and expense item to ascertain

17      the extent to which profits could be increased by instituting any operational or

18      logistical changes that were feasible and warranted.

19    (b)    As of the Petition Date, QHR had not yet implemented a transition from its

20      capitated payor agreements to fee for service payor relationships.  The

21      conversion to a fee for service based payor regime would engender an initial

22      severe downturn in cash flow because the District would lose its upfront

23      capitation payments, and there would be a delay inherent in billing on a fee for

24      service basis and collecting the receivables created thereby.  The termination

25      of capitation arrangements and the implementation of fee for service

26      arrangements had to be negotiated to replace the extant capitation system.

27

28

53253\953833v2

8

EXHIBIT 1

1          Moreover, many of the capitated relationships were governed by regulations

2          that do not allow expedient modification.[4]

3    (c)    Although authorized by the District's Board to solicit interest in the District's

4          non-essential assets and to attempt to sell such assets to generate cash to be

5          used for plan of adjustment purposes, QHR was unable to move forward

6          meaningfully on this mandate until the District's contractual relationship with

7          Select was resolved, given certain liens that were granted in favor of Select to

8          secure the repayment of advances that Select made to the District relating to

9          the contract negotiated in connection with Measure G.[5]

10    (d)    The sale of Moreno had not yet occurred, so it was uncertain whether the

11          benefits inherent thereunder could be factored into the plan promulgation

12          process.

13

14 **III.~~IV.~~ ADMINISTRATION OF THE DISTRICT'S CHAPTER 9 CASE**

    **A.**     **Formation of the Committee.**

15 Following a formation meeting held on March 26, 2008, the United States Trustee

16 appointed the members of the Official Committee of Unsecured Creditors (the "Committee"). The

17 Committee currently consists of the following members: (a) SEIU-United Healthcare Workers -

18 West; (b) Universal Health Services of Rancho Springs, Inc.; (c) Hemet Community Medical Group

19 ("HCMG"); (d) Sodexho USA, Inc.; (e) HCR Manor Care; (f) Hemet Healthcare Surgery, Inc.; (g)

20 Anaheim Memorial Medical Center; and (h) Southland Endoscopy Center. The Committee is

21 represented in the Chapter 9 Case by the firm of Pachulski Stang Ziehl & Jones LLP ("PSZ&J") and

22 receives financial advisory services from Alvarez & Marsal Healthcare ~~Indemnity~~Industry Group,

23 LLC ("AMHIG"). Pursuant to an agreement, the District agreed to pay the reasonable fees and costs

24 incurred by PSZ&J and AMHIG on a regular basis, provided that such fees and costs not exceed

25

26

27   [4]   These negotiations were completed during the chapter 9 case and the District weathered the cash
        flow crisis.

28   [5]   As a part of the sale of Moreno to Kaiser, Select released its liens.

~~5325-~~19533833v~~2~~

EXHIBIT 1

1  $40,000 in any one month and that those fees and costs are subject to the disclosure and

2  reasonableness requirements of section 943(b)(3) of the Bankruptcy Code.

3

4  **B.    Sale of Moreno to Kaiser.**

    In connection with Measure G, the District had entered into a contract to sell

5  substantially all of its assets to Select subject to obtaining a vote of the electorate approving the sale.

6  The contract also provided that if the electorate voted down the sale of substantially all of its assets,

7  the District would nonetheless enter into the Moreno Transaction; however, the Moreno Transaction

8  was not intended to be documented prior to the rejection of Measure G and Select's election to

9  continue with the Moreno Transaction. In early-December 2007, Select tendered notice that it

10  intended to proceed with the Moreno Transaction. Select had advanced $14 million of the purchase

11  price to the District and, under certain conditions, was entitled to have the advance repaid if the

12  District breached its obligation to sell Moreno to Select. Select secured repayment of the $14 million

13  deposit with deeds of trust on various real property assets of the District.

14  Select was then approached by Kaiser concerning Kaiser's desire to purchase Moreno

15  for more than the $47 million contemplated by the Moreno Transaction. In turn, Select entered into

16  discussions with the District concerning the District's assumption of the Moreno sale contract,

17  Select's assignment of its rights under the assumed contract to Kaiser and an equitable sharing of the

18  amount that Kaiser was to pay ~~over~~in excess of $47 million, taking into consideration, among other

19  things, Select's out of pocket costs. Also, with Select's consent, the District and Kaiser had

20  discussions concerning certain shared services and non-competition arrangements that would

21  augment and protect, respectively, the District's remaining operations.

22  Ultimately, the original agreement with Select was amended twice and Moreno was

23  sold to Kaiser on June 20, 2008. The consideration arising out of and related to the sale (totaling in

24  excess of $53 million) was used, pursuant to the Stipulation dated May 8, 2008 (the "Select

25  Stipulation"), to redeem the Series 1996 Bonds at par (approximately $33.7 million), replenish the

26  reserve fund for the Series 1993 ~~Bonds~~COPs and then to redeem at par approximately $6.3 million of

27  the Series 1993 ~~Bonds~~COPs, and to pay $10.4 million owed to Select on its $14 million advance.

28

1  Select also received the Select Administrative Note, which is a 5% promissory note, consistent with

2  the form thereof that appears as Exhibit "A" to the Select Stipulation.

3

**C.    Motions For Relief From The Stay.**

4  Numerous motions requesting relief from the automatic stay have been filed. When

5  the movant agreed both to liquidate its claim in another forum and not to enforce any claim so

6  liquidated against assets or property that were the District's but rather, to look exclusively to

7  insurance policy proceeds, the District stipulated to relief from the stay being granted. As of October

8  30, 2009, the Bankruptcy Court has not granted any motion for stay relief that the District opposed.

9

**D.    SEIU Litigation.**

10  There are two labor union that have been certified as the bargaining representative for

11  certain of the District's employees: the California Nurses Association ("CNA") and SEIU, United

12  Healthcare Workers – West ("SEIU"). Subsequent to the Petition Date, the District concluded that

13  the prepetition agreements, which had been negotiated between the District and SEIU, and the

14  District and CNA, ~~need~~needed to be modified: (1) to reflect current market conditions, and, in

15  particular, those related to wages and healthcare benefits, and (2) to implement changes to the

16  District's business model. To that end, the District opened a dialogue with both unions concerning

17  the possibility of negotiating modifications to their respective agreements.

