1  claim that is deemed reasonable, except to the extent such claim previously has been paid or

2  satisfied.

3          The District has paid the fees of its bankruptcy counsel and other professionals, as

4  well as the fees of the bankruptcy counsel and financial advisor of the Committee, on a regular basis

5  during the Chapter 9 Case.  Payments/invoices from the petition date through September 30, 2009

6  are summarized as follows:

| Professional | Dates of Employment | Fees/Expenses Invoice Through ~~September~~November 30, 2009 |
|---|---|---|
| Stutman, Treister & Glatt (Bankruptcy Counsel to the District) | 12/13/07 -- present | $~~2,984,304~~3,187,400.79 |
| Pachulski, Stang, Ziehl & Jones (Counsel to the Committee) | 4/7/08 - present | $~~288,007~~208,007.00 |
| Shattuck Hammond (Financial Advisors to District) | 12/13/07 - present | $~~495,623~~488,279.72 |
| The Piera Group (Special Transaction Advisor to District) | 7/09 - present | $~~678,559~~680,054.21 |
| ~~Alvarez & Marsal Healthcare~~ AMHIG (Financial Advisors to ~~District~~the Committee) | 4/7/08 - present | $~~403,951~~396,025.40 |

21          The District has reserved the right to object to the reasonableness of the fees and

22  expenses of the PSZ&J and ~~Alvarez~~AMHIG firms (including the fees and expenses previously paid).

23          **c.    Bar Date For Assertion Of Requests For Payment Of**
24                 **Administrative Claims (Other Than Ordinary Course**
                   **Administrative Claims) And Professional Claims.**
25          Section II.C. of the Plan provides that all requests for approval of Administrative

26  Expense and Professional Claims must be filed with the Bankruptcy Court and served upon the

27

28

~~5325~~19533833v2

32

EXHIBIT 1                                                                            45

1  District no later than thirty (30) days after the date on which the Notice of Effective Date is mailed

2  pursuant to the Plan.

3         *Any request for payment of an Administrative Claim, and any request for a finding*

4  *that a Professional Claim is reasonable, that is not timely filed by that deadline will be forever*

5  *barred, and holders of such claims will be barred from asserting such claims in any manner*

6  *against the District.*

7

8      **2.**    **Classes  1A and 1B (Claims of the Holders of Series 1993 COPs and 1996 Bonds.).**

9      The Plan classifies the claims of holders of the Series 1993 ~~Bonds~~COPs in Class 1A,

10  and the claims of holders of the Series 1996 Bonds in Class 1B.

11      ~~If the Two-Hospital Transaction is Consummated, there will be paid to the~~The

12  Indenture Trustee for the Bonds will be paid, on the ~~Effective~~Sale Closing Date, a sum sufficient to

13  fully satisfy ~~all~~at closing all outstanding principal, accrued interest, and unpaid fees and expenses of

14  the Indenture Trustee and its attorneys and advisors to which the Indenture Trustee is entitled, with

15  respect to the Allowed Class 1A and Class 1B Claims, as more specifically described in section 1.2.1

16  of the ASA.

17      ~~If the Alternative Transaction is Consummated, the Allowed Class 1A and Class 1B~~

18  ~~Claims shall be fully satisfied as follows:~~

19      ~~The District will use the net sale proceeds to partially pay, in the manner required by~~

20  ~~the Indenture, Allowed Class 1A and Class 1B Claims.  As to the balance owing on such claims, the~~

21  ~~ASA requires PHH to:~~

22      ~~(i)~~    ~~obtain, under provisions of the Indenture, the consent of the holders of~~

23  ~~Allowed Class 1A and 1B claims to a modified payment schedule under the Existing Bonds, which~~

24  ~~includes the payment of interest only for three (3) years from the Sale Closing Date, with principal~~

25  ~~re-amortized thereafter over the remaining terms of the Existing Bonds, and which provides for~~

26  ~~forbearance ("Payment Forbearance"), after the Sale Closing Date of any claims, actions or other~~

27  ~~enforcement against the District based on the failure of the District to meet any covenants (the "Bond~~

28

33

EXHIBIT 1

1   Covenants") in the Indentures or other documents relating to the Existing Bonds ("Bond

2   Documents")based upon the financial performance or status of the District and its operations (but

3   excluding payment defaults under the Existing Bonds, for which such forbearance shall not apply)

4   including, without limitation, covenants related to the required net income available for debt service

5   or other debt coverage requirements or any covenant against seeking bankruptcy relief (to the extent

6   it would be violated by the existing Chapter 9 Case) ("Covenant Forbearance").

7              (ii)      enter into a new secured loan agreement (the "Alternative Loan") with the

8   District by which PHH will advance, on the District's behalf, funds necessary to pay off the balance

9   of Existing Bonds (after application of proceeds of the Alternative Transaction), which loan shall

10   become a new loan on substantially the same terms as the Bond Documents, including the Bond

11   Covenants (as modified as set forth in subparagraph (i) above, including the Payment Forbearance

12   and the Covenant Forbearance), to be secured by collateral as provided in the Existing Bonds and

13   additionally secured by the "Additional Collateral" defined below:

14              (A) a second position deed of trust (junior to the modified Select

15   Administrative Note lien) on the MAB and the excess land portion of the San Jacinto Property; and

16              (B) a first position lien on the Orchard Property.

17              The Covenant Forbearance shall remain in effect through the District's fiscal

18   year ending June 30, 2012.  In the event that the District is in default of the Bond Covenants as of the

19   end of the District's fiscal year ending June 30, 2011, PHH may, as its sole remedy for a covenant

20   default other than a payment default, require that the District engage a nationally recognized manager

21   ("Manager") with experience in operating hospitals similar to HVMC.  The District will consult with

22   PHH in the selection of such Manager, and such Manager shall be reasonably acceptable to PHH,

23   which acceptance shall not be unreasonably withheld, delayed, or conditioned.  PHH will be entitled

24   to monitor the performance of the Manager and receive monthly reports on the Manager's progress

25   and the financial condition of the District.  The forgoing notwithstanding, the parties understand that

26   MVMC may be competitive with HVMC and that the sharing of certain information may violate

27   federal or state antitrust or unfair competition laws.

28

5325.1/9533833v2

**3.    Classes 1C (Other Secured Claims).**
The Plan classifies the Secured Claims filed by all creditors holding Secured Claims, other than those filed by holders of the Series 1993 COPs and the claims of holders of the Series 1996 Bonds, in Class 1C.

Aside from the Bondholders' claims, the District received 10 claims that were filed as Secured Claims.  As soon as practicable after the Effective Date, each claimant holding an Allowed Class 1C Claim will receive, at the election of the District, in its discretion, one of the following treatments in full satisfaction, discharge, exchange and release of its Allowed Class 1C Claim:

(a)    The Holder of the Class 1C Claim will receive the Collateral in which that Holder has a security interest; or

(b)    The Holder of the Class 1C Claim will receive any proceeds actually received by the District from the sale or disposition of the Collateral in which that Holder has a security interest; or

(c)    The Holder of the Class 1C Claim will receive Cash in the amount of that Holder's Allowed Class 1C Claim; or

(d)    The Holder of the Class 1C Claim will receive such other distributions or treatment as are necessary to leave the rights of said Holder Unimpaired or as are necessary to otherwise satisfy those requirements of chapter 11 that are incorporated into chapter 9 of the Bankruptcy Code.

The District will have fourteen (14) days after the date on which the Class 1C Claim is determined to be an Allowed Claim, to elect which treatment to provide to such holder of an Allowed Class 1C Claim.

**4.    3. Class 2A (General Unsecured Creditors).**
The Plan classifies most general unsecured claims in Class 2A.

As of the bar dates established by prior orders of the Bankruptcy Court, proofs of claim asserting general unsecured claims totaling approximately $2358.7 million, plus "unknown," "unliquidated" or "to be determined" amounts, excluding claims classified in Class 2B as described

1  below, were timely filed with the Bankruptcy Court. ~~The District believes that when the objection to~~

2  ~~claims process has been fully completed, there will be no more than approximately $22 million of~~

3  ~~allowed general unsecured claims.~~ For a further discussion of these claims, please refer to Section

4  IV.A.1 above.

5       ~~If the Two Hospital Transaction is Consummated, the~~ The holders of Allowed Claims

6  in Class 2A will receive their pro rata share of $17 million or such increased or reduced amount that

7  will be available for payment of such Claims, as further detailed in this sentence, which distributions

8  shall be paid in four equal annual installments without interest, with the first payment to be made on

9  the first anniversary of the Sale Closing Date, and on each anniversary thereafter; *provided*, *however*,

10  that such $17 million may either be (a) increased by any portion of the $4 million that PHH will

11  deposit into the PHH Administrative Claims Fund after complying with the procedures set forth in

12  Section 1.2.4.3 of the ASA; or (b) reduced, at the time and in the manner set forth in Section 1.2.4.3

13  of the ASA, by any amount in excess of the $4 million that PHH may be required to deposit into the

14  PHH Administrative Claims Fund to pay Allowed Administrative Claims in full.

15       ~~If the Alternative Transaction is consummated, the holders of Allowed Claims in~~

16  ~~Class 2A, as augmented by the Allowed Claims in Class 2B, will receive their pro rata share of any~~

17  ~~Class 2A Annual Cash Payment.~~

18       ~~As more fully set forth in the Plan and ASA, the Class 2A Annual Cash Payment~~

19  ~~consists of (i) the proceeds from the sale of HVMC, SNF, the Orchard Property and/or the San~~

20  ~~Jacinto Property and their related assets, after all senior obligations are satisfied upon the sale of such~~

21  ~~assets, and/or (ii) Excess Cash, consisting of the District's remaining cash, if any, at the end of each~~

22  ~~fiscal year, after accounting for, among other things, the payment and/or accrual of ordinary course~~

23  ~~operating expenses, debt service, including amounts that may be owed to the Bondholders and to~~

24  ~~Select, and amounts set aside as cash reserves for capital expenditures as well as other anticipated~~

25  ~~expenditures, in reasonable amounts, as necessary.~~

26       ~~The District has prepared projected financial statements that assume that the Alternate~~

27  ~~Transaction is consummated, which projected financial statements are attached here as Exhibit D.~~

