FILED

APR - 8 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk



ENTERED

APR 08 2010

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re:<br><br>VALLEY HEALTH SYSTEM, a<br>California Local Health Care District,<br><br>          Debtor.<br>_____<br><br>PRIME HEALTHCARE MANAGEMENT,<br>INC., a California corporation, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>VALLEY HEALTH SYSTEM, a<br>California Local Health Care District,<br>et al.,<br><br>          Defendants.<br>_____ | Case No. 6:07-bk-18293-PC<br><br>Chapter 9<br><br>Adversary No. 6:09-ap-01708-PC<br><br>**MEMORANDUM DECISION RE:<br>CONFIRMATION OF FIRST<br>AMENDED PLAN OF ADJUSTMENT<br>OF DEBTS OF VALLEY HEALTH<br>SYSTEM DATED DECEMBER 17,<br>2009, AS MODIFIED ON FEBRUARY<br>19, 2010, AND ADJUDICATION OF<br>THE CHALLENGE ACTIONS**<br><br>Date:  February 22, 2010<br>Time:  10:30 a.m.<br>Place: United States Bankruptcy Court<br>          Courtroom # 304<br>          3420 Twelfth Street<br>          Riverside, CA 92501 |

Valley Health System, a California Local Health Care District ("VHS") seeks

confirmation of its First Amended Plan for the Adjustment of Debts of Valley Health System

Dated December 17, 2009, as modified on February 19, 2010 (the "Modified First Amended

Plan") pursuant to § 943(b) of the Bankruptcy Code,[1] dismissal of the complaint in the above

referenced adversary proceeding, and adjudication of other causes of action alleged by Save the

Hospitals, Inc.,[2] Prime Healthcare Services, Inc.,[3] Prime Healthcare Management, Inc.,[4] Albert L.

_____

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule"
references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable
certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "AR" references are to the 1,822-page
administrative record lodged by VHS with the court on February 1, 2010.

[2] Save The Hospitals, Inc. is a California corporation organized on October 15, 2009. The
corporation's principal place of business is Ontario, California. Save The Hospitals, Inc. does

1   Lewis, Jr. ("Lewis"), John Lloyd ("Lloyd"), and Edward J. Fazekas ("Fazekas")[5] that arise under

2   state law and impact the feasibility of VHS's Modified First Amended Plan. At the hearing,

3   Gary E. Klausner, Daniel K. Spradlin, and M. Lois Bobak appeared for VHS; R.D. Kirwan and

4   Carlyle W. Hall, Jr. appeared for Physicians for Healthy Hospitals, Inc. ("PHH");[6] Marc W.

5   Rappel, Robert A. Klyman, Nathan M. Smith, and Daniel P. Brunton appeared for Save the

6   Hospitals, Inc., Prime Healthcare Services, Inc. and Prime Healthcare Management, Inc.

7   (collectively, "Prime"), Lewis, Lloyd, & Fazekas;[7] Samuel R. Maizel appeared for the Official

8   Committee of Unsecured Creditors (the "Committee");[8] Peter J. Mort appeared for Kali P.

9

10   not have any public members. It is not a creditor in VHS's bankruptcy case nor is it a resident or
taxpayer in the VHS district.

11

12   [2] Prime Healthcare Services, Inc. is a Delaware corporation, qualified to do business in
California. Prime Healthcare Services, Inc. is owned by Prem Reddy, M.D. ("Reddy") (10%

13   interest) and the Prem Reddy Family Foundation (90%). Reddy, in turn, is the sole director and
member of the Prem Reddy Family Foundation, which has no employees. Prime Healthcare

14   Services, Inc., by and through its affiliates and subsidiaries, owns and operates 13 acute care
hospitals throughout California. None of the hospitals are located within the geographic borders

15   of the VHS district, nor is the corporation a resident or taxpayer in the VHS district.

16   [3] Prime Healthcare Management, Inc. is a California corporation conducting business in
California. Reddy owns 100% of Prime Healthcare Management, Inc., which provides

17   management services to Prime Healthcare Services, Inc. Prime Healthcare Management, Inc. is

18   not a creditor in VHS's bankruptcy case nor is it a resident or taxpayer in the VHS district.

19   [4] Lewis, Lloyd, and Fazekas are citizens of California and residents of Riverside County. Lewis,
Lloyd, and Fazekas each reside in communities within the geographic boundaries served by the

20   VHS district. Lewis, Lloyd and Fazekas are not creditors of VHS.

21   [5] PHH is a Delaware corporation organized on June 18, 2009. PHH is qualified to do business

22   in California. The directors and officers of PHH are: Sreenivasa Nakka, M.D., President and
Director; Ratan Tiwari, M.D., Vice President and Director; Bhoodev Tiwari, M.D., Vice

23   President; Girdhari Purohit, M.D., Vice President; and Anil Rastogi, M.D., Secretary/CFO.

24   [6] Save the Hospitals, Inc., Prime, Lewis, Lloyd, and Fazekas are, at times, collectively referred to

25   as "the petitioners."

26   [7] The Committee appointed on March 26, 2008, consists of (a) SEIU, United Healthcare
Workers - West ("SEIU"); (b) Universal Health Services of Rancho Springs, Inc.; (c) LHIO, LLC

27

1  Chaudhuri, M.D. ("Chaudhuri"); Nathan F. Coco appeared for U.S. Bank, as Indenture Trustee

2  for the holders of the Valley Health System Certificates of Participation (1993 Refunding

3  Project) and the Valley Heath System District Revenue Bonds (Refunding and Improvements

4  Project) 1996 Series A ("U.S. Bank"); and Jay N. Hartz and Robert A. Davis, Jr. appeared for

5  Hemet Community Medical Group, Inc. ("HCMG").  The court, having considered VHS's

6  Modified First Amended Plan, the petitioners' objections thereto,[9] the petitioners' claims against

7  VHS under state law,[10] the evidentiary record, and arguments of counsel, makes the following

8  findings of fact and conclusions of law[11] pursuant to F.R.Civ.P. 52(a)(1), as incorporated into

9  FRBP 7052 and applied to contested matters by FRBP 9014(c).

10                          I. STATEMENT OF FACTS

11 A.     VHS – The District

12         VHS is a public agency formed in 1946 under the State of California Local Health Care

13 District Law ("LHCDL").[12]  VHS serves a district that encompasses 882 square miles in the San

14 Jacinto Valley in Riverside County, California, with a population within the district of nearly

15 360,000.  At its inception, VHS operated only an 18-bed hospital purchased from the city of

16

17 ("LHIO"); (d) Sodexo USA, Inc.; (e) HCR Manor Care, Inc.; (f) Hemet Healthcare Surgery, Inc.;
18 (g) Anaheim Memorial Medical Center; (h) HCMG; and (i) Southland Endoscopy Center.

19 [9] Save the Hospitals, Inc., Prime Healthcare Services, Inc., Lewis, Lloyd, and Fazekas object to
   confirmation of the VHS's Modified First Amended Plan.
20

21 [10] Prime Healthcare Management, Inc., Lewis, Lloyd, and Fazekas allege certain claims against
   VHS and PHH under state law.  The parties have stipulated to the jurisdiction of this court to
22 decide such claims in conjunction with confirmation of VHS's Modified First Amended Plan.
   See Stipulation, infra note 39.
23

24 [11] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby
   adopted as such.  To the extent that any conclusion of law is construed to be a finding of fact, it is
25 hereby adopted as such.

26 [12] Cal. Health & Safety Code § 32000, et seq.  Residents within VHS's territorial boundaries do
   not pay any taxes to VHS.
27

1   Hemet, California. On the petition date, VHS owned and operated the Hemet Valley HealthCare

2   Center (the "Skilled Nursing Facility"), a 113-bed skilled nursing facility in Hemet, California,

3   together with three acute hospitals – Hemet Valley Medical Center ("Hemet Hospital"), a 340-

4   bed facility in Hemet, California; Menifee Valley Medical Center ("Menifee Hospital"), an 84-

5   bed facility in Sun City, California; and Moreno Valley Community Hospital ("Moreno Valley

6   Hospital"), a 95-bed facility in Moreno Valley, California. The Moreno Valley Hospital and its

7   primary service area were situated outside VHS's boundaries. Each of the hospitals provided

8   comprehensive health services and 24-hour emergency medical services.[13]

9          The cost of VHS's comprehensive health care system was financed, in large part, by two

10  series of bonds issued by VHS (collectively, the "Bonds"): (1) the $61,650,000 Valley Health

11  System Certificates of Participation (1993 Refunding Project); and (2) the $47,335,000 Valley

12  Health System District Revenue Bonds (Refunding and Improvements Project) 1996 Series A.

13  U.S. Bank, VHS's largest creditor, was owed approximately $84 million in principal and interest

14  on the Bonds as of the date of the petition.

15  B.      Events Leading to Bankruptcy

16         Before filing its petition, VHS communicated with its major creditors, including U.S.

17  Bank, and the two labor unions that had been certified as the bargaining representatives for

18  certain VHS employees – SEIU and the California Nurses Association ("CNA"). VHS advised

19

20  _____

21  [13] Services offered at the Hemet Hospital include the Emory J. Cripe Radiation Therapy
    Treatment Center for cancer treatment; cardiac care services; inpatient and outpatient surgical
22  services; behavioral health services; speech, physical, and occupational therapy services; and CT
    imaging and magnetic resonance imaging. The Menifee Hospital provided inpatient and
23  outpatient X-ray services, including mammography, CT scan, and MRI services; a critical care
    unit; inpatient and outpatient surgery; inpatient and outpatient laboratory services; respiratory
24  services; physical therapy services; a joint replacement center; and cataract and retina specialty
    surgeries. The Moreno Valley Hospital offered inpatient medical, surgical and pediatric services;
25  critical care, post-critical care, and telemetry units; maternity and women's services; obstetrics;
26  inpatient and outpatient surgery; the Spine Center of Excellence program; cardiopulmonary
    services; and physical rehabilitation services.
27

1    its creditors and the unions of its intention to seek relief under chapter 9, and assured them that it

2    would negotiate a plan of adjustment consistent with the requirements of chapter 9 once it

3    developed a viable business plan.  VHS's Board of Directors approved the chapter 9 filing only

4    after a public meeting, noticed in accordance with state law, at which attendees were advised of

5    VHS's intention to file a chapter 9 petition and given the opportunity to question the board of

6    directors and its professionals and to be heard on the issue.  VHS's decision "was made only

7    after a careful review of all options and strategies and with the input and guidance of consultants

8    with expertise in healthcare restructuring, corporate counsel, bond counsel, and bankruptcy

9    counsel."[14]

10          VHS sought relief under chapter 9 only after exhausting its efforts to solve its financial

11    problems through an out-of-court restructuring of debt or the sale of its assets.  Two years earlier,

12    VHS had attempted to restructure its debt through Riverside County Measure I ("Measure I")

13    which contemplated the issuance of $485 million in general obligation bonds, secured by

14    property tax revenues, to retire VHS's special revenue bond debt, finance necessary capital

15    improvements, and provide VHS the time and capital required to return to profitability.  Measure

16    I was rejected by the voters on September 16, 2005.  VHS then attempted to improve its liquidity

17    through the sale of assets.