18  In the case of SEIU, the District did not have an executed collective bargaining

19  agreement. Rather, in 2006, the District and SEIU negotiated the terms of a tentative agreement that

20  would form the basis of a memorandum of understanding. A memorandum of understanding

21  ("MOU") based on the tentative agreement was drafted, but was never executed.

22  The District and SEIU conducted several bargaining sessions in an attempt to reach a

23  consensus as to modifications to the MOU. However, those negotiations broke down in July 2008.

24  As a result of the breakdown in negotiations, and because of the need for the District to implement

25  certain essential changes to wages and benefits, ~~to what~~ that might have otherwise been required

26  under the MOU, the Board voted to implement certain changes to wages and healthcare benefits at

27  its board meeting on July 28, 2008.

28

5325‑9533833v2

11

EXHIBIT 1

24

1        Several months of litigation between the SEIU and the District ensued before the

2 California Public Relations Board, the United States District Court for the Central District of

3 California, and this Court. The District and the SEIU ultimately resolved their differences

4 consensually. As a result of that consensual resolution, all pending litigation between SEIU and the

5 District (other than one grievance) was dismissed; the SEIU withdrew the over $3 million claim it

6 had filed in the Chapter 9 Case, which claim was reflected in the Court's registry of claims as claim

7 number 179, except with respect to the single grievance. The District and SEIU entered into a new

8 MOU.

9

10     **E.**       **CNA Negotiation and New MOU.**
        The District also renegotiated the terms and conditions of employment for its

11 employees who are members of CNA during the Chapter 9 Case. Along with the SEIU, CNA was

12 the subject of the District's Motion For Order (1) Approving Rejection Of Executory Contract With

13 SEIU; (2) Confirming Interim Modifications To Agreements With SEIU And CNA; And (3) Post-

14 Expiration Terms And Conditions Of Employment, filed June 9, 2009, and withdrawn August 10,

15 2009 after a consensual resolution mooted the Motion. The renegotiation of the CNA and SEIU

16 agreements resulted in significant cost avoidance and savings for the District.

17

18     **F.**       **Closure of SNF.**
        In September 2008, the Board, with the advice of the District's financial advisors,

19 decided to terminate its long-term care business and close its skilled nursing facility. The SNF had

20 been losing money from operations and was projected to continue to operate at a substantial loss. In

21 the ensuing months, the District, with the assistance of its counsel and financial advisors, terminated

22 its skilled nursing facility and successfully transitioned all of its patients to other facilities. That

23 process was concluded in early December 2008.

24        The District continues to operate a chemical dependency program and a post-

25 treatment retreat center ("<u>HVHC</u>") in the facility formerly occupied by the SNF.

26

27

28

**G.    Aetna Litigation.**

The District initiated an adversary proceeding against Aetna Health of California, Inc., and Aetna Health Management LLC (together, "Aetna") on October 2, 2008 by filing a complaint. In summary, the complaint asserted that Aetna owed the District $1,598,045.87 for post-petition services, and was in violation of the automatic stay by failing to turnover such funds. Aetna filed its answer on November 4, 2008, in which answer Aetna California asserted a counterclaim against the District. Aetna's answer and counterclaim asserted, in summary, that Aetna was entitled to retain the funds sought by the District, and requested that Aetna's proof of claim be allowed in the amount set forth it its proof of claim, designated as claim number 181-3 in the Court's registry of claims, which amount exceeds $3.8 million.

The District and Aetna are presently exploring the possibility of settling their disputes consensually.

**H.    Sale of Hemet Global Services.**

One of the District's assets was its interest in Hemet Global Services ("HGS"). The District decided to liquidate its ownership interest in HGS and successfully concluded a sale of such interest to HCMG for $3.4 million, plus $3.3 million for distributions that would be due the District on account of its interest through June 30, 2008. The District received $2.5 million in cash at the closing of the sale of its HGS interest, plus a promissory note in the face amount of $4.2 million, payable over sixty months.

**I.    Pending Litigation Matters Challenging Consummation of Sale Pursuant to ASA to be Resolved As Part of Plan Confirmation.**

Shortly after the District's Board of Directors approved the ASA and scheduled the election to obtain voter approval, certain parties[6] initiated proceedings relating to the proposed sale

---

[6] The parties involved in bringing various litigation tactics in an effort to derail the ASA sale process are comprised of some, or all, of the following parties: Prime Healthcare Services, Inc., a Delaware corporation; Prime Healthcare Management, Inc., a California corporation; Save Hemet Valley Hospitals, Inc., a California corporation, Albert L. Lewis, Jr. a taxpayer and resident of the VHS local health care district; John Lloyd, a taxpayer and resident of the VHS local health care district; and Edward J. Fazekas, a taxpayer and resident of the VHS local health care district (collectively, referred to herein as "Prime").

1    transaction in which they sought either directly to prevent the transaction from taking place or other

2    relief which would have precluded the sale to PHH from closing or the election regarding Measure P

3    from going forward.  These challenges included the following:

4             a.      **The Measure P Action ("Measure P Action").**  The Measure P Action was

5    initiated by Albert L. Lewis, Jr., on October 15, 2009, whereby Mr. Lewis brought a lawsuit in the

6    Superior Court against Barbara Dunmore, named as the defendant in the action in light of her alleged

7    role as the duly appointed Registrar of Voters for the County of Riverside, State of California, who

8    serves as Riverside County's Chief Electorate Officer.  The lawsuit named VHS and William Cherry,

9    M.D., Chairman of Board of Directors of VHS, as the "Real Parties in Interest".  In his complaint,

10   Mr. Lewis generally alleged that the language of Measure P, as adopted by the District's Board of

11   Directors, was false and misleading.  The primary claims were that Measure P (a) falsely represented

12   that the sale to PHH was necessary to retain access to acute service at HCMG and Menifee by not