28

~~5325~~ ~~9533833v2~~

36

EXHIBIT 1

1  ~~See Exhibit D to ascertain the amount of the Class 2A Annual Cash Payment projected for calendar~~

2  ~~years 2010, 2011 and 2012.~~

3  ~~The Class 2A Annual Cash Payment will be distributed on an annual basis, to the~~

4  ~~extent such proceeds are available, no later than 90 days after receipt of audited financial statements~~

5  ~~commencing on the one year anniversary of the Effective Date and continuing through the earlier of:~~

6  ~~(1) payment of all Allowed Class 2A Claims in full, without interest, or (2) the time at which the~~

7  ~~Class 2A Annual Cash Payments have aggregated $17 million.~~

8
9    **5.** **~~4.~~ Class 2B (General Unsecured Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO And Claims of Constituent Members Thereof).**

10   KM Strategic Management, Inc.~~,~~; HCMG~~,~~; Menifee Valley Medical Group~~;~~ and

11   LHIO, LLC have filed proofs of claims, identified as claim numbers 134, 135, 136 and 168 in the

12   Bankruptcy Court's official registry of claims, asserting alleged claims against the District relating to

13   certain alleged breaches and/or rejections by the District.  The Plan classifies these claims, and any

14   claims of constituent members of the forgoing that are derivative of such claims, in Class 2B.  PHH

15   contends that these claims total approximately $55 million.~~If~~  The claims assert damages for future

16   lost profits based on the District's alleged breaches of certain agreements, with two based on risk

17   sharing agreements with independent physician associations, one based on a long-term technology

18   sharing agreement relating to information necessary in order to maximize Medicare payments, and

19   one based on the District's alleged use of certain proprietary software programs.  Because the District

20   disputes these liabilities and the claimed damages are speculative, these claims will be vigorously

21   contested.  Accordingly, the District believes that, if the Two Hospital Transaction ~~is consummated,~~

22   ~~upon~~does not close, it will have substantial defenses to these claims, although the ~~there~~ is no

23   assurance as to whether the District will be successful in eliminating or reducing these claims.

24          ~~Upon~~ the Sale Closing Date, PHH will assume or otherwise satisfy all obligations

25   owed to holders of Allowed Class 2B Claims, with the District being fully and completely released

26   from any liability thereunder and held harmless from such Claims by PHH, as set forth in section

27   1.2.1(v) of the ASA.

28

1    ~~If the Alternative Transaction is consummated, the holders of Allowed Claims~~

2    ~~classified into Class 2B shall receive the same treatment as the holders of Allowed Class 2A Claims,~~

3    ~~with the District reserving the right to object to the allowability of any and all Class 2B Claims.~~

4

**6.**    ~~5.~~ **Class 2C (Interests of Defined Benefit Plan Participants).**

5    Under Section 4.8 of the "Valley Health System Retirement Plan Adopted January 1,

6    1971, as amended, the VHS Retirement Plan was frozen effective May 4, 1999, such that the

7    "Accrued Benefit" of each plan participant was frozen as of this date, and participants have accrued

8    no benefits under the VHS Retirement Plan since such date.

9    Under the Plan, Defined Benefit Plan Participants will be entitled to the same rights

10    and benefits to which such participants are currently entitled under the VHS Retirement Plan and the

11    MetLife Group Annuity Contract, and such participants shall have no recourse to the District or to

12    any assets of the District, and shall not be entitled to receive any distributions under the Plan.

13    Instead, all unallocated amounts held by MetLife Group, pursuant to the VHS Retirement Plan and

14    the MetLife Group Annuity Contract, will continue to be made available to provide retirement

15    benefits for participants in the manner indicated under the provisions of the VHS Retirement Plan

16    and the MetLife Group Annuity Contract.  Accordingly, the treatment of Allowed Class 2C ~~Claim-~~

17    ~~holders~~Claims set forth in the Plan does not affect any legal, equitable or contractual rights to which

18    the VHS Retirement Plan participants are entitled.

19

**B.**    **Treatment Of Executory Contracts And Unexpired Leases.**

20

**1.**    **Generally.**

21    The Bankruptcy Code empowers debtors, subject to the approval of the Bankruptcy

22    Court, to assume or reject the debtors' executory contracts and unexpired leases.  An "executory

23    contract" generally means a contract under which material performance other than the payment of

24    money is due by the parties.

25    If an executory contract or unexpired lease is rejected by the debtor, the rejection

26    operates as a prepetition breach of such agreement.  If an executory contract or unexpired lease is

27

28

1   assumed by the debtor, the assumption obligates the debtor to perform under the agreement, and

2   damages arising for any subsequent breach of the agreement are treated as administrative expenses.

3

      **2.**    **Assumption.**

4        As detailed in the ASA, PHH must notify the District in writing of any executory

5   contract or unexpired lease that PHH has elected to assume.  Subject to all conditions set forth in the

6   ASA, the District will include such executory contracts and unexpired leases in the

7   Assumption/Assignment Motion that will seek authority to assume and immediately assign such

8   executory contracts and unexpired leases to PHH.

9

      **a.**    **Cure Payments and Future Performance.**

10        After the provision of notice and the opportunity for a hearing on the

11   Assumption/Assignment Motion, the Bankruptcy Court will resolve any disputes regarding: (a) the

12   amount of any cure payment to be made in connection with the assumption of any contract or lease;

13   (b) the ability of PHH to provide "adequate assurance of future performance" within the meaning of

14   section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (c) any other

15   matter pertaining to such assumption and assignment.

16

      **3.**    **Rejection.**

17        The District will file the Rejection Motion, pursuant to section 365(a) of the

18   Bankruptcy Code, to seek approval and authorization for the rejection of such executory contracts

19   and unexpired leases that PHH has not elected to assume, which the District, in the exercise of its

20   business judgment, deems warranted.  ~~In the Two Hospital Transaction scenario, the~~The District

21   anticipates rejecting any executory contract and unexpired lease that is not needed for it to continue

22   operating as a local healthcare district.  ~~In the Alternative Transaction scenario, the District~~

23   ~~anticipates that the Rejection Motion will be narrower since the District would not want to reject any~~

24   ~~beneficial executory contract or unexpired lease that supports HVMC and the other assets retained by~~

25   ~~the District after the Sale Closing Date of the Alternative Transaction.~~

26

27

28

~~5325~~19533833v2

39

EXHIBIT 1

52

1

2

        **a.**      **Deadline For The Assertion Of Rejection Damage Claims;
Treatment Of Rejection Damage Claims.**

3          All proofs of Claims arising from the rejection of executory contracts or unexpired

4  leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30)

5  days after the date on which notice of entry of the order approving the rejection is mailed.  Any

6  Claim for which a proof of Claim is not filed and served within such time will be forever barred and

7  shall not be enforceable against the District or its assets, properties, or interests in property.  Unless

8  otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein

9  shall be classified into Class 2A and treated accordingly.

10

11    **C.**    **Means For Execution And Implementation Of The Plan.**

12    ~~**1.**~~    ~~**If Public Approval Is Obtained.**~~

         ~~If Public Approval is obtained and~~Upon consummation of the Two Hospital

13  Transaction ~~is consummated~~, PHH will provide the following combination of cash and assumption

14  of liabilities to enable the District to implement the Plan and satisfy its obligations under the ~~Two~~

15  ~~Hospital Transaction scenario set forth in the~~ Plan:

16        (1)    An amount of cash sufficient to pay the <u>outstanding principal, accrued interest,</u>

17  <u>and fees and expenses of the Indenture Trustee and its attorneys and advisors to which the Indenture</u>

18  <u>Trustee is entitled, with respect to the</u> Allowed Claims in Classes 1A and 1B in full <u>at closing</u> after

19  application of any reserves held internally by the District for payment of interest or principal on

20  Class 1A and Class 1B Claims.

21        (2)    Take responsibility for the Select Administrative Note, and holding the

22  District harmless with respect thereto.

23        (3)    Take responsibility for the PHH Assumed Current Liabilities, estimated at

24  approximately $31 million as of August 31, 2009, and indemnification of the District with respect

25  thereto.

26        (4)    Payment in full of Administrative Claims that are not part of the PHH

27  Assumed Current Liabilities from the $4 million PHH Administrative Claims Fund, or such

28

1    additional monies as are needed to pay Allowed Administrative Claims, to be funded by PHH

2    pursuant to section 1.2.4 of the ASA.

3         (5)    Contribute $17 million towards payment of Allowed Class 2A Claims in four

4    equal annual payments, with the first distribution to be made on the first anniversary of the Sale

5    Closing Date; provided however, that to the extent the PHH Administrative Claims Fund is

6    insufficient to pay all of the Allowed Administrative Claims in full, PHH may be obligated to

7    advance any such additional amounts as are necessary to pay all Allowed Administrative Claims, and

8    any amount so advanced shall be deducted dollar for dollar from PHH's obligation to contribute $17

9    million for the payment of Allowed Class 2A General Unsecured Claims while, conversely, to the

10    extent the PHH Administrative Claim Fund is not fully needed to pay Allowed Administrative

11    Claims, such excess shall be added to the $17 million to be paid pro rata to Class 2A.

12         (6)    Take responsibility for those claims designated in the Bankruptcy Court

13    docket by numbers 134, 135, 136 and 168 and indemnify and hold the District harmless with respect

14    thereto.

15         (7)    Accept an immediate assignment of the ~~contract~~executory contracts and leases

16    that it notifies the District to assume pursuant to the ASA.

17         (8)    Pay the severance payments owing to those District employees to whom PHH

18    does extend an offer of employment consistent with the terms set forth in the ASA or its Schedules.