18          On August 8, 2007, VHS approved a sale of substantially all of its assets to Select

19    HealthCare Solutions ("Select"), subject to voter approval in accordance with California law.

20    Select and VHS further agreed that, in the event the sale was not approved by the voters, then

21    Select would have the opportunity to purchase the Moreno Valley Hospital from VHS for $47

22    million.  Voters rejected Riverside County Measure G ("Measure G"), which sought approval of

23    the asset sale to Select, on November 6, 2007 – 37 days before VHS filed its chapter 9 petition.

24

25    [14] VHS's Reply to Objection of U.S. Bank as Indenture Trustee and Limited Objection of SEIU-
26    United Healthcare Workers – West and Local 121 RN to Chapter 9 Petition of Valley Health
      System, 3:1-3.
27

1    The Moreno Valley Hospital was generating monthly losses of between $300,000 to $500,000,

2    and Select had not pursued its opportunity to purchase the hospital from VHS prior to the petition

3    date.

4        VHS's method for generating revenue exacerbated its operating losses.  VHS derived its

5    income from a complicated system of capitation and sub-capitation agreements.  VHS was losing

6    money under its capitation contracts, as well as the associated capitation risk pools formed with

7    certain physician groups.  The unpaid risk pool liability alone associated with these capitation

8    contracts exceeded $16 million on the petition date, and VHS had not reserved funds for the

9    payment of these liabilities.

10       QHR Consulting Services ("QHR"), a turnaround specialist, was retained by VHS on

11   October 15, 2007 to analyze VHS's operations and complex contractual relationships, stabilize

12   VHS's financial situation, and assist in formulating a business plan to return VHS to profitability.

13   QHR examined VHS's $250 million annual budget before undertaking the task of framing a

14   meaningful business plan.  Based on its preliminary findings, QHR recommended operational

15   changes to increase VHS's revenues by approximately $12 million without materially increasing

16   expenses and to eliminate approximately $20 million in annual expenses with no degradation to

17   the quality of VHS's operations.  QHR determined that the key to returning VHS to profitability,

18   however, hinged upon (1) negotiating fee for service agreements to replace its capitation

19   contracts; and (2) consummating a sale of the Moreno Valley Hospital.

20   C.    VHS's Chapter 9 Petition

21       On December 13, 2007, VHS filed a voluntary petition under chapter 9 in this case

22   disclosing approximately 5,000 creditors holding claims in excess of $100 million.  On January

23   11, 2008, the court denied the United States trustee's motion seeking appointment of a patient

24   care ombudsman pursuant to § 333(a)(1).[15]  On February 20, 2008, the court overruled the

25

26   _____

27   [15] In re Valley Health Sys., 381 B.R. 756, 765 (Bankr. C.D. Cal. 2008).

1    objections of U.S. Bank and SEIU to VHS's petition and denied U.S. Bank's motion to dismiss,

2    holding that VHS had established that it was eligible for relief under chapter 9 and "was unable

3    to negotiate with creditors prior to the filing of its chapter 9 petition . . . because negotiation was

4    impracticable within the meaning of § 109(c)(5)(C)."[16]

5    D.      Relevant Events During Bankruptcy

6           After the filing of the petition, VHS renegotiated its contracts with Blue Cross, Health

7    Net, PacifiCare (United Health Care), Secure Horizons (United Health Care), Inter Valley, Inland

8    Empire Health Plan, and SCAN resulting in an estimated $1.2 million per month reduction in

9    operating losses.  Extensive negotiations between VHS, Select and Kaiser Hospital Foundation

10   ("Kaiser") resulted in a court-approved sale of the Moreno Valley Hospital to Kaiser for

11   approximately $53 million on May 20, 2008, which, among other things, reduced VHS's debt to

12   Select by $10.4 million and VHS's liability to U.S. Bank on the Bonds by nearly $40 million.

13   VHS closed the Skilled Nursing Facility in December 2008,[17] sold its interest in Hemet Global

14   Services to HCMG for $3.4 million, and successfully renegotiated its labor agreements with

15   CNA and SEIU.

16          On May 21, 2009, VHS posted public notice under the Brown Act[18] that the VHS Board

17

18   _____

     [16] In re Valley Health Sys., 383 B.R. 156, 165 (Bankr. C.D. Cal. 2008).

19
     [17] VHS continues to operate a chemical dependency and post-treatment retreat center on grounds
20   previously occupied by the Skilled Nursing Facility.

21   [18]   Under the Brown Act, the legislative body of a local agency, or its designee, must post an
     agenda at least 72 hours before a regular meeting briefly describing each item of business to be
22   transacted or discussed at the meeting.  Cal. Gov't Code § 54954.2(a).  The Brown Act also
     provides that a special meeting may be called at any time upon 24 hours notice specifying the
23   time and place of the special meeting and the business to be transacted or discussed.  Cal. Gov't
     Code § 64956.  Michael Sarrao, Vice President and General Counsel for Prime Healthcare
24   Services, Inc. ("Sarrao"), received email notification of each of the relevant VHS Board of
     Directors' meetings at issue in this case.  Prime does not raise any legal challenge regarding
25   whether the notice or agenda posted by VHS for each of these regular or special meetings of
26   VHS's Board of Directors met the requirements of the Brown Act.

27

1  of Directors would meet on May 27, 2009, to consider VHS's most recent financial statements.

2  At the meeting on May 27, 2009, Melanie Van Winkle, Vice President of Finance, presented the

3  Board of Directors with VHS's financial statements for the ten month period ending April 30,

4  2009. The statements confirmed that, despite fundamental changes in VHS's operations, VHS

5  was continuing to operate at a substantial loss. In response thereto, the VHS Board of Directors

6  formed an Ad Hoc Subcommittee of three board members, Vinay M. Rao, Glen Holmes, and

7  Amelia Hippert, to oversee "all aspects of the development and implementation of a financial

8  restructuring plan for the District."[19]

9      On June 26, 2009, VHS posted public notice that its Board of Directors[20] would meet on

10  June 29, 2009, to consider VHS's most recent financial statements and operating plans. At the

11  meeting on June 29, 2009, Hippert announced that VHS would henceforth "pursue a dual track in

12  addressing [VHS's] severe financial problems," stating that VHS would both "honor [its]

13  commitment to developing and implementing fiscal controls to stem continued losses," and

14  "simultaneously explore the potential sale of [VHS's] assets."[21]

15      VHS sustained a net loss of approximately $7.5 million for the fiscal year ending June 30,

16  2009. Although an improvement over the $17.8 million loss for the prior fiscal year, VHS

17  projected that it would do no better than break even from operations for the fiscal year ending

18  June 30, 2010. Heeding concerns of the Committee and U.S. Bank that it could run out of cash

19  by spring of 2010, VHS weighed all strategic options and slowly shifted the focus of a proposed

20  plan of adjustment from a financial restructuring of the district to a sale or lease of its remaining

21  _____

22  [19] Joint Pre-Trial Order, 7:8-9.

23  [20] At all material times after June 24, 2009, the VHS Board of Directors consisted of the
following members:  William Cherry, M.D. ("Cherry"), Chairman; Amelia Hippert ("Hippert"),
24  Vice Chairwoman; Robert O'Donnell ("O'Donnell"), Secretary; Vinay M. Rao ("Rao"),
25  Treasurer; Tom Wilson ("Wilson"), Director; Glen Holmes ("Holmes"), Director; and Madalaine
Dreier ("Dreier"), Director.

26  [21] AR00026.

27

1  two facilities – Hemet Hospital and Menifee Hospital.

2      On July 14, 2009, VHS posted public notice that its Board of Directors would meet on

3  July 15, 2009, to consider approval of an agreement with The Peira Group for consulting services

4  in connection with a potential sale of VHS's assets.  On July 15, 2009, the VHS Board of

5  Directors approved a consulting agreement with The Peira Group at a public meeting.

6  E.    VHS's Plan of Adjustment

7          1. Exclusive Negotiation Agreement

8      On July 24, 2009, PHH contacted VHS regarding its interest in purchasing substantially

9  all of VHS's assets.  To expedite the negotiations, PHH requested an exclusive right to negotiate

10  with VHS for a period of 90-days regarding a purchase of its assets and provided a draft

11  agreement (the "letter agreement") for VHS to consider at its next meeting.  That day, VHS

12  posted public notice that its Board of Directors would meet on July 27, 2009, to consider

13  approval of the letter agreement between VHS and PHH.

14      At the meeting on July 27, 2009, the VHS Board of Directors voted 5-2 to approve the

15  letter agreement between VHS and PHH with Cherry, Hippert, Dreier, Holmes, and Rao voting

16  for approval.  On July 30, 2009, VHS executed a letter agreement with PHH, effective on July

17  27, 2009, pursuant to which VHS agreed to negotiate exclusively with PHH for a period of 90

18  days for the sale of substantially all of its assets, including the Hemet Hospital and Menifee

19  Hospital.

20      On July 30, 2009, Universal Health Services ("Universal"), a publicly traded company,

21  sent Cherry a letter expressing its interest in purchasing substantially all of VHS's healthcare

22  facilities for approximately $25 million.  By letter dated August 13, 2009, Prime also advised

23  VHS of its interest in purchasing substantially all of VHS's assets, including the Hemet Hospital

24  and Menifee Hospital, for an unspecified amount.  On August 14, 2009, VHS responded that

25  VHS was subject to an exclusive negotiation agreement with PHH.

26

27

2. <u>Memorandum of Understanding and Term Sheet</u>

On September 15, 2009, VHS posted public notice that its Board of Directors would meet on September 16, 2009, to consider, among other things, a proposed Memorandum of Understanding and Term Sheet ("MOU/TS") between VHS and PHH concerning the sale of substantially all of VHS's assets to PHH for an estimated price of $156,000,000. On September 16, 2009, VHS's Board of Directors, at the conclusion of a public session, voted 6-1 to approve a non-binding MOU/TS providing for the sale of substantially all of VHS's assets to PHH, subject to voter approval. Cherry, Hippert, Dreier, Holmes, Rao, and Wilson voted to approve the MOU/TS and three resolutions calling for a special election. An initiative election to secure voter approval was scheduled for December 15, 2009. The MOU/TS further provided that, in the event the sale was not approved by voters, VHS would sell the Menifee Hospital to PHH but retain and continue to operate the Hemet Hospital (the "Alternate Sale"). VHS and PHH agreed to "negotiate, finalize and enter into a mutually acceptable form of an Asset Sale Agreement . . . , on terms generally consistent with the terms of [the MOU/TS], and to reasonably resolve any other issues not addressed [by the MOU/TS], by October 5th, 2009."[22]

3. <u>Fair Consideration Opinion</u>

On October 5, 2009, Valuation & Information Group ("V&IG")[23] presented the VHS Board of Directors with a document entitled "An Assessment and Comparison Between the Fair Market Value of Valley Health System and Related Assets and The Transaction Consideration

---

[22] AR01542.