13   disclosing that other buyers expressed an interest in purchasing these hospitals, (b) failed to state that

14   PHH would not be required to continue to provide acute and emergency services under certain

15   circumstances, and (c) failed to advise voters that a "No" vote on Measure P would mean the

16   implementation of the Alternative Transaction.  Based on these allegations, Mr. Lewis sought (i)

17   declaratory relief declaring Measure P to be false and/or misleading, (ii) injunctive relief requiring

18   the defendant to amend the language of Measure P, and (iii) a temporary restraining order and

19   preliminary injunction restraining and enjoining Ms. Dunmore from placing the current version of

20   Measure P on the ballot, the county's website or within any ballot pamphlets to be distributed to the

21   electorate.  Mr. Lewis's request for an Order Shortening time on the hearing and trial was denied by

22   the Superior Court at a hearing held on October 23, 2009.  Currently, there is a case management

23   conference hearing set in this matter for April 14, 2010.  However, the District anticipates that the

24   Measure P Action has become moot in light of the fact that the Registrar issued and printed the ballot

25   and the election was in fact held on December 15, 2009, and that the transaction should therefore be

26   dismissed or taken off of the Superior Court's calendar for this reason.

27

28

      b.    **The Public Records Act Action ("PRA Action").**  On or about October 27, 2009, Prime filed a "Notification of Intent to File State Court Action Against Debtor for Violation of Public Records Act."  On the same day, Prime filed its "Verified Petition for Writ of Mandate; Complaint for Injunctive Relief", alleging that VHS committed postpetition violations of the California Public Records Act contrary to California Code of Civil Procedure sections 526, 1060, 1085, and 1094.5, as well as California Government Code sections 6258 and 6259.  Prime asserted that the causes of action were not subject to the automatic stay because they related to postpetition acts that occured on or after September 21, 2009, when Prime submitted Public Records Act requests to VHS.[7]  At the hearing held on an expedited basis on November 23, 2009, the Superior Court ordered the District to produce certain reports prepared by the Peira Group to Prime by December 4, 2009.    The District then filed a Petition for Writ of Mandate with the California Court of Appeal, seeking to overturn a portion of the Order of the Superior Court.  On December 3, 2009, the Appellate Court issued a stay of the Superior Court's ruling and requested additional briefing by Prime.  The District has responded to such additional briefing and is awaiting a determination by the Appellate Court.  A case management conference is currently scheduled for April 26, 2010.

      c.    **The CEQA Action ("CEQA Action").**

      As a further effort to challenge and overturn VHS's approval of the ASA, on November 3, 2009, Prime filed a "Notification of Intent to File State Court Action Against Debtor for Violation of the California Environmental Quality Act", in which Prime alleged that VHS committed postpetition violations of the California Environmental Quality Act, California Public Resources Code section 21000 *et seq.* ("CEQA") and that it did not require relief from stay to pursue the action.  Thereafter, on November 6, 2009, Prime filed a "Verified Petition for Writ of Mandate; Complaint for Declaratory Relief and Injunctive Relief," in which it asserted that VHS's approval of the ASA was "procedurally and substantively illegal" because (a) in the event Public Approval was

---

[7]  While the District has taken the position that the relief sought in connection with both the Measure P Action and CEQA Action (as both are hereinafter defined) requires the Bankruptcy Court to grant relief from stay, and that therefore those actions were filed in violation of the automatic stay, the District has not taken that position with regard to the PRA Action.

1   obtained, it was likely that PHH would develop the agricultural property adjacent to Menifee but it

2   did not obtain the requisite approvals for such development, and/or (b) in the event Public Approval

3   was not obtained, and PHH purchased only Menifee under the Alternative Transaction, it was likely

4   that HVMC would close, thereby causing urban blight in Hemet.  Under either circumstance, Prime

5   has alleged that the proposed sale to PHH constitutes a "project" requiring compliance with the

6   California Environmental Quality Act, California Public Resources Code section 21000 *et seq.*

7   ("CEQA") and that the District has failed to comply.  On December 3, 2009, the District filed with

8   the Superior Court a Notice of Removal, removing this action to the Bankruptcy Court.  The

9   Bankruptcy Court has scheduled a status conference on the removed CEQA Action for January 19,

10   2010 at 9:30 a.m.  The District disputes the allegations that the sale constitutes a "project" requiring

11   compliance with CEQA and has engaged counsel with expertise in CEQA matters.   The District

12   intends to oppose the CEQA Action on both procedural and substantive grounds.

13         d.    **The Government Code Section 1090 Action ("Section 1090 Action").**

14         On October 13, 2009, Prime filed a motion seeking relief from the automatic stay to

15   pursue an action against the District (the "Section 1090 Stay Relief Motion"), the purpose of which

16   was to seek orders nullifying or invalidating the ASA and thereby preventing the District from

17   proceeding with the ASA and enjoining the election.[8]  Specifically, the Section 1090 Stay Relief

18   Motion was based on allegations that, among other things: (i) the VHS Board of Directors illegally

19   approved a rush sale of its assets to PHH, without adequately acknowledging the interest of other

20   potential purchasers; (ii) certain conflicts of interest exist relating to the approval of the ASA

21   because certain of the members of the VHS Board of Directors are financially interested, as they are

22   employed by, or derive financial benefits from, Dr. Kali Chaudhuri (one of the principals of PHH), in

23   violation of California Government Code Section 1090, which prohibits any board member from

24   being "financially interested in any contract made by them in their official capacity, or by any body

25   or board of which they are members"; and (iii) VHS failed to apply to the proper local government

26

27   [8]  Prime did not attach a copy of its proposed complaint to its moving papers, however, a copy of

28   the complaint was filed in a supplemental pleading shortly before the hearing (the "Section 1090 Action").

1    authorities for approval of its decision to exit the hospital business, in violation of the Cortese-Knox-

2    Hertzberg Local Government Reorganization Action of 2000, which requires VHS to apply to the

3    Riverside Local Area Formation Commission for approval of the sale of substantially all of its assets.

4    The Section 1090 Stay Relief Motion was heard by the Bankruptcy Court on November 12, 2009,

5    and was denied in its entirety, without prejudice, by order dated November 23, 2009 (the "Section

6    1090 Stay Relief Order").  Accordingly, the Section 1090 Action was not filed in the Superior Court.