19         (9)    Provide $400,000 per year to the District, commencing on the Sale Closing

20    Date, for a period of five (5) years for use by the District to, among other things, ~~to~~ pay its ongoing

21    operating expenses, including payroll and professional fees, and ~~to~~ fund any necessary elections,

22    monitor PHH's performance under the ASA, evaluate, analyze and object to creditor claims and

23    resolve any disputes concerning creditor claims, and make distributions to creditors under ~~this~~the

24    Plan.

25         (10)    Pay, for a period of five (5) years from the Sale Closing Date, the premiums

26    for (a) the District's directors and ~~offices~~officers tail errors and omissions insurance, which is

27    currently estimated at $450,000 and (b) the general liability and medical malpractice tail insurance.~~.~~

28

~~5325-1~~9533833v2

41

EXHIBIT 1

54

2.    ~~If Public Approval Is Not Obtained.~~

~~If Public Approval is not obtained, the District and PHH will seek to close the Alternative Transaction, which contemplates a cash purchase price of approximately $29 million, subject to certain deductions, as described below in (i) (iii), for the transfer to PHH of substantially all of the operating assets used in connection with Menifee, but the District will retain most of its pre-closing liabilities and non-operating assets such as cash, allowed receivables and causes of action. PHH will pay: (i) cure amounts up to $1 million required to be paid as a condition to assuming any of the District's contracts that PHH has elected to take an assignment of, the amount paid reducing dollar for dollar that $29 million purchase price; (ii) severance payments that may be owed to Menefee employees to whom PHH does not extend an offer of employment; and (iii) PTO payouts owing to the District's employees who are not hired by PHH or who are hired by PHH but do not consent to the transfer of such PTO obligations to PHH.~~

~~Use of Net Sale Proceeds to Partially Satisfy the Bonds~~

~~The District will deliver to the Indenture Trustee the net sale proceeds to partially pay Allowed Class 1A and Class 1B Claims, as provided for in the Indenture. As to the balance owing thereafter on account of the Bonds, the ASA requires PHH to:~~

~~(i)    obtain under provisions of the Indenture the consent of the holders of Allowed Class 1A and 1B Claims to Payment Forbearance and Covenant Forbearance; or~~

~~(ii)    enter into the Alternative Loan secured by the Additional Collateral.~~

~~The Covenant Forbearance shall remain in effect through the District's Fiscal Year ending June 30, 2012. In the event that the District is in default of the Bond Covenants as of the end of the District's Fiscal Year ending June 30, 2011, PHH may, as its sole remedy for a Covenant Default other than a payment default, require that the District engage a Manager. The District shall consult with PHH in the selection of such Manager, and such Manager shall be reasonably acceptable to PHH, which acceptance shall not be unreasonably withheld, delayed or conditioned. PHH shall be entitled to monitor the performance of the Manager and receive monthly reports on Manager's progress and the financial condition of the District. The foregoing notwithstanding, the~~

5325-9533833v2

42

EXHIBIT 1

55

1    parties understand that Menifee may be competitive with Hemet and that the sharing of certain

2    information may violate federal or state antitrust or unfair competition Laws.

3           In the event that the District is in default of the Bond Covenants as of the end of the

4    District's fiscal year ending June 30, 2012, PHH shall have rights of enforcement in the same manner

5    as provided in the Bond Documents.

6           Without limiting the preceding, the Covenant Forbearance shall not include a

7    forbearance of any covenants restricting further encumbrances by District (excluding any

8    encumbrances in favor of PHH, encumbrances as permitted in the Bond Documents, or otherwise as

9    contemplated by this Agreement), transfer of the District's assets or merger or restructuring of the

10   District (except in connection with the District's Chapter 9 Proceeding and otherwise consistent with

11   the terms of this Agreement). The Alternative Loan shall be provided pursuant to documents which,

12   to the extent reasonably applicable, are consistent with the terms of the Bond Documents, and

13   security and other provisions which are customary for commercial real property secured loans (to the

14   extent not inconsistent with the applicable terms under the Bond Documents or this Agreement).

15          Provided that the District is not in default of payments and the Bond Covenants under

16   the Alternative Loan, the Additional Collateral shall be released upon issuance of the District's

17   audited financial statements for the fiscal year ended June 30, 2012.

18          Restructuring of Select Administrative Note

19          The District is advised that Select has agreed, in the event Public Approval is not

20   obtained, to restructure the Select Administrative Note by granting a moratorium for twenty four

21   months, being paid interest only for the next thirty six months, and accepting payment of principal

22   and interest in equal monthly payments over the next sixty months. However, the repayment shall be

23   secured by a first priority lien on the MAB and, to the extent consistent with the Indenture, on the

24   excess portion of the San Jacinto Property.

25          Payments to Classes 2A and 2B

26          After consummation of the Alternative Transaction, the District will continue to

27   operate HVMC and HVHC and to own the MAB (subject to a lien in favor of Select), the San-

28

5325-9533833v2

43

EXHIBIT 1

56

1    ~~Jacinto Property, and the Orchard Property subject to PHH's right to enter into a commercially~~

2    ~~reasonable 35-year ground lease. On the Sale Closing Date, the District will have the cash on hand~~

3    ~~and cash to be generated by collection of accounts receivable of HVMC and the SNF and their future~~

4    ~~operations, with said cash to be used to pay all Allowed Administrative Claims, the restructured~~

5    ~~Select Note and any payments remaining due on account of the Allowed Class 1A and Class 1B~~

6    ~~Claims.~~

7    ~~All Excess Cash to the extent, if any, available, will be used to make the Class 2A~~

8    ~~Annual Cash Payments to holders of Allowed Claims in Classes 2A and 2B until the first to occur of~~

9    ~~the Claims in such Classes being paid in full, without interest, or all Class 2A Annual Cash~~

10   ~~Payments aggregating $17 million. Also, to the extent that HVMC, HVHC, the Orchard Property~~

11   ~~and/or the San Jacinto Property and their related assets are leased or sold, the net proceeds from~~

12   ~~those transactions will be also be used to fund all of the foregoing, including the Class 2A Annual~~

13   ~~Cash Payment to the extent of Excess Cash.~~

14

15   **1.**    ~~3.~~**Rights of Action.**
     The Plan provides, pursuant to section 1.6.12 of the ASA, ~~that, in the Two Hospital~~

16   ~~Transaction scenario,~~ all of the District's Claims, causes of action, rights of recovery, rights of offset,

17   recoupment rights to refunds and similar rights are transferred to PHH with certain limited

18   exceptions set forth in the ASA or schedules thereto. ~~In the Alternative Transaction scenario,all of~~

19   ~~the District's claims, choses in action, rights of recovery, rights of offset or recoupment, rights to~~

20   ~~refunds and similar rights are retained by the District, with limited exceptions related to the transfer~~

21   ~~of MVMC assets and the assignment of related agreements.The failure to list in this Disclosure~~

22   ~~Statement any potential or existing Right of Action retained by the District under the Alternative~~

23   ~~Transaction is not intended to and shall not limit the rights of the District to pursue any such action.~~

24   Unless a Right of Action is expressly waived, relinquished, released, compromised or settled in this

25   Plan, the District expressly reserves all Rights of Action for later adjudication and, as a result, no

26   precluding doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion,

27   claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Rights of

28

1    Action upon or after the confirmation or consummation of this Plan or the Effective Date. In

2    addition, the District expressly reserves the right to pursue or adopt against any other entity any

3    claims alleged in any lawsuit in which the District is a defendant or an interested party.

4

### D.    Distributions.

5        The District may retain one or more agents to perform or assist it in performing the

6    distributions to be made pursuant to the Plan, which agents may serve without bond. The District

7    may provide reasonable compensation to any such agent(s) without further notice or Court approval.

8    All distributions to any holder of an Allowed Claim shall be made at the address of such holder as

9    set forth in the books and records of the District or its agents, unless the District has been notified by

10    such holder in a writing that contains an address for such holder different from the address reflected

11    in its books and records. All distributions to the Bondholders shall be made in accordance with the

12    operative documents that govern the Bonds.

### 1.    Undeliverable Distributions.

13

14    *Holding Of Undeliverable Distributions.* If any distribution to any holders is

15    returned to the District or its agent as undeliverable, no further distributions shall be made to such

16    holder unless and until the District is notified in writing of such holder's then-current address.

17    Unless and until the District is so notified, such distribution shall be deemed to be "Unclaimed

18    Property."

19        *Unclaimed Property.* If any entity entitled to receive distributions pursuant to the

20    Plan does not present itself on the Effective Date or on such other date on which such entity becomes

21    eligible for distribution, such distributions shall be deemed to be "Unclaimed Property." Unclaimed

22    Property shall be set aside and held in a segregated account to be maintained by the District pursuant

23    to the terms of the Plan.

24        On the first anniversary of the Effective Date, the District will file with the

25    Bankruptcy Court a list of Unclaimed Property, together with a schedule that identifies the name and

26    last-known address of holders of the Unclaimed Property; the District otherwise will not be required

27    to attempt to locate any such entity. On the second anniversary of the Effective Date, all remaining

28

5325.9533833v2

45

EXHIBIT 1

58

1  Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in

2  the District.

3

       **2.**      **Timeliness Of Payments.**

4        Any payments or distributions to be made pursuant to the Plan shall be deemed to be

5  timely made if made within fourteen (14) days after the dates specified in the Plan; provided,

6  however, that all distributions on the Class 1A and Class 1B Claims will be paid at the Sale Closing

7  Date.  Whenever any distribution to be made under the Plan shall be due on a day that is a Saturday,

8  Sunday, or legal holiday, such distribution instead shall be made, without interest, on the

9  immediately succeeding day that is not a Saturday, Sunday, or legal holiday, but shall be deemed to

10  have been made on the date due.

11

       **3.**      **Compliance With Tax Requirements.**

12        The District will comply with all tax withholding and reporting requirements imposed

13  on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such

14  withholding and reporting requirements.  In connection with each distribution with respect to which

15  the filing of an information return (such as Internal Revenue Service Form 1099 or 1042) or

16  withholding is required, the District will file such information return with the Internal Revenue

17  Service and provide any required statements in connection therewith to the recipients of such

18  distribution, or effect any such withholding and deposit all moneys so withheld to the extent required

19  by law.  With respect to any entity from whom a tax identification number, certified tax

20  identification number, or other tax information required by law to avoid withholding has not been

21  received by the District, the District at its sole option, may withhold the amount required and

22  distribute the balance to such entity or decline to make such distribution until the information is

23  received.

24

       **4.**      **Time Bar To Cash Payments.**

25        Checks issued by the District on account of allowed claims will be null and void if not

26  negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for

27  reissuance of any check shall be made directly to the District by the holder of the allowed claim with

28

5325\9533833v2

46

EXHIBIT 1

59

respect to which such check originally was issued.  Any claim in respect of such a voided check must be made on or before the second anniversary of the Effective Date.  After such date, all claims in respect of voided checks will be discharged and forever barred and the District will retain all moneys related thereto.