[23] V&IG is a healthcare valuation and financial consulting business serving clients throughout the nation. V&IG is composed of licensed and experienced real estate appraisers, financial analysts, and healthcare industry professionals. V&IG had been retained by VHS to prepare an appraisal of (a) the Hemet Hospital; (b) the Menifee Hospital; (c) the three vacant parcels adjacent to the Menifee Hospital; (d) the Skilled Nursing Facility; (e) the Hemet Valley Medical Arts Building; and (f) five accessory buildings. VHS and Prime, which each engaged the professional services of V&IG on unrelated matters prior to the sale at issue in this case, stipulated that V&IG is a qualified appraiser for purposes of California Health & Safety Code § 32121(p).

By and Between PHH for Healthy Hospitals and Valley Health System" (the "Fair Consideration Opinion"). In conjunction with the Fair Consideration Opinion, V&IG appraised the following properties of VHS:

| Property | Value As of August 5, 2009 |
|---|---|
| Hemet Hospital | $27,830,000[24] |
| Menifee Hospital | 25,800,000[25] |
| Menifee – Adjacent Vacant Parcels | 6,830,000[26] |
| Skilled Nursing Facility | 4,500,000[27] |
| Hemet Valley Medical Arts Building | 8,700,000[28] |
| Five Accessory Buildings | 3,330,000[29] |

V&IG concluded in its Fair Consideration Opinion that, as of August 5, 2009, "[t]he Transaction Consideration of $169.773 million (including approximately $55 million of disputed claims) by and between PHH and VHS is equal to or greater than our estimate of the fair market value of the VHS Assets to be transferred in the Transaction, and that such amount constitutes fair and reasonable consideration to be received by VHS for the transferred assets as provided in Health & Safety Code Section 32121(p)."[30] With the Fair Consideration Opinion, the terms and conditions of the MOU/TS were reduced to an Asset Sale Agreement ("ASA") between VHS and PHH.

---

[24] AR00901. V&IG's appraisal of Hemet Hospital states a value of $27,330,000 as of August 5, 2009. V&IG increased this valuation by $500,000 in its Fair Consideration Opinion.

[25] AR00473.

[26] AR00474.

[27] AR01247. V&IG's appraisal of the Skilled Nursing Facility states a value of $4,550,000 as of August 5, 2009. V&IG reduced this valuation by $50,000 in its Fair Consideration Opinion.

[28] AR01093.

[29] AR00703.

[30] AR01602.

- 11 -

4. Asset Sale Agreement

On October 5, 2009, VHS posted public notice that its Board of Directors would meet on October 6, 2009, to consider approval of the ASA between VHS and PHH. On October 6, 2009, the VHS Board of Directors, at the conclusion of a public session, voted 6-1 to approve the ASA substantially in the form presented to the directors. Cherry, Hippert, Dreier, Holmes, Rao, and Wilson voted to approve the ASA. The ASA was executed on October 14, 2009.

On November 2, 2009, VHS filed a disclosure statement and proposed plan of adjustment predicated upon the asset sale alternatives set forth in the ASA. At the election on December 15, 2009, VHS's proposal to sell substantially all of its assets to PHH received voter approval by a wide margin.[31] On December 16, 2009, VHS filed its First Amended Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 ("First Amended Plan"), together with a First Amended Disclosure Statement With Respect to the Plan for the Adjustment of Debts of Valley Health System Dated December 17, 2009 ("First Amended Disclosure Statement") deleting any reference to the Alternate Sale.[32] By order entered on December 23, 2009, the court

---

[31] The Riverside County Registrar of Voters certified the election results as 87.07% in favor of the sale and 12.93% in opposition to the sale. See Exhibit 247.

[32] The ASA, as incorporated into VHS's First Amended Plan, will, among other things: (a) cause the allowed claims of VHS's bondholders [Classes 1A and 1B] (net of reserves held by VHS) to be paid in full, in cash at the time of the closing of the ASA; (b) provide VHS with $4 million cash to be used for payment of those administrative claims that are not being assumed by PHH at closing as well as additional funds that may be needed to pay administrative expenses; (c) provide $1.7 million, in installments through the fourth anniversary of the closing under the ASA, to the holders of allowed general unsecured claims of VHS [Class 2A], which sum may be adjusted upward or downward, depending on the total amount of administrative claims that are not assumed by PHH at closing; (d) assume substantially all of VHS's post-petition obligations; (e) cause the 5% unsecured promissory note of VHS payable to Select VHS Acquisition Company, LLC in the approximate amount of $8.9 million that is entitled to administrative priority status, to be satisfied; (f) pay VHS the sum of $400,000 per year for a period of five years to sustain it as a California Local Health Care District; (g) assume VHS's obligations for accrued employee paid time off; (h) assume VHS's obligations for accrued extended sick leave; (i) maintain core services, such as basic emergency services for at least five years as provided for in the ASA; (j) cause certain disputed claims filed in VHS's bankruptcy case, which PHH estimates

- 12 -

1   approved VHS's First Amended Disclosure Statement, established confirmation procedures, and

2   set a hearing on confirmation of VHS's First Amended Plan for February 9, 2010.

3   F.      The Challenge Actions

4        Due to the 90-day exclusivity agreement that preceded the MOU/TS and ASA, Prime was

5   blocked from negotiating the terms of a competing offer to purchase the assets of VHS. As a

6   result, Prime took steps to prevent consummation of the sale between VHS and PHH (the

7   "Challenge Actions").

8        1. The Measure P Action

9        On October 15, 2009, Lewis filed a complaint against Barbara Dunmore, Registrar of

10  Voters for the County of Riverside, in Case No. RIC538119, styled Lewis v. Dunmore, in the

11  Superior Court of California, County of Riverside, seeking to enjoin Dunmore from placing

12  Measure P on the ballot for the election on December 15, 2009. Lewis asserted that the language

13  of Measure P, as adopted by VHS's Board of Directors, allegedly was false and misleading.

14  Lewis's complaint named VHS and Cherry, its Chairman of the Board, as the "Real Parties in

15  Interest."[33] On October 23, 2009, the Superior Court denied Lewis's request for a hearing on

16  shortened time and the election went forward on December 15, 2009.

17       2. The Public Records Act Action

18       On October 27, 2009, Prime filed a complaint in Case No. RIC538931, styled Prime

19  Healthcare Management, Inc. v. Valley Health System, et al., in the Superior Court of California,

20  County of Riverside, to compel the disclosure of documents concerning the sale to PHH

21  contemplated by the ASA, including certain reports completed by The Peira Group (the "Peira

22

23  to total approximately $55 million, to be assumed by PHH and withdrawn; (k) employ
    substantially all of VHS's employees; (l) assume the collective bargaining agreements with SEIU
24  and CNA; (m) accept an immediate assignment of the executory contracts and unexpired leases
    that PHH notifies VHS to assume; and (n) pay the premiums for error and omissions tail
25  insurance for VHS ($3.75 million) and director and officer tail insurance ($450,000).

26

27  [33] Lewis did not seek relief from the automatic stay before proceeding with the state court action.

1  Reports") and the "Evaluation Material" referred to in the letter agreement between VHS and

2  PHH dated July 27, 2009, pursuant to the California Public Records Act.[34]  At an expedited

3  hearing on November 23, 2009, the state court ordered VHS to produce the Peira Reports for

4  inspection and copying by Prime not later than December 4, 2009.  On December 3, 2009, the

5  Fourth District Court of Appeal issued a stay of the trial court's order.

6          3. The CEQA Action

7          On November 6, 2009, the petitioners filed a Verified Petition for Writ of Mandate;

8  Complaint for Declaratory Relief and Injunctive Relief in Case No. RIC539783, styled Prime

9  Healthcare Management, Inc., et al. v. Valley Health System, et al., in the Superior Court of

10  California, County of Riverside.  In their complaint, the petitioners allege, in pertinent part, that

11  the ASA between VHS and PHH constitutes a "project" within the scope of the California

12  Environmental Quality Act ("CEQA"),[35] and that VHS abused its discretion by failing to perform

13  an environmental analysis pursuant to CEQA before placing the ASA on the ballot for voter

14  approval.[36]  The petitioners further allege that because PHH would likely develop the agricultural

15  property adjacent to the Menifee Hospital, VHS abused its discretion by failing to obtain

16  planning agency approval for the proposed sale in violation of California Government Code §

17

18  _____

19  [34] Cal. Gov't Code § 6250, et seq. Prime's lawsuit was preceded by a "Notification of Intent to
File State Court Action Against Debtor for Violation of California Public Records Act" filed
20  with this court on October 27, 2009. Prime did not seek relief from the automatic stay before
commencing the lawsuit, reasoning that its claims are based upon or arise out of VHS's acts or
21  omissions taken after the petition date.

22  [35] Cal. Pub. Res. Code § 21000, et seq.

23

24  [36] Between October 12-18, 2009, Prime executed written agreements with Lewis, Lloyd, and
Fazekas under the terms of which Prime agreed to indemnify and hold Lewis, Lloyd, and Fazekas
25  each harmless "from and against any and all liability, loss, fines, penalties, damage, claims or
causes of action and expenses associated therewith (including, without limitation, court costs and
26  attorneys' fees) caused directly or indirectly by [each of them] serving as a plaintiff in an action
against Valley Health System and its Board of Directors." See Exhibits 248:1, 249:2, and 250:2.

27

- 14 -

1   65402.[37] On December 3, 2009, VHS filed a notice with the state court removing the action to

2   this court under Adversary No. 6:09-ap-01708-PC.

3         4. The Government Code § 1090 Action

4         On October 13, 2009, the petitioners filed a motion seeking relief from the automatic stay

5   to file a complaint for an injunction and declaratory judgment in state court specifically to

6   "obtain an order voiding the ASA and requiring a fair and open sale process before the scheduled

7   voter referendum on December 15, 2009."[38] The petitioners alleged that "cause" existed for

8   relief from the stay because (a) the VHS Board of Directors illegally approved a sale of

9   substantially all of its assets to PHH without entertaining bids by other potential purchasers; (b)

10   at the time the ASA was approved, certain members of VHS's Board of Directors had a financial

11   interest in the transaction because they were employed by, or derived financial benefits from,

12   Chaudhuri, one of the principals of PHH, in violation of California Government Code § 1090;

13   and (c) VHS failed to obtain approval from the Riverside Local Agency Formation Commission

14   ("Riverside LAFCO") of its decision to exit the hospital business in violation of the Cortese-

15   Knox-Hertzberg Local Government Reorganization Act of 2000, California Government Code §

16   56000, et seq. ("Cortese-Knox").