7            **e.**    **Current Status of CEQA Action and Section 1090 Action Litigation.**

8            On or about November 20, 2009, Prime filed a "Renewed Motion for Relief from

9    Stay" (the "Renewed Stay Motion"), in which it once again requested that the Bankruptcy Court (i)

10    allow it to file the Section 1090 Action, and (ii) annul the automatic stay and permit Prime to

11    proceed with the previously filed CEQA Action.  Concurrent with the filing of its Renewed Stay

12    Motion, Prime requested that the Bankruptcy Court shorten time to expedite the hearing on the

13    motion, which application the Bankruptcy Court denied by order dated November 30, 2009.

14            On December 3, 2009, the District, acting pursuant to 28 U.S.C. Section 1452,

15    exercised its right to remove the CEQA action to the Bankruptcy Court.

16            Thereafter, on December 7, 2009, Prime filed its "Notice of Appeal" of the 1090 Stay

17    Relief Order and elected to have the District Court hear the appeal of the order.  On December 14,

18    2009, Prime noticed its Renewed Stay Motion for hearing on January 7, 2010 at 9:30 a.m.

19            **f.**    **Resolution of Pending "Challenge Actions" At Confirmation.**

20            As matters now stand:  (1) the CEQA Action is pending in the Bankruptcy Court; (2)

21    the Measure P Action is pending in the Superior Court; (3) the PRA Action is pending in the

22    Superior Court; and (4) the Section 1090 Action (collectively, hereinafter referred to as the

23    "Challenge Actions"), has not been filed.

24            The District has concluded that a full and final resolution of all of the various issues

25    that have been raised in the Challenge Actions is critical to both the confirmation and the

26    implementation of the Plan.  Once the Plan is confirmed, the District believes that the Two Hospital

27    Transaction will only close if the obstacles to the sale posed by the Challenge Actions are removed.

28

53251-9533833v2

17

EXHIBIT 1

30

1   Indeed, it seems unlikely that PHH will want to proceed with the closing of a sale pursuant to the

2   ASA until all challenges and concerns regarding the legality and enforceability of the Public Vote

3   and the ASA are adjudicated on a final basis or otherwise resolved.

4        Accordingly, the District intends to present evidence in connection with the hearing to

5   confirm the Plan which will address all of the issues that have been raised in the Challenge Actions

6   and will request that the Bankruptcy Court make findings of fact and conclusions of law and

7   adjudicate all of the issues pertaining to the Challenge Actions as part of the confirmation of the

8   Plan.  It is the District's position that the Bankruptcy Court's adjudication of the issues raised in

9   connection with the Challenge Actions will fully and finally resolve all of those issues such that any

10  pending or threatened actions relating to the subject matter thereof will be subject to dismissal or

11  judgment in favor of the District based on applications of the principles of collateral estoppel and *res*

12  *judicata.*

13

14  **J.**    **Prime's Expressed Interest in Purchasing The District's Assets.**
         On November 19, 2009, Prime sent a letter (the "Prime Letter") to Dr. William Cherry

15  expressing an interest in purchasing substantially all of the District Assets on terms and conditions

16  that were generally outlined in the letter.  At the time the District received the Prime Letter: (i) VHS

17  was subject to an exclusivity agreement with PHH which precludes the District from negotiating

18  with other potential purchasers during the exclusivity period; (ii) the District had already executed

19  the ASA and was further contractually prevented from engaging with Prime regarding a sale of its

20  assets; and (iii) the District had already filed its plan and disclosure statement based on the ASA and

21  its agreement with PHH.  Accordingly, the District did not engage in any formal discussions or

22  negotiations with Prime with regard to the offer set forth in the Prime Letter.

23

24  **IV.V.  THE DISTRICT'S LIABILITIES AND ASSETS**
         A copy Copies of the District's preliminary financial statements dated as of August 31, 2009,

25  and dated as of October 31, 2009 is are attached hereto as Exhibit B.  Set forth below is a summary of

26  the liabilities and assets that are relevant to the Plan.

27

28

53251-9533833v2

EXHIBIT 1

**A.      Liabilities.**

    **1.      Proofs of Claim.**

        The Bankruptcy Court established August ~~24~~,25, 2008 as the deadline for filing proofs of claim against the District~~, and by~~. By subsequent order, the Bankruptcy Court established July 10, 2009 as a~~the~~ supplemental bar date for claims filed by certain enumerated parties who did not get notice of the ~~initial bar date. Approximately 195 proofs of claim asserting claims aggregating to approximately $23 million, plus "unknown," "to be determined" or "unliquidated" amounts, were filed by the bar date relevant to the claim, with other proofs of claim being filed after the applicable~~August 25, 2008 bar date.

        ~~The District has engaged in a process aimed at ascertaining the difference between the proof of claim amount and the amount reflected as owing in the~~

        A total of approximately 263 proofs of claim[9] were filed as general unsecured claims and unsecured priority claims – which number includes 47 proofs of claim that amend previously filed claims – such that approximately 216 distinct claims have been filed against the District. The distinct claims comprise an aggregate of approximately $65.9 million in general unsecured and unsecured priority claims filed against the District, in addition to approximately $91 million in secured claims (which claimed amount does not reflect the amounts paid to the Bondholders since the Petition Date after the Moreno sale). The District's books and records ~~that resulted in stipulations with claimants that reduced the amount of filed claims by $2,213,306.69, excluding the stipulated withdrawal of SEIU's claim of more than $3 million. In addition, as a result of the District's process of discussing its reconciliation of proofs of claims with creditors, creditors have amended or withdrawn claims totaling $3,699,590.65. The District has also filed objections to four claims totaling $6,534,407.57, of which two, totaling $3,994,841.57, have been sustained. The~~

---

[9]   Some of the proofs of claims are composed of both a general unsecured claim and claim for an asserted priority and/or secured amount. These claims may therefore be included in the discussion of both the Filed General Unsecured Claims and Filed Priority Claims (as hereinafter defined).