### 5.    No *De Minimis* Distributions.

Notwithstanding any other provision of the Plan, no payment of less than ten dollars ($10.00) will be made by the District on account of any allowed claim.

### 6.    No Distributions On Account Of Disputed Claims.

No distributions shall be made on account of any part of any Disputed Claim until such Claim becomes Allowed (and then only to the extent so Allowed).  Distributions made after the Effective Date in respect of Claims that were not Allowed as of the Effective Date (but which later became Allowed) shall be deemed to have been made as of the Effective Date.

### 7.    No Postpetition Accrual.

Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, the District will not be required to pay to any holder of a claim any interest, penalty or late charge accruing with respect to such claim on or after the Petition dateDate.  Pursuant to the Plan, all post-Petition Date interest on the Series 1993 COPs and Series 1996 Bonds will be paid through the Sale Closing Date (solely with respect to those holders who do not agree to restructure their Bonds).

### 8.    Insurance Proceeds.

All distributions under the Plan will be net of any insurance proceeds actually received in payment of any Claim that otherwise is allowed and entitled to a distribution.

### E.    Disputed Claims.

### 1.    Claims Objection Deadline; Prosecution Of Objections.

The District will have the right to object to the allowance of claims filed with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part.  Unless otherwise ordered by the Bankruptcy Court, the District must file and serve any such objections to

1  claims by not later than one hundred and eighty (180) days after the Effective Date (or, in the case of

2  claims lawfully filed after the Effective Date, by not later than one hundred and eighty (180) days

3  after the date of filing of such claims).

4

5  **2.    Reserves, Payments, And Distributions With Respect To Disputed Claims.**

6  At such time as a disputed claim becomes an allowed claim, in whole or in part, the

7  District or its agent will distribute to the holder thereof the distributions, if any, to which such holder

8  is then entitled under the Plan.  Such distributions, if any, will be made as soon as practicable after

9  the date that the order or judgment of the Bankruptcy ~~court~~Court allowing such disputed claim

10  becomes a Final Order (or such other date as the claim becomes an allowed claim), but in no event

11  more than thirty (30) days thereafter.  Unless otherwise specifically provided in the Plan or allowed

12  by order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become

13  Allowed Claims.

14

15  **F.    Continuing Jurisdiction Of The Bankruptcy Court.**
The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range

16  of matters relating to the Chapter 9 Case, the Plan, and other related items.  Readers are encouraged

17  to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-

18  Effective Date jurisdiction.

19

20  **VI.~~VII.~~    CONFIRMATION AND EFFECTIVENESS OF THE PLAN**
**Because the law with respect to confirmation of a plan of adjustment is complex,**

21  **creditors concerned with issues regarding confirmation of the Plan should consult with their**

22  **own attorneys and financial advisors.**  The following discussion is intended solely for the purpose

23  of providing basic information concerning certain confirmation issues.  The District cannot and does

24  not represent that the discussion contained below is a complete summary of the law on this topic.

25  Many requirements must be met before the Bankruptcy Court may confirm the Plan.

26  Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by

27  the requisite number of creditors, and whether the Plan is in the "best interests" of creditors.  These

28

1  requirements, however, are not the only requirements for confirmation, and the Bankruptcy Court

2  will not confirm the Plan unless and until it determines that the Plan satisfies all applicable

3  requirements, including requirements not referenced in this Disclosure Statement.

**A.    Voting And Right To Be Heard At Confirmation.**

**1.    Who May Support Or Object To Confirmation Of The Plan?**

6  Any party in interest may support or object to the confirmation of the Plan.  Even

7  entities who may not have a right to vote (*e.g.*, entities whose claims are classified into an

8  unimpaired Class) may still have a right to support or object to confirmation of the Plan.  (*See*

9  Section I.C.2 for information regarding the applicable deadlines for objecting to confirmation of the

10  Plan).

**2.    Who May Vote To Accept Or Reject The Plan?**

12  A creditor generally has a right to vote for or against the Plan if its Claim is both

13  Allowed for purposes of voting and is classified into an impaired Class.  Generally, a claim is

14  deemed allowed if a proof of claim was timely filed, provided, however, that if an objection to a

15  claim has been filed, the claimant cannot vote unless the Bankruptcy Court, after notice and hearing,

16  either overrules the objection or allows the claim for voting purposes.  Thus, **the definition of**

17  **"Allowed Claim" used in the Plan for purpose of determining whether creditors are entitled to**

18  **receive distributions is different from that used by the Bankruptcy Court to determine**

19  **whether a particular claim is "allowed" for purposes of voting.  Holders of claims are advised**

20  **to review the definitions of "Allowed," "Claim," and "Disputed" set forth in Section I.A. of**

21  **the Plan to determine whether they may be entitled to vote on, and/or receive distributions**

22  **under, the Plan.**

**3.    Who Is Not Entitled To Vote?**

24  The holders of the following types of claims are not entitled to vote on the Plan:  (a)

25  claims that have been disallowed; (b) claims that are subject to a pending objection and which have

26  not been allowed for voting purposes; (c) claims that are not impaired; and (d) Administrative

53254 9533833v2

49

EXHIBIT 1

62

1  Expense Claims, since such claims are not placed in Classes and are required to receive certain

2  treatment specified by the Bankruptcy Code.

3

### 4.    Vote Necessary To Confirm The Plan.

4  The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least

5  one impaired Class has accepted the Plan without counting the votes of any insiders within that

6  Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be

7  confirmed by "cramdown" with respect to any dissenting impaired Class.

8  A Class of claims is considered to have accepted the Plan when more than one-half  in

9  number and at least two-thirds in dollar amount of the claims that actually voted in that Class have

10  voted in favor of the Plan.

11

### B.    The "Best Interests" Test.

12  The Bankruptcy Court also must determine that the Plan is in the "best interests of

13  creditors" pursuant to section 943(b)(7) of the Bankruptcy Code, which in the chapter 9 context

14  means that treatment under the Plan must be better than the only alternative available, which is

15  dismissal of the case.  Dismissal permits every creditor to fend for itself in the race to the courthouse,

16  since a court supervised liquidation under chapter 7 is not a permissible chapter 9 alternative.

17  The District submits that the Plan is in the best interests of all creditors because

18  significant payments will be made to all impaired Classes under the Two Hospital Transaction, and

19  at least material payments are expected to be made to all impaired Classes under the Alternative

20  Transaction.  *See* District's Projected Financials at Exhibit D hereto.  The Plan devotes all or nearly

21  all of the consideration obtained on account of those assets that the District is legally entitled to sell

22  to the repayment of the District's creditors.  The District has obtained a fair price for its assets,

23  whether under the Two Hospital Transaction, and the Alternative Transaction.  In the case of the

24  Two Hospital Transaction, the Plan will therefore result in the satisfaction of the Bonds, the payment

25  of administrative claims, and payment of a substantial amount on account of allowed unsecured

26  claims, albeit over time. In the case of the Alternative Transaction, the Plan provides a substantial

27  payment to the Bondholders, and a mechanism to satisfy the remaining bonds.  This, with the agreed

28

53251953833v2

50

EXHIBIT 1

63

1   ~~upon restructuring of the Select Administrative Note, will permit the District to continue to operate~~

2   ~~HVMC and HVHC and create the opportunity for the District to generate excess cash, if any, which,~~

3   ~~under the Plan, will be applied to satisfy general unsecured claims. In short, by~~ By implementing

4   the ASA, the District will be able ~~either~~ to convey ~~or preserve~~its hospital assets ~~as~~ a going concern.

5   As a going concern, the value of the District's assets is enhanced by several factors, including the

6   experience and talent of employees, the value of assembled contracts and equipment, and the

7   connections of the business to the community and other providers.  The Plan allows the District to

8   realize that value, and distribute it to its creditors.

9          In contrast, in the absence of the Plan, the District's creditors would be left to "fend

10  for themselves."  Individual creditor collection actions will likely aggregate, through suits and

11  attachments, to make continued operation of the Hospitals untenable, thus eliminating the value of

12  the District's assets as a going concern.  Without operating health care facilities, the value of the

13  District's assets would consist of only the value of empty buildings, raw land and used equipment.

14  This value would likely not be distributed pro rata.  Instead, those creditors ~~most~~ able to pursue

15  litigation most quickly would benefit at the expense of others, and, indeed, the total value may be

16  insufficient to repay the Bonds.

17          Moreover, ~~while~~ the Plan preserves the availability of healthcare services to patients

18  in the District~~, whether~~ under the auspices of PHH in the Two Hospital Transaction, ~~or PHH and the~~

19  ~~District in the Alternative Transaction,~~while the chaotic free-for-all that would occur in the absence

20  of the Plan and ensuing possibility that operations will cease as described above would work to the

21  severe detriment of the District's community.

22

23  **C.      Feasibility.**
           To satisfy the requirement set forth in Bankruptcy Code section 943(b)(7)~~'s~~

24  ~~requirement~~ that the Plan be feasible, the District must demonstrate the ability to make the payments

25  required under the Plan and still maintain its operations at the level that it ~~selects as~~deems necessary

26  to the continued viability of the health care district.

27

28

1    The District submits that the Plan is feasible.  Under the Two Hospital Transaction,

2    the ability to make the payments required by the Plan turns on the ability of PHH to close that

3    transaction if~~now that~~ Public Approval ~~is obtained, and the ability of PHH to make the lesser~~

4    ~~payments if Public Approval is not obtained and the Alternative Transaction closes.  No later than~~

5    ~~noon on~~has been obtained.  On December 4, 2009, PHH ~~must disclose~~disclosed to the District's

6    general ~~outside counsel under section 6.8 of the ASA~~ that it has the ~~financial commitments~~

7    ~~necessary~~counsel its equity and lender commitments pursuant to section 6.8 of the ASA.  Such

8    disclosures were made pursuant to the confidentiality provisions set forth in Section 6.8 of the ASA.