17         After an expedited hearing on November 2, 2009, and a continued hearing on November

18   12, 2009, the court denied the petitioners' request for relief from the automatic stay by order

19   entered on November 23, 2009 (the "November 23rd Order"). Before the November 23rd Order

20   was entered, the petitioners' filed a document entitled "Renewed Motion for Relief from the

21   Automatic Stay" re-urging its request for stay relief to commence the Government Code § 1090

22   _____

23   [37] The petitioners' lawsuit was preceded by a "Notification of Intent to File State Court Action
Against Debtor for Violation of the California Environmental Quality Act" filed with this court
24   on November 3, 2009. The petitioners did not seek relief from the automatic stay before
25   commencing the lawsuit.

26   [38] The petitioners' Memorandum of Points and Authorities in Support of Motion for Relief from
Automatic Stay to Pursue State Court Litigation, 2:20-22.
27

1   Action and belatedly seeking modification of the stay to purse the CEQA Action. On November

2   30, 2009, the court denied the petitioners' request for an expedited hearing on the "renewed"

3   motion. On December 7, 2009, the petitioners filed a notice of appeal with respect to the

4   November 23rd Order and a statement electing to have the appeal adjudicated by the district

5   court.

6        On January 20, 2010, VHS and the petitioners filed a Stipulation to Withdraw Renewed

7   Motion for Relief from Stay, Dismiss Appeal and To Adjudicate Issues Raised by Challenge

8   Actions ("Stipulation") pursuant to which the petitioners withdrew the "renewed" motion and

9   agreed to dismiss their appeal of the November 23rd Order. VHS and the petitioners also

10  stipulated to this court's jurisdiction to adjudicate the claims raised in the Challenge Actions in

11  conjunction with confirmation of VHS's First Amended Plan.[39] An order approving the

12  _____

13  [39] Pursuant to the Stipulation, VHS and the petitioners agreed that:

14       C. Subject to paragraph D. below, the Bankruptcy Court shall hear and decide: (1) all of
         the causes of action set forth in the Challenge Actions, including those set forth in the

15       First Amended Complaint, and (2) all grounds for opposing the Sale . . . . The
         Bankruptcy Court shall have the authority to make any findings and orders and to grant

16       any relief that could be granted by a state court of competent jurisdiction in ruling on [the
         petitioners'] claims . . . that (1) the PHH transaction does not provide "fair value" for

17       [VHS's] assets; (2) member(s) of the VHS board who voted to approve the PHH
         transaction had conflict(s) of interest prohibited by California Government Code section

18       1090 et seq.; (3) the PHH transaction required approval by LAFCO under Government

19       Code section 56824.12; (4) VHS violated CEQA in connection with the PHH transaction;
         and (5) the VHS board breached its fiduciary duty in approving the ASA with a "no shop"

20       provision as set forth in section 4.7 thereof (collectively, the "State Law Claims").

21
         D. To the extent that [the petitioners] assert any grounds for opposing the Sale (other
22       than the State Law Claims) that challenge the feasibility of [VHS's First Amended Plan]

23       or otherwise raise issues of bankruptcy law: (1) nothing herein contained shall constitute
         an admission or concession that any of the [petitioners] have standing or qualify as

24       "parties in interest" for purposes of appearing or being heard in connection with [VHS's]
         Plan, (2) such objections shall be governed by and decided under applicable provisions of

25       the Bankruptcy Code and cases decided thereunder, and (3) [VHS] reserves all rights to

26       oppose, defend against and dispute any such Plan objections and the bankruptcy court's
         authority to grant any relief related thereto other than to deny confirmation of its Plan.

27

1  stipulation was entered on January 22, 2010.  The appeal pending before the district court under

2  Case No. EDCV-09-02264 SVW was dismissed on January 29, 2010.  On February 1, 2010,

3  VHS lodged the 1,822-page administrative record relating to VHS's administrative proceedings

4  for its challenged approval of the ASA.

5  G.    The Confirmation Hearing

6      On February 9, 2010, the court commenced a hearing on confirmation of VHS's First

7  Amended Plan.  The petitioners timely filed an objection to confirmation, arguing that VHS's

8  First Amended Plan was neither "in the best interest of creditors" nor "feasible" as required by §

9  943(b)(7).  The petitioners argued that the plan was not feasible for two reasons not tied to the

10  Challenge Actions: "First, PHH may be prohibited from owning the health care facilities

11  comprising the bulk of VHS' assets in light of pending federal health care legislation which sets

12  forth a deadline by which a physician-owned hospital must have a Medicare provider agreement

13  in place in order to avail itself of the exception permitting physician ownership of a hospital.

14  Second, it is not clear that PHH has or will be able to obtain the financing necessary to effectuate

15  the proposed purchase of substantially all of VHS' assets."[40]  Beckman Coulter, Inc., Key

16  Equipment Finance, Inc., and U.S. Bank, which had also filed timely objections to confirmation

17  of VHS's First Amended Plan, withdrew their objections prior to the confirmation hearing.

18      At the hearing, the court determined that VHS's First Amended Plan satisfied the

19  requirements of § 943(b)(1) through (6).[41]  The court overruled the petitioners' objection

20  _____

21  Stipulation, 2:13-3:5.  The Stipulation is silent as to the petitioners' claim that the sale
contemplated by VHS's First Amended Plan violates California Government Code § 65402.

22

23  [40] Objection to Confirmation of First Amended Plan for the Adjustment of Debts of Valley
Health System Dated December 17, 2009 by Save the Hospitals, Inc.; Prime Healthcare Services,
Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas, 3:7-12.  The petitioners do not
24  allege in their objection that the sale contemplated by VHS's First Amended Plan violates
25  California Government Code § 65402.

26  [41] Section 943 sets forth seven requirements for confirmation of a plan in chapter 9.  11 U.S.C. §
943(b).  Section 943(b)(1) also requires that the plan comply with certain chapter 11
27

- 17 -

1    premised on § 943(b)(7) in part, finding that the plan is in the best interests of creditors[42] and that

2    the mere existence of pending federal health care legislation did not render the plan infeasible.[43]

3    The court continued the confirmation hearing to February 22, 2010, for an evidentiary hearing

4    with respect to the remaining prong of the petitioners' feasibility objection and the merits of the

5    petitioners' claims in the Challenge Actions. Prior to the continued hearing, VHS made four

6    adjustments to the First Amended Plan pursuant to 11 U.S.C. § 942.[44]

7    _____

8    confirmation standards made applicable to chapter 9 cases by § 901. 11 U.S.C. § 943(b)(1).
Section 901(a) incorporates the plan confirmation requirements of §§ 1129(a)(2), (a)(3), (a)(6),

9    (a)(8), (a)(10), (b)(1), (b)(2)(A), and (b)(2)(B). 11 U.S.C. § 901(a). The debtor bears the burden
of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence. In re

10    Pierce County Hous. Auth., 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009); In re Mount Carbon

11    Metro. Dist., 242 B.R. 18, 31 (Bankr. D. Colo. 1999). Once these standards are met, the court
must confirm the plan. Pierce County, 414 B.R. at 715; see 6 Alan N. Resnick & Henry J.

12    Sommer, Collier on Bankruptcy ¶ 943.03, at 943-7 (15th ed. Rev. 2009).

13    [42] With respect to the "best interest" requirement of § 943(b)(7), the court determined that
VHS's First Amended Plan provides "a better alternative for creditors than what they already

14    have" and is fair and equitable. See Mount Carbon, 242 B.R. at 34.

15    [43] The court hereby adopts and incorporates herein by reference its findings of fact and

16    conclusions of law regarding confirmation of VHS's First Amended Plan stated orally and
recorded in open court at the confirmation hearing on February 9, 2010, pursuant to F.R.Civ.P.

17    52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by FRBP 9014(c).

18         In their objection to confirmation, the petitioners did not identify the specific federal

19    health care legislation "which sets forth a deadline by which a physician-owned hospital must
have a Medicare provider agreement in place in order to avail itself of the exception permitting

20    physician ownership of a hospital." Objection to Confirmation of First Amended Plan for the
Adjustment of Debts of Valley Health System Dated December 17, 2009 by Save the Hospitals,

21    Inc.; Prime Healthcare Services, Inc.; Albert L. Lewis, Jr.; John Lloyd; and Edward J. Fazekas,

22    3:7-10. The court notes that a deadline of December 31, 2010 may be applicable under the
Health Care and Education Reconciliation Act of 2010, H.R. 4872, 111th Cong. § 1106 (2010)

23    (final version).

24    [44] Modification of First Amended Plan for the Adjustment of Debts of Valley Health System

25    Dated December 17, 2009. The plan modification did not require further disclosure nor did it
adversely change the treatment of the claims of any creditors other than those who had

26    voluntarily agreed to subordinate their claims on an individualized basis. VHS's First Amended
Plan, as modified, henceforth is VHS's Modified First Amended Plan.

27

1    At the continued hearing on February 22, 2010, the court denied VHS's request that the

2    petitioners' remaining confirmation objection be overruled as brought in bad faith[45] and

3    _____

4    [45] Prior to January 25, 2010, none of the petitioners were creditors of VHS nor did they have any
discernable interest in VHS's bankruptcy case other than as a potential purchaser of assets from
5    VHS. VHS had specifically reserved its right to challenge the petitioners' standing to object to
its plan prior to commencement of the confirmation hearing on February 9, 2010. Cf. Calpine
6    Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 531 (3d
7    Cir. 1999) ("Courts that have considered appellate standing in the context of the sale or other
disposition of estate assets have generally held that creditors have standing to appeal, but
8    disappointed prospective purchasers do not."); Simantob v. Claims Prosecutor, LLC (In re
Lahijani), 325 B.R. 282, 290 n.13 (9th Cir. BAP 2005) (stating that "disappointed prospective
9    bidders who are not creditors usually do not have standing to appeal").