1    remaining two objections are pending, but it appears that the claims show approximately $17 million[10]

2    owing to prepetition ordinary course unsecured creditors.

3
   **2.    General Unsecured Claims.**

4            A total of approximately 241 proofs of claim were filed as general unsecured claims –

5    which number includes 46 proofs of claim that amend previously filed claims – such that

6    approximately 195 distinct general unsecured claims have been filed against the District (the "Filed

7    General Unsecured Claims"). Of the Filed General Unsecured Claims, 183 proofs of claim assert

8    aggregate obligations of approximately $57 million, and 12 claims were filed in "unknown," "to be

9    determined" or "unliquidated" amounts.

10            The District has engaged in a process aimed at ascertaining the differences between

11    the amounts asserted in the Filed General Unsecured Claims and the amounts reflected as owing to

12    the claimants in the District's books and records or as otherwise evaluated by the District. To date,

13    the District has reduced the pool of Filed General Unsecured Claims by (i) approximately $1.24

14    million by reaching agreements with claimants pursuant to which such claimants amended their

15    original claims to reflect reduced amounts, plus (ii) approximately $4 million by successfully

16    objecting to claims, plus (iii) approximately $4.64 million through the process of negotiating

17    withdrawals of claims, including (a) the withdrawal of a general unsecured claim filed by Mark

18    O'Leary and Deborah O'Leary in the amount of approximately $2 million, and (b) the withdrawal of a

19    general unsecured claim in the amount of approximately $1.06 million filed by Dr. Kali P.

20    Chaudhuri for $1,060,000 will be withdrawn, and the other, filed by. [The District has also secured

21    stipulations withdrawing five additional unliquidated claims that were filed as general unsecured

22    claims for which claimants' recovery is restricted to insurance proceeds, and is on the verge of

23    obtaining additional stipulated withdrawals on this basis and others as part of its ongoing claim

24    resolution efforts.]

25

26

27    [10]    The $17 million in payables showing on the District's books and records does not include any
      amounts that the District may owe on account of deficiency claims that may be asserted by

28    secured creditors, including the Bondholders.

5325-9533833v2

20

EXHIBIT 1

1        In furtherance of its continuing claims analysis and resolution process, the District is

2    currently preparing to file a series of additional one-off objections as well as omnibus objections to

3    the Filed General Unsecured Claims, through which process the District expects to eliminate an

4    additional approximately $2,058,000 in claims because the claims were filed after the applicable bar

5    date and/or as duplicate claims.  In addition, the District intends to file substantive objections to

6    approximately $9.27 million of the Filed General Unsecured Claims that were filed in amounts that

7    are different from the amounts showing as owing to such creditors in the District's books and

8    records.  Finally, the District intends to object to approximately $20 million of the Filed General

9    Unsecured Claims that are based on obligations for which the District contends it is not liable.

10   Although the District is confident with regard to many of its defenses relating to the disputed Filed

11   General Unsecured Claims, it is important to note there is no assurance as to whether or not the

12   District will be successful in eliminating or reducing any or all of these claims.

13       **3.     Priority Unsecured Claims.**

14       A total of approximately 22 proofs of claim were filed as priority unsecured claims

15   –which number includes 4 proofs of claim that amend previously filed claims – such that

16   approximately 18 distinct claims have been filed against the District as unsecured priority claims (the

17   "Filed Priority Claims").  Of the Filed Priority Claims, 17 assert an aggregate of approximately $6.7

18   million in obligations against the District, and one claim was filed in an "unknown" amount.

19       To date, the District has been able to reduce the pool of Filed Priority Claims by

20   approximately $3.1 million through the process of negotiating withdrawals by claimants of six Filed

21   Priority Claims.  Included in this figure is the stipulated withdrawal of SEIU's priority claim, filed in

22   an amount exceeding $3 million (as discussed in Section III.D above).  Accordingly, only twelve

23   Filed Priority Claims in an aggregate amount of approximately $3.5 million remain, which amount

24   the District believes it may be able reduce to as little as $40,000 for the following reasons.

25       First, approximately $1.6 million of the $3.5 million in Filed Priority Claims pertains

26   to the adversary proceeding between Aetna and the District (as discussed in Section III.G above), in

27   which settlement discussions are ongoing.  The District believes that Aetna's claim will be settled or

28

5325-953833v2

21

EXHIBIT 1                                                        34

1    otherwise resolved by the Bankruptcy Court in a manner that does not require the District to go out

2    of pocket beyond giving up monies it believes it is owed by Aetna. If the District is correct

3    regarding its analysis of the Aetna claim, only approximately $1.9 million in Filed Priority Claims

4    will remain.

5              Next, because Chapter 9 only incorporates administrative claims allowed under

6    section 507(a)(2), which are Administrative Claims discussed in Section V.A.1.a below, the District

7    believes that most, if not all, of the Filed Priority Claims are not actually entitled to priority status

8    under chapter 9. Accordingly, the District intends to object to a $886,179 claim, which seeks priority

9    under section 507(a)(5) of the Bankruptcy Code, which the District believes was filed by a Defined

10   Benefit Plan Participant. Because chapter 9 only incorporates administrative claims allowed under

11   section 507(a)(2), this Defined Benefit Plan Claim is not entitled to priority status and should instead

12   be treated as an unsecured Class 2C Claim under the Plan. Accordingly, the District hopes that this

13   objection and reclassification will bring down the priority claim pool down to slightly in excess of $1

14   million. The approximately $1 million amount should be further reduced by objections to made to

15   three proofs of claim aggregating approximately $828,000, which seek priority based on rent that has

16   come due since the Petition Date and presumably has been paid by the District on a current basis

17   postpetition. Finally, the District believes it has additional objections to the remaining $187,000 of

18   Filed Priority Claims, which, if the District prevails, will reduce the Allowed priority claim pool to

19   approximately $40,000.