9    Although both the equity and lender commitments reviewed by the District's general counsel are

10    subject to commercially customary contingencies, including compliance with federal and state

11    securities laws and satisfaction of conditions in the ASA, the District's general counsel has reported

12    back to the District his conclusion that the information and documents reviewed reasonably provide

13    the evidence of sufficient capital to close both transaction, as required by Section 6.8 of the ASA .

14    The District has negotiated a fair price for sale of substantially all of its assets, and

15    will distribute the consideration received as set forth in the Plan.  The District will continue in a

16    limited fashion after consummating the Two Hospital Transaction, which limited operations will be

17    funded by future payments from PHH.  ~~Under the Alternative Transaction, the District will continue~~

18    ~~to operate HVMC and HVHC.  The District's management and financial advisor have prepared the~~

19    ~~projections attached as Exhibit D demonstrating that the District will be able, after the Effective~~

20    ~~Date, to meet its ongoing operating expenses and service its commitments under the Plan.  The~~

21    ~~District submits that it will be able to make all payments required pursuant to the Plan while~~

22    ~~maintaining its operations at the level that is necessary to continue its viability as a local healthcare~~

23    ~~district and that, as a result, the Plan is feasible within the meaning of section 943(b)(7).~~

24

25    **D.    "Cramdown."**

        The Bankruptcy Code provides that the Bankruptcy Court may confirm a plan of

26    adjustment that is not accepted by all impaired classes if at least one impaired Class of claims

27    accepts the Plan and the so-called "cramdown" provisions set forth in sections 1129(b)(1), (b)(2)(A)

28

1   and (b)(2)(B) of the Bankruptcy Code are satisfied. The Plan may be confirmed under the cramdown

2   provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy

3   Code, it (a) is "fair and equitable", and (b) does not discriminate unfairly with respect to each Class

4   of claims that is impaired under and has not accepted the Plan.

5          The "fair and equitable" standard, also known as the "absolute priority rule," requires,

6   among other things, that unless a dissenting unsecured Class of claims receives payment in full for

7   its allowed claims, no holder of allowed claims in any Class junior to that Class may receive or retain

8   any property on account of such claims. The "fair and equitable" standard also has been interpreted

9   to prohibit any class senior to a dissenting Class from receiving under a Plan more than 100% of its

10  allowed claims under a plan. The District believes that the Plan satisfies the "fair and equitable"

11  standard because, among other things, no classes junior to the classes of unsecured claims are

12  receiving or retaining any property under the Plan, and the holders of Allowed Claims in Classes 2A

13  and 2B are not receiving more than 100% payment of their allowed claims.

14         The requirement that the plan not "discriminate unfairly" means, among other things,

15  that a dissenting Class must be treated substantially equally with respect to other Classes of equal

16  rank. The District does not believe that the Plan unfairly discriminates against any Class that may

17  not accept or otherwise consent to the Plan.

18         **As noted above, the District has reserved the right to request the Bankruptcy**

19  **Court to confirm the Plan by "cramdown" in accordance with sections 1129(b)(1), (b)(2)(a)**

20  **and (b)(2)(b). The District also has reserved the right to modify the Plan to the extent, if any,**

21  **that confirmation of the Plan under sections 943 and 1129(b) of the Bankruptcy Code requires**

22  **such modifications.**

23  **E.      Effective Date.**

24  **1.      Conditions To The Occurrence Of The Effective Date.**

25         The Plan will not become effective and operative unless and until the Effective Date

26  occurs. Section XII of the Plan sets forth certain conditions to the occurrence of the Effective Date.

27  The District or PHH may waive in whole or in part the condition regarding agreements and

28

1  instruments contemplated by, or to be entered into pursuant to, the Plan.  Any such waiver of a

2  condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and

3  without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

4              The Effective Date will occur on the first Business Day after which the conditions set

5  forth in Section XII.B. of the Plan are satisfied or waived; *provided* that the Effective ~~date~~Date must

6  occur by no later than ~~on~~one year after the Confirmation Date.

7

        **2.      Non-Occurrence Of Effective Date.**

8              The Plan provides that, if confirmation occurs but the Effective Date does not occur

9  within the period authorized by the Plan (one year after the Confirmation Date), upon notification

10  submitted by the District to the Bankruptcy Court~~;~~; (a) the Confirmation Order shall be vacated~~;~~; (b)

11  no distributions under this Plan shall be made~~;~~; (c) the District and all holders of Claims shall be

12  restored to the *status quo* as of the day immediately preceding the Confirmation Date as though the

13  Confirmation Date never occurred~~;~~; and (d) all of the District's obligations with respect to the Claims

14  shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or

15  release of any claims by or against the District or any other entity or to prejudice in any manner the

16  rights of the District or any entity in any further proceedings involving the District.  The failure of

17  the Effective Date to occur, however, will not affect the validity of any order entered in the Chapter 9

18  Case other than the Confirmation Order.

19

    **F.      Effect Of Confirmation.**

20              Section X of the Plan provides that confirmation of the Plan and the occurrence of the

21  Effective Date will have a number of important and binding effects, some of which are summarized

22  below.  Readers are encouraged to review Section X of the Plan carefully and in its entirety to assess

23  the various consequences of confirmation of the Plan.

24

        **1.      Discharge Of The District.**

25              Pursuant to section 944 of the Bankruptcy Code, on the Effective Date. the District

26  will be discharged from all debts (as defined in the Bankruptcy Code) of the District and claims

27  against the District other than (a) any debt specifically and expressly excepted from discharge by the

28

~~53251~~9533833v~~2~~

54

EXHIBIT 1

67

1  Plan or the Confirmation Order, or (b) any debt owed to an entity that, before the confirmation of the

2  Plan, had neither notice nor actual knowledge of the Chapter 9 Case.

3              The rights afforded in the Plan and the treatment of claims will be in exchange for and

4  in complete satisfaction, discharge and release of all claims of any nature whatsoever arising on or

5  before the Effective Date, known or unknown, including any interest accrued or expenses incurred

6  thereon from and after the ~~petition date~~Petition Date, whether against the District or any of its

7  properties, assets, or interests in property.  Except as otherwise provided in the Plan, on the Effective

8  Date, all claims against the District will be deemed to be satisfied, discharged and released in full.

9

                    **2.      Injunction.**
10             The Plan provides that all entities who have held, hold or may hold pre-Effective Date

11  claims will be permanently enjoined, from and after the Effective Date, from (a) commencing or

12  continuing in any manner any action or other proceeding of any kind with respect to any such pre-

13  Effective Date claim against the District; (b) enforcing, attaching, collecting, or recovering by any

14  manner or means any judgment, award, decree or order against the District with respect to such pre-

15  Effective Date claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind

16  against the District or its property or interests in property; and (d) asserting any right of setoff,

17  subrogation or recoupment of any kind against any obligation due to the District with respect to any

18  such pre-Effective Date claim, except as otherwise permitted by section 553 of the Bankruptcy Code.

19

                    **3.      Term Of Existing Injunctions And Stays.**
20             The Plan provides that all injunctions or stays provided for in the Chapter 9 Case

21  pursuant to sections 105, 362, or 922 of the Bankruptcy Code, or otherwise, and in existence on the

22  Confirmation Date, will remain in full force and effect until the Effective Date.

23  **VII.~~VIII.~~     CERTAIN RISK FACTORS TO BE CONSIDERED**

24             Holders of claims against the District should read and consider carefully the factors

25  set forth below, as well as the other information set forth in this Disclosure Statement and the

26  documents delivered with this Disclosure Statement and/or incorporated by reference, prior to voting

27

28

~~5325-~~9533833v2

1  to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the

2  only risks involved in connection with the Plan and its implementation.

3

**A.    ~~The Two Hospital Transaction.~~**

4  ~~The primary risk~~One of the risks involved in the Two Hospital Transaction ~~scenario is~~

5  ~~the risk~~ that PHH will not be able to obtain the financing necessary to close the sale under the ASA.

6  Section 6.8 of the ASA ~~requires~~required PHH to demonstrate its financial ability to close the Two

7  Hospital Transaction by no later than December 4, 2009, subject to an opportunity to cure as set forth

8  in section 6.8 of the ASA.  PHH is a newly formed entity created solely for the purposes of

9  effectuating the two transactions contemplated by the Plan.  Hence, it does not have an established

10  track record.[11]

11  ~~It is also possible that Public Approval will not be obtained in the December 15~~

12  ~~election.  In that event the Two Hospital Transaction will not close.~~

13  The Indenture Trustee has notified the District and PHH that it will urge the holders

14  of Class 1A and Class 1B Claims to reject the Plan unless PHH demonstrates to the Indenture

15  Trustee's satisfaction, on or before the date which is fourteen (14) days prior to the Ballot deadline,

16  that PHH has the financial ability to close the Two Hospital Transaction as and when required under

17  the ASA.

18  An additional risk involved in the Two Hospital Transaction scenario is presented by

19  the schedules required by the ASA, which include, among other things, a schedule of all of the

20  District's executory contracts and unexpired leases.  The schedules are expected to be voluminous

21  and are presently being finalized.  It is possible, though the District does not anticipate it, that PHH

22  will terminate the transaction under the ASA upon review of the schedules.  In that event, the Plan

23  will not be consummated.

24  ~~There is also a risk that the amount of allowed administrative expenses, priority~~

25  ~~claims and general unsecured claims may be greater than currently estimated, in which case~~

26  ~~distributions to creditors may be reduced.~~

27

28  [11]  Please refer to the discussion of feasibility in Section V.C above.

~~53251~~9533833v2

56

EXHIBIT 1

69

B.    ~~The Alternative Transaction.~~

~~The risks described in connection with the Two Hospital Transaction also apply to the~~
~~Alternative Transaction. Section 9(a) of schedule 1.3.2 of the ASA requires PHH to demonstrate its~~
~~financial ability to close the Alternative Transaction. As in the case of the Two Hospital~~
~~Transaction, if PHH is financially unable to perform its obligations under the ASA, the Plan will not~~
~~be consummated.~~

~~Additional risks are posed in the Alternative Transaction scenario. If Public Approval~~
~~is not obtained, the District will still operate HVMC and HVHC. As set forth in Exhibit D and~~
~~described above, the District believes, but cannot assure, that it will operate on a cash flow positive~~
~~basis after the Alternative Transaction. Additionally, after the Alternative Transaction, the District~~
~~will still be subject to $15-18 million in debt owed on account of the Bonds, and the approximately~~
~~$8.4 million Select Administrative Note, in both cases, on modified terms. Additionally, the~~
~~District's remaining assets will be encumbered, as described in schedule 1.3.2 of the ASA, which~~
~~will impair the District's ability to borrow to meet the forgoing obligations. Finally, the HVMC~~
~~building has considerable seismic compliance issues. The District does not anticipate that it will~~
~~generate cash sufficient to renovate HVMC, and obtaining continued waivers of seismic compliance~~
~~cannot be assured.~~

There is also a risk that the amount of allowed administrative expenses, priority claims and general unsecured claims may be greater than currently estimated, in which case distributions to creditors may be reduced.