10

11    The deadline to file objections to confirmation of VHS's First Amended Plan was
January 25, 2010. In an apparent effort to preempt any issue concerning standing, Prime
12    purchased a claim in the case. On January 22, 2010, Prime purchased a Proof of Claim filed by
B.P. Cabinets, Inc. on July 17, 2008 (Claims Docket # 88-1), which evidenced an unsecured non-
13    priority claim in the amount of $4,290 for the replacement of countertops at the Hemet Valley
Hospital on or about October 15, 2007. On January 25, 2010, Prime filed a request for issuance
14    of a notice of the transferred claim pursuant to FRBP 3001(e), together with its objection to
confirmation of VHS's First Amended Plan.
15

16    The court denied VHS's request to overrule the petitioners' remaining feasibility
objection as brought in bad faith based upon findings of fact and conclusions of law stated orally
17    and recorded in open court at the hearing on February 22, 2010. The court's findings of fact and
conclusions of law are adopted and incorporated herein by reference. In its ruling, the court
18    noted that § 1109(b) states that "[a] party in interest, including the debtor, the trustee, a creditors'
committee, an equity security holders' committee, a creditor, an equity security holder, or any
19    indenture trustee, may raise and may appear and be heard on any issue" in a chapter 11 case. 11
20    U.S.C. § 1109(b). Section 1109(b) is applicable to chapter 9 cases. See 11 U.S.C. § 901(a).
Save the Hospitals, Inc., Lewis, Lloyd, and Fazekas had no standing to object to confirmation.
21    While it would not have been a stretch to find that Prime – which sought unsuccessfully to
purchase the assets of VHS being sold under the Modified First Amended Plan and which
22    purchased the B.P. Cabinets' unsecured claim on the eve of the confirmation hearing for the
admitted purpose of obtaining "an interest in the bankruptcy case" so it could object to the plan –
23    did so for an improper purpose, the court noted that "[t]here is no per se rule denying 'party in
interest' status to the purchaser of a claim against a [debtor]." In re Zaleha, 162 B.R. 309, 313
24    (Bankr. D. Idaho 1993). Prime did not purchase the claim for the specific purpose of controlling
25    the vote of a class of claims to block confirmation of the plan. See Figter Ltd. v. Teachers Ins. &
Annuity Ass'n of Am. (In re Figter), 118 F.3d 635, 639 (9th Cir. 1997) (observing that courts
26    "have been sensitive to situations where a company, which was not a preexisting creditor, has
27

1   proceeded to consider VHS's evidence regarding the ability of PHH to obtain the funds necessary

2   to consummate the purchase of VHS's assets under the Modified First Amended Plan.  On

3   February 23, 2010, the court overruled the petitioners' remaining feasibility objection not tied to

4   the Challenge Actions, finding that VHS's Modified First Amended Plan is feasible under §

5   943(b)(7) in that it offers a reasonable prospect of success and is workable.[46]  The court then

6   considered testimony and evidence regarding the Challenge Actions.  At the conclusion of the

7   hearing on February 26, 2010, the matter was taken under submission.

8                                    II. DISCUSSION

9          This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(a) and

10  1334(b).  The issues before the court involve both core and non-core matters.  Confirmation of a

11  plan of adjustment under chapter 9 is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and

12  (O).  The Challenge Actions involve the State Law Claims.  To the extent that the Challenge

13  Actions are non-core, the parties have stipulated to the jurisdiction of this court to adjudicate the

14  Challenge Actions in conjunction with confirmation.[47]  Venue is appropriate in this court.  28

15  U.S.C. § 1409(a).

16

17

18  _____

19  purchased a claim for the purpose of blocking an action against it.").  As the holder of an
    unsecured claim, Prime's interest in the proceeding is within the zone of interests that Congress

20  intended to protect with respect to the particular issues raised under § 943(b)(7).  Finally,
    whether or not Prime purchased the claim for the sole purpose of permitting it to object to

21  confirmation, the court has an independent obligation to determine that a proposed plan meets
    the confirmation requirements of § 943(b), notwithstanding creditor approval.  Mount Carbon,

22  242 B.R. at 36.

23  [46]  The court hereby adopts and incorporates herein by reference its findings of fact and
    conclusions of law regarding confirmation of VHS's Modified First Amended Plan stated orally

24  and recorded in open court at the continued confirmation hearing on February 23, 2010, pursuant

25  to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052 and applied to contested matters by
    FRBP 9014(c).

26

27  [47]  See Stipulation, supra note 39.

A.    VHS's Board of Directors Did Not Violate a Fiduciary Duty by Approving the ASA with an Unconditional "No Shop" Provision

Petitioners claim that VHS's Board of Directors elected to "disable itself from even considering better offers for the purchase of its assets by agreeing to an airtight 'no shop' clause in the ASA" and that its decision to do so "violates its fiduciary duties."[48] Section 4.7 of the ASA contains the following provision:

> No Shop. Provided that Purchaser is not in material breach or default of this Agreement, for which Seller has provided Purchaser with notice specifying such material breach or default and the reasonable opportunity to cure such material breach or default, Seller shall not, prior to the earlier of the Closing or termination of this Agreement, without the prior written consent of Purchaser: (i) offer for sale, lease or other disposition, the assets of the Hospital Businesses or the Assets (or any portion thereof); (ii) solicit offers or consider unsolicited offers to acquire (by sale, lease or otherwise) all or any material portion of any of the Hospital Businesses or the Assets; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation other than to acknowledge receipt; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital Businesses or the Assets.

AR01768. VHS declined to consider an offer from Prime due to the "no shop" clause in the ASA.[49] Petitioners claim that the VHS Board of Directors had a fiduciary duty both to VHS's creditors and the constituents of the heath care district to maximize the benefits of any asset sale by considering competing offers. However, the petitioners are unable to identify any statute or case law imposing such a fiduciary duty on directors of a California health care district. Nevertheless, the petitioners argue that the VHS Board of Directors considered itself bound by fiduciary duties, pointing to Hippert's statement at the Board of Directors meeting on July 29, 2009, that the sale of VHS's assets must be considered "if we are to carry out the fiduciary responsibilities each of us pledged to do when we were elected to serve on its Board."[50] VHS, on

---

[48] Plaintiffs' Trial Brief, 24:24-26.

[49] By letter dated August 13, 2009, Prime expressed an interest in purchasing substantially all of the assets of VHS for an unspecified amount. AR00386. At the hearing, Prime made an offer of proof that Prime's offer represented a better alternative for VHS's creditors and the public than the ASA.

[50] AR00026.

1   the other hand, asserts that it was under no statutory or regulatory restriction which precluded it

2   from approving a sale agreement containing a "no shop" provision.

3        A typical "no shop" clause prohibits a seller from soliciting or considering new or

4   alternative bids for assets subject to an existing asset sale agreement.[51]  Outside of bankruptcy, no

5   shop clauses and other lock-up agreements are not per se invalid but rather are evaluated on a

6   case by case basis and viewed in the context of the entire negotiated transaction.  See, e.g., Cottle

7   v. Storer Commc'n, Inc., 849 F.2d 570, 575 (11th Cir. 1988) ("While lock-ups in a takeover

8   situation are not per se illegal, they may be illegal in particular cases."); Jewel Cos., Inc. v. Pay

9   Less Drug Stores Nw., Inc., 741 F.2d 1555, 1562 (9th Cir. 1984) (holding that under California

10  law, a corporation's board of directors may enter into an exclusive merger agreement with the

11  board of directors of another corporation pending submission of the agreement to shareholders

12  for approval); Paramount Commc'ns, Inc. v. QVC Network, Inc., 637 A.2d 34, 49 n.20 (Del.

13  1994) (holding that a no-shop clause, when combined with the sale of control and other

14  protective provisions, was invalid because it prevented the directors "from carrying out their

15  fiduciary duties in considering unsolicited bids or in negotiating for the best value reasonably

16  available to stockholders"); Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173,

17  176 (Del. 1986) ("In our view, lock-ups and related agreements are permitted under Delaware

18  law where their adoption is untainted by director interest or other breaches of fiduciary duty.").

19  Courts apply the business judgment rule[52] to determine whether a corporation's board of

20

---

21  [51] See generally George V. Varallo & Srinivas M. Raju, A Process Based Model for Analyzing

22  Deal Protection Measures, 55 Bus. Law 1609, 1616-18 (2000).

23  [52] California's business judgment rule is codified in California Corporations Code § 309(a),
    which states:
24

25        A director shall perform the duties of a director, including duties as a member of any
          committee of the board upon which the director may serve, in good faith, in a manner

26        such director believes to be in the best interests of the corporation and its shareholders
          and with such care, including reasonable inquiry, as an ordinarily prudent person in a like
27

1    directors' decision to adopt a no-shop clause in a particular transaction is fair and reasonable to

2    the corporation and its shareholders.  See, e.g., Cottle, 849 F.2d at 577 ("The business judgment

3    rule thus prevents us from second guessing the directors' decision to grant the lock-up."); Jewel

4    Cos., 741 F.2d at 1562 ("In light of California's statutory scheme preserving the board's

5    traditional management function in the case of corporate control transactions, we see no reason to

6    conclude that the drafters of the Corporate Code intended to deprive a corporate board of the

7    authority to agree to refrain from negotiating or accepting competing offers until the shareholders

8    have considered an initial offer."); Revlon, Inc., 506 A.2d at 185 (holding that the board's

9    decision to grant an asset option lock-up with a no-shop provision represented a breach of the

10   directors' duty of care under the circumstances of the case, and was "not entitled to the deference

11   accorded it by the business judgment rule").

12          In the chapter 11 context, a debtor in possession stands in the shoes of a trustee and is a

13   fiduciary for the estate and its creditors.  11 U.S.C. § 1107(a); see, e.g., Thompson v. Margen (In

14   re McConville), 110 F.3d 47, 50 (9th Cir. 1997) (stating that chapter 11 debtors in possession

15   "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"),

16   cert. denied, 522 U.S. 966 (1997); Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839

17   F.2d 610, 614 (9th Cir. 1988) ("As debtor in possession he is the trustee of his own estate and

18   therefore stands in a fiduciary relationship to his creditors.") (footnote omitted); Devers v. Bank

19   of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985) ("A debtor-in-possession

20   has the duty to protect and conserve property in his possession for the benefit of creditors.").

21          When the debtor is a corporation, the debtor in possession's fiduciary obligations to the

22

23   _____

24          position would use under similar circumstances.

25   Cal. Corp. Code § 309(a).  "The general purpose of the business judgment rule is to afford
     directors broad discretion in making corporate decisions and to allow these decisions to be made
26   without judicial second-guessing in hindsight."  F.D.I.C. v. Castetter, 184 F.3d 1040, 1044 (9th
     Cir. 1999).
27

1    corporation, its creditors and shareholders, fall upon the officers and directors. See Commodity

2    Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) (stating that "the debtor's

3    directors bear essentially the same fiduciary obligation to creditors and shareholders as would the

4    trustee for a debtor out of possession"); Wolf v. Weinstein, 372 U.S. 633, 649 (1963) (observing

5    that "so long as the Debtor remains in possession, it is clear that the corporation bears essentially

6    the same fiduciary obligation to the creditors as does the trustee for the debtor out of

7    possession") (emphasis in original); Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.), 145

8    B.R. 637, 643 (9th Cir. BAP 1992) ("When the debtor is a corporation, corporate officers and

9    directors are considered to be fiduciaries both to the corporate debtor in possession and to the

10   creditors."). Corporate officers, as fiduciaries, must protect and preserve estate assets held in

11   trust for the benefit of creditors. Holta, 145 B.R. at 643; Hirsch v. Penn. Textile Corp. (In re

12   Centennial Textiles, Inc.), 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor

13   in possession and its managers are obligated to treat all parties to the case fairly, maximize the

14   value of the estate, and protect and conserve the debtor's property.") (internal citations omitted).

15        Not surprisingly, courts have scrutinized deal protection measures, such as break-up

16   fees,[53] no-shop clauses, and window shop provisions,[54] built into asset sales for which approval is

17   sought by a chapter 11 debtor in possession under § 363. See, e.g., In re Reliant Energy

18   Channelview LP, 594 F.3d 200, 210 (3d Cir. 2010) (holding that "[t]he Bankruptcy Court did not

19   abuse its discretion when it concluded that an award of a break-up fee was not necessary to

20   preserve the value of the estate"); O'Brien Envtl. Energy, Inc., 181 F.3d at 535 (stating that it is

21

22   _____

[53]  A break-up fee "'is an incentive payment to an unsuccessful bidder who placed the estate

23   property in a sales configuration mode . . . to attract other bidders to the auction.'" Official
     Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147

24   B.R. 650, 659 (S.D.N.Y. 1992), appeal dism'd, 3 F.3d 149 (2d Cir. 1993) (citation omitted).

25   [54]  "A window shop clause is a promise not to solicit a later, better offer, but which permits a

26   board to look at such an offer, provide information to the offeror, and, under appropriate
     circumstances, accept the offer. Id. at 655.