20

21       **4.**    **Class 2B - General Unsecured Claims of** KM Strategic Management,

22   ~~LLC, totaling $1,479,566 will not be the responsibility of the District if the~~
     ~~Two Hospital Transaction is consummated.~~

23

24           ~~The District believes that when the claims-allowance process is completed, no more~~

25   ~~than $22 million in Class 2A Claims will be allowed.~~**Inc., Hemet Community Medical Group,**

26   **Menifee Valley Community Medical Group, and LHIO and Claims of Constituent Members**

27   **Thereof**

28

1        As discussed in Section V.A.5 below, upon the Sale Closing Date, PHH will assume

2    or otherwise satisfy all obligations related to four claims filed by HCMG, Menifee Valley

3    Community Medical Group, and LHIO, LLC asserting unliquidated alleged claims against the

4    District relating to certain alleged breaches and/or rejections by the District. The Plan classifies

5    these claims, and any claims of constituent members of the forgoing that are derivative of such

6    claims, in Class 2B. PHH contends that these claims total approximately $55 million. The District

7    believes that, if the Two Hospital Transaction does not close, it will have substantial defenses to

8    these claims, although there is similarly no assurance as to whether the District will be successful in

9    eliminating or reducing these claims.

**5.**    ~~2.~~ **Claims of Series 1993 and 1996 Bondholders.**

11        By stipulation, the District has agreed that the ~~pre-petition~~prepetition secured claims

12    of the Indenture Trustee are allowable claims in the Chapter 9 Case. ~~There are presently outstanding~~

13    ~~$40,615,000 and $4,935,000 in allowable~~The Class 1A and Class 1B Claims are outstanding in the

14    principal amounts of $40,615,000 and $4,935,000, respectively, plus accrued interest thereon and

15    any unpaid fees and expenses of the Indenture Trustee and its attorneys and advisors to which the

16    Indenture Trustee is entitled. The Class 1A and Class 1B Claims~~, respectively~~ are secured by a first-

17    priority perfected pledge of the District Revenues (as defined in the Bond Documents) to the

18    Indenture Trustee, and the Indenture Trustee contends that the pledge of revenues will encumber the

19    sale proceeds from the Two Hospital Transaction.

**6.**    ~~3.~~ **Administrative Claim of Select.**

21        In connection with the sale of Moreno, the District issued to Select the Select

22    Administrative Note, which is an unsecured promissory note in the amount of $7,968,500. The

23    Select Administrative Note bears interest at a rate of 5% per annum from the date of issuance, with

24    no payment due until the later of November 15, 2009 or plan confirmation. As of the date hereof,

25    the amount due on the Select Administrative Note is approximately $8.7 million. The Select

26    Administrative Note will not be the responsibility of the District ~~if the Two Hospital Transaction is~~

27    ~~consummated. Under the Alternative Transaction, the Select Administrative Note will be~~

28

~~5325-~~9533833v2

23

EXHIBIT 1

36

1 ~~restructured so that there is a two-year moratorium, interest-only payments for the following three~~

2 ~~years, and a ratable amortization of principal and interest during the sixth through tenth years~~

3 ~~following the Sale Closing Date~~upon confirmation of the Plan.

4

        **7.**    **~~4.~~Statement Regarding Liabilities.**

5         The District disputes a number of the claims that have been asserted against it, and the

6 District's review and analysis of claims is ongoing.  Given the fact and inherent uncertainties in any

7 litigation regarding claims, no assurance can be given regarding the successful outcome of any

8 litigation that may be initiated in objection to such claims or regarding the ultimate amount of

9 unsecured claims that will be allowed against the District.

10         As described below, the Plan enables the District to file objections to claims at any

11 time within one hundred and eighty (180) days after the Effective Date.  The Plan also provides for

12 the District to retain any and all defenses, offset and recoupment rights, and counterclaims that may

13 exist with respect to any disputed claim, whether under section 502, 552, or 558 of the Bankruptcy

14 Code or otherwise.  The District reserves all rights with respect to the allowance and disallowance of

15 any and all claims.  **In voting on the Plan, creditors may not rely on the absence of a reference in**

16 **this Disclosure Statement or the Plan or the absence of an objection to their proofs of claim as**

17 **any indication that the District ultimately will not object to the amount, priority, security, or**

18 **~~allowability~~allowance of their claims.**

19

        **B.**    **Assets.**

20         The District's "fixed assets" primarily consist of its Hospitals, the Medical Arts

21 Building located in Hemet (the "MAB"), and raw land in Hemet that was originally conceived of as

22 expansion space.  Attached as Exhibit C is a copy of the most recent independent valuations of the

23 foregoing, prepared by Valuation & Information Group as of August 5, 2009, in the context of a sale

24 of the District's assets as a going concern.  In addition, the District owns cash, accounts receivable,

25 contract rights, and leases.

26         Under the Plan, the District will sell to PHH ~~either~~ substantially all of its assets~~, or, if~~

27 ~~Public Approval is not obtained, MVMC and~~ certain related additional assets.  The consideration to

28

1  be provided by PHH differs according to which transaction is ultimately consummated, and such

2  consideration, whether cash or assumption of liabilities, constitutes a significant portion of the

3  funding for the Plan under either scenario.

4  ~~Under the Alternative Transaction, the Plan vests in the District, for pursuit following~~

5  ~~the Effective Date, any and all claims and causes of action that currently exist in favor of the District.~~

6  The District's investigation regarding its potential claims and causes of action are ongoing and not

7  yet completed.

8  ~~Under the Two Hospital Transaction, pursuant~~Pursuant to section 1.6.12 of the ASA,

9  all of the District's claims, causes of action, rights of recovery, rights to offset, recoupment rights to

10  refunds and similar rights are transferred to PHH with certain exceptions set forth in section 1.7 of

11  the ASA or schedule 1.6.12 to the ASA.  Among other things, the District will retain: (i) all claims,

12  rights, interests and proceeds with respect to state or local tax refunds resulting from periods prior to

13  the Effective Time of the ASA; (ii) all rights, claims and choses in action with respect to any

14  Excluded Contracts, as defined in the ASA, (iii) certain assets not acquired by PHH; and (iv) any

15  affirmative defenses, counterclaims, rights of offset or recoupment, or other defenses in connection

16  with Excluded Liabilities, as defined in the ASA, and as necessary to object to or defend against

17  claims asserted against the District.