VIII.~~IX.~~    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

A.    Introduction.

The implementation of the Plan may have federal, state, local and foreign tax consequences to the District and ~~District~~ it's creditors. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

57

EXHIBIT 1

53251953833v2

1         The discussion below addresses the potential material ~~Federal~~ federal tax

2 consequences of the Plan to the District and a hypothetical investor typical of the holders of Claims

3 in this case. This discussion does not attempt to consider various facts or limitations applicable to

4 any particular creditor which may modify or alter the consequences described herein. A creditor may

5 find that the tax consequences of the Plan to such creditor differ materially from the tax

6 consequences discussed below because of such creditor's facts and circumstances. This discussion

7 does not address state, local or foreign tax consequences.

8         The following discussion is based upon the provisions of the Internal Revenue Code

9 of 1986, as amended (the "Internal Revenue Code"), the regulations promulgated thereunder, existing

10 judicial decisions and administrative rulings. In light of the rapidly-changing nature of tax law, no

11 assurance can be given that legislative, judicial or administrative changes will not be forthcoming

12 that would affect the accuracy of the discussion below. Any such changes could be material and

13 could be retroactive with respect to the transactions entered into or completed prior to the enactment

14 or promulgation thereof. The tax consequences of certain aspects of the Plan are uncertain due to the

15 lack of applicable legal authority and may be subject to judicial or administrative interpretations that

16 differ from the discussion below.

17       **TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE**

18 **CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF**

19 **FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR**

20 **WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE**

21 **PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE**

22 **INTERNAL REVENUE CODE, AND (2) SUCH DISCUSSION IS WRITTEN IN**

23 **CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN.**

24       **CREDITORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX**

25 **ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO**

26 ~~DEBTOR~~ **THE DISTRICT OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN,**

27 **INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

28

1    **B.    Federal Income Tax Consequences to ~~Debtor~~the District.**

2    **1.    ~~5.~~    Tax Consequences of ~~Debtor~~ the District's Sale of Assets.**

3    The Plan provides for the sale of District assets to PHH pursuant to the terms of the

4    ASA and the Plan.  A sale generally is a recognition event for federal income tax purposes and

5    requires the seller to recognize and report gain or loss measured by the difference between the

6    amount realized and the adjusted tax basis of the sold assets.  However, Internal Revenue Code

7    section 115 provides that gross income does not include "income derived from . . .the exercise of any

8    essential governmental function and accruing to a State or any political subdivision thereof . . ."  If

9    Internal Revenue Code section 115 applies to the District's sale of assets under the ASA, any income

10    or gain realized by the ~~Debtor~~ District upon such sale would be excluded from the District's gross

11    income.

12    The District is a political subdivision of the State of California and therefore believes

13    it meets one of the predicates for the application of Internal Revenue Code section 115.  The District

14    also believes, but cannot provide assurances, that its sale of assets pursuant to the ASA and this Plan

15    is an action that constitutes an "exercise of any essential governmental function" within the meaning

16    of Internal Revenue Code section 115 because such sale is compelled by economic and financial

17    necessity and is ancillary to the government function which it performed as a government

18    subdivision.  Consequently, the District believes that any income or gain it may realize upon the sale

19    of assets pursuant to the ASA is excluded from gross income and therefore will not give rise to a

20    federal income tax liability.

21    In addition to the exclusion provided by Internal Revenue Code section 115, there is

22    considerable case law and administrative authority supporting the position that any income or gain of

23    the District from the sale of its assets is not taxable under Internal Revenue Code section ~~11,~~ 11

24    (which applies the income tax to corporations and entities treated as corporations for federal income

25    tax purposes ) or is not otherwise subject to federal income tax.  *State of Michigan v. United States*,

26    40 F.3d 817 (6th Cir. 1994); *Florida Residential Property and Casualty Joint Underwriting Assoc. v.*

27    *United States*, 207 F.Supp.2d 1344 (N.D. Fla. 2002); Rev. Rul. 87-2, 1987-1 C.B. 18; Rev. Rul. 71-

28

EXHIBIT 1

1  131, 1971-1 C.B. 28; Rev. Rul. 71-132, 1971-1 C.B. 29.  The District believes these authorities

2  significantly strengthen its position that any income or gain it realizes from the sale of assets

3  pursuant to the ASA and the Plan will not give rise to a federal income tax liability.

4  Based upon the foregoing, the District anticipates that it will not report for federal

5  income tax purposes any income, gain, loss, deduction or credit (or item thereof) realized or

6  recognized by it in connection with its sale of assets.  The District also anticipates that, in conformity

7  with past practice, it will not file any federal corporate income tax return with respect to the ~~any~~ tax

8  period in which the sale of assets falls.

9  <u>2.</u>  ~~6.~~  **Reduction ~~Of Debtor~~<u>of the District</u>'s Indebtedness.**

10  As a result of the Plan's implementation, it is likely that not all creditors holding valid

11  Claims will be paid in full.  The District anticipates that any unpaid balance will be discharged

12  pursuant to Bankruptcy Code section 944.  (Any amount of potential discharged indebtedness for

13  federal income tax purposes will be referred to herein as a "Debt Discharge Amount").  In general,

14  the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must

15  include the Debt Discharge Amount in its gross income in the taxable year of discharge to the extent

16  that the Debt Discharge Amount exceeds any consideration given for such discharge.  No income

17  from the discharge of indebtedness is realized to the extent that payment of the liability being

18  discharged would have given rise to a deduction.

19  If a taxpayer is in a title 11 case and the discharge of indebtedness occurs pursuant to

20  a plan approved by the court, such discharge of indebtedness is specifically excluded from gross

21  income (the "Bankruptcy Exception").

22  Accordingly, the District should not be required to include in income any Debt

23  Discharge Amount as a result of Plan transactions.  If it were asserted or determined that, contrary to

24  the analysis described above, such Debt Discharge Amount does not qualify for exclusion based

25  upon the Bankruptcy Exception, ~~Debtor~~ the District would assert Internal Revenue Code section 115

26  as an additional basis for excluding any Debt Discharge Amount from income.  ~~Debtor~~ The District

27  would also take the position that, pursuant to case law and administrative authority, any Debt

28

1  Discharge Amount is not taxable. *State of Michigan v. United* States, 40 F.3d 817 (6th Cir. 1994);

2  *Florida Residential Property and Casualty Joint Underwriting Assoc. v. United States*, 207

3  F.Supp.2d 1344 (N.D. Fla. 2002); Rev. Rul. 87-2, 1987-1 C.B. 18; Rev. Rul. 71-131, 1971-1 C.B.

4  28; Rev. Rul. 71-132, 1971-1 C.B. 29.

5        The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by

6  the Debt Discharge Amount excluded from income on the basis of the Bankruptcy Exception.  Tax

7  attributes are reduced in the following order of priority: (i)  net operating losses and net operating

8  loss carryovers; (ii) general business credits; (iii) minimum tax credits; (iv) capital loss carryovers;

9  (v) basis of property of the taxpayer; (vi) passive activity loss or credit carryovers; and (vii) foreign

10  tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded

11  from gross income, except that general tax credits, minimum tax credits and foreign tax credits are

12  reduced by 33.3 cents for each dollar excluded from gross income.  Because attribute reduction

13  (including the reduction of NOLs) occurs after the determination of tax for the tax year of the

14  discharge, attribute reduction should not affect the District's ability to use its tax attributes, if any,

15  with  respect to income or gain recognized on the sale of assets pursuant to the ASA.  (Such

16  utilization of tax attributes will be completely unnecessary if, as discussed above, income or gain

17  from the sale is  excludable from gross income under Internal Revenue Code section 115 or

18  because government subdivisions are not subject to federal corporate income tax).

19        Except as described below, any Claim against  the District (except a Claim

20  that would give rise to a deduction if paid) that is discharged by payment to a creditor of cash and/or

21  property will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent

22  that the adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market

23  value of the payment made in cancellation thereof.

24        The District's Debt Discharge Amount may be increased to the extent that unsecured

25  creditors holding unscheduled Claims fail to timely file a proof of Claim and have their Claims

26  discharged on the Confirmation Date pursuant to Bankruptcy Code section 944.

27

28

5325-9533833v2

1    **C.    Tax Consequences To Creditors.**

2    The tax consequences of the Plan's implementation to a creditor will depend on

3    whether the creditor is a citizen or resident of the United States, ~~whether the creditor's present debt~~

4    ~~Claim constitutes a "security" of the District for federal income tax purposes and the type of~~

5    ~~consideration received by the creditor in exchange for its Claim,~~ whether the creditor reports income

6    on the cash or accrual method, whether the creditor receives consideration in more than one tax year

7    of the creditor, and whether all the consideration received by the creditor is deemed to be received by

8    that creditor in an integrated transaction.  The tax consequences upon the receipt of cash or other

9    property allocable to interest are discussed below under "Receipt of Interest."

10    **1.    Claims of Series 1993 and 1996 Bondholders.**

11    ~~The Series 1993 Bonds and Series 1996 Bonds are likely tax securities for federal~~

12    ~~income tax purposes.~~ Under the Two Hospital Transaction, the payment in full of the ~~Bonds~~

13    ~~would~~ Series 1993 Bonds and Series 1996 Bonds (collectively, the "District Bonds") should cause

14    each holder thereof to recognize gain or loss under Internal Revenue Code sections 1001 and 1271

15    measured by the difference between the amount realized with respect thereto and such holder's

16    adjusted tax basis in the District Bonds held by such holder.  The total cash amount received by such

17    a holder would be allocated between principal and interest, with the principal amount so received

18    being treated as the amount realized and the interest amount being treated as discussed below under

19    "Receipt of Interest."