27

1    permissible to offer a break-up fee and reimbursement of expenses to induce an initial bid,

2    provided the allowance of the fee is necessary to preserve the value of the estate and does not

3    give an advantage to a favored purchaser over other bidders by increasing the cost of

4    acquisition); Integrated Res., Inc., 147 B.R. at 664 (upholding bankruptcy court's decision to

5    approve an agreement negotiated by a disinterested board of directors after discussions with 30

6    potential bidders and before the debtors selected a purchaser and agreed to a break-up fee and

7    window shop provision).  In Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp. (In re Big

8    Rivers Elec. Corp.), 233 B.R. 739 (W.D. Ky. 1998), a district court held that a chapter 11 debtor

9    in possession could not enter into an agreement with a "no shop" clause, preventing the debtor

10   from actively soliciting or entertaining competing offers with other entities.  Id. at 752.  The

11   bankruptcy court had ruled that the agreement violated public policy because the "no shop"

12   clause interfered with the debtor's fiduciary obligation to maximize the estate's value.  In re Big

13   Rivers Elec. Corp., 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998).  The district court affirmed on

14   this issue, noting that "[t]his prohibition violates the underlying policy of the Bankruptcy Code to

15   maximize the value of the estate for the creditors by stifling the bidding process for the assets of

16   the debtor."  Big Rivers Elec. Corp., 233 B.R. at 753.

17        Unlike chapter 11, there is no concept of a debtor in possession in chapter 9.[55]  Section

18   541, which defines "property of the estate," is not incorporated into chapter 9.[56]  Nor is § 363,

19   which regulates the use, sale or lease of property, applicable to a chapter 9 case.  See 11 U.S.C. §

20   901(a).  By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete

21   control over its property and its operations, and is not restricted in its ability to sell, use, or lease

22

23   [55]  The term "'trustee', when used in a section that is made applicable to a case under [chapter 9]
     by section 103(e) or 901 . . . , means debtor, except as provided in section 926 . . . ."  11 U.S.C. §
24   902(5).

25   [56]  11 U.S.C. § 901(a).  The term "'property of the estate', when used in a section that is made
26   applicable in a case under [chapter 9] by section 103(e) or 901 . . . , means property of the
     debtor."  11 U.S.C. § 902(1).
27

1   its property.[57]

2          VHS is neither a chapter 11 debtor in possession nor a corporation.  VHS is a California

3   health care district in chapter 9.  VHS exists by virtue of the LHCDL, and its powers are

4   enumerated in California Health & Safety Code § 32121.  VHS is authorized by statute "[t]o

5   transfer, at fair market value, any part of its assets to one or more nonprofit corporations to

6   operate and maintain the assets."  Cal. Health & Safety Code § 32121(p)(1).  There is nothing in

7   § 32121 nor any section of the LHCDL imposing fiduciary obligations on the board of

8   directors of a local hospital district.[58]  Furthermore, § 32121(p)(1), by its terms, does not require

9   _____

10  [57] Section 904 states:

11         Notwithstanding any power of the court, unless the debtor consents or the plan so
12         provides, the court may not, by any stay, order, or decree, in the case or otherwise,
               <u>interfere</u> with –

13
               (1) any of the political or governmental powers of the debtor;
14             (2) any of the property or revenues of the debtor; or
               (3) the debtor's use or enjoyment of any income-producing property.
15

16  11 U.S.C. § 904 (emphasis added).  Section 105(a) is not applicable to chapter 9 cases.  11
    U.S.C. § 901(a).  To the extent that the court has power to issue certain orders under a specific
17  provision of the Code incorporated into chapter 9, that authority is equally limited by § 904.

18  [58] Arguably, the VHS directors as public officials each bear the same fiduciary relationship
19  towards their constituents as a "trustee bears to his <u>cestui que trust</u>, and should therefore act with
    the utmost good faith."  <u>See Hobbs, Wall & Co. v. Moran</u>, 109 Cal. App. 316, 319 (1930). "'A
20  public office is a public trust created in the interest and for the benefit of the people.  Public
    officers are obligated . . . to discharge their responsibilities with integrity and fidelity . . . . [T]hey
21  may not exploit or prostitute their official position for their private benefits.  When public
    officials are influenced in the performance of their public duties by base and improper
22  considerations of personal advantage, they violate their oath of office and vitiate the trust reposed
23  in them, and the public is injured by being deprived of their loyalty and honest services.  It is
    therefore the general policy of this state that public officers shall not have a personal interest in
24  any contract made in their official capacity.'"  <u>Breakzone Billiards v. City of Torrance</u>, 81
25  Cal.App.4th 1205, 1232 (2000) (quoting <u>Terry v. Bender</u>, 143 Cal.App.3d 198, 206 (1956)).
    Section 1090 of the California Government Code was enacted for the specific purpose of
26  "ferreting out any financial conflicts of interest, other than remote or minimal ones, that might
    impair public officials from discharging their fiduciary duties with undivided loyalty and
27

1  competitive bidding.

2      Competitive bidding in California is governed by statute.  Wilson v. L.A. County Metro.

3  Transp. Auth., 23 Cal.4th 305, 313 (2000).  No public entity in California is bound to engage in

4  competitive bidding absent a statutory mandate to do so.  Constr. Indus. Force Account Council

5  v. Amador Water Agency, 71 Cal.App.4th 810, 815 (1999).  "While there are 'powerful purposes

6  served by competitive bidding [e.g., preventing waste, favoritism, and corruption], there is no all-

7  pervasive public policy that requires all public entities to engage in that practice.  Rather, the

8  Legislature imposes competitive bidding requirements on public entities within its purview when

9  the Legislature determines it is in the public interest to do so.'"  Id. (quoting San Diego Serv.

10  Auth. for Freeway Emergencies v. Superior Court, 198 Cal.App.3d 1466, 1469 (1988)).

11      When the California legislature intends to require competitive bidding, it knows how to

12  draft legislation to accomplish that result.  See, e.g., Cal. Health & Safety Code § 32319(a) ("The

13  board of directors may sell the bonds pursuant to the resolution . . . [b]y giving notice inviting

14  sealed bids and selling to the highest responsible bidder."); Cal. Health & Safety Code § 32311

15  ("At the time appointed, the board of directors shall open the proposals, and may sell the bonds

16  or any portion thereof to the highest responsible bidder or bidders."); Cal. Gov't Code § 43627

17  ("Before selling the bonds, or any part thereof, the legislative body shall give notice inviting

18  sealed bids in such a manner as the legislative body may prescribe.  If satisfactory bids are

19  received, the bonds offered for sale shall be awarded to the highest responsible bidder."); Cal.

20  Pub. Res. Code § 5790.7(b) ("The board of directors shall award the sale of bonds to the highest

21  responsible bidder."); Cal. Educ. Code § 15148 ("If satisfactory bids are received, the bonds

22  offered for sale shall be awarded to the highest responsible bidder or bidders . . . ."); Cal. Harb. &

23  Nav. Code § 72(b) ("At the time and place fixed in the notice, the legislative body shall meet and

24  consider all bids that have been submitted.  The lease shall be awarded to the highest responsible

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  allegiance to the public entities they are obligated to serve."  Lexin v. Superior Court, 47
    Cal.App.4th 1050, 1073 (2010).

27

1    bidder . . . ."). The fact that California Health & Safety Code § 32121(p)(1) is silent with respect

2    to competitive bidding must be accorded meaning, particularly given the unambiguous language

3    of the statute. Cf. Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("'[W]here

4    Congress includes particular language in one section of a statute but omits it in another section of

5    the same Act, it is generally presumed that Congress acts intentionally and purposely in the

6    disparate inclusion or exclusion.'") (quoting Russello v. United States, 464 U.S. 16, 23 (1983);

7    Progressive West Ins. Co. v. Preciado, 479 F.3d 1014, 1018 (9th Cir. 2007) ("'Faced with

8    statutory silence . . . , we presume that Congress is aware of the legal context in which it is

9    legislating.'") (quoting Abrego v. Dow Chem. Co., 443 F.3d 676, 683-84 (9th Cir. 2006) (per

10   curiam).

11          The VHS Board of Directors must exercise the authority granted under California Health

12   & Safety Code § 32121 in the public interest.[59] Its decisions may be reviewed by writ of mandate

13   and set aside for abuse of discretion. Cal. Civ. Proc. Code § 1094.5. Directors are subject to

14   civil and criminal liability for contracts made by them in their official capacity in which they hold

15   a personal or financial interest. Cal. Gov't Code §§ 1090, 1097. They can be removed for

16   willful or corrupt misconduct in office. Id. § 3060. Any contract approved by the board of

17   directors that is tainted by a conflict of interest may be declared void. Id. § 1092(a). But the

18   petitioners have failed to establish that the VHS Board of Directors in approving the ASA with a

19   "no-shop" provision either breached a specific fiduciary duty imposed by law or violated any

20   statutory obligation to submit the proposed sale of assets to a competitive bidding process.

21   B.     No Member of VHS's Board of Directors Who Voted to Approve the ASA Was
            "Financially Interested" in the Contract in Violation of California Government Code §
22          1090

23          Petitioners accuse Cherry, Dreier, and Rao, three of VHS's seven directors, of public

24

25

26   _____

27   [59] See supra note 58.

- 28 -

1   corruption.[60] Petitioners charge that PHH is, in fact, a front for Chaudhuri, an influential

2   physician who lives and works in Riverside County, and that Cherry, Dreier, and Rao violated

3   the public trust by approving the ASA in their official capacities in violation of California

4   Government Code § 1090 primarily to line the pockets of Chaudhuri and professional

5   corporations in which Chaudhuri owns an interest. To establish that each of these directors has

6   an impermissible "financial interest" in the ASA in violation of § 1090, the petitioners ask the

7   court to draw inferences from evidence of a web of business relationships and personal contacts

8   involving Cherry, Dreier, Rao, and these professional corporations. In particular, the petitioners

9   point out that some of these professional corporations have filed proofs of claim against VHS.[61]

10   As part of the consideration for the purchase of VHS's assets, PHH agreed to assume liability for

11   certain claims and to indemnify and hold VHS harmless for the payment of such claims.[62]

---

[60] Petitioners do not allege that Hippert, O'Donnell, Holmes, or Wilson were financially interested in the ASA at the time it was approved by VHS or that they otherwise engaged in conduct in violation of California Government Code § 1090.