18  **Parties in interest may not rely on the absence of a reference in this Disclosure**

19  **Statement or Plan as any indication that the District ultimately will not pursue any and all**

20  **available claims and causes of action against them.  All parties who previously dealt with the**

21  **District hereby are on notice that the Plan preserves** ~~all~~**certain of the District's rights,** ~~actions,~~

22  ~~claims, and causes of action under the Alternative Transaction, and certain rights, claims,~~

23  ~~interests and defenses under the Two Hospital Transaction.~~  **The District expects that any and**

24  **all meritorious claims will be pursued and litigated after the Effective Date to the extent they**

25  ~~are~~ **remain vested in the District.**

26

27

28

EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.~~VI.~~   SUMMARY OF THE PLAN OF ADJUSTMENT

The discussion of the Plan set forth below is qualified in its entirety by reference to the more detailed provisions set forth in the Plan and its exhibits, the terms of which are controlling.  Holders of claims and other interested parties are urged to read the Plan and its exhibits, copies of which are attached to this Disclosure Statement as Exhibit A, in their entirety so that they may make an informed judgment regarding the Plan.

The Plan is premised upon the ASA by and between the District and PHH under which PHH ~~would~~will acquire ~~either: (1)~~ substantially all of the operating assets of the Debtor, including HVMC, MVMC, parcels adjacent thereto, HVHC, the MAB, and the ~~San Jacinto Property~~parcels consisting of approximately four (4) acres, fronting Florida Avenue, San Jacinto Avenue, Latham Street, and Laursen Street located in Hemet, as well as all accounts receivable, cash, and related assets, ~~via the Two Hospital Transaction, if, at the election set for December 15, 2009, the Public Approval is obtained; or, (2) the assets related to MVMC and two adjacent parcels, if Public Approval is not achieved, via the Alternative Transaction.~~

The means by which the Plan will be implemented ~~if Public Approval is obtained~~ are set forth in more detail in Section V.C.1. below, but, in summary:~~Under the Two Hospital Transaction~~, PHH will:

(i)    cause the Allowed Claims in Classes 1A and 1B, in the approximate ~~net~~ amount of $44.7 million (net of reserves held by the District), to be paid in full, in cash at the time of closing;

(ii)    provide the District with $4 million cash to be used for payment of administrative claims that are not being assumed by PHH, as well as additional funds that may be needed to pay administrative expenses;

(iii)    provide $17 million, in four annual installments on each successive anniversary of the Closing to the holders of allowed general unsecured claims against the Debtor, which sum may be adjusted upward or downward, depending on the total amount of administrative claims that are not assumed by PHH;

26

EXHIBIT 1

1          (iv)    assume substantially all of the District's post-petition obligations, estimated at

2    approximately $31 million as of August 31, 2009;

3          (v)    cause the Select Administrative Note to be satisfied;

4          (vi)    pay premiums of "tail" malpractice and error and omissions insurance

5    coverage;

6          (vii)    pay the District a termination fee of $2 million if it fails to perform under the

7    ASA;

8          (viii)    pay $400,000 per year for five years to sustain the District as a California

9    Local Health Care District;

10          (ix)    assume accrued employee "paid time off" obligations estimated to be about

11    $2.7 million;

12          (x)    honor accrued extended sick leave estimated to be about $3.3 million;

13          (xi)    maintain core ~~service~~services such as basic emergency services for five years;

14          (xii)    cause certain claims of its affiliates, which PHH estimates to total

15    approximately $55 million, to be withdrawn in the Chapter 9 Case;

16          (xiii)    maintain charity care policies consistent with applicable law;

17          (xiv)    assume the extant collective bargaining agreements with the SEIU and CNA;

18          (xv)    employ substantially all ~~of~~of the employees of VHS;

19          (xvi)    permit VHS to retain certain restricted assets such as the Beatrice Brown

20    bequest for "crippled" children's needs of about $807,000;

21          (xvii)    permit Valley Heath System Service Corporation to donate half of its cash

22    (approximately $550,000) to Ramona Community Services Corporation; and

23          (xviii)  provide a defense to certain legal claims if the transaction is challenged.

24          After the Sale Closing, the District would continue to exist as a California Local

25    Health Care District, but, having sold substantially all of its assets, would not operate any hospitals.

26    ~~The means by which the Plan would be implemented if Public Approval is not~~

27    ~~obtained are described in Section V.C.2. below, but, in summary:~~

28

1    ~~Under the Alternative Transaction, PHH will:~~

2    ~~(i)    pay $29 million for MVMC, two parcels of land adjacent to it, and the right to~~

3    ~~those assets that are actually located and used at, or which are used primarily in connection with the~~

4    ~~operations of, MVMC;~~

5    ~~(ii)    obtain modifications of the $15-$18 million of debt owing on the Bonds that~~

6    ~~would not be paid off by use of the $29 million purchase price, or loan the District the funds~~

7    ~~necessary to pay off the Bonds with terms and conditions consistent with the proposed~~

8    ~~modifications;~~

9    ~~(iii)    assume certain capital leases and other executory contracts and pay the cure~~

10    ~~costs associated therewith, but retaining the right to terminate the Alternative Transaction if the cure~~

11    ~~costs exceed $1 million;~~

12    ~~(iv)    pay all severance and "paid time off" for Menifee employees (estimated to be~~

13    ~~in the $700,000-$800,000 range) out of the $29 million purchase price; and~~

14    ~~(v)    cause the Select to restructure the Select Administrative Note so as to require~~

15    ~~no payments for the twenty-four months following the closing of the Alternative Transaction, interest~~

16    ~~only payments for the thirty-six months thereafter, and equal monthly payments of principal and~~

17    ~~interest commencing the sixty-first month such that the Select Administrative Note will be satisfied~~

18    ~~sixty months thereafter.~~

19    ~~After the Sale Closing, the District will continue to operate HVMC and HVHC, and~~

20    ~~would retain cash on hand, accounts receivable and choses in action as all the foregoing pertain to~~