20    ~~Under the Alternative Transaction, it is likely that a deemed exchange occurs for~~

21    ~~federal income tax purposes in which the old, unmodified Bonds are deemed to be exchange for~~

22    ~~Bonds as modified according to the terms of the Plan.  If the District were a privately held or~~

23    ~~publicly owned corporation, such deemed exchange likely would qualify as a recapitalization,~~

24    ~~resulting in a tax-free exchange pursuant to Internal Revenue Code section 368(a)(1)(E).  However,~~

25    ~~because of the District's status as a government subdivision, it is unclear to the District whether the~~

26    ~~deemed exchange can qualify as a recapitalization qualifying under section 368(a)(1)(E), and the~~

27    ~~District expresses no view with respect to this matter.  If the deemed exchange does not qualify for~~

28

5325:9533833v2

62

EXHIBIT 1

75

1   ~~tax-free exchange treatment as a recapitalization, holders of District Bonds will be required to~~

2   ~~recognize gain or loss on the transaction.~~

3       **2.    Other Creditors Holding Unsecured Claims.**

4       ~~A tax security generally is an obligation with an original term to maturity of 10 years~~

5   ~~or more or, possibly, 5 years or more.  Trade Claims generally are not tax securities because they are~~

6   ~~of short maturity.~~  An unsecured creditor holding a Claim in Class 2A  ~~that is classified as a tax~~

7   ~~security likely will be treated for tax purposes in substantially the same manner as the holder of a~~

8   ~~Claim based on a Bond under the Alternative Transaction, as described above.  An unsecured~~

9   ~~creditor holding a Claim in Class 2A that is not classified as a tax security~~  likely will recognize gain

10  or loss pursuant to Internal Revenue Code section 1001 and Treasury Regulation section 1.1001-3 as

11  a result of the significant modification of such creditor's rights that occurs under the Plan  and,

12  consequently, a deemed exchange of such Claim for rights under the Plan to receive four annual

13  installment payments.  Gain or loss will be measured by the difference between the amount realized

14  by a holder of a Class 2A Claim on such exchange and such holder's adjusted tax basis in such

15  Claim.  The amount realized by a holder of a Class 2A Claim will be the "issue price" of the Plan-

16  created obligation to pay such Claim over a period of four years without interest.  Such issue price

17  likely will be determined under Internal Revenue Code section 1274.

18      Certain creditors holding Class 2A Claims may be entitled to report income or gain

19  recognized on the deemed exchange described above on the installment method.  (The installment

20  method does not apply to recognized losses).  Holders of Class 2A Claims should consult with their

21  tax advisors to determine if the installment method is applicable to income or gains recognized by

22  them by reason of the deemed exchange described above.

23      The District anticipates that original issue discount will accrete with respect to the

24  four year installment obligation to holders of Class 2A Claims under the Plan.  The tax consequences

25  of original issue discount accretion are discussed below.

26

27

28

~~53251~~9533833v2

63

EXHIBIT 1
76

3. **Character of Recognized Gain or Loss.**

In the case of a creditor whose existing Claims constitute capital assets in such creditor's hands, the gain required to be recognized generally will be classified as a capital gain, except to the extent of interest (including accrued market discount, if any). ~~Any gain recognized will be treated as ordinary income to the extent of accrued market discount.~~ In this regard, it should be noted that ~~section~~ Section 582(c) of the Internal Revenue Code provides that the sale or exchange of a bond, debenture, note or certificate, or other evidence of indebtedness by a bank or certain other financial institutions shall not be considered the sale or exchange of a capital asset. Accordingly, any gain recognized by such creditors as a result of the Plan's implementation will be ordinary income, notwithstanding the nature of their Claims. Any capital gain recognized by a creditor will be long-term capital gain with respect to those Claims for which the creditor's holding period is more than one year, and short-term capital gain with respect to such Claims for which the creditor's holding period is one year or less.

4. **Receipt of Interest.**

Income attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the creditor's existing Claims are capital assets in its hands. ~~A creditor who, under its accounting method, was not previously required to include in income accrued but unpaid interest attributable to existing Claims, and who exchanges its interest Claim for cash, or other property pursuant to the Plan, will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that creditor realizes an overall gain or loss as a result of the exchange of its existing Claims. A creditor who had previously included in income accrued but unpaid interest attributable to its existing Claims may be able to recognize a loss to the extent such accrued but unpaid interest is not satisfied in full. For purposes of the above discussion, "accrued" interest means interest which was accrued while the underlying Claim was held by the creditor~~. The extent to which consideration distributable under the Plan is allocable to such interest is uncertain. The District anticipates that such income will be tax exempt to the holders of District Bonds. Holders of Class 2A Claims should consult with their tax

5325-9533833v2

77

1  advisors to determine whether any such interest is excludable from gross income pursuant to Internal

2  Revenue Code section 103 as interest on an obligation of a political subdivision of a State.

3           **5.**      **Other Tax Considerations.**

4             **a.**      **Market Discount.**

5        If a creditor has a lower tax basis in a ~~Debtor~~ District obligation than its face amount,

6  the difference may constitute market discount under section 1276 of the Internal Revenue Code.

7  (Certain District obligations are excluded from the operation of this rule, such as tax-exempt

8  obligations, obligations with a fixed maturity date not exceeding one year from the date of issue,

9  installment obligations to which Internal Revenue Code section 453B applies and, in all likelihood,

10  demand obligations or instruments).

11        Holders in whose hands the District obligations are market discount bonds will be

12  required to treat as ordinary income any gain recognized upon the exchange of such obligations to

13  the extent of the market discount accrued during the holder's period of ownership, unless the holder

14  has elected to include such market discount in income as it accrued.  Holders of Claims should

15  consult with their tax advisors to determine whether the market discount rules do not apply to such

16  Claims by reason of the District's status as a political subdivision.

17             **b.**    **Original Issue Discount.**

18        Original issue discount will accrete on the four year installment obligation payable

19  under the Plan to holders of Class 2A Claims.  Although a holder generally is required to include

20  accreted original issue discount in gross income pursuant to Internal Revenue Code section 1272, the

21  status of the obligor as a political subdivision of a State may render such original issue discount

22  exempt from federal income taxation.  I.R.C. § 1272(a)(2)(A).  Holders should consult with their tax

23  advisors to determine whether such original issue discount is includible in or excludable from their

24  gross income.

25             **c.**    ~~b.~~ **Withholding.**

26        The District or a disbursing agent will withhold any amounts required by law from

27  payments made to creditors.  This may require payments by certain creditors of the required

28

5325-9533833v2

1    withholding tax on the non-cash consideration issuable or deemed issuable under the Plan.  In

2    addition, creditors may be required to provide general tax information to the District or a disbursing

3    agent, and any failure by a creditor to comply with such a request may entitle the District to withhold

4    any and all distributions to such creditor until full compliance with the District's request for

5    information is achieved.

6    **IX.X.  RECOMMENDATION AND CONCLUSION**

7          The District believes that confirmation and implementation of the Plan is preferable

8    to all other available and feasible alternatives.  Accordingly, **the District urges holders of impaired**

9    **claims to vote to accept the Plan by so indicating on their ballots and returning them as**

10    **specified in this Disclosure Statement and on their ballots.**

11

12    DATED: ~~November 2,~~December 16, 2009        VALLEY HEALTH SYSTEM

13

14                         By: _____

                          */s/ Joel M. Bergenfeld*

15                             Joel M. Bergenfeld,
                            Chief Executive Officer

16

17    Submitted By:

18

19    CHARLES D. AXELROD, GARY E.
     KLAUSNER ~~and~~, H. ALEXANDER FISCH

20    and NEETA MENON, Members of
     STUTMAN, TREISTER & GLATT

21    PROFESSIONAL CORPORATION

22    By: _____*/s/ Neeta Menon*_____

23       ~~H. Alexander Fisch~~

24          Neeta Menon

25

26

27

28

1

## EXHIBITS

2

**Exhibit A**     Plan of Adjustment of Debts

**Exhibit B**     August 31, 2009 Preliminary Financial Statements and October 31, 2009 Financial
              Statements

**Exhibit C**     V&IG Valuation Summaries

**Exhibit D**     District's Three Year Projected Financial Statements

**Exhibit E**     ASA

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5325 9533833v2

EXHIBIT 1

80

# TABLE OF CONTENTS

|  |  |  | Page(s) |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| | A. | The Purpose Of This Disclosure Statement. | 1 |
| | B. | Summary Of Entities Entitled To Vote On The Plan And Of Certain Requirements Necessary For Confirmation Of The Plan. | 2 |
| | C. | Voting Procedures, Balloting Deadline, Confirmation Hearing, And Other Important Dates, Deadlines, And Procedures. | 3 |
| | | 1. Voting Procedures And Deadlines. | 3 |
| | | 2. Date Of The Confirmation Hearing And Deadlines For Objection To Confirmation Of The Plan. | 4 |
| | D. | Four Important Notices And Cautionary Statements. | 5 |
| | E. | Additional Information. | 6 |
| II. | BACKGROUND INFORMATION | | 6 |
| | A. | The District. | 6 |
| | B. | District's Financial Problems. | 7 |
| III. | ADMINISTRATION OF THE DISTRICT'S CHAPTER 9 CASE | | 9 |
| | A. | Formation of the Committee. | 9 |
| | B. | Sale of Moreno to Kaiser. | 10 |
| | C. | Motions For Relief From The Stay. | 11 |
| | D. | SEIU Litigation. | 11 |
| | E. | CNA Negotiation and New MOU. | 12 |
| | F. | Closure of SNF. | 12 |
| | G. | Aetna Litigation. | 12 |
| | H. | Sale of Hemet Global Services. | 13 |
| | I. | Pending Litigation Matters Challenging Consummation of Sale Pursuant to ASA to be Resolved As Part of Plan Confirmation. | 13 |
| | J. | Prime's Expressed Interest in Purchasing The District's Assets. | 18 |
| IV. | THE DISTRICT'S LIABILITIES AND ASSETS | | 18 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