[61] The proofs of claim include: (1) Claim # 134-1 filed by HCMG in an "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing Agreement between the Hemet Hospital and HCMG dated December 29, 1994; (2) Claim # 135-1 filed by LHIO in an "unknown" amount on August 22, 2008, based upon an alleged breach of an Information Technology Services Agreement between LHIO and VHS dated May 22, 2006; (3) Claim # 136-1 filed by HCMG in an "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing Cooperation and Support Agreement between VHS and HCMG dated March 27, 2006; and (4) Claim # 168-1 filed by Menifee Valley Community Medical Group, Inc. in an "unknown" amount on August 22, 2008, based upon an alleged breach of a Risk Sharing Cooperation and Support Agreement between VHS and Menifee Valley Community Medical Group, Inc. dated March 27, 2006.

[62] Section 1.2.1 **Purchaser's Estimate of Purchase Consideration** states, in pertinent part:

> "(v) <u>Assumed Rejection Claims</u>. The satisfaction or assumption by Purchaser of, and the full and complete release of Seller from any liability under, the rejection and/or breach claims filed by KM Strategic Management, Inc. ("KM"), Hemet Community Medical Group ("HCMG"), Menifee Valley Community Medical Group ("MVCMG"), LHIO, LLC ("LHIO"), and any claims of constituent members thereof which are derivative from such rejection and/or breach claims of KM, HCMG, MVCMG or LHIO, which Purchaser

1   Petitioners maintain that Cherry, Dreier, and Rao each had a conflict of interest when they voted

2   to approve the ASA notwithstanding a business relationship with one or more of these claimants.

3   VHS does not materially dispute the connections traced by the petitioners, but denies the

4   inferences made by the petitioners and argues that the interest, if any, of each of the targeted

5   directors under the circumstances of this case is too remote and speculative to constitute a

6   prohibited conflict of interest under California Government Code § 1090.

7        Section 1090 of the California Government Code states that:

8            Members of the Legislature, state, county, district, judicial district, and city
        officers or employees shall not be financially interested in any contract made by them in
9        their official capacity, or by any body or board of which they are members. Nor shall
        state, county, district, judicial district, and city officers or employees be purchasers at any
10       sale or vendors at any purchase made by them in their official capacity.

11           As used in this article, "district" means any agency of the state formed pursuant to
        general law or special act, for the local performance of governmental or proprietary
12       functions within limited boundaries.

13   Cal. Gov't Code § 1090. Section 1090 "codifies the long-standing common law rule that barred

14   public officials from being personally financially interested in the contracts they formed in their

15   official capacities." Lexin, 47 Cal.4th at 1072; see Breakzone Billiards, 81 Cal.App. at 1230

16   (stating that "[t]he purpose of this section is to prohibit self-dealing" by public officials);

17   Thomson v. Call, 38 Cal.3d 633, 645 (1985) ("[T]he policy goals of section 1090 support the rule

18   that public officers 'are denied the right to make contracts in their official capacity with

19   themselves or to become interested in contracts thus made.'") (quoting Stockton P.& S. Co. v.

20   Wheeler, 68 Cal.App. 592, 602 (1924)) (emphasis in original).

21        To establish a violation of § 1090, the plaintiff must establish that (1) the defendant

22

23   _____

24       contends constitutes an assumption and release of claims worth approximately
        $55,000,000 ("Assumed Rejection Claims") as detailed more fully in claim numbers 134,
25       135, 136, and 168 and any amendments thereto, and indemnifying, defending and holding
        Seller harmless with respect to the Assumed Rejection Claims; . . . ."

26

27   AR01732-AR01733.

- 30 -

1    government official or employee participated in an official capacity in the making of a contract;

2    (2) the defendant had a cognizable financial interest in the contract; and (3) if raised as an

3    affirmative defense, that the cognizable financial interest does not fall within the exceptions set

4    forth in either California Government Code § 1091 or § 1091.5.[63] Lexin, 47 Cal.4th at 1074.

5    "[A]n official has a financial interest in a contract if he might profit from it." People v. Honig,

6    48 Cal.App.4th 289, 333 (1996). Section 1090 is construed liberally to embrace both direct and

7    indirect financial interests.[64] See, e.g., Breakzone Billiards, 81 Cal.App.4th at 1230 ("This

8    statutory prong of the conflict of interest doctrine requires that the official have some interest in

9    the outcome, whether direct or indirect."); Honig, 48 Cal.App.4th at 323 ("This section has long

10    been interpreted as prohibiting an official from having any financial interest in a contract,

11    whether direct or indirect."); Terry v. Bender, 143 Cal.App.2d 198, 208 (1956) ("The fact that

12    [the public official's] interest might be small or indirect is immaterial so long as it is such as

13    deprives the [public] of his overriding fidelity to it and places him in the compromising situation

14    _____

15    [63] VHS asserts that neither Cherry, Dreier, or Rao possess a cognizable financial interest in the
     ASA. Therefore, VHS has not alleged a defense under either California Government Code §§
16    1091 or 1091.5.

17    [64] Courts have approved the following jury instruction for use in prosecuting criminal violations
     of §§ 1090 and 1097:
18

19        The phrase "financially interested" as used in Government Code section 1090 means any
          financial interest which might interfere with a state officer's unqualified devotion to his
20        public duty. The interest may be direct or indirect. It includes any monetary or
          proprietary benefit, or gain of any sort or the contingent possibility of monetary or
21        proprietary benefits. The interest is direct when the state officer, in his official capacity,
          does business with himself in his private capacity. The interest is indirect when the state
22        officer, or agency he directs, enters into a contract in his or its official capacity with an
          individual or entity, which individual or entity, by reason of the state officer's
23        relationship to the individual or entity at the time the contract is entered into, is in a
          position to render actual or potential pecuniary benefits directly or indirectly to the state
24        officer based on the contract the individual or entity has received.
25

26    Honig, 48 Cal.App.4th at 322-23.

27

1   where, in the exercise of his official judgment or discretion, he may be influenced by personal

2   considerations rather than the public good."). "Where the interest is remote and speculative, no

3   conflict of interest is held to be present under the statute." Breakzone Billiards, 81 Cal.App.4th

4   at 1230. A contract made in violation of § 1090 is void. See, e.g., Lexin, 47 Cal.4th at 1073

5   ("Where a prohibited interest is found, the affected contract is void from its inception.");

6   Thomson, 38 Cal.3d at 646 n.15 ("California courts have generally held that a contract in which a

7   public officer is interested is void, not merely voidable.") (emphasis in original).

8       California courts have long recognized that an impermissible conflict of interest arises

9   when a public official on behalf of a public entity participates in making a contract with another

10  entity at which the public official is employed or in which the public official owns an interest.

11  See, e.g., Miller v. City of Martinez, 28 Cal.App.2d 364, 368 (1938); Hobbs, Wall & Co., 109

12  Cal.App. at 321; Stockton Plumbing & Supply Co. v. Wheeler, 68 Cal.App. 592, 602 (1924).

13  Petitioners rely on this line of cases as authority for their charge of public corruption against

14  Cherry, Rao, and Dreier. However, these cases are inapposite.

15      In Stockton Plumbing & Supply Co. v. Wheeler, Charlesworth, a city councilman, was

16  employed as a sheet metal foreman at Stockton Plumbing and Supply Company ("Stockton

17  Plumbing"). Stockton Plumbing & Supply Co., 68 Cal.App. at 595. The City of Stockton

18  planned to build a memorial civic auditorium. Id. at 594. Stockton Plumbing was the lowest

19  responsible bidder for the performance of plumbing, heating, and ventilating work on the project.

20  Id. at 595. Charlesworth, as a member of the "Building Committee"of the city council,

21  supervised a revision of plans for the new auditorium, but was not present at the city council

22  meeting at which the construction contract was awarded. Id. The sole question was whether

23  Charlesworth was "interested" in the contract. Id. at 600. In holding that the contract was void

24  due to Charlesworth's conflict of interest, the court stated:

25          In this case Charlesworth was the sheet metal foreman of the petitioner's establishment
            and the contract proposed to be awarded to petitioner was connected directly with that
26          department of the petitioner's business. Under these circumstances, it would be
            exceedingly strange if Charlesworth were not to a considerable extent desirous of the
27

- 32 -

1    awarding of the contract to his employer. . . . While it may truly be said that he would not
      derive direct pecuniary gain from the contract, he certainly would indirectly be so
2    benefited, since upon the success of petitioner's business financially primarily depends
      the continued tenure of his position and the compensation which he receives for
3    performing the service required of him as the foreman of the department referred to.

4    Id. at 602.

5        In Hobbs, Wall & Co., Dressler, a city councilman, was employed as manager of Hobbs,

6    Wall & Co., which had sold goods to the city for $249.66. Dressler "was not a stockholder in the

7    corporation and had no direct pecuniary interest in it." Hobbs, Wall & Co., 109 Cal. App. at 317.

8    The city council, including Dressler, voted to pay the claims. J.J. Moran ("Moran"), the city

9    treasurer, refused to pay the warrants issued and presented for payment of the claims. Id. Hobbs,

10   Wall & Co. sought a writ of mandate to compel Moran to pay the warrants. Id. The trial court

11   denied the writ, holding that "Dressler, as the manager of the business from which the supplies

12   were purchased, was indirectly interested in the transaction, and that it was therefore illegal." Id.

13   The court of appeal affirmed the judgment, stating that "Dressler, as manager, had such an

14   interest in his employer's mercantile business as to preclude him from participating, as a member

15   of the council, in the allowance of the claims." Id. at 321.

16       In Miller v. City of Martinez, Severns, a city councilman, was employed by Shell Oil

17   Company ("Shell") as manager of its Martinez office. Miller, 28 Cal.App.2d at 365-66. Severns

18   also owned shares of stock in Shell. Id. at 366. The city council, including Severns, voted to

19   approve payment of Shell's claims for petroleum products and other merchandise purchased by

20   the city and ordered warrants drawn on the city treasury for payment of the sum of $4,639.89. Id.

21   Miller, a taxpayer and resident of the City of Martinez, filed suit to recover the amounts paid

22   alleging that the claims were void due to Severns' conflict of interest. Id. at 365. The trial court

23   entered judgment for the defendants, holding that the complaint failed to state a cause of action.

24   Id. The court of appeal reversed, stating that "[c]ases are numerous in which it has been held that

25   one who is an employee of another, or a corporation or firm, and at the same time a member of

26   the city council of a municipality is ineligible as such official to make or assist in making a

27

1   contract with the person or corporation in whose employment he is, and that a contract so made

2   is void upon the principle that such act would contravene public policy." Id. at 368.

3         In this case, PHH is a Delaware corporation qualified to do business in California.[65]

4   PHH's sole shareholder is PHH, LLC, a Delaware limited liability company qualified to do

5   business in California. PHH, LLC is managed by an Executive Committee and a Managing

6   Member. Chaudhuri is the Managing Member of PHH, LLC.[66] Neither Cherry, Dreier, or Rao

7   are employees of PHH or PHH, LLC nor do they own an interest in either PHH or PHH, LLC.