21    ~~HVMC.~~

22    ~~Accordingly, the Plan sets forth different treatment for the various classes of claims~~

23    ~~dealt with by the Plan depending on whether the transaction to close is the Two Hospital Transaction~~

24    ~~or the Alternative Transaction.~~

25

26

27

28

A.    **Classification And Treatment of Claims.**

1.    **Unclassified Claims.**
Section II of the Plan governs the treatment of certain claims that are not classified into Classes under the Plan.

a.    **Administrative Expense Claims.**
Administrative Expense Claims are claims of the kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code.  Section II.A. of the Plan provides for the treatment of Administrative Claims.  Throughout the course of the Chapter 9 Case, the District has endeavored to satisfy administrative expenses as they became due.  Accordingly, the District believes that most claims that otherwise would constitute Allowed Administrative Claims previously have been or will be satisfied in the ordinary course of business prior to the Effective Date, or will be included in the PHH Assumed Other Liabilities, under the Two Hospital Transaction, as described below.

(1)    ~~Two Hospital Transaction.~~

(1)    (a) Treatment of the Select Administrative Claim.
The Plan provides that, pursuant to section 1.2.1(ii) of the ASA, at the closing of the Two Hospital Transaction, the Select Administrative Note shall be satisfied in full or all obligations evidenced thereby shall be assumed by PHH and the District shall be released from any further liability in connection with the Select Administrative Note.  The District understands that Select has agreed to the forgoing treatment.

(2)    (b) Treatment of All Other Administrative Claims Other Than Professional Claims.

The Plan provides that, pursuant to section 1.2.1(iii) of the ASA, PHH will, upon closing of the Two Hospital Transaction, assume and satisfy certain postpetition administrative claims of the District, which are defined in the ASA as the "Assumed Other Liabilities."  The Assumed Other Liabilities consist of the "Assumed Current Liabilities" and "Other Liabilities," which are both defined in section 1.2.1(iii) of the ASA.  The District believes that substantially all of its administrative claims, with the exception of professional fees and certain claims arising from the

1   rejection of certain postpetition executory contracts, will be included in the Assumed Other

2   Liabilities.  PHH will also contribute additional funds as are necessary to satisfy Administrative

3   Claims that are not satisfied as a result of being treated as Assumed Other Liabilities ("Covered

4   Claims," under the ASA), including Professional Claims in the event that the $4 million contributed

5   at Closing is insufficient to pay such Covered Claims.

6          To the extent of any Administrative Claims, other than the Assumed Other Liabilities,

7   and except as provided in Section II.B of the Plan, with respect to Professional Claims, or to the

8   extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the

9   District or its agent will pay to each holder of an Allowed Administrative Claim, in full satisfaction,

10  release and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim

11  on the later of (i) the Effective Date, (ii) the date on which such claim becomes an Allowed

12  Administrative Claim, or as soon thereafter as is practicable, and (iii) the date funds are to be

13  available for that purpose under section 1.2.4.3 of the ASA.

14         From and after the Sale Closing Date, and except for Professional Claims, creditors

15  holding claims that relate to or arise from, any of the PHH Assumed Current Liabilities and Covered

16  Claims shall only have a right to collect payment on account of such claims from PHH and the

17  Administrative Claims Fund, and the District shall thereafter be relieved of any and all liability for

18  the payment of any and all claims relating to, or arising from, any of the PHH Assumed Current

19  Liabilities or Covered Claims.

20                    ~~(2)      The Alternative Transaction.~~

21
                              ~~(a)      Select Administrative Note.~~
22  ~~The Plan provides that, in the event of the Alternative Transaction, the Select~~

23  ~~Administrative Note shall be restructured in the following manner:~~

24         ~~1.      No payments on the Select Administrative Note shall be due or payable for a~~

25  ~~period of two years following the Effective Date of the Plan;~~

26

27

28

~~53251~~9533833v2

1      2. ~~The District shall pay to the holder of the Select Administrative Note, interest~~

2 ~~only, calculated at 5% per annum, for a period of three years, following the two-year payment~~

3 ~~moratorium provided for in the immediately preceding subparagraph;~~

4      3. ~~The District shall amortize the remaining principal balance of the Select~~

5 ~~Administrative Note in equal monthly installments during the sixth through tenth year following the~~

6 ~~Effective Date of the Plan; and~~

7      4. ~~The restructured Select Administrative Note shall be secured by a first~~

8 ~~position senior lien on (a) the MAB, (b) to the extent not inconsistent with any liens granted to the~~

9 ~~holders of the Bonds, the excess land portion of the San Jacinto Property.~~

10      ~~It is the District's understanding that Select consents to this treatment.~~

11

12      **~~(b)~~**     **~~Other Administrative Claims.~~**
  ~~Except as provided in Section II.B of the Plan, with respect to Professional Claims, or~~

13 ~~to the extent that the holder of an Allowed Administrative Claim agrees to a different treatment, the~~

14 ~~District or its agent shall pay to each holder of an Allowed Administrative Claim, in full satisfaction,~~

15 ~~release, and discharge of such claim, cash in an amount equal to such Allowed Administrative Claim~~

16 ~~on the later of (i) the Effective Date of the Plan, (ii) the date on which such claim becomes an~~

17 ~~Allowed Administrative Claim or as soon thereafter as is practicable, and (iii) to the extent that such~~

18 ~~Allowed Administrative Claim is an Ordinary Court Administrative Claim, such claim shall be paid~~

19 ~~in full and honored by the District in the ordinary course of business in accordance with the terms~~

20 ~~and conditions of the particular transaction and any agreements relating thereto.~~

21

22      **b.**     **Professional Claims.**
  Professional Claims are claims of professionals for services rendered or expenses

23 incurred in rendering such services in the Chapter 9 Case or incident to the Plan.

24      Section II.C. of the Plan provides that, pursuant to section 943(a)(3) of the

25 Bankruptcy Code, all Professional Claims must be disclosed and be reasonable and that, upon being

26 deemed reasonable, the District or its agent will pay to each holder of a Professional Claim, in full

27 satisfaction, release and discharge of such claim, cash in an amount equal to that portion of such

28