533831v2

i

EXHIBIT 1

81

|   |   | A. | Liabilities. | 18 |
|---|---|---|---|---|
| | | | 1. | Proofs of Claim. | 18 |
| | | | 2. | General Unsecured Claims. | 19 |
| | | | 3. | Priority Unsecured Claims. | 20 |
| | | | 4. | Class 2B - General Unsecured Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO and Claims of Constituent Members Thereof | 22 |
| | | | 5. | Claims of Series 1993 and 1996 Bondholders. | 22 |
| | | | 6. | Administrative Claim of Select. | 22 |
| | | | 7. | Statement Regarding Liabilities. | 23 |
| | B. | Assets. | 23 |

V.    SUMMARY OF THE PLAN OF ADJUSTMENT .......... 24

A.    Classification And Treatment of Claims. .......... 26

1.    Unclassified Claims. .......... 26

   a.    Administrative Expense Claims. .......... 26

      (1)    Treatment of the Select Administrative Claim. .......... 26

      (2)    Treatment of All Other Administrative Claims Other Than Professional Claims. .......... 27

   b.    Professional Claims. .......... 28

   c.    Bar Date For Assertion Of Requests For Payment Of Administrative Claims (Other Than Ordinary Course Administrative Claims) And Professional Claims. .......... 29

2.    Classes 1A and 1B (Claims of the Holders of Series 1993 COPs and 1996 Bonds.). .......... 29

3.    Classes 1C (Other Secured Claims). .......... 29

4.    Class 2A (General Unsecured Creditors). .......... 30

5.    Class 2B (General Unsecured Claims of KM Strategic Management, Inc., Hemet Community Medical Group, Menifee Valley Community Medical Group, and LHIO And Claims of Constituent Members Thereof). .......... 31

6.    Class 2C (Interests of Defined Benefit Plan Participants). .......... 31

533831v2

ii

EXHIBIT 1
82

| | | | | | |
|---|---|---|---|---|---|
| B. | | Treatment Of Executory Contracts And Unexpired Leases. | | | 32 |
| | 1. | Generally. | | | 32 |
| | 2. | Assumption. | | | 32 |
| | | a. | Cure Payments and Future Performance. | | 33 |
| | 3. | Rejection. | | | 33 |
| | | a. | Deadline For The Assertion Of Rejection Damage Claims; Treatment Of Rejection Damage Claims. | | 33 |
| C. | | Means For Execution And Implementation Of The Plan. | | | 33 |
| | 1. | Rights of Action. | | | 35 |
| D. | | Distributions. | | | 35 |
| | 1. | Undeliverable Distributions. | | | 36 |
| | 2. | Timeliness Of Payments. | | | 36 |
| | 3. | Compliance With Tax Requirements. | | | 37 |
| | 4. | Time Bar To Cash Payments. | | | 37 |
| | 5. | No De Minimis Distributions. | | | 37 |
| | 6. | No Distributions On Account Of Disputed Claims. | | | 37 |
| | 7. | No Postpetition Accrual. | | | 38 |
| | 8. | Insurance Proceeds. | | | 38 |
| E. | | Disputed Claims. | | | 38 |
| | 1. | Claims Objection Deadline; Prosecution Of Objections. | | | 38 |
| | 2. | Reserves, Payments, And Distributions With Respect To Disputed Claims. | | | 38 |
| F. | | Continuing Jurisdiction Of The Bankruptcy Court. | | | 39 |
| VI. | | CONFIRMATION AND EFFECTIVENESS OF THE PLAN | | | 39 |
| A. | | Voting And Right To Be Heard At Confirmation. | | | 39 |
| | 1. | Who May Support Or Object To Confirmation Of The Plan? | | | 39 |
| | 2. | Who May Vote To Accept Or Reject The Plan? | | | 40 |
| | 3. | Who Is Not Entitled To Vote? | | | 40 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

533831 v2

| | | | 4. | Vote Necessary To Confirm The Plan. | 40 |
| | B. | | | The "Best Interests" Test. | 41 |
| | C. | | | Feasibility. | 42 |
| | D. | | | "Cramdown." | 42 |
| | E. | | | Effective Date. | 43 |
| | | 1. | | Conditions To The Occurrence Of The Effective Date. | 43 |
| | | 2. | | Non-Occurrence Of Effective Date. | 44 |
| | F. | | | Effect Of Confirmation. | 44 |
| | | 1. | | Discharge Of The District. | 44 |
| | | 2. | | Injunction. | 45 |
| | | 3. | | Term Of Existing Injunctions And Stays. | 45 |
| VII. | CERTAIN RISK FACTORS TO BE CONSIDERED | | | | 45 |
| VIII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | | | | 46 |
| | A. | | | Introduction. | 46 |
| | B. | | | Federal Income Tax Consequences to the District. | 48 |
| | | 1. | | Tax Consequences of the District's Sale of Assets. | 48 |
| | | 2. | | Reduction of the District's Indebtedness. | 49 |
| | C. | | | Tax Consequences To Creditors. | 51 |
| | | 1. | | Claims of Series 1993 and 1996 Bondholders. | 51 |
| | | 2. | | Other Creditors Holding Unsecured Claims. | 51 |
| | | 3. | | Character of Recognized Gain or Loss. | 52 |
| | | 4. | | Receipt of Interest. | 52 |
| | | 5. | | Other Tax Considerations. | 53 |
| | | | a. | Market Discount. | 53 |
| | | | b. | Original Issue Discount. | 53 |
| | | | c. | Withholding. | 53 |
| IX. | RECOMMENDATION AND CONCLUSION | | | | 54 |

533833v2

iv

EXHIBIT 1

84

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

533833.v2

v

EXHIBIT 1

## TABLE OF AUTHORITIES

### CASES

*Florida Residential Property and Casualty Joint Underwriting Assoc. v. United
    States,*
    207 F.Supp.2d 1344 (N.D. Fla. 2002) .................................................. 48, 50

*State of Michigan v. United States,*
    40 F.3d 817 (6th Cir. 1994) ............................................................... 48, 50

*In re Valley Health Sys.,*
    383 B.R. 156 (Bankr. C.D. Cal. 2008) .................................................. 1

### STATUTES

11 U.S.C. § 105 ............................................................................ 45
11 U.S.C. § 362 ............................................................................ 45
11 U.S.C. § 507(a) ........................................................................ 21
11 U.S.C. § 922 ............................................................................ 45
11 U.S.C. § 943(a) ........................................................................ 28
11 U.S.C. § 943(b) ........................................................................ 41
11 U.S.C. § 944 ................................................................. 44, 49, 50
11 U.S.C. § 1124 .......................................................................... 3
11 U.S.C. § 1125 .......................................................................... 1
11 U.S.C. § 1129(b) .................................................................... 3, 42
28 U.S.C. § 1452 ....................................................................... 1, 17
I.R.C. § 115 ................................................................... 48, 49, 50
I.R.C. § 453B .............................................................................. 53
I.R.C. § 582(c) ............................................................................ 52
I.R.C. § 1001 .............................................................................. 51
I.R.C. § 1271 .............................................................................. 51
I.R.C. § 1272(a)(2)(A) .................................................................... 53
I.R.C. § 1276 .............................................................................. 53
Cal. Health and Safety Code § 32000 *et seq.* ........................................ 6
California Government Code § 1090 .................................................. 16, 17
California Public Resources Code § 21000 *et seq.* .................................. 15

### RULES

Rev. Rul. 71-131, 1971-1 C.B. 28 ................................................. 49, 50
Rev. Rul. 71-132, 1971-1 C.B. 29 ................................................. 49, 50
Rev. Rul. 87-2, 1987-1 C.B. 18 .................................................... 49, 50

EXHIBIT 1

Document comparison by Workshare Professional on Wednesday, December 16, 2009
3:13:49 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://STGINT/iManage/532519/2 |
| Description | #532519v2<iManage> - VHS: 11-2 Disclosure Statement |
| Document 2 ID | interwovenSite://STGINT/iManage/533833/2 |
| Description | #533833v2<iManage> - VHS: 11-2 Disclosure Statement (post-filing nits) and if Voter Approved |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 539 |
| Deletions | 297 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 846 |

EXHIBIT 1

# **Exhibit A**

EXHIBIT 1

88

1  CHARLES D. AXELROD (STATE BAR NO. 39507)

2  GARY E. KLAUSNER (STATE BAR NO. 69077)

3  H. ALEXANDER FISCH (STATE BAR NO. 223211)

4  NEETA MENON (STATE BAR NO. 254736)
   STUTMAN, TREISTER & GLATT

5  PROFESSIONAL CORPORATION
   1901 Avenue of the Stars

6

7  12th Floor

8  Los Angeles, CA 90067
   Telephone:  (310) 228-5600

9  Telecopy:  (310) 228-5788
   E-mail:  caxelrod@stutman.com

10         gklausner@stutman.com
           afisch@stutman.com

11         nmenon@stutman.com

12 Chapter 9 Counsel for
   Valley Health System

13

14

15              UNITED STATES BANKRUPTCY COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17                    RIVERSIDE DIVISION

18 In re                       )  Case No. 6:07-bk-18293-PC
                               )
19 VALLEY HEALTH SYSTEM,       )  Chapter 9
                               )
20                             )  FIRST AMENDED PLAN FOR THE
                               )  ADJUSTMENT OF DEBTS OF VALLEY
21                             )  HEALTH SYSTEM DATED NOVEMBER
                               )  2, DECEMBER 17, 2009
22                             )
                               )  Disclosure Statement Hearing
23                             )
                               )  Date:     December 8, 17, 2009
24                             )  Time:     2:00 p.m.
                               )  Place:    Courtroom 304
25          Debtor,            )            United States Bankruptcy Court
                               )            3420 Twelfth Street
26 _____ )            Riverside, California

27

28

532049533946v2

EXHIBIT 1                                                                    89

1

2

NOTE:  The Bankruptcy Court Has Not Yet Approved A Disclosure Statement With Respect

3
To The Proposed Plan Of Adjustment Of Debts.  The Filing Of This Proposed Plan Is Not

4
Intended To And Should Not Be Construed To Be A Solicitation Of Acceptances Of The Plan.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

532049533946v2

- 2-

EXHIBIT 1

90