8         The court agrees with VHS and PHH that the case of Hotchkiss v. Moran, 109 Cal.App.

9   321 (1930), which is the companion case of Hobbs, Wall & Co., is more directly in point. In that

10   case, Hotchkiss Electric Light Company ("Hotchkiss Electric") sold electricity to Crescent City

11   and was owed the sum of $305.82. Hotchkiss, 109 Cal.App. at 323. J.M. Hotchkiss

12   ("Hotchkiss"), the president of Hotchkiss Electric, was also a stockholder in Hobbs, Wall &

13   Company. Id. at 322. Dressler, who was employed as a manager of Hobbs, Wall & Company,

14   was a member of the Crescent City council and chairman of the finance committee. Id. at 322-

15   23. Dressler was not a stockholder in Hobbs, Wall & Company nor a stockholder or employee of

16   Hotchkiss Electric. Id. at 322. The city council, including Dressler, voted to pay the claim of

17   Hotchkiss Electric. Id. at 323. Moran, the city treasurer, refused to pay the warrants issued and

18   ————————————————

19   [65] See supra note 6.

20   [66] To fund a portion of the purchase of VHS's assets by PHH under the ASA, PHH, LLC intends
to undertake a legally compliant, exempt private offering to local community physicians who are
21   accredited investors utilizing a private placement memorandum "Subscription Process." The
primary investors will be local community physicians on the medical staffs of Hemet Hospital
22   and Menifee Hospital. At the closing of the sale of assets by VHS to PHH, investors in PHH,
23   LLC will receive ownership interests in PHH in proportion to the amount invested. Until this
syndication is completed, it is unknown what percentage any particular investor will have in
24   PHH or PHH, LLC. At the confirmation hearing on February 22, 2010, the court determined that
25   PHH would have the $56,150,000 needed to meet its obligations under the ASA. However,
Chaudhuri has agreed to invest, loan, or contribute funds necessary to permit PHH to meet its
26   obligations on the Sale Closing Date under the ASA to the extent PHH's offerings are
insufficient to fund the transaction.

27

1  presented for payment of the claim.  Id.  Hotchkiss sought a writ of mandate, and the trial court

2  ordered a writ of mandate to issue directing Moran to pay the warrants.  Id.  The court of appeal

3  affirmed, holding that "Dressler was not employed with or interested in the electric lighting

4  company, directly or indirectly."  Id.  In so holding, the court stated:

> It may not reasonably be said a contract for lighting a city violates the Municipal
> Corporation Act merely because the councilman who participates in the transaction is the
> manager of a mercantile business in which a prominent stockholder of the electric
> company is also a stockholder.  The interest of the councilman under such circumstances
> is too remote and speculative upon which to assume the contract will be thereby affected.

8  Id.; see Breakzone Billiards, 81 Cal.App.4th at 1230-31 ("Where the interest is remote and

9  speculative, no conflict of interest is held to be presented under the statute.  This has been the

10  rule since Hotchkiss v. Moran . . . .").

11      Petitioners presented extensive evidence at trial of contractual or employment

12  relationships between Cherry, Rao, and Dreier's husband, Dr. Ralph G. Dreier, M.D. ("Dr.

13  Dreier") and professional corporations in which Chaudhuri is an officer, director, or shareholder.

14  But whether any of these connections place Cherry, Rao, or Dreier in a position to receive,

15  directly or indirectly, an actual or pecuniary benefit based on the contract with PHH is, at best,

16  remote and speculative.

17      1. Chaudhuri and Related Entities

18      In addition to serving as the Managing Member of PHH, LLC, Chaudhuri is an officer,

19  director, or shareholder in each of the following professional corporations that provide medical

20  services to Riverside County:  HCMG; Menifee Valley Community Medical Group, Inc. (the

21  "Menifee Medical Group"); Temecula Valley Physicians Medical Group, Inc. (the "Temecula

22  Medical Group"); Devonshire Surgical Medical Group, Inc. ("Devonshire"); and Hemet

23  Healthcare Surgery Center, Inc. ("Hemet Surgery").

24      HCMG is a California professional corporation which operates as an independent

25  physicians association ("IPA").  HCMG contracts to provide medical care to health maintenance

26  organization ("HMO") enrollees residing in Hemet, San Jacinto, Sun City, Menifee, Lake

27

1  Elsinore, Wildomar, Canyon Lake, Corona, Temecula, Murrieta, Idyllwild, Anza, and the

2  surrounding unincorporated areas of Riverside County. HCMG is co-owned by approximately

3  45 physicians. Chaudhuri is Chairman of the Board of Directors of HCMG and owns a 38%

4  interest in the corporation. Chaudhuri has authority to terminate an HCMG contract with any

5  physician, subject to approval of HCMG's board of directors. Six of the initial investors in PHH,

6  who collectively have committed to invest in excess of $20 million in PHH, own 9% of the

7  equity in HCMG. Another 15 of the 49 physicians who have issued checks for $1,000 to PHH,

8  other than Chaudhuri, collectively own 23% of the equity in HCMG. HCMG, however, is not an

9  investor in PHH or PHH, LLC.

10     The Menifee Medical Group is a California professional corporation and a HCMG group

11  provider, operating as an IPA that accesses health plan contracts through HCMG for HMO

12  enrollees in the Menifee/Sun City area. Chaudhuri is the Chairman of the Board of Directors and

13  CEO of Menifee Medical Group. Chaudhuri has authority to terminate Menifee Medical

14  Group's contract with any physician, subject to approval of Menifee Medical Group's board of

15  directors. Chaudhuri is also the sole shareholder of the Menifee Medical Group. The Menifee

16  Medical Group is not an investor in PHH or PHH, LLC.

17     The Temecula Medical Group is a California professional corporation and a HCMG

18  group provider, operating as an IPA that accesses health plan contracts through HCMG for HMO

19  enrollees in Temecula, Lake Elsinore, Canyon Lake, Wildomar, Murrieta, and the surrounding

20  unincorporated areas of Riverside County. Chaudhuri is the Chairman of the Board of Directors

21  of Temecula Medical Group. Chaudhuri has authority to terminate Temecula Medical Group's

22  contract with any physician, subject to approval of Temecula Medical Group's board of directors.

23  Chaudhuri is also the majority (90%) shareholder of the Temecula Medical Group. Temecula

24  Medical Group is not an investor in PHH or PHH, LLC.

25     Devonshire is a surgical group comprised of independent contractor surgeons which

26  provide general, vascular and thoracic services to HCMG and its group provider, Menifee

27

1    Medical Group. Chaudhuri is a one-third minority shareholder of Devonshire. David Sizemore,

2    M.D. ("Sizemore") is President of Devonshire. Chaudhuri is not an officer of the corporation.

3    However, Devonshire is managed by KM Strategic Management, LLC ("KM"), which is owned

4    by Chaudhuri and Mike Foutz. While each of the principals of KM are committed to invest in

5    PHH, Devonshire is not an investor in PHH or PHH, LLC.

6        Hemet Surgery is a California professional corporation that operates an ambulatory

7    surgery facility in Hemet. Hemet Surgery contracts directly with HMOs, PPOs, Medicare,

8    MediCal, private insurers, and individuals to provide outpatient surgical services in the Hemet,

9    San Jacinto, Menifee, and Sun City areas. Hemet Surgery does not contract directly with

10    HCMG. Hemet Surgery is co-owned by six physicians, including Chaudhuri. Chaudhuri is a

11    member of the board of directors of Hemet Surgery. At all times relevant to this case, Kuan

12    Chen, M.D. ("Chen") has served as the President of Hemet Surgery. Chen, Chaudhuri, and

13    Sizemore are on Hemet Surgery's board of directors. Hemet Surgery is not an investor in PHH

14    or PHH, LLC.

15        2. Cherry

16        Petitioners contend that "PHH, by virtue of being controlled by the same group of

17    individuals responsible, directly or indirectly, for virtually all of Cherry's salary paid by

18    Temecula Medical Group and [HCMG], is in a position to render pecuniary benefits to Cherry

19    based on the contract (i.e., the ASA) it received."[67] Petitioners seek a finding that "Cherry had a

20    conflict of interest because he voted to approve the ASA that will compromise a claim of his

21    employer and benefit the Chairman of his employer."[68]

22        Cherry is a physician who has served as a member of VHS's Board of Directors since

23    November 2002. Cherry conducts a private practice in the Menifee/Temecula area through

24

25    [67] Plaintiffs' Trial Brief, 10:20-23.

26    [68] Petitioners' Proposed Findings of Fact and Conclusions of Law, 18:16-18.

27

- 37 -

1  William H. Cherry, M.D., Inc., a wholly-owned professional corporation. Cherry's practice

2  includes providing services for HMOs. Cherry provides primary health care services to health

3  plan enrollees of HCMG pursuant to a Primary Care Professional Service Agreement effective

4  April 1, 2002.[69] He is one of 125 primary care physicians, 900 specialists and 7,500 providers

5  who have agreements with HCMG. The contract with HCMG permits Cherry to access the

6  HMO network for his HMO patients. Cherry currently has 11,040 patient records. Cherry also

7  provides primary care services for HCMG's group provider, Temecula Medical Group, in the

8  Temecula area pursuant to an IPA Primary Care Physician Provider Agreement dated June 1,

9  2004.[70] Cherry accesses a network of medical specialists for his patients through his independent

10  provider agreement with the Temecula Medical Group. He provides these services through

11  William H. Cherry, Inc. and Same Day Medical Care, Inc. For services provided to HMO

12  enrollees, Cherry is compensated through a per member per month capitation fee via a

13  relationship between HCMG and insurance companies. Finally, Cherry is one of fifteen Medical

14  Directors for HCMG pursuant to a Medical Director Agreement with HCMG dated August 1,

15  2005.[71] Cherry serves as a medical director on behalf of HCMG over the geographic service area

16

17  [69] Section 8.1 entitled "Immediate Termination" authorizes HCMG to terminate the contract
18  immediately if the physician engages in "conduct or activity which substantially jeopardizes the
    Group's business reputation." Exhibit 100, Cherry 00073.

19
    [70] Section 6.15 entitled "Disparagement" states: "PCP shall refrain from making or publishing
20  disparaging statements concerning the Company, its directors, officers, shareholders and
    providers and the Company's management . . . and its directors, officers, employees and
21  shareholders." Exhibit 102, Cherry 00007. Section 12.2(c) entitled "Immediate Termination by
    Company" further states, in pertinent part, that the Company may immediately terminate the
22  contract upon written notice if the PCP has "made or published disparaging remarks about the
23  Company." Exhibit 102, Cherry 00013.

24  [71] Section 1.4 of the contract entitled "Public Support for Group / No Disparagement" states:
25  "Physician shall at all times publicly and privately support the Group, its directors, officers and
    representatives." Exhibit 103, Cherry 00025. Section 3.2 entitled "Termination by Group"
26  authorizes termination of the physician for cause upon 30 days written notice and without cause
    upon 90 days written notice to the physician. Exhibit 103, Cherry 00026.
27

- 38 -